# Exhibit A

**From:** Nick Brechbill <nick@clarelocke.com>
**Date:** Tuesday, May 7, 2024 at 4:50 PM
**To:** John Bash <johnbash@quinnemanuel.com>
**Cc:** William Burck <williamburck@quinnemanuel.com>,
Rachel Frank <rachelfrank@quinnemanuel.com>, Tom
Clare <tom@clarelocke.com>
**Subject:** Re: Nada et al. v. United Arab Emirates, et al., 24-
cv-206-ABJ (D.D.C.)

Thanks, John.  Attached are the summons for the Abu Dhabi
National Oil Company ("ADNOC") and the Complaint in this
action—in English and Arabic—along with certificates
authenticating the translations.  With this email, and pursuant to
Section 1608(b)(1) of the Foreign Sovereign Immunities Act and
the agreement between plaintiffs and ADNOC, plaintiffs consider
service to have been made upon ADNOC.

Best,
Nick

Nick Brechbill | Partner
C L A R E   L O C K E   L L P
10 Prince Street | Alexandria, Virginia 22314
(202) 899-3878 – direct
nick@clarelocke.com | www.clarelocke.com

This electronic message transmission contains information from the law firm of
Clare Locke LLP, which may be confidential or privileged.  The information is
intended exclusively for the individual or entity named above.  If you are not the
intended recipient, be aware that any disclosure, copying, distribution, or use of
the contents of this information is prohibited.  If you received this electronic
transmission in error, please notify us immediately at admin@clarelocke.com.

**From:** John Bash <johnbash@quinnemanuel.com>
**Date:** Tuesday, May 7, 2024 at 4:19 PM
**To:** Nick Brechbill <nick@clarelocke.com>

**Cc:** William Burck <williamburck@quinnemanuel.com>,
Rachel Frank <rachelfrank@quinnemanuel.com>
**Subject:** Nada et al. v. United Arab Emirates, et al., 24-cv-206-ABJ (D.D.C.)

Nick,

I am counsel to Abu Dhabi National Oil Company (ADNOC) in the action *Nada et al. v. United Arab Emirates, et al.*, 24-cv-206-ABJ (D.D.C.). My client has authorized me to enter into an agreement on its behalf with the plaintiffs' counsel in this action regarding service of process pursuant to Section 1608(a)(1) of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1608. For purposes of this matter only, ADNOC agrees to service of the summons and complaint by email sent from plaintiffs' counsel to me. ADNOC agrees to waive any objections to the adequacy of service of process, but expressly reserves and keeps all other defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, including but not limited to objections based on sovereign immunity.

John

28 USC 1608 Summons
12/11

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Hazim Nada and Lord Energy SA

*Plaintiff*

v.

The United Arab Emirates, et al.

*Defendant*

)
)
)
)
)
)
)

Civil Action No. **24-cv-00206-ABJ**

## SUMMONS IN A CIVIL ACTION

To:     *(Defendant's name and address)*

THE ABU DHABI NATIONAL OIL COMPANY
P.O. Box 898
Corniche Road West
Abu Dhabi, United Arab Emirates

A lawsuit has been filed against you.

Within 60 days after service of this summons on you (not counting the day you received it) you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Thomas A. Clare
Nicholas J. Brechbill
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314

If you fail to respond, judgment by default may be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.



*ANGELA D. CAESAR, CLERK OF COURT*

Date: 01/31/2024

/s/ Charles Briggs

*Signature of Clerk or Deputy Clerk*

28 USC 1608 Summons (12/11) (Page 2)

Civil Action No. 24-cv-00206-ABJ

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____.

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____, a person of suitable age and discretion who resides there,

on *(date)* _____, and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____, who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*

.

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

أمر استدعاء بموجب المادة 1608 من الباب
28 من مدونة القوانين الأمريكية
12/11

**محكمة الولايات المتحدة الإقليمية**
**لمقاطعة كولومبيا**

|  |  |  |
|---|---|---|
| حازم ندى ولورد إنيرجي إس إيه | ) |  |
| _____ | ) |  |
| *المُدَّعي* | ) |  |
|  | ) | الدعوى المدنية رقم 24-cv-00206-ABJ |
| ضد | ) |  |
| الإمارات العربية المتحدة وآخرين | ) |  |
| _____ | ) |  |
| *المُدَّعى عليه* | ) |  |

**استدعاء في دعوى مدنية**

إلى: *(اسم المُدَّعى عليه وعنوانه)*          شركة بترول أبوظبي الوطنية
ص.ب: 898
شارع الكورنيش الغربي
أبوظبي، الإمارات العربية المتحدة

لقد تم رفع دعوى قضائية ضدك.

في خلال 60 يومًا من تبليغك بأمر الاستدعاء هذا (دون احتساب اليوم الذي تلقيته فيه) يجب عليك تبليغ المُدَّعي بالرد على الشكوى المرفقة أو تقديم طلب بموجب القاعدة 12 من القواعد الفيدرالية للإجراءات المدنية.  يجب تبليغ الرد أو الطلب إلى المُدَّعي أو محاميه، الموضح تفاصيل اسمه وعنوانه فيما يلي:
توماس إيه كلير
نيكولاس جيه بريشبيل
كلير لوك إل إل بي
10 برينس ستريت
الأسكندرية، فيرجينيا 22314

إذا لم تقم بالرد، فقد يتم إصدار حكم غيابي ضدك للحصول على الانتصاف المطلوب في الشكوى. يجب عليك أيضًا تقديم ردك أو طلبك إلى المحكمة.

*أنجيلا دي سيزر، كاتب المحكمة*

[ختم:] محكمة الولايات المتحدة الإقليمية          /توقيع/ تشارلز بريجز
ومحكمة الإفلاس لمقاطعة كولومبيا          _____

التاريخ: 2024/01/31          *توقيع الكاتب أو نائبه*

الدعوى المدنية رقمABJ-00206-cv-24

**إثبات التبليغ**

**(يجب عدم تقديم هذا القسم إلى المحكمة ما لم يكن مطلوبًا بموجب القاعدة 4 (ل) من القواعد الفيدرالية للإجراءات المدنية)**

استلمت هذا الاستدعاء لـ *(اسم الشخص والصفة، إن وُجد)* _____ في _____
_____ *(التاريخ)*.

☐ قمت شخصيًا بتبليغ الشخص بأمر الاستدعاء في *(المكان)* _____
_____ بتاريخ *(التاريخ)* _____ ؛
أو

☐ تركت أمر الاستدعاء في محل إقامة الشخص أو مكان إقامته المعتاد لدى *(الاسم)* _____
_____ ، وهو شخص بالغ ويتمتع بالأهلية ويقيم هناك، في *(التاريخ)*
_____ ، وأرسلت نسخة بالبريد إلى آخر عنوان معروف للشخص؛ أو

☐ قمت بتبليغ أمر الاستدعاء إلى *(اسم الشخص)* _____ ، الذي تم تعيينه
بصفة قانونية لاستلام التبليغ بالإجراءات نيابة عن *(اسم المؤسسة)* _____ _____ في
_____ *(التاريخ)* ؛ أو

☐ أعدت أمر الاستدعاء دون تبليغه بسبب _____ ؛ أو

☐ غير ذلك *(يرجى التحديد)*:

أتعابي هي _____ دولار أمريكي للسفر و _____ دولار أمريكي للخدمات، بإجمالي _____ 0.00 _____ دولار أمريكي.

أقر تحت طائلة عقوبة الحنث باليمين بأن هذه المعلومات صحيحة.

التاريخ:

_____
*توقيع كاتب المحكمة*

_____
*الاسم والصفة بخط واضح*

_____
*عنوان كاتب المحكمة*

معلومات إضافية بشأن محاولة التبليغ، وما إلى ذلك:



# CERTIFICATION

TransPerfect is globally certified under the standards ISO 9001:2015, ISO 17100:2015, and ISO 18587:2017. This Translation Certificate confirms the included documents have been completed in conformance with the Quality Management System documented in its ISO process maps and are, to the best knowledge and belief of all TransPerfect employees engaged on the project, full and accurate translations of the source material.

File Name(s):

- **20240131 Summons - Abu Dhabi National Oil Company**

Source Language(s): **English**

Target Language(s): **Arabic**

Authorized Signature:                              Signature, Notary Public:

Name:      Jacqueline Yorke

Title:        Project Manager

Date:       February 8, 2024

WENDY POON
Notary Public - State of New York
No. 01PO0000184
Qualified in Queens County
My Commission Expires February 02, 20 2 7

*Stamp: Notary Public*

Reason for signature: I approve the accuracy of this document content as written

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HAZIM NADA <br> Via XXVII Maggio 29 <br> 22100 Como (CO), Italy, <br><br> and <br><br> LORD ENERGY SA <br> Contrada di Verla 1 <br> 6901 Lugano, Switzerland, <br><br>        Plaintiffs, <br><br>    v. <br><br> THE UNITED ARAB EMIRATES <br> C/O Ambassador of the UAE <br> Mr. Yousef Al-Otaiba <br> UAE Embassy <br> 3522 International Court N.W. #100 <br> Washington, D.C. 20008, <br><br> ARIAF STUDIES AND RESEARCH LLC <br> P.O. Box 3088 <br> Abu Dhabi, United Arab Emirates, <br><br> THE ABU DHABI NATIONAL OIL <br> COMPANY <br> P.O. Box 898 <br> Corniche Road West <br> Abu Dhabi, United Arab Emirates, <br><br> MOHAMED BIN ZAYED AL NAHYAN <br> Qasr Al-Watan <br> Al Ras Al-Akhdar <br> Abu Dhabi, United Arab Emirates, <br><br> MATAR HUMAID AL-NEYADI <br> Supreme Council of National Security <br> F834+JMQ, Al Ras Al-Akhdar <br> Abu Dhabi, United Arab Emirates, | Case No. _24-CV-00206_____ <br> JURY TRIAL DEMANDED |

ALP SERVICES SA )
Rue de Montchoisy 36 )
CH-1207 Geneva, Switzerland, )
)
DILIGENCE SARL )
Rue de Montchoisy 36 )
CH-1207 Geneva, Switzerland, )
)
MARIO BRERO )
Route de l'Allaman 14 )
1173 Fechy, Switzerland, )
)
LIONEL BADAL )
Rue Eugene Welter 60 )
2723 Howald, Luxembourg, )
)
MURIEL CAVIN )
Avenue du Mail 27 )
Geneva, Switzerland, )
)
LORENZO VIDINO )
1110 23rd Street N.W., Apartment 604 )
Washington, D.C. 20037, )
)
SYLVAIN BESSON )
Route de la Vuy 10 )
1305 Penthalaz, Switzerland, )
)
and )
)
JOHN DOE NOS. 1-25, )
)
              Defendants. )
)

## COMPLAINT

1.      Beginning in late 2017, the United Arab Emirates and some of its top officials managed, directed, and bankrolled a years-long "dark" public relations campaign through the Swiss private investigative firm, Alp Services S.A., which was founded, owned, and run by Mario Brero and Muriel Cavin.  The UAE and its officials, along with Alp, Brero, Cavin, and their employees, operated as an association-in-fact enterprise that leveraged a network of co-conspirators—private operatives, paid "journalists," and a professor at George Washington University in Washington, D.C., among many others—to smear dozens of innocent victims.

2.      For years, this enterprise made false and misleading statements to the press, on Wikipedia and elsewhere online, and to the world's top financial risk compliance monitors as part of an overarching scheme to "destroy" their targets' businesses and reputations by defrauding banks, their targets' business partners, government decision makers, and the public.  More than 8,000 of the enterprise's internal documents, procured by anonymous hackers in April 2021 and shared with law enforcement, show the enterprise's objectives, its longevity, and its devastating consequences.

3.      Among the enterprise's first targets were Hazim Nada, a crude oil trader, and his companies, Lord Energy SA and its U.S. subsidiary Americas Lord Energy Inc.  The enterprise used its network of co-conspirators to carry out what Alp routinely described as a "confidential offensive viral communication" campaign to, in Alp's words, "seriously damage, if not destroy, the reputation and viability" of Hazim and his companies.

4.      On information and belief, the UAE and its officials instructed Alp to target Hazim and his companies because they viewed Hazim and Lord Energy as serious competitive threats in the spot market for light crude oil in Asia.  In early 2017, Hazim and Lord Energy began moving large cargoes—many in excess of 1 million barrels—of Saharan Blend crude oil from Algeria into

Korea, Thailand, and Singapore. Saharan Blend is a type of light, sweet crude oil that competes with Murban crude oil—another light crude oil blend that at the time was the flagship crude oil produced by the UAE and its state-owned oil company, the Abu Dhabi National Oil Company ("ADNOC"). Between 2016 and 2018, Lord Energy's shipments of Saharan Blend to Asia supplanted about 13 million barrels of Murban, taking nearly $830 million in revenue directly from the UAE. This put Lord Energy on the UAE and ADNOC's radars as a viable commercial threat.

5.     The competitive threat Lord Energy posed to the UAE and ADNOC went far beyond just the specific Murban cargoes it supplanted with Saharan Blend. Once Lord Energy began actively moving large quantities of Saharan Blend crude oil into the UAE's main markets for Murban in Asia, the price differential of Murban relative to another similar grade of light, sweet crude oil commonly used as a price benchmark fell by about $0.27 per barrel. Given the amount of Murban being exported from the UAE to Korea, Thailand, and Singapore at the time, Lord Energy's entry into those markets cost Murban producers, especially the UAE and ADNOC, about $324,000 per day. During the year-plus that Lord Energy was competing with ADNOC (before the enterprise's fraudulent smear campaign bankrupted Lord Energy), ADNOC, which controls over 60% of Murban exports, lost about $70.1 million as a result of the lower prices it received.

6.     In early 2018, Lord Energy established a U.S. subsidiary in Houston, Texas to gain a foothold in the market for West Texas Intermediate ("WTI"), another type of light, sweet crude oil that was considered an equivalent grade to Saharan Blend and Murban and becoming increasingly popular with large refineries in Asia. Lord Energy's entry into WTI domestic transport and export markets once again challenged the UAE and ADNOC and threatened to further undercut the price they could receive for Murban exports to Asia.

7. So, the enterprise took out Americas Lord Energy Inc. In an October 21, 2019 impact assessment report to the UAE and its officials, Alp bragged that "[f]ollowing our media attacks, listing in World Check, and the financial difficulties it created, the US-branch, Americas Lord Energy Inc., was forced to cease its operations."

8. At the UAE's direction, in 2017, Alp concocted and widely publicized a false narrative accusing Hazim and Lord Energy of terrorist financing. Hazim's father had historic ties to the Muslim Brotherhood. On information and belief, Alp learned of Hazim's father's historic connection to the Muslim Brother because one of the journalists on Alp's payroll, Sylvain Besson, had previously written about Hazim's father. Alp exploited this information about Hazim's father to lend credibility to the enterprise's spurious claims about Hazim and his companies.

9. Unlike his father, Hazim has never been associated with the Muslim Brotherhood. Hazim is an American citizen who was born in Silver Spring, Maryland, attended Rutgers University in New Jersey, and maintains a house in Houston, Texas. He is proud of his American heritage, and he has only ever been to Egypt—where the Muslim Brotherhood was founded— once. None of that mattered to Alp.

10. The internal documents procured by the anonymous hackers show that one of Alp's preferred *modi operandi* was to unlawfully obtain phone records for its targets; use those records to map out the targets' supposed associates based on phone call data; dig for any dirt (regardless of how farfetched) on any of those associates (regardless of how far removed from the targets); and concoct a false narrative imputing to the targets the uncorroborated accusations Alp uncovered or fabricated about the targets' (in some cases, very distant) associates.

11. That is exactly what the enterprise did to Hazim. It unlawfully obtained his phone records in 2017; used those phone records to map out Hazim's purported network of associates;

and used rumors—including many that had been conclusively debunked—about some of those associates to manufacture a false narrative accusing Hazim of using his companies as fronts to finance the Muslim Brotherhood and al Qaeda, even though there was no evidence that Hazim ever had any ties to the Muslim Brotherhood and certainly not to al Qaeda. An example of a link diagram Alp prepared that supposedly maps out Hazim and Lord Energy's connections and associates is below.



12.     The UAE was quick to approve Alp's proposal to smear Hazim and Lord Energy as terrorist financiers because the false narrative that Alp manufactured about Hazim's alleged connections to the Muslim Brotherhood and involvement in terrorist financing fit with the UAE's broader geopolitical agenda of discrediting its regional rival, Qatar. For years, the UAE had been locked in a shadow conflict with Qatar—a key Muslim Brotherhood ally. By smearing Hazim and

Lord Energy in this way, the UAE could *not only* dispatch a competitive threat, *but also* sow suspicion about Qatar and the Muslim Brotherhood's activities in the United States and Europe.

13. The UAE's unlawful enterprise was discreet, organized, and effective. The UAE and then-Crown Prince of Abu Dhabi Mohamed bin Zayed Al Nahyan ("M.B.Z.") oversaw the enterprise's larger campaign, providing strategic guidance and direction. M.B.Z. enlisted Matar Humaid al-Neyadi ("Matar"), another UAE government official, to oversee operations at a more granular level by serving as a direct liaison with Alp. Matar—under the cover of Ariaf Studies and Research LLC—contracted with Alp and Diligence SARL, another firm that was founded, owned, and run by Mario Brero and Muriel Cavin, to propose targets and conduct "discreet" operations abroad to further the UAE's objectives, while keeping the UAE's role "invisible."

14. Matar worked hand in glove with Brero and one of Alp's senior employees, Lionel Badal, to identify targets including Hazim, Lord Energy, and dozens of others, and hire sources, journalists, and academics to write and publish false articles about those targets. The enterprise would then cite those false and misleading articles—which appeared legitimate but were actually fabricated by Brero, Cavin, Badal, and other Alp employees and written by journalists and academics on Alp's payroll—to defraud financial institutions, business partners, and counterparties and induce them to break ties with the enterprise's targets, ruining the targets' businesses and reputations.

15. The hacked documents lay out in detail each step of this plan. For example, a document written by Alp in February 2018 titled "Action Plan" explained Alp's proposal to the UAE. According to this document, which on information and belief, Alp shared with the UAE via email, Alp would:

- "**_Launch massive negative articles_** on dozens of key [Muslim Brotherhood] targets including but not limited to Lord Energy … in French, Italian and **_most importantly English_**."

- "**_[I]nform selected journalists about our targets_**, their leadership role within the MB in Europe and connections with Al Qaeda."

- "**_[A]ctivate our network of trusted journalists and editors_**, as we successfully did with _Le Temps_ and soon in _Le Point_."

- "**_[C]reate negative Wikipedia pages for our targets_**, including the company and its key directors, in a negative tone, in English, French, and Italian.  This would be the first source of information for anyone looking at the company (e.g. journalists, politicians, law enforcement and intelligence officials, compliance officers, etc.)."

- "**_[A]lert compliance databases and watchdogs, which are used by banks_** and multinationals, for example about Lord Energy's real activities and links to terrorism."

- "**_[D]iscreetly notify banks_** of MB companies' (e.g. Lord Energy, Eurozone Equity) links to terrorism and Political Exposed Persons (PEPs), **_the objective being to block their bank accounts and business_**."

- "[U]se … social media to **_boost public interest in the articles_** and viral actions."

- And "**_discreetly_** lobby decision-makers."[1]

---

[1] Emphasis added.

**2018 ACTION PLAN**

1. Launch massive negative articles on dozens of key MB targets, including but not limited to Lord Energy, FEMYSO and Nabil Ennasri, in French, Italian and most importantly English.

2. We would inform selected journalists about our targets, their leadership role within the MB in Europe and connections with Al Qaeda.

3. We would activate our network of trusted journalists and editors, as we successfully did with *Le Temps* and soon in *Le Point*.

4. We would create negative Wikipedia pages for our targets, including the company and its key directors, in a negative tone, in English, French and Italian. This would be the first source of information for anyone looking at the company (e.g. journalists, politicians, law enforcement and intelligence officials, compliance officers etc.).

5. We would also alert compliance databases and watchdogs, which are used by banks and multinationals, for example about Lord Energy's real activities and links to terrorism.

6. We would discreetly notify banks of MB companies' (e.g. Lord Energy, Eurozone Equity) links to terrorism and Political Exposed Persons (PEPs), the objective being to block their bank accounts and business.

7. We would also use of social media to boost public interest in the articles and viral actions.

8. Lastly, we would discreetly lobby decision-makers, notably at the European level.

16.     Alp concluded, "Should you give us the green light, we believe that we could seriously damage, if not destroy, the reputation and viability of key MB European groups through our confidential offensive viral communication."

17.     In Hazim's case, the enterprise hired "journalist" Sylvain Besson to write an article in early 2018 in a prominent newspaper falsely accusing Lord Energy of being a Muslim Brotherhood front company that funded terrorist organizations.  It then hired bloggers to repeat Besson's "reporting" with even more incendiary tones, in dozens of outlets, the majority of which were on U.S. platforms such as Medium, WordPress, and Tumblr, giving these false claims the illusion of broad media consensus.  The enterprise also created fake Wikipedia pages in English, French, and Italian to enshrine the false claims as genuine "controversies."  It used search engine

optimization tactics, with a special focus on English-language Google search results, to ensure that the enterprise's sponsored articles were among the top results when searching for Hazim or Lord Energy on Google and other U.S.-based search engines such as Yahoo! and Bing.  It emailed the false claims that Hazim and Lord Energy were involved in terrorist financing to journalists— including journalists from major U.S. media outlets like Bloomberg and Axios.  Finally, it fraudulently induced the compliance platform World-Check, which is owned by Thomson Reuters—a company publicly traded on the New York Stock Exchange and with several offices throughout the United States—to flag Hazim and Lord Energy under the risk category "terrorism," ensuring that U.S. and international financial institutions would refuse to lend to Hazim and Lord Energy.

18.     The enterprise's lies were outlandish but devastating.  They bankrupted Lord Energy and its U.S. subsidiary—companies that took Hazim more than ten years to build from nothing—cost Hazim hundreds of millions of dollars (Lord Energy was valued at about $150 million before the enterprise's smear campaign took hold), and eliminated a growing competitive threat to the UAE and ADNOC in certain Asian markets for light crude oil.  Plaintiffs bring this lawsuit asserting claims for violations of the Lanham Act, 15 U.S.C. § 1125(a)(1), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, and the Sherman Act, 15 U.S.C. §§ 1–7.  They seek to vindicate their rights and recover damages for the devastating economic harm that the enterprise's confidential, offensive, viral communication campaign caused to their businesses and reputations, along with the direct impact the smear campaign had on Hazim's personal life and emotional, physical, and psychological well-being.

## PARTIES AND RELEVANT NON-PARTIES

19.     Plaintiff Dr. Hazim Nada is the founder and sole owner of Lord Energy SA.  Hazim is a citizen of the United States and Italy.  Hazim was born in Silver Spring, Maryland, went to

college and graduated from Rutgers University in New Jersey, and maintains a house in Houston, Texas.  Hazim currently resides and is domiciled in Como, Italy.

20.     Plaintiff Lord Energy SA is a crude oil and commodity trading company founded by Hazim in 2008.  It is and always has been fully owned by Hazim.  Lord Energy SA is incorporated under the laws of Switzerland and its principal place of business is located at Contrada di Verla 1, CH-6900 Lugano, Switzerland.  As of October 2018, Lord Energy SA was valued at approximately $150 million, with annual revenue of about $1.71 billion.  Lord Energy was forced to declare bankruptcy in Switzerland in April 2019 as a result of the smear campaign conducted against it.

21.     Today, Lord Energy is essentially worthless because it is no longer able to obtain the credit needed to finance its commodity trading operations.  In addition, Lord Energy's bankruptcy restructuring caused a substantial number of clients and counterparties to lose significant amounts of money, destroying the relationships and good will Lord Energy built with those clients and counterparties and ensuring they would never do business with Lord Energy again.  In March 2017, Hazim opened to the public a second business outside Milan, Italy: a vertical wind tunnel that the U.S. Air Force and Italian military use to train paratroopers.

22.     Americas Lord Energy Inc. was a wholly owned subsidiary of Lord Energy SA. Americas Lord Energy Inc. was incorporated on April 24, 2018 under the laws of the State of Texas and had its principal place of business at 2101 City West Boulevard, Suite 230, Houston, Texas.  Americas Lord Energy Inc. was dissolved in March 2019.  Hazim and Douglas Koskie, a U.S. citizen domiciled in Texas, served as directors of Americas Lord Energy Inc.

23.     Defendant the United Arab Emirates is a foreign state.  The UAE maintains an Embassy in the District of Columbia.  It is located at 3522 International Court N.W., Suite 100, Washington, D.C. 20008.

24.     Defendant Mohamed bin Zayed Al Nahyan ("M.B.Z.") is a citizen of the UAE and the current President of the UAE and ruler of Abu Dhabi.  M.B.Z. was the Crown Prince of Abu Dhabi until May 14, 2022, when he was elected President by a decision of the members of the Federal Supreme Council of the UAE.  M.B.Z. had ultimate approval authority over the enterprise's disinformation operations.

25.     Defendant Matar Humaid al-Neyadi ("Matar") is a citizen of the UAE.  Matar was the UAE's main intermediary with Alp, Brero, and other co-conspirators outside the UAE.  Matar met with Brero numerous times in Switzerland and the UAE, he routinely approved Alp's proposed targets and viral communication operations, he kept his "boss" M.B.Z. informed about Alp's operations, and he ensured that Alp and its operations were adequately funded.  Between 2017 and 2021, Matar directed and approved millions of dollars to Alp to fund its smear campaign.

26.     Defendant the Abu Dhabi National Oil Company ("ADNOC") is the state-owned oil company of the UAE.  ADNOC is an instrumentality of the UAE as defined in 28 U.S.C. § 1603(b).  Lord Energy was a direct commercial competitor of ADNOC in markets for light crude oil in Asia.

27.     Defendant Ariaf Studies and Research LLC ("Ariaf") is a limited liability company formed under the laws of the UAE with its principal place of business in Abu Dhabi.  Ariaf was the signatory to the contracts between the UAE and Diligence SARL governing Brero, Cavin, and Alp's disinformation operations.  Ariaf was a front used by the UAE, M.B.Z., Matar, and other UAE officials to conceal the identities of Alp's true clients and insure they remained "invisible."

28.     Defendant Alp Services SA ("Alp") is a private investigative company founded, owned, and operated by Mario Brero and Muriel Cavin.  Alp is incorporated under the laws of Switzerland, and its principal place of business is located at Rue de Montchoisy 36, CH–1207 Geneva, Switzerland.  On information and belief, the majority of Alp's clients were private businesses, law firms, and ultra-high net worth individuals.

29.     Defendant Diligence SARL ("Diligence") is a private investigative company founded, owned, and operated by Mario Brero and Muriel Cavin.  Diligence is incorporated under the laws of Switzerland, and its principal place of business is located at Rue de Montchoisy 36, CH–1207 Geneva, Switzerland.  Diligence was a party to the contracts with Ariaf that governed Brero, Cavin, and Alp's disinformation operations.  Diligence entered into a non-disclosure agreement with Ariaf for work relating to the enterprise's smear campaign.

30.     Brero and Cavin used Alp and Diligence interchangeably as instrumentalities to plan and orchestrate disinformation operations in furtherance of the enterprise's smear campaign targeting Hazim, Lord Energy, and dozens of other targets.

31.     Defendant Mario Brero resides and is domiciled in Geneva, Switzerland.  He is a citizen of Italy.  Brero is one of the founders, owners, and operators of Alp and Diligence.  Brero routinely communicated and interacted with Matar and other UAE officials in connection with the enterprise's smear campaign targeting Hazim, Lord Energy, and dozens of other targets.  Among other things, Brero regularly proposed targets to Matar and the other UAE officials, devised tactics and operations to achieve the enterprise's objectives of destroying the businesses and reputations of their targets (including Hazim and Lord Energy), communicated with Matar regarding funding, and managed and directed Alp employees and the enterprise's co-conspirators in furtherance of the enterprise's objectives.

32.     On information and belief, defendant Muriel Cavin is a citizen of, resides in, and is domiciled in Switzerland.  She co-founded Alp and Diligence with Brero and is a longstanding director of Alp.  Cavin helped devise and manage disinformation operations in furtherance of the enterprise's objectives of destroying the businesses and reputations of their targets (including Hazim and Lord Energy).

33.     On information and belief, Defendant Lionel Badal is a citizen of and resides in Luxembourg.  Badal is a former senior Alp employee, who—like Brero and Cavin—devised and managed disinformation operations in furtherance of the enterprise's objectives of destroying the businesses and reputations of their targets (including Hazim and Lord Energy).  Badal also routinely communicated with Matar.  On information and belief, he is currently an investigator at the Luxembourg financial authority.

34.     Defendant Lorenzo Vidino, an American, is a citizen of, resides in, and is domiciled in Washington, D.C.  Vidino is the Director of the Program on Extremism at the George Washington University.  Vidino was hired by Alp as a contractor to provide leads on new targets and research and analysis on the Muslim Brotherhood.  The enterprise relied on Vidino, and his academic credentials, to legitimize the false and misleading statements it had published to discredit and destroy its targets.  Vidino consulted with Alp about Lord Energy.

35.     Upon information and belief, Defendant Sylvain Besson is a citizen of, resides in, and is domiciled in Switzerland.  At all relevant times, Besson worked as a journalist for the Swiss publication *Le Temps*.  Besson was on Alp's payroll, and he routinely published stories he knew to be false and misleading at Alp's behest.  In January 2018, Besson was hired by Alp and wrote an article that was published in *Le Temps* about Hazim and Lord Energy falsely claiming that Hazim and Lord Energy had ties to the Muslim Brotherhood and were involved in terrorist finance.

Besson had previously written about Hazim's father, and on information and belief, gave Alp the idea to paint Hazim and Lord Energy as terrorist financiers based solely on Hazim's father's historic connections to the Muslim Brotherhood.

36.     Defendants John Doe Nos. 1–25 are individuals and entities who conspired with the enterprise to publish false and misleading statements about Hazim and Lord Energy.  Plaintiffs are currently unaware of the identities of John Doe Nos. 1–25, and they intend to identify John Doe Nos. 1–25 through discovery in this action.  Upon information and belief, John Doe Nos. 1–25 include other unidentified UAE officials, Alp employees, journalists, and academics.

## JURISDICTION AND VENUE

37.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the laws of the United States, specifically the Lanham Act, 15 U.S.C. § 1125(a)(1), RICO, 18 U.S.C. §§ 1961–1968, and the Sherman Act, 15 U.S.C. §§ 1–7.

38.     This Court has subject matter jurisdiction over Defendants the UAE and ADNOC pursuant to 28 U.S.C. § 1330 because the UAE is a foreign state, see *id.* § 1603(a), and ADNOC is an agency or instrumentality of the UAE, *see id.* §§ 1603(a), 1603(b).  The claims brought herein are for relief in personam with respect to which neither the UAE nor ADNOC is entitled to immunity under 28 U.S.C. § 1605(a)(2).  This action is based on the UAE and ADNOC's commercial activity in the United States, acts performed in the United States in connection with their foreign activities, and foreign acts in connection with their foreign commercial activity that caused a direct effect in the United States.  *See id.*

39.     The UAE and its officials and instrumentalities—through Ariaf—entered into valid, private, commercial contracts to hire a private investigative firm—Alp—to conduct a "dark" public relations campaign that spanned years against the UAE's commercial competitors Hazim

and Lord Energy, as well as dozens of other targets.  The association-in-fact enterprise, which was overseen and managed by the UAE, its officials and instrumentalities, Alp, Brero, Cavin, and Badal, hired journalists, academics, and other co-conspirators to engage in activities typically carried out by private commercial actors.  These commercial activities included: writing articles published by private media outlets and on internet blogs, the majority of which were located in the United States; writing and editing Wikipedia entries, including on English-language Wikipedia pages; conducting search engine optimization operations to manipulate English-language search results on Google and other U.S.-based search engines including Yahoo! and Bing; alerting private financial risk watchdogs of targets' supposed ties to terrorism; emailing private financial institutions and journalists directly to alert them to targets' alleged ties to terrorism; and writing and publishing academic papers that lent credibility to the enterprise's fraudulent claims.

40.    The enterprise's commercial activities directly affected U.S. citizens and businesses.  The enterprise's commercial activities targeting Hazim and Lord Energy also affected certain U.S. markets for physical crude oil and financial instruments pegged to crude oil.

41.    This Court has personal jurisdiction over the UAE and ADNOC pursuant to 28 U.S.C. § 1330 for the same reasons it has subject-matter jurisdiction over claims against them.  *See supra* ¶ 38.

42.    This Court has general personal jurisdiction over Defendant Vidino because he is domiciled in the District of Columbia.  *See* D.C. Code § 13-422.

43.    This Court has personal jurisdiction over the other overseas Defendants—M.B.Z., Matar, Ariaf, Alp, Diligence, Brero, Cavin, Badal, Besson, and any of the John Doe Defendants who are citizens of a foreign state—pursuant to Federal Rule of Civil Procedure 4(k)(2).  Plaintiffs' claims arise under federal law (i.e., the Lanham Act, RICO, and the Sherman Act), summonses

will be served, none of these Defendants are subject to the jurisdiction of any single state court, and the exercise of federal jurisdiction is consistent with the U.S. Constitution and laws of the United States, because Defendants have sufficient minimum contacts with the United States.

44.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(3) and 1391(f)(4) and 18 U.S.C. § 1965(b).

## FACTUAL ALLEGATIONS

### *Hazim Founds the Commodity Trading Firm Lord Energy.*

45.     Plaintiff Dr. Hazim Nada is an American citizen who was born in Silver Spring, Maryland.  He attended and received his undergraduate degree from Rutgers University in New Jersey.  After graduating from Rutgers, Hazim earned a master's in physics at Cambridge University and a doctorate in applied math at Imperial College London.

46.     While still a student, Hazim traded commodities to pay for his graduate studies. During his Ph.D. studies, Hazim also worked as an analyst for Citigroup and, later, in an oil-centered trading commodities role with Merrill Lynch.

47.     Hazim founded the commodities trading company Lord Energy SA in 2008.  Hazim sought to enter the lucrative oil trade, but the barriers to entry were high.  Costs of a single shipment of crude oil ranged from $60 million to $160 million, and the industry's major players—Exxon Mobil, Chevron, and BP to name a few—delivered tens of billions of dollars to shareholders annually.

48.     So, Lord Energy started smaller, shipping coal, grain, cement, and steel across the Mediterranean.  Hazim's business savvy and quantitative acumen brought him almost immediate success.  From 2010 to 2016, Lord Energy developed the largest bagged cement import market in the region.

49.     This allowed Hazim and Lord Energy to break into the oil market.  In 2014, Lord Energy entered into a Tripartite Agreement through the U.S. branch of Macquarie Bank that allowed Lord Energy to conduct futures trades, which were necessary for Lord Energy to manage its crude oil cargo pricing.

50.     To compete against much larger rivals, however, Hazim and Lord Energy needed to innovate.  In oil, that meant exploring new "grades" of crude oil, opening new markets, and finding opportunities to arbitrage: to buy the right grades of crude oil at low prices from regions of oversupply and sell them at higher prices to areas where those grades were in high demand.

### Lord Energy Begins Exporting Saharan Blend Crude Oil to Asia.

51.     Crude oil is not a monolithic commodity.  Rather, the term "crude oil" encompasses a wide variety of raw and unprocessed mixtures of hydrocarbons that can be extracted in liquid form from the substrata of the earth's surface.

52.     Every geological formation holding oil reservoirs is characterized according to specific mixtures of hydrocarbons, giving rise to different types or grades of crude oil.  Crude oils are generally categorized by density, ranging from "light" to "medium" to "heavy," and sulfur content, ranging from "sweet" (low in sulfur) to "sour" (high in sulfur).  Therefore, crude oils typically fall into one of six buckets: light-sweet, medium-sweet, heavy-sweet, light-sour, medium-sour, and heavy-sour.

53.     Different grades of crude oil are processed by different types of refineries and produce different end products.  For example, sulfur is highly corrosive for refining systems, so refineries must take special precautions to protect their equipment to refine sour crude oils with high sulfur contents.  Similar grades do not necessarily produce the same yields of refined products.  But similar grades can be processed equally well by refineries.  If a refiner is unable to

obtain a specific grade at a certain time when it has excess refining capacity, the refiner will seek to substitute an equivalent grade.

54.     Crude oil is typically bought and sold through long-term contracts that specify regular deliveries at set quantities or through spot sales, i.e., short-term contracts for single or a small number of cargoes.  If a delivery under a long-term contract is delayed, for example because of bad weather or a problem with a tanker, a buyer may turn to the spot market to replace the delayed cargo.

55.     Different regions tend to produce different types of crude oil.  The Arabian Gulf produces a larger share of sour grades than light, sweet ones.  However, its overall production is so vast that even the relatively smaller volume of light, sweet crude oils (as compared to the volume of sour grades) produced by Gulf countries is still significant.  North Africa, West Africa, the United States, and the North Sea primarily produce light, sweet crude oils.

56.     Saharan Blend is a type of light, sweet crude oil, and it is Algeria's main crude oil export blend.  Algeria exports Saharan Blend from three shipping terminals: Béjaïa, Arzew, and Skikda.  Béjaïa is the only port in Algeria capable of fully loading Very Large Crude Carriers ("VLCCs")—the largest class of oil tankers, with the capacity to hold about 2 million barrels.

57.     Algeria produces approximately 1.2 million barrels of Saharan Blend daily, and about half of that volume is exported.  Historically, most Saharan Blend exports from Algeria were delivered to Europe.  Algeria's national oil corporation Sonatrach is the largest seller of Saharan Blend in Algeria, and the only seller with sufficient quantities to sell VLCC-sized parcels.

58.     Murban is another type of light crude oil, similar to Saharan Blend, with a slightly higher sulfur content.  It is primarily produced in Abu Dhabi.  About 2 million barrels are produced daily, and about 1.2 million of those are sold for export.  ADNOC is the dominant seller of Murban,

accounting for about 60% of all Murban exports from the UAE.  Murban is typically sold to refineries in Asia.

59.     Between 2016 and 2019, the UAE sold about 8 million barrels per month to refineries in Asia on the spot market, and it sought to expand its Murban production and exports. In November 2016, M.B.Z.—then head of the UAE's Supreme Petroleum Council—approved ADNOC's 2030 strategy and five-year business plan aimed at "generating sustained, strategic growth."[2]  ADNOC intended to establish Murban as the dominant benchmark for crude oil prices in the Middle East.

60.     Most large refineries in Asia have sophisticated de-sulfurization capabilities, so many of these refineries considered Murban to be equivalent to Saharan Blend, Arab Extra Light— a light, sweet crude oil exported by Saudi Arabia—and WTI, a type of light, sweet crude oil exported from the United States.  Beginning in the second half of 2018, WTI exports to Asia increased dramatically, making it the dominant competitor to Murban in the region.  Arab Extra Light, which is primarily sold on term contracts and generally is not available for purchase in the spot market, is the main price setter and benchmark for light, sweet crude oils like Saharan Blend and Murban.

61.     Because Saharan Blend historically was primarily exported to Europe and Murban was primarily exported to Asia, Saharan Blend was not generally considered to be a competitive threat to Murban.  That changed around 2016, when Hazim and Lord Energy brokered a deal with Sonatrach to use Béjaïa port to load VLCCs with Saharan Blend and export it to Asia.

---

[2] ADNOC Press Release, *Supreme Petroleum Council Approves ADNOC's 2030 Strategy and Five Year Business Plan Focused On Growth And Maximising Value* (Nov. 2, 2016), https://www.adnoc.ae/en/news-and-media/press-releases/2016/spc-approves-adnoc-strategy.

62.     Hazim and Lord Energy began shipping Saharan Blend from Algeria to Australia in early 2016.  These initial shipments posed no threat to ADNOC because the refinery in Australia to which Lord Energy sold its Saharan Blend cargoes lacked the de-sulfurization capabilities necessary to process Murban.

63.     The dynamic shifted in late 2016, however, when Lord Energy began shipping Saharan Blend to Korea, Thailand, and Singapore—major markets for Murban.  Between 2016 and 2018, Lord Energy's innovative new route cost the UAE and ADNOC more than $70.1 million both directly through supplanted spot cargoes that ADNOC lost to Lord Energy and indirectly as a result of the downward pressure that competition from Lord Energy exerted on Murban prices in spot and long-term markets.  These losses and the threat of continued competition from Lord Energy were more than enough incentive for the UAE and ADNOC to seek to eliminate this growing rival.

64.     Lord Energy's direct threat to ADNOC was abundantly clear.  Its Saharan Blend cargoes were in direct competition with Murban in Asian markets.  In particular, GS Caltex, the largest single customer of Lord Energy's Saharan Blend volumes, was also one of the largest purchasers of ADNOC's Murban.  The chart below lists specific cargoes Lord Energy exported to Asia between 2016 and 2018.  On information and belief, those highlighted in yellow are Lord Energy cargoes that supplanted Murban shipments.

| Lord Energy Cargoes Relevant for Murban | | | | |
|---|---|---|---|---|
| **Name of Vessel** | **Volume (Barrels)** | **Destination** | **Bill of Lading Month/Year** | **Crude Grade** |
| **2016** | | | | |
| Gener8 Maniate | 980,225.00 | Ampol | Feb. 2016 | Saharan |
| Seacross | 987,673.00 | Ampol | Feb. 2016 | Saharan |
| Cape Bastia | 967,272.00 | Ampol | May 2016 | Saharan |
| Cap Philip | 966,253.00 | Ampol | Sept. 2016 | Saharan |
| Daba/Cape Brindisi | 1,041,192.00 | Lukoil | Oct. 2016 | Saharan |
| United Kalavryta | 1,063,304.00 | GS Caltex | Nov. 2016 | Saharan |
| | | | | |
| **2017** | | | | |
| Cap Georges | 1,043,586.00 | GS Caltex | Mar. 2017 | Saharan |
| Christina | 1,050,690.00 | Lukoil Singapore | May 2017 | Saharan |
| Archangel | 1,076,472.00 | GS Caltex | May 2017 | Saharan |
| New Legend | 713,180.00 | Exxon Thailand | Jul. 2017 | Sarahan |
| New Legend | 350,000.00 | Ampol | Jul. 2017 | Saharan |
| Alagaila | 1,048,801.00 | Repsol (to Thailand) | Jul. 2017 | Saharan |
| Greek Warrior | 1,063,415.00 | GS Caltex | Sept. 2017 | Saharan |
| Greek Warrior | 638,625.00 | GS Caltex | Sept. 2017 | Saharan |
| DS Tina | 1,100,000.00 | GS Caltex | Oct. 2017 | Saharan |
| DS Tina | 981,268.00 | Chevron | Oct. 2017 | Saharan |
| DS Valentina | 1,972,171.00 | Chevron | Nov. 2017 | Saharan |
| Aegean Horizon | 997,484.00 | Ampol | Dec. 2017 | Saharan |
| Prudent Warrior | 1,058,386.00 | Ampol | Dec. 2017 | Saharan |
| | | | | |
| **2018** | | | | |
| Narmada Spirit | 1,060,572.00 | Repsol (China) | Mar. 2018 | Saharan |
| Marean Carina | 2,047,667.00 | GS Caltex | Nov. 2018 | WTI |

65.     Between 2016 and 2018, Lord Energy supplanted nearly 13 million barrels of Murban, worth about $829.9 million, with Saharan Blend in Asia.  This put Lord Energy on the UAE's radar as a growing commercial threat.

66.     But Lord Energy's threat to ADNOC's dominance in markets for light crude oil in Asia was far greater than the specific cargoes ADNOC lost to Lord Energy.  Lord Energy's introduction of Saharan Blend into spot markets in Asia as an alternative to Murban put significant downward pressure on the spot price for Murban.  This in turn put pressure on ADNOC and other Murban exporters to lower the prices they charged in Murban term contracts because it was difficult for ADNOC to justify higher prices to term customers than ADNOC was able to receive on the spot market.

22

67.     Thus, Lord Energy's entry into the market did not just affect the price ADNOC received for spot cargoes—it impacted the price ADNOC received for all Murban exports during the time it was competing with Lord Energy.  Lord Energy's entry into the market also complicated negotiations between ADNOC and its largest customers in Asia such as GS Caltex, Chevron, and Exxon Mobil.

68.     Determining the magnitude of Lord Energy's commercial threat to the UAE and ADNOC is an exercise in eliminating lurking variables.  The best way to assess the impact of cargo movements from outside the Gulf (i.e., Lord Energy's exports of Saharan Blend) is to compare Murban prices to prices of a grade similar to Murban in quality, which is not subject to spot market dynamics, and that is exported from the Gulf to similar destinations and end users.

69.     Here, Arab Extra Light—a light sweet blend produced by Saudi Arabia—is the most logical benchmark.  Between 2016 and 2018, Arab Extra Light was produced in very large quantities (about 1 million barrels per day), it was fully sold on term contracts with prices set based on refining margins, and it was primarily exported to many of the same refiners in Asia as Murban.

70.     Comparing the monthly official selling prices of Murban to the monthly official selling prices for Arab Extra Light shows periods when Murban was under pressure relative to Arab Extra Light.  Such pressure could have resulted from (1) significant production changes in the two grades or (2) spot market dynamics for Murban, which then feed back into the official selling price for all Murban exports.  Between early-2016 and early-2018, production volumes for Murban and Arab Extra Light were stable, so any significant changes in the spread between prices for Murban and Arab Extra Light must have been caused by events affecting the spot market for Murban—such as Lord Energy's introduction of Saharan Blend into Asian markets.

71.     Considering the size of the Murban spot market in Asia (about 8 million barrels per month), volumes of Saharan as large as 2–3 million barrels some months in 2017 would be expected to have a material impact on the differential between prices for Murban and prices for Arab Extra Light.  The graph below which charts the spread between Murban and Arab Extra Light Prices from early 2016 until late 2018 shows that, once Lord Energy began shipping Saharan Blend to Asia in early 2017, the average price differential between Murban and Arab Extra Light (shown by the red line in the graph below) fell by $0.27 per barrel.



72.     This decline in the average official selling price for Murban caused the UAE and ADNOC substantial losses.  In 2016, when no other competing grades were being exported to Asia, Murban was sold at a premium to Arab Extra Light of $0.77 per barrel on average.  In 2017, when Lord Energy was actively shipping large quantities of Saharan Blend to Asia the premium was only $0.50 per barrel.  Given that the UAE exported about 1.2 million barrels of Murban per day, this decrease of $0.27 per barrel resulted in a loss of about $324,000 per day for Murban

producers. That loss would have been over $118.3 million for the year in which Lord Energy was selling Saharan Blend on spot markets in Asia. Since ADNOC produced about 60% of the UAE's total supply of Murban, it lost about $70.1 million as a result of competition from Lord Energy in 2017.

73.     Once Lord Energy stopped exporting Saharan Blend to Asia in mid-2018—when Sonatrach stopped dealing with Lord Energy (and cut off Lord Energy's access to Saharan Blend) because of the smear campaign orchestrated by the UAE's unlawful enterprise—Murban prices rebounded.

74.     In early 2018, WTI shipped from the United States was emerging as a competitor to Murban in Asia. Lord Energy established a subsidiary in Houston, Texas—Americas Lord Energy Inc.—around that time to try to use WTI as a replacement for the Saharan Blend it was no longer able to export. However, the enterprise's smear campaign quickly crushed Lord Energy's U.S. subsidiary too, forcing the company into bankruptcy and ensuring that Lord Energy no longer posed a competitive threat to ADNOC.

75.     Lord Energy was not the only lucrative business Hazim owned and ran at the time. In 2017, he opened a wind tunnel near Milan that the Italian military and U.S. Air Force used (and continue to use) to train paratroopers. However, the enterprise never sought to smear Hazim's wind tunnel business. The reason is simple: the wind tunnel business did not pose a competitive threat to the UAE or ADNOC. The enterprise's failure to go after Hazim's wind tunnel business confirms that its motives were commercial. The enterprise targeted Lord Energy and Americas Lord Energy Inc. specifically because of the growing threat they posed to the UAE and ADNOC in the spot market for light crude oil exported to Asia.

### *The UAE Hires Alp and Organizes an Unlawful Enterprise.*

76.     In 2017, the UAE was approached by Alp Services, a private investigative firm in Switzerland.  Alp touted its ability to "destroy" targets through what it termed "offensive viral communication[s]."  Alp understood the power of online misinformation—and the value of online reputations.  It prided itself on secrecy.  And for a price, it was willing to do anything necessary to dispatch its targets, including breaking the law.

77.     Early in his career, one of Alp's founders and directors, Mario Brero, ran a business exporting computers and semiconductor manufacturing equipment from the United States to Europe.  He was indicted by federal prosecutors for violating U.S. laws prohibiting the export of sensitive American technologies to Eastern bloc countries through a system of straw buyers he set up in Western Europe.  Brero resolved the charges by signing a consent decree and exiting his computer export business.[3]

78.     After that, Brero decided to start a career as an investigator, and he founded Alp, along with Muriel Cavin, in Geneva in 1989.  In 2007, he and Cavin incorporated a second entity, Diligence SARL, at the same address as Alp, for the sole purpose of confusing clients of a competing investigative firm, also called Diligence, that was launching a branch in Geneva.[4]

79.     Alp and Brero's methods were as unscrupulous as they were effective.  In 2012, he was sued in French court for invasion of privacy.  In those proceedings, Brero acknowledged violating Swiss law by paying phone company employees for lists of customers' call histories.  The court convicted Brero of, among other things, disseminating information acquired by illegal means.

---

[3] David Kirkpatrick, *The Dirty Secrets of a Smear Campaign*, The New Yorker (Mar. 27, 2023), https://www.newyorker.com/magazine/2023/04/03/the-dirty-secrets-of-a-smear-campaign.
[4] David Kirkpatrick, *The Dirty Secrets of a Smear Campaign*, The New Yorker (Mar. 27, 2023), https://www.newyorker.com/magazine/2023/04/03/the-dirty-secrets-of-a-smear-campaign.

80.     Not only did Alp and Brero unlawfully *collect* private information about their targets, but they also *spread* disinformation about their targets—a technique they referred to as "offensive viral communication campaigns."

81.     Alp first pitched the UAE in May 2017.  Brero sent a letter on May 12, 2017 to give the UAE "a brief introduction to [Alp] and [their] specific skills," which included "finding negative information/red flags on individuals" and conducting "confidential offensive viral communication campaigns, notably through [Alp's] in-house team of IT and social media experts."  Brero boasted that Alp's "clients … include multinational companies, law firms, governments and government agencies," "Head of States," and "notorious ultra high-net-worth individuals."

82.     Brero assured the UAE that Alp's team, which comprised "a core of 20 analysts, investigators, and full-time consultants with extensive multi-disciplinary backgrounds," was "extremely sensitive to the necessity for any assignment to remain confidential."  All Alp employees and undercover consultants had "signed tight and legally binding confidentiality agreements," and Alp's "discreet offices and IT systems [were] the subject of appropriate, and regularly tested, security countermeasures."

83.     Despite Brero's bluster about Alp's sophisticated expertise, in truth, Alp's playbook was simple.  Alp would run straightforward background checks on its targets and impersonate those targets to unlawfully obtain confidential information such as phone and bank records.  It would use those records to diagram the targets' supposed associates and connections in elaborate link charts.  Then, Alp would scour the internet looking for any "negative" information on its targets' connections—heedless of whether the "negative" information was wildly farfetched and obviously untrue or had been proven false.  Alp would then hire journalists, academics, and

freelance writers to publish stories and blog posts imputing the negative information Alp had uncovered about the targets' connections to the targets themselves.

84.     Alp legitimized and further disseminated the false claims it concocted about its targets by creating fake Wikipedia "controversy" sections—citing its own "reporting" as truth— and using search engine optimization tactics to ensure the stories it had planted remained top results on Google, Yahoo!, Bing, and other search engines.  Finally, Alp would alert banks and bank compliance monitors to the false claims Alp manufactured to get banks to stop lending to Alp's targets, isolating them financially.

85.     On August 7, 2017, Alp prepared a more detailed proposal for the UAE.  The document, which had the filename "Arnica 0-first proposal-not agreed-20170807," described a "Global Action Plan" for Alp to launch "widespread offensive actions" against Qatar and its networks, including the Muslim Brotherhood, to expose and counter Qatar's efforts to "direct[] a global media and political campaign against" the UAE.  "Arnica" was one of the codenames Alp used to refer to its work for the UAE.

86.     Alp reiterated that it was "[i]ntransigent on security," and told the UAE that "given the sensitivity of the topic," Alp could not "put in writing the extent of [its] services."  Instead, the proposal was meant to provide an overview of Alp's capabilities.  Specifically, Alp proposed making "advanced cartographies of our targets' secret influence networks in Europe and the US," conducting "investigations to obtain damaging negative material on our key targets," and engaging in "offensive viral communication to discredit and embarrass key targets" using "dark PR" and "fake news."

87.     With respect to the offensive viral communications, Alp explained that, once it identified key targets and obtained "negative intelligence about them," it would "launch highly

aggressive online negative campaigns, relaying and spreading in a viral and strategic manner the previously identified negative intelligence, that could then appear in mainstream media."  Alp claimed it would use "tested advanced confidential techniques in 'dark PR'" and "aim to discredit [its] targets by discreetly, and subtlety, diffuse embarrassing and compromising intelligence" to make their targets "appear as either perverts, corrupts, hypocrites and/or terrorists" in the "eyes of the media/public/officials."  Alp wrote that it "could also use creative and particularly damaging actions, which [it] would describe verbally," and cautioned the UAE not to underestimate the "power of 'dark PR.'"

88.    On information and belief, Brero emailed Alp's proposal to the UAE officials before he travelled to Abu Dhabi to meet with them in person from August 7 to August 9, 2017.



89.     Nominally, Alp's client was an Emirati enterprise called Ariaf Studies and Research LLC.  Yet the hacked documents make clear that the UAE's top leadership was in charge.  Brero's main point of contact was Matar, but Brero also met with Matar's superior, whom Brero and Matar referred to as "His Excellency" and "the boss."  On information and belief, they were referring to M.B.Z.

90.     The UAE's unlawful enterprise had a clear chain of command.  On information and belief, M.B.Z., Matar, and other UAE officials provided funding, strategic guidance, and final approval.  Brero, Cavin, and their top deputy, Lionel Badal, devised the plan, identified targets, and oversaw execution of the campaign.  Brero, Cavin, Badal, M.B.Z., and Matar were deeply involved in managing the enterprise's affairs.  But to make the smear campaign effective, they conspired with journalists, academics, and others to legitimize their reputation-destroying lies.  These co-conspirators included Swiss journalist Sylvain Besson and Washington, D.C.-based Muslim Brotherhood "expert" Lorenzo Vidino.

### The UAE Instructs Alp to Devise Operations to Destroy Hazim and Lord Energy.

91.     On information and belief, the UAE and its officials recognized that Alp offered an opportunity to eliminate Lord Energy as a competitive threat.  As such, the UAE and its officials instructed Alp to devise operations against Hazim and Lord Energy as some of the first targets of the enterprise's overarching viral communication campaign.  Acting on the UAE's instructions, on September 13, 2017, Alp prepared a "strictly confidential" internal memo for "Project Arnica" about Hazim and Lord Energy titled, "Lord of the Gas – Al Taqwa reloaded."  The memo is only about a half a page long, but it identified Lord Energy as a trading company in Lugano, Switzerland.  And it included two paragraphs on Hazim's father, whom the memo described as "one of the principle financial strategist[s] of the Muslim Brotherhood."

92.     About a month later, on October 6, 2017, Alp wrote its first official report referencing Hazim and his company.  On information and belief, Alp shared this report internally and with the UAE and its officials via email.  The report explained that "very little is known about [Lord Energy]" and "nobody ever investigated the identity of its managers and its links to the entire network of the Muslim Brotherhood."   In other words, there was nothing to refute the false accusations Alp planned to invent about Hazim and Lord Energy's involvement in terrorist financing.  The report went on to claim:

- Lord Energy is "run by Doha-based heirs of the very senior Muslim Brotherhood leadership."

- "Confidential documents indicate that the company is at the center of European MB senior operators and has ties to Al-Qaeda related entities."

- "As we will demonstrate later on, confidential documents notably reveal contacts between Lord Energy executives, who are MB members, and Al-Qaeda related people and organisations."

- "Since 2013, Hazim Nada, CEO and founder of Lord Energy, is domiciled in Doha in Qatar, but still uses a Swiss mobile phone, for which we confidentially analysed its phone calls for June, July and August 2017.  One of his sisters, most probably Hasna, is even married to Mohamed Qaradawi, the son of [prominent Muslim preacher] Yusuf Qaradawi."

- "Confidential documents also reveal contacts between Doha-based Hazim Nada and Attia Nasreddin, Chairman of the Al-Qaeda related Nasco Group and son of Ahmed Nasreddin."

- "We chose Hazim Nada in his quality of son and heir of his father Youssef Nada once considered to be the 'foreign minister' of the Muslim Brotherhood and its key financier."

- "Lord Energy officially trades liquefied natural gas (LNG), crude oil and bagged cement, allowing it to operate globally and transfer important sums of money, the perfect cover."

93.     Hazim has never been a supporter, much less a financier, of the Muslim Brotherhood.  He was never domiciled in Doha; in fact, he lives in Italy and maintains a residence in Houston, Texas.  Lord Energy has never used crude trading as a "cover" for anything.  On

information and belief, the only "confidential documents" Alp had were phone records they unlawfully obtained.  And those phone records did not reveal anything of substance.  In fact, they revealed that Hazim was based in Italy and worked daily in the Lord Energy's office in Switzerland close to the Italian border and that he had no links whatsoever to the Muslim Brotherhood.

94.     Alp's allegations that Hazim had links to the Muslim Brotherhood were based solely on Hazim's father's historic ties to the group.  In its October 6, 2017 report, Alp wrote: "It goes without saying that [Youssef's] son will pursue the business activities, but also the cause of the Brotherhood."

95.     The report also alleged that Hazim's business associates Youssef Himmat, American citizen Imama Fatima, Davide Piccardo, and Omar Nasreddin were affiliated with the Muslim Brotherhood, thus further implicating Hazim in terrorist financing activity.  "They are young, they handle huge amounts of money, they are politically engaged, and they keep a discrete profile.  For these reasons, we have decided to focus our investigation on them," the report said.

96.     Yet Alp did to Himmat, Fatima, Piccardo, and Nasreddin exactly what it did to Hazim—it selectively interpreted their public connections to impute affiliations that did not exist. Himmat, a junior trader at Lord Energy, was never a Muslim Brotherhood member and holds strong views against the group.  His father was friends with Hazim's father, Youssef; and like Youssef, had long ago been placed on, and later removed from, a U.S. sanctions list.  Himmat was also the head of a Muslim charity, FEMYSO.  Although Alp accused FEMYSO of Muslim Brotherhood affiliations, nothing links the charity to the Brotherhood except Alp's own assertions.

97.     Nor did any of Hazim's other alleged Muslim Brotherhood contacts have any direct Brotherhood ties.  Imama Fatima, a U.S. citizen and Lord Energy board member, had briefly worked part-time for a company, MIGA Chamber, that had been removed from a U.S. sanctions

list five years prior to her employment.  Piccardo, an Italian citizen, was active in the Italian Muslim community.  Nasreddin was a Lord Energy operator whose father, like Youssef, had been removed from a U.S. sanctions list decades earlier.  Hazim had hired them for their professional experience and language ability, which was difficult to find in the south of Switzerland.  They were not the next generation of Muslim Brotherhood leaders as Alp falsely claimed.

### The Enterprise Launches a "Dark PR" and "Fake News" Campaign to Destroy Lord Energy and Eliminate a Competitive Threat.

98.     The enterprise's first public strike against Hazim and Lord Energy came on December 5, 2017, two months after Alp's report identifying Hazim and Lord Energy as potential targets.  Alp commissioned the political gossip website Africa Intelligence to write an article about Lord Energy falsely claiming that Algeria had blocked a Lord Energy tanker, the DS Valentina, at port because of purported concerns about its "waterproofness."  The article then mentioned Hazim's relationship with Youssef, reporting that Youssef was "alleged to have financed terrorism."  A Word document version of the article with the file name "Arnica-article lord energy-africa intelligence-201712" was among the documents obtained from Alp by the unidentified hackers.

99.     This article was false and misleading in several respects.  Algerian authorities did not block the DS Valentina over its seaworthiness.  The Algerian authorities were not involved with this matter at all.  The captain of the tanker halted loading because there was a dispute between Lord Energy and the shipowner.  The dispute was ultimately resolved years later through arbitration that was successfully settled in favor of Lord Energy.

100.     The Africa Intelligence article was just the enterprise's opening salvo.  But already it confirmed why the UAE directed Alp to target Hazim and his company: the UAE wanted to

disrupt Lord Energy's crude oil exports from Algeria.  This was the first, but not the last, time that the enterprise would specifically attack Lord Energy's business in Algeria.

101.     About a month after the Africa Intelligence article was published, the enterprise had another of its paid journalists publish a false article about Hazim.  This time, in a much more prominent publication—*Le Temps*, the sole French-language, nationwide daily newspaper in Switzerland.

102.     In December 2017, Alp drafted a confidential "preliminary report" on Hazim and Lord Energy with the file name "arnica 3-lord energy note-sylvain-20171214."  The report falsely claimed that Lord Energy was a "mysterious Muslim Brotherhood trading company linked to Al-Qaeda," and "[d]ocuments indicate that the Swiss company is at the center of European MB senior operations and has ties to Al-Qaeda related entities."  On information and belief, Alp emailed this memo to *Le Temps* reporter Sylvain Besson, who used the information Alp supplied to write an article for *Le Temps*.

103.     Brero met with Besson several times while pitching the UAE.   Email correspondence suggests the two were more than casual business associates—they were friends and co-conspirators.  Later Alp communications with the UAE would characterize Besson as "part of our extensive network."

104.     Besson had published a book in 2005 accusing Youssef Nada of ties with a supposed Islamist conspiracy.  That book, *The Conquest of the West: The Secret Project of the Islamists*, was largely based on an unsigned, 14-page document from 1982 that authorities

discovered at Youssef's house more than a decade later.  Now Brero offered Besson a way to bear
out his thesis—while also benefitting financially.[5]

105.    On January 5, 2018, Besson wrote an article about Hazim and Lord Energy for *Le
Temps*.  The article, which *Le Temps* published online, was titled, "Swiss secret services targeting
pro-Qatar Islamists."  It falsely claimed there were "traces" of "historical MB networks" at Lord
Energy and that "this new generation has sometimes kept some militant activities."  Hazim and
Lord Energy were never targeted or investigated by Swiss authorities, and no one at Lord Energy
"kept militant activities."  These claims were fabricated by Alp, and Besson eventually retracted
his claims in writing, acknowledging in a letter dated June 14, 2018, that his January 5, 2018 article
was not meant to "state, assert or imply that the company Lord Energy is or has been under
surveillance by the swiss intelligence service SRC.  Any suggestion to the contrary would be false
and misleading."

> Lausanne, the June 14. 2018
>
> I, Sylvain Besson, Deputy editor of *Le Temps*, hereby confirm that the article published on January 5th,
> 2018, with the title «Les Frères musulmans refont surface au Tessin», did not state, assert or imply that
> the company Lord Energy is or has been under surveillance by the swiss intelligence service SRC. Any
> suggestion to the contrary would be false and misleading.
>
> Sincerely,
>
> Le Temps
>
> Sylvain Besson
> Deputy editor

---

[5] David Kirkpatrick, *The Dirty Secrets of a Smear Campaign*, The New Yorker (Mar. 27, 2023),
https://www.newyorker.com/magazine/2023/04/03/the-dirty-secrets-of-a-smear-campaign.

106.     Besson's *Le Temps* article in January 2018 was followed by a flurry of fake reporting intended to solidify its fraudulent premise as truth.  Alp quickly published three other articles online that cited Besson's article and accused Lord Energy of links to "Islamic networks." Badal boasted in internal Alp emails that these new articles "amplify the impact of Le Temps article" and "put pressure on Swiss federal and local authorities to investigate LE and the MB."

107.     Around the same time, Badal and Brero identified another valuable co-conspirator who could lend credibility to their false claims: Lorenzo Vidino, the Director of the Program on Extremism at George Washington University in Washington, D.C. and a supposed expert on Islamism in Europe and North America, including the Muslim Brotherhood.  They intended to use Vidino as an American analogue to Besson—a credible and highly-credentialed intermediary who was willing to say whatever they wanted in exchange for money.

108.     On January 3, 2018, Badal asked Vidino for a meeting to discuss Lord Energy, which Badal described as "a very interesting (and discreet) trading company based in Lugano."

109.     Days later, on January 12, 2018, Brero treated Vidino to a $1,000 dinner at the Beau Rivage Hotel in Geneva.  According to Brero's prepared talking points, he initially planned to disguise the identity of his Emirati clients, telling Vidino that Alp had been hired by a "London-based law firm."  However, Vidino later acknowledged to *The New Yorker* that he knew the UAE was the "most realistic client."[6]

110.     On January 24, 2018, Vidino signed a contract with Alp to provide "[i]nteresting leads/rumours … regarding the subject of investigation organisations/individuals/funding in

---

[6] David Kirkpatrick, *The Dirty Secrets of a Smear Campaign*, The New Yorker (Mar. 27, 2023), https://www.newyorker.com/magazine/2023/04/03/the-dirty-secrets-of-a-smear-campaign.

Europe" and a "[l]ist of alleged members of the first tier organisations in European countries." Alp agreed to pay Vidino 3,000 Euros for his work.

111.    In early 2018, the enterprise vastly expanded its disinformation campaign.  An updated Alp strategy document from January underscored the campaign's secrecy and breadth.  It mentioned communicating using "encrypted channels" and engaging in "confidential actions," and proposed "strik[ing]" targets using "viral com" and "social media."  It required a budget of 300,000 Euros.

112.    On February 15, 2018, Alp published a "detailed investigative analysis" that falsely described Hazim and Lord Energy, among other targets, as part of the Muslim Brotherhood's "macro-level funding system."  On information and belief, Alp shared this document internally and sent it to the UAE and its officials via email.

113.    Days later, Alp prepared a PowerPoint presentation for the UAE—with the filename "August 2017 / February 2018 – ongoing"—that included a slide about Lord Energy, falsely accusing it of being a "front compan[y]" for the Muslim Brotherhood and of being "linked to Al-Qaeda."  The presentation ends: "Thank you very much for your trust."  On information and belief, Alp emailed this presentation to the UAE and its officials.

114.    That month, Brero visited Abu Dhabi, and afterwards, on information and belief, he sent via email a "formal letter of appreciation" to his "Excellency."  He wrote, "Your comments and advices were very helpful, especially on the next steps, and we will do everything possible to match your expectations."  Brero also offered thanks to "our dear friend" (a.k.a, Matar) for his "much valued feedbacks."

***The Enterprise Fraudulently Induces Bank Risk and Compliance Monitors
to Blacklist Hazim and Lord Energy for Alleged Ties to Terrorism.***

115.    By spring 2018, the enterprise's "offensive viral communication" plan began to have its desired effects.

116.    In March 2018, Hazim received an email from one of his contacts at Sonatrach forwarding a link to Besson's January 5, 2018 *Le Temps* article.  That month, he was also forced to defend Lord Energy to "new management" at Sonatrach, even though he had been working with Sonatrach for years.  Hazim explained to Sonatrach that Lord Energy "deal[s] with all major oil companies on a direct basis, including Chevron, Exxon Mobil, Shell and BP,"—in fact over 50% of Lord Energy's annual sales were with the U.S.-based companies Exxon and Chevron, and their affiliates and subsidiaries.  Hazim also explained to Sonatrach that "[o]ver the past three years [LE was] instrumental in recreating a market for Saharan Blend in Asia … [and] re-establishing the trade into Korea which had been closed for over 4 years."  Hazim also noted that Lord Energy had recently "establish[ed] a presence in Houston which [would] begin to handle US exports of light grades in May 2018."

117.    Sonatrach responded, "many thanks for your below email in which you explain briefly LORD Energy activities.  In order to complete this information, we kindly ask you to send us a presentation on LORD-Energy crude oil and products trades during the period 2015, 2016 and 2017 (sources and destinations / Buyers and Sellers...)."

118.    Sonatrach's requirement that Lord Energy undergo a new background check was particularly puzzling given that Lord Energy was Sonatrach's largest trading partner in 2017.  Lord Energy made more than $10 million in profit from its deals with Sonatrach in 2017 and more than $7 million in profit from its deals with Sonatrach in 2016.  Sonatrach ultimately stopped working with Lord Energy in mid-2018.

119.    As the enterprise's false claims about Lord Energy began to erode Lord Energy's relationship with Sonatrach, Hazim and his company continued to press forward with their pivot to U.S. markets.  Hazim hired a seasoned oil industry executive who was a U.S. citizen and lived in Houston, Douglas Koskie, to manage Lord Energy's planned subsidiary there.  That April, Americas Lord Energy, Inc. entered into an indemnity agreement with Koskie that stated, "The Company is preparing to engage in the oil and gas sector in the United States by establishing a local fully owned subsidiary."

120.    On April 24, 2018, Americas Lord Energy, Inc. filed a certificate of formation with the Texas Secretary of State.

121.    The following month, on May 16, 2018, Reuters published an article about Lord Energy's expansion.  Hazim told Reuters "We currently move about 3-4 million barrels of crude oil per month.  We plan to triple this over the next 18 months.  Our key to success has been in developing new markets for either established grades or finding new niches for difficult grades." He also said, "We have been the first to open the market for (Algerian) Saharan Blend into Australia for over 35 years and we reopened the arbitrage into South Korea ... and managed to find a blend for it to take into the Chinese market."  The article noted that Lord Energy's "end-users have been concentrated in Asia and the United States" and that the company "aim[ed] to expand into U.S. exports and imports."[7]

122.    Meanwhile, as Lord Energy was seeking to expand its presence in the United States and increase its exports of WTI (another grade, like Saharan Blend, that competed with Murban), the UAE's unlawful enterprise was determined to redouble its efforts to take down Hazim and

---

[7] Julia Payne, *Small Swiss trader Lord Energy enters Russian oil market with CEFC deal*, Reuters (May 16, 2018), https://www.reuters.com/article/idUSKCN1IH1K0/.

Lord Energy.  On February 26, 2018, Badal sent via email an "updated, more detailed" proposal to Matar recommending a "new three-months testing phase."  Alp proposed:

- Publishing "massive negative articles on dozens of key MB targets," including 10 negative articles about Lord Energy;

- Informing selected journalists about targets' "connections with Al Qaeda";

- Creating negative Wikipedia pages for targets in English, French, and Italian;

- Alerting "compliance databases and watchdogs, which are used by banks and multinationals, for example about Lord Energy's … links to terrorism";

- "Discreetly notify[ing] banks of MB companies' (e.g. Lord Energy … ) links to terrorism … the objective being to block their bank accounts and business";

- Putting "negative information on Lord Energy in the first pages of Google and other search engines (e.g. Yahoo, Bing)."

123.    In addition to fabricating negative pages on Wikipedia—a U.S.-based company—and manipulating results on U.S.-based search engines like Google, Yahoo!, and Bing, the proposal emphasized publication of negative information in "English-speaking media," specifically identifying "Daily Kos in the USA (which was once described as 'the second best blog' by Time Magazine)" as one potential outlet for negative information.

124.    In the proposal, Alp told Matar: "should you give us the green light, ***we believe that we could seriously damage, if not destroy, the reputation and viability*** of key MB European groups through our confidential offensive viral communication."  (Emphasis added.)

125.    An internal Alp document written on March 1, 2018, with the file name "arnica 6-action plan-I," outlined a plan for Alp to have 45 articles published about the targets it had identified at that point, about four per week, and Wikipedia pages.  The action plan called for 10 articles about Lord Energy, and it specifically called for an "[a]rticle in English" on the San Francisco-based blogging website Medium that would tie Lord Energy to "AQ."  The action plan also mentioned "[i]nform[ing] media UK + USA."

126.    At the same time, Alp began to prime its co-conspirators for the next phase of operations against Hazim and Lord Energy.  On April 30, 2018, Alp drafted a document with the file name "arnica 6-lorenzo-to do list-20180430," which included having Vidino prepare an "overview of key MB individuals/organisations/companies in the USA and interesting elements/rumours … to show our capacities by obtaining new, concrete, up-to-date information in the US."

127.    On May 7, 2018, Alp published a "confidential internal report" on Lord Energy titled "Lord Energy: The mysterious Muslim Brotherhood trading company linked to Al-Qaeda." The report falsely claimed once again that Lord Energy was "at the center of European MB senior operators and has ties to Al-Qaeda related entities."  The report also discussed Lord Energy's shipments of oil from Algeria to South Korea and its business with Sonatrach.

128.    One week later, on May 15, 2018, Alp drafted an email that, on information and belief, it sent to Nina May, a freelance journalist, directing her to prepare three articles about Lord Energy.  Alp itself wrote the headlines: "Lord Energy: the mysterious company linking Al-Qaeda and the Muslim Brotherhood"; "Lord Energy trading company linked to US designated terror-entities"; and "Exclusive: The Muslim Brotherhood has its own Swiss trading company."

129.    Alp instructed May to peruse the "background" materials it provided as "[t]he topic is complex."  Alp also instructed May not to share the confidential report and to "delete it safely after" she reviewed it.

130.    May wrote the articles as directed by Alp and published them pseudonymously.  On May 31, 2018, she sent Alp an invoice for nine articles she wrote "across three projects," five of which falsely accused Lord Energy of terrorist affiliations.  One article was titled "Lord Energy linked to US designated terror-entities."  Another was titled, "Reuters misses major terrorism link

in oil coverage: the true story of Swiss Lord Energy." This article was published on the U.S.-based blogging website WordPress. The article falsely claimed that Hazim "took over" his father's business, and it falsely concluded that "[t]he connections of Lord Energy to the Brotherhood—and to radical Islam and financiers—are substantial." May charged £250 per day. The total amount due was £1,140.

---

## Nina May
### Writing & Editing

█████████████████████

| | |
|---|---|
| **To:** | Alp Services SA<br>Rue de Montchoisy 36<br>1207 Geneva<br>Switzerland |
| **Contact:** | Lionel Badal |
| **Date:** | 31 May 2018 |
| **Invoice Number:** | 16/18 |
| **Your reference:** | - |
| **Job description:** | Nine article across three projects (1/2 day each): |

1. As Eric Arnoux's first fraud victim comes forward, his daughters attend £80,000-a-year Institut Le Rosey
2. Lord Energy: the mysterious company linking Al-Qaeda and the Muslim Brotherhood
3. Exclusive: The Muslim Brotherhood has its own Swiss trading company
4. Lord Energy linked to US designated terror-entities
5. Why the next series of Homeland should play in Lugano
6. Reuters misses major terrorism link in oil coverage: the true story of Swiss Lord Energy
7. Meet Olivier Couriol, the Swiss banker behind the Malian Airbus scandal
8. The Swiss banker at the centre of the Airbus-Mali investigation
9. Oliver Couriol: The name to know in corruption cases in Nigeria and Mali

| | |
|---|---|
| **Rate:** | £250/day |
| **Other costs/charges:** | £15 foreign bank transfer charges |
| **Total amount due:** | £1140 |

---

131.    That month, the enterprise also expanded its campaign to defraud banks and financial institutions into believing the false claims it manufactured about Hazim and Lord Energy's ties to terrorism, with the goal of causing those banks to sever ties with Hazim and Lord Energy, cutting off their access to credit.

132.    On June 6, 2018, Alp sent another email to Nina May and another freelance journalist on its payroll commissioning "a new short article" on Lord Energy, this time focused on its accounts at Crédit Suisse.  The article was to be titled, "Compliance: Muslim Brotherhood company Lord Energy linked to Crédit Suisse."

133.    A week later, on June 13, 2018, Alp sent an email about Lord Energy to the Crédit Suisse media relations email address (media.relations@credit-suisse.com), posing as a freelance journalist and using the pseudonym Laurent Martin.  The email claimed that Lord Energy was linked to radical Islamists and cited stories that Alp had planted about Lord Energy.  Alp's objective was to fraudulently induce Crédit Suisse to stop lending to Hazim and Lord Energy, thereby denying Hazim and Lord Energy access to their main source of credit, without which they would be unable to operate, and depriving Crédit Suisse of valuable banking relationships and interest income.

134.    On June 12, 2018, using that same pseudonym (Laurent Martin), Alp sent emails to WorldCompliance, World-Check, and Info4C—major bank risk compliance databases—claiming that Lord Energy was "directly linked to radical Islamists."  Alp once again cited some of the articles it had fabricated about Lord Energy, including Besson's January 5, 2018 *Le Temps* article.  The email concluded, "given counter-terrorist financing regulations, it would seem obvious to see the name of Lord Energy" in the databases.

135.    Based on Alp's report, Hazim, Lord Energy, and Alp employee Youssef Himmat
were added to World-Check under the "terrorism" risk category for "suspected links to the Muslim
Brotherhood."



136.    These databases are not mere public clearinghouses for business grievances.  They
correlate sanction and embargo lists, monitor regulatory and enforcement lists, and compile their

own de facto blacklists of high-risk individuals and entities, with a particular focus on terrorism, organized crime, and fraud.  These databases are owned, operated, and maintained by reputable companies that banks trust to provide accurate and up to date information.  WorldCompliance, for example, was acquired in 2013 by LexisNexis Risk Solutions, which is headquartered in Atlanta, Georgia.[8]  World-Check was acquired in 2011 by Thomson Reuters, a company whose shares are publicly traded on the New York Stock Exchange and has several offices throughout the United States.[9]  Banks then rely on these databases when performing due diligence on current and potential clients.  Appearing on a WorldCompliance or World-Check list can be fatal for a business of any type, but especially one in the oil business, where substantial bank loans are necessary to fund operations and national security interests are at stake.

137.    Alp knew all of this.  In June 2018, it prepared a "strictly confidential" "urgent update" report, stating: "We learned from a confidential source that, following our viral communication, [Lord Energy] is having serious problems with Western banks to receive credits. It has apparently being put on a watchlist used by banks.  Banks are concerned about its connections to radical Islamists."  On information and belief, Alp shared this report with the UAE and its officials via email.

138.    When Hazim learned that he had been designated by World-Check, he emailed World-Check on July 2, 2018 informing World-Check that there was an "ongoing" and "unknown defamation effort" against him and Lord Energy and asking World-Check to disclose "all the

---

[8] Relx, *LexisNexis Acquires WorldCompliance, Leading Provider of Global Anti-Money Laundering and Compliance Solutions* (Aug. 7, 2013), https://www.relx.com/media/press-releases/archive/07-08-2013.
[9] Thomson Reuters, *Thomson Reuters Acquires World-Check* (May 16, 2011), https://ir.thomsonreuters.com/news-releases/news-release-details/thomson-reuters-acquires-world-check; Thomson Reuters, 2022 Annual Report, https://ir.thomsonreuters.com/static-files/c8f80e59-857a-4312-a478-e7dc1e206891.

researchers who were involved in placing [Hazim, Lord Energy, and Himmat] in [World-Check's] system, along with all their professional links."  World-Check responded a week later on July 9 acknowledging that "an error was made."  However, World-Check stymied Hazim's efforts to identify his unknown defamers by refusing Hazim's request to identify the researchers who worked on his profile.

### *Hazim Fights Back, and the Enterprise Redoubles its Efforts.*

139.    By this point, Hazim knew he was the victim of a concerted effort to smear his name by falsely linking him and his company to terrorism.  He believed he was being targeted by a rival commodity trading firm.  However, he could not have imagined the scope or scale of the scheme against him.  Never in his wildest dreams would he have believed that he was at the center of a massive conspiracy masterminded by the UAE and its top officials who were colluding with a private investigative firm and its network of sources, journalists, and academics to spread false claims and destroy Hazim's business and reputation.

140.    In spring and summer 2018, Hazim tried to clear his name and identify the parties responsible for originating the false statements about him.  Hazim retained the U.K. law firm Carter-Ruck and sent legal letters to some of the outlets that had published false and defamatory statements about him demanding that they retract the statements and provide him with information about the parties responsible for writing them.  For example, on May 28 and again on May 30, 2018, Hazim sent an email to the contact email address (contact@mediapart.fr) for the French blogging website Mediapart regarding an article published on Mediapart titled, "Lord Energy SA: The Financial Networks of the Muslim Brotherhood in Switzerland Persist."  Hazim notified Mediapart that the article "contained misinformation," and he demanded that Mediapart "remove" the article and "furnish [him] with the details as to the person who has written such article, with strong defamatory connotations against our company."  Mediapart refused.

141.    Carter-Ruck, on Hazim's behalf, also sent similar retraction demand letters to Africa Intelligence, *Le Temps*, WordPress, and other websites.

142.    When Alp realized that Hazim was taking affirmative steps to try to counter the enterprise's disinformation campaign, Alp intensified its efforts.  In an "Urgent Update" to the UAE on June 6, 2018, Alp wrote that Cater-Ruck and Hazim were successful in removing two online articles; however, Alp planned to "re-publish them somewhere else in the coming days."  Alp also warned that Hazim was "likely to launch legal procedures in the UK," but Alp was unconcerned because its "work remain[ed] strictly confidential."

143.    Alp bragged that "following our viral communication, [Lord Energy] is having serious problems with Western banks to receive credits.  It has apparently be[en] put on a watchlist used by banks.  Banks are concerned about its connections to radical islamists."  Alp concluded: "This is all good news: it seems that our viral actions are working 1) Lord Energy is facing serious problems for its business operations and 2) it is going viral, with new people focusing on the company."

144.    In early June 2018, Alp published a French-language Wikipedia entry on Lord Energy which included a "controversies" section falsely accusing the company and its employees of terrorist ties.  Specifically, the entry stated that Hazim's father was the "shadow ambassador of the Muslim Brotherhood"; Himmat's student organization FENYSO was "considered close to the Muslim Brotherhood"; Lord Energy had "ties to the movement of the Muslim Brotherhood"; Davide Piccardo was an "Italian Islamist"; and Fatima Imama was "associated with US and UN sanctioned companies."  The entry cited Besson's January 5, 2018 article in *Le Temps* and other articles concocted by Alp.

145.     Hazim sought to have the Wikipedia page corrected and found himself in an "edit war" because Alp had a Wikipedia editor named Bédévore on its payroll.  Bédévore rebuffed Hazim's attempts to correct the article.  When Hazim attempted to edit the Wikipedia page by removing the false information and adding a section explaining that Lord Energy is pursuing legal action against the various media outlets responsible for publishing false claims about him, Bédévore rejected Hazim's revisions and sent him a Wikipedia message asking him for proof of legal action.

146.     Hazim informed Bédévore that Lord Energy engaged a defamation law firm to bring legal action against *Le Temps*, Africa Intelligence, and Mediapart.  Hazim noted that Besson had revised his *Le Temps* article, and Hazim was negotiating with Africa Intelligence to have its article corrected.  Hazim also pointed out that certain propositions in the Wikipedia article were not supported by the sources cited.  None of that mattered.

147.     In another "strictly confidential" "Urgent update" to the UAE on June 13, 2018, Alp wrote that "the French Wikipedia page for Lord Energy was attacked eight times by a user … [who] tried to remove all the critical content we created."  But Alp "quickly reacted" by blocking the user, and "requested assistance of friendly moderators" (i.e., Bédévore) "who countered the repeated attacks."  Alp reassured the UAE that, although Hazim made additional "attempts to remove the critical content," Alp and Bédévore were able to "put back the information."

148.     Alp reiterated that its "objective remains to paralyze" Lord Energy and outlined its plan to do so, including by creating new Lord Energy Wikipedia articles in English and Italian, creating Wikipedia articles for Hazim and Himmat, and "inform[ing] [Lord Energy's] bank, Crédit Suisse, and compliance databases about the risks of working with Lord Energy."

149.    To further mitigate the harm the enterprise's smear campaign was causing, Hazim

sent emails between June 13 and 22, 2018, to several of the financial institutions Lord Energy

borrowed from, as well as some of Lord Energy's counterparties and business partners, attaching

a letter and supporting documentation to refute the enterprise's lies.  Hazim sent this information

to UBS, Exxon Mobile, ING, Mare Shipping, Natixis, Swiss Card, BRS Shipbrokers, GS Caltex,

and Litasco.  He also sent the letter and supporting documentation to Julia Payne, the Reuters

journalist who had written favorably about Lord Energy just weeks before.

150.    In his letter, Hazim explained that: "[a] recent effort to smear and defame our

company … has been undergoing, trying to undermine our work and growing presence in the oil

market."  He noted that, as part of a "concerted effort," "[r]ecent articles have attacked [Lord

Energy's] employees, with particular attention to the Muslim ones."  Hazim, assuming a rival

trading firm was responsible, wrote that it was "disturbing to see … facts being twisted by [Lord

Energy's] competition and foes to try to force us out of the market after the growth and success

we have had with the hard work we have done."

### The Enterprise Bankrupts Hazim and his Companies.

151.    Hazim's efforts to refute the enterprise's false allegations were not enough.  The

enterprise countered Hazim's actions by continuing to bombard the internet with articles touting

the untrue narrative the enterprise had concocted that Hazim and Lord Energy had ties to terrorism.

152.    On June 4, 2018, the enterprise published an article titled "Lord Energy SA: The

Muslim Brotherhood has its own trading company" on Tumblr, a blogging and social networking

site headquartered in New York.  The article falsely asserted, among other things, that Hazim

"continues to support the network" and that "Lord Energy is a front for Muslim Brotherhood

funding through the sale of crude oil from North Africa."

153.   On June 6, 2018, the enterprise published an article titled "Lord Energy: the mysterious company linking Al-Qaeda and the Muslim Brotherhood" on WordPress, another U.S.-based blogging website.

154.   On June 7, 2018, the enterprise published an article titled "Why the next series of Homeland should play in Lugano and include Lord Energy" on Live Journal, a Russian-owned website with an office in California.  The article falsely asserted, among other things, that Lord Energy's "profits go to an organization deeply ingrained in the Muslim Brotherhood, with old ties to Al-Qaida.  Unsurprisingly, Swiss intelligence agency was said to be investigating its activities." The article attributed the information to Besson, stating he is "one of the world's more authoritative experts on radical Islamism."

155.   On June 8, 2018, Alp published an article titled "Reuters misses major terrorism link in oil coverage: the true story of Swiss Lord Energy trading company" on WordPress.

156.   On June 30, 2018, Alp published the sponsored article it had commissioned May to write earlier that month titled "Compliance: Muslim Brotherhood trading company Lord Energy linked to Crédit Suisse" on Medium, which is headquartered in San Francisco, California.  The article falsely claimed that Lord Energy was "apparently being monitored by the Swiss intelligence agency" and called into question Crédit Suisse's compliance with U.S. laws, stating "Lord Energy, a Swiss company with strong ties to the Muslim Brotherhood and al Qaeda sympathizers holds substantial assets at bank Crédit Suisse, raising questions about compliance and corporate governance at the banking giant. … While Crédit Suisse already had to pay $536 million to settle changes it violated [U.S.] sanctions on Iran, these revelations on Lord Energy could put the bank in trouble with the [U.S.] Treasury Department."

157.   The enterprise continued to publish additional articles throughout the summer and fall in 2018.  On August 22, 2018, for example, the enterprise had an article that was written by Nina May under the pseudonym "Farrah Ahmed" published on Medium.  The article, which was titled "How the European Union funds the Muslim Brotherhood's youth organization FEMYSO," falsely accused Lord Energy of being "a new financing vehicle for the Muslim Brotherhood."  On September 3, 2018, the enterprise had another article written by Nina May published on WordPress.  It was titled "KYC: Trading company Lord Energy linked to the Muslim Brotherhood."

158.   The enterprise also sought to defraud mainstream journalists, including in the United States, and induce them to repeat and republish the lies the enterprise concocted about Hazim and Lord Energy.  Between June 7 and June 19, 2018, Alp used a secure, encrypted Protonmail account under the pseudonym "Yvan Doucet" to send 12 emails with the subject line "Lord Energy SA – terrorism financing (confidential)" to reporters from the U.S.-based media outlets *Bloomberg* and *Axios* and the U.K.-based media outlets *The Sunday Times*, *The Observer*, *The Guardian*, *Financial Times*, *The Sun*—which is ultimately owned by the U.S.-based media company News Corp.—and *The Times*.

159.   On June 8, 2018, Alp sent the same email to Platts, one of the preeminent crude oil price reporting agencies, which is owned by S&P Global, and on June 7 and June 19, 2018, Alp sent the same email to Reuters reporter Julia Payne.

160.   The body of the email that Alp widely disseminated to U.S. and U.K.-based media outlets and a major crude oil price reporting agency contained links to several of the enterprise's prior planted articles.  The email also noted that, "[a]s a result of the article of Le Temps"—an

article which the enterprise instructed and paid for Besson to write—"Lord Energy has apparently been blacklisted by banks (under counter terrorism financing regulations)."

161.    The enterprise also drafted and submitted to Wikipedia English-language and Italian-language Wikipedia entries falsely accusing Hazim and Lord Energy of being involved with the Muslim Brotherhood and terrorist financing.  On July 6, 2018, Alp employee Raihane Hassaine emailed a draft of the French-language Wikipedia entry about Hazim to Badal, Brero, and other Alp employees for approval.  Of course, this draft entry cited to the other articles the enterprise previously commissioned, including Besson's January 5, 2018 article in *Le Temps*.

162.    The English and French Wikipedia entries falsely claimed that: "Hazim Nada … who was described as 'the shadow ambassador of the Muslim Brotherhood' by the Swiss newspaper *Le Temps*, founded Lord Energy SA," and "[a]ccording to an article in the newspaper *Le Temps*, historical networks of the Muslim Brotherhood have reappeared in Switzerland through the trading company Lord Energy.  While Lord energy denies any links to the Muslim Brotherhood, *Le Temps* noted that several of its managers were Islamist militants close to the Muslim Brotherhood."

163.    To add a thin veneer of legitimacy to these spurious claims, the Wikipedia entries also quoted Lorenzo Vidino.  They said, "According to Dr. Lorenzo G. Vidino, it is challenging to identify members of the Muslim Brotherhood as there is 'a conscious effort by the Western Brothers to downplay or even deny their ideological links to the Muslim Brotherhood', before adding that FEMYSO should be considered a 'transnational Brotherhood initiative and organization.'"

***The UAE and its Officials Remain in Close Contact with Alp, Brero, and Badal Regarding the Status and Impact of the Enterprise's Operations Against Hazim and Lord Energy.***

164.    Throughout 2018 and 2019, Alp routinely communicated with the UAE and its officials and kept them apprised of the status and impact of the enterprise's operations against Hazim, Lord Energy, and other targets through regular "Summary Reports," "Action Plans," And "Impact Assessments."  Alp also created "Press Reviews" listing the dozens of articles that Alp had planted, including numerous articles about Hazim and Lord Energy.

165.    As one example, Alp prepared and, on information and belief, sent to the UAE a "Summary Report – Impact Assessment" on July 23, 2018, that described the enterprise's "viral communication and discreet lobbying operations on 10 key targets," including Lord Energy.

166.    With respect to Lord Energy specifically, the report noted that "[w]ith our actions, Lord Energy is today publicly exposed as a controversial Muslim Brotherhood company with ties to terrorism financing and opaque activities.  Our Wikipedia page disclosed the various links between the firm's executives and Al-Qaeda related individuals and entities."  Even though "Lord Energy reacted furiously to the French Wikipedia page," Alp "won" the "battle."



167.    Alp boasted how, "through intense discreet lobbying over a period of two months," it was "able to add the names of Lord Energy, Youssef Himmat and Hazim Nada on the world's most influential compliance database World-Check" under the "'terrorism' category."  According

to Alp's sources, "while Lord Energy was expected to increase its operations and revenues, it is now facing serious problems due to these embarrassing and damaging revelations."



168.    Not only did Alp seek to disrupt Lord Energy's relationships with financial institutions by fraudulently inducing World-Check to add Lord Energy, Hazim, and Himmat to its database under the terrorism risk category, but Alp also "contacted [Crédit Suisse] through the profile of a 'freelance journalist', investigating Lord Energy" to "put pressure on the bank and close the accounts of the company."  Alp commented that its sources "later told [it] that Lord Energy's accounts were 'blocked by banks.'"



169.    The report also identified seven "new case studies" for the enterprise to target in "the next phase" of its disinformation scheme.  Alp noted that "[a]s always, all our actions were made strictly confidential and we remained invisible."

170.    In an August 6, 2018 "Summary Report – Impact Assessment," Alp also explained to the UAE how it "used social media and SEO techniques ('Search engine optimization') to boost visibility for our actions," and as a result, several of the articles the enterprise fabricated were "visible" on the first three pages of "Google USA."



171.    And Alp's "intervention also permitted to link the Muslim brotherhood to the company by automatically proposing a related result on Google when 'Lord Energy' is typed."



172.    In a similar update, which on information and belief, Alp sent via email to the UAE and some of its officials on November 6, 2018, Alp boasted that "[f]ollowing our latest actions, Google now directly associates Lord Energy with terrorism, and Hazim Nada with the [Muslim Brotherhood].   Importantly, both Lord Energy and Hazim Nada have launched counter-attacks: they now publish fake positive articles in a desperate attempt to 'clean' their online reputations, which we have countered with additional negative articles."



173.    Matar was Alp's main point of contact.  Brero and Badal frequently communicated with Matar via telephone, WhatsApp messages, and emails.   Alp's primary method of communicating with Matar and other UAE officials was through secure, encrypted Protonmail email accounts.  Alp used the account, "487563@protonmail.com" and Matar used the account,

"547321@protonmail.com."  The parties rarely referred to each other by name, instead greeting one another as "My Friend" or "Dear Friend."  These were obvious security measures meant to ensure that the enterprise's unlawful activities remained concealed, and the identities of the culpable parties remained confidential.

174.    Brero, Cavin, Badal, and other Alp employees also repeatedly met in person with Matar, M.B.Z., and other UAE officials.  On July 4, 2018, Brero had a telephone call with Matar to provide status updates.  Matar told Brero that Brero's team had done an "excellent job so far" and that "everyone is appreciate[ive] of what you've done so far."  Matar also informed Brero that Matar "told His Excellency" about the "action plan."  Matar mentioned that he was not sure if "they" would visit Brero or ask Brero to meet them in Abu Dhabi.

175.    On July 23, 2018, Matar had another telephone call with Brero and Badal, during which Matar informed them that he "did talk to His Excellency and … he's very pleased to meet you there next week."

176.    According to Alp's internal meeting minutes, on August 9 and 10, 2018, Brero and another Alp employee met in Zurich with Matar and another UAE official.  During that meeting, Matar informed the Alp representatives that he was "very pleased with the results of [Alp's] work so far."  Matar and the other official said that, "in terms of Alp's proposal," they "did not have the opportunity to discuss it with the 'big boss'"—presumably M.B.Z.—but "they will do so and keep Alp informed."  They told Brero and the other Alp employee to "continue with new cases trying to achieve the same impact as with Lord Energy (World Check, attach on Wikipedia, hiring UK lawyers …)."  Matar and the other official suggested that "the next big targets could be FEMYSO and other MB organizations in the EU – Alp needs to find additional evidence."  In a list of action items, "Matar/Ali" were to "send Alp info on Obama's 6 advisors linked to MB (CNN report)."

Matar and the other official also indicated they would provide Alp with a "safe (Katim) phone to communicate together."

### The Enterprise's Smear Campaign Disrupts
### Lord Energy's Business and Banking Relationships.

177.    The enterprise's campaign to "continue to critically reshape the reputation of [its] initial targets" was successful and destroyed both Hazim and Lord Energy.  As a result of the enterprise's efforts, various financial institutions and business partners ended their existing relationships with Lord Energy—some of which had begun decades earlier—and others refused to start new business dealings with Lord Energy.

178.    In July 2018, Exxon Mobil and Litasco—two companies with which Lord Energy had been doing business for years—required Hazim to provide information for their internal and compliance reviews regarding "trading with Lord Energy."  Exxon Mobil temporarily stopped doing business with Lord Energy while it conducted a compliance review.  Litasco stopped working with Lord Energy altogether.

179.    By mid-November 2018, Société Générale, Natixis, and BCP Bank also refused to work with Lord Energy.  BCP explained to Lord Energy that, while its compliance department "ha[d] no problem with [Hazim's] [f]ather (cleared by the US)," it did "not feel comfortable with [Himmat], [Piccardo], and Fatima"—three Muslim Lord Energy employees the enterprise had falsely identified as having ties to the Muslim Brotherhood, al Qaeda, or both.

180.    As the enterprise repeatedly acknowledged, it had specifically targeted and sought to disrupt Lord Energy's relationship with Crédit Suisse.  Not only did it have an article published on Medium in June 2018 falsely claiming that Lord Energy had "strong ties to the Muslim Brotherhood and al Qaeda sympathizers," which "rais[ed] questions about compliance and corporate governance at" Crédit Suisse, but the enterprise also used an alias to contact Crédit

Suisse directly and put pressure on the bank to end its relationship with Lord Energy. These efforts were ultimately successful. In December 2018, Crédit Suisse stopped supporting Lord Energy's trading positions, and in February 2019, it formally closed Lord Energy's accounts at the bank.

181.    Over the next several months, other banks and financial institutions ended their relationships with Hazim and Lord Energy or declined to enter into new relationships. On January 16, 2019, a Swiss credit card company—Swiss Card—terminated Lord Energy's account.

182.    On January 25, 2019, UBS informed Hazim and Himmat that "[a]fter intensive and exceptionally long discussions with our compliance and due diligence teams, it has been [] decided by our firm that we won't be in a position to help you with the financing of your business activity."

183.    On February 8, 2019, UBS informed Hazim that it would also be closing his personal bank account, which he had held for more than 27 years, along with the personal bank accounts of Hazim's mother and brother.

184.    On April 17, 2019, Macquarie terminated the "Futures Trading and Clearing Agreement" with Lord Energy that had been in place since 2014. And on December 2, 2020, Macquarie declined to enter into a new business relationship with Hazim because it "had no appetite to proceed further with the opportunity" given the enterprise's false allegations about Hazim and Lord Energy.

### *Because of the Harm Caused by the Enterprise's Smear Campaign, Lord Energy Closes its US Subsidiary and Declares Bankruptcy.*

185.    Once banks stopped lending to Lord Energy, its days were numbered. Given the incredibly high costs associated with purchasing crude oil cargoes, access to credit was essential. Without credit, Lord Energy could not operate.

186.    It did not take long for Lord Energy's business to fall apart. As of October 2018, Lord Energy was valued at about $150 million. It had about $60 million in cash on hand. And its

fixed assets were worth about $9 million.  By April 2019—only six months later—Lord Energy was over-indebted by about $80 million.

187.    In a last-ditch attempt to save his company, in December 2018, Hazim orchestrated a complex transaction in which Americas Lord Energy Inc. loaded a series of cargoes purchased from U.S. oil producers and transshipped them in the U.S. Gulf onto a VLCC.  The trade had a flat price optionality that required Americas Lord Energy Inc. to keep a long term paper position to monetize.  However, at the end of the month, Crédit Suisse closed Lord Energy's paper position. On information and belief, Crédit Suisse's decision was not made based on market risk considerations, but rather because Crédit Suisse feared that holding the position would make the bank appear to be supporting the Muslim Brotherhood.  The question of whether to close Lord Energy's position went all the way to Crédit Suisse's CEO at the time, Tidjane Thiam.  At one point, the position had lost about $65 million.  This loss was the death knell for Lord Energy.  The enterprise's scheme to fraudulently induce Crédit Suisse to stop lending to Lord Energy worked, and it accomplished the enterprise's objective of destroying Lord Energy.

188.    Lord Energy dissolved its U.S. subsidiary, Americas Lord Energy Inc., in April 2019.  Later that month, Lord Energy, SA filed for bankruptcy protection in Switzerland.

189.    As a direct result of the enterprise's unlawful scheme, Hazim suffered actual economic losses of about $150 million (i.e., the difference in the valuation of Lord Energy—which Hazim owned entirely—before the effects of the smear campaign kicked in and its valuation after the smear campaign had bankrupted it).  Prior to the damaging effects of enterprise's smear campaign, Lord Energy was a valuable asset for Hazim that he could have sold for about $150 million, but as a result of the smear campaign, that asset became worthless.

190.    Separately, Lord Energy incurred actual economic losses of about $149 million, as its balance sheet went from positive $69 million in cash on hand and fixed assets to negative $80 million in the blink of an eye once banks stopped lending to Lord Energy and counterparties stopped trading with it, all because of the false accusations that the enterprise concocted about how Hazim and Lord Energy were involved in financing terrorism and the Muslim Brotherhood.

191.    Hazim and Lord Energy have also lost substantial profit over the past nearly five years as a result of being forced out of business in early 2019 by the enterprise's unlawful conduct. Notably, 2019-2023 were banner years for the oil industry.  At the end of 2022, for example, Bloomberg reported a "Windfall for Vitol," a "Monster Year" for Trafigura, and "record" profitability for Glencore.







192.    From 2019-2022,[10] other oil trading firms with which Lord Energy competed—such as Vitol, Trafigura, and Glencore—made an average of 3.2 times their average annual profits from 2016-2018.  Lord Energy's average annual profit from 2016-2018 was about $16.8 million.  Multiplying that by the average industry-wide increase in profits during the 2019-2023 oil boom

---

[10] Sufficient data for 2023 has not yet been reported.

and the number of years Lord Energy has been unable to operate equals about $268.75 million in lost profits.

193.    Despite the damage that its smear campaign had already caused, the enterprise still continued to spread its lies about Lord Energy.  In May 2019, Alp hired Mariela Geier of G5 Integritas International, a private investigative firm in Miami, Florida, to perform a background check and "due diligence" on Americas Lord Energy Inc.

194.    In an update to Matar on June 19, 2019, Alp explained that it published an article in the Swiss financial blog *Inside Paradeplantz* titled "CS suffers millions worth of losses with risky Muslim traders."  Alp bragged that the blog "also published our comments about possible US sanctions against the bank."  Alp also proudly informed Matar of its success in destroying Americas Lord Energy Inc.:



195.    On July 23, 2019, the enterprise had another online article published about Lord Energy by Africa Intelligence titled, "Lord Energy's troubles far from over," the article claimed that "[w]hile its former operations in Algeria are being dissected by the new power, Lord Energy is being targeted by new creditors."  The article noted that a shipping company had enlisted a Swiss

lawyer to recover unpaid sums owed by Lord Energy, and Lord Energy had fallen behind payments on loans taken out with Crédit Suisse and closed its "Texan branch."

196.     The harm that the enterprise's false accusations have caused to Hazim and Lord Energy persist to this day.  As recently as March 2023, the "Know Your Customer" diligence department of Element Alpha—another oil trading firm—responded to a due diligence request relating to doing business with Lord Energy: "You mean these guys: I mean there have been worrying allegations of some employees being linked to the Muslim Brotherhood … Happy to start KYC, but this will require careful due diligence."

### *Lord Energy's Bankruptcy Has a Direct Effect in the United States.*

197.     The enterprise's efforts to drive Lord Energy out of the spot market for light crude oil had a substantial impact on U.S. commerce.  When the enterprise fraudulently induced Sonatrach to stop selling Lord Energy cargoes of Saharan Blend, that did not just impact the price of Murban in Asia.  It also impacted the price for WTI on the spot market.  WTI, Murban, and Saharan Blend are all viewed as equivalent blends of light crude oil by refineries in Asia.  So, impacting the supply of one blend impacts the price for all three.  Cutting off the supply of Saharan Blend substantially affected the spot market for WTI, which is produced in the United States, as well as Murban.

198.     More to the point, Americas Lord Energy Inc. was established precisely so Lord Energy could increase its exports of WTI.  Americas Lord Energy Inc. was a participant in the market for U.S.-produced WTI, and when it was dissolved that directly affected a major U.S. oil market.

199.     Additionally, every one of Lord Energy's trades were U.S. dollar denominated.  All U.S. dollar denominated trades must be cleared by U.S. financial institutions.  In Lord Energy's case, virtually all its trades were cleared by the New York branch of J.P. Morgan Chase.  When

Lord Energy was forced to declare bankruptcy and stop operating, it had a substantial impact on U.S. banks.

200.    Finally, when Lord Energy filed for bankruptcy in Switzerland, many of its priority creditors were U.S. entities.  They included Texas-based entities AMSPEC LLC, Lightering LLC, and Valls Ship Agencies, LP.  The enterprise's false and misleading smear campaign, which bankrupted Lord Energy and Americas Lord Energy Inc., also impacted U.S. commerce by preventing Lord Energy from continuing to do business with these, and other, U.S. entities, and forcing these U.S. entities to seek to recover debts owed to them by Lord Energy through Swiss bankruptcy proceedings.

### Despite His Best Efforts, Hazim Is Unable to Determine Who Was Behind the Smear Campaign that Destroyed His Company.

201.    Once Hazim realized he was the victim of a concerted disinformation campaign, he did everything he could to ascertain who was responsible.  He believed it was a rival commodity trading firm.

202.    He demanded that the media outlets responsible for publishing false accusations about him disclose their sources, and he demanded that World-Check provide him information about the researchers that had him designated.  They all refused.

203.    The enterprise's robust operational security measures stymied Hazim's efforts to identify the true parties responsible for the smear campaign against him.  All the members of the conspiracy took affirmative steps to conceal their involvement.  As just some examples, they used Protonmail accounts, which are end-to-end encrypted; they used aliases and pseudonyms to disguise their true identities; and they instructed their co-conspirators to delete emails after reading them.

204.    In 2020, Alp submitted a "five-year action plan" to the UAE, in which Alp

recognized the enterprise would "face a growing pressure to leave no traces, as we have managed

to do so far.  This will further require us to take all the appropriate measures to remain our identity

unknown – in terms of discreet contacts with the press, our viral campaigns, growing risks of

physical surveillance …."  This was consistent with Alp's routine reassurances to the UAE that

the enterprise's actions would always be "made strictly confidential" and "remain[] invisible."

205.    In June 2018, Hazim reported the defamatory campaign against him and his

companies to Swiss law enforcement.  After a perfunctory "investigation," Hazim met with a Swiss

police officer in February 2020 who explained to Hazim that he and the prosecutor were closing

the investigation, supposedly because of lack of evidence.  During their meeting, the officer left

the room where he and Hazim had been meeting, and the case file was strewn on the table in front

of Hazim.  While the officer was away, Hazim shuffled through the file and found requests for

records about Lord Energy by a Geneva-based investigative firm—Alp.  This was the first time

Hazim had ever heard of Alp.  At the time, Hazim did not know whether Alp was involved in the

smear campaign against him or just collecting information for due diligence purposes by a crude

oil market participant.

206.    Nevertheless, anxious for answers, in late February 2020, Hazim emailed the

general "contact us" email address listed on Alp's website.  Hazim alleged in his email that Alp

was responsible for the actions against him and his companies.  Hazim wrote to Alp that it had

engaged in "acts of fraud and prank calling to obtain private information regarding [Lord Energy]."

He offered to resolve the matter "amicably."

207.    Upon receipt of this email from Hazim, Alp immediately sent an update to Matar

informing him of Hazim's email.  Alp wrote that, "Of course, we are not planning to reply.  We

expect that he will escalate the matter and perhaps launch legal actions against us. We are ready to confront him. Let's talk rapidly to agree on a strategy and next steps."

208. True to its word, Alp never replied to Hazim. In early 2021, Hazim emailed the Alp general "contact us" email address again. And again, Alp did not respond.

### *Hackers Steal Documents from Alp's Internal Servers, and Hazim Learns the Truth.*

209. In April 2021, Hazim received a message from an encrypted French phone number he did not recognize. The sender wrote that he represented a group of hackers who had infiltrated Alp's servers. He sent Hazim a copy of the message that Hazim had sent to Alp's "contact us" email address as proof that the hackers were legitimate.

210. The hackers also allowed Hazim to review the internal Alp documents they had obtained, but they prevented him from downloading or saving any of the files. Hazim was shocked at what he read. The documents included emails among the enterprise and its co-conspirators directing operatives to publish articles linking Hazim and Lord Energy to terrorism. With these documents, Hazim was finally able to appreciate the enormity of the conspiracy against him. In a way, he was right that a competitor was responsible for the smear campaign against him. But that competitor was not a rival commodity trading firm as he suspected. It was the UAE, its top officials, and its state-owned oil company.

211. The hackers offered to sell the Alp files to Hazim for $30 million in cryptocurrency. Hazim responded that he was unable—and unwilling—to pay $30 million for the hacked files.

212. Hazim reported the hackers' communications to Swiss authorities, and a Swiss intelligence officer met with Hazim and took photos of the hackers' encrypted messages. Hazim heard nothing from the Swiss authorities for months after that. Eventually, however, the authorities obtained copies of the hacked documents that they shared with Hazim.

### *The Documents Expose the Enterprise's Long-Running, Wide-Ranging Conspiracy.*

213.   The scope and scale of the enterprise's overarching conspiracy was brazen and daunting.  The hacked documents revealed that Hazim was far from the enterprise's only target. According to the documents, the enterprise targeted more than 50 individuals and entities, using the same "viral communication" and "discreet lobbying" tactics they employed against Hazim.

214.   The enterprise's other targets included numerous other U.S. citizens and entities. For example, on May 3, 2018, Badal instructed Mariela Geier of G5 Integritas International—the private investigative firm in Florida that Alp tasked to compile background reports on Americas Lord Energy Inc.—to conduct a "solid background check" on a high-profile journalist, who lived in the United States, was a U.S. citizen, and worked for the prominent U.S. media outlet *Buzzfeed*. The enterprise also hired another private investigator, Ian Withers of Priority International Limited, to gather information from U.S. sources on this American journalist.  Badal was particularly interested in "any red flags, rumors or negative information" and "any links with security services or foreign governments" the investigators could uncover.

215.   On May 7, 2018, Badal sent Matar a "preliminary report" on the American journalist, noting that Alp was "still waiting [for] additional information from human sources and more details on" the journalist's spouse.  Alp subsequently prepared an additional research memo on his spouse and daughter.

216.   The enterprise used Geier to investigate other potential targets in the United States, including an Argentinian economist who lived in McLean, Virginia.  On October 10, 2019, Alp prepared and, on information and belief, sent to the UAE a 30-page "confidential report" on this U.S.-based economist.

217.   The enterprise also prepared an in-depth report about a U.S. citizen who founded the U.S.-based company Global Risk Advisors ("GRA").  On January 8, 2020, Badal emailed

Pierre Gastineau of *Intelligence Online* informing him of a civil lawsuit against GRA and its founder. Badal told Gastineau that "according to [Alp's] sources," GRA's founder "always seemed pretty close to the CIA." A week later, on January 15, 2018, *Intelligence Online* published an article about GRA and its founder.

218.  That same day, Alp emailed Matar to inform him about the article. Alp wrote, "As agreed, we informed our contact at Intelligence Online about the new US federal complaint … against Global Risk Advisors and [its founder]. Good news, they wrote an article about it today (please find attached). As a result of the complaint, they also wrote about Q's new US lobbyist (please also find attached)."

219.  These were not the only other American individuals and entities the enterprise targeted. It also conducted disinformation operations against George Soros's Open Society Foundation. In a March 7, 2019 Summary Report, Alp accused Soros of "funding several Muslim Brotherhood-related organizations in Europe." Alp claimed that, while Soros's alleged connection to the Muslim Brotherhood had "been mentioned … in the USA, the situation in Europe is not so well known." "As such," Alp wrote, "we started revealing the situation in the European continent."

220.  The enterprise also had its co-conspirators publish an article on Medium on January 13, 2019, titled "How George Soros funds the Muslim Brotherhood in Europe." The enterprise then used search engine optimization techniques to ensure the article appeared at the top of Google search results for "George Soros and the Muslim Brotherhood."



221.    These are just some the many victims targeted by the enterprise's disinformation campaign.   The hacked documents suggest that, between 2017 and April 2021—when the documents were obtained—the enterprise conducted operations targeting more than 50 individuals and entities.

222.    The enterprise continued to operate for years after it bankrupted Lord Energy in 2019.   Indeed, it may still be operating today.   On January 18, 2020, Alp prepared, and on information and belief, sent to the UAE a new "strictly confidential" action plan for 2020-2025. Alp wrote, "Thank you for renewing your trust with us.  We are ready to start the new five year Action Plan" which would follow the enterprise's tried and true strategy combining "media attacks" with actions to "influence decision makers," including "politicians, compliance databases,

banks" and "the public." Alp proposed a budget of 2.4 million Euros for the first year of the new five-year plan.

### COUNT ONE
#### Violations of the Lanham Act, 15 U.S.C § 1125(a)(1)(B)
#### *(Against the UAE, ADNOC, M.B.Z., Matar, Alp, Brero,*
#### *Cavin, Badal, and some of John Doe Nos. 1–25)*

223.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth fully herein.

224.    Beginning in May 2017, the UAE, ADNOC, M.B.Z., Matar, Alp, Brero, Cavin, Badal, and some of John Doe Nos. 1–25—working jointly and in concert with journalists, Wikipedia moderators, academics, private investigators, and others—arranged for false and deceptive advertising to be distributed in international and interstate commerce via the internet to Plaintiffs' current and prospective creditors, customers, counterparties, business partners, and a global internet audience. Typically, this false and deceptive advertising took the form of articles and blog posts published online. Although these appeared to be legitimate editorial pieces, they were in fact sponsored content commissioned, written, and published for the express purpose of damaging the business and reputation of one of the UAE and ADNOC's commercial competitors.

225.    The UAE, ADNOC, M.B.Z., Matar, Alp, Brero, Cavin, Badal, and some of John Doe Nos. 1–25 directed those false and misleading advertisements to Plaintiffs' consumers, counterparties, business partners, compliance and risk monitors, lenders, and the public.

226.    The advertisements contain false claims about Hazim and Lord Energy, including but not limited to the following:

        (a)    On December 5, 2017, the enterprise published an article online on the website Africa Intelligence falsely claiming that Algeria had blocked a Lord Energy oil tanker over concerns about the "waterproofness" of the vessel, and that Hazim's father was "alleged to have financed terrorism."

(b)     On January 5, 2018, the enterprise had an article written by Besson published online by *Le Temps* titled "Swiss secret services targeting pro-Qatar Islamists."   The article strongly and falsely implied that Swiss authorities were investigating Lord Energy.   It also falsely claimed that there were "traces" of "historical [Muslim Brotherhood] networks" at Lord Energy that "has sometimes kept some militant activities."

(c)     On May 15, 2018, the enterprise commissioned freelance writer Nina May to write an article that falsely accused Lord Energy of being "linked to US designated terror-entities."   On information and belief, this sponsored content was published online.

(d)     On May 15, 2018, the enterprise commissioned May to write a separate article that falsely accused Lord Energy of "linking Al-Qaeda and the Muslim Brotherhood."  The enterprise published this sponsored content on WordPress on June 6, 2018.

(e)     On May 15, 2018, the enterprise commissioned May to write a third article that falsely accused Lord Energy of being the Muslim Brotherhood's "own Swiss trading company" that falsely claimed that Hazim "continues to support the network" and "Lord Energy is a front for Muslim Brotherhood funding through the sale of crude oil from North Africa."  The enterprise published this sponsored content on Tumblr on June 4, 2018.

(f)     On or around May 31, 2018, the enterprise commissioned May to write and publish an article titled "Reuters misses major terrorism link in oil coverage: the true story of Swiss Lord Energy," which falsely claimed that Hazim "took over" his father's business and "[t]he connections of Lord Energy to the Brotherhood—and to radical Islam and financiers—are substantial."  The enterprise published this sponsored content on WordPress on June 8, 2018.

(g)     In early June 2018, the enterprise published a French-language Wikipedia entry on Lord Energy that cited the January 5, 2018 *Le Temps* article the enterprise had previously commissioned and falsely accused Lord Energy of terrorist ties.

(h)     On June 7, 2018, the enterprise published an article titled "Why the next series of Homeland should play in Lugano and include Lord Energy" on Live Journal.  The article falsely claimed that Lord Energy's "profits go to an organization deeply ingrained in the Muslim Brotherhood, with old ties to Al-Qaida" and a "Swiss intelligence agency was said to be investigating its activities."

(i)     On June 30, 2018, the enterprise published an article it had commissioned titled "Compliance: Muslim Brotherhood trading company Lord Energy linked to Crédit Suisse."  This sponsored content was published on Medium,

and the article falsely claimed that Lord Energy was "apparently being monitored by the Swiss intelligence agency" and had "strong ties to the Muslim Brotherhood and al Qaeda sympathizers."  The article also stated that "Lord Energy could put [Crédit Suisse] in trouble with the [U.S.] Treasury Department."

(j)    On or around July 6, 2018, the enterprise submitted English and Italian-language Wikipedia entries that falsely claimed that: Hazim was "'the shadow ambassador of the Muslim Brotherhood,'" "historical networks of the Muslim Brotherhood have reappeared in Switzerland through the trading company Lord Energy," and several Lord Energy managers "were Islamist militants close to the Muslim Brotherhood."

(k)    On August 22, 2018, the enterprise published an article it commissioned Nina May to write titled "How the European Union funds the Muslim Brotherhood's youth organization FEMYSO."  This sponsored content was published on Medium and falsely accused Lord Energy of being "a new financing vehicle for the Muslim Brotherhood."

(l)    On September 3, 2018, the enterprise published on WordPress another article it commissioned May to write that falsely accused Lord Energy of being "linked to the Muslim Brotherhood."

227.    These claims are false because they conflict with reality in several ways, as set forth above.

228.    Defendants were motivated to make these false claims because they were in commercial competition with Hazim and Lord Energy.  The articles that the enterprise concocted and commissioned constituted advertising and promotion because they were paid-for, sponsored content intended to boost ADNOC's spot-market sales and the price it could demand for Murban by disparaging Lord Energy.  The enterprise's sham accusations that Hazim and Lord Energy were involved in terrorist financing were meant to—and did—eliminate a commercial competitor by causing banks and financial institutions to stop lending to Hazim and Lord Energy and causing other industry participants to stop doing business with Hazim and Lord Energy.

229.    Defendants' advertising and promotion was made in the United States.  Several of the relevant false and misleading statements were published directly on U.S. websites including,

Medium, WordPress, Tumblr, and Wikipedia. Other false and misleading statements were published on foreign websites, such as *Le Temps*, and sent via email to U.S. journalists, price reporting agencies, and bank risk monitors. Defendants also manipulated results on U.S. search engines such as Google, Yahoo!, and Bing so that the enterprise's false and misleading advertising appeared on the first pages of these search engines.

230.    These false claims had the tendency to deceive a substantial segment of the target audience, Defendants intended that they deceive the target audience, and they did deceive the target audience. In fact, Alp routinely boasted that, as a result of its "viral actions" and "viral communications" Lord Energy was "facing serious problems for its business operations" and was "going viral, with new people focusing on the company."

231.    Because Defendants' false statements that Plaintiffs were involved in terrorist financing posed business and reputational risks to Plaintiffs' consumers, counterparties, business partners, creditors, and others, they found those false statements to be material.

232.    Further, the facts show that consumers, counterparties, business partners, and creditors in fact found Defendants' false claims to be material to their business decisions. For example, Société Générale, Natixis, and BCP refused to work with Lord Energy because while they "ha[d] no problem with [Hazim's] [f]ather (cleared by the US)" they did "not feel comfortable with [Himmat], [Piccardo], and Fatima"—Muslim employees of Lord Energy that Defendants falsely claimed were linked to the Muslim Brotherhood, al Qaeda, or both.

233.    Likewise, Crédit Suisse's CEO decided to terminate the bank's longstanding relationship with Hazim and Lord Energy because he feared that continuing to lend to Hazim would make the bank appear to be supporting the Muslim Brotherhood.

234.    UBS also closed Hazim's personal account with the bank, telling Hazim that, "[a]fter intensive and exceptionally long discussions with our compliance and due diligence teams, it has been [] decided by our firm that we won't be in a position to help you with the financing of your business activity."

235.    Litasco, another commodity trading firm, also stopped trading with Hazim and Lord Energy because Litasco had compliance concerns as a result of Defendants' statements falsely linking Hazim and Lord Energy to terrorist financing.

236.    The UAE, ADNOC, M.B.Z., Matar, Alp, Brero, Cavin, Badal, and some of John Doe Nos. 1–25 are jointly and severally liable for both their own false claims about Plaintiffs and similar claims that Defendants and their co-conspirators disseminated because they worked together to develop the false narrative that Hazim and Lord Energy are linked to the Muslim Brotherhood and involved in terrorist financing, and they all contributed to the publication and dissemination of Defendants' false statements.

237.    These false claims eroded Plaintiffs' goodwill among customers, counterparties, business partners, creditors, and the public which caused consumers, counterparties, business partners, and creditors to cease doing business with Plaintiffs.

238.    Instead, Plaintiffs were forced out of business.

239.    Plaintiffs demand that the UAE, ADNOC, M.B.Z., Matar, Alp, Brero, Cavin, Badal, and some of John Doe Nos. 1–25 be ordered to account for and pay to Plaintiffs all gains, profits, and damages derived from the above-described wrongful acts and that the Court issue an order multiplying or otherwise enhancing any award under the Lanham Act.

**COUNT TWO**
**Civil Racketeering, 18 U.S.C. § 1962(c)**
*(Against the UAE, M.B.Z., Matar, Alp, Brero, Cavin,*
*Badal, and some of John Doe Nos. 1–25)*

240.     Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth fully

herein.

241.     At all relevant times, the UAE, M.B.Z., Matar, Alp, Brero, Cavin, Badal, and some

of  John Doe Nos. 1–25 constituted "persons" within the meaning of 18 U.S.C. § 1961(3).

242.     Between at least May 2017 and April 2021, and almost certainly beyond,

Defendants were associated and in fact constituted an "enterprise" within the meaning of 18 U.S.C.

§ 1964(c), engaging in and affecting international and interstate commerce.  The enterprise had a

clear organization and structure.  The UAE, through M.B.Z., oversaw the enterprise's larger

campaign, providing strategic guidance and direction.  Matar managed operations at a more

granular level by serving as a liaison between the UAE and Alp.  Alp, Brero, Cavin, and Badal

carried out the enterprise's day-to-day operations by, among other things, proposing targets, hiring

sources, and commissioning false and misleading articles.  The enterprise's network of co-

conspirators wrote the articles and otherwise published and disseminated the enterprise's false and

misleading claims.

243.     At all relevant times, the members of this association-in-fact enterprise, agreed to,

intended to, and did conduct, and directly or indirectly participate in the conduct, of the enterprise's

affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), including

international and interstate wire fraud in violation of 18 U.S.C. § 1343 and bank fraud in violation

of 18 U.S.C. § 1344.

244.     The UAE, M.B.Z., Matar, Alp, Brero, Cavin, Badal, and some of John Doe Nos.

1–25 are persons distinct from the association-in-fact enterprise.  They managed and operated the

enterprise's affairs with full knowledge that their activities were unlawful and with intent to defraud. Specifically, the enterprise orchestrated a years' long coordinated smear campaign to publish false information about dozens of targets, including Hazim, Lord Energy SA, and Americas Lord Energy Inc. The enterprise used similar methods, which it referred to as "confidential offensive viral communication" operations and "discreet lobbying" to accomplish the enterprise's overarching objective of destroying the businesses and reputations of its dozens of targets.

245.    To carry out this fraudulent scheme, the UAE, M.B.Z., Matar, Alp, Brero, Cavin, Badal, and some of John Doe Nos. 1–25 utilized a network of co-conspirators, including journalists, bloggers, freelance writers, Wikipedia editors, academics, and other sources to concoct and disseminate false information about their targets with the specific intent of fraudulently inducing their targets' business partners, counterparties, financial institutions, and others to sever ties with those targets.

246.    In the case of Hazim and Lord Energy, the enterprise concocted the false narrative that Hazim and his companies were closely tied to the Muslim Brotherhood and involved in terrorist financing. In addition to the false statements listed in paragraph 226, which the enterprise used international and interstate wires to commission and publish online, the enterprise made use of international and interstate wires to disseminate the following false statements in furtherance of its scheme to defraud, in violation of 18 U.S.C. § 1343:

> (a)    On October 6, 2017, Alp wrote a report, which on information and belief it shared internally and with the UAE via email, falsely claiming that: Lord Energy was "run by Doha-based heirs of the very senior Muslim Brotherhood leadership"; Lord Energy was "at the center of European MB senior operators and has ties to Al-Qaeda related entities"; Lord Energy executives "are MB members, and Al-Qaeda related people"; Hazim was "domiciled in Doha in Qatar"; Hazim's father was "considered to be the 'foreign minister' of the Muslim Brotherhood and its key financier"; Lord

Energy provided the "perfect cover" for terrorist financing; Hazim would "pursue the business activities, but also the cause of the Brotherhood"; and Hazim's business associates Youssef Himmat, American citizen Imama Fatima, Davide Piccardo, and Omar Nasreddin were affiliated with the Muslim Brotherhood.

(b)    In December 2017, Alp drafted a confidential "preliminary report" on Hazim and Lord Energy with the file name "arnica 3-lord energy note-sylvain-20171214," which falsely claimed that Lord Energy was a "mysterious Muslim Brotherhood trading company linked to Al-Qaeda," and "at the center of European MB senior operations." On information and belief, Alp shared this memo via email with Besson, who used the information Alp supplied to write his January 5, 2018 article for *Le Temps*.

(c)    On February 15, 2018, Alp published a "detailed investigative analysis," which on information and belief it shared internally and with the UAE via email, that falsely described Hazim and Lord Energy, among other targets, as part of the Muslim Brotherhood's "macro-level funding system."

(d)    On February 21, 2018, Alp prepared a PowerPoint presentation, which on information and belief it shared internally and with the UAE via email, that included a slide about Lord Energy, falsely accusing it of being a "front compan[y]" for the Muslim Brotherhood and of being "linked to Al-Qaeda."

(e)    In February 2018, Alp prepared an "Action Plan," which on information and belief it circulated internally and shared with the UAE via email, that falsely claimed that Lord Energy had "links to terrorism and Political Exposed Persons," as well as the Muslim Brotherhood.

(f)    On June 12, 2018, using the pseudonym Laurent Martin, Alp sent emails to WorldCompliance, World-Check, and Info4C falsely claiming that Lord Energy was "directly linked to radical Islamists" and urging those compliance monitors to add the "name of Lord Energy" to their databases.

(g)    On June 13, 2018, Alp sent an email about Lord Energy to the Credit Suisse media relations email address (media.relations@credit-suisse.com), posing as a freelance journalist and using the pseudonym Laurent Martin. The email falsely claimed that Lord Energy was linked to radical Islamists, and it cited stories that Alp had sponsored and planted about Lord Energy.

(h)    Between June 7 and June 19, 2018, Alp used a secure, encrypted Protonmail account under the pseudonym "Yvan Doucet" to send 15 emails falsely claiming that "Lord Energy SA" was linked to "terrorism financing" to reporters from *Bloomberg*, *Axios*, *Reuters*, *The Sunday Times*, *The Observer*, *The Guardian*, *Financial Times*, *The Sun*, and *The Times*, as well as the price reporting agency Platts.

247.    The enterprise routinely made use of international and interstate wires to plan, facilitate, and carry out its scheme to destroy Hazim and Lord Energy's business and reputations. Between May 2017 and April 2021, members of the enterprise sent dozens—if not hundreds—of emails to one another and routinely participated in video meetings and phone calls to, among other things, formulate strategies; identify targets; identify and recruit co-conspirators; arrange for meetings and travel; pay sources, contractors, and co-conspirators; and address logistical matters, all in furtherance of the enterprise's overarching scheme.  As just some examples:

(a)     On August 7, 2017, Alp prepared a detailed proposal for the UAE in which Alp outlined a "Global Action Plan" involving "widespread offensive actions."  On information and belief, Alp shared this document with the UAE via email.

(b)     On January 3, 2018, Badal and Vidino exchanged emails (Brero and Cavin were copied on the exchange) to arrange for Vidino to meet with Badal, Brero, and Cavin in Geneva on January 12, 2018.

(c)     On February 26, 2018, Badal sent an "updated, more detailed" proposal to Matar recommending a "new three-month testing phase" and providing an overview of Alp's proposed targets and the actions Alp intended to take against each.

(d)     On May 7, 2018, Alp published a "confidential internal report" on Lord Energy that falsely claimed that Lord Energy was "at the center of European MB senior operators and has ties to Al-Qaeda related entities."  On information and belief, the report was shared internally at Alp via email.

(e)     On May 15, 2018, Alp drafted an email that, on information and belief, it sent to Nina May directing her to write three articles about Lord Energy.

(f)     On June 6, 2018, Alp prepared an "Urgent Update" for the UAE regarding Hazim and Lord Energy's efforts to counter the enterprise's smear campaign.  On information and belief, Alp shared the update internally and with the UAE via email.

(g)     On June 13, 2018, Alp prepared another "strictly confidential" "Urgent Update" for the UAE regarding Hazim and Lord Energy's efforts to try to correct the French-language Wikipedia page for Lord Energy that Alp created.  On information and belief, Alp shared this Update with the UAE via email.

(h)    On July 23, 2018, Alp prepared for the UAE a "Summary Report – Impact Assessment" that described the enterprise's "viral communication and discreet lobbying operations on 10 key targets," including Lord Energy. On information and belief, Alp shared this Report with the UAE via email.

(i)    Alp prepared, and on information and belief sent via email to the UAE, another "Summary Report – Impact Assessment" on August 6, 2018 that explained how Alp used social media and search engine optimization techniques to "boost visibility for [their] actions."

(j)    In a similar update to Matar and the UAE on November 6, 2018, Alp boasted that "[f]ollowing our latest actions, Google now directly associates Lord Energy with terrorism, and Hazim Nada with the [Muslim Brotherhood]."

248.    These are just some examples of the many "Summary Reports," "Urgent Updates," "Impact Assessments," and other emails, electronic communications, and international and interstate wires the enterprise used to further its scheme to defraud. The enterprise's use of international and interstate wires was not only anticipated, but it was an essential part of the enterprise's scheme to create the false public perception that Hazim and his companies were involved in terrorist financing.

249.    The UAE, M.B.Z., Matar, Alp, Brero, Cavin, Badal, and some of John Doe Nos. 1–25 also routinely committed acts of bank fraud in violation of 18 U.S.C. § 1344. Through their false and misleading statements, they intended to and in fact did deceive numerous banks and financial institutions and fraudulently induce those banks and financial institutions to end their banking relationships with Hazim and Lord Energy. The UAE, M.B.Z., Matar, Alp, Brero, Cavin, Badal, and some of John Doe Nos. 1–25 knew, and intended, that the banks would suffer financial harm from terminating their profitable, longstanding lending arrangements with Hazim and his companies. Indeed, in June 2018, Alp bragged that "following our viral communication, [Lord Energy] is having serious problems with Western banks to receive credits. It has apparently being put on a watchlist used by banks. Banks are concerned about its connections to radical Islamists."

250.    Specifically, the following banks and financial institutions terminated profitable banking relationships with Hazim and Lord Energy or declined to initiate new banking relationships as a result of the enterprise's false statements:

(a)     In November 2018, Société Générale refused to work with Lord Energy;

(b)     In November 2018, BCP Bank refused to work with Lord Energy because its compliance department did "not feel comfortable" with three Lord Energy employees the enterprise had falsely identified as having ties to terrorism and the Muslim Brotherhood;

(c)     In December 2018, Crédit Suisse—a bank the enterprise specifically targeted—stopped supporting Lord Energy's trading positions, and in February 2019, formally closed Lord Energy's accounts;

(d)     In January 2019, Swiss Card terminated Lord Energy's account;

(e)     In January 2019, UBS—after long discussions with its compliance and due diligence teams—declined to finance Lord Energy's business activities;

(f)     In February 2019, UBS closed Hazim's personal account—which he had held for more than 27 years—and the personal accounts of Hazim's mother and brother;

(g)     In April 2019, Macquarie Bank terminated its Futures Trading and Clearing Agreement with Lord Energy, which had been in place since 2014; and

(h)     In December 2020, Macquarie Bank declined to enter into a new banking relationship with Lord Energy because it had "no appetite to proceed" with the opportunity.

251.    These acts of racketeering activity were related to each other and the enterprise as a whole.  The enterprise engaged in a continuous pattern of racketeering that began in 2017 and lasted until at least 2021, and almost certainly beyond.  In January 2020, Brero sent an email to Matar in which he wrote that he looked forward to working "alongside [Matar] for the next five years."  Brero also thanked Matar for his trust as the enterprise engaged in a "very sensitive … new long-term assignment."

252.    The association-in-fact enterprise was engaged in and affected international and interstate commerce.  The enterprise's smear campaign against Hazim and Lord Energy was meant

to, and did, drive a competing oil company out of business. The enterprise's racketeering activities destroyed a business valued at over $150 million, and which generated over $1.71 billion in annual revenue. The enterprise's efforts to bankrupt Lord Energy also impacted global spot-market prices for light crude oil exported to Asia, including markets for U.S.-produced WTI. The price dynamics that the enterprise sought to (and did) affect through its pattern of racketeering activity impacted billions of dollars' worth of crude oil trades.

253.    As a direct and proximate result of Defendants' racketeering activities in violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property in an amount to be proven at trial. Plaintiffs now seek treble damages under 18 U.S.C. § 1964(c) to remedy that injury. Plaintiffs' injuries are grounded in the United States. Among other things, Hazim is an American citizen, and Defendants destroyed Lord Energy's American subsidiary.

### COUNT THREE
**Racketeering Conspiracy, 18 U.S.C. § 1962(d)**
***(Against All Defendants)***

254.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth fully herein.

255.    18 U.S.C. § 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

256.    As set forth above, Defendants, unlawfully and willfully combined, conspired, and agreed to violate 18 U.S.C. § 1962(c). Specifically, Defendants committed overt acts in furtherance of the conspiracy described above, including by publishing and directing the publication of dozens of false and misleading articles about Hazim, Lord Energy, and dozens of other individuals and entities.

257.    Defendants intentionally conspired and agreed to directly and indirectly participate in the conduct of the enterprise's affairs through a pattern of racketeering activity. Defendants

knew their acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. 1962(d).

258.     As a direct and proximate results of the enterprise's conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property in an amount to be proven at trial.  Plaintiffs now seek treble damages under 18 U.S.C. § 1964(c) to remedy that injury.

## COUNT FOUR
### Violations of Section 1 of the Sherman Act, 15 U.S.C. § 1
*(Against the UAE, ADNOC, M.B.Z., Matar, Alp, Diligence, Brero,*
*Cavin, Badal, and some of John Doe Nos. 1–25)*

259.     Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth fully herein.

260.     As set forth above, Defendants contracted, combined, conspired, and agreed to unlawfully and unreasonably restrain international and interstate commerce.  Defendants' smear campaign against Lord Energy was specifically intended to—and did—eliminate a growing competitive threat to ADNOC in the spot market for light crude oil exported to Asia.  Defendants fabricated and publicized false statements that Hazim and Lord Energy were involved in terrorist financing to prevent banks from lending to Hazim or Lord Energy and discourage customers, counterparties, and business partners from doing business with Hazim or Lord Energy.

261.     Lord Energy's export of Saharan Blend and WTI to Asia put downward pressure on prices ADNOC could charge for Murban—an equivalent grade of light crude oil.  Through their unreasonable anticompetitive conduct, Defendants forced Lord Energy out of the spot market for light crude oil in Asia, driving back up the prices the UAE and ADNOC received for Murban exports.

262.    Defendants' conspiracy, and the resulting impact on the spot market for light crude oil in Asia, occurred in and affected international and interstate commerce, and it had a direct, substantial, and foreseeable effect on U.S. export trade and commerce with foreign nations.  Prices that U.S.-based producers of WTI could receive for WTI exports were directly impacted by the enterprise's unlawful efforts to drive Lord Energy out of the market.

263.    Defendants' unlawful and anticompetitive conduct also had a direct, substantial, and foreseeable effect on Americas Lord Energy Inc., a U.S. company engaged in the export of WTI to foreign nations, primarily in Asia.  Specifically, Defendants' unlawful conduct forced Americas Lord Energy Inc. out of business completely.  It also forced Lord Energy SA to declare bankruptcy, which impacted U.S. companies engaged in foreign commerce by preventing Lord Energy from continuing to do business with several U.S. entities, and forcing these U.S. entities to seek to recover debts owed to them by Lord Energy through Swiss bankruptcy proceedings.

264.    Plaintiffs are entitled to treble damages for the violations of the Sherman Act alleged herein.

## COUNT FIVE
### Violations of Section 2 of the Sherman Acts, 15 U.S.C. § 2
*(Against the UAE, ADNOC, M.B.Z., Matar, Alp, Diligence, Brero, Cavin, Badal, and some of John Doe Nos. 1–25)*

265.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth fully herein.

266.    As set forth above, prior to 2017 when Lord Energy entered the spot market for light crude oil exported to Asia, ADNOC possessed monopoly power.  At the time, Murban from the UAE was the only light crude oil grade exported in volume to refineries in Asia.  Murban producers in the UAE sold about 8 million barrels of Murban per month on the spot market in Asia.  ADNOC was the dominant seller of Murban, accounting for about 60% of all Murban

cargoes sold on the spot market in Asia. At the time, ADNOC sought to expand Murban production with the ultimate goal of making Murban a benchmark for oil prices in the Middle East.

267.    Lord Energy's entry into the spot market for light crude oil in Asia threatened ADNOC's monopoly and its plans for continued growth. During some months in 2017, Lord Energy sold volumes of Saharan Blend as large as 2–3 million barrels on the spot market in Asia.

268.    Defendants launched their unlawful smear campaign against Hazim and Lord Energy with the specific intent of "destroy[ing]" Lord Energy and driving it out of the market so ADNOC could maintain its monopoly power.

269.    Defendants' conspiracy, and the resulting impact on the spot market for light crude oil in Asia, occurred in and affected international and interstate commerce, and it had a direct, substantial, and foreseeable effect on U.S. export trade and commerce with foreign nations. Prices that U.S.-based producers of WTI could receive for WTI exports were directly impacted by the enterprise's unlawful efforts to drive Lord Energy out of the market.

270.    Defendants' unlawful and anticompetitive conduct also had a direct, substantial, and foreseeable effect on Americas Lord Energy Inc., a U.S. company engaged in the export of WTI to foreign nations, primarily in Asia. Specifically, Defendants' unlawful conduct forced Americas Lord Energy Inc. out of business completely. It also forced Lord Energy SA to declare bankruptcy, which impacted U.S. companies engaged in foreign commerce by preventing Lord Energy from continuing to do business with several U.S. entities, and forcing these U.S. entities to seek to recover debts owed to them by Lord Energy through Swiss bankruptcy proceedings.

271.    Plaintiffs are entitled to treble damages for the violations of the Sherman Act alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter an award and judgment in their favor, and against all Defendants jointly and severally, as follows:

(a)     Awarding Plaintiffs actual damages of not less than $299 million;

(b)     Awarding Plaintiffs lost profits of not less than $268.75 million;

(c)     Awarding Plaintiffs disgorgement of Defendants' profits not less than $354.8 million;

(d)     Awarding Plaintiffs treble damages;

(e)     Awarding Plaintiffs all expenses and costs, including attorneys' fees; and

(f)     Awarding Plaintiffs damages in an amount to be determined at trial for emotional, psychological, and reputational harm;

(g)     Such other and further relief as the Court deems appropriate.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all claims and issues so triable.

Date:   January 24, 2024

/s/ Thomas A. Clare, P.C.
Thomas A. Clare, P.C. (D.C. Bar No. 461964)
Nicholas J. Brechbill (D.C. Bar No. 229988)
CLARE LOCKE LLP
10 Prince Street
Alexandria, Virginia 22314
Telephone: (202) 628-7400
tom@clarelocke.com
nick@clarelocke.com

*Attorneys for Plaintiffs Hazim Nada and Lord Energy SA*

**في محكمة الولايات المتحدة المحلية لمقاطعة كولومبيا**

| | | |
|---|---|---|
| | ( | حازم ندا |
| | ( | فيا 27 ماجيو 29 |
| | ( | 22100 كومو، إيطاليا، |
| | ( | |
| | ( | و |
| | ( | |
| | ( | لورد إنرجي إس أيه |
| | ( | كونترادا دي فيرلا 1 |
| | ( | 6901 لوجانو، سويسرا، |
| | ( | |
| | ( | المدعيان، |
| | ( | |
| | ( | ضد |
| | ( | |
| | ( | الإمارات العربية المتحدة |
| | ( | عناية/ سفير دولة الإمارات العربية المتحدة |
| | ( | السيد/ يوسف العتيبة |
| | ( | سفارة الإمارات العربية المتحدة |
| | ( | 3522 المحكمة الدولية شمال غرب رقم 100 |
| | ( | واشنطن العاصمة 20008، |
| الدعوى رقم 24-CV-00206 | ( | شركة أرياف للدراسات والبحوث ذ.م.م |
| مطلوب إجراء محاكمة أمام هيئة محلفين | ( | صندوق بريد 3088 |
| | ( | أبوظبي، الإمارات العربية المتحدة، |
| | ( | |
| | ( | شركة بترول أبوظبي الوطنية |
| | ( | صندوق بريد 898 |
| | ( | شارع الكورنيش الغربي |
| | ( | أبوظبي، الإمارات العربية المتحدة، |
| | ( | |
| | ( | محمد بن زايد آل نهيان |
| | ( | قصر الوطن |
| | ( | رأس الأخضر |
| | ( | أبوظبي، الإمارات العربية المتحدة، |
| | ( | |
| | ( | مطر حامد النيادي |
| | ( | المجلس الأعلى للأمن الوطني |
| | ( | F834+JMQ، الرأس الأخضر |
| | ( | أبوظبي، الإمارات العربية المتحدة، |
| | ( | |
| | ( | |
| | ( | |

شركة ألب سيرفسيز إس أيه ( 
رو دي مونت تشويسي 36 ( 
CH-1207 جنيف، سويسرا، ( 
( 
شركة ديليجانس إس أيه آر إل ( 
رو دي مونت تشويسي 36 ( 
CH-1207 جنيف، سويسرا ( 
( 
ماريو بريرو ( 
روت دي الامان 14 ( 
1173 فيشي، سويسرا، ( 
( 
ليونيل بادال ( 
رو يوجين ويلتر 60 ( 
2723 هوالد، لوكسمبورغ، ( 
( 
موريل كافين ( 
أفينيو دو ميل 27 ( 
جنيف، سويسرا، ( 
( 
لورينزو فيدينو ( 
1110 شارع 23 شمال غرب، شقة 604 ( 
واشنطن العاصمة 20037، ( 
( 
سيلفان بيسون ( 
روت دي لا فوي 10 ( 
1305 بينثالاز، سويسرا، ( 
( 
و ( 
( 
المدعى عليهم مجهولي الهوية أرقام 1-25، ( 
( 
المدعى عليهم. ( 
( 

2

Case 1:24-cv-00206-ABJ    Document 1    Filed 01/24/24    Page 3 of 71

<u>**شكوى**</u>

1.    بدءًا من أواخر عام 2017، قامت دولة الإمارات العربية المتحدة وبعض كبار مسؤوليها بإدارة وتوجيه وتمويل حملة علاقات عامة "خفية" استمرت لسنوات من خلال شركة التحقيق السويسرية الخاصة، ألب سيرفيسز إس أيه، التي تم تأسيسها وإدارتها من جانب ماريو بريرو وموريل كافين وكانت مملوكة لهما. عملت دولة الإمارات العربية المتحدة ومسؤولوها، إلى جانب شركة ألب وبريرو وكافين وموظفيهم، كمؤسسة مشتركة استفادت من شبكة من المشاركين في التآمر - وهم عناصر من القطاع الخاص، ودفعوا "للصحفيين"، وأستاذ في جامعة جورج واشنطن في واشنطن العاصمة، من بين أشخاص آخرين - للتشهير بالعشرات من الضحايا الأبرياء.

2.    على مدار سنوات، قدمت هذه المؤسسة بيانات كاذبة ومضللة إلى الصحافة، وعلى ويكيبيديا وأماكن أخرى عبر الإنترنت، وإلى أكبر مراقبي الامتثال للمخاطر المالية في العالم كجزء من مخطط شامل "لتدمير" أعمال أهدافهم وسمعتهم من خلال الاحتيال على البنوك وشركاء الأعمال المستهدفين وصناع القرار الحكوميين والجمهور. تظهر أكثر من 8000 وثيقة داخلية للمؤسسة، تم الحصول عليها من قِبل متسللين مجهولين في أبريل 2021 وتمت مشاركتها مع جهات إنفاذ القانون، أهداف المؤسسة وطول مدتها وعواقبها المدمرة.

3.    ومن بين الأهداف الأولى للمؤسسة حازم ندا، تاجر النفط الخام، وشركتيه، لورد إنرجي إس أيه، وشركتها الأمريكية التابعة أمريكاز لورد إنرجي إنك. استخدمت المؤسسة شبكتها من المشاركين في التآمر لتنفيذ ما وصفته شركة ألب بشكل روتيني بأنه حملة "اتصالات سريعة الانتشار مسيئة سرية" من أجل، على حد تعبير شركة ألب، "إلحاق ضرر جسيم بسمعة حازم وشركتيه وقابليتهما للاستمرار إن لم يتم تدميرها".

4.    وبناءً على المعلومات والاعتقاد، طلبت دولة الإمارات العربية المتحدة ومسؤولوها من شركة ألب استهداف حازم وشركتيه لأنهم يعتبرون حازم وشركة لورد إنرجي تهديدات تنافسية خطيرة في السوق الفورية للنفط الخام الخفيف في آسيا. في أوائل عام 2017، بدأ كل من حازم وشركة لورد إنرجي في نقل شحنات كبيرة - تتجاوز أكثر من مليون برميل - من النفط الخام من مزيج الصحراء من الجزائر إلى كوريا وتايلاند وسنغافورة. مزيج الصحراء هو نوع من النفط الخام الخفيف الحلو الذي يتنافس مع نفط مربان الخام - وهو مزيج نفط خام خفيف آخر كان في ذلك الوقت هو النفط الخام الرئيسي الذي تنتجه دولة الإمارات العربية المتحدة وشركتها النفطية المملوكة للدولة، شركة بترول أبوظبي الوطنية ("أدنوك"). في الفترة ما بين عامي 2016 و2018، أضافت شحنات شركة لورد إنرجي من مزيج الصحراء إلى آسيا حوالي 13 مليون برميل من نفط مربان، مما أدى إلى تحقيق إيرادات تقدر بحوالي 830 مليون دولار أمريكي مباشرة من الإمارات العربية المتحدة. وهذا وضع شركة لورد إنرجي على رادارات الإمارات العربية المتحدة وشركة أدنوك كتهديد

تجاري محتمل.

5.‏ تجاوز التهديد التنافسي الذي تشكله شركة لورد إنرجي على دولة الإمارات العربية المتحدة وشركة أدنوك حدود شحنات مربان المحددة التي استبدلتها بمزيج الصحراء. وبمجرد أن بدأت شركة لورد إنرجي في نقل كميات كبيرة من النفط الخام من مزيج الصحراء إلى الأسواق الرئيسية في الإمارات العربية المتحدة لنفط مربان في آسيا، انخفض فرق السعر في نفط مربان مقارنة بدرجة أخرى مماثلة من النفط الخام الخفيف الحلو الذي يُستخدم عادةً كمعيار للأسعار بحوالي 0.27 دولار للبرميل. ونظراً لكمية نفط مربان التي تم تصديرها من الإمارات إلى كوريا وتايلاند وسنغافورة في ذلك الوقت، فإن دخول شركة لورد إنرجي إلى تلك الأسواق كلف منتجي نفط مربان، وخاصة الإمارات العربية المتحدة وشركة أدنوك، حوالي 324 ألف دولار يومياً. خلال العام للتالي للعام الذي تنافست فيه شركة لورد إنرجي مع شركة أدنوك (قبل أن تؤدي حملة التشهير الاحتيالية التي قامت بها المؤسسة إلى إفلاس شركة لورد إنرجي)، فقدت شركة أدنوك، التي تسيطر على أكثر من 60% من صادرات نفط مربان، حوالي 70.1 مليون دولار أمريكي نتيجة لانخفاض الأسعار التي حصلت عليها.

6.‏ في أوائل عام 2018، أسست شركة لورد إنرجي شركة تابعة أمريكية في هيوستن بولاية تكساس حتى يتسنى لها التواجد في سوق خام غرب تكساس الوسيط ("خام غرب تكساس الوسيط")، وهو نوع آخر من النفط الخام الخفيف والحلو الذي كان يُعتبر من الدرجة المكافئة لمزيج الصحراء ونفط مربان، وأصبح يحظى بشعبية متزايدة لدى المصافي الكبيرة في آسيا. وكان دخول شركة لورد إنرجي إلى أسواق النقل والتصدير المحلية في خام غرب تكساس الوسيط يشكل تحدياً جديداً لدولة الإمارات العربية المتحدة وشركة أدنوك وهدد بتقويض السعر الذي يمكن أن تتلقاه مقابل صادرات نفط مربان إلى آسيا.

7.‏ لذلك، استحوذت الشركة على شركة أمريكاز لورد إنرجي إنك. وفي تقرير تقييم الأثر الصادر في 21 أكتوبر 2019 إلى الإمارات العربية المتحدة ومسؤوليها، تفاخرت شركة ألب قائلة "بعد هجماتنا الإعلامية، والإدراج في وورلد تشيك، والصعوبات المالية التي خلقتها واضطر الفرع الأمريكي، شركة أمريكاز لورد إنرجي إنك، إلى وقف عملياته."

8.‏ بناءً على توجيهات دولة الإمارات العربية المتحدة، في عام 2017، قامت شركة ألب بتلفيق ونشر رواية كاذبة على نطاق واسع تتهم فيها حازم وشركة لورد إنرجي بتمويل الإرهاب. كان لوالد حازم علاقات تاريخية مع جماعة الإخوان المسلمين. بناءً على المعلومات والاعتقاد، علمت شركة ألب بعلاقة والد حازم التاريخية بجماعة الإخوان المسلمين لأن أحد الصحفيين المدرجين في كشوف الرواتب الخاصة بشركة ألب، وهو سيلفان بيسون، سبق أن كتب عن والد حازم. استغلت شركة ألب هذه المعلومات عن والد حازم لإضفاء المصداقية على ادعاءات المؤسسة الزائفة بشأن حازم وشركاته.

9. وعلى عكس والده، لم يرتبط حازم أبدًا بجماعة الإخوان المسلمين. حازم هو مواطن أمريكي وُلد في سيلفر سبرينغ، ماريلاند، ودرس في جامعة روتجرز في نيو جيرسي، ولديه منزل في هيوستن، تكساس. إنه فخور بتراثه الأمريكي، ولم يسبق له الذهاب إلى مصر - حيث تأسست جماعة الإخوان المسلمين - إلا مرة واحدة. لم يهم أي من ذلك شركة ألب.

10. تُظهر الوثائق الداخلية التي حصل عليها المتسللون المجهولون أن أحد *الأساليب* المفضلة لدى شركة ألب كان هو الحصول بشكل غير قانوني على سجلات الهاتف لأهدافها؛ واستخدام هذه السجلات لتحديد الشركاء المفترضين للأهداف بناءً على بيانات المكالمات الهاتفية؛ والبحث عن أي أعمال مشينة (بغض النظر عن مدى بعدها) من جانب أي من هؤلاء الزملاء (بغض النظر عن البعد عن الأهداف)؛ وتلفيق رواية كاذبة تُنسب إلى الأهداف الاتهامات غير المؤكدة التي كشفت عنها شركة ألب أو اختلقها بشأن الأهداف (في بعض الحالات، بعيد جدًا).

11. وهذا بالضبط ما فعلته المؤسسة مع حازم. وحصلت بشكل غير قانوني على سجلات هاتفه في عام 2017؛ واستخدمت سجلات الهاتف هذه لتحديد شبكة شركاء حازم المزعومة؛ واستخدمت الشائعات - بما في ذلك العديد من تلك التي تم فضحها بشكل قاطع - حول بعض هؤلاء الشركاء لاختلاق رواية كاذبة تتهم حازم باستخدام شركتيه كواجهات لتمويل جماعة الإخوان المسلمين وتنظيم القاعدة، على الرغم من عدم وجود دليل على أن حازم كان لديه أي علاقة مع جماعة الإخوان المسلمين، وبالتأكيد مع تنظيم القاعدة. يوجد أدناه مثال على مخطط الارتباط الذي أعدته شركة ألب والذي من المفترض أنه يوضح اتصالات حازم وشركة لورد إنرجي وشركائهما.

5



12.    وسرعان ما وافقت دولة الإمارات العربية المتحدة على اقتراح شركة ألب بالتشهير بحازم وشركة لورد إنرجي كممولين للإرهاب لأن الرواية الكاذبة التي اختلقتها شركة ألب حول علاقاتها المزعومة مع جماعة الإخوان المسلمين والمشاركة في تمويل الإرهاب يتناسب مع جدول الأعمال الجيوسياسي الأوسع نطاقًا لدولة الإمارات العربية المتحدة المتمثل في تشويه سمعة منافسها الإقليمي، قطر. ظلت دولة الإمارات العربية المتحدة لسنوات في صراع خفي مع قطر - حليف رئيسي لجماعة الإخوان المسلمين. ومن خلال تشويه سمعة كل من حازم وشركة لورد إنرجي بهذه الطريقة، *لا تستطيع الإمارات العربية المتحدة إرسال تهديد تنافسي فحسب، بل أيضًا* إثارة الشك بشأن قطر وأنشطة جماعة الإخوان المسلمين في الولايات المتحدة وأوروبا.

13.    كانت المؤسسة غير القانونية التابعة لدولة الإمارات العربية المتحدة سرية ومنظمة وفعالة. أشرفت دولة الإمارات العربية المتحدة وولي عهد أبو ظبي آنذاك محمد بن زايد آل نهيان على الحملة الأكبر للمؤسسة، حيث قدما التوجيه والإرشاد الاستراتيجي. أدرج محمد بن زايد آل نهيان مطر حامد النيادي ("مطر")، وهو مسؤول آخر في حكومة الإمارات العربية المتحدة، للإشراف على العمليات على مستوى أكثر تفصيلاً من خلال العمل كحلقة وصل مباشرة مع شركة ألب. تعاقد مطر - تحت إشراف شركة أرياف للدراسات والبحوث ذ.م.م - مع شركة ألب وشركة ديليجانس إس أيه إل، وهي شركة أخرى تم تأسيسها وإدارتها من جانب ماريو بريرو وموريل كافين وكانت مملوكة لهما، لاقتراح أهداف وإجراء

6

عمليات "سرية" في الخارج لتعزيز أهداف دولة الإمارات العربية المتحدة، مع الحفاظ على دور دولة الإمارات "غير مرئي".

14.       عمل مطر جنبًا إلى جنب مع بريرو وأحد كبار موظفي شركة ألب، ليونيل بادال، لتحديد الأهداف بما في ذلك حازم وشركة لورد إنرجي وعشرات الآخرين، وتوظيف المصادر والصحفيين والأكاديميين لكتابة ونشر مقالات كاذبة حول هذه الأهداف. ثم تستشهد المؤسسة بتلك المقالات الكاذبة والمضللة ـ التي بدت مشروعة ولكن تم اختلاقها بالفعل من قبل بريرو وكافين وبادال وغيرهم من موظفي شركة ألب ومكتوبة من قبل الصحفيين والأكاديميين المدرجين في كشوف الرواتب الخاصة بشركة ألب ـ للاحتيال على المؤسسات المالية وشركاء الأعمال والأطراف المقابلة وحثهم على قطع علاقاتهم مع أهداف المؤسسة، مما يدمر أعمال الأهداف وسمعتهم.

15.       يتم توضيح الوثائق التي تم الحصول عليها من خلال التسلل بالتفصيل في كل خطوة من هذه الخطة. على سبيل المثال، وثيقة كتبتها شركة ألب في فبراير 2018 بعنوان "خطة العمل" أوضحت اقتراح شركة ألب لدولة الإمارات العربية المتحدة. وفقًا لهذه الوثيقة، التي شاركتها شركة ألب مع دولة الإمارات العربية المتحدة عبر البريد الإلكتروني بناءً على المعلومات والاعتقاد، فإن شركة ألب:

- *ستنشر مقالات سلبية ضخمة* حول العشرات من الأهداف الرئيسية [جماعة الإخوان المسلمين] بما في ذلك على سبيل المثال لا الحصر شركة لورد إنرجي ... باللغة الفرنسية والإيطالية *والأهم من ذلك الإنجليزية."*

- *"ستبلغ الصحفيين المختارين بأهدافنا ودورهم* القيادي داخل جماعة الإخوان المسلمين في أوروبا وعلاقاتهم مع تنظيم القاعدة".

- *"ستقوم بتنشيط شبكتنا من الصحفيين والمحررين الموثوق بهم، كما فعلنا بنجاح مع صحيفة لوتان* وقريبًا في *صحيفة لوبوان".*

- *ستقوم بإنشاء صفحات ويكيبيديا سلبية لأهدافنا،* بما في ذلك الشركة وأعضاء مجلس إدارتها الرئيسيين، بنبرة سلبية، باللغات الإنجليزية والفرنسية والإيطالية. سيكون هذا هو المصدر الأول للمعلومات لأي شخص ينظر إلى الشركة (مثل الصحفيين والسياسيين ومسؤولي إنفاذ القانون والاستخبارات ومسؤولي الامتثال وما إلى ذلك)."

- *"ستقوم بتنبيه قواعد بيانات الامتثال وهيئات المراقبة، والتي تستخدمها البنوك* والشركات متعددة الجنسيات، على سبيل المثال، حول الأنشطة الحقيقية لشركة لورد إنرجي وروابطها بالإرهاب".

- *"ستخطر البنوك بشكل سري* بروابط الشركات التابعة لجماعة الإخوان المسلمين (مثل شركة لورد إنرجي، وشركة يوروزون إكويتي) بالإرهاب والأشخاص المعرضين سياسيًا، *والهدف من ذلك هو تجميد حساباتهم المصرفية وأعمالهم".*

- "سوف تستخدم ... وسائل التواصل الاجتماعي *لتعزيز المصلحة العامة في المقالات* والإجراءات سريعة الانتشار".

- و"سوف تضغط *بشكل سري* على صناع القرار".[1]

<div style="border:1px solid black; padding:1em">

**خطة العمل لعام 2018**

1. نشر مقالات سلبية ضخمة حول الأهداف الرئيسية التابعة لجماعة الإخوان المسلمين، بما في ذلك على سبيل المثال لا الحصر شركة لورد إنرجي، والمنتدى الإسلامي الأوروبي للشباب والطلاب، ونبيل الناصري، باللغة الفرنسية والإيطالية والأهم من ذلك الإنجليزية.
2. سنبلغ الصحفيين المختارين بأهدافنا ودورهم القيادي داخل جماعة الإخوان المسلمين في أوروبا وعلاقاتهم مع تنظيم القاعدة.
3. سنقوم بتنشيط شبكتنا من الصحفيين والمحررين الموثوق بهم، كما فعلنا بنجاح مع صحيفة *لوتان* وقريبًا في صحيفة *لوبوان*.
4. سنقوم بإنشاء صفحات ويكيبيديا سلبية لأهدافنا، بما في ذلك الشركة وأعضاء مجلس إدارتها الرئيسيين، بنبرة سلبية، باللغات الإنجليزية والفرنسية والإيطالية. سيكون هذا هو المصدر الأول للمعلومات لأي شخص ينظر إلى الشركة (مثل الصحفيين والسياسيين ومسؤولي إنفاذ القانون والاستخبارات ومسؤولي الامتثال وما إلى ذلك).
5. كما سنقوم بتنبيه قواعد بيانات الامتثال وهيئات المراقبة، التي تستخدمها البنوك والشركات متعددة الجنسيات، على سبيل المثال حول الأنشطة الحقيقية لشركة لورد إنرجي وروابطها بالإرهاب.
6. سنخفض البنوك بشكل سري من روابطها لجماعة الإخوان المسلمين (مثل شركة لورد إنرجي، وشركة يوروزن (كويتي) بالإرهاب والأشخاص المعرضين سياسيًا، والهدف من ذلك هو تجميد حساباتهم المصرفية وأعمالهم.
7. كما سنستخدم وسائل التواصل الاجتماعي لتعزيز المصلحة العامة في المقالات والإجراءات سريعة الانتشار.
8. وأخيرًا، سوف نضغط على صناع القرار بشكل سري، لا سيما على المستوى الأوروبي.

</div>

16. واختتمت شركة ألب كلامها قائلةً "إذا أعطيتمونا الضوء الأخضر، فإننا نعتقد أننا قد نلحق ضررًا بالغًا بسمعة المجموعات الأوروبية الرئيسية التابعة لجماعة الإخوان المسلمين وقابليتها للاستمرار، إن لم ندمّرها، من خلال اتصالاتنا سريعة الانتشار المسيئة السرية".

17. في قضية حازم، عينت المؤسسة "صحفيًا" سيلفان بيسون لكتابة مقالة في أوائل عام 2018 في صحيفة بارزة يتهم فيها شركة لورد إنرجي زورًا بكونها شركة واجهة للإخوان المسلمين تمول المنظمات الإرهابية. ثم قامت بتعيين مدونين لتكرار "تقارير" بيسون بنبرة أكثر إثارة، في العشرات من المنافذ، كانت معظمها على منصات أمريكية مثل Medium وWordPress وTumblr، مما منح هذه الادعاءات الكاذبة وهم الإجماع على وسائل الإعلام الواسعة. أنشأت المؤسسة أيضًا صفحات ويكيبيديا مزيفة باللغات الإنجليزية والفرنسية والإيطالية لتكريس الادعاءات الكاذبة باعتبارها "نقاط مثيرة للجدل" حقيقية. واستخدمت أساليب تحسين محركات البحث، مع التركيز بشكل خاص على نتائج بحث Google باللغة الإنجليزية، لضمان أن المقالات التي ترعاها المؤسسة كانت من بين أفضل النتائج عند البحث عن حازم أو شركة لورد إنرجي على Google ومحركات البحث الأخرى في الولايات المتحدة مثل !Yahoo وBing. وأرسلت رسالة بريد

---

[1] تمت إضافة التأكيد.

إلكتروني بالمزاعم الكاذبة بأن حازم وشركة لورد إنرجي متورطان في تمويل الإرهاب إلى الصحفيين - بما في ذلك الصحفيين من وسائل الإعلام الأمريكية الكبرى مثل بلومبيرغ وأكسيوس. وأخيرًا، حثت الشركة بشكل احتيالي منصة الامتثال وورلد تشيك، المملوكة لشركة تومسون رويترز - وهي شركة متداولة علنًا في بورصة نيويورك ولها العديد من المكاتب في جميع أنحاء الولايات المتحدة - على الإشارة إلى حازم وشركة لورد إنرجي تحت فئة المخاطر "الإرهاب"، مما يضمن رفض المؤسسات المالية الأمريكية والدولية إقراض حازم وشركة لورد إنرجي.

18.    كانت أكاذيب المؤسسة غريبة ولكنها مدمرة. وقد أدت إلى إفلاس شركة لورد إنرجي وشركتها التابعة الأمريكية - الشركتان اللتان قضى حازم أكثر من عشر سنوات من عمره لبنائهما من العدم - وكلفا حازم مئات الملايين من الدولارات (قدرت قيمة شركة لورد إنرجي بنحو 150 مليون دولار قبل أن تترسخ حملة التشهير التي قامت بها المؤسسة)، وأزالت تهديدًا تنافسيًا متزايدًا على دولة الإمارات العربية المتحدة وشركة أدنوك في بعض الأسواق الآسيوية للنفط الخام الخفيف. يرفع المدعيان هذه الدعوى القضائية مؤكدين فيها دعاوى انتهاكات قانون لانهام، القسم 1125(أ)(1) من الباب 15 من مدونة القوانين الأمريكية، وقانون المنظمات الفاسدة والمتأثرة بالابتزاز، الأقسام 1961-1968 من الباب 18 من مدونة القوانين الأمريكية، وقانون شيرمان، الأقسام 1-7 من الباب 15 من مدونة القوانين الأمريكية. فهما يسعيان إلى الدفاع عن حقوقهما والحصول على تعويض عن الأضرار الاقتصادية المدمرة التي تسببت فيها حملة الاتصالات سريعة الانتشار السرية والمسيئة التي أطلقتها المؤسسة لأعمالهم وسمعتهم، إلى جانب التأثير المباشر لحملة التشهير على حياتهم الشخصية ورفاهيتهم العاطفية والجسدية والنفسية.

## الأطراف وغير الأطراف المعنيين

19.    المدعي الدكتور حازم ندا هو المؤسس والمالك الوحيد لشركة لورد إنرجي إس أيه. حازم هو مواطن يحمل الجنسيتين الأمريكيتين والإيطالية. وُلد حازم في سيلفر سبرينغ بولاية ماريلاند، ودرس في الكلية وتخرج من جامعة روتجرز في نيو جيرسي، ولديه منزل في هيوستن بولاية تكساس. يقيم حازم حاليًا في كومو بإيطاليا.

20.    المدعي شركة لورد إنرجي إس أيه هي شركة لتجارة النفط الخام والسلع أسسها حازم في عام 2008. وهي مملوكة بالكامل لحازم. تأسست شركة لورد إنرجي إس أيه بموجب قوانين سويسرا ويقع مقر عملها الرئيسي في كونترادا دي فيرلا 1، CH-6900 لوجانو، سويسرا. اعتبارًا من أكتوبر 2018، بلغت قيمة شركة لورد إنرجي إس أيه حوالي 150 مليون دولار، بإيرادات سنوية تبلغ حوالي 1.71 مليار دولار. أضطرت شركة لورد إنرجي إلى إعلان إفلاسها في سويسرا في أبريل 2019 نتيجة لحملة التشهير التي أجريت ضده.

21.    واليوم، أصبحت شركة لورد إنرجي بلا قيمة لأنها لم تعد قادرة على الحصول على الائتمان اللازم

9

لتمويل عمليات تجارة السلع. بالإضافة إلى ذلك، تسببت إعادة هيكلة بسبب الإفلاس التي أجرتها شركة لورد إنرجي في خسارة عدد كبير من العملاء والأطراف المقابلة لمبالغ كبيرة من المال، مما دمر العلاقات والشهرة التي بنتها شركة لورد إنرجي مع هؤلاء العملاء والأطراف المقابلة ويضمن عدم قيامهم بأي أعمال مع شركة لورد إنرجي مرة أخرى. في مارس 2017، افتتح حازم للجمهور عملاً ثانيًا خارج ميلانو بإيطاليا: نفق رياح عمودي تستخدمه القوات الجوية الأمريكية والجيش الإيطالي لتدريب المظلات.

22.       كانت شركة أمريكاز لورد إنرجي إنك شركة تابعة مملوكة بالكامل لشركة لورد إنرجي إس أيه. تأسست شركة أمريكاز لورد إنرجي إنك في 24 أبريل 2018 بموجب قوانين ولاية تكساس ويقع مقر  عملها الرئيسي في 2101 شارع سيتي ويست، جناح 230، هيوستن، تكساس. تم حل شركة أمريكاز لورد إنرجي إنك في مارس 2019. عمل كل من حازم ودوجلاس كوسكي، وهو مواطن أمريكي مقيم في تكساس، كأعضاء مجلس إدارة لشركة أمريكاز لورد إنرجي إنك.

23.       المدعى عليه دولة الإمارات العربية المتحدة دولة أجنبية. تحتفظ الإمارات العربية المتحدة بسفارة في مقاطعة كولومبيا. ويقع مقرها في 3522 المحكمة الدولية شمال غرب، جناح 100، واشنطن العاصمة 20008.

24.       المدعى عليه محمد بن زايد آل نهيان مواطن إماراتي والرئيس الحالي لدولة الإمارات العربية المتحدة وحاكم أبوظبي. كان محمد بن زايد ولي عهد أبوظبي حتى 14 مايو 2022، عندما تم انتخابه رئيسًا بموجب قرار من أعضاء المجلس الأعلى للاتحاد الإماراتي. كان محمد بن زايد آل نهيان يتمتع بسلطة اعتماد نهائية على عمليات التشويه الإعلامي التي تقوم بها المؤسسة.

25.       المدعى عليه مطر حامد النيادي ("مطر") مواطن إماراتي. كان مطر الوسيط الرئيسي لدولة الإمارات العربية المتحدة مع شركة ألب وبريرو وغيرهما من المشاركين في التآمر خارج دولة الإمارات العربية المتحدة. اجتمع مطر مع بريرو عدة مرات في سويسرا والإمارات العربية المتحدة، وافق بشكل روتيني على الأهداف المقترحة لشركة ألب وعمليات الاتصالات سريعة الانتشار، وأبقى "رئيسه" محمد بن زايد آل نهيان على علم بعمليات شركة ألب، وتأكد من تمويل شركة ألب وعملياتها بشكل كافٍ. في الفترة ما بين عامي 2017 و2021، وجه مطر ووافق على منح ملايين الدولارات إلى شركة ألب لتمويل حملتها للتشهير.

26.       المدعى عليه شركة بترول أبوظبي الوطنية ("أدنوك") هي شركة بترول مملوكة للدولة في دولة الإمارات العربية المتحدة. شركة أدنوك هي جهاز تابع لدولة الإمارات العربية المتحدة على النحو المحدد في القسم 1603(ب) من الباب 28 من مدونة القوانين الأمريكية. كانت شركة لورد إنرجي منافسًا تجاريًا مباشرًا لشركة أدنوك في أسواق النفط الخام

الخفيف في آسيا.

27.     المدعى عليه شركة أرياف للدراسات والبحوث ذ.م.م ("أرياف") هي شركة ذات مسؤولية محدودة تأسست بموجب قوانين دولة الإمارات العربية المتحدة ويقع مقر عملها الرئيسي في أبوظبي. كانت شركة أرياف الموقع على العقود المبرمة بين دولة الإمارات العربية المتحدة وشركة ديليجانس إس أيه آر إل التي تحكم عمليات التشويه الإعلامي التي يقوم بها بريرو وكافين وشركة ألب. كانت شركة أرياف واجهة استخدمتها الإمارات العربية المتحدة، ومحمد بن زايد آل نهيان، ومطر، وغيرهم من المسؤولين الإماراتيين لإخفاء هويات عملاء شركة ألب الحقيقيين والتأكد من أنهم ظلوا "غير مرئيين".

28.     المدعى عليه شركة ألب سيرفيسز إس أيه ("ألب") هي شركة تحقيقات خاصة تم تأسيسها وإدارتها من جانب ماريو بريرو وموريل كافين وكانت مملوكة لهما. تأسست شركة ألب بموجب قوانين سويسرا، ويقع مقر عملها الرئيسي في رو دي مونت تشويسي 36، CH-1207 جنيف، سويسرا. بناءً على المعلومات والاعتقاد، كان غالبية عملاء شركة ألب من الشركات الخاصة وشركات المحاماة والأفراد أصحاب الثروات الكبيرة.

29.     المدعى عليه شركة ديليجانس إس أيه آر إل ("ديليجانس") هي شركة تحقيقات خاصة تم تأسيسها وإدارتها من جانب ماريو بريرو وموريل كافين وكانت مملوكة لهما. تأسست شركة ديليجانس بموجب قوانين سويسرا، ويقع مقر عملها الرئيسي في رو دي مونت تشويسي 36، CH-1207 جنيف، سويسرا. كانت شركة ديليجانس طرفًا في العقود المبرمة مع شركة أرياف والتي تحكم عمليات التشويه الإعلامي التي يقوم بها بريرو وكافين وشركة ألب. تم إبرام اتفاقية عدم إفصاح مع شركة أرياف للعمل المتعلق بحملة التشهير التي قامت بها المؤسسة.

30.     استخدم بريرو وكافين شركتي ألب وديليجانس بالتبادل كأدوات لتخطيط وتنسيق عمليات التشويه الإعلامي لتعزيز حملة التشهير التي تستهدف حازم وشركة لورد إنرجي وعشرات الأهداف الأخرى.

31.     يقيم المدعى عليه ماريو بريرو في جنيف بسويسرا. وهو مواطن إيطالي. بريرو هو أحد مؤسسي ومالكي ومشغلي شركتي ألب وديليجانس. تواصل بريرو بشكل روتيني وتفاعل مع مطر والمسؤولين الآخرين في الإمارات العربية المتحدة فيما يتعلق بحملة التشهير التي قامت بها المؤسسة والتي تستهدف حازم وشركة لورد إنرجي وعشرات الأهداف الأخرى. ومن بين أمور أخرى، اقترح بريرو بانتظام أهدافًا لمطر والمسؤولين الآخرين في دولة الإمارات العربية المتحدة، وابتكر أساليب وعمليات لتحقيق أهداف المؤسسة المتمثلة في تدمير أعمال أهدافها وسمعتهم (بما في ذلك حازم وشركة لورد إنرجي)، وتواصل مع مطر فيما يتعلق بالتمويل، وقام بإدارة وتوجيه موظفي شركة ألب والمشاركين في التآمر التابعين للمؤسسة لتعزيز أهداف المؤسسة.

11

32.    بناءً على المعلومات والاعتقاد، فإن المدعى عليه موريل كافين هي مواطنة سويسرية وتقيم في سويسرا. شاركت في تأسيس شركتي ألب وديليجانس مع بريرو وهي عضو مجلس إدارة منذ فترة طويلة في شركة ألب. ساعدت كافين في ابتكار وإدارة عمليات التشهير الإعلامي لتعزيز أهداف المؤسسة المتمثلة في تدمير أعمال أهدافها وسمعتهم (بما في ذلك حازم وشركة لورد إنرجي).

33.    بناءً على المعلومات والاعتقاد، فإن المدعى عليه ليونيل بادال هو مواطن من لوكسمبورغ ويقيم في لوكسمبورغ. بادال هو موظف كبير سابق في شركة ألب، وقد قام - مثل بريرو وكافين - بتطوير وإدارة عمليات التشويه الإعلامي لتعزيز أهداف المؤسسة المتمثلة في تدمير أعمال أهدافها وسمعتهم(بما في ذلك حازم وشركة لورد إنرجي). كما تواصل بادال بشكل روتيني مع مطر. وبناءً على المعلومات والاعتقاد، فهو حاليًا محقق في السلطة المالية في لوكسمبورغ.

34.    المُدعى عليه لورينزو فيدينو مواطن أمريكي يقيم في واشنطن العاصمة، كما أنه مدير برنامج التطرف في جامعة جورج واشنطن. تم تعيين فيدينو من قبل شركة ألب كمقاول لتقديم خيوط حول الأهداف الجديدة والبحث والتحليل حول جماعة الإخوان المسلمين. واعتمدت المؤسسة على فيدينو وعلى أوراق اعتماده الأكاديمية لإضفاء الشرعية على البيانات الكاذبة والمضللة التي نشرتها لتشويه سمعة أهدافها وتدميرها. تشاور فيدينو مع شركة ألب بشأن شركة لورد إنرجي.

35.    بناءً على المعلومات والاعتقاد، فإن المدعى عليه سيلفان بيسون هو مواطن سويسري ويقيم في سويسرا. في جميع الأوقات ذات الصلة، عمل بيسون صحفيًا في الصحيفة السويسرية*لوتان*. كان بيسون مدرج في كشوف الرواتب الخاصة بشركة ألب، وكان ينشر قصصًا بشكل روتيني كان يعرف أنها كاذبة ومضللة بناءً على طلب من شركة ألب. في يناير 2018، تم تعيين بيسون من قبل شركة ألب وكتب مقالًا نُشر في صحيفة*لوتان* عن حازم وشركة لورد إنرجي يزعم زورًا أن حازم وشركة لورد إنرجي كان تربطهما علاقات مع جماعة الإخوان المسلمين وتورطا في تمويل الإرهاب. كان بيسون قد كتب سابقًا عن والد حازم، وبناءً على المعلومات والاعتقاد، أعطى شركة ألب فكرة إظهار حازم وشركة لورد إنرجي كممولين للإرهاب بناءً فقط على الروابط التاريخية لوالد حازم بجماعة الإخوان المسلمين.

36.    المدعى عليهم مجهولو الهوية أرقام 1-25 هم أفراد وكيانات تآمروا مع المؤسسة لنشر بيانات كاذبة ومضللة عن حازم وشركة لورد إنرجي. لا يعلم المدعيان حاليًا هويات المدعى عليهم مجهولي الهوية أرقام 1-25، ويعتزمان تحديد المدعى عليهم مجهولي الهوية أرقام 1-25 من خلال الاكتشاف في هذه الدعوى. بناءً على المعلومات والاعتقاد، يضم المدعى عليهم مجهولو الهوية أرقام 1-25 مسؤولين إماراتيين آخرين وموظفين غير محددين في شركة ألب وصحفيين وأكاديميين.

## الاختصاص القضائي ومحل النظر في الدعوى

37.    تتمتع هذه المحكمة بالاختصاص القضائي الموضوعي على هذه الدعوى وفقًا للقسم 1331 من الباب 28 من مدونة القوانين الأمريكية لأن دعاوى المدعين تنشأ بموجب قوانين الولايات المتحدة، وتحديدًا قانون لانهام، القسم 1125(أ)(1) من الباب 15 من مدونة القوانين الأمريكية، وقانون المنظمات الفاسدة والمتأثرة بالابتزاز، الأقسام 1961-1968 من الباب 18 من مدونة القوانين الأمريكية، وقانون شيرمان، الأقسام 1-7 من الباب 15 من مدونة القوانين الأمريكية.

38.    تتمتع هذه المحكمة بالاختصاص القضائي الموضوعي على المدعى عليهم في دولة الإمارات العربية المتحدة وشركة أدنوك وفقًا للقسم 1330 من الباب 28 من مدونة القوانين الأمريكية نظرًا لأن دولة الإمارات العربية المتحدة دولة أجنبية، راجع *المرجع السابق* القسم 1603(أ)، وشركة أدنوك هي وكالة أو جهاز تابع لدولة الإمارات العربية المتحدة، *راجع المرجع السابق* الأقسام 1603(أ)، و1603(ب). وتُعد الدعاوى المقدمة في هذه الوثيقة للحصول على سبيل انتصاف شخصي لا يحق لدولة الإمارات العربية المتحدة ولا لشركة أدنوك الحصول على حصانة بشأنها بموجب القسم 1605(أ)(2) من الباب 28 من مدونة القوانين الأمريكية. ويستند هذا الإجراء إلى النشاط التجاري لدولة الإمارات العربية المتحدة وشركة أدنوك في الولايات المتحدة، والأعمال التي يتم تنفيذها في الولايات المتحدة فيما يتعلق بأنشطتها الأجنبية، والأعمال الأجنبية المتعلقة بنشاطها التجاري الأجنبي التي تسببت في تأثير مباشر في الولايات المتحدة. *راجع المرجع السابق.*

39.    أبرمت دولة الإمارات العربية المتحدة ومسؤولوها وأجهزتها – من خلال شركة أرياف – عقودًا تجارية خاصة وصالحة لتعيين شركة تحقيق خاصة – شركة ألب – لإجراء حملة علاقات عامة "خفية" امتدت لسنوات ضد منافسيها التجاريين حازم وشركة لورد إنرجي، بالإضافة إلى عشرات الأهداف الآخرين. المؤسسة المشتركة، التي تشرف عليها وتديرها الإمارات العربية المتحدة، ومسؤولوها، وأجهزتها، وشركة ألب، وبريرو، وكافين، وبادال، والصحفيين المعينين، والأكاديميين، وغيرهم من المشاركين في التآمر للمشاركة في الأنشطة التي عادةً ما تُنفّذها الجهات الفاعلة التجارية الخاصة. وشملت هذه الأنشطة التجارية: كتابة مقالات تنشرها على وسائل الإعلام الخاصة وعلى المدونات الإلكترونية، كانت معظمها موجودة في الولايات المتحدة؛ وكتابة الإدخالات على ويكيبيديا وتحريرها، بما في ذلك صفحات ويكيبيديا باللغة الإنجليزية؛ وإجراء عمليات تحسين محركات البحث للتلاعب بنتائج البحث باللغة الإنجليزية على Google ومحركات البحث الأخرى في الولايات المتحدة بما في ذلك !Yahoo وBing؛ وتنبيه هيئات مراقبة المخاطر المالية الخاصة بالروابط المفترضة للأهداف بالإرهاب؛ وإرسال بريد إلكتروني إلى المؤسسات المالية الخاصة والصحفيين مباشرة لتنبيههم بصلات الأهداف

13

المزعومة بالإرهاب؛ وكتابة ونشر أوراق أكاديمية تضفي المصداقية على الادعاءات الاحتيالية من جانب المؤسسة.

40.‏       أثرت الأنشطة التجارية للمؤسسة بشكل مباشر على المواطنين والشركات الأمريكية. كما أثرت الأنشطة التجارية للمؤسسة التي تستهدف حازم وشركة لورد إنيرجي على بعض الأسواق الأمريكية فيما يتعلق بالنفط الخام المادي والأدوات المالية المرتبطة بالنفط الخام.

41.‏       تتمتع هذه المحكمة بالاختصاص القضائي الشخصي على دولة الإمارات العربية المتحدة وشركة أدنوك وفقًا للقسم 1330 من الباب 28 من مدونة القوانين الأمريكية لنفس الأسباب التي تتمتع بها بالاختصاص القضائي الموضوعي على الدعاوى المرفوعة ضدها. *راجع أعلاه الفقرة 38.*

42.‏       تتمتع هذه المحكمة بالاختصاص القضائي الشخصي العام على المدعى عليه فيدينو لأنه مقيم في مقاطعة كولومبيا. *راجع القسم 13-422 من قانون مقاطعة كولومبيا.*

43.‏       تتمتع هذه المحكمة بالاختصاص القضائي الشخصي على المدعى عليهم الآخرين في الخارج - محمد بن زايد آل نهيان، ومطر، وشركة أرياف، وشركة ألب، وشركة ديليجانس، وبريرو، وكافين، وبادال، وبيبسون، وأي من المدعى عليهم مجهولي الهوية الذين هم مواطنون تابعون لدولة أجنبية - وفقًا للقاعدة الفيدرالية للإجراءات المدنية 4(ك)(2). تنشأ دعاوى المدعين بموجب القانون الفيدرالي (أي قانون لانهام، وقانون المنظمات الفاسدة والمتأثرة بالابتزاز، وقانون شيرمان)، وسيتم التبليغ بالاستدعاءات، ولا يخضع أي من هؤلاء المدعى عليهم للاختصاص القضائي لأي محكمة ولاية واحدة، وتتوافق ممارسة الاختصاص القضائي الفيدرالي مع الدستور الأمريكي وقوانين الولايات المتحدة، لأن المدعى عليهم لديهم الحد الأدنى الكافي من الاتصالات مع الولايات المتحدة.

44.‏       مكان النظر في الدعوى مناسب في هذه المنطقة القضائية وفقًا للقسمين 1391(ب)(3) و1391(و)(4) من الباب 28 والقسم 1965(ب) من الباب 18 من مدونة القوانين الأمريكية.

## الادعاءات الوقائعية

### *أسس حازم شركة لورد إنرجي لتجارة السلع.*

45.‏       المدعي الدكتور حازم ندا هو مواطن أمريكي وُلد في سيلفر سبرينغ، ميريلاند. وقد التحق بجامعة روتجرز في نيو جيرسي وحصل على شهادته الجامعية منها. حصل حازم بعد تخرجه من جامعة روتجرز على درجة الماجستير في الفيزياء من جامعة كامبريدج ودرجة الدكتوراه في الرياضيات التطبيقية من إمبريال كوليدج لندن.

46.‏       وبينما كان لا يزال طالبًا، كان حازم يتاجر في السلع لدفع تكاليف دراساته العليا. خلال دراسات الدكتوراه، عمل حازم أيضًا كمحلل لدى سيتي جروب، وبعد ذلك في دور تداول السلع المتمركز حول النفط مع ميريل لينش.

14

47.‏ أسس حازم شركة لورد إنرجي إس أيه لتجارة السلع في عام 2008. سعى حازم إلى الدخول في تجارة النفط المربحة، ولكن كانت العوائق التي تحول دون الدخول مرتفعة. تراوحت تكاليف شحنة واحدة من النفط الخام من 60 مليون دولار إلى 160 مليون دولار، وقامت الجهات الرئيسية الفاعلة في الصناعة - إكسون موبيل وشيفرون وبي بي على سبيل المثال لا الحصر - بتسليم عشرات المليارات من الدولارات للمساهمين سنويًا.

48.‏ لذلك، بدأت شركة لورد إنرجي أصغر حجمًا في شحن الفحم والحبوب والأسمنت والصلب عبر البحر الأبيض المتوسط. وقد ساهم الذكاء التجاري والفطنة الكمية لحازم في تحقيق نجاح فوري تقريبًا. في الفترة من 2010 إلى 2016، طورت شركة لورد إنرجي أكبر سوق لاستيراد الأسمنت المعبأ في المنطقة.

49.‏ وقد سمح ذلك لحازم وشركة لورد إنرجي بالاقتحام في سوق النفط. في عام 2014، أبرمت شركة لورد إنرجي اتفاقية ثلاثية من خلال الفرع الأمريكي لبنك ماكواري والتي سمحت لشركة لورد إنرجي بإجراء عمليات تداول آجلة، والتي كانت ضرورية لشركة لورد إنرجي لإدارة تسعير شحنات النفط الخام.

50.‏ ومع ذلك، كان حازم وشركة لورد إنرجي بحاجة إلى الابتكار من أجل المنافسة مع المنافسين الأكبر حجمًا. في النفط، كان ذلك يعني استكشاف "درجات" جديدة من النفط الخام وفتح أسواق جديدة وإيجاد فرص للمراجحة: شراء الدرجات المناسبة من النفط الخام بأسعار منخفضة من مناطق بها فائض معروض وبيعها بأسعار أعلى إلى المناطق التي كانت فيها هذه الدرجات تشهد طلبًا مرتفعًا.

### شركة لورد إنرجي تبدأ في تصدير النفط الخام من مزيج الصحراء إلى آسيا.

51.‏ النفط الخام ليس سلعة أحادية. وبدلًا من ذلك، يشمل مصطلح "النفط الخام" مجموعة متنوعة من الخلائط الخام وغير المعالجة من الهيدروكربونات التي يمكن استخراجها في صورة سائلة من الطبقات التحتية لسطح الأرض.

52.‏ يتم وصف كل تكوين جيولوجي يضم مكامن النفط وفقًا لخلائط محددة من الهيدروكربونات، مما يؤدي إلى ظهور أنواع أو درجات مختلفة من النفط الخام. يتم تصنيف النفط الخام عمومًا حسب الكثافة، والتي تتراوح من "خفيف" إلى "متوسط" إلى "شديد"، ومحتوى الكبريت، الذي يتراوح من "حلو" (منخفض الكبريت) إلى "حامض" (عالي الكبريت). ولذلك، فإن النفط الخام عادةً ما يقع في واحد من ستة مجموعات: حلو خفيف، حلو متوسط، حلو شديد، حامض خفيف، حامض متوسط، حامض شديد.

53.‏ وتتم معالجة درجات مختلفة من النفط الخام بواسطة أنواع مختلفة من المصافي وإنتاج منتجات نهائية مختلفة. فعلى سبيل المثال، يُعد الكبريت مادة أكالة للغاية لأنظمة التصفية، لذا يجب على المصافي اتخاذ احتياطات خاصة لحماية معداتها من أجل تنقية أنواع النفط الخام الحامضة ذات المحتويات عالية الكبريت. لا تنتج الدرجات المماثلة بالضرورة

نفس نواتج المنتجات المُصفاة. ولكن الدرجات المماثلة يمكن معالجتها بشكل جيد من خلال المصافي. إذا لم تتمكن المصفاة من الحصول على درجة معينة في وقت معين عندما يكون لديها قدرة تصفية زائدة، فسوف تسعى المصفاة إلى استبدال درجة مكافئة.

54.      عادةً ما يتم شراء النفط الخام وبيعه من خلال عقود طويلة الأجل تحدد عمليات التسليم المنتظمة بكميات محددة أو من خلال المبيعات الفورية، أي العقود قصيرة الأجل لشحنة واحدة أو عدد صغير من الشحنات. إذا تأخر التسليم بموجب عقد طويل الأجل، على سبيل المثال بسبب سوء الأحوال الجوية أو مشكلة مع ناقلة، فقد يلجأ المشتري إلى السوق الفوري لاستبدال الشحنة المتأخرة.

55.      تميل المناطق المختلفة إلى إنتاج أنواع مختلفة من النفط الخام. وينتج الخليج العربي حصة أكبر من الدرجات الحامضة من الدرجات الخفيفة والحلوة. ومع ذلك، فإن إنتاجها الإجمالي كبير للغاية لدرجة أن حجم النفط الخام الحلو الخفيف الأصغر نسبيًا (مقارنة بحجم الدرجات الحامضة) التي تنتجها دول الخليج لا يزال كبيرًا. تنتج شمال أفريقيا وغرب أفريقيا والولايات المتحدة وبحر الشمال بشكل أساسي أنواع نفط خام خفيفة وحلوة.

56.      مزيج الصحراء هو نوع من النفط الخام الخفيف الحلو، وهو مزيج تصدير النفط الخام الرئيسي في الجزائر. تصدر الجزائر مزيج الصحراء من ثلاث محطات شحن: بجاية وأرزيو وسكيكدة. يُعد ميناء بجاية الميناء الوحيد في الجزائر القادر على تحميل ناقلات النفط الخام الكبيرة جدًا بالكامل – وهي الفئة الأكبر من ناقلات النفط، مع القدرة على استيعاب حوالي مليوني برميل.

57.      تنتج الجزائر حوالي 1.2 مليون برميل من مزيج الصحراء يوميًا، ويتم تصدير حوالي نصف هذا الحجم. تاريخيًا، تم تسليم معظم صادرات مزيج الصحراء من الجزائر إلى أوروبا. تعد شركة النفط الوطنية للنفط في الجزائر، سوناطراك، أكبر بائع لمزيج الصحراء في الجزائر، والبائع الوحيد الذي يمتلك كميات كافية لبيع الناقلات بحجم ناقلات النفط الخام الكبيرة جدًا.

58.      مربان هو نوع آخر من النفط الخام الخفيف، مشابه لمزيج الصحراء، مع محتوى كبريت أعلى قليلاً. ويتم إنتاجه في المقام الأول في أبوظبي. يتم إنتاج حوالي 2 مليون برميل يوميًا، ويُباع حوالي 1.2 مليون برميل منها للتصدير. تُعد شركة أدنوك البائع المهيمن لنفط مربان، حيث تمثل حوالي 60% من جميع صادرات نفط مربان من دولة الإمارات العربية المتحدة. يُباع نفط مربان عادةً لمصافي في آسيا.

59.      بين عامي 2016 و2019، باعت دولة الإمارات حوالي 8 ملايين برميل شهريًا لمصافي في آسيا في السوق الفورية، وسعت إلى توسيع إنتاجها وصادراتها من نفط مربان. في نوفمبر 2016، وافق محمد بن زايد - رئيس

المجلس الأعلى للبترول الإماراتي - على استراتيجية شركة أدنوك لعام 2030 وخطة العمل الخمسية التي تهدف إلى "النمو الاستراتيجي المستدام".[2] اعتزمت شركة أدنوك وضع نفط مربان كمعيار سائد لأسعار النفط الخام في الشرق الأوسط.

60.    تتمتع معظم المصافي الكبيرة في آسيا بقدرات متطورة لإزالة الكبريت، لذا اعتبرت العديد من هذه المصافي أن نفط مربان يعادل مزيج الصحراء والنفط العربي الخفيف الممتاز – وهو نفط خام خفيف حلو مُصدّر من المملكة العربية السعودية - وخام غرب تكساس الوسيط، وهو نوع من النفط الخام الخفيف والحلو المُصدّر من الولايات المتحدة. بدءًا من النصف الثاني من عام 2018، زادت صادرات خام غرب تكساس الوسيط إلى آسيا بشكل كبير، مما يجعلها المنافس المهيمن على مربان في المنطقة. يعتبر النفط العربي الخفيف الممتاز، الذي يُباع بشكل أساسي على عقود محددة المدة ولا يتوفر عمومًا للشراء في السوق الفوري، المحدد الرئيسي للسعر والمعيار القياسي لنفط الخام الخفيف والحلو مثل مزيج الصحراء ونفط مربان.

61.    نظرًا لأن مزيج الصحراء كان يُصدّر تاريخيًا إلى أوروبا ونفط مربان يُصدّر أساسًا إلى آسيا، فإن مزيج الصحراء لا يُعتبر بشكل عام تهديدًا تنافسيًا لنفط مربان. وقد تغير ذلك في عام 2016 تقريبًا، عندما توسط كل من حازم واللورد إنرجي في صفقة مع سوناطراك لاستخدام ميناء بجاية لتحميل ناقلات النفط الخام الكبيرة جدًا بمزيج الصحراء وتصديره إلى آسيا.

62.    بدأ كل من حازم وشركة لورد إنرجي شحن مزيج الصحراء من الجزائر إلى أستراليا في أوائل عام 2016. ولا تشكل هذه الشحنات الأولية أي تهديد لشركة أدنوك لأن المصفاة في أستراليا التي باعت لها شركة لورد إنيرجي شحناتها من مزيج الصحراء كانت تفتقر إلى قدرات إزالة الكبريت اللازمة لمعالجة نفط مربان.

63.    ومع ذلك، تحولت الديناميكية في أواخر عام 2016، عندما بدأت شركة لورد إنرجي في شحن مزيج الصحراء إلى كوريا وتايلاند وسنغافورة - وهي أسواق رئيسية لنفط مربان. بين عامي 2016 و2018، كلف المسار الجديد المبتكر الذي اتبعته شركة لورد إنرجي شركة الإمارات العربية المتحدة وشركة أدنوك أكثر من 70.1 مليون دولار أمريكي بشكل مباشر من خلال شحنات فورية مستبدلة خسرتها شركة أدنوك لصالح شركة لورد إنرجي وبشكل غير مباشر نتيجة للضغط الهبوطي الذي مارسته المنافسة من شركة لورد إنرجي على أسعار نفط مربان في الأسواق الفورية وطويلة الأجل. كانت هذه الخسائر والتهديد بالمنافسة المستمرة من شركة لورد إنرجي أكثر من مجرد حافز كافٍ للإمارات العربية المتحدة وشركة أدنوك للسعي للقضاء على هذا التنافس المتزايد.

---

[2] بيان صحفي لشركة أدنوك، *المجلس الأعلى للبترول الأعلى يوافق على استراتيجية شركة أدنوك لعام 2030 وخطة العمل الخمسية التي تركز على النمو وتعظيم القيمة* (2 نوفمبر 2016)، https://www.adnoc.ae/en/news-and-media/press-releases/2016/spc-approves-adnoc-strategy.

<div dir="rtl">

64.    كان التهديد المباشر من شركة لورد إنرجي لشركة أدنوك واضحًا للغاية. كانت شحنات مزيج الصحراء الخاصة بها في منافسة مباشرة مع نفط مربان في الأسواق الآسيوية. وعلى وجه الخصوص، كانت شركة جي إس كالتيكس، أكبر عميل فردي لأحجام مزيج الصحراء لدى شركة لورد إنرجي، واحدة من أكبر المشترين لنفط مربان لدى شركة أدنوك. يسرد المخطط الوارد أدناه شحنات محددة تم تصديرها إلى آسيا بين عامي 2016 و2018. بناءً على المعلومات والاعتقاد، فإن الشحنات المميزة باللون الأصفر هي شحنات شركة لورد إنيرجي التي حلت محل شحنات نفط مربان.

| اسم السفينة | الحجم (برميل) | الوجهة | بوليصة الشحن شهر/سنة | درجة الخام |
|---|---|---|---|---|
| | | شحنات شركة لورد إنيرجي ذات الصلة بنفط مربان | | |
| 2016 | | | | |
| جينير 8 مانيات | 980,225.00 | أمبول | فبراير 2016 | مزيج الصحراء |
| سي كروس | 987,673.00 | أمبول | فبراير 2016 | مزيج الصحراء |
| كيب باستيا | 967,272.00 | أمبول | مايو 2016 | مزيج الصحراء |
| كاب فيليب | 966,253.00 | أمبول | سبتمبر 2016 | مزيج الصحراء |
| دابا/كيب برينديسي | 1,041,192.00 | لوك أويل | أكتوبر 2016 | مزيج الصحراء |
| يونايتد كالافريتا | 1,063,304.00 | جي إس كالتيكس | نوفمبر 2016 | مزيج الصحراء |
| | | | | |
| 2017 | | | | |
| كاب جورج | 1,043,586.00 | جي إس كالتيكس | مارس 2017 | مزيج الصحراء |
| كريستينا | 1,050,690.00 | لوك أويل سنغافورة | مايو 2017 | مزيج الصحراء |
| أرشانجل | 1,076,472.00 | جي إس كالتيكس | مايو 2017 | مزيج الصحراء |
| نيو ليجيند | 713,180.00 | إكسون تايلاند | يوليو 2017 | مزيج الصحراء |
| نيو ليجيند | 350,000.00 | أمبول | يوليو 2017 | مزيج الصحراء |
| ألاجاليا | 1,048,801.00 | ربسول (إلى تايلاند) | يوليو 2017 | مزيج الصحراء |
| جريك ووريور | 1,063,415.00 | جي إس كالتيكس | سبتمبر 2017 | مزيج الصحراء |
| جريك ووريور | 638,625.00 | جي إس كالتيكس | سبتمبر 2017 | مزيج الصحراء |
| دي إس تينا | 1,100,000.00 | جي إس كالتيكس | أكتوبر 2017 | مزيج الصحراء |
| دي إس تينا | 981,268.00 | شيفرون | أكتوبر 2017 | مزيج الصحراء |
| دي إس فالنتينا | 1,972,171.00 | شيفرون | نوفمبر 2017 | مزيج الصحراء |
| إيجين هوريزون | 997,484.00 | أمبول | ديسمبر 2017 | مزيج الصحراء |
| برودينت ووريور | 1,058,386.00 | أمبول | ديسمبر 2017 | مزيج الصحراء |
| | | | | |
| 2018 | | | | |
| نارمادا سبيريت | 1,060,572.00 | ربسول (الصين) | مارس 2018 | مزيج الصحراء |
| ماريان كارينا | 2,047,667.00 | جي إس كالتيكس | نوفمبر 2018 | خام غرب تكساس الوسيط |

65.    في الفترة ما بين عامي 2016 و2018، استبدل شركة لورد إنرجي ما يقرب من 13 مليون برميل من نفط مربان، بقيمة 829.9 مليون دولار أمريكي تقريبًا، بمزيج الصحراء في آسيا. وهذا يضع شركة لورد إنرجي على رادار الإمارات العربية المتحدة كتهديد تجاري متزايد.

</div>

66. لكن تهديد شركة لورد إنرجي لهيمنة شركة أدنوك في أسواق النفط الخام الخفيف في آسيا كان أكبر بكثير من الشحنات المحددة التي فقدتها شركة أدنوك لصالح شركة لورد إنرجي. إن إدخال لورد إنيرجي لمزيج الصحراء في الأسواق الفورية في آسيا كبديل لنفط مربان يضع ضغطًا هبوطيًا كبيرًا على السعر الفوري لنفط مربان. وهذا بدوره يضع ضغطًا على شركة أدنوك ومصدري نفط مربان الآخرين لخفض الأسعار التي فرضوها في العقود لأجل لنفط مربان لأنه كان من الصعب على شركة أدنوك تبرير أسعار أعلى للعملاء لأجل مما كانت شركة أدنوك قادرة على تلقيه في السوق الفورية.

67. وبالتالي، فإن دخول شركة لورد إنرجي إلى السوق لم يؤثر فقط على السعر الذي حصلت عليه شركة أدنوك للشحنات الفورية - بل أثر على السعر الذي حصلت عليه شركة أدنوك لجميع صادرات نفط مربان خلال الفترة التي كانت تتنافس فيها مع شركة لورد إنرجي. كما أدى دخول شركة لورد إنرجي إلى السوق إلى تعقيد المفاوضات بين شركة أدنوك وأكبر عملائها في آسيا مثل جي إس كالتيكس وشيفرون وإكسون موبيل.

68. إن تحديد حجم التهديد التجاري الذي تشكله شركة لورد إنرجي على الإمارات العربية المتحدة وشركة أدنوك هو بمثابة ممارسة للقضاء على المتغيرات الكامنة. أفضل طريقة لتقييم أثر تحركات البضائع من خارج الخليج (أي صادرات شركة لورد إنرجي من مزيج الصحراء) هي مقارنة أسعار نفط مربان بأسعار درجة مماثلة لنفط مربان من حيث الجودة، والتي لا تخضع لديناميكيات السوق الفورية، والتي يتم تصديرها من الخليج إلى وجهات مماثلة ومستخدمين نهائيين مماثلين.

69. هنا، يُعد النفط العربي الخفيف الممتاز - وهو مزيج حلو خفيف تنتجه المملكة العربية السعودية - المعيار الأكثر منطقية. بين عامي 2016 و2018، تم إنتاج النفط العربي الخفيف الممتاز بكميات كبيرة جدًا (حوالي مليون برميل يوميًا)، وتم بيعها بالكامل وفق عقود آجلة مع تحديد الأسعار استنادًا إلى هوامش التصفية، وتم تصديرها في المقام الأول إلى العديد من نفس المصافي في آسيا التي يتم تصدير نفط مربان إليها.

70. إن مقارنة أسعار البيع الرسمية الشهرية لنفط مربان بأسعار البيع الرسمية الشهرية للنفط العربي الخفيف الممتاز تُظهر الفترات التي كان فيها نفط مربان تحت ضغط مقارنةً بالنفط العربي الخفيف الممتاز. وكان من الممكن أن ينتج هذا الضغط عن (1) تغييرات كبيرة في الإنتاج في الدرجتين أو (2) ديناميات السوق الفورية لنفط مربان، والتي تنعكس بعد ذلك في سعر البيع الرسمي لجميع صادرات نفط مربان. في الفترة ما بين أوائل عام 2016 وأوائل عام 2018، كانت أحجام إنتاج نفط مربان والنفط العربي الخفيف الممتاز مستقرة، لذلك لا بد أن أي تغييرات كبيرة في الانتشار بين أسعار نفط مربان والنفط العربي الخفيف الممتاز قد حدثت بسبب الأحداث التي تؤثر على السوق الفوري لنفط مربان - مثل

19

إدخال شركة لورد إنرجي لمزيج الصحراء إلى الأسواق الآسيوية.

71.    وبالنظر إلى حجم سوق مربان نفط الفوري في آسيا (حوالي 8 ملايين برميل شهريًا)، من المتوقع أن
يكون لأحجام مزيج الصحراء التي تصل إلى 2-3 ملايين برميل في بعض الأشهر في عام 2017 أثر جوهري على الفرق
بين أسعار نفط مربان وأسعار النفط العربي الخفيف الممتاز. يوضح الرسم البياني أدناه الذي يرسم الفرق بين أسعار نفط
مربان وأسعار النفط العربي الخفيف الممتاز من أوائل عام 2016 حتى أواخر عام 2018 أنه بمجرد أن بدأت شركة لورد
إنرجي في شحن مزيج الصحراء إلى آسيا في أوائل عام 2017، انخفض متوسط فرق السعر بين نفط مربان والنفط العربي
الخفيف الممتاز (الموضح بالخط الأحمر في الرسم البياني أدناه) بمقدار 0.27 دولار للبرميل.



72.    وقد تسبب هذا الانخفاض في متوسط سعر البيع الرسمي لنفط مربان في خسائر كبيرة لدولة الإمارات
العربية المتحدة وشركة أدنوك. في عام 2016، عندما لم يتم تصدير أي درجات منافسة أخرى إلى آسيا، تم بيع نفط مربان
بسعر أعلى من النفط العربي الخفيف الممتاز بقيمة 0.77 دولار للبرميل في المتوسط. في عام 2017، عندما كانت شركة
لورد إنرجي تقوم بنشاط بشحن كميات كبيرة من مزيج الصحراء إلى آسيا، كان الفرق 0.50 دولار فقط للبرميل. وبالنظر
إلى أن دولة الإمارات العربية المتحدة قد صدّرت حوالي 1.2 مليون برميل من نفط مربان يوميًا، فإن هذا الانخفاض البالغ
0.27 دولار للبرميل أدى إلى خسارة حوالي 324,000 دولار يوميًا لمنتجي نفط مربان. كانت هذه الخسارة ستزيد عن
118.3 مليون دولار أمريكي للسنة التي كانت فيها شركة لورد إنرجي تبيع فيها مزيج الصحراء في الأسواق الفورية في آسيا.
ونظرًا لأن شركة أدنوك أنتجت حوالي 60% من إجمالي المعروض من نفط مربان في الإمارات العربية المتحدة، فقدت

حوالي 70.1 مليون دولار أمريكي نتيجة للمنافسة من جانب شركة لورد إنرجي في عام 2017.

73.     بمجرد أن توقفت شركة لورد إنرجي عن تصدير مزيج الصحراء إلى آسيا في منتصف عام 2018 -
عندما توقفت شركة سوناطراك عن التعامل مع شركة لورد إنرجي (وأعاقت وصول شركة لورد إنرجي إلى مزيج
الصحراء) بسبب حملة التشويه التي نظمتها المؤسسة غير القانونية في دولة الإمارات العربية المتحدة - انتعشت أسعار نفط
مربان.

74.     في أوائل عام 2018، كان خام غرب تكساس الوسيط الذي يتم شحنه من الولايات المتحدة ناشئ كمنافس
لنفط مربان في آسيا. أسست شركة لورد إنرجي شركة تابعة لها في هيوستن بولاية تكساس - وهي شركة أمريكاز لورد
إنرجي - في ذلك الوقت تقريبًا لمحاولة استخدام خام غرب تكساس الوسيط كبديل لمزيج الصحراء، لم يعد بإمكانها التصدير.
ومع ذلك، سرعان ما أدت حملة التشهير التي قامت بها المؤسسة إلى تدمير شركة أمريكاز لورد إنرجي التابعة لها أيضًا،
مما أجبر الشركة على الإفلاس ويضمن أن شركة لورد إنرجي لم تعد تشكل تهديدًا تنافسيًا لشركة أدنوك.

75.     لم تكن شركة لورد إنرجي هي الشركة المربحة الوحيدة التي يملكها ويديرها حازم في ذلك الوقت. وفي
عام 2017، افتتح نفق رياح بالقرب من ميلانو استخدمه الجيش الإيطالي والقوات الجوية الأمريكية (ولا تزال تستخدمه)
لتدريب المظلات. ومع ذلك، لم تسعى المؤسسة مطلقًا إلى تشويه أعمال حازم في أنفاق الرياح. والسبب بسيط: أن أعمال
نفق الرياح لم تشكل تهديدًا تنافسيًا لدولة الإمارات العربية المتحدة أو شركة أدنوك. يؤكد عدم متابعة المؤسسة لأعمال نفق
الرياح الخاصة بحازم أن دوافعها كانت تجارية. استهدفت المؤسسة شركة لورد إنرجي وشركة أمريكاز لورد إنرجي، على
وجه التحديد بسبب التهديد المتزايد الذي يشكلونه على دولة الإمارات العربية المتحدة وشركة أدنوك في السوق الفوري
للنفط الخام الخفيف المُصدّر إلى آسيا.

*تقوم دولة الإمارات العربية المتحدة بتعيين شركة ألب وتنظيم مؤسسة غير قانونية.*

76.     في عام 2017، تواصلت شركة ألب سيرفسيز مع دولة الإمارات العربية المتحدة، وهي شركة تحقيقات
خاصة في سويسرا. وقد وصفت شركة ألب قدرتها على "تدمير" الأهداف من خلال ما أطلق عليه "الاتصالات سريعة
الانتشار المسيئة." فهمت شركة ألب قوة المعلومات الخاطئة عبر الإنترنت - وقيمة السمعة عبر الإنترنت. لقد افتخرت
بالسرية. ونظير مقابل، كانت على استعداد للقيام بأي شيء ضروري للقضاء على أهدافها، بما في ذلك انتهاك القانون.

77.     كان ماريو بريرو، وهو أحد مؤسسي شركة ألب وأحد أعضاء مجلس إدارتها، في بداية حياته المهنية
يدير شركة تصدير أجهزة الكمبيوتر ومعدات تصنيع أشباه الموصلات من الولايات المتحدة إلى أوروبا. وقد اتهمه المدعون
العامون الفيدراليون بانتهاك قوانين الولايات المتحدة التي تحظر تصدير التقنيات الأمريكية الحساسة إلى دول الكتلة الشرقية

من خلال نظام من المشترين غير الرسميين أنشأه في أوروبا الغربية. قام بريرو بحل الاتهامات من خلال التوقيع على مرسوم موافقة والخروج من أعمال تصدير الكمبيوتر الخاصة به.[3]

78.‏ بعد ذلك، قرر بريرو بدء مهنة كمحقق، وأسس شركة ألب، إلى جانب موريل كافين، في جنيف في عام 1989. وفي عام 2007، قام هو وكافين بتأسيس كيان ثانٍ، وهو شركة ديليجانس إس أيه إل، على نفس عنوان شركة ألب، لغرض وحيد وهو إرباك عملاء شركة تحقيق منافسة، تُسمى أيضًا شركة ديليجانس، والتي كانت تُطلق فرعًا في جنيف.[4]

79.‏ كانت الأساليب التي تستخدمها شركة ألب وبريرو عديمة الضمير بقدر ما كانت فعالة. في عام 2012، تمت مقاضاته في المحكمة الفرنسية بسبب انتهاك الخصوصية. في تلك الإجراءات، أقر بريرو بانتهاك القانون السويسري عن طريق الدفع لموظفي شركة الهاتف مقابل الحصول على قوائم تاريخ اتصال العملاء. أدانت المحكمة بريرو، من بين أمور أخرى، بنشر المعلومات التي تم الحصول عليها بوسائل غير قانونية.

80.‏ لم تجمع شركة ألب وبريرو معلومات خاصة عن أهدافهما بشكل غير قانوني فحسب، بل قاما أيضًا بنشر معلومات مضللة عن أهدافهما ـ وهي تقنية أشارا إليها باسم "حملات الاتصالات سريعة الانتشار المسيئة".

81.‏ بدأت شركة ألب العمل لأول مرة في دولة الإمارات العربية المتحدة في مايو 2017. أرسل بريرو خطابًا في 12 مايو 2017 لإعطاء الإمارات العربية المتحدة "مقدمة موجزة عن [شركة ألب] ومهاراتها المحددة"، والتي تضمنت "العثور على معلومات سلبية/علامات تحذيرية عن الأفراد" وإجراء "حملات اتصالات سريعة الانتشار مسيئة سرية، لا سيما من خلال فريق [شركة ألب] الداخلي من خبراء تكنولوجيا المعلومات ووسائل التواصل الاجتماعي." وأكد بريرو أن "عملاء" شركة ألب ... يشملون شركات متعددة الجنسيات وشركات محاماة وحكومات ووكالات حكومية" و"رؤساء دول" و"أفرادًا معروفين من أصحاب الثروات الكبيرة".

82.‏ وأكد بريرو لدولة الإمارات العربية المتحدة أن فريق شركة ألب، الذي يتألف من "أساس يضم 20 محللًا ومحققًا ومستشارًا يعملون بدوام كامل يتمتعون بخلفيات واسعة متعددة التخصصات"، كان "حساسًا للغاية لضرورة بقاء أي مهمة سرية". لقد "وقع جميع موظفي شركة ألب والمستشارين السريين على اتفاقيات سرية صارمة وملزمة قانونًا"، و"كانت] مكاتب شركة ألب وأنظمة تكنولوجيا المعلومات لديها موضوعًا لتدابير أمنية مضادة مناسبة ومختبرة بانتظام."

83.‏ على الرغم من الضجيج الذي أثاره بريرو حول خبرة شركة ألب المتطورة، في الحقيقة، كان دليل شركة

---

[3] ديفيد كيركباتريك، *الأسرار القذرة لحملة التشهير*، ذا نيويوركر (27 مارس 2023)، https://www.newyorker.com/magazine/2023/04/03/the-dirty-secrets-of-a-smear-campaign.
[4] ديفيد كيركباتريك، *الأسرار القذرة لحملة التشهير*، ذا نيويوركر (27 مارس 2023) https://www.newyorker.com/magazine/2023/04/03/the-dirty-secrets-of-a-smear-campaign.

ألب بسيطًا. كانت شركة ألب تجري عمليات تحقق مباشرة من الخلفية بشأن أهدافها وتنتحل شخصية تلك الأهداف للحصول بشكل غير قانوني على معلومات سرية مثل الهاتف والسجلات المصرفية. وسوف تستخدم تلك السجلات لرسم مخططات للشركاء والارتباطات المفترضة للأهداف في مخططات ارتباط مفصلة. بعد ذلك، كانت شركة ألب تفحص الإنترنت بحثًا عن أي معلومات "سلبية" بشأن اتصالات أهدافها - دون النظر إلى ما إذا كانت المعلومات "السلبية" مستبعدة إلى حدٍ كبير ومن الواضح أنها غير صحيحة أو ثبت أنها خاطئة. بعد ذلك، كانت شركة ألب تعين صحفيين وأكاديميين وكتاب مستقلين لنشر القصص ومنشورات المدونات التي تنسب المعلومات السلبية التي كشفتها شركة ألب عن صلات الأهداف إلى الأهداف نفسها.

84. قامت شركة ألب بإضفاء الشرعية ونشر المزيد من الادعاءات الكاذبة التي اختلقتها حول أهدافها من خلال إنشاء أقسام "مثيرة للجدل" مزيفة على ويكيبيديا - نقلاً عن "تقاريرها" الخاصة باعتبارها حقيقة - واستخدام أساليب تحسين محرك البحث لضمان بقاء القصص التي اختلقتها في أعلى النتائج على Google وYahoo! وBing وغيرها من محركات البحث. وأخيرًا، ستقوم شركة ألب بتنبيه البنوك ومراقبي الامتثال المصرفي للادعاءات الكاذبة التي قامت شركة ألب باختلاقها لجعل البنوك تتوقف عن إقراض الأهداف، مما يؤدي إلى عزلهم ماليًا.

85. في 7 أغسطس 2017، أعدت شركة ألب عرضًا أكثر تفصيلاً لدولة الإمارات العربية المتحدة. وقد وصف المستند، الذي يحمل اسم الملف "Arnica O-first proposal-not agreed-20170807"، "خطة عمل عالمية" لشركة ألب لإطلاق "أفعال مسيئة واسعة النطاق" ضد قطر وشبكاتها، بما في ذلك جماعة الإخوان المسلمين، للكشف عن جهود قطر "لتوجيه حملة إعلامية وسياسية عالمية ضد" دولة الإمارات العربية المتحدة ومواجهتها. كانت "أرنيكا" أحد الأسماء الرمزية التي استخدمها شركة ألب للإشارة إلى عمله في دولة الإمارات العربية المتحدة.

86. وأكدت شركة ألب على أنها "لا تتهاون بشأن الأمن"، وأخبرت دولة الإمارات العربية المتحدة أنه "نظرًا لحساسية الموضوع"، لم تتمكن شركة ألب من "كتابة مدى خدماتها". وبدلاً من ذلك، كان الهدف من العرض تقديم نظرة عامة على قدرات شركة ألب. وعلى وجه التحديد، اقترحت شركة ألب عمل "رسومات بيانية متقدمة لشبكات التأثير السرية لأهدافنا في أوروبا والولايات المتحدة"، وإجراء "التحقيقات للحصول على مواد سلبية ضارة بشأن أهدافنا الرئيسية"، والمشاركة في "اتصالات سريعة الانتشار مسيئة لتشويه وإحراج الأهداف الرئيسية" باستخدام "العلاقات العامة الخفية" و"الأخبار المزيفة".

87. وفيما يتعلق بالاتصالات سريعة الانتشار المسيئة، أوضحت شركة ألب أنه بمجرد أن حددت الأهداف الرئيسية وحصلت على "استخبارات سلبية عنها"، فإنها "ستطلق حملات سلبية عدوانية للغاية عبر الإنترنت، وتنقل وتنشر

بطريقة سريعة الانتشار واستراتيجية الاستخبارات السلبية التي تم تحديدها سابقًا، والتي يمكن أن تظهر بعد ذلك في وسائل الإعلام السائدة". ادعت شركة ألب أنها ستستخدم "تقنيات سرية متقدمة تم اختبارها في العلاقات العامة الخفية" و"تهدف إلى تشويه سمعة أهدافها من خلال نشر المعلومات الاستخبارية المحرجة والمضرة بشكل سري وخبيث" لجعل أهدافها "تظهر إما على أنها منحرفين و/أو فاسدين و/أو منافقين و/أو إرهابيين" في "أعين وسائل الإعلام/الجمهور/المسؤولين." كتبت شركة ألب أنه "يمكنها أيضًا استخدام أفعال إبداعية ومضرة بشكل خاص، والتي يمكن وصفها شفيًا"، وحذرت دولة الإمارات العربية المتحدة من التقليل من شأن "قوة "العلاقات العامة الخفية".

88.     بناءً على المعلومات والاعتقاد، أرسل بريرو عرض شركة ألب عبر البريد الإلكتروني إلى المسؤولين الإماراتيين قبل سفره إلى أبوظبي لمقابلتهم شخصيًا من 7 أغسطس إلى 9 أغسطس 2017.



89.     اسميًا، كان عميل شركة ألب شركة إماراتية تسمى شركة أرياف للدراسات والبحوث ذ.م.م. ومع ذلك، توضح الوثائق التي تم الحصول عليها من خلال التسلل أن القيادة العليا لدولة الإمارات العربية المتحدة كانت مسؤولة. كان نقطة الاتصال الرئيسية لبريرو هي مطر، ولكن بريرو التقى أيضًا برئيس مطر، الذي أشار إليه بريرو ومطر باسم "صاحب السمو" و"الرئيس". بناءً على المعلومات والاعتقاد، كانوا يشيرون إلى محمد بن زايد آل نهيان.

90.     كان للمؤسسة غير القانونية في دولة الإمارات العربية المتحدة سلسلة قيادة واضحة. بناءً على المعلومات

والاعتقاد، قدم كل من محمد بن زايد آل نهيان ومطر وغيرهم من المسؤولين الإماراتيين التمويل والتوجيه الاستراتيجي والموافقة النهائية. وضع بريرو وكافين ونائبهما الأول، ليونيل بادال، الخطة، وحددوا الأهداف، وأشرفوا على تنفيذ الحملة. شارك بريرو وكافين وبادال ومحمد بن زايد آل نهيان ومطر بعمق في إدارة شؤون المؤسسة. ولكن لجعل حملة التشهير فعالة، تآمروا مع الصحفيين والأكاديميين وغيرهم لإضفاء الشرعية على أكاذيبهم المدمرة لسمعتهم. وكان من بين هؤلاء المشاركين في التآمر الصحفي السويسري سيلفان بيسون و"الخبير" في شؤون جماعة الإخوان المسلمين المقيم في واشنطن العاصمة، لورينزو فيدينو.

*تآمر الإمارات العربية المتحدة شركة ألب بابتكار عمليات لتدمير حازم وشركة لورد إنرجي.*

91.     بناءً على المعلومات والاعتقاد، أدركت الإمارات العربية المتحدة ومسؤولوها أن شركة ألب قدمت فرصة للقضاء على شركة لورد إنرجي كتهديد تنافسي. وعلى هذا النحو، طلبت دولة الإمارات العربية المتحدة ومسؤولوها من شركة ألب ابتكار عمليات ضد حازم وشركة لورد إنرجي باعتبارها بعض الأهداف الأولى لحملة الاتصالات سريعة الانتشار الشاملة للمؤسسة. وطبقًا لتعليمات دولة الإمارات العربية المتحدة، في 13 سبتمبر 2017، أعدت شركة ألب مذكرة داخلية "سرية للغاية" بشأن "مشروع أرنيكا" بشأن حازم وشركة لورد إنرجي بعنوان "اللورد الغاز – إعادة تحميل التقوى". يبلغ طول المذكرة حوالي نصف صفحة فقط، لكنها حددت شركة لورد إنرجي كشركة تجارية في لوجانو، سويسرا. وشملت فقرتين عن والد حازم، الذي وصفته المذكرة بأنه "أحد الإستراتيجيين الماليين الرئيسيين لجماعة الإخوان المسلمين".

92.     بعد حوالي شهر، في 6 أكتوبر 2017، كتبت شركة ألب أول تقرير رسمي لها يشير إلى حازم وشركته. بناءً على المعلومات والاعتقاد، شاركت شركة ألب هذا التقرير داخليًا ومع دولة الإمارات العربية المتحدة ومسؤوليها عبر البريد الإلكتروني. وأوضح التقرير أنه "لا يُعرف سوى القليل جدًا عن [شركة لورد إنرجي]" و"لم يحقق أحد مطلقًا في هوية مديريها وعلاقتها بشبكة جماعة الإخوان المسلمين بأكملها". وبعبارة أخرى، لم يكن هناك ما ينفي الاتهامات الزائفة التي خططت شركة ألب لاختراعها بشأن تورط حازم وشركة لورد إنرجي في تمويل الإرهاب. ومضى التقرير في الادعاءات التالية:

- تتم إدارة شركة لورد إنرجي "من قبل ورثة كبار قادة الإخوان المسلمين المقيمين في الدوحة".

- "تشير الوثائق السرية إلى أن الشركة تعتبر أحد كبار المشغلين التابعين لجماعة الإخوان المسلمين في أوروبا ولها علاقات مع كيانات مرتبطة بتنظيم القاعدة".

- "كما سنوضح لاحقًا، تكشف الوثائق السرية بشكل خاص عن جهات الاتصال بين المسؤولين التنفيذيين لدى شركة لورد إنرجي، الذين هم أعضاء في مجلس الإدارة، والأشخاص والمنظمات المرتبطة بتنظيم القاعدة".

- "منذ عام 2013، يقيم حازم ندا، الرئيس التنفيذي ومؤسس شركة لورد إنرجي، في الدوحة بدولة قطر، ولكنه لا يزال يستخدم هاتفًا محمولاً سويسريًا بتحليل مكالماته الهاتفية الخاصة به بشكل سري في يونيو ويوليو وأغسطس 2017. بل إن إحدى شقيقاته، وعلى الأرجح حسناء، متزوجة من محمد القرضاوي، ابن [الداعية

الإسلامي البارز] يوسف القرضاوي".

- "تكشف الوثائق السرية أيضًا عن جهات اتصال بين حازم ندا المقيم في الدوحة وعطية نصر الدين، رئيس مجموعة ناسكو ذات الصلة بالقاعدة وابنه أحمد نصر الدين".

- "لقد اخترنا حازم ندا بصفته ابن يوسف ندا الذي كان يعتبر في السابق "وزير خارجية" جماعة الإخوان المسلمين والممول الرئيسي لها ووريثه".

- "تتاجر شركة لورد إنرجي رسميًا في الغاز الطبيعي المسال والنفط الخام والأسمنت المعبأ، مما يسمح لها بالعمل عالميًا ونقل مبالغ مالية كبيرة"، الغطاء المثالي".

93.     لم يكن حازم داعمًا، ناهيك عن كونه مموّلًا، لجماعة الإخوان المسلمين. لم يقم أبدًا في الدوحة؛ بل إنه يعيش في إيطاليا ويقيم في هيوستن بولاية تكساس. ولم يكن يقيم في الدوحة أبدًا؛ في الواقع، يعيش في إيطاليا ويحتفظ بمقر إقامة في هيوستن، تكساس. بناءً على المعلومات والاعتقاد، كانت "الوثائق السرية" الوحيدة التي حصلت عليها شركة ألب هي سجلات الهاتف التي حصلوا عليها بشكل غير قانوني. ولم تكشف سجلات الهاتف هذه عن أي شيء جوهري. في الواقع، كشفوا عن أن حازم كان مقيمًا في إيطاليا ويعمل يوميًا في مكتب شركة لورد إنرجي في سويسرا بالقرب من الحدود الإيطالية وأنه ليس لديه أي روابط على الإطلاق مع جماعة الإخوان المسلمين.

94.     استندت ادعاءات شركة ألب بأن حازم لديه علاقات مع جماعة الإخوان المسلمين فقط إلى الروابط التاريخية لوالد حازم مع الجماعة. كتبت شركة ألب في تقريرها الصادر في 6 أكتوبر 2017: "من البديهي أن نجل [يوسف] سوف يتابع الأنشطة التجارية، ولكن أيضًا قضية الإخوان المسلمين".

95.     كما زعم التقرير أن شركاء عمل حازم يوسف همت والمواطنة الأمريكية فاطمة إمامة وديفيد بيكاردو وعمر نصر الدين كانوا تابعين لجماعة الإخوان المسلمين، مما أدى إلى تورط حازم في نشاط تمويل الإرهاب. جاء في التقرير "إنهم شباب، ويتعاملون مع مبالغ مالية ضخمة، ويشاركون سياسيًا، ويحتفظون بمكانة منفصلة. ولهذه الأسباب، قررنا تركيز تحقيقنا عليهم".

96.     ومع ذلك، فقد فعلت ألب مع همت وفاطمة وبيكاردو ونصر الدين بالضبط ما فعلته مع حازم - حيث فسرت علاقاتهم العامة بشكل انتقائي لإلصاق انتماءات لم تكن موجودة. ولم يكن همت، وهو تاجر مبتدئ في شركة لورد إنرجي، عضوًا في جماعة الإخوان المسلمين أبدًا ويمتلك وجهات نظر قوية ضد الجماعة. وكان والده صديقًا لوالد حازم، يوسف؛ ومثله مثل يوسف، تم وضعه منذ فترة طويلة في قائمة العقوبات الأمريكية وإزالته منها لاحقًا. كما كان همت رئيسًا لمؤسسة خيرية إسلامية، المنتدى الإسلامي الأوروبي للشباب والطلاب. وعلى الرغم من أن شركة ألب اتهمت المنتدى الإسلامي الأوروبي للشباب والطلاب بانتمائه إلى جماعة الإخوان المسلمين، إلا أنه لا يوجد شيء يربط المؤسسة الخيرية بجماعة الإخوان باستثناء تأكيدات شركة ألب الخاصة.

26

97.    كما أن أيًا من جهات اتصال الإخوان المسلمين المزعومة لدى حازم لم يكن لديه أي علاقات مباشرة مع الإخوان. كانت فاطمة إمامة، وهي مواطنة أمريكية وعضو مجلس إدارة في شركة لورد إنرجي، قد عملت لفترة وجيزة بدوام جزئي لدى شركة، وهي ميجا تشامبر، والتي تمت إزالتها من قائمة العقوبات الأمريكية قبل خمس سنوات من عملها. كان بيكاردو، وهو مواطن إيطالي، نشطًا في المجتمع الإسلامي الإيطالي. كان نصر الدين مشغلاً لشركة لورد إنيرجي تم استبعاد والده، مثل يوسف، من قائمة العقوبات الأمريكية قبل عقود. وقد وظفهم حازم لخبرتهم المهنية وقدرتهم اللغوية، والتي كان من الصعب العثور عليها في جنوب سويسرا. لم يكونوا من قادة الإخوان المسلمين كما زعمت شركة ألب زورًا.

### تطلق المؤسسة حملة "العلاقات العامة الخفية" و"الأخبار المزيفة" لتدمير شركة لورد إنرجي والقضاء على التهديد التنافسي.

98.    جاءت أول ضربة عامة من المؤسسة ضد حازم وشركة لورد إنرجي في 5 ديسمبر 2017، بعد شهرين من تقرير شركة ألب الذي حدد حازم وشركة لورد إنرجي كأهداف محتملة. كلفت شركة ألب الموقع الإلكتروني للإشاعات السياسية أفريكا إنتليجنس بكتابة مقالة عن شركة لورد إنرجي للادعاء زورًا أن الجزائر قد حظرت ناقلة شركة لورد إنرجي، وهي دي إس فالنتينا، في الميناء بسبب المخاوف المزعومة بشأن "مقاومتها للماء". ثم ذكرت المقالة بعد ذلك علاقة حازم مع يوسف، حيث ذكرت أن يوسف "يُزعم أنه قام بتمويل الإرهاب". كانت نسخة مستند Word من المقالة التي تحمل اسم الملف "Arnica-article lord energy-africa intelligence-201712" من بين المستندات التي حصل عليها المتسللون غير المعروفين من شركة ألب.

99.    كانت هذه المقالة كاذبة ومضللة من عدة جوانب. ولم تمنع السلطات الجزائرية السفينة دي إس فالنتينا بسبب صلاحيتها للإبحار. لم تشارك السلطات الجزائرية في هذه المسألة على الإطلاق. أوقف ربان الناقلة التحميل لأنه كان هناك نزاع بين شركة لورد إنرجي ومالك السفينة. تم حل النزاع في النهاية بعد سنوات من خلال التحكيم الذي تمت تسويته بنجاح لصالح شركة لورد إنرجي.

100.    كانت مقالة أفريكا إنتليجنس مجرد بداية من جانب المؤسسة. ولكن بالفعل أكدت على سبب توجيه دولة الإمارات العربية المتحدة شركة ألب لاستهداف حازم وشركته: أرادت دولة الإمارات العربية المتحدة تعطيل صادرات شركة لورد إنرجي من النفط الخام من الجزائر. كانت هذه هي المرة الأولى، وليس الأخيرة، التي تهاجم فيها المؤسسة على وجه التحديد أعمال شركة لورد إنرجي في الجزائر.

101.    وبعد شهر تقريبًا من نشر مقالة أفريكا إنتليجنس، نشرت المؤسسة مقالة زائفة عن حازم. هذه المرة، في صحيفة أكثر بروزًا -لوتان، الصحيفة اليومية الوحيدة باللغة الفرنسية على مستوى الدولة في سويسرا.

102.    في ديسمبر 2017، صاغت شركة ألب "تقريرًا أوليًا" سريًا عن حازم وشركة لورد إنرجي يحمل اسم الملف "arnica 3-lord energy note-sylvain-20171214." وزعم التقرير كذبًا أن شركة لورد إنرجي كانت "شركة تجارية غامضة تابعة للإخوان المسلمين مرتبطة بتنظيم القاعدة"، و"تشير الوثائق إلى أن الشركة السويسرية تشارك في العمليات الكبيرة التي تنفذها جماعة الإخوان المسلمين في أوروبا ولها علاقات مع الكيانات المرتبطة بتنظيم القاعدة". بناءً على المعلومات والاعتقاد، أرسلت شركة ألب هذه المذكرة عبر البريد الإلكتروني إلى المراسل الصحفي سيلفان بيسون، الذي استخدم المعلومات التي قدمتها شركة ألب لكتابة مقال لصحيفة *لوتان*.

103.    التقى بريرو ببيسون عدة مرات أثناء الترويج لدولة الإمارات العربية المتحدة. تشير مراسلات البريد الإلكتروني إلى أن الاثنين كانا أكثر من مجرد شركاء عمل عارضين – فهما صديقان وشريكان في التآمر. وفي وقت لاحق، كانت اتصالات شركة ألب مع دولة الإمارات العربية المتحدة تصف بيسون بأنه "جزء من شبكتنا الواسعة".

104.    نشر بيسون كتابًا في عام 2005 يتهم يوسف ندا بعلاقات مع مؤامرة إسلامية مزعومة. استند هذا الكتاب، *غزو الغرب: المشروع السري للإسلاميين* إلى حد كبير إلى وثيقة غير موقعة من 14 صفحة من عام 1982 اكتشفتها السلطات في منزل يوسف بعد أكثر من عقد من الزمان. والآن عرض بريرو على بيسون طريقة لتنفيذ أطروحته – مع الاستفادة المالية أيضًا.[5]

105.    في 5 يناير 2018، كتب بيسون مقالاً عن حازم وشركة لورد إنرجي لصحيفة *لوتان*. وكان المقال الذي نشرته صحيفة *لوتان* على الإنترنت بعنوان "الخدمات السرية السويسرية التي تستهدف الإسلاميين المؤيدين لقطر". وقد زعمت كذبًا أنه كانت هناك "دلائل" على وجود "شبكات قديمة لجماعة الإخوان المسلمين" في شركة لورد إنرجي وأن "هذا الجيل الجديد قام في بعض الأحيان ببعض الأنشطة المسلحة". لم يتم استهداف حازم وشركة لورد إنرجي أو التحقيق معهما من قبل السلطات السويسرية، ولم يقم أي شخص في شركة لورد إنرجي "بأنشطة مسلحة". تم اختلاق هذه الادعاءات من قبل شركة ألب، وفي النهاية تراجع بيسون عن ادعاءاته كتابيًا، معترفًا في خطاب بتاريخ 14 يونيو 2018، أن مقالته بتاريخ 5 يناير 2018 لم يكن المقصود منها "التصريح أو التأكيد أو الإشارة ضمنًا إلى أن شركة لورد إنرجي تخضع أو كانت تخضع للمراقبة من جانب جهاز الاستخبارات السويسري. وأي اقتراح بخلاف ذلك سيكون زائفًا ومضللاً."

---

[5] ديفيد كيركباتريك، *الأسرار القذرة لحملة التشهير*، ذا نيويوركر (27 مارس 2023)، https://www.newyorker.com/magazine/2023/04/03/the-dirty-secrets-of-a-smear-campaign.

لوزان، 14 يونيو، 2018

أؤكد أنا، سيلفان بيسون، نائب رئيس التحرير في صحيفة لوتان، بموجب هذه الوثيقة أن المقال المنشور في 5 يناير 2018،
بعنوان "Les Frères musulmans refont surface au Tessin" (جماعة الإخوان المسلمين تعود إلى الظهور
في تيسينو)"، لم يذكر أو يؤكد أو يشير ضمناً إلى أن شركة لورد إنرجي تخضع أو كانت تخضع للمراقبة من جانب جهاز
الاستخبارات السويسري. وأي اقتراح بخلاف ذلك سيكون زائفاً ومضللاً.

مع خالص تحياتي،

لوتان

[توقيع]

سيلفان بيسون
نائب رئيس التحرير

106.    أعقب المقال الذي كتبه بيسون في صحيفة لوتان في يناير 2018 موجة من التقارير المزيفة التي تهدف
إلى ترسيخ فرضيتها الاحتيالية على أنها حقيقة. وسرعان ما نشرت شركة ألب ثلاثة مقالات أخرى على الإنترنت استشهدت
بمقال بيسون واتهمت شركة لورد إنرجي بأنها لديها علاقات مع "الشبكات الإسلامية". تفاخر بادال في رسائل البريد
الإلكتروني الداخلية لشركة ألب بأن هذه المقالات الجديدة "تزيد من تأثير المقال المنشور في صحيفة لوتان" و"تضغط على
السلطات الفيدرالية والمحلية السويسرية للتحقيق في شركة لورد إنرجي وجماعة الإخوان المسلمين."

107.    وفي نفس الوقت تقريبًا، حدد بادال وبربرو مشاركًا في التآمر آخر قيّمًا يمكنه إضفاء المصداقية على
ادعاءاتهم الكاذبة: لورينزو فيدينو، مدير برنامج التطرف في جامعة جورج واشنطن في واشنطن العاصمة وخبير مزعوم
في الإسلام في أوروبا وأمريكا الشمالية، بما في ذلك جماعة الإخوان المسلمين. وكانا يعتزمان استخدام فيدينو كنظير أمريكي
لبيسون - وسيط موثوق به وعالي الاعتماد كان على استعداد لقول ما يريدونه مقابل المال.

108.    في 3 يناير 2018، طلب بادال من فيدينو عقد اجتماع لإجراء مناقشة بشأن شركة لورد إنرجي، والتي
وصفها بادال بأنها "شركة تجارية مثيرة للاهتمام (وسرية للغاية) ويقع مقرها في لوجانو."

109.    بعد أيام، في 12 يناير 2018، قدّم بربرو لفيدينو عشاء بقيمة 1000 دولار في فندق بوريفاج في
جنيف. وفقًا لنقاط الحوار التي أعدها بربرو، فقد خطط في البداية لإخفاء هوية عملائه الإماراتيين، وأخبر فيدينو أن شركة
ألب قد تم تعيينها من قبل "شركة محاماة مقرها لندن". ومع ذلك، أقر فيدينو لاحقًا لصحيفة ذا نيويوركر بأنه يعلم بأنه

الإمارات العربية المتحدة هي "العميل الأكثر واقعية".[6]

110.    في 24 يناير 2018، وقعت فيديبو عقدًا مع شركة ألب لتقديم "خيوط/شائعات مثيرة ... فيما يتعلق بموضوع منظمات التحقيق/الأفراد/التمويل في أوروبا" و"قائمة بالأعضاء المزعومين في منظمات المستوى الأول في الدول الأوروبية". وافقت شركة ألب على دفع 3000 يورو لفيديبو مقابل عمله.

111.    في أوائل عام 2018، وسعت المؤسسة نطاقًا واسعًا لحملتها المضللة. أكدت وثيقة استراتيجية شركة ألب المحدثة في يناير على سرية الحملة واتساع نطاقها. وذكرت التواصل باستخدام "قنوات مشفرة" والمشاركة في "إجراءات سرية"، واقترحت "ضرب" الأهداف باستخدام "الاتصالات سريعة الانتشار" و"وسائل التواصل الاجتماعي". وقد طلبت ميزانية تبلغ 300,000 يورو.

112.    في 15 فبراير 2018، نشرت ألب "تحليلًا تحقيقيًا مفصلاً"، والذي وصف بشكل كاذب حازم ولورد إنرجي، من بين أهداف أخرى، كجزء من "نظام التمويل الشامل" للإخوان المسلمين. بناءً على المعلومات والاعتقاد، شاركت شركة ألب هذه الوثيقة داخليًا وأرسلتها إلى دولة الإمارات العربية المتحدة ومسؤوليها عبر البريد الإلكتروني.

113.    وبعد أيام، أعدت شركة ألب عرضًا تقديميًا في PowerPoint لدولة الإمارات العربية المتحدة - تحت اسم الملف "ongoing" "August 2017 / February 2018" - والذي تضمن شريحة عن شركة لورد إنرجي، اتهمتها زورًا بأنها "شركة واجهة" لجماعة الإخوان المسلمين وأنها "مرتبطة بتنظيم القاعدة". ينتهي العرض التقديمي: "شكرًا جزيلاً على تقتكم". بناءً على المعلومات والاعتقاد، أرسلت شركة ألب هذا العرض التقديمي عبر البريد الإلكتروني إلى دولة الإمارات العربية المتحدة ومسؤوليها.

114.    في ذلك الشهر، زار بريرو أبوظبي، وبعد ذلك، بناءً على المعلومات والاعتقاد، أرسل عبر البريد الإلكتروني "خطاب تقدير رسمي" إلى "صاحب السمو". وكتب: "كانت تعليقاتك ونصائحك مفيدة للغاية، خاصةً في الخطوات التالية، وسنبذل كل ما في وسعنا لتلبية توقعاتك". كما قدم بريرو أيضًا الشكر إلى "صديقنا العزيز" (المعروف أيضًا باسم "مطر") على "تعليقاته القيمة للغاية".

**تحث المؤسسة، باحتيال، مراقبي المخاطر والامتثال في البنك على إدراج كل من حازم وشركة لورد إنرجي في القائمة السوداء بسبب الروابط المزعومة بالإرهاب.**

115.    بحلول ربيع عام 2018، بدأت خطة "الاتصالات سريعة الانتشار المسيئة" للمؤسسة في تحقيق آثارها المرجوة.

---

[6] ديفيد كيركباتريك، *الأسرار القذرة لحملة التشهير*، ذا نيويوركر (27 مارس 2023)، https://www.newyorker.com/magazine/2023/04/03/the-dirty-secrets-of-a-smear-campaign.

116.    في مارس 2018، تلقى حازم رسالة بريد إلكتروني من أحد جهات الاتصال الخاصة به في شركة سوناطراك لإعادة توجيه رابط إلى للمقالة التي نشرها بيسون في صحيفة *لوتان* بتاريخ 5 يناير 2018. وفي ذلك الشهر، اضطر أيضًا إلى الدفاع عن شركة لورد إنرجي أمام "الإدارة الجديدة" في شركة سوناطراك، على الرغم من أنه كان يعمل مع سوناطراك لسنوات. أوضح حازم لشركة سوناطراك أن شركة لورد إنرجي "تتعامل" مع جميع شركات النفط الكبرى على أساس مباشر، بما في ذلك شيفرون وإكسون موبيل وشل وبي بي"، - في الواقع كانت أكثر من 50% من مبيعات شركة لورد إنرجي السنوية مع شركات إكسون وشيفرون الكائنة في الولايات المتحدة والشركات التابعة لها وفروعها. كما أوضح حازم لشركة سوناطراك أنه "على مدار السنوات الثلاث الماضية، كانت [شركة لورد إنرجي] عاملاً أساسيًا في إعادة إنشاء سوق لمزيج الصحراء في آسيا ... [و]إعادة تأسيس التجارة في كوريا التي تم إغلاقها لأكثر من 4 سنوات." وأشار حازم أيضًا إلى أن شركة لورد إنرجي "أنشأت مؤخرًا وجودًا في هيوستن حيث بدأت في التعامل مع الصادرات الأمريكية من الدرجات الخفيفة في مايو 2018."

117.    أجابت شركة سوناطراك قائلةً: "شكرًا جزيلاً على رسالتك الإلكترونية أدناه التي تشرح فيها بإيجاز أنشطة شركة لورد إنرجي. ولإكمال هذه المعلومات، نرجو منك التكرّم بإرسال عرض تقديمي لنا حول تداولات النفط الخام والمنتجات من شركة لورد إنرجي خلال الفترة 2015 و2016 و2017 (المصادر والوجهات/المشترين والبائعين...)."

118.    كان متطلب شركة سوناطراك بأن تخضع شركة لورد إنرجي لفحص جديد للخلفية أمرًا محيرًا بشكل خاص نظرًا لأن شركة لورد إنرجي كانت أكبر شريك تجاري لشركة سوناطراك في عام 2017. حققت شركة لورد إنرجي أرباحًا تزيد عن 10 ملايين دولار أمريكي من صفقاتها مع شركة سوناطراك في عام 2017 وأكثر من 7 ملايين دولار أمريكي من صفقاتها مع شركة سوناطراك في عام 2016. توقفت شركة سوناطراك في نهاية المطاف عن العمل مع شركة لورد إنرجي في منتصف عام 2018.

119.    وبينما بدأت ادعاءات المؤسسة الكاذبة بشأن شركة لورد إنرجي في تقويض علاقة شركة لورد إنرجي مع شركة سوناطراك، استمر حازم وشركته في المضي قدمًا في تركيزهم على الأسواق الأمريكية. عيّن حازم مديرًا تنفيذيًا مخضرمًا في صناعة النفط كان مواطنًا أمريكيًا وعاش في هيوستن، دوجلاس كوسكي، لإدارة الشركة التابعة المخطط لها لدى شركة لورد إنرجي هناك. في أبريل، أبرمت شركة لورد إنرجي في الأمريكتين اتفاقية تعويض مع شركة كوسكي تنص على ما يلي: "تستعد الشركة للمشاركة في قطاع النفط والغاز في الولايات المتحدة من خلال إنشاء شركة فرعية محلية مملوكة بالكامل."

120.    في 24 أبريل 2018، قدمت شركة أمريكاز لورد إنرجي إنك شهادة تأسيس إلى وزير الخارجية في

تكساس.

121.     في الشهر التالي، في 16 مايو 2018، نشرت رويترز مقالة عن توسع شركة لورد إنرجي. يقول حازم لرويترز: "ننقل حاليًا حوالي 3-4 ملايين برميل من النفط الخام شهريًا. ونخطط لمضاعفة هذا العدد ثلاث مرات على مدار الـ 18 شهرًا القادمة. كان مفتاح النجاح لدينا يتمثل في تطوير أسواق جديدة إما للدرجات المحددة أو العثور على مجالات جديدة للدرجات الصعبة." وقال أيضًا: "لقد كنا أول من فتح السوق لمزيج الصحراء (الجزائري) في أستراليا لأكثر من 35 عامًا وأعدنا فتح المراجعة في كوريا الجنوبية... وتمكنا من العثور على مزيج له ليدخل السوق الصينية." أشارت المقالة إلى أن "المستخدمين النهائيين" التابعين لشركة لورد إنرجي كانوا مركزين في آسيا والولايات المتحدة" وأن الشركة "تهدف إلى التوسع في الصادرات والواردات الأمريكية."[7]

122.     وفي الوقت نفسه، نظرًا لأن شركة لورد إنرجي كانت تسعى إلى توسيع وجودها في الولايات المتحدة وزيادة صادراتها من خام غرب تكساس الوسيط (درجة أخرى، مثل مزيج الصحراء، التي تنافست مع نفط مربان)، فقد تم تصميم المشروع غير القانوني لدولة الإمارات العربية المتحدة على مضاعفة جهودها للقضاء على حازم وشركة لورد إنرجي. في 26 فبراير 2018، أرسل بادال عبر البريد الإلكتروني عرضًا "محدثًا وأكثر تفصيلاً" إلى مطر يوصي فيه "بمرحلة اختبار جديدة مدتها ثلاثة أشهر". اقترحت شركة ألب:

- نشر "مقالات سلبية ضخمة حول عشرات الأهداف الرئيسية التابعة لجماعة الإخوان المسلمين"، بما في ذلك 10 مقالات سلبية حول شركة لورد إنرجي؛
- إبلاغ الصحفيين المختارين "بصلات الأهداف مع تنظيم القاعدة"؛
- إنشاء صفحات ويكيبيديا سلبية للأهداف باللغات الإنجليزية والفرنسية والإيطالية؛
- تنبيه "قواعد بيانات الامتثال وهيئات المراقبة، والتي تستخدمها البنوك والشركات متعددة الجنسيات، على سبيل المثال، بشأن ... روابط شركة لورد إنرجي بالإرهاب"؛
- "إخطار البنوك بشكل سري بروابط الشركات التابعة لجماعة الإخوان المسلمين (مثل شركة لورد إنرجي ...) بالإرهاب ... والهدف من ذلك هو تجميد حساباتها المصرفية وأعمالهم"؛
- وضع "معلومات سلبية عن شركة لورد إنرجي في الصفحات الأولى من Google ومحركات البحث الأخرى (مثل Bing، Yahoo)."

123.     بالإضافة إلى إنشاء صفحات سلبية على ويكيبيديا - وهي شركة مقرها الولايات المتحدة - والتلاعب بالنتائج على محركات البحث الموجودة في الولايات المتحدة مثل Google وYahoo! وBing، أكد المقترح على نشر المعلومات السلبية في "وسائل الإعلام الناطقة باللغة الإنجليزية"، وتحديدًا تحديد "Daily Kos in the USA (التي

---

[7] جوليا باين، يدخل تاجر سويسري صغير، لورد إنرجي، سوق النفط الروسية مع صفقة CEFC، رويترز (16 مايو 2018)، https://www.reuters.com/article/idUSKCN1IH1K0.

وصفتها مجلة التايم ذات مرة بأنها "ثاني أفضل مدونة")" باعتبارها أحد منافذ المعلومات السلبية المحتملة.

124.    في هذا العرض، قالت شركة ألب لمطر: "إذا أعطيتمونا الضوء الأخضر، *فإننا نعتقد أننا قد نلحق ضررًا بالغًا، إن لم ندمر، بسمعة المجموعات الأوروبية الرئيسية التابعة لجماعة الإخوان المسلمين وقابليتها للاستمرار*، إن لم ندمرها، من خلال اتصالاتنا سريعة الانتشار المسيئة السرية". (تمت إضافة التأكيد.)

125.    حددت وثيقة داخلية خاصة بشركة ألب مكتوبة في 1 مارس 2018، باسم الملف "Action -6 arnica I-Plan"، خطة شركة ألب لنشر 45 مقالة حول الأهداف التي حددتها في تلك المرحلة، حوالي أربعة مقالات في الأسبوع، وصفحات ويكيبيديا. دعت خطة العمل إلى كتابة 10 مقالات حول شركة لورد إنرجي، ودعت تحديدًا إلى كتابة "مقال باللغة الإنجليزية" على موقع المدونات الإلكتروني الموجود في سان فرانسيسكو "Medium" والذي من شأنه ربط شركة لورد إنرجي بتنظيم القاعدة. وذكرت خطة العمل أيضًا "إبلاغ وسائل الإعلام في المملكة المتحدة والولايات المتحدة الأمريكية".

126.    وفي الوقت نفسه، بدأت شركة ألب في إعداد المتآمرين معها للمرحلة التالية من العمليات ضد حازم وشركة لورد إنرجي. في 30 أبريل 2018، صاغت شركة ألب وثيقة تحمل اسم الملف "do to-lorenzo-6 arnica list-20180430"، والتي تضمنت إعداد فيديو "نظرة عامة على الأفراد/المؤسسات/الشركات الرئيسية في الولايات المتحدة الأمريكية والعناصر/الإشاعات المثيرة للاهتمام ... لإظهار قدراتنا من خلال الحصول على معلومات جديدة وملموسة وحديثة في الولايات المتحدة."

127.    في 7 مايو 2018، نشرت شركة ألب "تقريرًا داخليًا سريًا" عن شركة لورد إنرجي بعنوان "لورد إنرجي: شركة الإخوان المسلمين التجارية الغامضة المرتبطة بتنظيم القاعدة." وادعى التقرير كذبًا مرة أخرى أن شركة لورد إنرجي كانت "أحد كبار المشغلين التابعين لجماعة الإخوان المسلمين في أوروبا ولديها علاقات مع الكيانات المرتبطة بتنظيم القاعدة". كما ناقش التقرير شحنات لورد إنرجي من النفط من الجزائر إلى كوريا الجنوبية وأعمالها مع شركة سوناطراك.

128.    بعد أسبوع واحد، في 15 مايو 2018، صاغت شركة ألب رسالة بريد إلكتروني، بناءً على المعلومات والاعتقاد، أرسلتها إلى نينا ماي، صحفية مستقلة، توجهها لإعداد ثلاثة مقالات عن شركة لورد إنرجي. كتبت شركة ألب نفسها العناوين الرئيسية: "لورد إنرجي: الشركة الغامضة التي تربط بين تنظيم القاعدة وجماعة الإخوان المسلمين"؛ و"شركة لورد إنرجي التجارية المرتبطة بكيانات الإرهاب المحددة من قبل الولايات المتحدة"؛ و"حصري: تمتلك جماعة الإخوان المسلمين شركتها التجارية السويسرية الخاصة."

129.    طلبت شركة ألب من ماي الاطلاع على المواد "الخلفية" التي قدمتها على أنها "الموضوع معقد". كما

33

طلبت شركة ألب من ماي عدم مشاركة التقرير السري و"حذفه بأمان بعد" مراجعته.

130.    كتبت ماي المقالات وفقًا لتوجيهات ألب وقامت بنشرها باسم مستعار. في 31 مايو 2018، أرسلت إلى شركة ألب فاتورة لتسعة مقالات كتبتها "عبر ثلاثة مشاريع"، خمسة منها اتهمت فيها شركة لورد إنرجي زورًا بانتماءات إرهابية. أحد المقالات بعنوان "شركة لورد إنرجي ترتبط بكيانات إرهابية معينة في الولايات المتحدة". وهناك عنوان آخر بعنوان "رويترز تفتقد وجود علاقة إرهابية كبيرة في تغطية النفط: القصة الحقيقية لشركة لورد إنرجي السويسرية." نُشرَت هذه المقالة على موقع المدونات الإلكتروني WordPress في الولايات المتحدة. وزعم المقال كذباً أن حازم "تولى" أعمال والده، وخلص كذباً إلى أن "علاقات شركة لورد إنرجي بجماعة الإخوان المسلمين - والإسلام المتطرف والممولين - قوية". قد يتم فرض 250 جنيهًا إسترلينيًا في اليوم. بلغ إجمالي المبلغ المستحق 1,140 جنيه إسترليني.

نينا ماي
الكتابة والتحرير

| | |
|---|---|
| **إلى:** | شركة ألب سيرفيسز إس أيه<br>رو دي مونت تشويسي 36<br>1207 جنيف<br>سويسرا |
| **جهة الاتصال:** | ليونيل بادال |
| **التاريخ:** | 31 مايو 2018 |
| **رقم الفاتورة:** | 18/16 |
| **مرجعكم:** | - |
| **الوصف الوظيفي:** | تسع مقالات في ثلاثة مشاريع (نصف يوم لكل منها) |

1. مع ظهور أول ضحية احتيال لإريك أرنو، تحضر بناته معهد لو روزي الذي يتقاضى 80 ألف جنيه إسترليني سنويًا.
2. لورد إنرجي: الشركة الغامضة التي ترتبط بتنظيم القاعدة وجماعة الإخوان المسلمين
3. حصريًا: تمتلك جماعة الإخوان المسلمين شركتها التجارية السويسرية الخاصة
4. شركة لورد إنرجي ترتبط بكيانات إرهابية معينة في الولايات المتحدة
5. لماذا يجب أن يتم عرض السلسلة القادمة من Homeland في لوجانو؟
6. رويترز تفتقد وجود علاقة إرهابية كبيرة في تغطية النفط: القصة الحقيقية لشركة لورد إنرجي السويسرية
7. تعرف على أوليفييه كوريول، المصرفي السويسري الذي يقف وراء فضيحة إيرباص المالية
8. مصرفي سويسري في مركز تحقيق إيرباص-مالي
9. أوليفييه كوريول: الاسم الذي يجب معرفته في قضايا الفساد في نيجيريا ومالي

| | |
|---|---|
| **السعر:** | 250 جنيه إسترليني/اليوم |
| **التكاليف/الرسوم الأخرى:** | 15 جنيهًا إسترلينيًا رسوم التحويل المصرفي الأجنبي |
| **إجمالي المبلغ المستحق:** | 1140 جنيه استرليني |

34

131.    وفي ذلك الشهر، وسعت المؤسسة أيضًا حملتها للاحتيال على البنوك والمؤسسات المالية لتصديق الادعاءات الكاذبة التي اختلقتها بشأن علاقات حازم وشركة لورد إنرجي بالإرهاب، بهدف جعل تلك البنوك تقطع علاقاتها مع حازم وشركة لورد إنرجي، مما أدى إلى منع حصولها على الائتمان.

132.    في 6 يونيو 2018، أرسلت شركة ألب بريدًا إلكترونيًا آخر إلى نينا ماي وصحفيًا مستقلًا آخر مُدرج في كشوف الرواتب، طلبت فيه كتابة "مقالة قصيرة جديدة" عن شركة لورد إنرجي، ركزت هذه المرة على حساباتها في بنك كريدي سويس. وكان من المقرر أن يحمل المقال عنوان "الامتثال: شركة الإخوان المسلمين لورد إنرجي مرتبطة بكريدي سويس."

133.    بعد أسبوع، في 13 يونيو 2018، أرسلت شركة ألب رسالة بريد إلكتروني حول شركة لورد إنرجي إلى عنوان البريد الإلكتروني للعلاقات الإعلامية في كريدي سويس (media.relations@credit-suisse.com)، تظاهرت فيها بأنها صحفي مستقل واستخدمت الاسم المستعار لوران مارتن. ادعت رسالة البريد الإلكتروني أن شركة لورد إنرجي كانت مرتبطة بالإسلاميين المتطرفين واستشهدت بالقصص التي اختلقتها شركة ألب عن شركة لورد إنرجي. وكان هدف شركة ألب يتمثل في حث كريدي سويس بشكل احتيالي على التوقف عن إقراض حازم وشركة لورد إنرجي، وبالتالي حرمان حازم وشركة لورد إنرجي من الوصول إلى مصدر الائتمان الرئيسي، والذي بدونه لن يتمكنوا من العمل، وحرمان كريدي سويس من العلاقات المصرفية القيّمة ودخل الفائدة.

134.    في 12 يونيو 2018، وباستخدام نفس الاسم المستعار (لوران مارتن)، أرسلت شركة ألب رسائل بريد إلكتروني إلى وورلد كومبليانس، وورلد تشيك، Info4C - قواعد بيانات الامتثال لمخاطر البنوك الرئيسية - مدعيةً أن شركة لورد إنرجي "مرتبطة بشكل مباشر بالإسلاميين المتطرفين". استشهدت شركة ألب مرة أخرى ببعض المقالات التي اختلقتها عن شركة لورد إنرجي، بما في ذلك المقالة التي كتبها بيسون في صحيفة *لوتان* بتاريخ 5 يناير 2018. وخلصت رسالة البريد الإلكتروني إلى أنه "نظرًا للوائح مكافحة تمويل الإرهاب، يبدو من الواضح رؤية اسم شركة لورد إنرجي" في قواعد البيانات.

135.    استنادًا إلى تقرير شركة ألب، تمت إضافة حازم وشركة لورد إنرجي والموظف في شركة ألب يوسف همت إلى وورلد تشيك تحت فئة مخاطر "الإرهاب" فيما يتعلق "بالروابط المشتبه بها مع جماعة الإخوان المسلمين".



136.    قواعد البيانات هذه ليست مجرد غرف مقاصة عامة لتظلمات الأعمال. فهم يربطون قوائم العقوبات والحظر، ويراقبون القوائم التنظيمية وقوائم الإنفاذ، ويجمعون قوائمهم السوداء الفعلية للأفراد والكيانات عالية المخاطر، مع التركيز بشكل خاص على الإرهاب والجريمة المنظمة والاحتيال. وتُعد قواعد البيانات هذه مملوكة لشركات حسنة السمعة تثق بها البنوك لتوفير معلومات دقيقة ومحدثة. على سبيل المثال، تم الاستحواذ على وورلد كومبلاينس في عام 2013 من قبل شركة ليكسيس نيكسيس ريسك سوليوشنز، التي يقع مقرها الرئيسي في أتلانتا، جورجيا.8 استحوذت تومسون رويترز على شركة وورلد تشيك في عام 2011، وهي شركة يتم تداول أسهمها علنًا في بورصة نيويورك ولها العديد من المكاتب

---

8 ريلكس، شركة ليكسيس نيكسيس تستحوذ على وورلد كومبلاينس، المزود الرائد لحلول الامتثال ومكافحة غسيل الأموال العالمية (7 أغسطس 2013)، https://www.relx.com/media/pressreleases/archive/07-08-2013.

في جميع أنحاء الولايات المتحدة.[9] ثم تعتمد البنوك على قواعد البيانات هذه عند إجراء العناية الواجبة بشأن العملاء الحاليين والمحتملين. يمكن أن يكون الظهور في قائمة وورلد كومبلايانس أو وورلد تشيك مميزًا لأي عمل من أي نوع، ولكن خاصةً في أعمال النفط، حيث تكون القروض المصرفية الكبيرة ضرورية لتمويل العمليات وتكون مصالح الأمن القومي على المحك.

137.    كانت شركة ألب تعرف كل هذا. في يونيو 2018، أعدت تقرير "تحديث عاجل" "سري للغاية"، ينص على ما يلي: "لقد علمنا من مصدر سري أنه بعد اتصالنا سريع الانتشار، تواجه شركة [لورد إنرجي] مشاكل خطيرة مع البنوك الغربية لتلقي الائتمانات. ويبدو أنه تم وضعها في قائمة مراقبة تستخدمها البنوك. وتشعر البنوك بالقلق إزاء علاقاتها بالإسلاميين المتطرفين." بناءً على المعلومات والاعتقاد، شاركت شركة ألب هذا التقرير مع دولة الإمارات العربية المتحدة ومسؤوليها عبر البريد الإلكتروني.

138.    عندما علم حازم أنه قد تم تعيينه من قبل وورلد تشيك، أرسل رسالة بريد إلكتروني إلى وورلد تشيك في 2 يوليو 2018 لإبلاغها بوجود "جهود تشهير مستمرة" و"غير معروفة" ضده وضد شركة لورد إنيرجي وطلب منها الإفصاح عن "جميع الباحثين المشاركين في وضع [حازم وشركة لورد إنرجي وهمت] في نظام [وورلد تشيك]، إلى جانب جميع روابطهم المهنية." ردت وورلد تشيك بعد أسبوع في 9 يوليو معترفة بحدوث "خطأ". ومع ذلك، أحبطت وورلد تشيك جهود حازم للتعرف على المشوهين المجهولين من خلال رفض طلب حازم التعرف على الباحثين الذين عملوا على ملفه الشخصي.

*يقاوم حازم، وتضاعف المؤسسة جهودها.*

139.    في هذه المرحلة، علم حازم أنه كان ضحية لجهود متضافرة لتشهير اسمه من خلال ربطه وشركته بالإرهاب بشكل خاطئ. كان يعتقد أنه يتم استهدافه من قبل شركة تجارة سلع منافسة. ومع ذلك، لم يكن بإمكانه أن يتخيل نطاق أو حجم المخطط ضده. لم يكن ليتخيل أبدًا في أسوأ أحلامه أن يتعرض لمؤامرة ضخمة دبرتها الإمارات العربية المتحدة وكبار مسؤوليها الذين كانوا يتواطؤون مع شركة تحقيق خاصة وشبكة مصادرها وصحفيين وأكاديميين لديها لنشر ادعاءات كاذبة وتدمير أعمال حازم وسمعته.

140.    في ربيع وصيف 2018، حاول حازم توضيح اسمه وتحديد الأطراف المسؤولة عن إصدار البيانات الكاذبة عنه. تعاقد حازم مع شركة المحاماة البريطانية كارتر-روك وأرسل خطابات قانونية إلى بعض المنافذ التي نشرت

---

[9] تومسون رويترز، *تومسون رويترز تستحوذ على وورلد تشيك* (16 مايو 2011)، https://ir.thomsonreuters.com/news-releases/news-release-details/thomson-reuters-acquiresworld-check؛ تومسون رويترز، التقرير السنوي لعام 2022، https://ir.thomsonreuters.com/staticfiles/c8f80e59-857a-4312-a478-e7dc1e206891.

بيانات كاذبة وتشهيرية عنه يطالبها فيها بالتراجع عن البيانات وتزويده بمعلومات عن الأطراف المسؤولة عن كتابتها. على سبيل المثال، في 28 مايو ومرة أخرى في 30 مايو 2018، أرسل حازم بريدًا إلكترونيًا إلى عنوان البريد الإلكتروني لجهة الاتصال (contact@mediapart.fr) لموقع المدونات الفرنسي "ميديا بارت" بخصوص مقال نُشر على ميديا بارت بعنوان "لورد إنرجي إس أيه: الشبكات المالية للإخوان المسلمين في سويسرا لا تزال قائمة". وأخطر حازم ميديا بارت بأن هذه المقالة "تحتوي على معلومات مضللة"، وطالب ميديا بارت "بإزالة" المقالة و"تزويده بالتفاصيل المتعلقة بالشخص الذي كتب هذه المقالة، التي تشتمل على دلالات تشهيرية قوية ضد شركتنا." رفضت ميديا بارت ذلك.

141.    كما أرسلت كارتر-روك، نيابةً عن حازم، خطابات طلب تراجع مماثلة إلى أفريكا إنتليجنس، *لوتان*، ووردبريس، وغيرها من المواقع الإلكترونية.

142.    عندما أدركت شركة ألب أن حازم يتخذ خطوات إيجابية لمحاولة مواجهة حملة المعلومات المضللة للمؤسسة، كثّفت شركة ألب جهودها. في "تحديث عاجل" لدولة الإمارات العربية المتحدة في 6 يونيو 2018، كتبت شركة ألب أن كارتر-روك وحازم نجحا في إزالة مقالين عبر الإنترنت؛ ومع ذلك، خططت شرك ألب "لإعادة نشرهما في مكان آخر في الأيام القادمة". حذرت شركة ألب أيضًا من أن حازم "من المحتمل أن يبدأ إجراءات قانونية في المملكة المتحدة"، ولكن شركة ألب لم تكن قلقة لأن "عملها لا يزال سري تمامًا".

143.    تفاخرت شركة ألب بأن [لورد إنرجي] "تواجه مشاكل خطيرة مع البنوك الغربية لتلقي الائتمانات بعد اتصالاتنا سريعة الانتشار. ويبدو أنه تم وضعها في قائمة مراقبة تستخدمها البنوك. وتشعر البنوك بالقلق إزاء علاقاتها بالإسلاميين المتطرفين." خلصت شركة ألب إلى ما يلي: "هذه كلها أخبار جيدة: يبدو أن إجراءاتنا سريعة الانتشار ناجحة: 1) تواجه شركة لورد إنرجي مشاكل خطيرة في عملياتها التجارية و2) تنتشر بسرعة كبيرة، مع تركيز أشخاص جدد على الشركة."

144.    في أوائل يونيو 2018، نشرت شركة ألب مقالة باللغة الفرنسية في ويكيبيديا عن شركة لورد إنرجي تضمنت قسمًا "للنقاط المثيرة للجدل" يتهم الشركة وموظفيها زورًا بالروابط الإرهابية. وعلى وجه التحديد، ذكرت المقالة أن والد حازم كان "سفيرًا سريًا لجماعة الإخوان المسلمين"؛ وأن المنظمة الطلابية التي ينتمي إليها همت، المنتدى الإسلامي الأوروبي للشباب والطلاب، كانت "تُعتبر قريبة من الإخوان المسلمين"؛ وأن شركة لورد إنرجي كان لديها "صلات بحركة الإخوان المسلمين"؛ وأن ديفيد بيكاردو كان "إسلاميًا إيطاليًا"؛ وأن فاطمة إمامة كانت "مرتبطة بالشركات الأمريكية والشركات الخاضعة لعقوبات الأمم المتحدة". استشهدت المقالة بالمقال الذي نشره بيسون في صحيفة *لوتان* بتاريخ 5 يناير 2018، ومواد أخرى صمّمتها شركة ألب.

145. سعى حازم إلى تصحيح صفحة ويكيبيديا ووجد نفسه في "حرب التحرير" لأن شركة ألب كان لديها محرر ويكيبيديا يُدعى بيديفور مُدرج في كشوف الرواتب. رفض بيديفور محاولات حازم لتصحيح المقالة. عندما حاول حازم تحرير صفحة ويكيبيديا عن طريق إزالة المعلومات الكاذبة وإضافة قسم يوضح أن شركة لورد إنرجي تسعى إلى اتخاذ إجراء قانوني ضد مختلف وسائل الإعلام المسؤولة عن نشر ادعاءات كاذبة عنه، رفض بيديفور مراجعات حازم وأرسل له رسالة ويكيبيديا تطلب منه إثبات الإجراء القانوني.

146. أبلغ حازم بيديفور أن شركة لورد إنرجي قد تعاقدت مع شركة محاماة للتشهير لرفع دعوى قانونية ضد صحيفة *لوتان* وأفريكا إنتليجنس وميديا بارت. وأشار حازم إلى أن بيسون قد راجع مقاله في صحيفة *لوتان*، وكان حازم يتفاوض مع أفريكا إنتليجنس لتصحيح مقاله. وأشار حازم أيضًا إلى أن بعض المقترحات الواردة في مقال ويكيبيديا لم تكن مدعومة بالمصادر المذكورة. لم يهم أي من ذلك.

147. في "تحديث عاجل" آخر "سري للغاية" لدولة الإمارات العربية المتحدة في 13 يونيو 2018، كتبت شركة ألب أن "صفحة ويكيبيديا الفرنسية لشركة لورد إنرجي قد تعرضت للهجوم ثماني مرات من قبل مستخدم ... حاول إزالة كل المحتوى الهام الذي أنشأناه." لكن شركة ألب "تفاعلت بسرعة" من خلال حظر المستخدم، و"طلبت مساعدة من مشرفين ودودين" (أي بيديفور) "الذين واجهوا الهجمات المتكررة". طمأنت شركة ألب دولة الإمارات العربية المتحدة أنه على الرغم من أن حازم بذل "محاولة إضافية لإزالة المحتوى النقدي"، إلا أن شركة ألب وبيديفور تمكنا من "إعادة المعلومات".

148. وأكدت شركة ألب أن "هدفها يظل شل" شركة لورد إنرجي وأوجزت خطتها للقيام بذلك، بما في ذلك عن طريق إنشاء مقالات ويكيبيديا جديدة لشركة لورد إنرجي باللغتين الإنجليزية والإيطالية، وإنشاء مقالات ويكيبيديا لحازم وهمت، و"إبلاغ بنك [لورد إنرجي] وكريدي سويس وقواعد بيانات الامتثال حول مخاطر العمل مع شركة لورد إنرجي."

149. ولزيادة تخفيف الضرر الذي تسببت فيه حملة التشهير التي قامت بها المؤسسة، أرسل حازم رسائل بريد إلكتروني في الفترة ما بين 13 و22 يونيو 2018 إلى العديد من المؤسسات المالية التي اقترضت منها شركة لورد إنرجي، بالإضافة إلى بعض الأطراف المقابلة وشركاء الأعمال لدى شركة لورد إنرجي، مرفقًا بها خطابًا ووثائق داعمة لدحض كذب المؤسسة. أرسل حازم هذه المعلومات إلى بنك يو بي إس وإكسون موبيل وأي إن جي ومراي شيبينج وناتيكسيس وسويس كارد وبي آر سي شيب بروكرز وجي إس كالتيكس وليتاسكو. كما أرسل الخطاب والوثائق الداعمة إلى جوليا باين، صحفية رويترز التي كتبت بشكل إيجابي عن شركة لورد إنرجي قبل أسابيع فقط.

150. وأوضح حازم في خطابه: "كان الجهد الأخير لتشويه سمعة شركتنا والتشهير بها... يخضع لمحاولة

تقويض عملنا والتواجد المتزايد في سوق النفط." وأشار إلى أنه، كجزء من "الجهد المتضافر"، "هاجمت المقالات الأخيرة موظفي [شركة لورد إنرجي]"، مع إيلاء اهتمام خاص للموظفين المسلمين". كتب حازم، على افتراض أن شركة تجارية منافسة هي المسؤولة، أنه "من المزعج رؤية... الحقائق التي يتم تحريفها من قبل منافسي [لورد إنرجي] وإعدائها لمحاولة إجبارنا على الخروج من السوق بعد النمو والنجاح الذي حققناه من خلال العمل الشاق الذي قمنا به."

### *المؤسسة تُفلس حازم وشركاته.*

151.    لم تكن جهود حازم لدحض الادعاءات الكاذبة للمؤسسة كافية. وقد قاومت المؤسسة الإجراءات التي اتخذها حازم من خلال الاستمرار في ملء الإنترنت بمقالات تتناول السرد غير الصحيح الذي توصلت إليه المؤسسة بأن حازم وشركة لورد إنرجي كان لهما علاقات بالإرهاب.

152.    في 4 يونيو 2018، نشرت المؤسسة مقالاً بعنوان "لورد إنرجي إس أيه: تمتلك جماعة الإخوان المسلمين شركتها التجارية الخاصة" على موقع Tumblr، وهو موقع للتدوين والتواصل الاجتماعي يقع مقره الرئيسي في نيويورك. أكد المقال كذبًا، من بين أمور أخرى، أن حازم "يستمر في دعم الشبكة" وأن "شركة لورد إنرجي هي واجهة لتمويل الإخوان المسلمين من خلال بيع النفط الخام من شمال أفريقيا".

153.    في 6 يونيو 2018، نشرت المؤسسة مقالًا بعنوان "لورد إنرجي: الشركة الغامضة التي تربط تنظيم القاعدة والإخوان المسلمين" على WordPress، وهو موقع إلكتروني آخر للتدوين في الولايات المتحدة.

154.    في 7 يونيو 2018، نشرت المؤسسة مقالًا بعنوان "لماذا يجب أن تعرض السلسلة التالية من Homeland في لوجانو وأن تتضمن لورد إنرجي" على موقع Live Journal، وهو موقع إلكتروني مملوك لروسيا وله مكتب في كاليفورنيا. أكد المقال كذبًا، من بين أمور أخرى، أن "أرباح شركة لورد إنرجي تذهب إلى منظمة متأصلة بعمق في جماعة الإخوان المسلمين، ولها علاقات قديمة مع تنظيم القاعدة. ومن غير المستغرب أن وكالة الاستخبارات السويسرية تحقق في أنشطتها." نسبت المقالة المعلومات إلى بيسون، مشيرةً إلى أنه "أحد أكثر الخبراء موثوقية في العالم في الإسلام المتطرف".

155.    في 8 يونيو 2018، نشرت شركة ألب مقالة بعنوان "رويترز تفتقد رابطًا إرهابيًا كبيرًا في التغطية النفطية: القصة الحقيقية لشركة التجارة السويسرية لورد إنرجي" على WordPress.

156.    في 30 يونيو 2018، نشرت ألب المقالة التي ترعاها والتي كلفت ماي بكتابتها في وقت سابق من ذلك الشهر بعنوان "الامتثال: شركة الإخوان المسلمين التجارية لورد إنرجي مرتبطة بكريدي سويس" على Medium، الذي يقع مقره الرئيسي في سان فرانسيسكو، كاليفورنيا. ادعى المقال كذباً أن شركة لورد إنرجي "تخضع على ما يبدو للمراقبة

من قبل وكالة الاستخبارات السويسرية" وشكك في امتثال بنك كريدي سويس للقوانين الأمريكية، مشيراً إلى أن "شركة لورد إنرجي، وهي شركة سويسرية لها علاقات قوية مع جماعة الإخوان المسلمين والمتعاطفين مع تنظيم القاعدة، تمتلك أصول كبيرة في بنك كريدي سويس، مما يثير تساؤلات حول الامتثال وحوكمة الشركات في العملاق المصرفي. ... على الرغم من أن بنك كريدي سويس اضطر بالفعل إلى دفع 536 مليون دولار لتسوية التغييرات التي انتهك فيها عقوبات [الولايات المتحدة] المفروضة على إيران، إلا أن هذه الإفصاحات بشأن شركة لورد إنرجي قد تعرض البنك إلى مشكلة مع وزارة الخزانة [الأمريكية]."

157.      استمرت المؤسسة في نشر مقالات إضافية طوال فصل الصيف والخريف عام 2018. في 22 أغسطس 2018، على سبيل المثال، كان لدى المؤسسة مقال كتبته نينا ماي تحت اسم مستعار "فرح أحمد" نُشر على موقع Medium. وقد اتهم المقال الذي كان بعنوان "كيف يمول الاتحاد الأوروبي منظمة الشباب "المنتدى الإسلامي الأوروبي للشباب والطلاب" التابعة لجماعة الإخوان المسلمين"، شركة لورد إنرجي كذبًا بأنها "أداة تمويل جديدة لجماعة الإخوان المسلمين". في 3 سبتمبر 2018، نشرت الشركة مقالة أخرى كتبتها نينا ماي على WordPress. وكانت بعنوان "اعرف عميلك: شركة لورد إنرجي التجارية المرتبطة بجماعة الإخوان المسلمين."

158.      كما سعت المؤسسة أيضًا إلى الاحتيال على الصحفيين الرئيسيين، بما في ذلك في الولايات المتحدة، وحثهم على تكرار وإعادة نشر الأكاذيب التي لفقتها المؤسسة حول حازم وشركة لورد إنرجي. في الفترة ما بين 7 يونيو و19 يونيو 2018، استخدمت شركة ألب حساب Protonmail آمن ومشفر تحت اسم مستعار "إيفان دوسيت" لإرسال 12 رسالة بريد إلكتروني تحمل عنوان "لورد إنرجي إس أيه - تمويل الإرهاب (سري)" إلى المراسلين من المنافذ الإعلامية الكائنة في الولايات المتحدة *بلومبيرج وأكسيوس* والمنافذ الإعلامية الكائنة في المملكة المتحدة *ذا صنداي تايمز، ذا أوبزرفر، ذا جارديان، فايننشال تايمز، ذا صن* - التي تملكها في النهاية شركة نيوز كورب الإعلامية الكائنة في الولايات المتحدة - *وصحيفة ذا تايمز.*

159.      في 8 يونيو 2018، أرسلت شركة ألب نفس البريد الإلكتروني إلى بلاتس، إحدى الوكالات البارزة للإبلاغ عن أسعار النفط الخام، المملوكة لشركة ستاندرد آند بورز جلوبال، وفي 7 يونيو و19 يونيو 2018، أرسلت شركة ألب نفس البريد الإلكتروني إلى مراسلة رويترز جوليا باين.

160.      يحتوي نص البريد الإلكتروني الذي نشرته شركة ألب على نطاق واسع على وسائل الإعلام في الولايات المتحدة والمملكة المتحدة وكالة رئيسية للإبلاغ عن أسعار النفط الخام على روابط للعديد من المقالات التي تمت اختلاقها سابقًا. وأشار البريد الإلكتروني أيضًا إلى أنه "كنتيجة لمقالة لوتان" - وهي مقالة طلبت المؤسسة من بيسون كتابتها ودفعت

41

مقابلها – "على ما يبدو أن شركة لورد إنرجي قد تم إدراجها في القائمة السوداء من قبل البنوك (بموجب لوائح تمويل الإرهاب)."

161.    كما صاغت المؤسسة وقدمت إلى ويكيبيديا مقالات ويكيبيديا باللغة الإنجليزية والإيطالية تتهم زورًا حازم وشركة لورد إنرجي بالتورط في تمويل جماعة الإخوان المسلمين والإرهاب. في 6 يوليو 2018، أرسل موظف ألب، ريان حسين، عبر البريد الإلكتروني مسودة لمقال ويكيبيديا باللغة الفرنسية حول حازم إلى بادال وبريرو وغيرهم من موظفي شركة ألب للموافقة عليه. بالطبع، استشهدت مسودة المقالة هذه بالمواد الأخرى التي كلفت بها المؤسسة سابقًا، بما في ذلك مقالة بيسون في 5 يناير 2018 في صحيفة *لوتان*.

162.    ادعت مقالات ويكيبيديا الإنجليزية والفرنسية كذبًا ما يلي: "حازم ندا... الذي وصفه الصحيفة السويسرية *لوتان* بأنه "السفير السري لجماعة الإخوان المسلمين"، أسس شركة لورد إنرجي إس أيه"، و"وفقًا لمقال في صحيفة *لوتان*، عادت الشبكات القديمة لجماعة الإخوان المسلمين إلى الظهور في سويسرا من خلال الشركة التجارية لورد إنرجي. وبينما تنفي شركة لورد إنرجي أي روابط مع الإخوان المسلمين، أشارت *لوتان* إلى أن العديد من مديريها كانوا مسلحين إسلاميين مقربين من جماعة الإخوان المسلمين."

163.    ولإضافة قدر رفيع من الشرعية إلى هذه الادعاءات الزائفة، استشهدت مقالات ويكيبيديا أيضًا بلورينزو فيدينو. وقالوا: "وفقًا لما ذكره الدكتور لورينزو جي فيدينو، من الصعب تحديد أعضاء جماعة الإخوان المسلمين حيث أن هناك "جهدًا واعيًا من جانب الإخوان الغربيين للتقليل من أو حتى إنكار روابطهم الأيديولوجية بجماعة الإخوان المسلمين"، قبل إضافة أن يتم اعتبار المنتدى الإسلامي الأوروبي للشباب والطلاب بمثابة "مبادرة وتنظيم إخواني عابر للحدود الوطنية".

*تظل دولة الإمارات العربية المتحدة ومسؤولوها على اتصال وثيق مع شركة ألب وبريرو وبادال فيما يتعلق بوضع عمليات المؤسسة وأثرها ضد حازم وشركة لورد إنرجي.*

164.    طوال عامي 2018 و2019، تواصلت شركة ألب بشكل روتيني مع دولة الإمارات العربية المتحدة ومسؤوليها وأبقتهم على علم بوضع عمليات المؤسسة وأثرها ضد حازم وشركة لورد إنرجي والأهداف الأخرى من خلال "التقارير الموجزة" و"خطط العمل" و"تقييمات الأثر" المنتظمة. كما أنشأت شركة ألب "مراجعات صحفية" تسرد العشرات من المقالات التي اختلقتها شركة ألب، بما في ذلك العديد من المقالات حول حازم وشركة لورد إنرجي.

165.    فعلى سبيل المثال، أعدت شركة ألب "تقريرًا موجزًا - تقييم الأثر" في 23 يوليو 2018، والذي وصف "الاتصالات سريعة الانتشار وعمليات الضغط السرية على 10 أهداف رئيسية"، بما في ذلك شركة لورد إنرجي، وأرسلته، بناءً على المعلومات والاعتقاد، إلى دولة الإمارات العربية المتحدة.

166.    وفيما يتعلق بشركة لورد إنرجي على وجه التحديد، أشار التقرير إلى أنه "من خلال أفعالنا، تم الكشف

اليوم علنًا عن شركة لورد إنرجي باعتبارها شركة مثيرة للجدل تابعة لجماعة الإخوان المسلمين ولها علاقات بتمويل الإرهاب والأنشطة الغامضة. كشفت صفحتنا على ويكيبيديا عن الروابط المختلفة بين المسؤولين التنفيذيين للشركة والأفراد والكيانات المرتبطة بتنظيم القاعدة." على الرغم من أن رد فعل شركة "لورد إنرجي" كان غاضبًا على صفحة ويكيبيديا الفرنسية، إلا أن ألب "انتصر" في "المعركة".



167.    تفاخرت شركة ألب بأنه "من خلال ممارسة ضغط خفي مكثف على مدار شهرين"، كان "يمكن إضافة أسماء شركة لورد إنرجي ويوسف وحازم ندا إلى قاعدة بيانات الامتثال الأكثر تأثيرًا في العالم وورلد تشيك" تحت فئة "الإرهاب". ووفقًا لمصادر شركة ألب، "في حين كان من المتوقع أن تزيد شركة لورد إنرجي من عملياتها وإيراداتها، فإنها تواجه الآن مشكلات خطيرة بسبب هذه التصريحات المحرجة والضارة".



168.    لم تسعَ شركة ألب فقط إلى قطع علاقات شركة لورد إنرجي مع المؤسسات المالية من خلال حث وورلد تشيك بشكل احتيالي على إضافة شركة لورد إنرجي وحازم وهمت إلى قاعدة بياناتها ضمن فئة مخاطر الإرهاب، ولكن شركة ألب "تواصلت أيضًا مع [كريدي سويس] من خلال ملف تعريف "صحفي مستقل"، وأبلغته بأن لورد إنرجي "تفرض ضغط على البنك وطالبته بغلق حسابات الشركة". وعلقت شركة ألب بأن مصادرها "أبلغت لاحقًا أن حسابات شركة لورد إنرجي "قامت البنوك بتجميدها".



169. حدد التقرير أيضًا سبع "دراسات حالة جديدة" يمكن للمؤسسة استهدافها في "المرحلة التالية" من مخطط المعلومات المضللة الذي يتبعه. وأشارت شركة ألب إلى أنه "كالعادة كانت جميع أفعالنا سرية للغاية وظللنا نعمل في الخفاء".

170. في التقرير الصادر بعنوان "التقرير الموجز - تقييم الأثر" بتاريخ 6 أغسطس 2018، أوضحت ألب أيضًا لدولة الإمارات العربية المتحدة كيف "استخدمت وسائل التواصل الاجتماعي وتقنيات تحسين محركات البحث" ('تحسين محركات البحث') لتعزيز ظهور أفعالنا"، ونتيجة لذلك، كانت العديد من المقالات التي قامت المؤسسة بتلفيقها "ظاهرة" في الصفحات الثلاث الأولى من "Google USA".



171. كما سمح "تدخل شركة ألب" أيضًا بربط جماعة الإخوان المسلمين بالشركة من خلال اقتراح نتيجة ذات صلة تلقائيًا على Google عند كتابة كلمة "Lord Energy".



172. في تحديث مماثل، بناءً على المعلومات والاعتقاد، أرسلت ألب عبر البريد الإلكتروني إلى الإمارات العربية المتحدة وبعض مسؤوليها في 6 نوفمبر، 2018، متفاخرةً بقول "بعد أحدث خطواتنا، يربط Google الآن لورد إنرجي بالإرهاب مباشرةً، ويربط حازم ندا [بالإخوان المسلمين]، والأهم من ذلك، أطلق كل من شركة لورد إنرجي وحازم ندا هجمات مضادة: فهم ينشرون الآن مقالات إيجابية مزيفة في محاولة يائسة "لتنظيف" سمعتهم على الإنترنت، والتي تصدينا لها بمزيد من المقالات السلبية."



173. كان مطر نقطة الاتصال الرئيسية لشركة ألب. وكثيرًا ما تواصل بريرو وبادال مع مطر عبر الهاتف ورسائل WhatsApp ورسائل البريد الإلكتروني. وكانت الطريقة الأساسية لشركة ألب للتواصل مع مطر والمسؤولين الإماراتيين الآخرين هي من خلال حسابات بريد إلكتروني Protonmail آمنة ومشفرة. حيث استخدمت شركة ألب الحساب، "protonmail.com@487563" واستخدم مطر الحساب، "protonmail.com@547321". ونادرًا ما كان الطرفان يُشيران إلى بعضهما البعض بالاسم، وبدلاً من ذلك يُحييان بعضهما البعض بألقاب مثل "صديقي" أو "صديقي العزيز". وكانت هذه تدابير أمنية واضحة تهدف إلى ضمان إخفاء الأنشطة غير القانونية للمؤسسة، والحفاظ على سرية هويات الأطراف المذنبة.

174. كذلك، اجتمع بريرو وكافين وبادال وغيرهم من موظفي شركة ألب بشكل متكرر شخصيًا مع مطر ومحمد بن زايد وغيرهم من المسؤولين الإماراتيين. وفي 4 يوليو 2018، أجرى بريرو مكالمة هاتفية مع مطر لتقديم تحديثات عن الوضع. وأخبر مطر بريرو أن فريق بريرو قد قام "بعمل رائع حتى الآن" وأن "الجميع يقدرون ما قمتم به

حتى الآن." كما أبلغ مطر بريرو أنه "أبلغ صاحب السمو" "بخطة العمل". وذكر مطر أنه لم يكن متأكدًا مما إذا كانوا "هم" سيزورون بريرو أو سيطلبون منه مقابلتهم في أبوظبي.

175.   في 23 يوليو 2018، أجرى مطر مكالمة هاتفية أخرى مع بريرو وبادال، أخبرهما خلالها بأنه "تحدث إلى صاحب السمو و... إنه سعيد جدًا بلقائكم هناك الأسبوع القادم".

176.   وفقًا لمحاضر الاجتماعات الداخلية لشركة ألب، في 9 و10 أغسطس 2018، التقى بريرو وموظف آخر في ألب في زيورخ مع مطر ومسؤول آخر في ألب في الإمارات العربية المتحدة. وخلال هذا الاجتماع، أبلغ مطر ممثلي شركة ألب أنه "سعيد جدًا بنتائج عمل [ألب] حتى الآن". وقال مطر والمسؤول الآخر أنه "فيما يتعلق بمقترح ألب"، "لم تتاح لهم الفرصة لمناقشته مع "الرئيس الكبير" - يُفترض أنه محمد بن زايد - ولكنهم "سيفعلون ذلك ويبقون ألب على اطلاع". وأخبروا بريرو وموظف شركة ألب الآخر أن "يواصلوا العمل في المسائل الجديدة محاولين تحقيق نفس التأثير كما فعلوا مع لورد إنرجي (قائمة وورلد تشيك، الربط على موقع ويكيبيديا، تعيين محامين بريطانيين...)." واقترح مطر والمسؤول الآخر أن "الأهداف الكبيرة التالية يمكن أن تكون المنتدى الإسلامي الأوروبي للشباب والطلاب (FEMYSO) ومؤسسات جماعة الإخوان المسلمين الأخرى في الاتحاد الأوروبي - وتحتاج ألب إلى العثور على أدلة إضافية". وتضمنت قائمة بنود العمل، إرسال "مطر/علي" "معلومات ألب حول مستشاري أوباما الستة المرتبطين بجماعة الإخوان المسلمين (تقرير سي إن إن)." كما أشار كل من مطر والمسؤول الآخر إلى أنهما سيقدمان لشركة ألب "هاتفًا آمنًا (كاتم) للتواصل معًا".

*حملة التشهير التي شنتها المؤسسة تؤدي إلى تعطيل أعمال شركة لورد إنرجي وعلاقاتها المصرفية.*

177.   نجحت حملة المؤسسة "المتواصلة في إعادة تشكيل سمعة [أهدافها] الأولية بشكل خطير" ودمرت كلًا من حازم ولورد إنرجي. ونتيجة لجهود المؤسسة، أنهت العديد من المؤسسات المالية وشركاء الأعمال القائمة مع لورد إنرجي - والتي بدأت بعضها قبل عقود - ورفض آخرون بدء تعاملات تجارية جديدة معها.

178.   في يوليو 2018، طلبت إكسون موبيل وليتاسكو - وهما شركتان تمارسان أعمالاً مع لورد إنرجي منذ سنوات - من حازم تقديم معلومات لمراجعاتهم الداخلية ومراجعات الامتثال فيما يتعلق "بالتداول مع لورد إنرجي". وتوقفت إكسون موبيل مؤقتًا عن العمل مع لورد إنرجي أثناء إجراء مراجعة الامتثال. وتوقفت ليتاسكو عن العمل مع لورد إنرجي تمامًا.

179.   بحلول منتصف نوفمبر 2018، رفض كل من سوسيتيه جنرال وناتيكسيس وبنك بي سي بي العمل مع شركة لورد إنرجي. وأوضح بنك بي سي بي لشركة لورد إنرجي أنه في حين أن إدارة الامتثال لديه "ليس لديها أي مشكلة مع والد [حازم] (الذي برأته الولايات المتحدة)، إلا أنها "لديها تحفظات تجاه [همت] و[بيكاردو] وفاطمة" - وهم ثلاثة

موظفين مسلمين لدى لورد إنرجي ادعت المؤسسة كذبًا أنهم تربطهم علاقات بجماعة الإخوان المسلمين أو تنظيم القاعدة أو كليهما.

180.    وفقًا لما أقرت به المؤسسة مرارًا وتكرارًا، فقد استهدفت على وجه التحديد وسعت إلى تعطيل علاقة شركة لورد إنرجي مع كريدي سويس. فلم تقم فقط بنشر مقالة على موقع Medium في يونيو 2018 تدعي كذبًا أن لورد إنرجي تتمتع "بعلاقات قوية مع الإخوان المسلمين والمؤيدين لتنظيم القاعدة"، والتي "[أثارت] أسئلة حول الامتثال وحوكمة الشركة لدى " كريدي سويس، بل استخدمت المؤسسة أيضًا اسمًا مستعارًا للاتصال بكريدي سويس مباشرةً والضغط على البنك لإنهاء علاقته مع لورد إنرجي. وقد نجحت هذه الجهود في النهاية. ففي ديسمبر 2018، توقف بنك كريدي سويس عن دعم مراكز التداول الخاصة بشركة لورد إنرجي، وفي فبراير 2019، أغلق حسابات لورد إنرجي رسميًا في البنك.

181.    على مدار الأشهر القليلة القادمة، أنهت البنوك والمؤسسات المالية الأخرى علاقاتها مع حازم ولورد إنرجي أو رفضت الدخول في علاقات جديدة. وفي 16 يناير 2019، أنهت شركة بطاقات ائتمان سويسرية، وهي شركة سويس كارد، حساب شركة لورد إنرجي.

182.    في 25 يناير 2019، أبلغ بنك يو بي إس حازم وهمت بأنه " بعد [[مناقشات] مكثفة وطويلة للغاية مع فرق الامتثال والعناية الواجبة لدينا، قررت [] شركتنا أننا لن نكون في وضع يمكّننا من مساعدتكم في تمويل نشاطكم التجاري."

183.    في 8 فبراير 2019، أبلغ بنك يو بي إس حازم بأنه سيغلق حسابه المصرفي الشخصي، الذي كان يحتفظ به لأكثر من 27 عامًا، بالإضافة إلى الحسابات المصرفية الشخصية لوالدة حازم وأخيه.

184.    في 17 أبريل 2019، أنهى بنك ماكواري "اتفاقية تداول العقود الآجلة والمقاصة" مع لورد إنرجي التي كانت سارية منذ عام 2014. وفي 2 ديسمبر 2020، رفضت ماكواري الدخول في علاقة عمل جديدة مع حازم لأنها "لم يكن لديها رغبة في المضي قدمًا في هذه الفرصة" نظرًا للادعاءات الكاذبة التي قدمتها المؤسسة بشأن حازم ولورد إنرجي.

*بسبب الضرر الناجم عن حملة التشهير التي شنتها المؤسسة، لورد إنرجي تغلق*
*شركتها التابعة الأمريكية وتعلن إفلاسها.*

185.    بمجرد توقف البنوك عن الإقراض إلى لورد إنرجي، أصبحت أيامها معدودة. ونظرًا للتكاليف المرتفعة للغاية المرتبطة بشراء شحنات النفط الخام، كان الحصول على الائتمان أمرًا ضروريًا. وبدون ائتمان، لا يمكن لشركة لورد إنرجي العمل.

186.    لم يستغرق الأمر وقتًا طويلاً حتى انهارت أعمال لورد إنرجي. واعتبارًا من أكتوبر 2018، قُدرت قيمة شركة لورد إنرجي بنحو 150 مليون دولار. وكان لديها حوالي 60 مليون دولار نقدًا. وبلغت قيمة أصولها الثابتة حوالي

9 ملايين دولار. وبحلول أبريل 2019 - بعد ستة أشهر فقط - كانت شركة لورد إنرجي مثقلة بحوالي 80 مليون دولار من الديون.

187.   في محاولة أخيرة لإنقاذ شركته، في ديسمبر 2018، نسق حازم معاملة معقدة قامت فيها شركة أمريكاز لورد إنرجي إنك بتحميل سلسلة من الشحنات المشتراة من منتجي النفط الأمريكيين ونقلتها إلى ناقلة خام كبيرة جدًا. وكان للمعاملة خيار السعر الثابت الذي تطلب من شركة أمريكاز لورد إنرجي إنك الحفاظ على مركز ورقي طويل الأجل للتحويل لقيمة نقدية. ومع ذلك، في نهاية الشهر، أغلق كريدي سويس المركز الورقي لشركة لورد إنرجي. بناءً على المعلومات والاعتقاد، لم يتخذ بنك كريدي سويس القرار استنادًا إلى اعتبارات مخاطر السوق، بل لأن كريدي سويس يخشى أن يؤدي الاحتفاظ بهذا المركز إلى جعل البنك يبدو وكأنه يدعم جماعة الإخوان المسلمين. وقد وصلت مسألة إغلاق مركز لورد إنرجي إلى الرئيس التنفيذي لبنك كريدي سويس في ذلك الوقت، تيدجان تيام. وفي مرحلة ما، خسر المركز حوالي 65 مليون دولار. وكانت هذه الخسارة إيذانًا بنهاية لورد إنرجي. وقد أدى مخطط المؤسسة لحث كريدي سويس بشكل احتيالي على التوقف عن الإقراض إلى لورد إنرجي إلى تحقيق هدف المؤسسة المتمثل في تدمير لورد إنرجي.

188.   حلّت شركة لورد إنرجي شركتها التابعة الأمريكية، شركة أمريكاز لورد إنرجي إنك، في أبريل 2019. وفي وقت لاحق من ذلك الشهر، تقدمت شركة لورد إنرجي إس أيه بطلب للحماية من الإفلاس في سويسرا.

189.   كنتيجة مباشرة للمخطط غير القانوني للمؤسسة، عانى حازم من خسائر اقتصادية فعلية تبلغ حوالي 150 مليون دولار (أي الفرق بين قيمة شركة لورد إنرجي - التي كان يمتلكها حازم بالكامل - قبل أن تبدأ آثار حملة التشهير وقيمتها بعد أن أدت حملة التشهير إلى إفلاسها). وقبل الآثار المدمرة لحملة التشهير التي شنتها المؤسسة، كانت لورد إنرجي أصلاً قيمًا بالنسبة لحازم كان بإمكانه بيعه بحوالي 150 مليون دولار، ولكن نتيجة لحملة التشهير، أصبح هذا الأصل عديم القيمة.

190.   بشكل منفصل، تكبدت شركة لورد إنرجي خسائر اقتصادية فعلية بلغت حوالي 149 مليون دولار، حيث تحولت ميزانيتها العمومية من مبلغ موجب قدره 69 مليون دولار في صورة نقد وأصول ثابتة إلى مبلغ سلبي قدره 80 مليون دولار في غمضة عين بمجرد توقف البنوك عن إقراض شركة لورد إنرجي وتوقف الأطراف المقابلة عن التعامل معها، كل ذلك بسبب الاتهامات الزائفة التي ادعتها المؤسسة بشأن تورط حازم ولورد إنرجي في تمويل الإرهاب ومع جماعة الإخوان المسلمين.

191.   بالإضافة إلى ذلك، خسر كل من حازم ولورد إنرجي أرباحًا كثيرة على مدار السنوات الخمس الماضية تقريبًا نتيجة لإجبارهما على ترك العمل في أوائل عام 2019 بسبب السلوك غير القانوني للمؤسسة. ومن الجدير بالذكر أن

الأعوام ما بين 2023-2019 كانت أعوام متميزة في قطاع النفط. وعلى سبيل المثال، في نهاية عام 2022، أبلغت

بلومبيرج عن تحقيق "مكاسب غير متوقعة لشركة فيتول"، وأنه "عام النجاح الساحق" لشركة ترافيجورا، وسجلت أرباح

"غير مسبوقة" لشركة جلينكور.







192.    منذ 2019 إلى 2022،[10] حققت شركات تجارة النفط الأخرى التي تنافس معها لورد إنرجي – مثل

فيتول وترافيجورا وجلينكور – متوسط أرباح سنوية قدرها 3.2 ضعف متوسط أرباحها السنوية من 2016-2018. وقد

بلغ متوسط الأرباح السنوية لشركة لورد إنرجي من 2016-2018 حوالي 16.8 مليون دولار. وبضرب متوسط الزيادة

في الأرباح على مستوى قطاع النفط خلال طفرة زيادة أرباح النفط في الفترة ما بين 2019-2023 وعدد السنوات التي

لم تتمكن فيها شركة لورد إنرجي من العمل ستبلغ أرباحها المفقودة حوالي 268.75 مليون دولار.

193.    على الرغم من الضرر الفعلي الذي تسببت فيه حملتها للتشهير، إلا أن المؤسسة لا تزال تواصل نشر

كذبتها حول لورد إنرجي. وفي مايو 2019، عيّنت ألب ماريلا جبر من شركة جي 5 إنتجريتاس إنترناشيونال، وهي شركة

تحقيقات خاصة في ميامي بولاية فلوريدا، لإجراء فحص الخلفية و"العناية الواجبة" بشأن شركة أمريكاز لورد إنرجي إنك.

---

[10] لم يتم الإبلاغ بعد عن بيانات كافية لعام 2023.

194. في تحديث مُقدم لمطر في 19 يونيو 2019، أوضحت ألب أنها نشرت مقالة في المدونة المالية
السويسرية *Inside Paradeplantz* بعنوان "بنك كريدي سويس يعاني من خسائر تقدر بالملايين في تعاملاته مع تجار
مسلمين محفوفين بالمخاطر". وتفاخرت ألب بأن المدونة "نشرت أيضًا تعليقاتنا حول العقوبات الأمريكية المحتملة ضد
البنك". كما أبلغت ألب بفخر مطر بنجاحها في تدمير شركة أمريكاز لورد إنرجي إنك:

195. في 23 يوليو 2019، نشرت المؤسسة مقالة أخرى عبر الإنترنت عن لورد إنرجي على موقع أفريكا
إنتليجنس بعنوان: "مشاكل لورد إنرجي بعيدة كل البعد عن الانتهاء"، ادعت المقالة أن "[]في الوقت الذي تفحص فيه السلطة
الجديدة في الجزائر عملياتها السابقة، تعاني لورد إنرجي من استهدافها بواسطة دائنين جدد." وأشارت المقالة إلى أن شركة
شحن قد استعانت بمحام سويسري لاسترداد المبالغ غير المدفوعة المستحقة على لورد إنرجي، وقد تأخرت لورد إنرجي
عن سداد القروض التي تم الحصول عليها من كريدي سويس وأغلقت "فرعها في تكساس".

196. لا يزال الضرر الذي تسببت فيه الاتهامات الكاذبة التي وجهتها المؤسسة لحازم ولورد إنرجي مستمرًا
حتى يومنا هذا. ومؤخرًا في مارس 2023، رد قسم العناية الواجبة "اعرف عميلك" في شركة إليمنت ألفا - وهي شركة
أخرى لتجارة النفط - على طلب العناية الواجبة المتعلق بممارسة الأعمال مع لورد إنرجي قائلاً: "أنت تقصد هؤلاء
الأشخاص: أعني أنه كان هناك ادعاءات مقلقة بأن بعض الموظفين مرتبطين بجماعة الإخوان المسلمين... يسعدنا أن نبدأ
إجراءات "اعرف عميلك"، ولكن هذا سيتطلب إجراءات عناية واجبة دقيقة."

*إفلاس لورد إنرجي وتأثيره المباشر في الولايات المتحدة.*

197. كان لجهود المؤسسة الرامية إلى إخراج لورد إنرجي من السوق الفورية للنفط الخام الخفيف تأثير كبير
على التجارة الأمريكية. فعندما حثت المؤسسة شركة سوناطراك بشكل احتيالي على التوقف عن بيع شحنات لورد إنرجي
من نفط مزيج الصحراء، لم يؤثر ذلك فقط على سعر خام مربان في آسيا. بل أثر أيضًا على سعر خام غرب تكساس الوسيط

في السوق الفورية. ويُنظر إلى كل من خام غرب تكساس الوسيط ومربان ومزيج الصحراء على أنه مزيج مكافئ للنفط الخام الخفيف من المصافي في آسيا. لذلك، يؤثر التأثير على توريد مزيج واحد على سعر الأمزجة الثلاثة. وقد أثر قطع إمدادات مزيج الصحراء بشكل كبير على السوق الفورية لخام غرب تكساس الوسيط، الذي يتم إنتاجه في الولايات المتحدة، وكذلك خام مربان.

198.   والأهم من ذلك، فقد تأسست شركة أمريكاز لورد إنرجي إنك على وجه الخصوص حتى تتمكن لورد إنرجي من زيادة صادراتها من خام غرب تكساس الوسيط. وكانت شركة أمريكاز لورد إنرجي إنك مشاركة في سوق خام غرب تكساس الوسيط المُنتج في الولايات المتحدة، وعندما تم حلها، أثر ذلك بشكل مباشر على سوق نفط أمريكية كبرى.

199.   بالإضافة إلى ذلك، كانت كل صفقة من صفقات لورد إنرجي مقومة بالدولار الأمريكي. ويجب على المؤسسات المالية الأمريكية تسوية جميع التداولات المقومة بالدولار الأمريكي. وفي حالة لورد إنرجي، تم تسوية جميع صفقاتها تقريبًا بواسطة فرع جي بي مورجان تشيس في نيويورك. وعندما أُجبرت شركة لورد إنرجي على إعلان إفلاسها ووقف عملها، كان لها تأثير كبير على البنوك الأمريكية.

200.   وأخيرًا، عندما قدمت لورد إنرجي دعوى إفلاس في سويسرا، كان العديد من دائنيها ذوي الأولوية كيانات أمريكية. وشملت الكيانات الكائنة في تكساس AMSPEC LLC و Lightering LLC و Valls Ship Agencies, LP. كما أثرت حملة التشهير الكاذبة والمضللة التي أطلقتها المؤسسة، والتي أدت لإفلاس كل من لورد إنرجي وأمريكاز لورد إنرجي، على التجارة الأمريكية من خلال منع لورد إنرجي من مواصلة العمل مع هذه الكيانات الأمريكية وغيرها، وإجبار هذه الكيانات الأمريكية على السعي لاسترداد الديون المستحقة لها من لورد إنرجي من خلال إجراءات الإفلاس السويسرية.

*على الرغم من بذله قصارى جهده، فشل حازم في تحديد من كان وراء حملة التشهير التي دمرت شركته.*

201.   بمجرد أن أدرك حازم أنه كان ضحية لحملة تضليل منسقة، بذل كل ما في وسعه للتأكد من المسؤول. وكان يعتقد أنها شركة تجارة سلع منافسة.

202.   طالب وسائل الإعلام المسؤولة عن نشر اتهامات كاذبة ضده الكشف عن مصادرها، وطلب من "وورلد تشيك" أن تقدم له معلومات عن الباحثين الذين حددوا اسمه. ولكنهم رفضوا جميعًا.

203.   أدت التدابير الأمنية التشغيلية القوية التي اتخذتها المؤسسة إلى عرقلة جهود حازم لتحديد الأطراف الحقيقية المسؤولة عن حملة التشهير التي تم شنها ضده. واتخذ جميع أعضاء المؤامرة خطوات حاسمة لإخفاء مشاركتهم. وكبعض الأمثلة فقط، استخدموا حسابات Protonmail، التي تم تشفيرها من الطرفين؛ واستخدموا أسماء مستعارة وغير

حقيقية لإخفاء هوياتهم الحقيقية؛ وطلبوا من شركائهم في المؤامرة حذف رسائل البريد الإلكتروني بعد قراءتها.

204.    في عام 2020، قدمت ألب "خطة عمل مدتها خمس سنوات" إلى دولة الإمارات العربية المتحدة، حيث أدركت ألب أن المؤسسة "ستواجه ضغطًا متزايدًا لإخفاء آثارها، كما تمكنا من القيام بذلك حتى الآن. وسيتطلب منا ذلك أيضًا اتخاذ جميع التدابير المناسبة للحفاظ على هوياتنا سرية- من حيث الاتصالات السرية مع الصحافة وحملاتنا سريعة الانتشار والمخاطر المتزايدة للمراقبة الفعلية...." وكان هذا يتفق مع طمأنة ألب الروتينية لدولة الإمارات العربية المتحدة بأن تصرفات المؤسسة ستكون دائمًا "سرية للغاية" و"لا تزال [] في الخفاء".

205.    في يونيو 2018، أبلغ حازم سلطات إنفاذ القانون السويسرية عن حملة التشهير ضده وضد شركاته. وبعد "تحقيق" روتيني، التقى حازم بضابط شرطة سويسري في فبراير 2020 وأوضح لحازم أنه هو والمدعي العام كانا يغلقان التحقيق، ويُفترض أن ذلك بسبب نقص الأدلة. وخلال اجتماعهما، غادر الضابط الغرفة التي كان يلتقي فيها مع حازم، وتناثر ملف القضية على الطاولة أمام حازم. وأثناء غياب الضابط، تصفح حازم الملف ووجد طلبات للحصول على سجلات حول لورد إنرجي مقدمة من شركة تحقيقات مقرها جنيف -وهي شركة ألب. وكانت هذه هي المرة الأولى التي يسمع فيها حازم عن ألب. وفي ذلك الوقت، لم يكن حازم يعرف ما إذا كانت ألب مشاركة في حملة التشهير ضده أم أنها تجمع المعلومات لأغراض العناية الواجبة لصالح أحد المشاركين في سوق النفط الخام.

206.    مع ذلك، كان حازم قلقًا بشأن الإجابات، وفي أواخر فبراير 2020، أرسل بريدًا إلكترونيًا إلى عنوان البريد الإلكتروني العام تحت رابط "اتصل بنا" المدرج على موقع ألب الإلكتروني. وزعم حازم في رسالة البريد الإلكتروني التي أرسلها أن ألب كانت مسؤولة عن الإجراءات المتخذة ضده وضد شركاته. وكتب حازم إلى شركة ألب متهمًا أياها بالمشاركة في "أعمال الاحتيال والاتصالات الكاذبة للحصول على معلومات خاصة بشأن [لورد إنرجي]." وعرض حل المسألة "بطريقة ودية".

207.    عند استلام رسالة البريد الإلكتروني هذه من حازم، أرسلت ألب على الفور تحديثًا إلى مطر لإبلاغه برسالة البريد الإلكتروني المرسلة من حازم. وردت شركة ألب قائلة "بالطبع، نحن لا نخطط للرد. ونتوقع منه تصعيد الأمر وربما اتخاذ إجراءات قانونية ضدنا. ونحن مستعدون لمواجهته. لنتحدث بسرعة للاتفاق على استراتيجية والخطوات التالية."

208.    وقت وفت ألب بوعدها ولم ترد أبدًا على حازم. في أوائل عام 2021، أرسل حازم بريدًا إلكترونيًا إلى عنوان البريد الإلكتروني المدرج تحت رابط "اتصل بنا" العام لشركة ألب مرة أخرى. ومرة أخرى، لم ترد شركة ألب.

*سرقة المخترقين للمستندات من خوادم ألب الداخلية، ومعرفة حازم للحقيقة.*

209.    في أبريل 2021، تلقى حازم رسالة من رقم هاتف فرنسي مشفر لم يتعرف عليه. حيث كتب المرسل

أنه يمثل مجموعة من المخترعين الذين اخترقوا خوادم شركة ألب. وأرسل إلى حازم نسخة من الرسالة التي أرسلها حازم إلى عنوان البريد الإلكتروني المدرج تحت رابط "اتصل بنا" الخاص بشركة ألب كدليل على صدق كلامه.

210. كما سمح المخترقون لحازم بمراجعة وثائق ألب الداخلية التي حصل عليها، ولكنهم منعوه من تنزيل أي من الملفات أو حفظها. صُدم حازم مما قرأه. وشملت الوثائق رسائل بريد إلكتروني بين المؤسسة وشركائها في المؤامرة توجه العملاء لنشر مقالات تربط بين حازم ولورد إنرجي بالإرهاب. وبهذه الوثائق، تمكن حازم أخيرًا من تقدير حجم المؤامرة ضده. بطريقة ما، كان محقًا في أن أحد المنافسين كان مسؤولاً عن حملة التشهير ضده. لكن هذا المنافس لم يكن شركة تجارية لسلع منافسة كما اشتبه. بل كانت الإمارات العربية المتحدة وكبار مسؤوليها وشركة النفط المملوكة للدولة.

211. عرض المخترقون بيع ملفات الألب إلى حازم مقابل 30 مليون دولار أمريكي بالعملات الرقمية. ورد حازم بأنه غير قادر على -وغير راغب في - دفع 30 مليون دولار أمريكي مقابل الملفات المقرصنة.

212. أبلغ حازم السلطات السويسرية عن اتصالات المخترقين، والتقى ضابط استخبارات سويسري بحازم والتقط صورًا لرسائل المخترقين المشفرة. ولم يسمع حازم أي شيء من السلطات السويسرية لعدة أشهر بعد ذلك. ومع ذلك، في النهاية، حصلت السلطات على نسخ من الوثائق المقرصنة التي شاركها المخترقون مع حازم.

### الوثائق تكشف عن مؤامرة المؤسسة طويلة المدى وواسعة النطاق.

213. كان نطاق وحجم المؤامرة الشاملة للمؤسسة سافرًا ومرعبًا. فقد كشفت الوثائق المقرصنة أن حازم لم يكن الهدف الوحيد للمؤسسة. فوفقًا للوثائق، استهدفت المؤسسة أكثر من 50 فردًا وكيانًا، باستخدام نفس أساليب "الاتصالات سريعة الانتشار" و"الضغط السري" التي استخدموها ضد حازم.

214. وشملت الأهداف الأخرى للمؤسسة العديد من المواطنين الأمريكيين والكيانات الأمريكية الأخرى. على سبيل المثال، في 3 مايو 2018، كلَّف بادال ماريلا جبر من شركة جي 5 إنتجريتاس إنترناشيونال – وهي شركة تحقيق خاصة في فلوريدا كلفتها ألب بجمع تقارير خلفية عن شركة أمريكاز لورد إنرجي إنك: - بإجراء "تحقيق قوي عن خلفية" صحفي رفيع المستوى، يعيش في الولايات المتحدة، وهو مواطن أمريكي ويعمل لدى شركة الإعلام الأمريكية البارزة *باز فيد*. كما قامت المؤسسة بتعيين محقق خاص آخر، إيان ويذرز من شركة بريورتي إنترناشيونال ليمتد، لجمع المعلومات من مصادر أمريكية عن هذا الصحفي الأمريكي. وكان بادال مهتمًا بشكل خاص "بأي مؤشرات خطر أو إشاعات أو معلومات سلبية" و"أي روابط مع أجهزة أمنية أو حكومات أجنبية" يمكن للمحققين الكشف عنها.

215. في 7 مايو 2018، أرسل بادال إلى مطر "تقريرًا أوليًا" عن الصحفي الأمريكي، مشيرًا إلى أن ألب كانت "لا تزال تنتظر [من أجل] معلومات إضافية من مصادر بشرية والمزيد من التفاصيل عن" زوجة الصحفي. وأعدت

ألب بعد ذلك مذكرة بحثية إضافية عن زوجته وابنته.

216.     استعانت المؤسسة بخبير للتحقيق بخصوص الأهداف المحتملة الأخرى في الولايات المتحدة، بما في ذلك خبير اقتصادي أرجنتيني عاش في ماكلين بولاية فيرجينيا. وفي 10 أكتوبر 2019، أعدت ألب بناءً على معلومات واعتقادات "تقريرًا سريًا" مكونًا من 30 صفحة عن هذا الاقتصادي المقيم في الولايات المتحدة وأرسلته إلى الإمارات العربية المتحدة.

217.     كما أعدت المؤسسة تقريرًا متعمقًا عن مواطن أمريكي أسس شركة جلوبال ريسك أدفايزرز ("جلوبال ريسك أدفايزرز") التي يقع مقرها في الولايات المتحدة. وفي 8 يناير 2020، أرسل بادال رسالة بريد إلكتروني إلى بيير جاستينيو من *إنتليجينس أونلاين* لإبلاغه برفع دعوى مدنية ضد شركة جلوبال ريسك أدفايزرز ومؤسسها. وقد أخبر بادال جاستينيو أنه "وفقًا لمصادر [ألب]،" "بدا مؤسس شركة جلوبال ريسك أدفايزرز دائمًا قريبًا جدًا من وكالة الاستخبارات المركزية." وبعد أسبوع، في 15 يناير 2018، نشرت *إنتليجينس أونلاين* مقالاً عن شركة جلوبال ريسك أدفايزرز ومؤسسها.

218.     في نفس اليوم، أرسلت ألب رسالة بريد إلكتروني إلى مطر لإبلاغه بالمقال. وكتب ألب: "كما هو متفق عليه، أبلغنا جهة اتصالنا في إنتليجنس أونلاين بشأن الشكوى الفيدرالية الأمريكية الجديدة... ضد جلوبال ريسك أدفايزرز و[مؤسسها]. ولدينا أخبار سارة، لقد كتبوا مقالة عن الأمر اليوم (يُرجى الاطلاع على المرفق). ونتيجة للشكوى، كتبوا أيضًا عن جماعة الضغط الأمريكية الجديدة في Q (يُرجى أيضًا الاطلاع على المرفق)."

219.     لم يكن هؤلاء الأفراد والكيانات الأمريكية الأخرى الوحيدة التي استهدفتها المؤسسة. فقد أجرت أيضًا عمليات تشهير ضد مؤسسة المجتمع المنفتح التابعة لجورج سوروس. ففي تقرير موجز بتاريخ 7 مارس 2019، اتهمت ألب سوروس "بتمويل العديد من المنظمات المرتبطة بجماعة الإخوان المسلمين في أوروبا". وزعمت ألب أنه على الرغم من أن علاقة سوروس المزعومة بجماعة الإخوان المسلمين "تم ذكرها... في الولايات المتحدة الأمريكية، إلا أن الوضع في أوروبا ليس معروفًا جيدًا". وكتبت ألب: "ونظرا لذلك، بدأنا في استكشاف الوضع في القارة الأوروبية".

220.     كما دفعت المؤسسة أيضًا عملائها لنشر مقال على موقع Medium في 13 يناير 2019 بعنوان "كيف يمول جورج سوروس جماعة الإخوان المسلمين في أوروبا". ثم استخدمت المؤسسة تقنيات تحسين محركات البحث لضمان ظهور المقالة في أعلى نتائج Google عند البحث عن "جورج سوروس وجماعة الإخوان المسلمين".



221.    تعد هذه أمثلة من بعض الضحايا الكثيرين الذين استهدفتهم حملات التشهير التي شنتها المؤسسة. تشير الوثائق المقرصنة إلى أنه، في الفترة ما بين عامي 2017 وأبريل 2021 - عندما تم الحصول على الوثائق - قامت المؤسسة بإجراء عمليات تستهدف أكثر من 50 فردًا وكيانًا.

222.    استمرت المؤسسة في العمل لسنوات بعد أن أدت لإفلاس لشركة لورد إنرجي في عام 2019. بل في الواقع، إنها لا تزال تعمل حتى اليوم. في 18 يناير 2020، أعدت ألب خطة عمل جديدة "سرية للغاية" لعام 2020-2025، وبناءً على المعلومات والاعتقاد أرسلتها إلى الإمارات العربية المتحدة. وكتبت ألب: "شكرًا لكم على تجديد ثقتكم بنا. نحن على استعداد لبدء خطة العمل الخمسية الجديدة التي ستتبع استراتيجية المؤسسة المجربة والحقيقية التي تجمع بين "الهجمات الإعلامية" والإجراءات الرامية إلى "التأثير على صناع القرار"، بما في ذلك "السياسيين وقواعد بيانات الامتثال والبنوك" و"الجمهور". واقترحت ألب ميزانية تبلغ 2.4 مليون يورو للسنة الأولى من الخطة الخمسية الجديدة.

<u>الاتهام الأول</u>
<u>انتهاكات قانون قانون لانهام، الباب 15 من مدونة القوانين الأمريكية، القسم 1125 (أ) (1) (ب)</u>
*(ضد دولة الإمارات العربية المتحدة وأدنوك ومحمد بن زايد*
*ومطر وألب وبريرو وكافين وبادال وبعض المدعى عليهم مجهولي*
*الهوية أرقام 25-1)*

223.    يكرر المدعون كل فقرة من الفقرات السابقة ويعيدون الادعاء بها كما لو كانت واردة بالكامل في هذه

الوثيقة.

٢٢٤.    بدءًا من مايو ٢٠١٧، رتبت دولة الإمارات العربية المتحدة وشركة أدنوك ومحمد بن زايد ومطر وشركة

ألب وبريرو وكافين وبادال وبعض من المدعى عليهم مجهولي الهوية رقم ١-٢٥ - الذين يعملون معًا وبالتنسيق مع

الصحفيين ووسطاء ويكيبيديا والأكاديميين والمحققين الخاصين وغيرهم - لنشر الإعلانات الكاذبة والخادعة في التجارة

الدولية وبين الدول عبر الإنترنت على الدائنين والعملاء والأطراف المقابلة وشركاء الأعمال الحاليين والمحتملين للمدعين

وجمهور الإنترنت العالمي. وعادةً ما كانت هذه الإعلانات الكاذبة والمضللة تأخذ شكل مقالات ومنشورات مدونة منشورة

على الإنترنت. وعلى الرغم من أن هذه المقالات تبدو وكأنها مقالات تحريرية حقيقية، إلا أنها في الواقع عبارة عن

محتوى مدعوم تم كتابته ونشره لغرض صريح يتمثل في الإضرار بأعمال وسمعة أحد المنافسين التجاريين لدولة

الإمارات العربية المتحدة وشركة أدنوك.

٢٢٥.    وجّهت كل من دولة الإمارات العربية المتحدة وشركة أدنوك ومحمد بن زايد ومطر وشركة ألب وبريرو

وكافين وبادال وبعض من المدعى عليهم مجهولي الهوية رقم ١-٢٥ تلك الإعلانات الكاذبة والمضللة إلى مستهلكي

والأطراف المقابلة وشركاء الأعمال ومراقبي الامتثال والمخاطر ومقرضي المدعين، والجمهور.

٢٢٦.    تحتوي الإعلانات على ادعاءات كاذبة حول حازم ولورد إنرجي، بما في ذلك على سبيل المثال لا

الحصر ما يلي:

(أ)    في ٥ ديسمبر ٢٠١٧، نشرت المؤسسة مقالًا عبر الإنترنت على الموقع الإلكتروني أفريكا إنتليجنس تدعي فيه زورًا أن الجزائر قد حظرت ناقلة نفط لورد إنرجي بسبب مخاوف بشأن "مقاومة السفينة للماء"، وأن والد حازم "يزعم أنه قام بتمويل الإرهاب".

(ب)    في ٥ يناير ٢٠١٨، حثت المؤسسة بيسون على كتابة مقال نشرته صحيفة *لوتان* على الإنترنت بعنوان "وكالة المخابرات السويسرية تستهدف الإسلاميين المؤيدين لقطر". وقد أشارت المقالة ضمنيًا وبشدة وبشكل خاطئ أن السلطات السويسرية كانت تحقق في قضية لورد إنرجي. كما زعمت كذبًا أنه كانت هناك "دلائل" على وجود "شبكات قديمة [لجماعة الإخوان المسلمين]" داخل شركة لورد إنرجي والتي "قامت أحيانًا ببعض الأنشطة المسلحة".

(ج)    في ١٥ مايو ٢٠١٨، كلفت المؤسسة الكاتبة المستقلة نينا ماي بكتابة مقالة اتهمت لورد إنرجي كذبًا بأنها "مرتبطة بكيانات إرهابية حددتها الولايات المتحدة." وبناءً على المعلومات والاعتقاد، تم نشر هذا المحتوى الذي تمت رعايته على الإنترنت.

(د)    في ١٥ مايو ٢٠١٨، كلفت المؤسسة ماي بكتابة مقالة منفصلة اتهمت فيها لورد إنرجي كذبًا "بالارتباط بتنظيم القاعدة وجماعة الإخوان المسلمين". ونشرت المؤسسة هذا المحتوى المدعوم على WordPress في ٦ يونيو ٢٠١٨.

(ه)    في ١٥ مايو ٢٠١٨، كلفت المؤسسة ماي بكتابة مقال ثالث اتهمت فيه لورد إنرجي كذبًا بأنها "شركة تجارية سويسرية مملوكة لجماعة الإخوان المسلمين" وادعت كذبًا أن حازم "يستمر في دعم الشبكة" و"لورد إنرجي هي واجهة لتمويل جماعة الإخوان المسلمين من خلال بيع النفط الخام من شمال أفريقيا". ونشرت المؤسسة هذا المحتوى المدعوم على Tumblr في ٤ يونيو ٢٠١٨.

(و) في 31 مايو 2018 تقريبًا، كلفت المؤسسة ماي بكتابة ونشر مقال بعنوان "رويترز تفوت رابط رئيسي للإرهاب في التغطية النفطية: القصة الحقيقية لشركة لورد إنرجي السويسرية"، والذي ادعت فيه زورًا أن حازم "تولى" أعمال والده و"أن [] لورد إنرجي تتمتع بصلات كبيرة بجماعة الإخوان المسلمين وبالإسلام المتطرف ومموليه" ونشرت المؤسسة هذا المحتوى المدعوم على WordPress في 8 يونيو 2018.

(ز) في أوائل يونيو 2018، نشرت المؤسسة مشاركة باللغة الفرنسية في ويكيبيديا عن لورد إنرجي استشهدت بمقال صحيفة *لوتان* الصادر في 5 يناير 2018 والذي دعمت المؤسسة سابقًا كتابته واتهمت فيه لورد إنرجي زورًا بعلاقتها بجماعات إرهابية.

(ح) في 7 يونيو 2018، نشرت المؤسسة مقالًا بعنوان "لماذا يجب أن تعرض السلسلة التالية من Homeland في لوجاند وأن تتضمن لورد إنرجي" على موقع Live Journal. وادعى المقال زورًا أن "أرباح لورد إنرجي تعود إلى منظمة متعاونة بعمق مع جماعة الإخوان المسلمين، ولها علاقات قديمة مع تنظيم القاعدة" و"قال إن وكالة استخبارات سويسرية تحقق في أنشطتها".

(ط) في 30 يونيو 2018، نشرت المؤسسة مقالة نشرتها بعنوان "الامتثال: الشركة التجارية للإخوان المسلمين لورد إنرجي مرتبطة بكريدي سويس." وقد نُشر هذا المحتوى الذي تمت رعايته على موقع Medium، وادعى المقال زورًا أن لورد إنرجي "تبدو أنها تخضع لمراقبة وكالة الاستخبارات السويسرية" ولديها "علاقات قوية مع الإخوان المسلمين والمؤيدين لتنظيم القاعدة". وذكر المقال أيضًا أن "لورد إنرجي قد تضع [كريدي سويس] في مشكلة مع [الولايات المتحدة] وزارة الخزانة."

(ي) في 6 يوليو 2018 تقريبًا، نشرت المؤسسة مشاركات في ويكيبيديا باللغة الإنجليزية والإيطالية والتي ادعت فيها كذبًا بما يلي: أن حازم كان "سفيرًا سريًا لجماعة الإخوان المسلمين" و"ظهور شبكات قديمة لجماعة الإخوان المسلمين مرة أخرى في سويسرا من خلال الشركة التجارية لورد إنرجي"، وأن العديد من مديري لورد إنرجي "كانوا مسلحين إسلاميين مقربين من الإخوان المسلمين".

(ك) في 22 أغسطس 2018، نشرت المؤسسة مقالًا كلفت نينا ماي بكتابة بعنوان "كيف يمول الاتحاد الأوروبي المنتدى الإسلامي الأوروبي للشباب والطلاب التابع للإخوان المسلمين." ونُشر هذا المحتوى الذي تمت رعايته على موقع Medium واتهم لورد إنرجي كذبًا بأنها "أداة تمويل جديدة للإخوان المسلمين".

(ل) في 3 سبتمبر 2018، نشرت المؤسسة على WordPress مقالة أخرى كلفت ماي بكتابتها واتهمت فيها لورد إنرجي كذبًا بأنها "مرتبطة بجماعة الإخوان المسلمين".

227. هذه الادعاءات خاطئة لأنها تتعارض مع الواقع بعدة طرق، كما هو موضح أعلاه.

228. كان المدعى عليهم مدفوعين لتقديم هذه الادعاءات الكاذبة لأنهم كانوا في منافسة تجارية مع حازم ولورد إنرجي. شكلت المقالات التي قامت الشركة بتلفيقها ودعمها إعلانًا وترويجًا نظرًا لأنها كانت محتوى تم الدفع مقابله ورعايته يهدف إلى تعزيز مبيعات السوق الفورية لشركة أدنوك والسعر الذي يمكن أن تطلبه مقابل نفط مربان من خلال التقليل من شأن شركة لورد إنرجي. وكان القصد من الاتهامات الزائفة التي وجهتها المؤسسة بأن حازم ولورد إنرجي كانا متورطين في تمويل الإرهاب - وقد حققته- القضاء على منافس تجاري من خلال التسبب في توقف البنوك والمؤسسات المالية عن إقراض حازم ولورد إنرجي والتسبب في توقف المشاركين الآخرين في الصناعة عن العمل مع حازم ولورد إنرجي.

229.‏ تم الإعلان عن المدعى عليهم والترويج لهم في الولايات المتحدة. ونُشرت العديد من البيانات الكاذبة والمضللة ذات الصلة مباشرةً على مواقع الويب الأمريكية، بما في ذلك Medium وWordPress وTumblr وWikipedia. كما تم نشر بيانات كاذبة ومضللة أخرى على مواقع إلكترونية أجنبية، مثل *لوتان*، وإرسالها عبر البريد الإلكتروني إلى الصحفيين الأمريكيين ووكالات الإبلاغ عن الأسعار ومراقبي المخاطر المصرفية. كما تلاعب المُدعى عليهم بالنتائج على محركات البحث الأمريكية مثل Google وYahoo! وBing بحيث ظهرت إعلانات المؤسسة الزائفة والمضللة على الصفحات الأولى من محركات البحث هذه.

230.‏ كانت هذه الادعاءات الكاذبة تميل إلى خداع شريحة كبيرة من الجمهور المستهدف، وكان المدعى عليهم يقصدون خداع الجمهور المستهدف، وقد خدعوا الجمهور المستهدف بالفعل. في الواقع، تباهت ألب بشكل روتيني أنه نتيجة "لإجراءاتها سريعة الانتشار" و"اتصالاتها سريعة الانتشار" كانت لورد إنرجي "تواجه مشاكل خطيرة في عملياتها التجارية" وكانت أخبارها "تنتشر بسرعة، مع تركيز أشخاص جدد على الشركة".

231.‏ ونظرًا لأن التصريحات الكاذبة للمدعى عليهم التي تفيد بأن المدعين متورطان في تمويل الإرهاب تشكل مخاطر تجارية ومخاطر على السمعة بالنسبة لمستهلكي المدعين والأطراف المقابلة وشركاء الأعمال والدائنين وغيرهم، فقد وجدوا أن هذه التصريحات الكاذبة كان لها أهمية جوهرية.

232.‏ علاوة على ذلك، تُظهر الحقائق أن المستهلكين والأطراف المقابلة وشركاء الأعمال والدائنين وجدوا في الواقع أن الادعاءات الكاذبة للمدعى عليهم لها تأثير جوهري على قراراتهم التجارية. فعلى سبيل المثال، رفض كل من سوسيتيه جنرال وناتيكسيس وبنك بي سي بي العمل مع شركة لورد إنرجي لأنه في حين "لم [يكن] لديهم مشكلة مع والد [حازم] [] (الذي برأته الولايات المتحدة)"، لم يشعروا "بالارتياح تجاه [همت] و[بيكاردو] وفاطمة" ـ وهم ثلاثة موظفين مسلمين لدى لورد إنرجي ادعت المؤسسة كذبًا أنهم تربطهم علاقات بجماعة الإخوان المسلمين أو تنظيم القاعدة أو كليهما.

233.‏ وبالمثل، قرر الرئيس التنفيذي لبنك كريدي سويس إنهاء علاقة البنك طويلة الأمد مع حازم ولورد إنرجي لأنه كان يخشى أن يؤدي استمرار إقراض حازم إلى جعل البنك يبدو أنه يدعم جماعة الإخوان المسلمين.

234.‏ أغلق بنك يو بي إس أيضًا الحساب الشخصي لحازم لدى البنك، وأخبره أنه " بعد [[مناقشات]] مكثفة وطويلة للغاية مع فرق الامتثال والعناية الواجبة لدينا، قررت [] شركتنا أننا لن نكون في وضع يمكّننا من مساعدتكم في تمويل نشاطكم التجاري."

235.‏ كما توقفت شركة ليتاسكو، وهي شركة أخرى لتجارة السلع، عن التداول مع حازم ولورد إنرجي لأنها كانت لديها مخاوف تتعلق بالامتثال نتيجة لتصريحات المدعى عليهم التي تربط بشكل خاطئ بين حازم ولورد إنرجي

وتمويل الإرهاب.

236.    تتحمل كل من دولة الإمارات العربية المتحدة، وأدنوك ومحمد بن زايد ومطر وألب وبريرو وكافين وبادال، وبعض المدعى عليهم مجهولي الهوية أرقام 1-25 المسؤولية بالتضامن والتكافل عن كل من ادعاءاتهم الكاذبة بشأن المدعين والادعاءات المماثلة التي نشرها المدعى عليهم وشركاؤهم في المؤامرة لأنهم عملوا معًا على تلفيق القصص الكاذبة التي تفيد بأن حازم إنرجي ولورد إنرجي مرتبطان بجماعة الإخوان المسلمين ومشاركين في تمويل الإرهاب، وقد ساهموا جميعًا في نشر وتوزيع البيانات الكاذبة عن المدعى عليهم.

237.    أدت هذه الادعاءات الكاذبة إلى تقويض سمعة المدعين بين العملاء والأطراف المقابلة وشركاء الأعمال والدائنين والجمهور مما تسبب في توقف المستهلكين والأطراف المقابلة وشركاء الأعمال والدائنين عن التعامل مع المدعين.

238.    وبدلاً من ذلك، أجبر المدعيان على ترك العمل.

239.    يطلب المدعيان أن يخضع كل من دولة الإمارات العربية المتحدة وشركة أدنوك ومحمد بن زايد ومطر وشركة ألب وبريرو وكافين وبادال وبعض من المدعى عليهم مجهولي الهوية رقم 1-25 للمحاسبة ويُأمروا بدفع جميع الأرباح المفقودة والخسائر الناتجة عن الأفعال غير المشروعة الموصوفة أعلاه وأن تصدر المحكمة أمرًا بمضاعفة أو تعزيز أي حكم بموجب قانون لانهام.

<u>الاتهام الثاني</u>
**الابتزاز المدني، الباب 18 من مدونة القوانين الأمريكية، القسم 1962 (ج)**
*(ضد دولة الإمارات العربية المتحدة، محمد بن زايد، مطر، ألب،
بريرو، كافين، بادال، وبعض المدعى عليهم مجهولي الهوية أرقام 1-
25)*

240.    يكرر المدعون كل فقرة من الفقرات السابقة ويعيدون الادعاء بها كما لو كانت واردة بالكامل في هذه الوثيقة.

241.    في جميع الأوقات ذات الصلة، مثّل كل من دولة الإمارات العربية المتحدة ومحمد بن زايد ومطر وشركة ألب وبريرو وكافين وبادال وبعض من المدعى عليهم مجهولي الهوية رقم 1-25 "أشخاصًا" بالمعنى المقصود في القسم 1961 (3) من الباب 18 من مدونة القوانين الأمريكية.

242.    في الفترة ما بين مايو 2017 وأبريل 2021 على الأقل، وبالتأكيد تقريبًا بعد ذلك، كان المدعى عليهم مرتبطين وشكلوا في الواقع "مؤسسة" بالمعنى المقصود في القسم 1964 (ج) من الباب 18 من مدونة القوانين الأمريكية، وشاركوا في التجارة الدولية وبين الدول وأثروا عليها. وكان لدى المؤسسة تنظيم وهيكل واضحين. وأشرفت دولة الإمارات العربية المتحدة، من خلال محمد بن زايد، على الحملة الكبرى للمؤسسة، حيث قدمت التوجيه والإرشاد الاستراتيجي. وأدار

مطر العمليات على مستوى أكثر دقة من خلال العمل كحلقة وصل بين دولة الإمارات العربية المتحدة وشركة ألب. ونفذت شركة ألب وبريرو وكافين وبادال العمليات اليومية للمؤسسة من خلال، من بين أمور أخرى، اقتراح الأهداف، وتعيين الموارد، والتكليف بنشر مواد خاطئة ومضللة. وكتبت شبكة المتآمرين في المؤسسة المقالات وقامت بنشر وتوزيع الادعاءات الكاذبة والمضللة للمؤسسة.

243.    في جميع الأوقات ذات الصلة، اتفق أعضاء هذه المؤسسة ذات الصلة على، واعتزموا، وقاموا بالفعل، بالمشاركة بشكل مباشر أو غير مباشر في تصرفات المؤسسة من خلال نمط من النشاط الابتزازي الذي ينتهك القسم 1962 (ج) من الباب 18 من مدونة القوانين الأمريكية، بما في ذلك الاحتيال الإلكتروني الدولي وبين الدول بما ينتهك القسم 1343 من الباب 18 من مدونة القوانين الأمريكية والاحتيال المصرفي بما ينتهك القسم 1344 من الباب 18 من مدونة القوانين الأمريكية.

244.    يعتبر كل من دولة الإمارات العربية المتحدة ومحمد بن زايد ومطر وشركة ألب وبريرو وكافين وبادال وبعض من المدعى عليهم مجهولي الهوية رقم 1-25 أشخاص متميزون في هذه المؤسسة المشتركة. وقد قاموا بإدارة شؤون المؤسسة وتشغيلها مع العلم الكامل بأن أنشطتها كانت غير قانونية وبقصد الاحتيال. وعلى وجه التحديد، نسقت المؤسسة حملة تشهير منسقة لمدة سنوات لنشر معلومات خاطئة حول عشرات الأهداف، بما في ذلك حازم ولورد إنرجي إس إيه وأمريكاز لورد إنرجي إنك. واستخدمت المؤسسة أساليب مماثلة، والتي أشارت إليها باسم عمليات "الاتصالات السرية المسيئة سريعة الانتشار" و"الضغط السري" لتحقيق الهدف الشامل للمؤسسة المتمثل في تدمير أعمال وسمعة العشرات من أهدافها.

245.    ولتنفيذ هذا المخطط الاحتيالي، استخدمت دولة الإمارات العربية المتحدة ومحمد بن زايد ومطر وشركة ألب وبريرو وكافين وبادال وبعض من المدعى عليهم مجهولي الهوية رقم 1-25 شبكة من المتآمرين المشاركين، بما في ذلك الصحفيين والمدونين والكتاب المستقلين ومحرري ويكيبيديا والأكاديميين والمصادر الأخرى لصياغة ونشر معلومات خاطئة حول أهدافهم بنية محددة تتمثل في حث شركاء الأعمال والأطراف المقابلة والمؤسسات المالية وغيرهم على قطع العلاقات مع هذه الأهداف بطريقة احتيالية.

246.    في حالة كل من حازم ولورد إنرجي، صاغت المؤسسة قصص ملفقة تفيد بأن حازم وشركاته كانوا مرتبطين ارتباطًا وثيقًا بجماعة الإخوان المسلمين ومتورطين في تمويل الإرهاب. بالإضافة إلى البيانات الكاذبة المدرجة في الفقرة 226، والتي استخدمت المؤسسة شبكات دولية وبين الولايات لدعمها ونشرها عبر الإنترنت، استخدمت المؤسسة شبكات دولية وبين الدول لنشر البيانات الكاذبة التالية تعزيزًا لمخططها للاحتيال، بما يخالف القسم 1343 من الباب 18

من مدونة القوانين الأمريكية:

(أ) في 6 أكتوبر 2017، كتبت شركة ألب تقريرًا، بناءً على المعلومات والاعتقادات وشاركته داخليًا ومع دولة الإمارات العربية المتحدة عبر البريد الإلكتروني، تدعي فيه زورًا ما يلي: أن لورد إنرجي كانت "يديرها ورثة من كبار قادة الإخوان المسلمين في الدوحة"؛ وأن لورد إنرجي "تعتبر أحد كبار المشغلين التابعين لجماعة الإخوان المسلمين في أوروبا ولها علاقات مع الكيانات المرتبطة بتنظيم القاعدة"؛ وأن المديرين التنفيذيين لشركة لورد إنرجي "هم أعضاء في جماعة الإخوان المسلمين، ومرتبطون بالقاعدة"؛ وأن حازم كان "مقيمًا في الدوحة في قطر"؛ وأن والد حازم "يُعتبر وزيرًا الخارجية" لجماعة الإخوان المسلمين ومموّلها الرئيسي"؛ وأن شركة لورد إنرجي وفرت "الغطاء المثالي" لتمويل الإرهاب؛ وأن حازم كان "يتابع أنشطة الأعمال، ولكن أيضًا يتابع أعمال الإخوان المسلمين"؛ وأن شركاته التجاريين يوسف همت، وهو مواطن أمريكي، و إمامة فاطمة وديفيد بيكاردو وعمر نصر الدين تابعين للإخوان المسلمين.

(ب) في ديسمبر 2017، صاغت ألب "تقريرًا أوليًا" سريًا عن حازم ولورد إنرجي يحمل اسم الملف "مذكرة الطاقة أرنيكا 3 لورد- سيلفان-20171214"، والذي ادعى كذبًا أن لورد إنرجي كانت "شركة تجارية غامضة للإخوان المسلمين مرتبطة بتنظيم القاعدة"، و"تشارك في العمليات الكبيرة التي تنفذها جماعة الإخوان المسلمين في أوروبا". وبناءً على المعلومات والاعتقاد، شاركت ألب هذه المذكرة عبر البريد الإلكتروني مع بيسون، الذي استخدم المعلومات التي قدمتها ألب لكتابة مقاله في 5 يناير 2018 في صحيفة *لوتان*.

(ج) في 15 فبراير 2018، نشرت ألب "تحليلًا تحقيقيًا مفصلًا"، وبناءً على المعلومات والاعتقاد شاركته داخليًا ومع دولة الإمارات العربية المتحدة عبر البريد الإلكتروني، والذي وصف بشكل كاذب حازم ولورد إنرجي، من بين أهداف أخرى، كجزء من "نظام التمويل الشامل" للإخوان المسلمين.

(د) في 21 فبراير 2018، أعدت ألب عرض PowerPoint تقديمي، والذي بناء على معلومات واعتقاد شاركته داخليًا ومع دولة الإمارات العربية المتحدة عبر البريد الإلكتروني، وتتضمن شريحة عن لورد إنرجي، تتهمها زورًا بأنها "واجهة []" للإخوان المسلمين وأنها "مرتبطة بتنظيم القاعدة".

(ه) في فبراير 2018، أعدت ألب "خطة عمل"، وبناءً على المعلومات والاعتقاد، عممتها داخليًا وشاركتها مع دولة الإمارات العربية المتحدة عبر البريد الإلكتروني، والتي ادعت فيها كذبًا أن لورد إنرجي لديها "روابط بالإرهاب والأشخاص المعرضين سياسيًا"، وكذلك جماعة الإخوان المسلمين.

(و) في 12 يونيو 2018، وباستخدام الاسم المستعار لوران مارتن، أرسلت ألب رسائل بريد إلكتروني إلى وورلد كومبلاينس، وورلد تشيك، Info4C تزعم فيها كذبًا أن لورد إنرجي "مرتبطة بشكل مباشر بالإسلاميين المتطرفين" وتحث مراقبي الامتثال هؤلاء على إضافة "اسم لورد إنرجي" إلى قواعد البيانات الخاصة بهم.

(ز) في 13 يونيو 2018، أرسلت ألب رسالة بريد إلكتروني حول لورد إنرجي إلى عنوان البريد الإلكتروني للعلاقات الإعلامية في كريدي سويس (-media.relations@credit suisse.com)، تتظاهر فيها بأنها صحفي مستقل واستخدمت الاسم المستعار لوران مارتن. وادعى البريد الإلكتروني كذبًا أن لورد إنرجي كانت مرتبطة بالإسلاميين المتطرفين، واستشهدت بالقصص التي دعمتها ألب وزرعتها حول لورد إنرجي.

(ح) في الفترة ما بين 7 يونيو و19 يونيو 2018، استخدمت ألب حساب Protonmail آمن ومشفر تحت اسم مستعار "إيفان دوست" لإرسال 15 رسالة بريد إلكتروني تزعم بالكذب أن "الورد إنرجي إس آيه" كانت مرتبطة "بتمويل الإرهاب" إلى مراسلين من بلومبيرج وأكسيوس ورويترز وصنداي تايمز وذا أوبزيرفر وذا جارديان وفاينانشيال تايمز وذات صن وذا تايمز،

بالإضافة إلى وكالة بلاتس للإبلاغ عن الأسعار.

247.  استفادت المؤسسة بشكل روتيني من الشبكات الدولية وبين الدول لتخطيط وتيسير وتنفيذ مخططها لتدمير أعمال وسمعة كل من حازم ولورد إنرجي. وفي الفترة ما بين مايو 2017 وأبريل 2021، أرسل أعضاء المؤسسة العشرات - إن لم يكن المئات - من رسائل البريد الإلكتروني إلى بعضهم البعض وشاركوا بشكل روتيني في اجتماعات الفيديو والمكالمات الهاتفية، من بين أمور أخرى، لصياغة الاستراتيجيات؛ وتحديد الأهداف؛ وتحديد المتآمرين وتوظيفهم؛ وترتيب الاجتماعات والسفر؛ ومصادر الدفع، والمقاولين، والمتآمرين؛ ومعالجة المسائل اللوجستية، وكل ذلك لتعزيز المخطط الشامل للمؤسسة. كأمثلة فقط:

(أ)  في 7 أغسطس 2017، أعدت ألب عرضًا تفصيليًا لدولة الإمارات العربية المتحدة حددت فيه ألب "خطة عمل عالمية" تتضمن "إجراءات هجومية واسعة النطاق". وشاركت شركة ألب هذه الوثيقة مع دولة الإمارات العربية المتحدة عبر البريد الإلكتروني بناءً على المعلومات والاعتقاد.

(ب)  في 3 يناير 2018، تبادل بادال وفيدينو رسائل البريد الإلكتروني (تم إرسال نسخة إلى بريرو وكافين) للترتيب لمقابلة فيدينو مع بادال وبريرو وكافين في جنيف في 12 يناير 2018.

(ج)  في 26 فبراير 2018، أرسل بادال عرضًا "محدثًا وأكثر تفصيلاً" إلى مطر يوصي فيه بـ "مرحلة اختبار جديدة مدتها ثلاثة أشهر" ويقدم نظرة عامة على أهداف ألب المقترحة والإجراءات التي تنوي ألب اتخاذها ضد كل منها.

(د)  في 7 مايو 2018، نشرت ألب "تقريرًا داخليًا سريًا" عن لورد إنرجي ادعى زورًا أن لورد إنرجي "تعتبر أحد كبار المشغلين التابعين لجماعة الإخوان المسلمين في أوروبا ولها علاقات مع الكيانات المرتبطة بتنظيم القاعدة". وبناءً على المعلومات والاعتقاد، تمت مشاركة التقرير داخليًا في ألب عبر البريد الإلكتروني.

(ه)  في 15 مايو 2018، صاغت ألب رسالة بريد إلكتروني، بناءً على المعلومات والاعتقاد، أرسلتها إلى نينا ماي تطلب منها كتابة ثلاثة مقالات عن لورد إنرجي.

(و)  في 6 يونيو 2018، أعدت ألب "تحديثًا عاجلاً" لدولة الإمارات العربية المتحدة بشأن جهود كل من حازم ولورد إنرجي لمواجهة حملة التشهير التي شنتها المؤسسة. وبناءً على المعلومات والاعتقاد، شاركت ألب التحديث داخليًا ومع دولة الإمارات العربية المتحدة عبر البريد الإلكتروني.

(ز)  في 13 يونيو 2018، أعدت ألب "تحديثًا عاجلاً" آخر "سريًا للغاية" لدولة الإمارات العربية المتحدة بشأن جهود كل من حازم ولورد إنرجي لمحاولة تصحيح صفحة ويكيبيديا باللغة الفرنسية للورد إنرجي التي أنشأتها ألب. وشاركت شركة ألب هذا التحديث مع دولة الإمارات العربية المتحدة عبر البريد الإلكتروني بناءً على المعلومات والاعتقاد.

(ح)  في 23 يوليو 2018، أعدت ألب لدولة الإمارات العربية المتحدة "تقريرًا موجزًا - تقييمًا للأثر" يصف "الاتصالات سريعة الانتشار وعمليات الضغط السرية التي أجرتها المؤسسة بشأن 10 أهداف رئيسية"، بما في ذلك لورد إنرجي. وشاركت شركة ألب هذا التقرير مع دولة الإمارات العربية المتحدة عبر البريد الإلكتروني بناءً على المعلومات والاعتقاد.

(ط)  أعدت ألب، وبناءً على المعلومات والاعتقاد أرسلت عبر البريد الإلكتروني إلى دولة الإمارات العربية المتحدة، "تقرير موجز - تقييم الأثر" آخر في 6 أغسطس 2018 والذي أوضح كيف استخدمت ألب وسائل التواصل الاجتماعي وتقنيات تحسين محركات البحث "لتعزيز ظهور

الإجراءات [التي أجرتها]."

(ي) في تحديث مماثل لمطر والإمارات العربية المتحدة في 6 نوفمبر 2018، تفاخرت ألب بأنه "[] وبعد أحدث أفعالنا، يربط Google الآن مباشرةً لورد إنرجي بالإرهاب وحازم ندا بـ [جماعة الإخوان المسلمين]".

248.    هذه ليست سوى بعض الأمثلة على العديد من "التقارير الموجزة" و"التحديثات العاجلة" و"تقييمات التأثير" ورسائل البريد الإلكتروني الأخرى والاتصالات الإلكترونية والشبكات الدولية وبين الدول التي استخدمتها المؤسسة لتعزيز مخططها للاحتيال. لم يكن استخدام المؤسسة للشبكات الدولية وبين الدول متوقعًا فحسب، بل كان جزءًا أساسيًا من مخطط المؤسسة لخلق تصور عام كاذب بأن حازم وشركته متورطين في تمويل الإرهاب.

249.    كما ارتكبت دولة الإمارات العربية المتحدة ومحمد بن زايد ومطر وشركة ألب وبريرو وكافين وبادال وبعض من المدعى عليهم مجهولي الهوية رقم 25-1 أعمال احتيال مصرفي بشكل روتيني بما يخالف القسم 1344 من الباب 18 من مدونة القوانين الأمريكية. ومن خلال بياناتهم الكاذبة والمضللة، استهدفوا خداع وخدعوا بالفعل العديد من البنوك والمؤسسات المالية وحثوا تلك البنوك والمؤسسات المالية على إنهاء علاقاتها المصرفية مع حازم ولورد إنرجي. علم كل من دولة الإمارات العربية المتحدة ومحمد بن زايد ومطر وشركة ألب وبريرو وكافين وبادال وبعض من المدعى عليهم مجهولي الهوية رقم 25-1 وقصدوا، تعرض البنوك لضرر مالي جراء إنهاء ترتيبات الإقراض المربحة طويلة الأجل مع حازم وشركاته. في الواقع، في يونيو 2018، تفاخرت ألب بأن [لورد إنرجي] "تواجه مشاكل خطيرة مع البنوك الغربية لتلقي الائتمانات بعد اتصالاتنا سريعة الانتشار. ويبدو أنه تم وضعها في قائمة مراقبة تستخدمها البنوك. وتشعر البنوك بالقلق إزاء علاقاتها بالإسلاميين المتطرفين."

250.    وعلى وجه التحديد، أنهت البنوك والمؤسسات المالية التالية علاقات مصرفية مربحة مع حازم ولورد إنرجي أو رفضت بدء علاقات مصرفية جديدة نتيجة للبيانات الكاذبة التي نشرتها المؤسسة:

(أ) في نوفمبر 2018، رفض بنك سوسيتيه جنرال التعامل مع شركة لورد إنرجي؛

(ب) في نوفمبر 2018، رفض بنك بي سي بي العمل مع لورد إنرجي لأن إدارة الامتثال لديه "لم تشعر بالارتياح" بخصوص ثلاثة من موظفي لورد إنرجي الذين حددتهم المؤسسة كذبًا على أنهم تربطهم علاقات بالإرهاب وجماعة الإخوان المسلمين؛

(ج) في ديسمبر 2018، توقف بنك كريدي سويس—— وهو بنك استهدفته المؤسسة —— عن دعم مراكز التداول الخاصة بشركة لورد إنرجي، وفي فبراير 2019، أغلق حسابات لورد إنرجي رسميًا؛

(د) في يناير 2019، أنهت شركة سويس كارد حساب لورد إنرجي؛

(ه) في يناير 2019، رفض بنك يو بي إس - بعد مناقشات طويلة مع فرق الامتثال والعناية الواجبة - تمويل أنشطة أعمال لورد إنرجي؛

(و)  في فبراير 2019، أغلق بنك يو بي إس حساب حازم المصرفي الشخصي ـــ الذي كان يحتفظ به لأكثر من 27 عامـًـــا، بالإضافة إلى الحسابات المصرفية الشخصية لوالدة حازم وأخيه؛

(ز)  في أبريل 2019، أنهى بنك ماكواري "اتفاقية تداول العقود الآجلة والمقاصة" مع لورد إنرجي التي كانت سارية منذ عام 2014؛ و

(ح)  في ديسمبر 2020، رفض بنك ماكواري الدخول في علاقة مصرفية جديدة مع لورد إنرجي لأنه "لا يرغب في المضي قدمًا" في هذه الفرصة.

251.  كانت أعمال الابتزاز هذه مرتبطة ببعضها البعض وبالمؤسسة ككل. وقد انخرطت المؤسسة في نمط مستمر من الابتزاز بدأ في عام 2017 واستمر حتى عام 2021 على الأقل، وما بعد ذلك بالتأكيد تقريبًا. في يناير 2020، أرسل بريرو رسالة بريد إلكتروني إلى مطر كتب فيها أنه يتطلع إلى العمل "إلى جانب [مطر] على مدار السنوات الخمس القادمة". كما شكر بريرو مطر على ثقته حيث شاركت المؤسسة في "مهمة حساسة جدًا... جديدة طويلة الأجل".

252.  شاركت المؤسسة المشتركة في الواقع في التجارة الدولية وبين الدول وأثّرت عليها. وكان الهدف من حملة التشهير التي شنتها المؤسسة ضد حازم ولورد إنرجي، والذي تحقق بالفعل، هو إخراج شركة نفط منافسة من العمل. فقد دمرت أنشطة الابتزاز التي تقوم بها المؤسسة شركة تزيد قيمتها عن 150 مليون دولار أمريكي، وكانت تحقق إيرادات سنوية تزيد عن 1.71 مليار دولار أمريكي. كما أثرت جهود المؤسسة لإفلاس لورد إنرجي على أسعار السوق الفورية العالمية للنفط الخام الخفيف المُصدّر إلى آسيا، بما في ذلك أسواق خام غرب تكساس الوسيط المُنتج في الولايات المتحدة. وأثرت ديناميكيات الأسعار التي سعت المؤسسة إلى (ونجحت في) التأثير عليها من خلال نمط نشاط الابتزاز الخاص بها على صفقات النفط الخام التي تقدر بمليارات الدولارات.

253.  كنتيجة مباشرة ومتصلة لأنشطة ابتزاز المدعى عليهم التي تنتهك القسم 1962 (ج) من الباب 18 من مدونة القوانين الأمريكية، تضررت أعمال المدعين وممتلكاتهما بمبلغ يثبت في المحاكمة. ويسعى المدعيان الآن للحصول على ثلاثة أضعاف التعويضات بموجب القسم 1964 (ج) من الباب 18 من مدونة القوانين الأمريكية لتعويض هذه الأضرار. وقد وقعت أضرار المدعين في الولايات المتحدة. وأيضًا من بين أمور أخرى، فإن حازم مواطن أمريكي، وقد دمر المدعى عليهم الشركة الأمريكية التابعة لشركة لورد إنرجي.

<div align="center">

**الاتهام الثالث**
**التآمر للابتزاز، الباب 18 من مدونة القوانين الأمريكية، القسم 1962 (د)**
*(ضد جميع المدعى عليهم)*

</div>

254.  يكرر المدعون كل فقرة من الفقرات السابقة ويعيدون الادعاء بها كما لو كانت واردة بالكامل في هذه الوثيقة.

255.  القسم 1962 (د) من الباب 18 من مدونة القوانين الأمريكية يجعل من "غير القانوني لأي شخص التآمر

لانتهاك أي من أحكام القسم الفرعي (أ) أو (ب) أو (ج) من هذا القسم".

256.    كما هو موضح أعلاه، قام المدعى عليهم، بشكل غير قانوني ومقصود، بالاجتماع والتآمر والاتفاق على انتهاك القسم 1962 (ج) من الباب 18 من مدونة القوانين الأمريكية. وعلى وجه التحديد، ارتكب المدعى عليهم أفعالاً علنية دعمًا للمؤامرة الموضحة أعلاه، بما في ذلك نشر وتوجيه نشر العشرات من المقالات الكاذبة والمضللة حول حازم ولورد إنرجي وعشرات الأفراد والكيانات الأخرى.

257.    تآمر المدعى عليهم واتفقوا عمدًا على المشاركة بشكل مباشر وغير مباشر في المشاركة في أفعال المؤسسة من خلال نمط من النشاط الابتزازي. وكان المدعى عليهم يعرفون أن أفعالهم كانت جزءًا من نمط نشاط ابتزازي ووافقوا على ارتكاب تلك الأفعال لتعزيز المخططات الموضحة أعلاه. ويشكل هذا السلوك مؤامرة لانتهاك القسم 1962 (ج) من الباب 18 من مدونة القوانين الأمريكية، بما يخالف القسم 1962 (د) من الباب 18 من مدونة القوانين الأمريكية.

258.    وكنتائج مباشرة ومتصلة بمؤامرة المؤسسة، والأعمال الصريحة التي تم اتخاذها لتعزيز هذه المؤامرة، وانتهاكات القسم 1962 (د) من الباب 18 من مدونة القوانين الأمريكية، تضررت أعمال المدعين وممتلكاتهما بمبلغ يثبت في المحاكمة. ويسعى المدعيان الآن للحصول على ثلاثة أضعاف التعويضات بموجب القسم 1964 (ج) من الباب 18 من مدونة القوانين الأمريكية لتعويض هذه الأضرار.

<u>الاتهام الرابع</u>
**انتهاكات القسم 1 من قانون شيرمان، الباب 15 من مدونة القوانين الأمريكية، القسم 1**
*(ضد دولة الإمارات العربية المتحدة وأدنوك ومحمد بن زايد ومطر وألب وديليجانس وبربرو وكافين وبادال وبعض المدعى عليهم مجهولي الهوية أرقام 1-25)*

259.    يكرر المدعون كل فقرة من الفقرات السابقة ويعيدون الادعاء بها كما لو كانت واردة بالكامل في هذه الوثيقة.

260.    كما هو موضح أعلاه، تعاقد المدعى عليهم واجتمعوا وتآمروا واتفقوا على تقييد التجارة الدولية وبين الدول بشكل غير قانوني وغير معقول. وكانت حملة التشهير التي أطلقها المدعى عليهم ضد لورد إنرجي تهدف على وجه التحديد - وقد فعلت - القضاء على تهديد منافس متنامي لشركة أدنوك في السوق الفورية للنفط الخام الخفيف المُصدّر إلى آسيا. حيث قام المدعى عليهم بصياغة ونشر بيانات كاذبة تفيد بأن حازم ولورد إنرجي كانا متورطين في تمويل الإرهاب لمنع البنوك من الإقراض إلى حازم أو لورد إنرجي وتثبيط العملاء والأطراف المقابلة وشركاء الأعمال من التعامل مع حازم أو لورد إنرجي.

261.    يفرض تصدير لورد إنرجي لمزيج الصحراء وخام غرب تكساس الوسيط إلى آسيا ضغطًا تنازليًا على

الأسعار التي قد تفرضها أدنوك على خام مربان- وهي درجة مكافئة من النفط الخام الخفيف. ومن خلال سلوكهم غير المعقول المناهض للمنافسة، أجبر المدعى عليهم لورد إنرجي على الخروج من السوق الفوري للنفط الخام الخفيف في آسيا، مما أدى إلى زيادة الأسعار التي تلقتها الإمارات العربية المتحدة وشركة أدنوك لصادرات مربان.

262.    حدثت مؤامرة المدعى عليهم، والتأثير الناتج على السوق الفورية للنفط الخام الخفيف في آسيا، في التجارة الدولية وبين الدول وأثرت عليها، وكان لها تأثير مباشر وجوهري ومتوقع على قطاع التصدير الأمريكي والتجارة مع الدول الأجنبية. وقد تأثرت الأسعار التي يمكن أن يحصل عليها منتجو خام غرب تكساس الوسيط في الولايات المتحدة لصادرات خام غرب تكساس الوسيط بشكل مباشر بالجهود غير القانونية التي تبذلها المؤسسة لإخراج لورد إنرجي من السوق.

263.    كذلك، كان للسلوك غير القانوني والمناهض للمنافسة الذي ارتكبه المدعى عليهم تأثير مباشر وجوهري ومتوقع على شركة أمريكا لورد إنرجي، وهي شركة أمريكية تعمل في تصدير خام غرب تكساس الوسيط إلى دول أجنبية، بشكل أساسي في آسيا. وعلى وجه التحديد، أجبر السلوك غير القانوني للمدعى عليهم شركة أمريكا لورد إنرجي على الخروج من العمل تماماً. كما أجبر لورد إنرجي إس أيه على الإعلان عن إفلاسها، مما أثر على الشركات الأمريكية المشاركة في التجارة الخارجية من خلال منع لورد إنرجي من مواصلة مزاولة الأعمال التجارية مع العديد من الكيانات الأمريكية، وأجبر هذه الكيانات الأمريكية على السعي لاسترداد الديون المستحقة لها من لورد إنرجي من خلال إجراءات الإفلاس السويسرية.

264.    يحق للمدعين الحصول على ثلاثة أضعاف التعويضات لانتهاكات قانون شيرمان المزعومة في هذه الوثيقة.

<u>الاتهام الخامس</u>
انتهاكات القسم 2 من قانون شيرمان، الباب 15 من مدونة القوانين الأمريكية، القسم 2
*(ضد دولة الإمارات العربية المتحدة وأدنوك ومحمد بن زايد ومطر*
*وألب وديليجانس وبريرو وكافين وبادال وبعض المدعى عليهم*
*مجهولي الهوية أرقام 1-25)*

265.    يكرر المدعون كل فقرة من الفقرات السابقة ويعيدون الادعاء بها كما لو كانت واردة بالكامل في هذه الوثيقة.

266.    كما هو موضح أعلاه، قبل عام 2017 عندما دخلت شركة لورد إنرجي السوق الفورية للنفط الخام الخفيف المُصدّر إلى آسيا، كانت شركة أدنوك تمتلك قوة احتكارية. في ذلك الوقت، كان خام مربان المنتج من الإمارات العربية المتحدة هو درجة النفط الخام الخفيفة الوحيدة التي يتم تصديرها بكميات كبيرة إلى المصافي في آسيا. وكان منتجو خام مربان في الإمارات العربية المتحدة يبيعون حوالي 8 ملايين برميل منه شهريًا في السوق الفورية في آسيا. وكانت

شركة أدنوك هي البائع المهيمن لخام مربان، بما يقرب من 60% من جميع شحنات مربان المباعة في السوق الفورية في آسيا. وفي ذلك الوقت، سعت شركة أدنوك إلى توسيع إنتاجها من خام مربان بهدف نهائي يتمثل في جعله مقياسًا لأسعار النفط في الشرق الأوسط.

267.    هدد دخول لورد إنرجي إلى السوق الفورية للنفط الخام الخفيف في آسيا احتكار شركة أدنوك وخططها للنمو المستمر. وخلال بضعة أشهر في عام 2017، باعت لورد إنرجي كميات كبيرة من مزيج الصحراء تصل إلى 2-3 ملايين برميل في السوق الفورية في آسيا.

268.    أطلق المدعى عليهم حملتهم غير القانونية للتشهير ضد حازم ولورد إنرجي بنية محددة تتمثل في "تدمير []" لورد إنرجي ودفعها للخروج من السوق حتى تتمكن شركة أدنوك من الحفاظ على قوتها الاحتكارية.

269.    حدثت مؤامرة المدعى عليهم، والتأثير الناتج على السوق الفورية للنفط الخام الخفيف في آسيا، في التجارة الدولية وبين الدول وأثرت عليها، وكان لها تأثير مباشر وجوهري ومتوقع على قطاع التصدير الأمريكي والتجارة مع الدول الأجنبية. وقد تأثرت الأسعار التي يمكن أن يحصل عليها منتجو خام غرب تكساس الوسيط في الولايات المتحدة لصادرات خام تكساس الوسيط بشكل مباشر بالجهود غير القانونية التي تبذلها المؤسسة لإخراج لورد إنرجي من السوق.

270.    كذلك، كان للسلوك غير القانوني والمناهض للمنافسة الذي ارتكبه المدعى عليهم تأثير مباشر وجوهري ومتوقع على شركة أمريكاز لورد إنرجي، وهي شركة أمريكية تعمل في تصدير خام غرب تكساس الوسيط إلى دول أجنبية، بشكل أساسي في آسيا. وعلى وجه التحديد، أجبر السلوك غير القانوني للمدعى عليهم شركة أمريكاز لورد إنرجي على الخروج من العمل تمامًا. كما أجبر لورد إنرجي إس أيه على الإعلان عن إفلاسها، مما أثر على الشركات الأمريكية المشاركة في التجارة الخارجية من خلال منع لورد إنرجي من مواصلة مزاولة الأعمال التجارية مع العديد من الكيانات الأمريكية، وأجبر هذه الكيانات الأمريكية على السعي لاسترداد الديون المستحقة لها من لورد إنرجي من خلال إجراءات الإفلاس السويسرية.

271.    يحق للمدعين الحصول على ثلاثة أضعاف التعويضات لانتهاكات قانون شيرمان المزعومة في هذه الوثيقة.

## <u>طلب سبل الانتصاف</u>

ولهذا يطلب المدعيان بكل احترام من المحكمة إصدار حكم لصالحهما، وضد جميع المدعى عليهم مجتمعين وفرادى، على النحو التالي:

(أ)      منح المدعين تعويضات فعلية لا تقل عن 299 مليون دولار؛

(ب)   منح المدعين الأرباح المفقود بقيمة لا تقل عن 268.75 مليون دولار؛

(ج)   منح المدعين تعويضًا عن أرباح المدعى عليهم بما لا يقل عن 354.8 مليون دولار؛

(د)   منح المدعين ثلاثة أضعاف التعويضات؛

(ه)   منح المدعين جميع النفقات والتكاليف، بما في ذلك أتعاب المحاماة؛ و

(و)   منح المدعين تعويضات بمبلغ يتم تحديده في المحاكمة عن

272.   الضرر العاطفي والنفسي والسمعة؛

(ز)   أي سبيل انتصاف آخر أو إضافي تراه المحكمة مناسبًا.

**طلب المحاكمة أمام هيئة المحلفين**

يطلب المدعون محاكمة أمام هيئة محلفين بشأن جميع المطالبات والمسائل التي يمكن النظر فيها.

التاريخ: 24 يناير 2024 *توقيع مطابق/ توماس أيه كلير، شركة مهنية*

توماس أيه كلير، شركة مهنية (رقم تسجيل المحامين في مقاطعة كولومبيا 461964)
نيكولاس جيه بريشبل (رقم تسجيل المحامين في مقاطعة كولومبيا 229988)
كلير لوك إل إل بي
10 شارع برينس
الكساندريا، فيرجينيا 22314
الهاتف: 628-7400 (202)
tom@clarelocke.com
nick@clarelocke.com

*محامو المدعين حازم ندا ولورد انرجي إس أيه*



# CERTIFICATION

TransPerfect is globally certified under the standards ISO 9001:2015, ISO 17100:2015, and ISO 18587:2017. This Translation Certificate confirms the included documents have been completed in conformance with the Quality Management System documented in its ISO process maps and are, to the best knowledge and belief of all TransPerfect employees engaged on the project, full and accurate translations of the source material.

File Name(s):

- **[001] 20240124 Complaint**

Source Language(s): **English**

Target Language(s): **Arabic**

*Authorized Signature:*

*Signature, Notary Public:*

*Name:*    Jacqueline Yorke

*Title:*    Project Manager

*Date:*    February 6, 2024

WENDY POON
Notary Public - State of New York
No. 01PO0000184
Qualified in Queens County
My Commission Expires February 02, 20 2 7

*Stamp: Notary Public*

Reason for signature: I approve the accuracy of this document content as written