**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HAZIM NADA, *et al.*, | |
| *Plaintiffs*, | |
| *v.* | Case No. 24-cv-206-ABJ |
| THE UNITED ARAB EMIRATES, *et al.*, | |
| *Defendants*. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS THE UNITED ARAB EMIRATES, HIS HIGHNESS SHEIKH MOHAMED BIN ZAYED AL NAHYAN, AND MATAR HUMAID AL-NEYADI'S MOTION TO DISMISS**

John B. Bellinger III
Amy Jeffress
Sally L. Pei
Stephen K. Wirth
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, DC 20001
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
john.bellinger@arnoldporter.com

Robert Reeves Anderson
ARNOLD & PORTER KAYE SCHOLER LLP
1144 Fifteenth Street, Suite 3100
Denver, CO 80202

*Counsel for Defendants the United Arab Emirates,
His Highness Sheikh Mohamed bin Zayed Al Nahyan,
and Matar Humaid al-Neyadi*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ...................................................................................................... 1

STATEMENT OF THE CASE .................................................................................... 3

ARGUMENT ............................................................................................................. 5

I.     The UAE Is Immune from Suit Under the Foreign Sovereign Immunities Act. ............... 5

       A.     The Complaint fails to allege any conduct by the UAE in the United States. ......... 6

       B.     The Complaint fails to allege any direct effect in the United States. .................... 9

II.    The UAE Officials Are Immune from Suit Under the Common Law. ............................ 13

       A.     H.H. Sheikh Mohamed enjoys absolute immunity. ............................................. 13

       B.     Mr. al-Neyadi enjoys immunity for acts undertaken in his official capacity ........ 14

III.   The Court Lacks Personal Jurisdiction Over the UAE Officials. ..................................... 17

       A.     The UAE Officials lack minimum contacts with the United States. .................... 17

       B.     Exercising personal jurisdiction would be unfair and unreasonable. ................... 21

IV.   The Complaint Fails to State a Claim. ........................................................................ 21

       A.     Plaintiffs fail to state a claim under the Lanham Act. .......................................... 22

            1.     The alleged speech is non-commercial. ................................................... 22

            2.     The alleged speech is not advertising or promotion. ............................... 23

            3.     Plaintiffs' claim seeks an impermissible extraterritorial application of the Lanham Act. .......................................................................... 25

       B.     Plaintiffs fail to state a claim under the RICO Act. ............................................. 26

            1.     The Complaint fails to allege any predicate acts. .................................... 26

            2.     The Complaint fails to allege a "pattern of racketeering activity." ......... 27

            3.     The Complaint fails to allege RICO proximate causation. ....................... 30

            4.     The Complaint fails to allege a domestic injury to business or property. ................................................................................................ 31

5.     The Complaint fails to allege an enterprise. ............................... 32

6.     The Complaint fails to allege a RICO conspiracy. ..................... 34

7.     Plaintiffs' RICO claims are time-barred. ................................... 34

C.   Plaintiffs' Sherman Act claim fails for lack of subject-matter jurisdiction and fails to state a claim. ....................................................................... 35

1.     The Court lacks subject-matter jurisdiction under the FTAIA. ............... 35

2.     Plaintiffs fail to state a claim under the Sherman Act. ............................ 38

a.     The Complaint fails to allege a relevant market or antitrust injury. ........................................................................... 39

b.     The Complaint fails to state a Section 1 claim. ........................... 41

c.     The Complaint fails to state a Section 2 claim. ........................... 43

3.     Plaintiffs' Sherman Act claims are time-barred. ......................................... 44

CONCLUSION ....................................................................................................... 45

## TABLE OF AUTHORITIES

**Cases**                                                                    Page(s)

*Abitron Austria GmbH v. Hetronic International, Inc.*,
   600 U.S. 412 (2023) ..................................................................................25

*Am. President Lines, LLC v. Matson, Inc.*,
   633 F. Supp. 3d 209 (D.D.C. 2022) .........................................................40

*Am. Steel Erectors v. Loc. Union No. 7*,
   815 F.3d 43 (1st Cir. 2016) ......................................................................43

*Andrx Pharm., Inc. v. Biovail Corp. Int'l*,
   256 F.3d 799 (D.C. Cir. 2001) .................................................................40

*Anza v. Ideal Steel Supply Corp.*,
   547 U.S. 451 (2006) ................................................................................30

*Argentine Republic v. Amerada Hess Shipping Corp.*,
   488 U.S. 428 (1989) ............................................................................5, 13

*\*Asa Accugrade, Inc. v. Am. Numismatic Ass'n*,
   370 F. Supp. 2d 213 (D.D.C. 2005) .............................................41, 42, 43

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..................................................................................3

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
   459 U.S. 519 (1983) ..................................................................................4

*Boyle v. United States*,
   556 U.S. 938 (2009) ................................................................................33

*Bregman v. Perles*,
   747 F.3d 873 (D.C. Cir. 2014) .................................................................45

*Broidy Cap. Mgmt. LLC v. Muzin*,
   No. 19-cv-0150 (DLF), 2020 WL 1536350 (D.D.C. Mar. 31, 2020) ...............28, 29

*Brooke Grp. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993) ................................................................................42

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962) ................................................................................39

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977) ................................................................................41

*Burger King Corp. v. Rudzewicz,*
  471 U.S. 462 (1985)................................................................17, 18, 19, 21

*Calphalon Corp. v. Rowlette,*
  228 F.3d 718 (6th Cir. 2000) ...............................................................20

*Cockrum v. Donald J. Trump for President, Inc.,*
  319 F. Supp. 3d 158 (D.D.C. 2018) ..................................................18, 20

*Ctr. for Immigr. Studs. v. Cohen,*
  410 F. Supp. 3d 183 (D.D.C. 2019) .............................................2, 26, 27, 34

*Den Norske Stats Oljeselskap As v. HeereMac Vof,*
  241 F.3d 420 (5th Cir. 2001) ...............................................................38

*Dial A Car, Inc. v. Transp., Inc.,*
  82 F.3d 484 (D.C. Cir. 1996) ...............................................................40

*Dial a Car, Inc. v. Transp., Inc.,*
  884 F. Supp. 584 (D.D.C. 1995) ...........................................................42

*Doe 1 v. Buratai,*
  318 F. Supp. 3d 218 (D.D.C. 2018) .......................................................15

*Duty Free Ams., Inc. v. Estee Lauder Cos.,*
  797 F.3d 1248 (11th Cir. 2015) ...........................................................43

*E. Sav. Bank, FSB v. Papageorge,*
  31 F. Supp. 3d 1 (D.D.C. 2014).............................................................34

*Edmondson & Gallagher v. Alban Towers Tenants Association,*
  48 F.3d 1260 (D.C. Cir. 1995)...........................................................28, 29

*Eliahu v. Jewish Agency for Israel,*
  919 F.3d 709 (2d Cir. 2019)..................................................................15

*Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.,*
  417 F.3d 1267 (D.C. Cir. 2005) ............................................................37

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.,*
  542 U.S. 155 (2004).................................................................36, 37, 38

*Farah v. Esquire Mag.,*
  736 F.3d 528 (D.C. Cir. 2013)........................................................22, 23, 24

*Farhang v. Indian Inst. of Tech.,*
  655 F. App'x 569 (9th Cir. 2016) .........................................................15

iv

*Feld Ent. Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals*,
   873 F. Supp. 2d 288 (D.D.C. 2012) ........................................................34

*First American Corp. v. Al-Nahyan*,
   948 F. Supp. 1107 (D.D.C. 1996) ..........................................................14

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
   92 U.S. 351 (2021).................................................................................18

*FTC v. Facebook, Inc.*,
   560 F. Supp. 3d 1 (D.D.C. 2021) ..........................................................39

*Global Index, Inc. v. Mkapa*,
   290 F. Supp. 2d 108 (D.D.C. 2003) ......................................................11

*GTE New Media Servs. Inc. v. BellSouth Corp.*,
   199 F.3d 1343 (D.C. Cir. 2000) ............................................................19

*H.J. Inc. v. Nw. Bell Tel. Co.*,
   492 U.S. 229 (1989)..............................................................................26

*Hemi Grp., LLC v. City of New York*,
   559 U.S. 1 (2010)..................................................................................30

*Holmes v. Sec. Inv. Prot. Corp.*,
   503 U.S. 258 (1992)..............................................................................30

*Hytera Commc'ns Corp. Ltd. V. Motorola Sols., Inc.*,
   623 F. Supp. 3d 857 (N.D. Ill. 2022) ....................................................43

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945)........................................................................17, 21

*Int'l Television Prods. Ltd. v. Twentieth Century-Fox Television Div. of Twentieth
Century-Fox Film Corp.*,
   622 F. Supp. 1532 (S.D.N.Y. 1985)......................................................40

*In re Intel Corp. Microprocessor Antitrust Litig.*,
   452 F. Supp. 2d 555 (D. Del. 2006)..................................................36, 37

*Jam v. Int'l Fin. Corp.*,
   3 F.4th 405 (D.C. Cir. 2021)...................................................................7

*Johnson v. Arden*,
   614 F.3d 785 (8th Cir. 2010) ................................................................19

*Kimberlin v. National Bloggers Club*,
   No. 13-cv-3059, 2015 WL 1242763 (D. Md. Mar. 17, 2015) ...............27

*Kimm v. Lee*,
    No. 04-cv-5724, 2005 WL 89386 (S.D.N.Y. Jan. 13, 2005) ................................................27

*Levy v. BASF Metals Ltd.*,
    917 F.3d 106 (2d Cir. 2019).................................................................................................35

*Lewis v. Mutond*,
    918 F.3d 142 (D.C. Cir. 2019) .............................................................................................16

*Lopez v. Council on Am.-Islamic Rels. Action Network, Inc.*,
    657 F. Supp. 2d 104 (D.D.C. 2009) .....................................................................................28

*Lotes Co. v. Hon Hai Precision Indus. Co.*,
    753 F.3d 395 (2d Cir. 2014)...............................................................................36, 37, 38

*Manoharan v. Rajapaksa*,
    711 F.3d 178 (D.C. Cir. 2013) .............................................................................................14

*In re McCormick & Co., Inc., Pepper Prod. Mktg. & Sales Pracs. Litig.*,
    215 F. Supp. 3d 51 (D.D.C. 2016) ..................................................................................24, 25

*McKesson Corp. v. Islamic Republic of Iran*,
    672 F.3d 1066 (D.C. Cir. 2012) ..........................................................................................5, 6

*Miango v. Democratic Republic of Congo*,
    No. 15-cv-1265 (ABJ), 2019 WL 2191806 (D.D.C. Jan. 19, 2019)......................................14

*Miango v. Democratic Republic of Congo*,
    No. 15-cv-1265 (ABJ), 2020 WL 3498586 (D.D.C. June 29, 2020)......................................15

*Millicom Int'l Cellular v. Republic of Costa Rica*,
    995 F. Supp. 14 (D.D.C. 1998) ............................................................................................12

*Mwani v. bin Laden*,
    417 F.3d 1 (D.C. Cir. 2005) ............................................................................................17, 18

*Neumann v. Reinforced Earth Co.*,
    786 F.2d 424 (D.C. Cir. 1986) .............................................................................................39

*Newman v. Jewish Agency for Israel*,
    No. 16-cv-7593, 2017 WL 6628616 (S.D.N.Y. Dec. 28, 2017) ...........................................17

*NicSand, Inc. v. 3M Co.*,
    507 F.3d 442 (6th Cir. 2007) ...............................................................................................40

*O'Quinn v. World Indus. Const.*,
    68 F.3d 471 (5th Cir. 1995) .................................................................................................20

*OBB Personenverkehr AG v. Sachs,
    577 U.S. 27 (2015)..........................................................................................7, 8

Odhiambo v. Republic of Kenya,
    930 F. Supp. 2d 17 (D.D.C. 2013) ...................................................................10, 11

*Princz v. Fed. Republic of Germany,
    26 F.3d 1166 (D.C. Cir. 1994) ...............................................................10, 11, 13

Republic of Argentina v. Weltover, Inc.,
    504 U.S. 607 (1992)....................................................................................10, 12

Revell v. Lidov,
    317 F.3d 467 (5th Cir. 2002) ....................................................................19

Ritchie v. Sempra Energy,
    No. 10-cv-1513, 2013 WL 12171757 (S.D. Ca. Oct. 15, 2013) ...........................27

RJR Nabisco, Inc. v. Eur. Cmty.,
    579 U.S. 325 (2016)....................................................................................31, 32

Robinson v. Lowe's Home Ctrs., Inc.,
    No. 06-cv-4403, 2007 WL 2739187 (E.D. Pa. Sept. 19, 2007).........................35

RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP,
    682 F.3d 1043 (D.C. Cir. 2012) ..................................................................34

Ruhrgas AG v. Marathon Oil Co.,
    526 U.S. 574 (1999)....................................................................................17

S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.,
    740 F.2d 980 (D.C. Cir. 1984) ....................................................................39

Samantar v. Yousuf,
    560 U.S. 305 (2010)....................................................................................14, 15

Sanderson v. Culligan Int'l Co.,
    415 F.3d 620 (7th Cir. 2005) ....................................................................44

Saudi Arabia v. Nelson,
    507 U.S. 349 (1993)......................................................................................5

Second Amend. Found. v. U.S. Conf. of Mayors,
    274 F.3d 521 (D.C. Cir. 2001) ....................................................................17

