# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HAZIM NADA, *et al.*,

        *Plaintiffs,*

    *v.*

THE UNITED ARAB EMIRATES, *et al.*,

        *Defendants.*

No. 1:24-cv-206 (ABJ)

**DEFENDANTS ALP SERVICES SA, DILIGENCE SARL,
MARIO BRERO, LIONEL BADAL, AND MURIEL CAVIN'S
MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND .................................................................................................................. 3

STANDARD OF REVIEW .................................................................................................. 6

ARGUMENT ....................................................................................................................... 7

I.      PLAINTIFFS FAIL TO ALLEGE PERSONAL JURISDICTION OVER THE EUROPEAN DEFENDANTS. ................................................................................ 7

         A.     Plaintiffs Cannot Establish General Jurisdiction over the European Defendants. ......................................................................................... 7

         B.     Plaintiffs Cannot Establish Specific Jurisdiction over the European Defendants. ......................................................................................... 9

II.     PLAINTIFFS FAIL TO STATE A CLAIM ................................................................ 13

     A.     Plaintiffs Fail to Plead a Plausible Claim Under the Lanham Act. ..................... 13

         1.     *None of the Alleged Statements at Issue Constitute "Commercial Advertising or Promotion."* ................................................................. 13

         2.     *At Minimum, the Lanham Act Claim Should Be Dismissed as to Defendant Cavin, As It Contains No Allegations As to Him.* ................... 16

     B.     Plaintiffs' Civil Racketeering Claim Under RICO Should Be Dismissed. ........... 18

         1.     *Plaintiffs Do Not Adequately Allege a "Pattern of Racketeering Activity" Under RICO.* ............................................................. 18

         2.     *Plaintiffs Fail to Plead an "Enterprise."* ............................................... 22

     C.     Plaintiffs' Racketeering Conspiracy Claim Under RICO Should Be Dismissed. ...................................................................................... 25

         1.     *Defendants Are Protected Under the Intracorporate Conspiracy Doctrine.* .................................................................................... 25

         2.     *Plaintiffs Fail to Plead a Plausible Claim Under § 1962(c) of the RICO Act.* ................................................................................ 27

     D.     Plaintiffs' Fourth and Fifth Claims Under the Sherman Act Should Be Dismissed. ...................................................................................... 27

         1.     *Plaintiffs Lack Antitrust Standing Necessary to Bring Their Sherman Act Claims.* ................................................................. 27

         2.     *Plaintiffs Fail to Plead a Conspiracy Under the Sherman Act.* ............... 29

        3.      *With Respect to the Fourth Claim, Plaintiffs Fail to Plead "Unreasonabl[e] [R]estrain[t]s [on] [I]nterstate [C]ommerce."* .......... 31

        4.      *With Respect to the Fifth Claim, Plaintiffs Fail to Plead "Monopoly Power."* ................................................................................ 33

III.    PLAINTIFFS' CLAIMS ARE TIME-BARRED ............................................................. 34

        A.      RICO Claims. ..................................................................................................... 34

        B.      Sherman Act Claims. ......................................................................................... 36

CONCLUSION .................................................................................................................................. 37

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Adobe Systems, Inc. Sec. Litig.*,
787 F. Supp. 912 (N.D. Cal. 1992) ......................................................................22

*Am. Needle, Inc. v. Nat'l Football League*,
560 U.S. 183 (2010) ...............................................................................30, 31

*Am. President Lines, LLC v. Matson, Inc.*,
633 F. Supp. 3d 209 (D.C. Cir. 2022) ...................................................................33

*Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam*,
387 F. Supp. 3d 71 (D.D.C. 2019) .......................................................................19

*Andrx Pharms., Inc. v. Biovail Corp. Int'l*,
256 F.3d 799 (D.C. Cir. 2001) ...........................................................................27

*Asa Accugrade, Inc. v. Am. Numismatic Ass'n*,
370 F. Supp. 2d 213 (D.D.C. 2005) .....................................................................32

*Asahi Metal Indus. Co. v. Superior Ct. of Cal.*,
480 U.S. 102 (1987) ...............................................................................10, 13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ......................................................................7, 19, 31, 33

*Ashland Oil, Inc. v. Arnett*,
875 F.2d 1271 (7th Cir. 1989) ...........................................................................26

*Ass'n of Retail Travel Agents, Ltd. v. Air Transport Ass'n of Am.*,
635 F. Supp. 534 (D.D.C. 1986) .........................................................................28

*Associated Gen. Contractor of Cal., Inc. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983) .....................................................................................27

*W. Assocs. Ltd. P'ship, ex rel. Ave. Assocs. Ltd. P'ship v. Mkt. Square Assocs.*,
235 F.3d 629 (D.C. Cir. 2001) ...........................................................18, 19, 21, 22

*Bates v. Nw. Human Servs., Inc.*,
466 F. Supp. 2d 69 (D.D.C. 2006) .......................................................................23

*Bd. of Trs. of State Univ. of New York v. Fox*,
492 U.S. 469 (1989) .....................................................................................14

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)..............................................................................................7, 19, 31, 33

*Bernhardt v. Islamic Republic of Iran*,
    47 F.4th 856 (D.C. Cir. 2022) ....................................................................................10

*Bolger v. Youngs Drug Prods. Corp.*,
    463 U.S. 60 (1983).....................................................................................................14

*Bowie v. Maddox*,
    642 F.3d 1122 (D.C. Cir. 2011) .................................................................................26

*Boyle v. United States*,
    556 U.S. 938 (2009)...................................................................................................24

*Brooke Group Ltd. v. Brown Williamson Tobacco Corp.*,
    509 U.S. 209 (1993)...................................................................................................33

*Brown v. Sim*,
    No. Civ.A. 03-2655, 2005 WL 3276190 (D.D.C. Sept. 30, 2005) ...........................25

*Browning v. Clinton*,
    292 F. 3d 235 (D.C. Cir. 2002) ...................................................................................7

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977)...................................................................................................28

*Cedric Kushner Promotions, Ltd. v. King*,
    533 U.S. 158 (2001)...................................................................................................23

*In re Century 21–Re/Max Real Estate Adver. Litig.*,
    882 F. Supp. 915 (C.D. Cal. 1994) ............................................................................17

*Chalabi v. Hashemite Kingdom of Jordan*,
    503 F. Supp. 2d 267 (D.D.C. 2007), *aff'd*, 543 F.3d 725 (D.C. Cir. 2008)............35

*Chambers Dev. Co., Inc. v. Browning-Ferris Indus.*,
    590 F. Supp. 1528 (W.D. Pa. 1984)...........................................................................26

*Cheeks v. Fort Myer Constr. Corp.*,
    71 F. Supp. 3d 163 (D.D.C. 2014)..............................................................................29

*In re Chicago Newspaper Liquidation Corp.*,
    490 B.R. 487 (Bankr. D. Del. 2013) ..........................................................................15

*City of Mt. Pleasant, Iowa v. Assoc. Elec. Co-op.*,
    838 F.2d 268 (8th Cir. 1988) .....................................................................................30

ii

*Clay v. Blue Hackle N. Am., LLC*,
   907 F. Supp. 2d 85 (D.D.C. 2012) ............................................................................6

*Companhia Brasileira Carbureto De Calcio-CBBCC v. Applied Indus. Materials Corp.*,
   887 F. Supp. 2d 9 (D.D.C. 2012) ............................................................................36

*Conditioned Ocular Enhancement, Inc. v. Bonaventura*,
   458 F. Supp. 2d 704 (N.D. Ill. 2006) ......................................................................17

*Confederate Mem'l Ass'n v. Hines*,
   995 F.2d 295 (D.C. Cir. 1993) ................................................................................23

*Copperweld Corp. v. Indep. Tube Corp.*,
   467 U.S. 752 (1984) ..........................................................................................29, 30

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014) ..................................................................................................8

*Dial A Car, Inc. v. Transp., Inc.*,
   82 F.3d 484 (D.C. Cir. 1996) ............................................................................28, 34

*Dial A Car, Inc. v. Transp. Inc.*,
   884 F. Supp. 584 (D.D.C. 1995) ......................................................................14, 31

*Doe I v. State of Israel*,
   400 F. Supp. 2d 86 (D.D.C. 2005) ....................................................................11, 24

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992) ................................................................................................33

*Edmondson & Gallagher v. Alban Towers Tenants Ass'n*,
   48 F.3d 1260 (D.C. Cir. 1995) ................................................................................21

*Elemary v. Holzmann*,
   533 F. Supp. 2d 116 (D.D.C. 2008) ........................................................................17

*Feld Ent. Inc. v. Am. Soc. for the Prevention of Cruelty to Animals*,
   873 F. Supp. 2d 288 (D.D.C. 2012) ........................................................................34

*Fogie v. THORN Americas, Inc.*,
   190 F.3d 889 (8th Cir. 1999) ..................................................................................26

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
   592 U.S. 351 (2021) ..................................................................................................7

*FTC v. Facebook, Inc.*,
   581 F. Supp. 3d 34 (D.D.C. 2022) ..........................................................................33

*Gatewood v. Fiat, S. p. A.*,
    617 F.2d 820 (D.C. Cir. 1980) .................................................................................12

*Gilmore v. The Palestinian Interim Self-Government Auth.*,
    422 F. Supp. 2d 96 (D.D.C. 2014) ...............................................................................8

*GTE New Media Servs. Inc. v. BellSouth Corp.*,
    199 F.3d 1343 (D.C. Cir. 2000) ................................................................................11

*H.J. Inc. v. Nw. Bell Tele. Co.*,
    492 U.S. 229 (1989)....................................................................................18, 19, 21

*Helman v. Murry's Steaks, Inc.*,
    742 F. Supp. 860 (D. Del. 1990) ...............................................................................26

*Hytera Commc'ns Corp. Ltd. v. Motorola Sols., Inc.*,
    623 F. Supp. 3d 857 (N.D. Ill. 2022) ........................................................................32

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945).....................................................................................................7

*Jagielski v. Package Machine Co.*,
    489 F. Supp. 232 (E.D. Pa. 1980) .............................................................................26

*Johnson v. Comm'n on Presidential Debates*,
    869 F.3d 976 (D.C. Cir. 2017) ..................................................................................28

*Kelly v. Palmer, Reifler & Assocs., P.A.*,
    681 F. Supp. 2d 1356 (S.D. Fla. 2010) .....................................................................24

*Kowal v. MCI Commc'ns Corp.*,
    16 F.3d 1271 (D.C. Cir. 1994) ..............................................................................7, 19

*Landmark Savings & Loan v. Rhoades*,
    527 F. Supp. 206 (E.D. Mich. 1981)..........................................................................26

*Livnat v. Palestinian Auth.*,
    82 F. Supp. 3d 19 (D.D.C. 2015) ................................................................................9

*Max Daetwyler Corp. v. Input Graphics, Inc.*
    608 F. Supp. 1549 (E.D. Pa. 1985) ...........................................................................16

*McFarlane v. Esquire Magazine*,
    74 F.3d 1296 (D.C. Cir. 1996)...................................................................................10

*MCI Telecomm. Corp. v. Graphnet, Inc.*,
    881 F. Supp. 126 (D.N.J. 1995) ................................................................................30

*McIntyre's Mini Computer Sales Grp., Inc. v. Creative Synergy Corp.*,
644 F. Supp. 580 (E.D. Mich. 1986)..........................................................26