Shahar v. Ofek,
    No. 4:22-cv-00632, 2024 WL 1289562 (E.D. Tex. Mar. 26, 2024).....................15

*Shrader v. Biddinger*,
    633 F.3d 1235 (10th Cir. 2011) ...................................................................19

*Sikhs for Justice v. Singh*,
    64 F. Supp. 3d 190 (D.D.C. 2014) ..............................................................13

*Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*,
    947 F. Supp. 2d 88 (D.D.C. 2013) ..............................................................39

*Smugglers Notch Homeowners Ass'n, Inc. v. Smugglers' Notch Mgmt. Co., Ltd.*,
    414 F. App'x 372 (2d Cir. 2011) .................................................................40

*Solomon v. Dechert LLP*,
    No. 22-cv-3137 (JEB), 2023 WL 6065025 (D.D.C. Sept. 18, 2023) ...............30, 31

*Sumotext Corp. v. Zoove, Inc.*,
    No. 16-cv-1370, 2016 WL 6524409 (N.D. Cal. Nov. 3, 2016) .............................40

*Teltschik v. Williams & Jensen, PLLC*,
    748 F.3d 1285 (D.C. Cir. 2014) ...............................................................2, 27

*In re Terrorist Attacks on Sept. 11, 2001*,
    122 F. Supp. 3d 181 (S.D.N.Y. 2015) ..........................................................15

*U1it4less, Inc. v. Fedex Corp.*,
    871 F.3d 199 (2d Cir. 2017) ......................................................................33

*Underhill v. Hernandez*,
    168 U.S. 250 (1897) .................................................................................14

*United States v. Crisci*,
    273 F.3d 235 (2d Cir. 2001) ......................................................................27

*United States v. E. I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) .................................................................................39

*United States v. LSL Biotech.*,
    379 F.3d 672 (9th Cir. 2004) .................................................................36, 37

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) .....................................................................43

*United States v. Philip Morris USA Inc.*,
    566 F.3d 1095 (D.C. Cir. 2009) ..............................................................22, 23

*United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n*,
    33 F.3d 1232 (10th Cir. 1994) ...............................................................11, 12

*US Dominion, Inc. v. MyPillow, Inc.*,
  No. 21-cv-0445 (CJN), 2022 WL 1597420 (D.D.C. May 19, 2022)......................................33

*Valambhia v. United Republic of Tanzania*,
  964 F.3d 1135 (D.C. Cir. 2020) ..................................................................................9

\*Virtual Countries, Inc. v. Republic of South Africa*,
  300 F.3d 230 (2d Cir. 2002).......................................................................................12

*Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*,
  546 U.S. 164 (2006)..................................................................................................40

*W. Assocs. Ltd. P'ship v. Mkt. Square Assocs.*,
  235 F.3d 629 (D.C. Cir. 2001)...................................................................................28

\*Walden v. Fiore*,
  571 U.S. 277 (2014)....................................................................................17, 18, 19, 20

*Wampler v. Sw. Bell Tel. Co.*,
  597 F.3d 741 (5th Cir. 2010) ......................................................................................40

\*Wye Oak Tech., Inc. v. Republic of Iraq*,
  24 F.4th 686 (D.C. Cir. 2022)..............................................................................7, 8, 9

*Yegiazaryan v. Smagin*,
  599 U.S. 533 (2023)..................................................................................................31

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
  401 U.S. 321 (1971)..................................................................................................44

**Statutes & Rules**

15 U.S.C.
  § 1 ............................................................................................................................41
  § 2 ............................................................................................................................43
  § 6a ..........................................................................................................................35
  § 6a(1) ......................................................................................................................36
  § 6a(2) ......................................................................................................................36
  § 15b ........................................................................................................................44
  § 1151(a)(1)(B) ........................................................................................................25
  § 1125(a)(1)(B) ...........................................................................................22, 24, 25

18 U.S.C.
  § 1343 ......................................................................................................................26
  § 1344 ......................................................................................................................26
  § 1961(1) ..................................................................................................................26
  § 1961(5) ..................................................................................................................26
  § 1962(a) ..................................................................................................................34

18 U.S.C. (continued)

§ 1962(b) ........................................................................................................34
§ 1962(c) ....................................................................................................28, 34

28 U.S.C.

§ 1330 .....................................................................................................5, 6, 13
§ 1605(a)(2) ......................................................................................6, 7, 9, 10, 13

Federal Rules of Civil Procedure

Rule 4(k)(2) .....................................................................................................17
Rule 11 ..............................................................................................................1
Rule 12 ..............................................................................................................1
Rule 12(b)(1) ...............................................................................................6, 38
Rule 12(b)(2) ...............................................................................................6, 17
Rule 12(b)(6) .............................................................................................22, 38

## Other Authorities

*Actions Against Foreigners*,
   1 Op. Att'y Gen. 81 (1797) ........................................................................14

Brief for the United States as Amicus Curiae,
   *Lewis v. Mutond*, No. 19-185 (S. Ct. May 26, 2020) ...............................16

Brief for the United States as Amicus Curiae in Support of Affirmance,
   *Matar v. Dichter*, 563 F.3d 9 (2d Cir. 2009) (No. 07-2579), 2007 WL 6931924 .................15

Restatement (2d) of Foreign Relations Law of the United States (1965) .....................16

Suggestion of Immunity,
   *Doğan v. Barak*, No. 2:15-cv-8130 (C.D. Cal. June 10, 2016)..............................15

**INTRODUCTION**

A reader patient enough to parse the 87-page Complaint might question why this case was filed in the United States. After all, two foreign Plaintiffs have sued a sovereign government from the Middle East, its head of state, and another foreign official—all of whom enjoy immunity and are not subject to this Court's jurisdiction—for alleged conduct committed entirely outside the United States. That reader also might ask why the Complaint would recast what appears to be a garden-variety defamation dispute (a so-called "smear campaign") as purported violations of federal advertising, RICO, and antitrust laws, despite not alleging even the basic elements of those federal claims. Whatever the motive for Plaintiffs' strategic choices, the Complaint's myriad legal shortcomings suggest that this action is a political statement masquerading as a lawsuit. While the Complaint arguably avoids running afoul of Rule 11, it cannot survive Rule 12.

Plaintiffs are a Swiss commodities trading company and its Italian-domiciled owner. They allege that the United Arab Emirates—acting through its president and another government official—hired a Swiss private investigative firm to spread false news articles, blog posts, and other communications concerning Plaintiffs' association with the Muslim Brotherhood. Plaintiffs claim that these false statements eventually forced them out of business because third-party financial institutions (located outside the United States) refused to extend financing to them. The Complaint documents at length Defendants' specific focus on Plaintiffs' connections to the Muslim Brotherhood, a terrorist organization that the UAE has designated and opposed both domestically and internationally for decades. But Plaintiffs surmise this was all a ruse, positing that the UAE had no interest in disrupting terrorist financing networks in Europe, but only acted to eliminate Plaintiffs' competition with the UAE's state-owned oil company, the Abu Dhabi National Oil Company (ADNOC).

Even accepting the truth of Plaintiffs' allegations, the Complaint must be dismissed for

numerous reasons. Principally, the UAE is immune from suit under the Foreign Sovereign Immunities Act, and no exception to immunity applies. In particular, the commercial-activities exception does not apply because the UAE is not alleged to have engaged in any conduct in the United States or in conduct abroad that had a direct effect here. The UAE officials are likewise immune under principles of common-law immunity long recognized and asserted by the U.S. State Department in similar cases. And the Court also lacks personal jurisdiction over the UAE Defendants—*i.e.*, the UAE Government, president, and government official—because the UAE is immune and there are no allegations that the UAE officials directed any conduct whatsoever at the United States.

Beyond these jurisdictional defects, the Complaint fails to state a claim for false advertising, racketeering, or an antitrust violation. With respect to the Lanham Act claim, this lawsuit has nothing to do with false advertising. The allegedly false statements described in the Complaint are neither commercial speech nor advertising under the Lanham Act: they make no mention of Plaintiffs' (or ADNOC's) products and were not made to influence Plaintiffs' (or ADNOC's) customers. Even if statements about Plaintiffs' ties to the Muslim Brotherhood could be considered advertising (and they cannot), the Lanham Act applies only to *domestic* uses in commerce. By Plaintiffs' own account, any "advertising" influenced only foreign financial institutions and harmed Plaintiffs in Italy and Switzerland. Nothing was done to influence the purchasing decisions of anyone in the United States.

As for the racketeering claim, this Court has admonished prior litigants for "tr[ying] to shoehorn a defamation claim into the RICO framework," holding that "a plaintiff 'complaining about a defamatory statement cannot end-run the requirements for a defamation claim' by pleading it as a RICO violation." *Ctr. for Immigr. Studs. v. Cohen*, 410 F. Supp. 3d 183, 191 (D.D.C. 2019) (A.B. Jackson, J.) (quoting *Teltschik v. Williams & Jensen, PLLC*, 748 F.3d 1285, 1288 (D.C. Cir.

2014), *aff'd*, 806 F. App'x 7 (D.C. Cir. 2020). The Complaint suffers that flaw and more: it identifies no predicate acts, no pattern of racketeering, no causation, no domestic injury, and no enterprise. Even if Plaintiffs had sufficiently alleged RICO's elements, the claim would be time-barred.

Finally, on the Sherman Act claim, the Complaint cannot overcome the Foreign Trade Antitrust Improvement Act's jurisdictional bar, which requires Plaintiffs to identify a direct effect on U.S. commerce that caused their injury. (Plaintiffs allege the opposite causal chain: that Defendants' conduct harmed them personally, which, in turn, had an effect on U.S. commerce.) Nor do Plaintiffs plead the fundamental elements of a Section 1 or Section 2 claim under the Sherman Act. They fail to allege a relevant market or that they suffered an antitrust injury. They fail to allege that the UAE (or any other defendant) entered into an agreement to unreasonably restrain trade, or that the UAE (or any other defendant) acquired or maintained monopoly power by anticompetitive means. And even if Plaintiffs could tick all those boxes, their claims would nevertheless be barred under the Sherman Act's four-year statute of limitations.

The Court should dismiss the Complaint with prejudice.

## STATEMENT OF THE CASE

This background section summarizes the allegations of the Complaint (Dkt. 1) without conceding their truth. And, given the Complaint's considerable length, this section necessarily focuses on the gravamen of Plaintiffs' claims, reserving discussion of certain specific allegations for the argument sections that follow. But at the outset, the UAE Defendants wish to make clear that they vigorously dispute Plaintiffs' characterization of the facts and Plaintiffs' entitlement to relief. While the Court must accept certain of Plaintiffs' allegations as true for purposes of this motion, the Court need not accept as true inferences unsupported by facts set out in the Complaint or legal conclusions cast as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Nor can the Court "assume that [Plaintiffs] can prove facts that [they] ha[ve] not alleged." *Associated*

*Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

Plaintiffs are Hazim Nada, a U.S. and Italian dual citizen domiciled in Como, Italy; and his privately owned oil company, Lord Energy SA, which is incorporated, and has its principal place of business, in Lugano, Switzerland. Compl. ¶¶ 19–20.

The Complaint alleges that, beginning in 2017, the UAE—acting through its president, H.H. Sheikh Mohamed bin Zayed Al Nahyan, and another UAE official, Matar Humaid al-Neyadi —hired a Swiss private investigative firm (Alp) to investigate Plaintiffs' ties to the Muslim Brotherhood, a terrorist organization. *Id.* ¶¶ 1, 13, 91–92. After initial investigations, Alp produced a report in which it concluded that Lord Energy "is at the center of European [Muslim Brotherhood] senior operators and has ties to Al-Qaeda related entities." *Id.* ¶ 92. Alp further reported that "confidential documents notably reveal contacts between Lord Energy executives, who are [Muslim Brotherhood] members, and Al-Qaeda related people and organisations." *Id.* Alp specifically noted that Mr. Nada's father, Youssef Nada, was "once considered to be the 'foreign minister' of the Muslim Brotherhood and its key financier." *Id.* As the Complaint acknowledges, the United States sanctioned Youssef Nada (as well as the fathers of two other Lord Energy employees) for their work for the Muslim Brotherhood. *Id.* ¶¶ 96–97. Alp assessed that Lord Energy's work in the oil industry was "the perfect cover" for the company's financing of the Muslim Brotherhood. *Id.* ¶ 92.

The Complaint alleges that, at the UAE's direction, Alp engaged in a "Dark PR" campaign against Plaintiffs by allegedly commissioning false and misleading news articles, blog posts, and Wikipedia articles describing Plaintiffs' ties to the Muslim Brotherhood. *See id.* ¶¶ 98–106, 128–32, 144–48, 152–57. Alp also allegedly emailed similar information (as well as links to the articles Alp had allegedly commissioned) to Crédit Suisse, "major bank risk compliance databases," and "one of the preeminent crude oil price reporting agencies." *Id.* ¶¶ 133–34, 159. The purpose of this

campaign, Alp allegedly stated, was to "seriously damage, if not destroy, the reputation and via-bility of key [Muslim Brotherhood] European groups through our confidential offensive viral com-munication." *Id.* ¶ 124. Alp allegedly kept the UAE informed of its progress through emails and in telephonic and in-person meetings in Switzerland and the UAE. *Id.* ¶¶ 164–76.