*McLendon v. Cont'l Grp., Inc.*,
602 F. Supp. 1492 (D.N.J. 1985) .............................................................26

*Merrick v. Am. Sec. & Tr. Co.*,
107 F.2d 271 (D.C. Cir. 1939)..................................................................24

*Micronics Filtration Holdings, Inc. v. Miller*,
No. 18-CV-303-JL, 2018 WL 4845749 (D.N.H. Oct. 4, 2018)...............17

*Miley v. Hard Rock Hotel & Casino Punta Cana*,
No. 19-3381 (CKK), 2022 WL 296199 (D.D.C. Feb. 1, 2022)..................9

*Mizlou Television Network, Inc. v. Nat'l Broad. Co.*,
603 F. Supp. 677 (D.D.C. 1984) ..............................................................28

*Northeast Jet Ctr., Ltd. v. Lehigh–Northampton Airport Auth.*,
767 F. Supp. 672 (E.D. Pa. 1991) ............................................................26

*Nuevos Destinos, LLC v. Peck*,
No. 15-cv-1846 (EGS), 2019 WL 78780 (D.D.C. Jan. 2, 2019) ................9

*Paleteria La Michoacana, Inc. v. Productos Lacetos Tocumbo S.A. De C.V.*,
2015 WL 13691543 (D.D.C. Feb. 3, 2015) ..............................................17

*Pudlo v. Adamski*,
789 F. Supp. 247 (N.D. Ill. 1992) ............................................................30

*Pyramid Secs. Ltd. v. IB Resolution, Inc.*,
924 F.2d 1114 (D.C. Cir. 1991)...............................................................19

*Ray v. Spirit Airlines, Inc.*,
836 F.3d 1340 (11th Cir. 2016) ...............................................................23

*Republic of Kazakhstan v. Stati*,
380 F. Supp. 3d 55 (D.D.C. 2019)............................................................27

*Rhodes v. Consumers' Buyline, Inc.*,
868 F. Supp. 368 (D. Mass. 1993) ...........................................................26

*Riggs Inv. Mgmt. v. Columbia Partners*,
966 F. Supp. 1250 (D.D.C. 1997).............................................................14

*Rothery Storage & Can Co. v. Atlas Van Lines, Inc.*,
792 F.2d 210 (D.C. Cir. 1986) .................................................................33

*RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*,
    682 F.3d 1043 (D.C. Cir. 2012) ........................................................................25

*Safra v. Palestinian Auth.*,
    82 F. Supp. 3d 37 (D.D.C. 2015) ....................................................................13

*Saine v. A.I.A., Inc.*,
    582 F. Supp. 1299 (D. Colo. 1984) ..................................................................26

*Sanderson v. Brugman*,
    No. IP00-459, 2001 WL 699876 (S.D. Ind. May 29, 2001) .............................17

*Second Amendment Found. v. U.S. Conf. of Mayors*,
    274 F.3d 521 (D.C. Cir. 2001) ................................................................ *passim*

*Shatsky v. Organization*,
    955 F.3d 1016 (D.C. Cir. 2020) ........................................................................8

*Si v. Laogai Rsch. Found.*,
    71 F. Supp. 3d 73 (D.D.C. 2014) ....................................................................25

*Sinclair v. TubeSockTedD*,
    596 F. Supp. 2d 128 (D.D.C. 2009) ................................................................11

*Solano v. Delmed, Inc.*,
    759 F. Supp. 847 (D.D.C. 1991) ....................................................................36

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993) ...............................................................................31, 34

*Stromberg v. Marriott Intern., Inc.*,
    474 F. Supp. 2d 57 (D.D.C. 2007) ....................................................................3

*Sun Life Assurance Co. of Canada v. Imperial Premium Fin., LLC*,
    904 F.3d 1197 (11th Cir. 2018) ......................................................................26

*Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.*,
    370 U.S. 19 (1962) .........................................................................................29

*U.S. Dominion, Inc. v. MyPillow, Inc.*,
    No. 1:21-cv-0445 (CJN), 2022 WL 1597420 (D.D.C. May 19, 2022) ......23, 24, 26

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) .......................................................................................33

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ..........................................................................34

*United States v. Philip Morris USA, Inc.*,
  449 F. Supp. 2d 1 (D.D.C. 2006) ....................................................................25

*United States v. Turkette*,
  452 U.S. 576 (1981) .......................................................................................22

*Valet Apartment Servs., Inc. v. Atlanta Journal and Const.*,
  865 F. Supp. 828 (N.D. Ga. 1994) ................................................................30

*Vollrath v. Sammi Corp.*,
  No. CV 85–820 MRP, 1989 WL 201632 (C.D. Cal. 1989)...........................30

*Walden v. Fiore*,
  571 U.S. 277 (2014) .......................................................................................12

*Watkins Inc. v. McCormick & Co. (In re McCormick & Co.*
  *Pepper Prods. Mktg. & Sales Practices Litig.)*,
  215 F. Supp. 3d 51 (D.D.C. 2016) ...........................................................14, 16

*Webb v. Culberson, Heller & Norton, Inc.*,
  357 F. Supp. 923 (N.D. Miss. 1973) ..............................................................26

*Webster v. Omnitrition Int'l, Inc.*,
  79 F.3d 776 (9th Cir. 1996) ............................................................................26

*Yancoski v. E.F. Hutton & Co., Inc.*,
  581 F. Supp. 88 (E.D. Pa. 1983) ....................................................................26

*Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Loc. Union 639*,
  883 F.2d 132 (D.C. Cir. 1989) .......................................................................23

*Ziglar v. Abbasi*,
  582 U.S. 120 (2017) .......................................................................................25

**Statutes**

15 U.S.C. § 1 ...........................................................................................27, 29

15 U.S.C. § 2 ...........................................................................................27, 29

15 U.S.C. § 15b ..............................................................................................36

18 U.S.C. § 1891(1) ........................................................................................20

18 U.S.C. § 1961(5) ........................................................................................18

18 U.S.C. § 1962(c) ..................................................................................18, 27

18 U.S.C. § 1962(d) ..........................................................................25, 26, 27

**Rules**

Fed. R. Civ. P. 4(k)(2).................................................................................7, 9, 10, 11

Fed. R. Civ. P.8.........................................................................................17, 18

Fed. R. Civ. P. 9(b)...................................................................................16, 17, 20

Defendants ALP Services S.A. ("Alp Services"), Diligence SARL ("Diligence"), Mario Brero, Lionel Badal, and Muriel Cavin (collectively, "the European Defendants") respectfully request that this Court dismiss with prejudice Plaintiffs' Complaint pursuant to Federal Rules of Civil Procedure 12(b)(2) and (6), for reasons stated in this Memorandum of Law, as well as those in the Memorandum of Law in support of the motion to dismiss filed by Defendants the United Arab Emirates, His Highness Sheikh Mohamed bin Zayed Al Nahyan, and Matar Humaid al-Neyadi (collectively, the "UAE Defendants").

## INTRODUCTION

This lawsuit is a defamation claim—and a contrived one at best—masquerading as litigation under the Lanham Act, the Racketeer Influenced and Corrupt Organization Act ("RICO"), and the Sherman Act.  The reason Plaintiffs—Hazim Nada ("Nada"), a crude oil trader residing in Italy, and Lord Energy SA ("Lord Energy"), his privately owned company based in Switzerland—try to shoehorn their allegations into causes of action under these statutes is because a defamation claim between foreign parties for events that took place outside of the United States simply does not belong in this Court.

Plaintiffs' allegations nevertheless fail, for two reasons.  *First*, there is no personal jurisdiction over the European Defendants, all of whom are based in Switzerland or Luxembourg. None of the European Defendants reside in the United States, have a home or office in the United States, or conduct any business in the United States.  Nor does the Complaint allege adequately that the European Defendants have the requisite minimal contacts with the United States to establish personal jurisdiction.  No court in this District—in fact, no court in the United States— has a legitimate interest in adjudicating claims of alleged wrongdoing that occurred in Switzerland and the UAE as a part of the UAE's effort to combat financing of the Muslim Brotherhood—an

entity it has designated as a terrorist organization.  Even taking at face value Plaintiffs' inherently implausible allegations that the UAE Defendants sought to eliminate Lord Energy's purported competition with the UAE-owned Abu Dhabi National Oil Company ("ADNOC") in the Asian oil market, the Complaint contains no allegations that the European Defendants engaged in any conduct in the United States or purposefully directed conduct at the United States.

*Second*, the Complaint fails to state a claim for false advertising, racketeering, or an antitrust violation under the Lanham Act, RICO, or the Sherman Act.  The statements in journal articles or blog posts that the European Defendants allegedly commissioned do not qualify as "commercial advertising or promotion," which is a required element under the Lanham Act.  The Lanham Act claim should additionally be dismissed as to Defendant Muriel Cavin, as it contains no particularized allegations that Cavin's purported actions violated the Lanham Act.

The European Defendants' alleged conduct does not constitute a "pattern of racketeering activity" under RICO.  The claimed "enterprise" no longer presents an open-ended threat of future harm; rather, the alleged scheme is complete.  The Complaint also alleges, at most, a single action and a single injury during a relatively short period of time.  Those allegations do not plausibly allege an ongoing pattern of racketeering activity.  And Plaintiffs' RICO conspiracy claim fails because, under the intracorporate conspiracy doctrine, an entity cannot enter into a conspiracy agreement with its subsidiary or agent.

Plaintiffs' Sherman Act claims fare no better.  The Complaint fails to allege that the European Defendants' actions harmed *competition* in the relevant market (which Plaintiffs do not even try to define).  At most, Plaintiffs allege harm to a single competitor—but that is insufficient

to state a plausible claim under the Sherman Act.  Finally, Plaintiffs' claims under both the Lanham Act and the Sherman Act are barred by the applicable statutes of limitation.[1]

## BACKGROUND[2]

Plaintiff Nada is a dual U.S. and Italian citizen domiciled in Como, Italy.  Compl. ¶ 19. Nada is the founder and sole owner of Lord Energy—a crude oil and commodity trading company incorporated under the laws of Switzerland, and with its principal place of business in Lugano, Switzerland.  Compl. ¶¶ 19-20.

Defendants Alp Services and Diligence are Swiss investigative firms founded, owned, and run by Defendants Brero and Cavin.  Compl. ¶¶ 1; 28-29.  They are incorporated under the laws of Switzerland, and have their principal place of business in Geneva, Switzerland.  Compl. ¶¶ 28-29.  Brero and Cavin are domiciled in Switzerland.  Compl. ¶¶ 31-32.  Brero is an Italian citizen, Compl. ¶ 31, and Cavin is a Swiss citizen, Compl. ¶ 32.  Defendant Badal is a former senior Alp Services' employee; he is a citizen of, and resides in, Luxembourg.  Compl. ¶ 33.

Plaintiffs allege that Alp Services approached the UAE in 2017 with a "Global Action Plan" proposal to conduct a public relations campaign "against Qatar and its networks, including the Muslim Brotherhood," and "to expose and counter Qatar's efforts to 'direct[] a global media and political campaign against' the UAE."  Compl. ¶ 85; *see also id*. ¶ 76.  Alp Services "proposed

---

[1] The European Defendants do not, at this time, move to dismiss the Complaint on *forum non conveniens* grounds.  If this Court does not dismiss the Complaint against the European Defendants for lack of personal jurisdiction or failure to state a claim, the European Defendants reserve the right to move at the appropriate time to dismiss any remaining allegations on *forum non conveniens* grounds.  *See Stromberg v. Marriott Intern., Inc.*, 474 F. Supp. 2d 57, 60 (D.D.C. 2007).