The Complaint alleges that, as a consequence of Alp's dark PR campaign, "various finan-cial institutions and business partners ended their existing relationships with Lord Energy … and others refused to start new business dealings with Lord Energy." *Id.* ¶ 177; *see id.* ¶ 177–84. The Complaint claims that Lord Energy lost access to credit and had to wind down operations. *Id.* ¶ 185–87. In April 2019, Lord Energy dissolved its U.S. subsidiary, Americas Lord Energy, and filed for bankruptcy in Switzerland. *Id.* ¶ 188.

In January 2024, Plaintiffs initiated this lawsuit against the UAE Defendants, Alp and its founders, and several other individuals who allegedly worked with Alp. Although largely framed as a defamation suit related to Defendants' purported "smear campaign" against Plaintiffs, the Complaint asserts false advertising claims under the Lanham Act, civil racketeering claims under RICO, and antitrust claims under the Sherman Act. *See id.* ¶¶ 223–71.

## ARGUMENT

### I.      The UAE Is Immune from Suit Under the Foreign Sovereign Immunities Act.

This Court lacks subject-matter and personal jurisdiction over the UAE because the UAE is immune from suit under the Foreign Sovereign Immunities Act (FSIA). The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in federal court." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989); *see* 28 U.S.C. § 1330. Foreign states are "presumptively immune from the jurisdiction of United States courts," unless a specific statutory exception to immunity applies. *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993). The FSIA's exceptions to immunity are "narrowly drawn." *McKesson Corp. v. Islamic Republic of Iran*, 672

F.3d 1066, 1075 (D.C. Cir. 2012).

Plaintiffs allege that this Court has jurisdiction solely under the commercial activity exception (Compl. ¶ 38), which provides that a sovereign is not immune in a case

> [1] in which the action is based upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2) (bracketed numbers added for clarity).

Each clause of the commercial activity exception requires not only that Plaintiffs identify commercial activities carried out by the foreign state, but also that such activities have a sufficient nexus to the United States. Plaintiffs have failed to carry their burden. Plaintiffs' own allegations—including lengthy quotations from Defendants' internal communications—make clear that the UAE was concerned not with propping up oil prices in the UAE, but with combatting terrorist financing in Europe. Plaintiffs assert that Defendants were hiding their true motivations even in these confidential communications, which conspicuously never mention Plaintiffs' business or the oil trade more broadly. But even so, the Complaint fails to allege any commercial activity (or other acts) performed by the UAE in the United States, or any acts performed by the UAE abroad that had direct effects in the United States. The alleged conduct therefore lacks a sufficient nexus to the United States to abrogate the UAE's sovereign immunity. And because the UAE is immune, this Court lacks subject-matter and personal jurisdiction over the UAE under 28 U.S.C. § 1330. *See* Fed. R. Civ. P. 12(b)(1), (2).

### A.    The Complaint fails to allege any conduct by the UAE in the United States.

The first two clauses of the commercial activity exception require Plaintiffs to identify specific acts performed in the United States by the UAE that constitute the gravamen of their

lawsuit. *See Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 700–02 & n.2 (D.C. Cir. 2022).

As the D.C. Circuit has recognized, the first clause "relate[s] only to the conduct of the foreign

state—*i.e.*, it is the foreign state that has to have engaged in activity that took place in the United

States." *Id.* at 700–01. The "second clause … requires that the act at issue be one that *the foreign

state* has performed in the United States in connection with its commercial activity elsewhere." *Id.*

700; *see id.* at 696. And even if Plaintiffs can identify some conduct by the UAE in the United

States, the FSIA further requires that Plaintiffs' suit be "based upon" that conduct, 28 U.S.C.

§ 1605(a)(2), meaning that the UAE's conduct in the United States must constitute the "gravamen"

of the lawsuit. *Wye Oak*, 24 F.4th at 702 n.2. "[T]he gravamen analysis does not require courts to

undertake a 'claim-by-claim, element-by-element analysis,' but rather to 'zero in on the core of

the suit.'" *Jam v. Int'l Fin. Corp.*, 3 F.4th 405, 409 (D.C. Cir. 2021) (cleaned up) (quoting *OBB

Personenverkehr AG v. Sachs*, 577 U.S. 27, 34–35 (2015)). "[I]f the 'gravamen' of a lawsuit is

tortious activity abroad," the Court cannot assert jurisdiction over the foreign state. *Id.* at 408.

Plaintiffs have not satisfied these requirements. The Complaint does not allege a single act

by the UAE (or its officials) in the United States—much less sufficient U.S. conduct to shift the

gravamen of the suit from Switzerland (where the overwhelming majority of the alleged conduct

occurred) to the United States. Plaintiffs do not allege that the UAE "carried on" any "commercial

activity … *in the United States*." 28 U.S.C. § 1605(a)(2) (emphasis added). Nor do they allege any

"act performed" by the UAE "*in the United States* in connection with" the UAE's commercial

activity elsewhere. *Id.* (emphasis added). The only acts alleged to have been carried out by UAE

officials were the hiring of a Swiss firm (Alp), providing feedback to Alp, and otherwise liaising

with Alp (telephonically and in person). *See, e.g.*, Compl. ¶¶ 88–91, 113, 174–76. *All* of this al-

leged conduct occurred in Geneva or Abu Dhabi. The Complaint is devoid of any allegation of

specific acts performed by the UAE in the United States and thus fails to satisfy the first two clauses of the commercial activity exception. *See Wye Oak*, 24 F.4th at 700–02.

But even if Plaintiffs had alleged *some* U.S. conduct by the UAE, the gravamen of Plaintiffs' lawsuit still concerns alleged conduct abroad. *See id.* at 702 n.2. Plaintiffs allege that the UAE—through its official—contracted with Alp to harm Plaintiffs in Italy and Switzerland. Compl. ¶¶ 76–88. And Plaintiffs allege that Alp spread "app[arently] legitimate" articles, allegedly "fabricated by … Alp employees and written by journalists and academics on Alp's payroll," to "induce [foreign banks] to break ties" with Plaintiffs, causing reputational and financial harm that Plaintiffs felt in Switzerland and Italy. *Id.* ¶ 14. There is no allegation that these articles were written or posted online from the United States. Rather, the Complaint alleges that this scheme was conducted by Alp and its employees in Geneva and approved by UAE officials in Abu Dhabi. *Id.* ¶¶ 89–90. All of this alleged conduct centers around Switzerland and the UAE.[1]

The Supreme Court's decision in *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, is instructive. The California-resident plaintiff (Sachs) purchased a Eurail pass over the Internet from a travel agent in Massachusetts, which had acted as an agent for the Austrian national railway (OBB). *Id.* at 30–31. Sachs later traveled to Austria and was gravely injured while attempting to

---

[1] Plaintiffs allege that only one Defendant, Dr. Lorenzo Vidino, is a D.C. resident. Yet the Complaint itself alleges conduct only in Switzerland. *See, e.g.*, Compl. ¶¶ 109, 247. But even if Dr. Vidino's conduct had occurred in the United States and could be ascribed to the UAE (it cannot), Plaintiffs identify no conduct by Dr. Vidino in the United States related to their claims. The Complaint alleges only that Dr. Vidino "was hired by Alp as a contractor to provide leads on new targets and research and analysis on the Muslim Brotherhood" and "consulted with Alp about Lord Energy." Compl. ¶ 34. The Complaint includes no allegation, for example, that Dr. Vidino engaged in conduct that violated RICO or that harmed Plaintiffs in any way. *See* Compl. ¶¶ 34, 107–10, 247(b). Even if Plaintiffs could make such allegations (and establish that Dr. Vidino's conduct was carried out in the United States), the alleged conduct of one *sub*contractor in the United States— as part of an alleged sprawling conspiracy centered in Switzerland and the UAE—is insufficient to shift the gravamen of Plaintiffs' lawsuit here.

board OBB's train. *Id* at 30. Sachs sued OBB for failing to warn her on the ticket (which was sold

to her in the United States) of the train's and platform's design defects. *Id.* The Court accepted that

OBB had engaged in commercial conduct in the United States when it sold Sachs the Eurail pass,

yet the Court nevertheless determined that the gravamen of the suit was tortious activity in Austria,

where Sachs was injured. *Id.* at 35–36. The same reasoning applies here. Even if the UAE had

engaged in some conduct in the United States, the gravamen of Plaintiffs' suit remains squarely in

Switzerland, where the overwhelming majority of the wrongful conduct allegedly occurred.

Plaintiffs attempt to create a nexus to the United States by alleging that some of the articles

and blog posts that Plaintiffs complain about appeared on U.S.-based websites, like Wikipedia, or

were emailed (by Alp employees from Switzerland) to certain U.S.-based recipients (as well as

foreign recipients). *See* Compl. ¶ 149–62. But those are not "act[s] *performed* in the United States,"

28 U.S.C. § 1605(a)(2) (emphasis added), and they do not shift the entire gravamen of Plaintiffs'

suit from Switzerland to the United States. Indeed, most of the alleged articles appeared on foreign

websites and in foreign languages. *Id.* ¶¶ 98, 105–06, 121, 140, 144–45, 154. The alleged intended

readers were foreign financial institutions—like Crédit Suisse, Société Générale, Natixis, and BCP

Bank—that did business with Plaintiffs in Europe. *Id.* ¶¶ 149, 250. And the alleged purpose of

publishing these articles was to harm Plaintiffs in Switzerland and Italy. *Id.* ¶¶ 224, 228. Likewise,

the fact that Plaintiffs owned a U.S. subsidiary is immaterial to the first two clauses of the com-

mercial activity exception, which are concerned only with *the UAE's conduct* in the United States,

not any effects felt here. *See Wye Oak*, 24 F.4th at 700–02.

## B.    The Complaint fails to allege any direct effect in the United States.

The commercial activity exception's third clause applies only if Plaintiffs "first identify an

'act outside the territory of the United States' and allege that it 'cause[d] a direct effect in the

United States.'" *Valambhia v. United Republic of Tanzania*, 964 F.3d 1135, 1140 (D.C. Cir. 2020)

(quoting 28 U.S.C. § 1605(a)(2)). A "direct effect" must "follow as an immediate consequence of the [foreign sovereign's] activity." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 617–18 (1992) (cleaned up). A "direct effect … is one which has *no intervening element*, but, rather, flows in a straight line without deviation or interruption." *Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1172 (D.C. Cir. 1994) (emphasis added). "[A]n effect is not direct if many events and actors necessarily intervened between the act perpetrated overseas and the impact felt here." *Odhiambo v. Republic of Kenya*, 930 F. Supp. 2d 17, 31 (D.D.C. 2013) (A.B. Jackson, J.) (cleaned up).

**1.** Plaintiffs assert four purported U.S. effects (Compl. ¶¶ 197–200), but none of them are "direct" because they depend on attenuated causal chains and intervening acts by third parties.

*First*, Plaintiffs allege that officials at Algeria's national oil corporation (Sonatrach) read an article (allegedly commissioned by Alp) in Swiss newspaper *Le Temps* and, after further investigation, decided "to stop selling Lord Energy cargoes of Sahara Blend" for Lord Energy to export to Asia. *Id.* ¶ 197; *see id.* ¶ 116–18. Sonatrach's decision, in turn, allegedly "impacted the price for WTI," a different oil blend, "which is produced in the United States." *Id.* ¶ 197. To simply write out the entire causal chain is to demonstrate how *indirect* its effect in the United States is. It depends not only on the independent choices of a different sovereign actor (Sonatrach), but complex market dynamics involving various blends of light sweet crude produced and sold around the world. That "many events and actors necessarily intervened between the act perpetrated overseas and the impact felt here" is an understatement. *Odhiambo*, 930 F. Supp. 2d at 31 (cleaned up).

*Second*, Plaintiffs allege that "Americas Lord Energy Inc. was a participant in the market for U.S.-produced WTI, and when it was dissolved that directly affected a major U.S. oil market." Compl. ¶ 198. But Plaintiffs fail to allege any facts (such as price changes) demonstrating that "a major U.S. oil market" was in fact "affected." *Id.* And even if they could, again, the causal chain

from any alleged act by the UAE to this purported U.S. effect depends on numerous intervening actors and events. The Complaint alleges that the UAE contracted with Alp to commission negative press stories and blog posts about Plaintiffs, which Alp employees emailed to journalists, Crédit Suisse, and a "preeminent crude oil reporting agenc[y]." *Id.* ¶ 159; *see id.* ¶ 180. The Complaint further alleges that, based on those articles, blog posts, and emails, "various financial institutions and business partners ended their existing relationships with Lord Energy … and others refused to start new business dealings with Lord Energy." *Id.* ¶ 177. Specifically, two of Plaintiffs' business partners "required [Mr. Nada] to provide information for their internal and compliance reviews" and paused or stopped working with Lord Energy (*id.* ¶ 178), and several foreign financial institutions "refuse[d] to work with Lord Energy" (*id.* ¶ 179; *see id.* ¶¶ 180–84). The loss of these business relationships then allegedly caused Lord Energy to lose access to credit, without which "Lord Energy could not operate." *Id.* ¶ 185. And after a "last-ditch" deal failed to save the company, Lord Energy dissolved its U.S. subsidiary, Americas Lord Energy. *Id.* ¶¶ 187–88. Each of these links in the causal chain depends on intervening actors exercising independent judgment. Indeed, Plaintiffs allege that Crédit Suisse's CEO was personally involved in directing the bank's relationship with Lord Energy during that crucial last-ditch deal. *Id.* ¶ 187. The independent choices of any one of these banks, partners, and rating agencies is sufficient to sever any "direct" link between the UAE's conduct and the United States. *See Princz*, 26 F.3d at 1172; *Odhiambo*, 930 F. Supp. 2d at 31.