[2] To avoid repetition, the European Defendants adopt and incorporate by reference the Statement of the Case section of the UAE Defendants' Memorandum in Support.  *See* UAE Defendants' Memo. of Law in Support of Their Mot. to Dismiss ("UAE Mot.), ECF No. 62-1 at 3-5.  In reciting Plaintiffs' allegations, the European Defendants do not concede the allegations' factual accuracy or Plaintiffs' characterization of the relevant facts.

making 'advanced cartographies of [the] targets' secret influence networks in Europe and the US,'" and "conducting 'investigations to obtain damaging negative material on [the] key targets.'" Compl. ¶ 86.  Once Alp Services "identified key targets and obtained 'negative intelligence about them,' it would 'launch highly aggressive online negative campaigns.'" Compl. ¶ 87.  Plaintiffs allege that Brero sent Alp Services' proposal to UAE officials by email on August 7, 2017, and then traveled to Abu Dhabi for in-person meetings on August 7-9, 2017.  Compl. ¶ 88.  The Complaint does not allege that either Alp Services' August 7, 2017 proposal—or any other representations Alp Services or Brero made in an effort to secure work from the UAE—ever mentioned Nada or Lord Energy.

Plaintiffs next allege that the UAE officials somehow "recognized" Alp Services' proposal to conduct a public relations campaign "against Qatar and its networks, including the Muslim Brotherhood," as "an opportunity to eliminate Lord Energy as a competitive threat" to ADNOC. Compl. ¶¶ 85, 91.  The Complaint then asserts that "the UAE and its officials instructed Alp [Services] to devise operations against Hazim [Nada] and Lord Energy as some of the first targets" of this public relations campaign.  Compl. ¶ 91.

Plaintiffs allege that, "[a]cting on the UAE's instructions," on September 13, 2017, Alp Services prepared a confidential page-and-a-half memorandum about Nada and Lord Energy, which identified Nada's father as "'one of the principal financial strategist[s] of the Muslim Brotherhood.'"  Compl. ¶ 91.  A month later, on October 6, 2017, Alp Services allegedly submitted a report on Nada and Lord Energy.  Compl. ¶ 92.  The report noted a dearth of information about Lord Energy, "'the identity of its managers,'" and "'its links to the entire network of the Muslim Brotherhood.'"  Compl. ¶ 92.  Nevertheless, Alp Services' report allegedly uncovered the following: (1) Lord Energy is run by "heirs of the very senior Muslim Brotherhood leadership";

(2) "the company is at the center of European M[uslim] B[rotherhood] senior operators and has ties to Al-Qaeda related entities"; (3) there was evidence of "contacts between Lord Energy executives, who are M[uslim] B[rotherhood] members, and Al-Qaeda related people and organisations"; (4) Nada had contacts with "Attia Nasreddin, Chairman of the Al-Qaeda related Nasco Group"; (5) Nada's father, Youssef Nada, was "once considered to be the 'foreign minister' of the Muslim Brotherhood and its key financier;" and (6) Lord Energy's trade in liquefied natural gas, crude oil, and bagged cement "allow[s] it to operate globally and transfer important sums of money" as "the perfect cover" for financing the Muslim Brotherhood.  Compl. ¶ 92 (internal quotation marks omitted).  The report also identified several of Nada's business associates as affiliated with the Muslim Brotherhood.  Compl. ¶ 95.

On May 7, 2018, Alp Services allegedly produced another confidential report on Lord Energy, entitled "Lord Energy: The mysterious Muslim Brotherhood trading company linked to Al-Qaeda."  Compl. ¶ 127.  The report again discussed how "Lord Energy was 'at the center of European M[uslim] B[rotherhood] senior operators and has ties to Al-Qaeda related entities.'" Compl. ¶ 127.

Plaintiffs allege that Alp Services commissioned articles about Nada and Lord Energy, and their connection to the Muslim Brotherhood.  Those articles included publications in a Swiss French-language daily newspaper *Le Temps*, a political gossip website Africa Intelligence, and a French blogging website Mediapart.  Compl. ¶¶ 98; 101; 140.  Plaintiffs also allege that Alp Services published a French-language Wikipedia entry about Lord Energy, which included a section discussing Lord Energy's ties to the Muslim Brotherhood.  Compl. ¶ 144.  Plaintiffs further allege that Alp Services commissioned a freelance journalist to produce three articles about Lord

Energy and its connection to the Muslim Brotherhood, which appeared on the blogging website WordPress.  Compl. ¶¶ 128-30.

The Complaint also alleges that Alp Services anonymously alerted Crédit Suisse, a Swiss bank, to Lord Energy's ties to radical Islamists, and pointed to the news stories Alp Services had commissioned.  Compl. ¶ 133.  Plaintiffs next allege that Crédit Suisse terminated its relationship with Nada and Lord Energy because its CEO feared that continuing to lend to Nada "would make the bank appear to be supporting the Muslim Brotherhood."  Compl. ¶ 233.

Plaintiffs contend that they learned of Alp Services' public relations campaign in April 2021 from anonymous hackers "who had infiltrated Alp [Services]'s servers."  Compl. ¶ 209. These hackers allowed Nada to review Alp Services' internal documents that they had obtained (apparently, for free), and then offered to sell these files to him for $30 million.  Compl. ¶ 210. The Complaint claims that Nada refused to pay the hackers, and instead reported them to the Swiss authorities.  Compl. ¶ 212.  Although Nada "heard nothing from the Swiss authorities for months," the Swiss government "[e]ventually . . . obtained copies of the hacked documents" and shared them with Nada.  Compl. ¶ 212.

## STANDARD OF REVIEW

"The plaintiffs bear the burden of establishing personal jurisdiction over the defendants." *Clay v. Blue Hackle N. Am., LLC*, 907 F. Supp. 2d 85, 87 (D.D.C. 2012).  "To meet this burden, plaintiffs 'must allege specific acts connecting [the] defendant with the forum' and 'cannot rely on conclusory allegations.'"  *Id.* (quoting *Second Amendment Found. v. U.S. Conf. of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001)) (alterations in original) (additional citations omitted).  A court lacks jurisdiction unless a foreign defendant has such "minimum contacts" with the forum state

6

that maintenance of a suit would not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

A court must also dismiss a complaint that fails to state a clam upon which relief can be granted. *Browning v. Clinton*, 292 F. 3d 235, 242 (D.C. Cir. 2002). Dismissal may be based on the lack of a cognizable legal theory or on plaintiffs' failure to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In assessing the legal sufficiency of a complaint, a court need not accept as true allegations that are "no more than [legal[ conclusions" or the "formulaic recitation of the elements" of a cause of action, *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) (internal quotation marks and citation omitted), or that do not "raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555. A court also "need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). "Nor must the court accept legal conclusions cast in the form of factual allegations." *Id.*

## ARGUMENT

## I.   PLAINTIFFS FAIL TO ALLEGE PERSONAL JURISDICTION OVER THE EUROPEAN DEFENDANTS.

Personal jurisdiction over nonresident defendants—such as the European Defendants— may be either general or specific. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358-59 (2021). Here, none of the European Defendants is subject to this Court's general or specific jurisdiction.

### A. Plaintiffs Cannot Establish General Jurisdiction over the European Defendants.

Plaintiffs contend that this Court has jurisdiction over the European Defendants under Federal Rule of Civil Procedure 4(k)(2). Compl. ¶ 43. Under this rule, the Court may only find

jurisdiction if: "(1) the plaintiff's claims arise under federal law; (2) the putative defendant is beyond the jurisdictional reach of any state court of general jurisdiction; and (3) the federal courts' exercise of personal jurisdiction over the defendant must not offend the Constitution or other federal law." *Gilmore v. The Palestinian Interim Self-Government Auth.*, 422 F. Supp. 2d 96, 104 (D.D.C. 2014). The Complaint does not contain any allegations that would warrant assertion of general jurisdiction over any of the European Defendants. None of them reside in the United States, and they lack sufficient contacts with the United States to warrant assertion of general jurisdiction.

As to the corporate European Defendants, the Supreme Court has held that—except in "an exceptional case"—general personal jurisdiction over a corporation is proper only where the corporation is "at home," which means either a formal place of incorporation or a principal place of business. *Daimler AG v. Bauman*, 571 U.S. 117, 139 n.19 (2014). The Complaint alleges that Alp Services and Diligence are incorporated under the laws of Switzerland, and have their principal place of business in Geneva, Switzerland. Compl. ¶¶ 28-29. The Complaint does not allege that either Alp Services or Diligence has an office or any employees in the United States. Nor are there any allegations that Alp Services or Diligence has constant and pervasive contacts with the United States that would render it "at home" in the United States, much less the District of Columbia. Accordingly, there is no basis to assert general personal jurisdiction over Alp Services and Diligence. *See, e.g.*, *Shatsky v. Organization*, 955 F.3d 1016, 1024 (D.C. Cir. 2020) ("a court may exercise general jurisdiction over a nonresident corporation only if the corporation is 'essentially at home in the forum'") (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 138-39 (2014)).

With respect to the individual European Defendants, the Complaint does not allege that Brero, Cavin, or Badal are citizens of the United States, reside or work in the United States, own property, pay taxes, or have ever visited the United States. *See* Compl. ¶¶ 31-33. At most, the Complaint alleges that these individual defendants directed others to produce work—journal articles and Internet blog posts—that was accessible from the United States. But "limited connections to the United States do not render a foreign defendant essentially at home in the forum." *Nuevos Destinos*, 2019 WL 78780, at *6. The connection between the European Defendants' alleged activities—even if assumed to be true—and the United States is simply too attenuated to render them "at home" in the United States. *See, e.g.*, *Livnat v. Palestinian Auth.*, 82 F. Supp. 3d 19, 30 (D.D.C. 2015), *aff'd*, 851 F.3d 45 (D.C. Cir. 2017) (defendant was not "essentially at home" in the United States even though it allegedly had "many connections" to the country, including "the performance of fundraisers, community outreach, cultural events, and lectures, as well as certain governmental services, particularly consular services"); *Nuevos Destinos, LLC v. Peck*, No. 15-cv-1846 (EGS), 2019 WL 78780, at *5 (D.D.C. Jan. 2, 2019) (no general jurisdiction under Federal Rule of Civil Procedure 4(k)(2) where "plaintiffs do not allege that any of the Peruvian defendants are domiciled, incorporated, or have a principal place of business in the United States") (citing (quoting *Daimler*, 571 U.S. at 137).