*Third*, Plaintiffs allege that "every one of Lord Energy's trades were U.S. dollar denominated." Compl. ¶ 199. But courts have repeatedly held that trading in U.S. dollars alone is not a direct effect in the United States. *See Global Index, Inc. v. Mkapa*, 290 F. Supp. 2d 108, 115 (D.D.C. 2003) (citing cases); *United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n*, 33 F.3d

1232, 1238 (10th Cir. 1994). Otherwise, innumerable foreign transactions involving foreign sovereigns—but having no connection to the United States aside from their use of the dollar—could give rise to jurisdiction here.

*Fourth*, Plaintiffs allege that "when Lord Energy filed for bankruptcy in Switzerland, many of its priority creditors were U.S. entities." Compl. ¶ 200. But this is even further removed from the United States than Plaintiffs' other purported effects. As a court in this Circuit has explained, "plaintiffs cannot rely on any repercussion felt by their … creditors to establish 'direct effects' … because any derivative harm would be too indirect to qualify as an 'immediate consequence' of the defendants' conduct." *Millicom Int'l Cellular v. Republic of Costa Rica*, 995 F. Supp. 14, 22 (D.D.C. 1998) (quoting *Weltover*, 504 U.S. at 618).

**2.** Faced with similar facts, the Second Circuit held in *Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230 (2d Cir. 2002), that a foreign state's publication of a defamatory press release, which purportedly prevented a U.S.-based company from obtaining funding from U.S. investors, did not create a "direct effect" in the United States. In that case, South Africa was accused of publishing a press release that "damaged the plaintiff's ability to raise capital." *Id.* at 237. American media outlets picked up the press release, which allegedly prompted U.S. investors to rethink their business relationships with the U.S.-based plaintiff. *Id.*

The Second Circuit accepted as true that the plaintiff's "corporate survival … depend[ed] entirely upon its ability to raise funds in the capital markets." *Id*. But the court nevertheless concluded that the effects of the press release were too attenuated to confer jurisdiction because the causal chain between the press release and the plaintiff's injuries depended on independent decision-making by third parties. *Id*. Even apart from the intervening role of the press, "[a]ny ultimate

effect … depended principally on a shift in investors' sentiments regarding the plaintiff's pro-
spects," which meant that "[t]he press release's effect thus depended crucially on variables inde-
pendent of [South Africa]." *Id.* at 237–38. Because the plaintiff's injury hinged on investors' in-
dependent evaluation, the "causal web d[id] not provide the requisite immediacy to establish ju-
risdiction." *Id.* at 238.

Similarly, here, the alleged downstream effects of the UAE's conduct abroad—whether on
the WTI market, on Americas Lord Energy, or on Lord Energy's creditors—"depended crucially
on variables independent of the [UAE]," namely, the choices of banks, business partners, and rat-
ings agencies. *Id.* Each of those third-party decisions or evaluations is an "intervening element"
that breaks the causal chain from the UAE's alleged conduct abroad to any effect in the United
States. *Princz*, 26 F.3d at 1172.

\*      \*      \*

Plaintiffs have failed to allege facts demonstrating that the UAE engaged in conduct that
abrogates its sovereign immunity under the FSIA. 28 U.S.C. § 1605(a)(2). The Court therefore
lacks subject-matter jurisdiction and personal jurisdiction over all claims against the UAE. *See
Amerada Hess*, 488 U.S. at 439; 28 U.S.C. § 1330.

## II.     The UAE Officials Are Immune from Suit Under the Common Law.

H.H. Sheikh Mohamed and Mr. al-Neyadi (the "UAE Officials") also enjoy immunity, not
under the FSIA, but under the common law, which bars suits against foreign heads of state and
against other foreign government officials acting in their official capacity.

### A.     H.H. Sheikh Mohamed enjoys absolute immunity.

Foreign heads of state are "absolutely immune from suit in the United States" while in
office. *Sikhs for Justice v. Singh*, 64 F. Supp. 3d 190, 193 (D.D.C. 2014) (collecting cases). Head-
of-state immunity allows foreign leaders to perform their official functions without interference.

*See id.* at 193–94. There is only one prerequisite for this immunity: the defendant must be a sitting head of state. *See id.* Courts in this jurisdiction have afforded absolute immunity to many sitting heads of state, including H.H. Sheikh Mohamed's predecessor. *See First American Corp. v. Al-Nahyan*, 948 F. Supp. 1107 (D.D.C. 1996); *see, e.g.*, *Manoharan v. Rajapaksa*, 711 F.3d 178 (D.C. Cir. 2013) (President of Sri Lanka); *Miango v. Democratic Republic of Congo*, No. 15-cv-1265 (ABJ), 2019 WL 2191806, at *2 (D.D.C. Jan. 19, 2019) (A.B. Jackson, J.) (President of DRC).

It is undisputed that H.H. Sheikh Mohamed is the sitting president and head of state of the UAE. Compl. ¶ 24. H.H. Sheikh Mohamed is thus absolutely immune from suit, and this Court lacks subject-matter jurisdiction over claims against him. *See Miango*, 2019 WL 2191806, at *2.

### B.   Mr. al-Neyadi enjoys immunity for acts undertaken in his official capacity.

While certain officials enjoy *status*-based immunities (such as the head-of-state immunity that applies to H.H. Sheikh Mohamed), other foreign officials enjoy *conduct*-based immunity under the common law for actions arising from their official acts as government officials. Official-acts immunity requires dismissal of the claims against Mr. al-Neyadi.

Official-acts immunity has a long history under U.S. federal common law. In 1797, the U.S. Attorney General first opined that "a person acting under a commission from the sovereign of a foreign nation is not amenable for what he does in pursuance of his commission, to any judicial tribunal in the United States." *Actions Against Foreigners*, 1 Op. Att'y Gen. 81, 81 (1797). A century later, in *Underhill v. Hernandez*, 168 U.S. 250 (1897), the Supreme Court described the doctrine of official-acts immunity as "[t]he immunity of individuals from suits brought in foreign tribunals for acts done within their own states, in the exercise of governmental authority … as civil officers." *Id.* at 252. And in *Samantar v. Yousuf*, 560 U.S. 305 (2010), the Supreme Court affirmed the continuing vitality of official-acts immunity under the common law. Federal courts have since consistently reaffirmed the immunity of foreign officials for conduct undertaken in their official

capacities. *See, e.g.*, *Eliahu v. Jewish Agency for Israel*, 919 F.3d 709, 713 (2d Cir. 2019); *Miango v. Democratic Republic of Congo*, No. 15-cv-1265 (ABJ), 2020 WL 3498586, at *6 (D.D.C. June 29, 2020) (A.B. Jackson, J.), *aff'd*, No. 20-5244, 2022 WL 10219715 (D.C. Cir. Oct. 18, 2022); *Doe 1 v. Buratai*, 318 F. Supp. 3d 218, 238 (D.D.C. 2018), *aff'd on other grounds*, No. 18-7170, 2019 WL 668339 (D.C. Cir. Feb. 15, 2019).

*Samantar* provides a two-step framework for the official-acts immunity analysis. 560 U.S. at 311. At the first step, the court must "surrender[] its jurisdiction" when the State Department issues a "suggestion of immunity." *Id.* If, however, the State Department has not taken a position in the case, the court must proceed to the second step and "decide for itself whether all the requisites for such immunity exist[]." *Id.* As the United States has stressed, the principles governing foreign official immunity "are susceptible to general application by the judiciary without the need for recurring intervention by the Executive, particularly in the form of suggestions of immunity filed on a case-by-case basis." Brief for the United States as Amicus Curiae in Support of Affirmance at 21 n.*, *Matar v. Dichter*, 563 F.3d 9 (2d Cir. 2009) (No. 07-2579), 2007 WL 6931924. Courts have not hesitated to grant official-acts immunity even without case-specific participation by the Executive Branch. *See, e.g.*, *Eliahu*, 919 F.3d at 712–13; *Shahar v. Ofek*, No. 4:22-cv-00632, 2024 WL 1289562, at *1 (E.D. Tex. Mar. 26, 2024); *Buratai*, 318 F. Supp. 3d at 238; *Farhang v. Indian Inst. of Tech.*, 655 F. App'x 569, 571 (9th Cir. 2016); *In re Terrorist Attacks on Sept. 11, 2001*, 122 F. Supp. 3d 181, 189 (S.D.N.Y. 2015).

"[U]nder principles of customary international law accepted by the Executive Branch, a foreign official enjoys immunity from suit based upon acts taken in an official capacity." Suggestion of Immunity at 7, *Doğan v. Barak*, No. 2:15-cv-8130 (C.D. Cal. June 10, 2016), ECF No. 48; *see Eliahu*, 919 F.3d at 712.

Plaintiffs' lawsuit presents a paradigmatic case of official-acts immunity. The Complaint alleges that Mr. al-Neyadi acted in his capacity as a "UAE government official" "to further the UAE's objectives." Compl. ¶ 13. According to the Complaint, Mr. al-Neyadi "was the UAE's main intermediary" with the other Defendants (*id.* ¶ 25), "directed and approved millions of dollars [in state funds] to Alp to fund [the UAE's alleged] smear campaign" (*id.*), was acting at the direction of his "boss," H.H. Sheikh Mohamed (*id.* ¶¶ 25, 89, 176), and "serv[ed] as a liaison between the UAE and Alp" (*id.* ¶ 242). These are official acts—allegedly taken in Mr. al-Neyadi's official capacity and to further the UAE's interests. The Complaint does not allege that Mr. al-Neyadi acted to further his own personal interests in any way. He is therefore immune from suit.[2]

*    *    *

The Court need not seek or wait for a determination by the Executive Branch with respect to the immunity of either H.H. Sheikh Mohamed or Mr. al-Neyadi. The Court should determine that the UAE officials are immune from suit under common law principles.

---

[2] The Restatement (Second) of Foreign Relations Law of the United States identifies an additional element, stating that official-acts immunity applies "with respect to acts performed in [a foreign official's] official capacity *if the effect of exercising jurisdiction would be to enforce a rule of law against the state*." Restatement (2d) of Foreign Relations Law of the United States § 66(f) (1965) (emphasis added). But the Executive Branch has rejected that approach as inconsistent with customary international law. Brief for the United States as Amicus Curiae at 17, *Lewis v. Mutond*, No. 19-185 (S. Ct. May 26, 2020). The D.C. Circuit has not resolved whether the Second Restatement accurately reflects U.S. common law or customary international law. *See Lewis v. Mutond*, 918 F.3d 142, 146 (D.C. Cir. 2019) ("proceed[ing] on that understanding without deciding the issue"). This Court need not resolve that question here. The Complaint alleges facts that establish Mr. al-Neyadi's entitlement to immunity under both the Executive Branch's and the Second Restatement's approaches because Plaintiffs seek to hold the UAE "jointly and severally" liable for Mr. al-Neyadi's conduct (Compl. at 86), which would enforce a rule of law against the UAE. *See Lewis*, 918 F.3d at 147.

### III.     The Court Lacks Personal Jurisdiction Over the UAE Officials.

The Court should additionally dismiss the claims against the UAE Officials for lack of personal jurisdiction. *See* Fed. R. Civ. P. 12(b)(2); *Newman v. Jewish Agency for Israel*, No. 16-cv-7593, 2017 WL 6628616, at *2–4 (S.D.N.Y. Dec. 28, 2017). Personal jurisdiction "is an essential element of the jurisdiction of a district court, without which the court is powerless to proceed to an adjudication." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (cleaned up). Plaintiffs bear the burden of establishing this Court's personal jurisdiction over each Defendant by alleging "specific acts connecting [each] defendant with the forum." *Second Amend. Found. v. U.S. Conf. of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001). And Plaintiffs must demonstrate that the exercise of personal jurisdiction "comport[s] with 'fair play and substantial justice.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945)). Plaintiffs have failed to carry their burden.

### A.     The UAE Officials lack minimum contacts with the United States.

There are two types of personal jurisdiction: "general" and "specific." Plaintiffs assert no basis for general jurisdiction, as neither H.H. Sheikh Mohamed nor Mr. al-Neyadi is a U.S. citizen or resident. Instead, Plaintiffs assert specific jurisdiction under Rule 4(k)(2) of the Federal Rules of Civil Procedure, which authorizes personal jurisdiction over foreign defendants located abroad to the extent "consistent with the U.S. Constitution." *See* Compl. ¶ 43. Plaintiffs bear the burden of showing that each "defendant has sufficient contacts with the United States as a whole to justify the exercise of personal jurisdiction." *Mwani v. bin Laden*, 417 F.3d 1, 11 (D.C. Cir. 2005).

The Due Process Clause protects defendants from "being subject to the binding judgments of a forum with which [they have] established no meaningful contacts, ties, or relations." *Burger King*, 471 U.S. at 471–72 (cleaned up). Jurisdiction cannot be based on "random, fortuitous, or attenuated contacts" between a defendant and the United States. *Walden v. Fiore*, 571 U.S. 277,

286 (2014) (quoting *Burger King*, 471 U.S. at 475). Rather, a defendant must have "purposefully directed" its activities here. *Burger King*, 471 U.S. at 472–73. And the defendant's forum contacts—not the plaintiff's—must form the basis for the suit: Plaintiffs must show that their claims "arise out of or relate to the defendant's contacts" with the forum. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 92 U.S. 351, 359 (2021); *see Mwani*, 417 F.3d at 12.