### B. Plaintiffs Cannot Establish Specific Jurisdiction over the European Defendants.

"A plaintiff seeking to establish specific jurisdiction over a non-resident defendant must demonstrate that specific jurisdiction comports with the forum's long-arm statute and does not violate due process." *Miley v. Hard Rock Hotel & Casino Punta Cana*, No. 19-3381 (CKK), 2022 WL 296199, at *3 (D.D.C. Feb. 1, 2022). "The plaintiff must show that the foreign defendant has purposefully directed his activities at residents of the forum, and that the alleged injuries arise out

of or relate to those activities.  *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 864 (D.C. Cir. 2022) (internal quotation marks and citations omitted).  "This test ensures that a district court exercises specific personal jurisdiction only over those foreign defendants who had fair warning that a particular activity may subject them to U.S. jurisdiction."  *Id.* (internal quotation marks and citations omitted).  "Whether the exercise of jurisdiction is 'consistent with the Constitution' for purposes of Rule 4(k)(2) depends on whether a defendant has sufficient contacts with the United States as a whole to justify the exercise of personal jurisdiction under the Due Process Clause of the Fifth Amendment."  *Mwani v. bin Laden*, 417 F.3d 1, 11 (D.C. Cir. 2005) (citations omitted). "The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders."  *Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 114 (1987).

The Complaint attempts to tie the European Defendants (who are residents of either Switzerland or Luxembourg) to the United States by alleging they commissioned journalists or academics to: (1) write articles, which were published by "private media outlets and on internet blogs," including those "located in the United States"; (2) write and edit "Wikipedia entries, including on English-language Wikipedia pages"; and (3) conduct "search engine optimization operations to manipulate English-language search results on Google and other U.S.-based search engines."  Compl. ¶ 39.  But the ability of U.S. residents to access online publications from the United States, or discover the writings through U.S. search engines, does not mean the authors— much less the European Defendants, who allegedly hired these authors—purposefully directed activities at the United States.  *See, e.g.*, *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1300 (D.C. Cir. 1996) ("writing an article for a publication that is circulated throughout the nation,

including the District, hardly constitutes doing or soliciting business, or engaging in a persistent course of conduct, within the District"); *GTE New Media Servs. Inc. v. BellSouth Corp*., 199 F.3d 1343, 1349 (D.C. Cir. 2000) ("personal jurisdiction surely cannot be based solely on the ability of District residents to access the defendants' websites, for this does not by itself show any persistent course of conduct by the defendants in the District").

Moreover, the fact that "statements posted on the Internet can be downloaded and viewed in the District of Columbia is insufficient to establish personal jurisdiction," *Sinclair v. TubeSockTedD*, 596 F. Supp. 2d 128, 133 (D.D.C. 2009), and a "website accessible by computers in the District of Columbia, or by District of Columbia residents, is not purposeful availment; rather, it is merely an unavoidable side-effect of modern internet technology," *Doe I v. State of Israel*, 400 F. Supp. 2d 86, 121 (D.D.C. 2005). The same conclusion applies to Rule 4(k)(2) analysis for websites accessible in the United States generally. The Internet, including its search engines, its websites, and any blogs located on it, are widely accessible all over the world. The Internet's broad platform does not mean that those who contribute content to it are purposefully directing their conduct at the United States, such that they could reasonably expect to be subject to litigation there.

To the extent the Complaint alleges that the European Defendants sought to frustrate Plaintiffs' business operations, the allegations are that they targeted businesses in Asia, not any business in the United States. The Complaint alleges that the European Defendants targeted Plaintiffs because the UAE and its officials "viewed Hazim and Lord Energy as serious competitive threats in the spot market for light crude oil in Asia." Compl. ¶ 4; *see also id.* ¶¶ 5, 18, 26, 64-8. The Complaint contains no allegations that the European Defendants had any interest in the U.S. market for crude oil, were engaged in any crude oil transactions in the United States,

or had any plans to enter crude oil business in the United States.  Indeed, there are no allegations that Plaintiffs themselves engaged in any such business activities in the United States.  Simply put, the Complaint contains no allegation that any of the European Defendants purposefully directed their activities at the United States.

The Complaint ultimately invokes an indirect theory of specific jurisdiction, asserting that this Court has jurisdiction because the European Defendants' alleged activities "directly affected U.S. citizens and businesses" and "certain U.S. markets for physical crude oil and financial instruments pegged to crude oil."  Compl. ¶ 40.  The Complaint alleges that a U.S. Lord Energy subsidiary located in Texas was forced to cease operations as a result of defendants' alleged "smear campaign."  Compl. ¶¶ 5-7.  At most, these are speculative downstream market effects of alleged activity directed at Plaintiffs' business in Asia, and therefore do not constitute activities purposefully directed at the United States.  Even if some indirect effects of this activity were ultimately felt in the United States, that is insufficient to establish specific jurisdiction.  *See, e.g.*, *Walden v. Fiore*, 571 U.S. 277, 289 (2014) ("Petitioner's actions in Georgia did not create sufficient contacts with Nevada simply because he allegedly directed his conduct at plaintiffs whom he knew had Nevada connections.").  That is particularly so in this case, where the U.S.-based Subsidiary is not even located in the District of Columbia.  In fact, even directly soliciting business in the District of Columbia is not necessarily enough to establish specific jurisdiction in the District of Columbia—much less engaging in activities wholly outside of the District of Columbia that allegedly had an indirect impact on business in the United States.  *See, e.g.*, *Gatewood v. Fiat, S. p. A.*, 617 F.2d 820, 825 (D.C. Cir. 1980) (requiring "regular[]" solicitation of business in D.C. to subject a party to specific jurisdiction in D.C.).

There are no allegations in the Complaint that the European Defendants engaged in activities intended to have an effect in the United States, or had any interest in effecting the United States.  Even taken at face value, the Complaint alleges only that the UAE Defendants (foreign state and its officials) hired the European Defendants (foreign nationals) to advance a foreign state-owned oil company's interests in foreign markets.  None of this touches the United States in a way that would warrant invoking this Court's jurisdiction.  *See Safra v. Palestinian Auth.*, 82 F. Supp. 3d 37, 55 (D.D.C. 2015) (the alleged "jurisdictional connection" is "simply too attenuated to support specific jurisdiction" "[e]ven if Plaintiffs were able to present information showing a network of contacts that aim to influence U.S. policy, through terrorist activity among other means"); *see also Asahi Metal Indus.*, 480 U.S. at 103-04.

## II.      PLAINTIFFS FAIL TO STATE A CLAIM

Even assuming this Court has jurisdiction to adjudicate Plaintiffs' claims, those claims fail as a matter of law.  Plaintiffs' allegations of false advertisement, racketeering, and antitrust violations are legally insufficient, factually unsupported, and inherently implausible.

### A.      Plaintiffs Fail to Plead a Plausible Claim Under the Lanham Act.

Plaintiffs allege Defendants Alp Services, Brero, Cavin, and Badal, among others, violated Section 1125(a)(1)(B) of the Lanham Act.  Compl. ¶¶ 223-239.[3]  These allegations fail.[4]

#### 1.      *None of the Alleged Statements at Issue Constitute "Commercial Advertising or Promotion."*

Unless there are sufficient allegations that "defendants made statements of fact in *their commercial advertising or promotion* that were (1) false or misleading, (2) actually or likely

---

[3] Plaintiffs do not allege that Diligence violated the Lanham Act.  *See* Compl. Count One.

[4] In additions to the reasons stated below, Plaintiffs' Lanham Act allegations also fail for reasons stated in the UAE Defendants' memorandum in support of their motion to dismiss, which the European Defendants incorporate here by reference.  *See* UAE Mot. at 22-26.

deceptive, (3) material in their effects on buying decisions, (4) connected with interstate commerce, and (5) actually or likely injurious to the plaintiff," a plaintiff's Lanham Act claim must be dismissed. *Dial A Car, Inc. v. Transp. Inc.*, 884 F. Supp. 584, 592 (D.D.C. 1995) (citing *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 964 (D.C. Cir. 1990)) (emphasis added).

The Lanham Act was intended to rein in false advertising and/or promotions; it was not intended to regulate all potentially harmful speech. *See Riggs Inv. Mgmt. v. Columbia Partners*, 966 F. Supp. 1250, 1267 (D.D.C. 1997) ("The Lanham Act creates liability for false or misleading statements made in 'commercial advertising or promotion.'") (citing 15 U.S.C. § 1125(a)(1)(b)). Thus, Plaintiffs' Lanham Act claim must be dismissed unless it is based on "(1) commercial speech; (2) made by a defendant who is in commercial competition with the plaintiff; (3) for the purpose of influencing consumers to buy the defendant's goods or services[; and] (4) . . . disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Watkins Inc. v. McCormick & Co. (In re McCormick & Co. Pepper Prods. Mktg. & Sales Practices Litig.)*, 215 F. Supp. 3d 51, 59 (D.D.C. 2016) (citation omitted).

Here, even assuming the alleged statements at issue are attributable to the European Defendants, those statements do not qualify as "commercial advertising or promotion" necessary to bring a Lanham Act claim. *First*, commercial speech must propose a commercial transaction. *Bd. of Trs. of State Univ. of New York v. Fox*, 492 U.S. 469, 470 (1989); *see also Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-67 (1983). Thus, in *GOLO, LLC v. HighYa, LLC*, a court found that online reviews of a program did not qualify as commercial speech because they raised facts about and analyzed a product without making a specific recommendation, and so did not promote a competing product or expressly propose a commercial transaction. 310 F. Supp. 3d

499, 505 (E.D. Pa. 2018).  Therefore, the court found that, the plaintiff did not state a claim for false advertising or false association under the Lanham Act.  *Id.* at 507.  Here, too, the alleged statements are not commercial in nature.  They do not advertise a product at all, let alone a competing one.  They do not identify any competitor.  And they do not propose a commercial transaction.  Instead, the alleged statements focus on identifying connections between Plaintiffs and the Muslim Brotherhood, Compl. ¶ 231—links that raise terrorism-related concerns, but that are entirely outside the commercial sphere.

*Second*, Defendants Alp Services, Brero, Cavin, and Badal are not competitors with Plaintiffs under any reasonable definition of that term.  Alp Services is a private investigative firm, and the individual European Defendants are its officers or employees.  Compl. ¶¶ 28-33.  By contrast, Plaintiffs are involved in crude oil and commodities trading.  Compl. ¶¶ 19-20, 22.  These are entirely different fields of business, and no reasonable person would conclude that the European Defendants and Plaintiffs are in competition.  *See, e.g.*, *In re Chicago Newspaper Liquidation Corp.*, 490 B.R. 487, 498 (Bankr. D. Del. 2013) ("Defendant's business was selling information via newspapers and the Internet not the business of selling backpacks; as a result, the Defendants' business never competed, fairly or unfairly, with the Plaintiff's business.").  At most, the Complaint alleges that the European Defendants acted at the behest of the UAE Defendants, who sought to promote the interests of ADNOC, Lord Energy's alleged competitor.  Compl. ¶¶ 228, 230.

*Third*, Alp, Brero, Cavin, and Badal did not make the alleged statements to promote either their own products or services, or those of ADNOC—Lord Energy's alleged competitor.  Again, the European Defendants do not offer products or services in the oil industry.  Nor did the articles or posts allegedly commissioned by the European Defendants discuss any ADNOC products that

were competing with those of Lord Energy.  Rather, those articles and posts stated that Nada and Lord Energy "were involved in terrorist financing," Compl. ¶ 228; *see also id.* ¶ 226—a statement that is entirely unrelated to any commercial potential of Lord Energy's (or ADNOC's) products.