Plaintiffs do not allege that the UAE Officials directed their conduct at the United States. Rather, all of the Complaint's allegations regarding H.H. Sheikh Mohamed or Mr. al-Neyadi concern conduct allegedly undertaken in the UAE or Switzerland with respect to Plaintiffs, who are based in Italy and Switzerland. *See, e.g.*, Compl. ¶¶ 88–89, 133, 173–76. There are no allegations whatsoever in the Complaint that either H.H. Sheikh Mohamed or Mr. al-Neyadi undertook any conduct purposefully directed at the United States.

Plaintiffs may attempt to predicate personal jurisdiction over the UAE Officials on conduct allegedly undertaken by other members of the supposed conspiracy. But "'[c]ivil conspiracy' is not a boundless concept that empowers this Court to exercise personal jurisdiction over alleged wrongdoers from the beginning of any wrongdoing by an alleged co-conspirator to the time when the co-conspirators cease covering up their wrongdoing." *Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158, 175–76 (D.D.C. 2018). Even in conspiracy cases, specific jurisdiction must be analyzed on a defendant-by-defendant and claim-by-claim basis. A "defendant['s] contacts for specific jurisdiction must relate to" the "specific wrongful conduct" that gives rise to Plaintiffs' claims. *Id.* at 176. And they must be "contacts that the 'defendant *himself*' created with the forum." *Id.* at 177 (quoting *Walden*, 571 U.S. at 284). Otherwise, plaintiffs could obviate individual constitutional protections simply by invoking the word "conspiracy." *See id.* at 175–76.

Even if other Defendants' (or third parties') conduct could be imputed to the UAE Officials—and it cannot—the Complaint has described no contacts with the United States sufficient to support personal jurisdiction. Plaintiffs allege that the UAE engaged a Swiss firm (Alp) to allegedly target and defame a Swiss company (Lord Energy) and its Italian-domiciled owner (Mr. Nada). Compl. ¶¶ 76, 81, 88, 90. Specifically, Plaintiffs allege that Alp spread "app[arently] legitimate" articles that were allegedly "fabricated by … Alp employees and written by journalists and academics on Alp's payroll" to "induce [foreign banks] to break ties" with Plaintiffs, causing them reputational and financial harm, which Plaintiffs felt in Switzerland and Italy. *Id.*¶ 14. Plaintiffs further allege that the UAE Officials authorized this purported smear campaign primarily from the UAE, where the UAE Officials live and work, but also during in-person meetings in Switzerland. *Id.* ¶¶ 164–76. These are quintessentially foreign contacts.

To be sure, the Complaint alleges that some of the purportedly false articles appeared on U.S.-based "private media outlets" and "internet blogs." *See id.* ¶¶ 39, 123. But there is no allegation—nor any plausible inference to be drawn—that the alleged use of certain U.S.-based third-party websites (among other foreign-based websites) was anything more than "random" or "fortuitous." *Walden*, 571 U.S. at 286 (quoting *Burger King*, 471 U.S. at 475). Indeed, Plaintiffs do not allege that any of these articles were directed at U.S. readers (as distinguished from readers in Switzerland or elsewhere) or that these articles even mentioned Plaintiffs' U.S. activities. Internet publication, without more, does not suffice to establish personal jurisdiction.[3]

The Complaint further alleges that Alp (not the UAE Officials) "hired" Defendant Lorenzo Vidino "as a contractor to provide leads on new targets and research and analysis on the Muslim

---

[3] *See, e.g.*, *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1349–50 (D.C. Cir. 2000); *Shrader v. Biddinger*, 633 F.3d 1235, 1241 (10th Cir. 2011); *Johnson v. Arden*, 614 F.3d 785, 797 (8th Cir. 2010); *Revell v. Lidov*, 317 F.3d 467, 473 (5th Cir. 2002).

Brotherhood." Compl. ¶ 34. But the Complaint's allegations concerning Dr. Vidino cannot support personal jurisdiction because they do not "relate to" the "specific wrongful conduct" that gives rise to Plaintiffs' claims. *Cockrum*, 319 F. Supp. 3d at 176. Plaintiffs notably do not allege that Dr. Vidino engaged in any conduct (in the United States or elsewhere) that harmed Mr. Nada or Lord Energy.[4] Moreover, the "'minimum contacts' analysis looks to the defendant's contacts with the forum … not the defendant's contacts with persons who reside there." *Walden*, 571 U.S. at 285. The fact that Alp purportedly contracted with an alleged U.S. domiciliary did not create any relevant contacts *with the United States*; indeed, the Complaint does not allege that Alp required performance of the contract in the United States or that Dr. Vidino's U.S. presence was anything more than "fortuitous." *Id.* at 286; *see, e.g.*, *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 723 (6th Cir. 2000); *O'Quinn v. World Indus. Const.*, 68 F.3d 471, at *2 (5th Cir. 1995) ("[T]he actions of an independent contractor in a forum state are not sufficient, absent other contacts, to subject a non-resident corporation to personal jurisdiction.").

And while the Complaint mentions the bankruptcy of a U.S. company, Americas Lord Energy, it never alleges that the UAE Officials were specifically aware of—much less specifically targeting—that entity before its bankruptcy in May 2019. *See* Compl. ¶¶ 193–94. The mere allegation that Plaintiffs suffered economic damage that affected their wholly owned U.S. subsidiary is not sufficient to create personal jurisdiction here: "[I]t is the *defendant*, not the plaintiff or third parties, who must *create contacts* with the forum State." *Walden*, 571 U.S. at 291. Indeed, even if Defendants "knew" that their conduct abroad would have an effect in the United States, mere

---

[4] The Complaint alleges, generally, that Dr. Vidino was hired "to provide leads on new targets." Compl. ¶ 34. But the Complaint alleges that he was hired *after* Defendants had already targeted Plaintiffs based on their ties to the Muslim Brotherhood. *See id.* ¶¶ 107–10. The Complaint alleges no specific conduct by Dr. Vidino directed at Plaintiffs.

"knowledge" of domestic effects cannot support personal jurisdiction. *Id.* at 289. The UAE Officials thus lack minimum contacts with the United States sufficient to support personal jurisdiction.

### B.   Exercising personal jurisdiction would be unfair and unreasonable.

Even if the UAE Officials had minimum contacts with the United States (they do not), the exercise of personal jurisdiction still must "comport with 'fair play and substantial justice.'" *Burger King*, 471 U.S. at 476 (quoting *Int'l Shoe*, 326 U.S. at 320). Exercising jurisdiction here would be neither fair nor reasonable.

*First*, the "burden" on the UAE Officials is great. *Id.* at 477. They are sitting UAE government officials located in the UAE, and the overwhelming majority of witnesses and evidence are located outside the United States. Attending trial here would not only impose great logistical and security burdens; it would distract the UAE officials from their government duties. *Second*, the United States' and Plaintiffs' "interest" in litigating in the United States are minimal. *Id.* Plaintiffs do not reside in the United States; their claims concern alleged conduct that occurred outside the United States with alleged effects in Italy and Switzerland. *Third*, the "interstate judicial system[]" would be best served if this case were adjudicated elsewhere, such as in Switzerland, where most of the alleged conduct occurred, the effects of that conduct were primarily felt, and many parties reside. *Id. Finally*, no "shared interest of … several States in furthering fundamental substantive social policies" supports jurisdiction. *Id.* Plaintiffs seek to impose U.S. false advertising, anti-racketeering, and antitrust law on a foreign sovereign and its officials for alleged conduct abroad. As explained below, Congress did not intend those statutes to apply extraterritorially in a case like this. There is no "shared interest of the several States" in applying federal law here.

## IV.   The Complaint Fails to State a Claim.

Plaintiffs seek to shoehorn their sprawling allegations into three unrelated federal statutes: the Lanham Act, RICO, and the Sherman Act. But the shoe does not fit. Plaintiffs fail to allege

even the most basic elements of these statutes because their claims simply have nothing to do with false advertising, racketeering, or antitrust. To be clear, the Court should dismiss this lawsuit for the jurisdictional and non-merits reasons set forth above. *See supra* Sections I–III. But if the Court does reach the merits, it should dismiss the Complaint with prejudice for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6).

### A.    Plaintiffs fail to state a claim under the Lanham Act.

Plaintiffs allege that Defendants violated the Lanham Act by engaging in "false and deceptive advertising" when they allegedly published "articles and blog posts … online," which "appeared to be legitimate editorial pieces" but were "in fact sponsored content commissioned, written, and published for the express purpose of damaging [Plaintiffs'] business and reputation." Compl. ¶ 224. But the statute Plaintiffs invoke, 15 U.S.C. § 1125(a)(1)(B), applies only to commercial speech, only to advertising or promotion, and only to domestic uses in commerce. The Complaint fails to allege any of these necessary elements.

### 1.    *The alleged speech is non-commercial.*

The Lanham Act "appl[ies] only to commercial speech," *Farah v. Esquire Mag.*, 736 F.3d 528, 541 (D.C. Cir. 2013), which is "defined as 'expression related solely to the economic interests of the speaker and its audience' or 'speech proposing a commercial transaction,'" *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1143 (D.C. Cir. 2009) (citation omitted). Thus, to be actionable under the Lanham Act, the speech must concern a "competing" commercial product. *Farah*, 736 F.3d at 541. This limitation prevents the Act from being used "to quash" speech by someone "who is communicating ideas or expressing points of view." *Id.* (citation omitted).

The D.C. Circuit's decision in *Farah*, 736 F.3d 528, is instructive. There, the plaintiffs had published a book promoting the conspiracy theory that President Obama was not born in the United States. *Id.* at 530. After President Obama released his birth certificate demonstrating he was born

in Hawaii, *Esquire Magazine* published an article entitled "BREAKING: Jerome Corsi's Birther Book Pulled from Shelves!" *Id.* Plaintiffs sued *Esquire* for defamation under D.C. law and for Lanham Act violations, alleging that *Esquire* had published a false representation about the book as a deceitful competitive tactic.

The D.C. Circuit rejected the Lanham Act claim. Noting that the case was "principally a defamation action," *id.*, the court reaffirmed that the Lanham Act's provisions "apply only to commercial speech," and held that the statements on *Esquire*'s website "cannot plausibly be viewed as commercial speech under § 1125(a)(1)(A) or (B) of the Lanham Act," *id.* at 541. The plaintiffs had not alleged that *Esquire* was "selling or promoting a competing book," only that "'generally' *Esquire* is their competitor." *Id.* The court thus concluded that the plaintiffs had failed to allege facts to support a Lanham Act claim. *Id.*

Like the plaintiffs in *Farah*, Plaintiffs here claim that they and ADNOC are business competitors and that Defendants published false articles to damage Plaintiffs' business reputation. Compl. ¶¶ 228, 230. But the articles at issue here were silent about any of Plaintiffs' or Defendants' "competing" products and made no representations about "any goods or services." *Farah*, 736 F.3d at 541. Instead, Plaintiffs allege that the articles misrepresented that Plaintiffs "were involved in terrorist financing" (Compl. ¶ 228; *see id.* ¶ 226)—a claim that has nothing to do with any commercial feature of Plaintiffs' goods or services (or ADNOC's competing goods or services). Such speech is not an "'expression related solely to the economic interests of the speaker and its audience' or 'speech proposing a commercial transaction.'" *Philip Morris*, 566 F.3d at 1143 (citation omitted). It is thus not commercial and does not fall within the scope of the Lanham Act.

### 2. The alleged speech is not advertising or promotion.

Plaintiffs' Lanham Act claim fails for the additional reason that the alleged conduct does not involve advertising. Because Plaintiffs specifically bring a false *advertising* claim under the

Lanham Act, *see* Compl. ¶¶ 223–39, they must demonstrate that the purportedly false articles "misrepresent[] the nature, characteristics, qualities, or geographic origin of his or another person's goods, services, or commercial activities" in "commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B). Advertising or promotion, in this context, must involve representations "about [a] product to be sold" either by the plaintiff or the defendant. *In re McCormick & Co., Inc., Pepper Prod. Mktg. & Sales Pracs. Litig.*, 215 F. Supp. 3d 51, 60 (D.D.C. 2016). Such representations must also be "for the purpose of influencing consumers to buy the defendant's goods or services" and "disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within [the relevant] industry." *Id.* at 59 (citation omitted). For example, "[i]mages" and "statements on product packaging are advertising," as they "signal[] to the consumer vital information about a product" and are "influential in affecting a customer's choices." *Id.* at 60. But critical or disparaging statements about a competitor that do not mention specific "goods, services, or commercial activities" cannot form the basis for a false advertising claim. 15 U.S.C. § 1125(a)(1)(B); *see Farah*, 736 F.3d at 540–41.

Plaintiffs' false advertising claim fails because none of the alleged conduct relates to promoting (or disparaging) a particular "product to be sold," nor were any of the alleged statements made to "influenc[e] consumers" or "disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within [the relevant] industry." *McCormick & Co.*, 215 F. Supp. 3d at 59–60. The communications Plaintiffs identify do not disparage Plaintiffs' goods or services (or promote ADNOC's goods or services), but rather make claims about Plaintiffs' "involve[ment] in terrorist financing." *See* Compl. ¶ 228; *see id.* ¶ 226. Unlike a typical advertisement, such information is broadly important to the general public—that is, *newsworthy*—which is why it was published in reputable newspapers, like *Le Temps*. *Id.* ¶ 35. Plaintiffs dispute the truth of

those articles, but that dispute does not transform the articles into advertising.