*Fourth*, aside from conclusory allegations (Compl. ¶¶ 231, 237), Plaintiffs fail to plead that the statements were sufficiently disseminated to the oil industry's *purchasing public*.  Such statements are not advertising or promotion under the Lanham Act.  Plaintiffs allege only that the articles and blog posts commissioned by the European Defendants affected Lord Energy's relationships with financial institutions—not customers.  Compl. ¶¶ 232-35.  The Lanham Act is unambiguous that the actionable false advertisement statements must have been disseminated to the purchasing public—not to financiers.  *See Watkins Inc. v. McCormick & Co. (In re McCormick & Co. Pepper Prods. Mktg. & Sales Practices Litig.)*, 215 F. Supp. 3d 51, 59 (D.D.C. 2016) (false statement must be "disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry").

Thus, the alleged statements that the European Defendants commissioned do not qualify as "commercial advertising or promotion" under the Lanham Act.  Accordingly, Plaintiffs' First Claim should be dismissed.

### 2.    *At Minimum, the Lanham Act Claim Should Be Dismissed as to Defendant Cavin, as It Contains No Allegations as to Her.*

A Lanham Act claim based on a theory of false advertising and promotion is essentially a fraud claim that requires pleading with specificity under Rule 9 of the Federal Rules of Civil Procedure.  *See Max Daetwyler Corp. v. Input Graphics, Inc.* 608 F. Supp. 1549, 1556 (E.D. Pa. 1985) ("[T]he policies which underlie Rule 9's requirement that the nature of an alleged misrepresentation be pleaded with specificity are equally applicable to the type of misrepresentation claims presented in plaintiffs' Lanham Act [false advertising] claim.");

*Conditioned Ocular Enhancement, Inc. v. Bonaventura*, 458 F. Supp. 2d 704, 709 (N.D. Ill. 2006) ("Claims that allege . . . false advertising under the Lanham Act are subject to the heightened pleading requirements of [Rule] 9(b)."); *Sanderson v. Brugman*, No. IP00-459, 2001 WL 699876 at *8 (S.D. Ind. May 29, 2001) (same); *Micronics Filtration Holdings, Inc. v. Miller*, No. 18-CV-303-JL, 2018 WL 4845749, at *1 (D.N.H. Oct. 4, 2018) (same); *In re Century 21–Re/Max Real Estate Adver. Litig.*, 882 F. Supp. 915, 927 (C.D. Cal. 1994) (same); *see also* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").[5]

Here, the Complaint contains *no allegations* as to Defendant Cavin's purported actions that would violate the Lanham Act. Plaintiffs do not allege which purportedly defamatory article(s) Cavin was responsible for commissioning or disseminating. Plaintiffs fail to provide the basic circumstances necessary to meet the heightened pleading standard Rule 9 demands as to Cavin, and their Lanham Act claim must be dismissed at least as to her. *See Elemary v. Holzmann*, 533 F. Supp. 2d 116, 137 (D.D.C. 2008). Moreover, even if this Court applies the more lenient pleading standard of Rule 8(a), Plaintiffs' claims cannot satisfy that standard either. *See Paleteria La Michoacana, Inc. v. Productos Lacetos Tocumbo S.A. De C.V.*, No. 11-1623 (RC), 2015 WL 13691543, at *5 & n. 4 (D.D.C. Feb. 3, 2015).

Accordingly, Plaintiffs' Lanham Act claim should be dismissed with respect to Defendant Cavin.

---

[5] Federal courts "are divided as to whether Lanham Act false advertising claims must meet the Rule 9(b) specificity requirement," *Paleteria La Michoacana, Inc. v. Productos Lacetos Tocumbo S.A. De C.V.*, 2015 WL 13691543, *5 n.4 (D.D.C. Feb. 3, 2015), and the D.C. Circuit has not yet addressed the question. Regardless, "the false advertising claim must, at minimum 'place defendants on notice of their alleged wrongdoing,' including what 'falsehoods or misrepresentations' are alleged." *Id.* (citation omitted).

**B.**      **Plaintiffs' Civil Racketeering Claim Under RICO Should Be Dismissed.**

Plaintiffs allege that Defendants Alp Services, Brero, Cavin, and Badal, among others, violated 18 U.S.C. § 1962(c).[6]  A claim under 18 U.S.C. § 1962(c) requires: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *W. Assocs. Ltd. P'ship, ex rel. Ave. Assocs. Ltd. P'ship v. Mkt. Square Assocs.*, 235 F.3d 629, 633 (D.C. Cir. 2001) (citing *Pyramid Secs. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1117 (D.C. Cir. 1991)).[7]

**1.**      ***Plaintiffs Do Not Adequately Allege a "Pattern of Racketeering Activity" Under RICO.***

A "'pattern of racketeering activity' requires at least two [predicate] acts of racketeering activity." 18 U.S.C. § 1961(5).  The Supreme Court explained that this showing requires: (1) "that the racketeering predicates are related" (*i.e.* relatedness) and (2) "that they amount to or pose a threat of continued criminal activity" (*i.e.* continuity).  *H.J. Inc. v. Nw. Bell Tele. Co.*, 492 U.S. 229, 238-39 (1989).  Continuity refers either to "a closed period of repeated conduct" (a "closed-period continuity") or to "past conduct that by its nature projects into the future with a threat of repetition" (an "open-ended continuity").  *Id.* at 241.  The Complaint does not come close to alleging a "pattern of racketeering activity" under either theory of continuity.

**a.**      **Plaintiffs' Conclusory Pleading Should Be Disregarded.**

Instead of pleading facts sufficient to establish a "pattern of racketeering," Plaintiffs merely assert that Defendants' "enterprise engaged in a continuous pattern of racketeering that began in 2017 and lasted until at least 2021, and almost certainly beyond."  Compl. ¶ 251.  That is insufficient even under the lenient standard set forth in Federal Rule of Civil Procedure 8.  *See*

---

[6] Plaintiffs do not allege that Diligence violated RICO.  *See* Compl. Count Two.

[7] In additions to the reasons stated below, Plaintiffs' racketeering allegations under RICO also fail for reasons stated in the UAE Defendants' memorandum in support of their motion to dismiss, which the European Defendants incorporate here by reference.  *See* UAE Mot. at 26-34.

*Twombly*, 550 U.S. at 555 ("[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."); *Iqbal*, 556 U.S. at 678; *see also Kowal*, 16 F.3d at 1276 ("[T]he court need not … accept legal conclusions cast in the form of factual allegations.").  The paucity of Plaintiffs' allegations reflects the fact that credibly alleging a "pattern of racketeering" here is legally impossible.  *See infra* at 21-22.

> **b.      The Alleged Predicate Acts Cannot Constitute a "Pattern" Under Open-Ended Continuity Because the Alleged Scheme Is Complete.**

Open-ended continuity requires predicate acts that "amount to or pose a threat of continued criminal activity."  *H.J. Inc.*, 492 U.S. at 239; *see also Western Assocs. Ltd. Part. v. Market Square*, 235 F.3d 629, 633 (D.C. Cir. 2001) (describing a "threat of future criminal activity").  That is, open-ended continuity "indicate[s] a requirement of far more than a hypothetical possibility of further predicate acts."  *Pyramid Secs.*, 924 F.2d at 1119.  "[I]t must be shown that the predicates establish a *threat* of long-term racketeering activity . . . ."  *H.J. Inc.*, 492 U.S. at 230 (emphasis in original); *see also Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam*, 387 F. Supp. 3d 71, 85-86 (D.D.C. 2019) (scheme utilizing mail and wire fraud to wrestle control over church away from certain parishioners over two-year period was not continuing racketeering activity because scheme ended when it ousted those parishioners from the church).

Here, based on Plaintiffs' own allegations, there can be no open-ended threat of a continuing racketeering scheme because the alleged scheme is complete.  Plaintiffs concede as much.  They first allege that European Defendants targeted Plaintiffs to eliminate Lord Energy (and indirectly Nada) as a competitor to ADNOC.  *See*, *e.g.*, Compl. ¶ 63.  They then allege that they have been harmed.  *See*, *e.g.*, Compl. ¶ 18 (referring to purported and completed harm on Nada's personal life and well-being); *id.* ¶ 186 ("It did not take long for Lord Energy's business

to fall apart.").  Critically, the nature of the alleged harms does not suggest future action by European Defendants.  For instance, Plaintiffs concede that Lord Energy is now bankrupt and no longer in operation.  *See* Compl. ¶ 18.  Thus, it would not make sense for European Defendants to again plan, prepare, and act on a scheme to harm Plaintiffs, particularly if the entire aim of the alleged original scheme was to remove a business competitor to ADNOC—now a completed objective.  *See* Compl. ¶ 18 (alleging Defendants "eliminated a growing competitive threat to the UAE and ADNOC"); *id.* ¶ 189 (referring to Lord Energy as now "worthless").

Elsewhere, Plaintiffs attempt to paint a picture of an ongoing, open-ended scheme by alleging other acts that occurred after Lord Energy's bankruptcy.  *See* Compl. ¶¶ 213-222.  The Court should disregard those allegations because they are irrelevant.  *First*, none relate to Plaintiffs or to the purported scheme against them.  Compl. ¶¶ 213-22 (referring to a high profile journalist, Argentine economist, the founder of a U.S. based intelligence company, and George Soros).  *Second*, none identify racketeering acts, let alone a pattern of such acts.  For instance, Plaintiffs take issue with performing background checks (*e.g.*, Compl. ¶ 214), preparing reports based on those checks (*e.g.*, Compl. ¶ 215), and sharing the reports with those who commissioned them (*e.g.*, Compl. ¶ 215).  But those acts are not "racketeering activity" as defined in the RICO Act.  *See* 18 U.S.C. § 1891(1).  Indeed, none of these allegations relate to Plaintiffs' theories of wire and bank fraud underlying their RICO claim.  And in any event, none are pleaded with the requisite particularity required under Federal Rule of Civil Procedure 9.

c.      **The Alleged Predicate Acts Do Not Constitute a "Pattern" During a Closed Period.**

The D.C. Circuit considers six factors to determine whether there is continuous racketeering over a closed period: "[1.] the number of unlawful acts, [2.] the length of time over which the acts were committed, [3.] the similarity of the acts, [4.] the number of victims, [5.] the

20

number of perpetrators, and [6.] the character of the unlawful activity." *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265 (D.C. Cir. 1995).  No specific factor is determinative, and the Supreme Court has encouraged a "natural and commonsense approach" with respect to the overall analysis.  *H.J.*, 492 U.S. at 237; *see also W. Assocs. Ltd. P'ship*, 235 F.3d at 634 ("*Edmondson* does not establish a rigid test, but rather presents a flexible guide for analyzing RICO allegations on a case by case basis.").  For instance, "RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *W. Assocs. Ltd. P'ship*, 235 F.3d at 637 (internal quotation marks and citation omitted).

But where there is only a single scheme, a single injury, and few victims, it is "virtually impossible for plaintiffs to state a RICO claim." *Edmondson*, 48 F.3d at 1265.  Thus, in *Edmonson*, the D.C. Circuit found no pattern of racketeering activity even though a tenants' association committed fifteen different predicate acts of wire fraud, bank fraud, extortion, and others to block the sale of a property, because all those predicate acts were in furtherance of a single goal— blocking a real-estate transaction.  *Id.*  And though the acts occurred over three years, most of them took place in two narrow time periods within those three years.  *Id.*

Here, like in *Edmonson*, Plaintiffs fail to plead a continued pattern of racketeering activity during a closed period.  *First*, even assuming Plaintiffs sufficiently pleaded the predicate acts of wire and bank fraud (they did not, *see infra* at 19-20; *see also* UAE Mot. at 26-27), like the predicate acts in *Edmonson*, the alleged acts of wire and bank fraud were in furtherance of the single objective to eliminate Lord Energy as a competitor to ADNOC.  *Second*, like the single transaction in *Edmonson* that fell apart due to the defendant's acts, here, the European Defendants' alleged acts resulted in a single purported harm to Lord Energy and its continuing ability to operate.