Plaintiffs also do not allege that the articles or blog posts they identify were designed to influence Plaintiffs' *customers*—namely, oil producers or refiners—or were sufficiently disseminated *to those customers* to constitute "advertising" or "promotion" within the petroleum industry. *See McCormick & Co.*, 215 F. Supp. 3d at 59. If anything, Plaintiffs allege that the articles targeted a different set of actors entirely: financial institutions. *See, e.g.*, Compl. ¶¶ 232–33. The target readers are not Plaintiffs' "consumers" or "the purchasing public" in any sense, *McCormick & Co.*, 215 F. Supp. 3d at 59–60, so the alleged statements do not constitute "advertising or promotion" under 15 U.S.C. § 1125(a)(1)(B).

### 3. *Plaintiffs' claim seeks an impermissible extraterritorial application of the Lanham Act.*

Plaintiffs have not adequately pleaded the basic elements of a false advertising claim. But even if they had, their claim still must be dismissed because it impermissibly attempts to apply the Lanham Act extraterritorially. The Supreme Court recently held in *Abitron Austria GmbH v. Hetronic International, Inc.*, 600 U.S. 412 (2023), that Congress did not intend 15 U.S.C. § 1151(a)(1)(B) to apply extraterritorially; as such, the alleged "infringing use in commerce" must occur domestically. 600 U.S. at 415. *Abitron* forecloses Plaintiffs' claim.

To begin, many of the "false claims" identified in the Complaint appeared on foreign websites or in foreign languages, including articles in *Le Temps* and *Africa Intelligence*, as well as Wikipedia pages in French and Italian. *See* Compl. ¶ 226. These statements and articles are plainly not "domestic" uses in commerce, as they were prepared by foreign actors, appeared on foreign websites, and were targeted at foreign audiences. Granted, some of the purported "sponsored content" allegedly appeared on websites hosted by U.S. companies. *See id.* ¶ 229. But the Complaint's constant refrain is that Defendants allegedly sought to influence foreign financial institutions (like

Crédit Suisse) to harm Plaintiffs in Italy and Switzerland—not to influence the purchasing deci-sions of anyone in the United States. *See, e.g.*, Compl. ¶¶ 134, 149, 232–33. Moreover, all of the online content was presumably *accessible* to anyone in the world with an Internet connection. If merely posting statements on a website that happened to be owned by a U.S. entity were sufficient to domesticate foreign conduct, that would open the doors to countless false advertising claims that otherwise lack any connection to the United States. There is no basis to conclude that Congress sought, through the Lanham Act, to police advertising worldwide.

### B. Plaintiffs fail to state a claim under the RICO Act.

Plaintiffs allege that Defendants violated (and conspired to violate) the Racketeer Influ-enced and Corrupt Organization Act by engaging in a pattern of wire and bank fraud. But Plaintiffs have failed to allege the basic elements of a RICO claim: the Complaint alleges no injury to busi-ness or property in the United States, no predicate RICO act (much less a pattern of racketeering activity), no proximate cause, and no enterprise. To cap it off, Plaintiffs' claims fall outside of RICO's four-year statute of limitations. The Court should dismiss the RICO claims with prejudice.

### 1. The Complaint fails to allege any predicate acts.

To state a RICO claim, Plaintiff also must allege at least two predicate acts of racketeering activity. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989); 18 U.S.C. § 1961(1), (5). Plain-tiffs attempt to satisfy this requirement by casting their defamation claims as violations of federal criminal statutes prohibiting wire and bank fraud. *See* Compl. ¶ 243 (citing 18 U.S.C. §§ 1343, 1344). But this Court has held that such attempts at artful pleading cannot support a RICO claim.

This Court's decision in *Center for Immigration Studies v. Cohen*, 410 F. Supp. 3d 183 (D.D.C. 2019) (A.B. Jackson, J.), *aff'd*, 806 F. App'x 7 (D.C. Cir. 2020), is directly on point. There, the plaintiff alleged that the defendant committed wire fraud by falsely labeling the plaintiff a "hate group." *Id.* at 190. In dismissing the plaintiff's claim, this Court observed that the complaint

had "clearly tried to shoehorn a defamation claim into the RICO framework," and held that "a plaintiff 'complaining about a defamatory statement cannot end-run the requirements for a defamation claim' by pleading it as a RICO violation." *Id.* at 191 (quoting *Teltschik*, 748 F.3d at 1288).

Other federal courts have taken a similar approach. In *Kimberlin v. National Bloggers Club*, No. 13-cv-3059, 2015 WL 1242763, at *1, *9 (D. Md. Mar. 17, 2015), the court dismissed the plaintiff's claim that the defendant violated RICO by "provid[ing] false information to media outlets, politicians, and law enforcement officials" because the claim "reflect[ed] more of an attempt to spin an alleged scheme to harm his reputation than … a viable RICO claim." In *Ritchie v. Sempra Energy*, No. 10-cv-1513, 2013 WL 12171757 at *4 (S.D. Ca. Oct. 15, 2013), the court held that allegations of a smear campaign (via a website and press releases), containing false statements designed to injure the company's goodwill and lower its stock prices, did not state a predicate offense under RICO. And in *Kimm v. Lee*, No. 04-cv-5724, 2005 WL 89386, at *4 (S.D.N.Y. Jan. 13, 2005), the court dismissed RICO claims arising out of an alleged smear campaign as "thinly clothed defamation claims." Plaintiffs' RICO claim suffers the same defects. Defamation is not a RICO predicate, no matter what labels Plaintiffs affix or what statutory provisions they cite. The Complaint thus fails to sufficiently allege any RICO predicate act, and the Court should reject Plaintiffs' transparent attempt "to shoehorn [their] defamation claim into the RICO framework." *Ctr. for Immigr. Studs.*, 410 F. Supp. 3d at 190.[5]

2. *The Complaint fails to allege a "pattern of racketeering activity."*

The alleged conduct does not amount to a "pattern of racketeering activity" under RICO,

---

[5] The same arguments apply to Plaintiffs' bank fraud allegations. Those allegations suffer the additional defect that they do not allege that Defendants received any money from the banks they purportedly defrauded, do not allege that the banks released any property (to them or anyone else), and do not allege that Defendants intended to harm the banks. *See United States v. Crisci*, 273 F.3d 235, 239–40 (2d Cir. 2001).

18 U.S.C. § 1962(c), because Plaintiffs allege only a single scheme. The D.C. Circuit has made clear that "if a plaintiff alleges only a single scheme, a single injury, and few victims it is 'virtually impossible for plaintiffs to state a RICO claim.'" *W. Assocs. Ltd. P'ship v. Mkt. Square Assocs.*, 235 F.3d 629, 634 (D.C. Cir. 2001) (citation omitted). Moreover, "RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Id.* "The pattern requirement thus helps to prevent ordinary business disputes"—or, as here, an ordinary defamation claim—"from becoming viable RICO claims, with defendants subject to treble damages, simply because the parties used the United States mails or a fax machine to transmit contested financial documents." *Id.*

Courts in this Circuit have therefore consistently rejected civil RICO claims arising out of mail and wire fraud—even if they involved numerous uses of the mails or wires over many years—where the scheme was directed at a small group of victims or caused a single injury. In *Western Associates Ltd.*, even though the plaintiffs alleged "dozens of predicate acts extending continually over an eight-year period," the court rejected their RICO claim because it involved "a single scheme," a single injury, and a related set of victims. *Id.* at 634–35. Similarly, in *Edmondson & Gallagher v. Alban Towers Tenants Association*, 48 F.3d 1260, 1264–65 (D.C. Cir. 1995), the D.C. Circuit dismissed a RICO claim despite the allegation of a single scheme spanning three years with multiple predicate acts of mail and wire fraud and three victims. And a district court in this Circuit dismissed a RICO claim that involved "one scheme, spanning about two years, with only four identified victims." *Lopez v. Council on Am.-Islamic Rels. Action Network, Inc.*, 657 F. Supp. 2d 104, 115 (D.D.C. 2009).

Most recently, in *Broidy Cap. Mgmt. LLC v. Muzin*, No. 19-cv-0150 (DLF), 2020 WL

1536350 (D.D.C. Mar. 31, 2020), *aff'd*, 12 F.4th 789 (D.C. Cir. 2021), the district court dismissed RICO claims brought by a plaintiff (Broidy) against Qatari officials alleging that the defendants had hacked the emails and disseminated damaging information to silence and retaliate against him for his criticism of Qatar. The court held that Broidy had not alleged an open-ended scheme, but rather a "one time racket," because there was no risk of future harm: "[t]he alleged hacking already ha[d] happened, and the stories that were meant to silence Broidy already ha[d] been published." *Id.* at *9. Broidy also had failed to allege a closed-ended scheme because the timeframe was short (only about five months) and because "Broidy allege[d] only a single scheme to 'retaliate against, discredit, and ultimately silence Mr. Broidy' by 'manufacturing negative news stories and exposing his confidential communications and trade secrets to the public.'" *Id.* at*10 (cleaned up).

Plaintiffs fail to allege a pattern of racketeering that distinguishes this case from these precedents. The Complaint alleges a single scheme to harm Mr. Nada's reputation in order to undercut his business. The fraudulent conduct alleged in the Complaint spans less than a year, involves one set of related victims (Mr. Nada and his company), and one injury (the bankruptcy of Lord Energy). Such allegations are indistinguishable from those in *Edmondson & Gallagher*, *Lopez*, and *Broidy* that failed to allege a pattern of racketeering.

Plaintiffs attempt to characterize the UAE's alleged conduct as part of a "long-running, wide-ranging conspiracy," asserting that Mr. Nada "was far from the enterprise's only target." Compl. at 66 & ¶ 213 (capitalization altered). But the Complaint identifies only four other supposed "targets" and alleges no facts to support the conclusion that Defendants committed any unlawful conduct (much less RICO predicate acts) directed at them. The Complaint alleges that (1) Alp asked a third party to conduct a background check of a journalist (*id.* ¶ 214); (2) Alp prepared "and, on information and belief, sent to the UAE" a report on an economist (*id.* ¶ 216); (3) Alp

prepared a report on the founder of Global Risk Advisors (GRA) and emailed a journalist concerning a civil suit filed against GRA's founder (*id.* ¶ 217); and (4) Alp directed a third party to publish a blog post about how donations by George Soros's foundation had been used to fund organizations with ties to the Muslim Brotherhood in Europe (*id.* ¶ 220). None of this alleged conduct amounts to racketeering—much less a pattern of racketeering—under RICO. Nor is any of this alleged conduct remotely related to Plaintiffs' claim that the true goal of the enterprise was to affect global oil prices, rather than to combat terrorist financing in Europe.

3.   *The Complaint fails to allege RICO proximate causation.*

To state a civil RICO claim, injured parties must show that the RICO predicate offense was the "proximate cause" of their injury. *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992); *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 8–9 (2010). Proximate cause under RICO requires a "direct relation between the injury asserted and the injurious conduct alleged." *Holmes*, 503 U.S. at 268. "A link that is too remote, purely contingent, or indirect is insufficient." *Hemi Grp.*, 559 U.S. at 9 (cleaned up). The Supreme Court has emphasized that RICO proximate cause differs from the proximate-cause standard applied in other contexts because it requires more than mere foreseeability. *See id.* at 12; *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006).

Applying that standard, the district court in *Solomon v. Dechert LLP*, No. 22-cv-3137 (JEB), 2023 WL 6065025 (D.D.C. Sept. 18, 2023), held that a plaintiff failed to demonstrate RICO causation where he alleged that the defendant hacked his emails and disseminated their contents to his employer and the press, which led to him being fired. The court explained, "a RICO predicate that merely facilitates an injurious act taken by a third party who acts out of her own interests and in her own judgment does not proximately cause the injury." *Id.* at *11. The court concluded that, because the press and the plaintiff's employer independently decided whether to publish the emails

and to fire him, respectively, the defendants' dissemination of the hacked emails was not "decisive" and thus not the proximate cause of the plaintiff's injuries. *Id.*

As in *Solomon*, Plaintiffs fail to allege proximate cause under RICO. Plaintiffs allege that Alp commissioned false articles and blog posts and emailed some of them to banks and the bank risk compliance databases. Compl. ¶¶ 246–47. But merely commissioning articles to be posted online is not enough to show that Defendants' conduct caused Plaintiffs to lose financing, which requires intervening actions by numerous third parties. As for the alleged communications with Crédit Suisse and the bank risk compliance databases (*id.* ¶¶ 133–34), there is a distinct temporal gap between the alleged communications in June 2018 and Crédit Suisse's decision to close Lord Energy's account in 2019. *See id.* ¶¶ 246–47, 250. In light of Plaintiffs' allegation that Lord Energy had a "longstanding relationship" with Crédit Suisse (*id.* ¶ 233) and the fact that Crédit Suisse's CEO was allegedly personally involved in specific business decisions related to Lord Energy (*id.* ¶ 187), it is implausible that Crédit Suisse did not exercise independent judgment in deciding to close Lord Energy's account. Those are precisely the sorts of allegations that the *Solomon* court held failed to allege proximate cause. *See* 2023 WL 6065025, at *3–4, *10–11.