*Third*, there is only one victim under Plaintiffs' theory—Lord Energy, as Nada's interest in Lord Energy does not transform him into another victim.  *See W. Assocs. Ltd. P'ship*, 235 F.3d at 635 (to the extent the partners of a partnership are injured, "they [are] injured indirectly, which does not make them individual victims under RICO").  And *fourth*, the alleged timeframe here is short, from December 2017 to August 2018, and most of the relevant activity is concentrated in June 2018.  *See* Compl. ¶ 98 (first purported article written at Defendants' direction); *id.* ¶ 157 (last purported article); *id.* ¶¶ 152-156 (June 2018 articles).[8]  If the three-year timeframe with two periods of intense activity in *Edmonson* was deemed insufficient, the less than one-year alleged timeframe here with a single period of concentrated activity certainly weighs against finding a continued pattern of racketeering activity.

For the foregoing reasons, Plaintiffs fail to establish a pattern of racketeering activity necessary to plead civil racketeering under RICO.  Accordingly, Plaintiffs' Second Claim should be dismissed.

## 2.     *Plaintiffs Fail to Plead an "Enterprise."*

To meet the "enterprise" element of a RICO claim, Plaintiffs must show: (1) an ongoing organization, (2) the various associates of which function as a continuing unit, and (3) the organization has an existence wholly *separate and apart* from the alleged pattern of racketeering activity.  *United States v. Turkette*, 452 U.S. 576, 583 (1981).  With respect to the third element,

---

[8] Plaintiffs make various allegations regarding internal communications among Defendants.  *See*, *e.g.*, Compl. ¶ 112 (alleging that, on February 15, 2018, Alp Services circulated a report to the UAE).  Those allegations are irrelevant to establish a pattern of racketeering activity because they were never intended to be disseminated to outsiders.  Internal communications between Defendants or their internal reports by definition do not involve outsiders.  Thus, they cannot constituted predicate acts in furtherance of RICO based in fraud.  *See In re Adobe Systems, Inc. Sec. Litig.*, 787 F. Supp. 912, 917 (N.D. Cal. 1992) ("internal corporate projections" that were never disclosed "cannot serve as the basis for securities fraud liability").

the pleaded RICO enterprise must be distinct from the defendant person/entity alleged to have

violated the RICO Act.  *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 158 (2001)

("[O]ne must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an

'enterprise' that is not simply the same 'person' referred to by a different name."); *Confederate*

*Mem'l Ass'n v. Hines*, 995 F.2d 295, 300 (D.C. Cir. 1993) ("[T]he same entity cannot be [named

as] the RICO enterprise and [as] a RICO defendant.") (citation omitted); *Yellow Bus Lines, Inc. v.*

*Drivers, Chauffeurs & Helpers Loc. Union 639*, 883 F.2d 132, 139 (D.C. Cir. 1989), *on reh'g in*

*part*, 913 F.2d 948 (D.C. Cir. 1990) (designation of one entity "as both the 'enterprise' and the

defendant 'person' does not comport with statutory language or design"); *Bates v. Nw. Human*

*Servs., Inc.*, 466 F. Supp. 2d 69, 80 (D.D.C. 2006).

 As a matter of law, a principal and its agents acting within the scope of their roles cannot

constitute a RICO enterprise because a principal "necessarily acts through its agents."  *U.S.*

*Dominion, Inc. v. MyPillow, Inc.*, No. 1:21-cv-0445 (CJN), 2022 WL 1597420, at *5 (D.D.C. May

19, 2022).[9]  In that case, U.S. Dominion, Inc., its public relations firm Hamilton Place, and its

attorneys at Clare Locke did not constitute a RICO enterprise for launching and sustaining a "vast

and never-ending public relations campaign" against the defendants.  2022 WL 1597420, at *5-6.

As Dominion's agents, Hamilton and Clare Locke at all times acted at the direction of and for the

benefit of Dominion.  *Id.*  Thus, they could not be independent "persons" associating with an

enterprise because they were part of Dominion.  *See id.* at *5 (defining "enterprise").  Put

---

[9] *See Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1357 (11th Cir. 2016) ("When an individual
defendant acts through a corporation, he may have formed an association-in-fact with an entity
distinct from himself . . . .  In contrast to an individual, a corporation cannot act except through its
officers, agents, and employees.  Thus, a corporate defendant acting through its officers, agents,
and employees is simply a corporation.  Labeling it as an enterprise as well would only amount to
referring to the corporate 'person' by a different name.").

differently, Dominion could not associate with itself as part of an enterprise, and it was not sufficiently "separate and apart" from the alleged enterprise. *Id.* ("[I]f a corporate defendant were to face RICO liability 'for participating in an enterprise comprised only of its agents,' then RICO liability 'will attach to any act of corporate wrong-doing and the statute's distinctness requirement' between the 'person' and the 'enterprise' would be 'rendered meaningless.'") (quoting *U1it4less, Inc. v. Fedex Corp.*, 871 F.3d 199, 205–06 (2d Cir. 2017)); *see also Kelly v. Palmer, Reifler & Assocs., P.A.*, 681 F. Supp. 2d 1356, 1382–83 (S.D. Fla. 2010) (finding no RICO enterprise between lawyers and clients because lawyers "were agents of the . . . clients who provided legal and other services").

Here, as pleaded by Plaintiffs, the UAE and the alleged enterprise are one and the same. As in *Dominion*, the alleged enterprise here consists solely of the UAE and other Defendants acting at the direction of and for the benefit of the UAE (*i.e.* purportedly as the UAE's agents).[10]  On Plaintiffs' theory, the other Defendants are not other members of the purported enterprise, but are only alleged UAE agents.  This leaves the UAE as the only real member of the alleged enterprise, but of course the UAE cannot associate as an enterprise with itself.  *See Boyle v. United States*, 556 U.S. 938, 946 (2009) ("[A]n association-in-fact enterprise is a *group of persons* associated together for a common purpose of engaging in a course of conduct.") (citing *Turkette*, 452 U.S. at 583) (emphasis added).  Like the alleged "enterprise" in *Dominion*, the alleged enterprise here is simply the UAE under a "different name."

---

[10] *See Doe I*, 400 F. Supp. 2d at 104 ("The Court is mindful that foreign sovereigns are legal fictions to the extent that they can only act through their individual officers."); *see also Merrick v. Am. Sec. & Tr. Co.*, 107 F.2d 271, 279-80 (D.C. Cir. 1939) ("A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law.  It can function only through its officers, agents, or representatives.") (internal quotation marks and citation omitted).

For the foregoing reasons, Plaintiffs fail to plead an enterprise necessary to plead civil racketeering under RICO.  Accordingly, Plaintiffs' Second Claim should be dismissed.

### C.   Plaintiffs' Racketeering Conspiracy Claim Under RICO Should Be Dismissed.

Plaintiffs allege that the European Defendants, among others, violated 18 U.S.C. § 1962(d). "To state a § 1962(d) conspiracy, the complaint must allege that (1) two or more people agreed to commit a subsection (c) offense, and (2) a defendant agreed to further that endeavor." *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1048 (D.C. Cir. 2012) (citing *Salinas v. United States*, 522 U.S. 52, 65 (1997)).[11]

### 1.   *Defendants Are Protected Under the Intracorporate Conspiracy Doctrine.*

Similar to how principals and their agents acting in the scope of their agency cannot form a RICO enterprise (*see supra* at 22-24), under the Intracorporate Conspiracy Doctrine, a principal and/or agents acting within the scope of their agency cannot constitute a RICO conspiracy.  *See Brown v. Sim*, No. Civ.A. 03-2655, 2005 WL 3276190, at *3 (D.D.C. Sept. 30, 2005).  This is because "[t]o state a § 1962(d) conspiracy, the complaint must allege that . . . two or more people agreed." *RSM Prod.*, 682 F.3d at 1048.  But an agent acting on behalf of a principal is not an independent entity but merely an extension of the principal.  *See Ziglar v. Abbasi*, 582 U.S. 120, 153 (2017).  "[I]t then follows that there has not been an agreement between two or more separate people" because the principal cannot enter into an agreement with itself.  *Id.*

The D.C. Circuit has not yet expressly applied the intracorporate conspiracy doctrine to RICO conspiracy claims, but it has extended the doctrine to other claims, following the above

---

[11] In additions to the reasons stated below, Plaintiffs' conspiracy allegations under RICO also fail for reasons stated in the UAE Defendants' memorandum in support of their motion to dismiss, which the European Defendants incorporate here by reference.  *See* UAE Mot. at 34.

reasoning.[12]  *See, e.g., Si v. Laogai Rsch. Found.*, 71 F. Supp. 3d 73, 98 (D.D.C. 2014) (applying doctrine to conspiracy in False Claims Act context); *Bowie v. Maddox,* 642 F.3d 1122, 1130 (D.C. Cir. 2011) (collecting cases in which courts applied the doctrine to conspiracy to interfere with civil rights claims, 42 U.S.C. § 1985); *see also Dominion*, 2022 WL 1597420, at *5-6 (principal and agents cannot constitute a RICO enterprise following a substantially similar rationale).  And other federal courts have applied the doctrine to bar RICO conspiracy claims.[13]

Under the doctrine, as a matter of law, the European Defendants could not have entered into an agreement to commit RICO because, assuming (though not conceding) the truth of Plaintiffs' allegations, they are agents of the UAE.  *See* Compl. ¶ 8.  Thus, they could not have

---

[12] *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1 (D.D.C. 2006), is inapposite.  *Phillip Morris* involved Phillip Morris USA, Inc. and its parent company Altria Group.  449 F Supp. 2d at 906 n.77.  Altria was held liable for conspiring with Phillip Morris to commit RICO.  *Id.*  The court, concerned that the corporate structure between the parent and subsidiary companies was being utilized for RICO purposes, noted that RICO laws aimed to prevent the infiltration of legitimate businesses by racketeers.  *Id.*  As such, the court held that the intracorporate conspiracy doctrine as applied in the context of a parent and subsidiary relationship did not protect either against a claim for RICO conspiracy.  *Id.*  But here, as pleaded in the Complaint, Defendants Alp Services, Diligence, Brero, Cavin, and Badal are merely the UAE's agents, engaged for an independent project.  There is no formal and longstanding structural relationship between the UAE and these European Defendants.  These European Defendants are not seeking to "infiltrate" the UAE.  To the contrary, as the Complaint alleges, the UAE engaged them.  *See* Compl. ¶¶ 8, 91.