> ### 4.   *The Complaint fails to allege a domestic injury to business or property.*

Even if a plaintiff alleges that he was harmed by a pattern of RICO activity, he must also "allege and prove a *domestic* injury to business or property" because RICO "does not allow recovery for foreign injuries." *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 354 (2016) (emphasis added). As the Supreme Court recently explained, whether a plaintiff has met this requirement "is a context-specific inquiry that turns largely on the particular facts alleged in a complaint." *Yegiazaryan v. Smagin*, 599 U.S. 533, 543 (2023). "Specifically, courts should look to the circumstances surrounding the alleged injury to assess whether it arose in the United States," including "the nature of the alleged injury, the racketeering activity that directly caused it, and the injurious

aims and effects of that activity." *Id.* at 543–44.

Plaintiffs' alleged injuries are overwhelmingly foreign. Mr. Nada is domiciled in Italy; Lord Energy is incorporated and headquartered in Switzerland. The allegations in the Complaint center on harms to Plaintiffs' reputation and business in Italy and Switzerland. Compl. ¶¶ 19–20. Likewise, the UAE Defendants are domiciled in the UAE, and all of their alleged conduct occurred abroad and was allegedly directed at Italy and Switzerland. *Id.* ¶¶ 13, 23–25. The only injury that Plaintiffs attempt to locate in the United States concerns Americas Lord Energy, a wholly owned subsidiary of Lord Energy, which was incorporated under the laws of the State of Texas in April 2018 and dissolved (less than a year later) in March 2019. *Id.* ¶ 22; *but see id.* ¶ 188 (alleging dissolution in April 2019). But the allegations of harm suffered by non-party Americas Lord Energy are threadbare and tangential. The Complaint contains no allegations that Americas Lord Energy had any revenues, earnings, or capital whatsoever. Instead, the Complaint alleges that Americas Lord Energy was "*preparing* to engage in the oil and gas sector in the United States." *Id.* ¶ 119 (emphasis added); *see id.* ¶ 121. While the Complaint alleges a single transaction involving Americas Lord Energy—"in which Americas Lord Energy loaded a series of cargoes purchased from U.S. oil producers and transshipped them in the U.S. Gulf onto a VLCC" (*id.* ¶ 187)— Plaintiffs identify no injuries suffered in the United States in connection with this alleged transaction. Plaintiffs simply state that Crédit Suisse (a Swiss bank) "closed Lord Energy's paper position," which "[a]t one point" had "lost about $65 million." *Id.* Such scant allegations come nowhere close to asserting a domestic injury. *See RJR Nabisco*, 579 U.S. at 354.

### 5. The Complaint fails to allege an enterprise.

The Complaint alleges that Defendants formed an "association-in-fact enterprise" (Compl. ¶ 243), which is a type of enterprise that has "at least three structural features: a purpose, relation-

ships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). This definition is broad but not limitless. Plaintiffs cannot plead a RICO enterprise between a corporate defendant and its agents or employees acting within the scope of their roles for the corporation, because "a corporation necessarily acts through its agents and employees." *US Dominion, Inc. v. MyPillow, Inc.*, No. 21-cv-0445 (CJN), 2022 WL 1597420, at *5 (D.D.C. May 19, 2022). "As courts have repeatedly recognized, a contrary rule would make little sense, because if a corporate defendant were to face RICO liability 'for participating in an enterprise comprised only of its agents,' then RICO liability 'will attach to any act of corporate wrong-doing and the statute's distinctness requirement' between the 'person' and the 'enterprise' would be 'rendered meaningless.'" *Id.* (quoting *U1it4less, Inc. v. Fedex Corp.*, 871 F.3d 199, 205–06 (2d Cir. 2017)).

Applying these principles, the district court in *US Dominion* rejected arguments that Dominion had formed a RICO enterprise with a law firm (Clare Locke) and a public-relations firm (Hamilton Place) that Dominion had hired—and which at all relevant times had acted "[a]t the direction of Dominion"—because the complaint included "no allegations that Clare Locke or Hamilton Place did anything outside the scope of their relationship with Dominion." *Id.* at *5–6. Plaintiffs' allegations here are closely analogous: they allege a RICO enterprise between a foreign sovereign, its officials, and a public-relations firm and its employees, all acting "to further the UAE's objectives." Compl. ¶ 13. As in *US Dominion*, all of the UAE Officials' purported conduct was allegedly undertaken in their official capacities; and Alp and its employees allegedly acted at the UAE's direction. Compl. ¶ 13.[6] Such allegations are insufficient to plead a RICO enterprise.

---

[6] Plaintiffs allege no facts connecting Defendants ADNOC, Dr. Vidino, or Mr. Besson to the supposed enterprise.

6.    *The Complaint fails to allege a RICO conspiracy.*

Plaintiffs' RICO conspiracy claim fails from the start because the Complaint fails to state a substantive RICO violation for the reasons above. *See Ctr. for Immigr. Studs.*, 410 F. Supp. 3d at 194 ("Because the Court finds that plaintiff failed to allege a substantive RICO violation under Section 1962(c), it has failed to plead a conspiracy to violate RICO under Section 1962(d)."); *E. Sav. Bank, FSB v. Papageorge*, 31 F. Supp. 3d 1, 15 (D.D.C. 2014) ("Since the plaintiff has failed to plead a RICO violation under 18 U.S.C. § 1962(a)–(c), its claim under § 1962(d) must fail, because there was no violation in which the defendant could have conspired."), *aff'd*, 629 F. App'x 1 (D.C. Cir. 2015). The Complaint fails to allege the basic elements of a RICO conspiracy: "that (1) two or more people agreed to commit a subsection (c) offense, and (2) a defendant agreed to further that endeavor." *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1048 (D.C. Cir. 2012). Indeed, as described above, Defendants' alleged conduct—commissioning articles and other communications concerning Plaintiffs' ties to the Muslim Brotherhood—come nowhere near to alleging racketeering conduct (or any predicate act). Accordingly, Plaintiffs' conspiracy claim must also be dismissed.

7.    *Plaintiffs' RICO claims are time-barred.*

The Court can—and should—dismiss Plaintiffs' RICO claims for all of the reasons discussed above. But were there any doubt, the Court could alternatively dismiss Plaintiffs claims under RICO's four-year statute of limitations.

RICO's statute of limitations "begins to run from the date of discovery of the injury. Under the discovery rule, a cause of action accrues when the plaintiff has knowledge of (or by the exercise of reasonable diligence should have knowledge of) (1) the existence of the injury, (2) its cause in fact, and (3) *some* evidence of wrongdoing." *Feld Ent. Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288, 308 (D.D.C. 2012) (cleaned up). The discovery rule does

*not* require that the plaintiff know the specific identity of the defendant. *See, e.g.*, *Levy v. BASF Metals Ltd.*, 917 F.3d 106, 108 (2d Cir. 2019) ("The relevant inquiry … is not whether Levy had discovered the identity of the defendants or whether she had discovered the manipulation scheme she alleges in her complaint. Rather, the question is when Levy discovered her … injury[.]"); *Robinson v. Lowe's Home Ctrs., Inc.*, No. 06-cv-4403, 2007 WL 2739187, at *2 (E.D. Pa. Sept. 19, 2007) ("Uncertainty as to the identity of a defendant is not the sort of lack of knowledge which triggers the discovery rule.").

The Complaint alleges that by the spring of 2018, "[Mr. Nada] knew he was the victim of a concerted effort to smear his name by falsely linking him and his company to terrorism" (Compl. ¶ 139); "[i]n June 2018, [Mr. Nada] reported the defamatory campaign against him and his companies to Swiss law enforcement" (*id.* ¶ 205); and in April 2019, Lord Energy declared bankruptcy (*id.* ¶ 188). Plaintiffs were therefore on notice of the existence of their injuries, their cause, and some evidence of wrongdoing more than four years before filing the Complaint in January 2024. Thus, Plaintiffs' RICO claim must be dismissed as outside the statute of limitations.

### C. Plaintiffs' Sherman Act claim fails for lack of subject-matter jurisdiction and fails to state a claim.

Plaintiffs' Sherman Act claims must be dismissed because the Court lacks subject-matter jurisdiction under the Foreign Trade Antitrust Improvement Act (FTAIA) and because Plaintiffs fail to allege the elements necessary to state a claim under the Sherman Act.

#### 1. The Court lacks subject-matter jurisdiction under the FTAIA.

Federal courts lack jurisdiction over Sherman Act claims rooted in substantially foreign conduct. 15 U.S.C. § 6a. Under the FTAIA, a federal court has subject-matter jurisdiction over Sherman Act claims involving foreign conduct *only* where the conduct both (1) sufficiently affects

U.S. commerce—*i.e.*, it has a "direct, substantial, and reasonably foreseeable effect" on U.S. domestic, import, or (certain) export commerce, and (2) has an effect of a kind that antitrust law considers harmful—*i.e.*, the "effect" must "giv[e] rise to a [Sherman Act] claim." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 162 (2004) (quoting 15 U.S.C. § 6a(1), (2)). Put differently, the FTAIA "includes two distinct causation inquiries, one asking whether the defendants' foreign conduct caused a *cognizable* domestic effect, and the other asking whether that effect caused the plaintiff's injury." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 414 (2d Cir. 2014) (emphasis added). The Complaint fails to satisfy either requirement.

**a.** Plaintiffs do not plausibly plead a "direct" effect on U.S. commerce. *Empagran*, 542 U.S. at 162. An effect is *direct* under the FTAIA only if it "follows as an immediate consequence of the defendant's activity" with no "intervening developments." *United States v. LSL Biotech.*, 379 F.3d 672, 680–81 (9th Cir. 2004). Alleged domestic effects are not "direct" when they are "premised on a multitude of *speculative* and changing factors affecting business and investment decisions." *In re Intel Corp. Microprocessor Antitrust Litig.*, 452 F. Supp. 2d 555, 561 (D. Del. 2006) (emphasis added).

Plaintiffs allege that Defendants' conduct ultimately drove Lord Energy's U.S. subsidiary Americas Lord Energy out of business; and because Americas Lord Energy was allegedly a participant in the market to export U.S.-produced WTI, Plaintiffs contend that its bankruptcy directly affected that market. *See* Compl. ¶¶ 74, 197–98. But Plaintiffs fail to sufficiently plead the nature of the alleged market effect—a critical element of any antitrust claim. For instance, while Plaintiffs allege that Lord Energy's no longer selling Saharan Blend in Asia "impacted the price for WTI on the spot market," they do not allege how the price changed, or how any price change would relate to any U.S. export market. *See* Compl. ¶ 197.

Plaintiffs' allegations not only lack necessary specifics, they are premised on "a multitude of speculat[ion] and changing factors affecting business and investment decisions." *In re Intel Corp.*, 452 F. Supp. 2d at 561. For example, the purported "effect" on the U.S. oil market is entirely speculative—Plaintiffs have not alleged that Americas Lord Energy was involved in anything but a "small component of [WTI exported] in the United States." *Lotes Co.*, 753 F.3d at 409–10. And Plaintiffs cannot demonstrate an existing effect on U.S. exports of WTI because they have not alleged that there was lack of capacity in WTI export channels or high barriers to entry. *See LSL Biotechnologies*, 379 F.3d at 682. "At most … [D]efendants' conduct may cause ripple effects in the United States, but such effects are simply too attenuated to bring [Plaintiffs'] foreign injury within the ambit of the Sherman Act." *Lotes Co.*, 753 F.3d at 409–10 (cleaned up).

**b.** To satisfy the FTAIA's second causation requirement, Plaintiffs must allege facts establishing that the domestic effects of Defendants' conduct proximately caused their injury. As the D.C. Circuit has put it, "[t]he statutory language—'gives rise to'—indicates a direct causal relationship, that is, proximate causation." *Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*, 417 F.3d 1267, 1271 (D.C. Cir. 2005), *vacated on other grounds*, 542 U.S. 155.

Plaintiffs allege that Defendants' conduct "forc[ed]" Lord Energy and Americas Lord Energy "into bankruptcy," and that the companies' bankruptcy in turn "directly impacted" U.S. commerce, *i.e.*, "the prices U.S.-based producers of WTI could receive for WTI exports." Compl. ¶¶ 74, 262. According to Plaintiffs, these pricing effects "prevent[ed] Lord Energy from continuing to do business with several U.S. entities." *Id.* ¶ 263.

This theory of injury turns the causation inquiry on its head. The crux of Plaintiffs' position is that their injury (going out of business) had effects on U.S. commerce. But to satisfy FTAIA, Plaintiffs must allege the opposite—that effects of the Defendants' conduct on U.S. commerce

gave rise to Plaintiffs' injuries. In other words, the "direction of causation runs the wrong way ....
[A]n effect never precedes its cause." *Lotes Co.*, 753 F.3d at 414 (cleaned up). The Fifth Circuit's
decision in *Den Norske Stats Oljeselskap As v. HeereMac Vof*, 241 F.3d 420 (5th Cir. 2001), is
instructive. There, the plaintiff, a Norwegian oil corporation, brought a Sherman Act claim predi-
cated on allegations that the defendants' anticompetitive conduct led to higher operating costs in
the North Sea, and also imposed higher prices on U.S. purchasers of certain services in the Gulf
of Mexico. The Fifth Circuit dismissed the claim for lack of causation. Under the FTAIA, the court
explained, "the effect on United States commerce … must give rise to the claim that [the plaintiff]
asserts against the defendants." *Id.* at 427. That is, the plaintiff's "injury must stem from the effect
of higher prices." *Id.*

Such an injury is missing here. Plaintiffs have not alleged that the effect of Defendants'
purported conduct on U.S. commerce gave rise to their claims. Nor have they alleged that the
prices that U.S.-based producers of WTI could receive for WTI exports, or U.S. companies' ina-
bility to do business with Plaintiffs, caused Plaintiffs' bankruptcy. Instead, Plaintiffs seek redress
for precisely the "type of independently caused foreign injury" that puts the claim outside of U.S.
jurisdiction. *Empagran*, 542 U.S. at 173; *see* Fed. R. Civ. P. 12(b)(1).