[13] *See Fogie v. THORN Americas, Inc.*, 190 F.3d 889, 899 (8th Cir. 1999) (applying the doctrine to RICO conspiracy claim); *Rhodes v. Consumers' Buyline, Inc.*, 868 F. Supp. 368, 377 (D. Mass. 1993) ("[F]or purposes of §1962(d), a corporate entity is incapable of 'conspiring' with its own officers and employees."); *Northeast Jet Ctr., Ltd. v. Lehigh–Northampton Airport Auth.*, 767 F. Supp. 672, 684–85 (E.D. Pa. 1991); *Chambers Dev. Co., Inc. v. Browning-Ferris Indus.*, 590 F. Supp. 1528, 1541 (W.D. Pa. 1984); *Yancoski v. E.F. Hutton & Co., Inc.*, 581 F. Supp. 88, 97 (E.D. Pa. 1983); *Jagielski v. Package Machine Co.*, 489 F. Supp. 232, 233 (E.D. Pa. 1980); *Helman v. Murry's Steaks, Inc.*, 742 F. Supp. 860, 883 (D. Del. 1990); *McIntyre's Mini Computer Sales Grp., Inc. v. Creative Synergy Corp.*, 644 F. Supp. 580, 585 (E.D. Mich. 1986); *Landmark Savings & Loan v. Rhoades*, 527 F. Supp. 206, 209 (E.D. Mich. 1981); *McLendon v. Cont'l Grp., Inc.*, 602 F. Supp. 1492, 1510, 1512 (D.N.J. 1985); *Saine v. A.I.A., Inc.*, 582 F. Supp. 1299, 1307 n.9 (D. Colo. 1984);*Webb v. Culberson, Heller & Norton, Inc.*, 357 F. Supp. 923, 924 (N.D. Miss. 1973).  *But see Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271 (7th Cir. 1989); *Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 787 (9th Cir. 1996); *Sun Life Assurance Co. of Canada v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1213 (11th Cir. 2018).

entered into agreements with themselves when they allegedly acted in the scope of their agency. Nor did they enter into agreements with the UAE when they allegedly acted in the same scope. Even assuming the truth of Plaintiffs' improbable allegations, Plaintiffs thus fail to allege an agreement to adequately plead their RICO conspiracy claim.

>    **2.    *Plaintiffs Fail to Plead a Plausible Claim Under § 1962(c) of the RICO Act.***

To successfully plead a RICO conspiracy claim, a plaintiff must also successfully plead a substantive RICO violation.  *See Republic of Kazakhstan v. Stati*, 380 F. Supp. 3d 55, 65 (D.D.C. 2019) (finding plaintiff "failed to plead a conspiracy to violate RICO under Section 1962(d)" where "that plaintiff failed to allege a substantive RICO violation under Section 1962(c)").

For the reasons stated above (*see supra* 18-25), Plaintiffs fail to plead a plausible RICO claim.  Accordingly, Plaintiffs' racketeering conspiracy claim under RICO should be dismissed.

>    **D.    <u>Plaintiffs' Fourth and Fifth Claims Under the Sherman Act Should Be Dismissed.</u>**

Plaintiffs allege that the European Defendants, among others, violated 15 U.S.C. §§ 1-2. These allegations similarly fail.[14]

>    **1.    *Plaintiffs Lack Antitrust Standing Necessary to Bring Their Sherman Act Claims.***

Unless a plaintiff pleads injury "of the type the antitrust laws were intended to prevent," the plaintiff lacks standing to bring a claim under the Sherman Act.  *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 812 (D.C. Cir. 2001); *Associated Gen. Contractor of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983) ("Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must

---

[14] In additions to the reasons stated below, Plaintiffs' Sherman Act allegations also fail for reasons stated in the UAE Defendants' memorandum in support of their motion to dismiss, which the European Defendants incorporate here by reference.  *See* UAE Mot. at 35-44.

make a further determination whether the plaintiff is a proper party to bring a private antitrust action.").  Because "[t]he antitrust laws . . . were enacted for 'the protection of competition not competitors,'" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (citation omitted), "an antitrust violation must involve injury to *commercial competition*," *Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976, 983 (D.C. Cir. 2017) (emphasis added);  *see also Ass'n of Retail Travel Agents, Ltd. v. Air Transport Ass'n of Am.*, 635 F. Supp. 534, 537 (D.D.C. 1986) ("To distinguish its claim from a mere business tort, [Plaintiff] must allege significant anticompetitive effects resulting from [Defendants'] actions."); *Mizlou Television Network, Inc. v. Nat'l Broad. Co.*, 603 F. Supp. 677, 683 (D.D.C. 1984) ("To distinguish this claim from a mere business tort, plaintiff must make a sufficient allegation of anti-competitive effects resulting from [defendant's] actions; absent injury to *competition*, injury to plaintiff as a *competitor* will not satisfy this pleading requirement.") (citing *Brunswick*, 429 U.S. at 488) (emphasis added).

Here, the Complaint does not allege harm to competition.  Rather, Plaintiffs allege that the European Defendants harmed Lord Energy, a single competitor.  *See* Compl. ¶¶ 185-191.  But the Sherman Act is not designed to protect individual competitors, and injury to a single competitor is insufficient to constitute injury to competition.  *See Dial A Car, Inc. v. Transp., Inc.*, 82 F.3d 484, 486-87 (D.C. Cir. 1996) (where "injury involves only one specific competitor," it "is insufficient to support a finding that the market as a whole is or will be injured").

Nor do Plaintiffs adequately allege that by harming Lord Energy, Defendants harmed competition.  While Plaintiffs allege that Lord Energy was a competitor to ADNOC in the Asian crude oil markets, Compl. ¶¶ 26, 58, 61,[15] the Complaint does not describe the state of competition

---

[15] This is assuming that Plaintiffs properly selected and defined the Asian crude oil markets as the relevant markets in bringing their Sherman Act claims.

in those markets, particularly where, according to Plaintiffs' own allegations, Lord Energy does not appear to have had meaningful market share.  *Compare* Compl. ¶ 4 ("Between 2016 and 2018, Lord Energy's shipments of Saharan Blend to Asia supplanted about 13 million barrels of Murban."), *with id*. ¶ 59 ("Between 2016 and 2019, the UAE [alone] sold about 8 million barrels *per month* to refineries in Asia.") (emphasis added).[16]  Because Plaintiffs allege nothing as to the state of competition in the Asian crude oil markets, their Complaint cannot support any inference that Lord Energy's exit from those markets had any effect on competition.

For the foregoing reasons, Plaintiffs lack antitrust standing to bring their Sherman Act claims, and their Fourth and Fifth Claims should be dismissed.

## 2.     *Plaintiffs Fail to Plead a Conspiracy Under the Sherman Act.*

For Plaintiffs to plead violations of Sections 1 and 2 of the Sherman Act, they must allege that the European Defendants conspired to restrain trade or commerce and to monopolize any part of trade or commerce.  *See* 15 U.S.C. §§ 1-2; *Cheeks v. Fort Myer Constr. Corp.*, 71 F. Supp. 3d 163, 172 (D.D.C. 2014) ("[P]laintiffs must allege joint action by two or more distinct and independent entities, by way of contract, combination or conspiracy, which unreasonably restrains interstate commerce, and which has in fact damaged plaintiffs.").  But, again assuming the truth of Plaintiffs' allegations of an agency relationship between the European Defendants and the UAE, a principal and agents acting in the scope of their agency cannot constitute a conspiracy since they are considered a single entity, and an entity cannot enter into an agreement with itself.  *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984); *Sunkist Growers, Inc. v.*

---

[16] Plaintiffs do plead price, volume, and revenue figures, but only as they relate to Lord Energy's effect on the UAE.  *See*, *e.g.*, Compl. ¶¶ 5-6.  This suggests that Plaintiffs have the wherewithal to obtain information regarding the Asian crude oil markets.  But, tellingly, they do not provide the necessary specifics as they relate to the state of competition in those markets.  The reason for Plaintiffs' silence is simple:  the facts are not there; there was no harm to competition.

*Winckler & Smith Citrus Products Co.*, 370 U.S. 19, 29 (1962) (looking to "practical" realities of even legally separate entities to determine that they are a single organization).[17]

To that end, a single entity as a matter of law cannot conspire to restrain trade or monopolize a particular market by acting only with its alleged agents, because doing so would not "depriv[e] the marketplace of the independent centers of decisionmaking." *Copperweld*, 467 U.S. at 769 ("[A]n internal 'agreement' to implement a single, unitary firm's policies does not raise the antitrust dangers that § 1 was designed to police.").[18]   That is to say, "[t]he relevant inquiry, therefore, is whether there is a contract, combination or conspiracy *amongst separate economic actors* pursuing *separate economic interests*, such that the agreement deprives the marketplace of independent centers of decisionmaking and therefore of diversity of entrepreneurial interests, and thus of actual or potential competition." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195 (2010) (internal quotation marks and citation omitted) (emphasis added).

Here, Plaintiffs' Complaint contains several fatal flaws.  *First*, Plaintiffs fail to plead a single interaction or implication of a connection between ADNOC—the only plausible alleged

---

[17] While a Section 2 violation does not require more than one independent entity (unlike a Section 1 violation), none of the named European Defendants are actors in any crude oil market, nor do Plaintiffs allege as much.  Thus, the only way Plaintiffs can possibly allege that the named European Defendants have violated Section 2 is by way of conspiracy.  *See* Compl. ¶ 269 (referring to "Defendants' conspiracy, and the resulting impact").

[18] It follows that a Section 2 conspiracy claim cannot be based on an internal agreement.  *See Valet Apartment Servs., Inc. v. Atlanta Journal and Const.*, 865 F. Supp. 828, 833-34 (N.D. Ga. 1994) ("The *Copperweld* principle applies also to § 2 conspiracy claims.") (citing *Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 687 F. Supp. 832, 839 (S.D.N.Y. 1988)); *Vollrath v. Sammi Corp.*, No. CV 85–820 MRP, 1989 WL 201632, at *15 (C.D. Cal. 1989), *aff'd*, 9 F.3d 1455 (9th Cir. 1993) ("The *Copperweld* rule should be equally applicable to an allegation of conspiracy under section 2.") (citing *H.R.M., Inc. v. Tele-Communications, Inc.*, 653 F. Supp. 645, 648 (D. Colo. 1987)); *Pudlo v. Adamski*, 789 F. Supp. 247, 252 (N.D. Ill. 1992), *aff'd*, 2 F.3d 1153 (7th Cir. 1993); *MCI Telecomm. Corp. v. Graphnet, Inc.*, 881 F. Supp. 126, 131 (D.N.J. 1995); *see also City of Mt. Pleasant, Iowa v. Assoc. Elec. Co-op.*, 838 F.2d 268, 270, 274-77 (8th Cir. 1988).

actor in any crude oil market—and the named European Defendants.  As such, any alleged conspiracy between them is conclusory.  *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.

*Second*, the Complaint alleges that the European Defendants are agents of the UAE.  *See* Compl. ¶ 8.  But agents acting in the scope of their agency on behalf of a single principal cannot constitute a conspiracy.  Thus, Plaintiffs fail to plead a conspiracy necessary to plead their Section 1 and Section 2 claims.

*Third*, no combination of Defendants changes the fact that the Complaint refers to only a single actor in the crude oil market.  Regardless of whether that actor is the UAE (or ADNOC), that is a single actor, not "separate economic *actors*" pursing "separate economic interests." *American Needle*, 560 U.S. at 195.  In other words, the UAE/ADNOC's actions are incapable of "depriv[ing] the marketplace of independent centers of decisionmaking and therefore of diversity of entrepreneurial interests, and thus of actual or potential competition."  *Id.*

Accordingly, Plaintiffs' Sherman Act claims should be dismissed.