### 2. Plaintiffs fail to state a claim under the Sherman Act.

Independent of the Complaint's jurisdictional flaws, the Sherman Act claims should be
dismissed for failure to sufficiently plead the substantive elements of Section 1 and Section 2 of
the Sherman Act. Fed. R. Civ. P. 12(b)(6). These provisions are intended to protect competition in
the United States by forbidding agreements to unreasonably restrain trade and unreasonable efforts
to achieve or maintain monopoly power. They do not prevent foreign competitors from disparaging
each other. Plaintiffs' attempt to convert their defamation claim into an antitrust claim fails.

> a. *The Complaint fails to allege a relevant market or antitrust injury.*

Two threshold shortcomings common to both Section 1 and Section 2 claims independently warrant dismissal: Plaintiffs fail to define the relevant market and fail to allege antitrust injury.

*First*, the plaintiff "bears the burden of establishing the relevant market." *Neumann v. Reinforced Earth Co.*, 786 F.2d 424, 429 (D.C. Cir. 1986). To plead an antitrust market, a plaintiff must define both a relevant product market and a relevant geographic market. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962); *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 13 (D.D.C. 2021). "[A]n alleged product market … must be plausible," *Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*, 947 F. Supp. 2d 88, 103 (D.D.C. 2013), and must include all "commodities reasonably interchangeable by consumers for the same purposes," *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956). "[T]he relevant geographic market must be sufficiently defined so that the Court understands in which part of the country competition is threatened." *Sky Angel*, 947 F. Supp. 2d at 104. Once the plaintiff has defined the relevant market, they must show that the defendant holds market power over the relevant market. *See S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*, 740 F.2d 980, 1000 (D.C. Cir. 1984).

The Complaint fails to define a relevant market—either a geographic or a product market—in the United States. Plaintiffs must specifically allege the geographic area in which anticompetitive harm occurred because market power can be assessed only in a well-defined market with an observable set of competitors and competitive conditions. But here, it is unclear whether the Plaintiffs are trying to allege a geographic market with respect to an Asian spot market for light crude oil or an American market for light crude oil exportation to Asia. It is likewise unclear whether the product market Plaintiffs seek to allege is light crude oil, generally, or WTI, Murban, or Saharan Blend, specifically, or whether the market is the freight-forwarding of oil (since Lord Energy's principal "product" seems to have been arranging for the shipment of oil). This failure to allege a

properly defined market is fatal to Plaintiffs' Sherman Act claims as a whole.[7]

Second, U.S. antitrust laws protect *competition*, not individual competitors. *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 179–80 (2006). To state an antitrust claim, a plaintiff must demonstrate an "antitrust injury." *Andrx Pharm., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 812 (D.C. Cir. 2001). "At a minimum, this requirement means that one competitor may not use the antitrust laws to sue a rival merely for vigorous or intensified competition." *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007). Injury to "one specific competitor … is insufficient to support a finding that the market as a whole is or will be injured." *Dial A Car, Inc. v. Transp.*, Inc., 82 F.3d 484, 486–87 (D.C. Cir. 1996). Plaintiffs bear the burden of proving that the defendant's action targeted or harmed competition as a whole in the relevant market, and not just Plaintiffs as the competitor. *See Am. President Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209, 220 (D.D.C. 2022).

The Complaint fails to plausibly allege antitrust injury. Even assuming that the relevant market is the "spot market for light crude oil in Asia," Compl. ¶¶ 261–62, the Complaint does not contain any concrete, non-speculative facts to establish that the "spot market for light crude oil in Asia" has suffered an anticompetitive injury. Instead, the Complaint contains conclusory and vague statements about the supposed effects of Defendants' smear campaign on Plaintiffs and, in turn, on U.S. commerce. Assuming instead that the relevant market is American light crude oil exportation to Asia, the Complaint likewise contains no plausible allegations that the American

---

[7] *See, e.g.*, *Smugglers Notch Homeowners Ass'n, Inc. v. Smugglers' Notch Mgmt. Co.*, Ltd., 414 F. App'x 372, 375 (2d Cir. 2011) (affirming dismissal for failure to adequately allege market); *Wampler v. Sw. Bell Tel. Co.*, 597 F.3d 741, 744–45 (5th Cir. 2010) (same); *Sumotext Corp. v. Zoove, Inc.*, No. 16-cv-1370, 2016 WL 6524409, at *3 (N.D. Cal. Nov. 3, 2016) (same); *Int'l Television Prods. Ltd. v. Twentieth Century-Fox Television Div. of Twentieth Century-Fox Film Corp.*, 622 F. Supp. 1532, 1539 (S.D.N.Y. 1985) (same).

market has suffered an anticompetitive injury. "This omission alone is fatal to both Sherman Act claims." *Asa Accugrade, Inc. v. Am. Numismatic Ass'n*, 370 F. Supp. 2d 213, 216 (D.D.C. 2005).

Plaintiffs also fail to explain how the alleged smear campaign against Lord Energy had a direct, substantial, and foreseeable effect on U.S. citizens or businesses, or how it affected certain U.S. markets pegged to crude oil or U.S.-based producers of WTI crude oil and the prices that U.S.-based WTI producers could receive for WTI exports. Lord Energy is a Saharan blend crude oil and commodity trading company incorporated and located in *Switzerland*, and the supposed smear campaign was allegedly intended to eliminate a competitive threat to ADNOC in the spot market for light crude oil exported to *Asia*. Similarly, Plaintiffs never explain how the alleged smear campaign which allegedly also affected U.S.-based Americas Lord Energy, affected a U.S. market as a whole. The Complaint merely states that Lord Energy's bankruptcy "impacted U.S. companies engaged in foreign commerce by preventing Lord Energy from continuing to do business with [them]." Compl. ¶¶ 263, 270. But the only injuries Plaintiffs actually allege are injuries to themselves—that they went out of business. As the Supreme Court has explained, an injury to competition does not arise merely from an injury to a competitor. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977). Plaintiffs have thus failed to allege an antitrust injury, and their claims must be dismissed.

b.      *The Complaint fails to state a Section 1 claim.*

Section 1 of the Sherman Act prohibits any "contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several states, or with foreign nations." 15 U.S.C. § 1. To state a Section 1 claim, Plaintiffs must allege "(1) that defendants entered into some agreement for concerted activity (2) that either did or was intended to unreasonably restrict trade in the relevant market, which (3) affects interstate commerce." *Asa Accugrade*, 370 F. Supp. 2d at 215 (quoting 15 U.S.C. § 1). Plaintiffs have failed to do so.

*First*, the Complaint "does not … allege facts capable of supporting a reasonable inference that defendants formed an agreement to restrain trade unreasonably." *Id.* at 216. The Complaint discusses alleged "false" and "defamatory statements" by Defendants during a deliberate "defamatory campaign" against Plaintiffs and Americas Lord Energy. *See, e.g.*, Compl. ¶¶ 2, 138, 140, 205. The Complaint also asserts that Defendants engaged in a concerted effort to "'destroy' their targets' businesses and reputations." *Id.* ¶ 2. But the Complaint does not allege non-speculative and non-conclusory facts that can plausibly plead that Defendants formed an agreement to *restrain trade unreasonably*. Instead, the Complaint invokes the bare legal conclusion that, through this campaign, "Defendants … agreed to unlawfully and unreasonably restrain international and interstate commerce." *Id.* ¶ 260. "[A] plaintiff must do more than simply paraphrase the language of the federal antitrust laws or state in conclusory terms that a defendant has violated those laws" to withstand a motion to dismiss. *Dial a Car, Inc. v. Transp., Inc.*, 884 F. Supp. 584, 588 (D.D.C. 1995), *aff'd*, 82 F.3d 484 (D.C. Cir. 1996).

*Second*, the Complaint fails to demonstrate that the objectionable conduct, *i.e.*, the "defamatory campaign," is the subject of an antirust claim rather than a defamation claim. Federal courts have rejected plaintiffs' attempts to convert tort claims into antitrust claims—including in cases alleging defamation. "Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws." *Brooke Grp. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993). In *Asa Accugrade*, the court rejected Section 1 claims predicated upon "alleged defamation and tortious interference." 370 F. Supp. 2d at 214. The court explained that "[p]ublishing negative statements about a business is not the sort of conduct that … is … manifestly anticompetitive, nor would it almost always tend to restrict competi-

42

tion." *Id.* at 217 (cleaned up). The mere allegation that the defendant published defamatory statements online was insufficient to demonstrate the formation of an agreement to restrain trade. *Id.*

The claims here suffer the same defects. An alleged intent to harm a competitor's business does not demonstrate "the existence of a systemic set of exclusionary restraints resulting in harm to competition in the marketplace," as required to state a Section 1 claim. *Am. Steel Erectors v. Loc. Union No. 7*, 815 F.3d 43, 70 (1st Cir. 2016). Even "[f]alse statements about a competitor— without more—do not give rise to an antitrust violation." *Hytera Commc'ns Corp. Ltd. V. Motorola Sols., Inc.*, 623 F. Supp. 3d 857, 879–80 (N.D. Ill. 2022). Making false statements— even clearly false statements—about a competitor, "might be characterized as unsavory, or even illegal under other laws," but "they do not give rise to a federal antitrust claim without factual allegations specifically addressing how these practices have harmed competition." *Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1268 (11th Cir. 2015) (citation omitted)."Plaintiff[s] cannot convert whatever losses [they] may have suffered from" an alleged smear campaign into "a federal antitrust claim by merely alleging in bare and conclusory terms the language of the antitrust statute." *Asa Accugrade*, 370 F. Supp. 2d at 218.

> *c.    The Complaint fails to state a Section 2 claim.*

Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. But "merely possessing monopoly power is not itself an antitrust violation." *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001). To state a Section 2 claim, Plaintiffs must allege not only Defendants' possession of monopoly power, but also their "willful … maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Id.* at 50 (citation omitted).

Plaintiffs fail to state a Section 2 claim. The Complaint does not allege that the UAE (or any defendant other than ADNOC) has, was, or is attempting to obtain a monopoly in any market. The Complaint does allege that "ADNOC possessed monopoly power" in 2017, and that ADNOC is the "dominant seller of Murban, accounting for about 60% of all Murban exports from the UAE." Compl. ¶¶ 58, 266. But Plaintiffs have not alleged that ADNOC's alleged market power was anything other than the result of a superior light crude oil. Nor have Plaintiffs alleged facts demonstrating that ADNOC is the UAE's alter ego.

Even if Plaintiffs had plausibly alleged that the UAE had or has monopoly power, they have not adequately alleged that the UAE acquired or maintained that power by anticompetitive means. Plaintiffs allege that Defendants engaged in a foreign-based "unlawful smear campaign" with the "specific intent" intent of driving Lord Energy out of the market so that ADNOC could maintain its monopoly power. Compl. ¶ 268. That does not suffice to state a claim. As the Seventh Circuit explained, "[a]ntitrust law condemns practices that drive up prices by curtailing output," but "[f]alse statements about a rival's goods do not curtail output in either the short or long term." *Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 623 (7th Cir. 2005). Simply put, Plaintiffs have not alleged that Defendants' statements harmed competition, so they cannot state a Section 2 claim.

### 3. *Plaintiffs' Sherman Act claims are time-barred.*

Finally, even if Plaintiffs could overcome the jurisdictional and substantive flaws described above, Plaintiffs' claims would be time-barred because "damages are recoverable under the federal antitrust acts only if suit therefor is 'commenced within four years after the cause of action accrued.'" *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971) (quoting 15 U.S.C. § 15b). An antitrust claim accrues and the statute of limitations begins to run when a defendant commits an overt act that injures a plaintiff's business. *Id.*

The untimeliness of Plaintiffs' Sherman Act claims is clear on the face of the Complaint.

*See Bregman v. Perles*, 747 F.3d 873, 875, 879 (D.C. Cir. 2014). Plaintiffs' claims accrued more than four years before they filed this case. As described above with respect to Plaintiffs' untimely RICO claim, Plaintiffs' antitrust claim accrued, at the latest, when Lord Energy declared bankruptcy in April 2019. *Supra* Section IV.B.7. Plaintiffs filed suit on January 24, 2024, more than four years later—outside the statute of limitations. The claim therefore must be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint with prejudice.

Dated: July 16, 2024

Respectfully submitted,

*/s/ John B. Bellinger III*
John B. Bellinger III (Bar No. 405059)
Amy Jeffress (Bar No. 449258)
Sally L. Pei (Bar No. 1030194)
Stephen K. Wirth (Bar No. 1034038)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, DC 20001
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
john.bellinger@arnoldporter.com

Robert Reeves Anderson (Bar No. 994989)
ARNOLD & PORTER KAYE SCHOLER LLP
1144 Fifteenth Street, Suite 3100
Denver, CO 80202

*Counsel for Defendants the United Arab Emirates, His Highness Sheikh Mohamed bin Zayed Al Nahyan, and Matar Humaid al-Neyadi*