### 3.    With Respect to the Fourth Claim, Plaintiffs Fail to Plead "Unreasonabl[e] [R]estrain[t]s [on] [I]nterstate [C]ommerce."

To plead their Section 1 claim, Plaintiffs must allege (1) that defendants entered into some agreement for concerted activity (2) that either did or was intended to unreasonably restrict trade in the relevant market, which (3) affects interstate commerce.  *See Dial A Car, Inc. v. Transp., Inc.*, 884 F. Supp. 584, 591 (D.D.C. 1995), *aff'd*, 82 F.3d 484 (D.C. Cir. 1996).  Actions that "unreasonably restrict trade" affect competition in an identified market.  *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993) ("The [Sherman Act] directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself.").

False statements about a competitor on their own do not constitute "unreasonable restraints on interstate commerce." *Asa Accugrade, Inc. v. Am. Numismatic Ass'n*, 370 F. Supp. 2d 213, 216-17 (D.D.C. 2005); *see also Hytera Commc'ns Corp. Ltd. v. Motorola Sols., Inc.*, 623 F. Supp. 3d 857, 879–80 (N.D. Ill. 2022) ("[F]alse statements about a competitor—without more—do not give rise to an antitrust violation.") (citing *Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 623 (7th Cir. 2005)).   Thus, the court in *Asa Accugrade* rejected a plaintiff's Section 1 claim based on "alleged defamation and tortious interference" with the plaintiffs' business.   370 F. Supp. 2d at 217.   The court held that "[p]ublishing negative statements about a business is not the sort of conduct that constitutes a *per se* antitrust violation," rejecting as the basis for the plaintiff's Section 1 and Section 2 Sherman Act claims "several false and defamatory statements regarding plaintiff's personnel, business services and products ... published by a defendant or published on an internet website maintained by a defendant."   *Id.*

Plaintiffs' allegations here are no different than those in *Asa Accugrade*.   Plaintiffs base the entirety of their Section 1 claim on "Defendants' smear campaign against Lord Energy." Compl. ¶ 260.[19]   While allegations of a smear campaign may be appropriate for a business tort or defamation claim, without more (and as pleaded, there is no more), they are not "unreasonable restraints on interstate commerce."   Indeed, the alleged smear campaign seems to have affected only Lord Energy, which declared bankruptcy; that is, a single competitor in the crude oil market. *Supra* at 21-22.   That, plainly, does not evidence an unreasonable restraint on interstate commerce. To the contrary, it resembles an "act of pure malice by one business competitor against another," which the U.S. Supreme Court has expressly rejected as a basis to bring an antitrust claim.   *See*

---

[19] Plaintiffs concede that this alleged campaign was based on perceived connections between Plaintiffs and the Muslim Brotherhood.   Compl. ¶¶ 11-12.   It was thus wholly unrelated to Plaintiffs' role in a crude oil market.

*Brooke Group Ltd. v. Brown Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993) ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws.").

### 4. With Respect to the Fifth Claim, Plaintiffs Fail to Plead "Monopoly Power."

To plead their Section 2 Claim, Plaintiffs must allege that (1) Defendants possessed monopoly power in a relevant market and (2) Defendants willfully acquired or maintained that power, in a manner distinguishable from growth or development as a consequence of a superior product, business acumen, or historic accident. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992); *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); *Am. President Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209, 220 (D.C. Cir. 2022). Monopoly power is defined as the ability "to control prices or exclude competition." *Grinnell*, 384 U.S. at 571 (internal quotation marks omitted). A firm is a monopolist if it can profitably raise prices substantially above the competitive level. *FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 43 (D.D.C. 2022).

Here, beyond conclusory statements, Plaintiffs do not allege that Defendants possessed monopoly power. *See Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678. Thus, Plaintiffs' allegations that "ADNOC possessed monopoly power" in 2017 should be disregarded in their entirety. *See* Compl. ¶ 266. And Plaintiffs' allegations that ADNOC was also the "dominant seller of Murban, accounting for about 60% of all Murban [exports from the UAE]" provide no meaningful information as to ADNOC's role in the crude oil market. Compl. ¶ 84. ADNOC's role as a Murban exporter of the UAE on its own says nothing about ADNOC's role in the crude oil market. Additionally, 60% of a market is likely insufficient, as a matter of law, to constitute a monopoly. *See Rothery Storage & Can Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 230 n. 11 (D.C.

Cir. 1986) ("it is doubtful whether sixty or sixty-four percent would be enough" to constitute a monopoly") (internal quotation marks and citation omitted).

But even if there was a monopoly, Plaintiffs do not show in any way that the monopoly was improperly obtained or maintained. *See United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) ("[M]erely possessing monopoly power is not itself an antitrust violation."); *see also Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993) (claim of attempted monopolization must show that parties have "engaged in predatory or anticompetitive conduct with . . . a specific intent to monopolize and . . . [have] a dangerous probability of achieving monopoly power."); *Dial A Car*, 82 F.3d at 487. Plaintiffs' allegations do not show any "predatory or anticompetitive conduct" by Defendants to obtain or maintain that monopoly, for the same reasons explained above why the purported smear campaign by Defendants does not qualify as improper conduct under the Sherman Act. *See supra* at 29-31.

## III.   PLAINTIFFS' CLAIMS ARE TIME-BARRED.

Plaintiffs' claims under RICO and the Sherman Act are also time-barred by their respective statutes of limitations.

### A.   RICO Claims.

"Civil RICO actions face a four year statute of limitations, which begins to run from the date of discovery of the injury." *Feld Ent. Inc. v. Am. Soc. for the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288, 308 (D.D.C. 2012). The discovery rule provides that "a cause of action accrues when the plaintiff has knowledge of (or by the exercise of reasonable diligence should have knowledge of) (1) the existence of the injury, (2) its cause in fact, and (3) some evidence of

wrongdoing." *Chalabi v. Hashemite Kingdom of Jordan*, 503 F. Supp. 2d 267, 274 (D.D.C. 2007) (citations omitted) (internal quotation marks omitted), *aff'd*, 543 F.3d 725 (D.C. Cir. 2008).[20]

The Complaint alleges that Defendants were associated and in fact constituted an enterprise between May 2017 and April 2021.  Compl. ¶ 242.  But all the alleged acts taken in furtherance of the alleged conspiracy took place before 2019.  Compl. ¶¶ 226, 246.  The Complaint alleges that plaintiffs suffered injury because banks and financial institutions allegedly "end[ed] their banking relationships with Hazim and Lord Energy."  Compl. ¶ 249.  The Complaint alleges that various banks and financial institutions closed accounts or refused to work with Plaintiffs starting in November 2018.  Compl. ¶ 249(a).  The Complaint lists eight different instances where banks and financial institutions allegedly ended their relationship with plaintiffs.  Compl. ¶ 249.  Seven of these occurred before May 2019 (Compl. ¶ 249(a-g)), and therefore fall outside the four-year statute of limitations, given the Complaint was filed in January 2024.

The Complaint alleges Plaintiffs suffered only one injury that occurred within the four-year statute of limitations: "In December 2020, Macquarie Bank declined to enter into a new banking relationship with Lord Energy because it had 'no appetite to proceed' with the opportunity."  Compl. ¶ 249(h).  This December 2020 allegation is a transparent attempt to bring Plaintiffs' claims within a statute of limitations that has expired, and is fatally flawed given other allegations in the Complaint demonstrate that the supposed injury incurred by Macquarie Bank was inflicted outside of the statute of limitations.  The Complaint alleges that Plaintiffs suffered injury in April 2019 because *Macquarie Bank* terminated its agreement with Lord Energy.  Compl.

---

[20] The discovery rule is inapplicable here.  *See* UAE Mot. at 34-35.  Plaintiffs concede they were on notice of their claims as early as 2018, as evidenced by the fact that Nada filed reports of a "defamatory campaign against him and his companies to Swiss law enforcement."  Compl. ¶ 205; *see also id.* ¶ 139 ("By this point [in 2018], [Nada] knew he was the victim."); *id.* ¶ 205 (Lord Energy files for bankruptcy).

¶ 249(g).  The alleged injury inflicted via Macquarie Bank giving rise to Plaintiffs' claims arose, therefore, in April 2019.  Plaintiffs cannot restart the clock in December 2020 for an injury that the Complaint itself alleges was suffered in April 2019.  *See Solano v. Delmed, Inc*., 759 F. Supp. 847, 853 (D.D.C. 1991) (finding statute of limitations had run where "[t]hirteen of the 19 acts of racketeering alleged by plaintiffs" occurred outside the statute of limitations, even where plaintiffs claimed the alleged pattern was not detectable until some time after, because "Plaintiffs provide no reason why the pattern was clearly formed at act number 14, but not at act number 13.").

### B.  Sherman Act Claims.

"Any action to enforce any cause of action under section 15, 15a, or 15c of [the Sherman Act] shall be forever barred unless commenced within four years after the cause of action accrued." 15 U.S.C. § 15b.  "Generally, an antitrust claim accrues and the statute of limitations begins to run when a defendant commits an overt act that injures a plaintiff's business . . . .  Even so, an antitrust suit can be brought more than four years after the events which initially created the cause of action if the damages attributable to the defendant's actions outside the limitation period were speculative or unprovable at that time."  *Companhia Brasileira Carbureto De Calcio-CBBCC v. Applied Indus. Materials Corp*., 887 F. Supp. 2d 9, 19 (D.D.C. 2012) (internal quotation marks and citations omitted).

The Complaint alleges that Defendants violated the Sherman Act by causing Lord Energy to go out of business after spreading an alleged "smear campaign" about Hazim and Lord Energy. Compl. ¶¶ 260, 268.  The alleged facts underlying the Sherman Act claims are the same as those underlying the RICO claims, and all took place before July 2018.  *See* Compl. ¶¶ 226, 246.  The statute of limitations began to accrue, therefore, no later than July 2018.  Filing the complaint in January 2024, more than five years later, renders the claim outside the statute of limitations.

The Complaint also alleges that Plaintiffs began suffering damage from a "smear campaign" as early as November 2018 when certain banks and financial institutions refused to work with Lord Energy.  Compl. ¶ 250.  Therefore, Plaintiffs were aware of their alleged injury as of November 2018 and should have brought the Sherman Act claims in or before November 2022, which they did not.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Complaint should be dismissed with prejudice.

Dated:  July 16, 2024

By:   */s/ Igor V. Timofeyev*
Igor V. Timofeyev (D.C. Bar No. 998291)
Vanessa Omoroghomwan (D.C. Bar No. 1644765)
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC 20036
Telephone: (202) 551-1700
igortimofeyev@paulhastings.com
vanessaomoroghomwan@paulhastings.com

Adam Fee (*pro hac vice*)
PAUL HASTINGS LLP
1999 Avenue of The Stars, 27th Floor
Los Angeles, California 90067
Telephone: (310) 620-5700
adamfee@paulhastings.com

D. Scott Carlton (*pro hac vice*)
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, California 90071
Telephone: (212) 683-6000
scottcarlton@paulhastings.com

*Attorneys for Defendants ALP Services SA, Diligence SARL, Mario Brero, Lionel Badal, and Muriel Cavin*