**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| HAZIM NADA, *et al.*, |
| *Plaintiffs*, |
| *v.* |
| THE UNITED ARAB EMIRATES, *et al.*, |
| *Defendants*. |

Case No. 24-cv-206-ABJ

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT LORENZO VIDINO'S
MOTION TO DISMISS**

Matthew D. McGill (D.C. Bar #481430)
Nathaniel J. Tisa (D.C. Bar #90006243)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
T: (202) 887-3680
F: (202) 530-9662
mmcgill@gibsondunn.com
ntisa@gibsondunn.com

*Counsel for Lorenzo Vidino*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

STATEMENT OF THE CASE ................................................................................................. 3

LEGAL STANDARDS ............................................................................................................ 8

ARGUMENT ............................................................................................................................ 8

   I.    The Complaint Should Be Dismissed On First Amendment Grounds. ........................... 9

        A.    The First Amendment Bars Extending Civil Liability To Protected Conduct. ....... 9

        B.    Dr. Vidino Engaged In First Amendment Protected Speech. ............................... 11

        C.    Dr. Vidino Is Entitled To Immunity Under The *Noerr-Pennington* Doctrine. ...... 17

   II.    The Complaint Fails to State a RICO Conspiracy Claim Against Dr. Vidino. .............. 20

        A.    Nada Does Not Allege That Dr. Vidino Conspired To Violate RICO. .................. 21

        B.    Nada Does Not Allege A Substantive RICO Violation And Therefore Cannot Maintain A RICO Conspiracy Claim. ................................................................... 25

   III.    Dismissal Should Be With Prejudice. ............................................................................ 38

CONCLUSION ...................................................................................................................... 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbas v. Foreign Policy Grp., LLC*,
　783 F.3d 1328 (D.C. Cir. 2015)..................................................................................38, 39

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*,
　483 U.S. 143 (1987)...................................................................................................25, 37

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
　486 U.S. 492 (1988).........................................................................................................18

*Am. Biocare, Inc. v. Howard & Howard Att'ys, PLLC*,
　2016 WL 5661583 (E.D. Mich. Sept. 30, 2016)...............................................................28

*Anderson v. Liberty Lobby, Inc.*,
　477 U.S. 242 (1986).........................................................................................................12

*Anza v. Ideal Steel Supply Co.*,
　547 U.S. 451 (2006).............................................................................................29, 33, 35

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009)...............................................................................................8, 20, 28

*W. Assocs. Ltd. P'Ship, ex rel. Ave. Assocs. Ltd. P'Ship v. Mkt. Square Assocs.*,
　235 F.3d 629 (D.C. Cir. 2001)........................................................................................25, 32

*Barden v. Goodsell*,
　2021 WL 5921351 (D. Idaho Dec. 15, 2021) ..................................................................39

*Barlow v. McLeod*,
　666 F. Supp. 222 (D.D.C. 1986).....................................................................................21

*Bates v. Nw. Hum. Servs., Inc.*,
　466 F. Supp. 2d 69 (D.D.C. 2006)........................................................................8, 28, 29

*BEG Invs., LLC v. Alberti*,
　85 F. Supp. 3d 13 (D.D.C. 2015).....................................................................................14

*Belizan v. Hershon*,
　434 F.3d 579 (D.C. Cir. 2006)..........................................................................................38

*Bell Atl. Corp. v. Twombly*,
　550 U.S. 544 (2007)...............................................................................................8, 25, 28

*Boley v. Atl. Monthly Grp.*,
   950 F. Supp. 2d 249 (D.D.C. 2013) ....................................................................15

*Boyle v. United States*,
   556 U.S. 938 (2009).........................................................................................36

*Broidy Cap. Mgmt. LLC v. Muzin*,
   2020 WL 1536350 (D.D.C. 2020) ....................................................................33

*Cheeks v. Ft. Meyer Constr. Corp.*,
   216 F. Supp. 3d 146 (D.D.C. 2016).................................................................21

*City of Oakland v. Wells Fargo & Co.*,
   14 F.4th 1030 (9th Cir. 2021) (en banc) .....................................................33, 35

*Covad Commc'ns Co. v. Bell Atl. Corp.*,
   398 F.3d 666 (D.C. Cir. 2005)........................................................................10

*Covad Commc'ns Co. v. Bell Atl. Corp.*,
   407 F.3d 1220 (D.C. Cir. 2005).........................................................................5

*Ctr. for Immigr. Stud. v. Cohen*,
   410 F. Supp. 3d 183 (D.D.C. 2019)............................................................26, 27

*Dist. Telecomms. Dev. Corp. v. Dist. Cablevision, Inc.*,
   638 F. Supp. 418 (D.D.C. 1985)......................................................................36

*Dun & Broadstreet, Inc. v. Greenmoss Builders, Inc.*,
   472 U.S. 749 (1985)...........................................................................................9

*E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
   365 U.S. 127 (1961).........................................................................................10

*E. Sav. Bank, FSB v. Papageorge*,
   31 F. Supp. 3d 1 (D.D.C. 2014).............................................................18, 32, 33

*Edmondson & Gallagher v. Alban Towers Tenants Ass'n*,
   48 F.3d 1260 (D.C. Cir. 1995).....................................................................32, 33

*Feld Ent., Inc. v. Am. Soc'y for Prevention of Cruelty to Animals*,
   873 F. Supp. 2d 288 (D.D.C. 2012)...........................................11, 17, 18, 19, 37

*Flanagan v. Islamic Republic of Iran*,
   190 F. Supp. 3d 138 (D.D.C. 2016)...................................................................5

*Flood v. Nat'l Football League*,
   2009 WL 86577 (E.D. Cal. Jan. 8, 2009) ........................................................17

*Frederick Douglass Found., Inc. v. District of Columbia*,
    82 F.4th 1122 (D.C. Cir. 2023) ..................................................................4

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974) ..................................................................14

*Greenpeace, Inc. v. Dow Chem. Co.*,
    808 F. Supp. 2d 262 (D.D.C. 2011) ..................................................25, 32

*Hargraves v. Cap. City Mortg. Corp.*,
    140 F. Supp. 2d 7 (D.D.C. 2000) ..................................................................38

*Harris v. D.C. Water & Sewer Auth.*,
    791 F.3d 65 (D.C. Cir. 2015) ..................................................................8

*Hemi Grp., LLC v. City of New York*,
    559 U.S. 1 (2010) ..................................................33, 34, 35

*Holmes v. Sec. Inv. Prot. Corp.*,
    503 U.S. 258 (1992) ..................................................25, 33, 34

*Hourani v. Mirtchev*,
    796 F.3d 1 (D.C. Cir. 2015) ..................................................................26

*Humphrey v. GlaxoSmithKline PLC*,
    905 F.3d 694 (3d Cir. 2018) ..................................................30, 32

*Intex Recreation Corp. v. Team Worldwide Corp.*,
    390 F. Supp. 2d 21 (D.D.C. 2005) ..................................................................29

*Jankovic v. Int'l Crisis Grp.*,
    822 F.3d 576 (D.C. Cir. 2016) ..................................................10, 12, 14

*Johnson v. Holder*,
    2013 WL 6157345 (D.D.C. Nov. 25, 2013) ..................................................................39

*Joseph Burstyn, Inc. v. Wilson*,
    343 U.S. 495 (1952) ..................................................16, 17

*Keren Kaymeth LeIsrael-Jewish Nat'l Fund v. Educ. for Just Peace in Middle
    East*, 66 F.4th 1007 (D.C. Cir. 2023) ..................................................................8

*King v. Twp. of E. Lampeter*,
    17 F. Supp. 2d 394 (E.D. Pa. 1998) ..................................................................17

*Liberty Lobby, Inc. v. Rees*,
    852 F.2d 595 (D.C. Cir. 1988) ..................................................................12

*Lopez v. Council on Am.-Islamic Rels. Action Network, Inc.*,
    657 F. Supp. 2d 104 (D.D.C. 2009) ...................................................................33

*Marks v. City of Seattle*,
    2003 WL 23024522 (W.D. Wash. Oct. 16, 2003) ...............................................26

*Martinez v. JPMorgan Chase Bank, N.A.*,
    178 F. Supp. 3d 184 (S.D.N.Y. 2016) ...........................................................35, 36

*McFarlane v. Esquire Mag.*,
    74 F.3d 1296 (D.C. Cir. 1996) ..........................................................................14

*Meng v. Schwartz*,
    116 F. Supp. 2d 92 (D.D.C. 2000) ....................................................................26

*Mirbaha v. Pompeo*,
    513 F. Supp. 3d 179 (D.D.C. 2021) ....................................................................4

*Molecular Diagnostics Labs. v. Hoffmann-La Roche Inc.*,
    402 F. Supp. 2d 276 (D.D.C. 2005) ..................................................................37

*Murray v. Mulgrew*,
    704 F. Supp. 2d 45 (D.D.C. 2010) ....................................................................33

*N. Am. Butterfly Ass'n v. Wolf*,
    977 F.3d 1244 (D.C. Cir. 2020) ........................................................................39

*Nader v. Democratic Nat'l Comm.*,
    567 F.3d 692 (D.C. Cir. 2009) ..........................................................................10

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
    138 S. Ct. 2361 (2018) ......................................................................................18

*Ne. Women's Ctr., Inc. v. McMonagle*,
    868 F.2d 1342 (3d Cir. 1989) ............................................................................11

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ...........................................................................2, 9, 10, 11

*NOW, Inc. v. Scheidler*,
    510 U.S. 249 (1994) ..........................................................................................11

*Nunes v. WP Co. LLC*,
    513 F. Supp. 3d 1 (D.D.C. 2020) ......................................................................15

*OAO Alfa Bank v. Ctr. for Pub. Integrity*,
    387 F. Supp. 2d 20 (D.D.C. 2005) ....................................................................12

*Owens v. Republic of Sudan*,
  826 F. Supp. 2d 128 (D.D.C. 2011) ............................................................................5

*Phila. Newspapers, Inc. v. Hepps*,
  475 U.S. 767 (1986) ............................................................................................10, 14

*Quick v. EduCap, Inc.*,
  318 F. Supp. 3d 121 (D.D.C. 2018) ..........................................................................36

*Ray v. Spirit Airlines, Inc.*,
  836 F.3d 1340 (11th Cir. 2016) ................................................................................37

*Republic of Kazakhstan v. Stati*,
  380 F. Supp. 3d 55 (D.D.C. 2019) ........................................................................3, 25

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
  487 U.S. 781 (1988) ..................................................................................................16

*RJR Nabisco, Inc. v. European Community*,
  579 U.S. 325 (2016) ......................................................................................25, 30, 32

*Rotella v. Wood*,
  528 U.S. 549 (2000) ..................................................................................................38

*RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*,
  682 F.3d 1043 (D.C. Cir. 2012) ........................................................2, 21, 22, 23, 24

*Rux v. Republic of Sudan*,
  495 F. Supp. 2d 541 (E.D. Va. 2007) .........................................................................5

*Samuel v. Wells Fargo & Co.*,
  311 F. Supp. 3d 10 (D.D.C. 2018) ............................................................................39

*Sandvig v. Sessions*,
  315 F. Supp. 3d 1 (D.D.C. 2018) ..............................................................................10

*Savage v. Council on Am.-Islamic Rels., Inc.*,
  2008 WL 2951281 (N.D. Cal. July 25, 2008) ....................................................11, 16

*Shatsky v. Palestine Liberation Org.*,
  955 F.3d 1016 (D.C. Cir. 2020) ................................................................................39

*Smithfield Foods, Inc. v. United Food & Com. Workers Int'l Union*,
  585 F. Supp. 2d 789 (E.D. Va. 2008) ........................................................................12

*Snyder v. Phelps*,
  562 U.S. 443 (2011) ...............................................................................................9, 10

*Sosa v. DIRECTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006) ...................................................................................11

*St. Amant v. Thompson*,
    390 U.S. 727 (1968) .................................................................................................15

*Stankevich v. Kaplan*,
    156 F. Supp. 3d 86 (D.D.C. 2016) .....................................................................36, 37

*Steele v. Fannie Mae*,
    134 F. Supp. 3d 191 (D.D.C. 2015) .........................................................................27

*Tavoulareas v. Piro*,
    817 F.2d 762 (D.C. Cir. 1987) .................................................................................15

*Teltschik v. Williams & Jensen, PLLC*,
    748 F.3d 1285 (D.C. Cir. 2014) ...............................................................................26

*Time, Inc. v. Hill*,
    385 U.S. 374 (1967) ............................................................................................16, 17

*United Mine Workers of Am. v. Pennington*,
    381 U.S. 657 (1965) .................................................................................................10

*United States v. Alebbini*,
    979 F.3d 537 (6th Cir. 2020) .....................................................................................5

*United States v. Almadaoji*,
    2021 WL 5002373 (S.D. Ohio Oct. 27, 2021) ...........................................................5

*United States v. Ceasar*,
    10 F.4th 66 (2d Cir. 2021) ....................................................................................5, 19

*United States v. Crisci*,
    273 F.3d 235 (2d Cir. 2001) .....................................................................................28

*United States v. Dais*,
    482 F. Supp. 3d 800 (E.D. Wis. 2020) .......................................................................5

*United States v. Hendricks*,
    950 F.3d 348 (6th Cir. 2020) .....................................................................................5

*United States v. Larson*,
    807 F. Supp. 2d 142 (W.D.N.Y. 2011) .....................................................................12

*United States v. Lemire*,
    720 F.2d 1327 (D.C. Cir. 1983) ...............................................................................29

*United States v. Neill,*
    964 F. Supp. 438 (D.D.C. 1997) ...........................................................................7

*United States v. Philip Morris USA Inc.,*
    396 F.3d 1190 (D.C. Cir. 2005) .........................................................................14

*United States v. Philip Morris USA Inc.,*
    566 F.3d 1095 (D.C. Cir. 2009) (per curiam) ..............................................11, 18

*United States v. Ramic,*
    2024 WL 2274529 (W.D. Ky. May 20, 2023) ....................................................5

*United States v. Shafi,*
    2018 WL 3159769 (N.D. Cal. June 28, 2018) ..............................................5, 19

*United States v. Turkette,*
    452 U.S. 576 (1981) ...........................................................................................36

*US Dominion, Inc. v. MyPillow, Inc.,*
    2022 WL 1597420 (D.D.C. May 19, 2022) .......................................................37

*Venetian Casino Resort, L.L.C. v. NLRB,*
    793 F.3d 85 (D.C. Cir. 2015) ....................................................................2, 11, 17

*Waldbaum v. Fairchild Publ'ns, Inc.,*
    627 F.2d 1287 (D.C. Cir. 1980) .....................................................................12, 13

*Yegiazaryan v. Smagin,*
    143 S. Ct. 1900 (2023) .......................................................................................30

**Constitutional Provisions**

U.S. Const. Amend. I ........................................................2, 3, 9, 10, 11, 12, 14, 16, 38

**Statutes**

15 U.S.C. § 1–2 ............................................................................................................3

15 U.S.C. § 1125 ..........................................................................................................3

18 U.S.C. § 1962 ..............................................................................................3, 21, 25

18 U.S.C. § 1964 ..............................................................................................3, 14, 25

**Rules**

Fed. R. Civ. P. 9 ...............................................................................................8, 28, 29

Fed. R. Civ. P. 12 ........................................................................................................8

**Other Authorities**

*Algeria's Struggle Against Terrorism: Hr'g before H. Subcomm. on Int'l Rels.*,
109th Cong. (Mar. 3, 2005) ............................................................................4, 13

*Beyond Iraq & Syria: ISIS' Global Reach: Hr'g before S. Foreign Rels. Comm.*,
115th Cong. (June 8, 2017).................................................................................4

David Kirkpatrick, *The Dirty Secrets of a Smear Campaign*,
New Yorker (Mar. 27, 2023) ........................................................................22, 23

*Inside the Mind of ISIS: Hr'g before S. Comm. on Homeland Sec. & Gov't Affs.*,
114th Cong. (Jan. 20, 2016)................................................................................4

*Islamic Extremism in Europe: Hr'g before H. Subcomm. on Europe and
Emerging Threats*, 109th Cong. (April 27, 2005).....................................................4

Lorenzo Vidino, *The Closed Circle: Joining & Leaving the Muslim Brotherhood
in the West* (Colum. Univ. Press 2020)..............................................................7, 19

Lorenzo Vidino, *The Muslim Brotherhood in Austria* (Aug. 2017) ................................7

Lorenzo Vidino, *The New Muslim Brotherhood in the West*
(Colum. Univ. Press 2010)................................................................................19

*The Muslim Brotherhood in the West: Hr'g before H. Subcomm. on Terrorism,
HUMINT, Analysis & Counterintelligence*, 112 Cong. (Apr. 13, 2011) ...............4, 6, 13, 19

Muslim Brotherhood Terrorist Designation Act, S.2230, 114th Cong. (2015) ...........13

Muslim Brotherhood Terrorist Designation Act, S.3151, 117th Cong. (2021) ...........13

## INTRODUCTION

Hazim Nada filed this action for over a billion dollars in damages on January 24, 2024, alleging that a "'dark' public relations campaign" made false statements in 2017 and 2018 about Nada and his wholly-owned Swiss shipping company, Lord Energy SA, that led to the company's bankruptcy in mid-2019.  ECF No. 1 ("Compl.") ¶¶ 1, 188.  Nada alleges that the United Arab Emirates ("UAE"), its state-owned oil company, and several UAE officials retained Swiss private-investigation firm Alp Services SA ("Alp") to develop a network of journalists to promote the narrative that Nada and Lord Energy were associated with the Muslim Brotherhood.  *See id.* ¶¶ 8, 11.  These claims, Nada alleges, eventually made their way into foreign media outlets and websites, which were later noticed by financial-compliance entities, which then alerted banking institutions, which ultimately decided to cut off Lord Energy's financing.  *See id.* ¶¶ 17–18.

The Complaint bears all the hallmarks of an effort to allege defamation, but Nada does not assert a defamation claim.  Rather, Nada brings this action under federal law—which does not recognize Anti-SLAPP protections for baseless claims that chill protected speech—and invokes causes of action under the Lanham Act, Racketeer Influenced and Corrupt Organizations Act ("RICO"), and Sherman Act—statutes that bear little if any relation to the alleged misconduct. What is more, Nada does not limit himself to suing the actors involved in the alleged scheme. Rather, Nada also names Dr. Lorenzo Vidino—an academic expert on the Muslim Brotherhood who, since 2005, has testified before Congress, frequently consults with U.S. law enforcement, regularly serves as an expert witness in federal cases, and has published academic research—in the Complaint's RICO conspiracy count on the flimsy theory that "*[t]he enterprise* relied on [Dr.] Vidino, and his academic credentials, to legitimize the false and misleading statements *it had published*[.]"  Compl. ¶ 34 (emphases added).

Regardless whether Nada can maintain this action against any Defendant (and he cannot), the Complaint fails to state a RICO conspiracy claim against Dr. Vidino for multiple reasons.

*First*, the First Amendment bars using precisely such creative pleading tactics to chill protected speech and petitioning activities with the threat of civil liability.  Nada's claim against Dr. Vidino is a brazen attempt to punish him for decades of work tracing the Muslim Brotherhood's operations, recruitment activities, and financing in the West and for advocating particular policy responses by U.S. officials.  Nada does not allege that Dr. Vidino acted with the "malice" required to hold a speaker liable for statements on matters of public concern, *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964), or that Dr. Vidino engaged in petitioning activities for fraudulent or corrupt ends so as to take that conduct outside the immunity conferred by the *Noerr-Pennington* doctrine, *Venetian Casino Resort, L.L.C. v. NLRB*, 793 F.3d 85, 92 (D.C. Cir. 2015).  Indeed, Nada does not allege that Dr. Vidino made *any statements at all* about Nada or Lord Energy, only that other Defendants relied on his academic work on the Muslim Brotherhood.  That is nowhere near sufficient to overcome the substantial First Amendment concerns raised by this lawsuit.

*Second*, the RICO conspiracy count against Dr. Vidino fails as a matter of law because Nada does not allege that Dr. Vidino knowingly agreed to join a RICO conspiracy.  *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1048 (D.C. Cir. 2012).  No matter how hard one squints, the Complaint lacks any factual allegation that Dr. Vidino knew or should have known an alleged conspiracy *existed*, let alone that he agreed to further its supposed goals.  The only allegation that ties Dr. Vidino to any other Defendant is Nada's claim that Dr. Vidino had dinner with Alp employee Mario Brero and was retained to provide "[i]nteresting leads/rumours . . . regarding the subject of investigation organisations/individuals/funding in Europe."  Compl. ¶ 110; *see id.* ¶¶ 108–09.  But all of this occurred in January 2018—months after

Alp supposedly initiated the campaign against Lord Energy—and in any case, Nada never alleges that Dr. Vidino provided Alp with any information on Nada or Lord Energy at all, never mind material that was false or misleading.

*Third*, the RICO conspiracy count fails as a matter of law because Nada does not plausibly allege a substantive RICO claim against the other Defendants.  Plaintiffs cannot maintain an action for racketeering conspiracy without a corresponding racketeering claim, *Republic of Kazakhstan v. Stati*, 380 F. Supp. 3d 55, 65 (D.D.C. 2019), and Nada does not plausibly allege any of the elements—predicate offense, domestic injury, pattern of racketeering activity, proximate cause, or RICO enterprise—required for a civil RICO claim to survive a motion to dismiss.  Moreover, Nada's racketeering and conspiracy claims are plainly barred by RICO's statute of limitations because Nada waited more than four years after allegedly discovering his supposed injury to file this lawsuit.

This Court should dismiss Dr. Vidino from the case on First Amendment grounds or, in the alternative, because Nada fails to state a claim against him for racketeering conspiracy.  Dismissal should be with prejudice because Nada cannot overcome these flaws by amending the Complaint.

## STATEMENT OF THE CASE

Nada filed this action for actual and treble damages under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), RICO, 18 U.S.C. §§ 1962(c)–(d), 1964(c), and the Sherman Act, 15 U.S.C. §§ 1–2, on January 24, 2024.  *See* Compl. at 71, 76, 82–84.  Nada alleges that the UAE retained Alp to initiate a "'dark' public relations campaign" that led to the bankruptcy of Nada's foreign oil-shipping company, Lord Energy.  *See id.* ¶¶ 8–18.  The Complaint names as defendants the UAE, several UAE entities and officials, Alp, several supposed Alp employees and contractors, and 25 John Does who allegedly perpetrated the scheme.  *See id.* ¶¶ 23–33, 35–36.  The Complaint also

names Dr. Lorenzo Vidino as a defendant in the RICO conspiracy count, only, which is brought "[a]gainst [a]ll [d]efendants."  *Id.* at 82; *see id.* ¶ 34.[1]

According to the Complaint, Dr. Lorenzo Vidino is a "credible and highly credentialed" expert on Muslim Brotherhood activities in Europe and North America.  Compl. ¶ 107; *see id.* ¶ 90. Dr. Vidino conducts academic research on that subject, including in his role as Director of the Program on Extremism at the George Washington University.  *See id.* ¶ 34.

Public records confirm that Dr. Vidino is a "special[ist] in Islamism and political violence in Europe and North America" who authors books and reports about extremist organizations operating in the West.  *Inside the Mind of ISIS: Hr'g before S. Comm. on Homeland Sec. & Gov't Affs.*, 114th Cong. 7 (Jan. 20, 2016) (Statement of Sen. Ron Johnson).  Since 2005, Dr. Vidino has testified before Congress about Islamic fundamentalism, including the Muslim Brotherhood, and advocated for certain legislative, diplomatic, and law-enforcement responses based on his academic research and conclusions.  *See id.*; *Beyond Iraq & Syria: ISIS' Global Reach: Hr'g before S. Foreign Rels. Comm.*, 115th Cong. (June 8, 2017); *The Muslim Brotherhood in the West: Hr'g before H. Subcomm. on Terrorism, HUMINT, Analysis & Counterintelligence*, 112 Cong. (Apr. 13, 2011) ("*Muslim Brotherhood Hr'g*"); *Islamic Extremism in Europe: Hr'g before H. Subcomm. on Europe and Emerging Threats*, 109th Cong. (April 27, 2005); *Algeria's Struggle Against Terrorism: Hr'g before H. Subcomm. on Int'l Rels.*, 109th Cong. (Mar. 3, 2005) ("*Algeria Terrorism Hr'g*").[2]

---

[1] Because this is a motion to dismiss, Dr. Vidino recites the allegations as stated in the Complaint without conceding their accuracy or completeness.  *See Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1132 (D.C. Cir. 2023).

[2] "Courts may take judicial notice of congressional testimony because the [fact of the] testimony is not subject to reasonable dispute."  *Mirbaha v. Pompeo*, 513 F. Supp. 3d 179, 185 n.2 (D.D.C. 2021) (quotation omitted).

Law enforcement officials regularly consult with Dr. Vidino in matters involving extremist organization financing, recruitment, and operations in the United States, including by procuring his testimony in federal prosecutions. *See, e.g.*, *United States v. Ceasar*, 10 F.4th 66, 70, 72 (2d Cir. 2021) (recounting Dr. Vidino's testimony about extremist organizations' influence outside of directly controlled territory at sentencing phase of conspiracy-to-provide-material-support prosecution); *United States v. Ramic*, 2024 WL 2274529, at *1 (W.D. Ky. May 20, 2023) (admitting similar testimony by Dr. Vidino in material-support-for-terrorism prosecution after concluding his testimony "will assist the jury in understanding and evaluating the evidence"); *United States v. Shafi*, 2018 WL 3159769, at *3–4 (N.D. Cal. June 28, 2018) (similar). Because of his academic credentials and publications, federal courts have permitted Dr. Vidino to serve as an expert witness on the subject of extremism and relied on his testimony. *See, e.g.*, *Ceasar*, 10 F.4th at 70, 72; *United States v. Alebbini*, 979 F.3d 537, 549–50 (6th Cir. 2020); *United States v. Hendricks*, 950 F.3d 348, 351, 353 (6th Cir. 2020); *Ramic*, 2024 WL 2274529, at *1; *United States v. Almadaoji*, 2021 WL 5002373, at *2–3 (S.D. Ohio Oct. 27, 2021); *United States v. Dais*, 482 F. Supp. 3d 800, 806 (E.D. Wis. 2020); *Shafi*, 2018 WL 3159769, at *3–4; *Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138, 176 (D.D.C. 2016); *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 141, 144 (D.D.C. 2011); *Rux v. Republic of Sudan*, 495 F. Supp. 2d 541, 552–53 (E.D. Va. 2007).[3]

In the Complaint, Nada alleges that Lionel Badal, an Alp employee, asked Dr. Vidino for a meeting in Switzerland in January 2018—several months after Alp had allegedly decided to target Nada. Compl. ¶¶ 14, 91, 108. Badal told Dr. Vidino that Lord Energy was a "trading company based in Lugano." *Id.* ¶ 108. Dr. Vidino met with Alp employee Mario Brero later that month for

---

[3] Similarly, this Court may take judicial notice "of facts on the public record" in prior federal court decisions. *Covad Commc'ns Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005).

a dinner "in Geneva." *Id.* ¶ 109.  In an effort to "disguise the identity" of Alp's clients, Brero stated that he was working for a "London-based law firm." *Id.*  Two weeks later, Dr. Vidino "signed a contract with Alp to provide '[i]nteresting leads/rumours . . . regarding the subject of investigation organisations/individuals/funding in Europe' and a 'list of alleged members of the first tier organisations in European countries" in exchange for "3,000 Euros." *Id.* ¶ 110; *see also id.* ¶ 126 (Alp drafted a list of action items "which included having [Dr.] Vidino prepare an 'overview of key MB individuals/organisations/companies in the USA.'").

According to Nada, Alp sought out Dr. Vidino in order to "rel[y] on . . . his academic credentials" to legitimize statements allegedly published "to discredit and destroy" Lord Energy. Compl. ¶ 34; *see also id.* ¶ 39 (alleging that the scheme involved "publishing academic papers that lent credibility to the enterprise's fraudulent claims").  The Complaint's only mention of any statements by Dr. Vidino is an allusion to "Wikipedia entries" that quoted Dr. Vidino as having opined that "it is challenging to identify members of the Muslim Brotherhood as there is 'a conscious effort by the Western Brothers to downplay or even deny their ideological links to the Muslim Brotherhood.'"  *Id.* ¶ 163.

That statement has nothing to do with Nada or Lord Energy—rather, it is a general statement about the Muslim Brotherhood, an organization to which Nada denies having any ties. *See, e.g.*, Compl. ¶¶ 9, 93, 97.  The Complaint does not specify whether the author of the Wikipedia entry cited a source for this statement, but Dr. Vidino made similar statements in his 2011 congressional testimony, long before the events allegedly giving rise to this action, and in prior academic publications.  *See Muslim Brotherhood H'rg* (testifying that "it is fair to say that in the United States and in virtually all Western countries, there are organizations and networks that have historical, financial, personal, organizational, and ideological ties to the Muslim Brotherhood" and

noting that some intelligence agencies have publicly concluded that "Muslim Brothers . . . do not always reveal their religious loyalties and ultra-orthodox agenda to outsiders"); Lorenzo Vidino, *The Muslim Brotherhood in Austria* 9 (Aug. 2017); *see also* Lorenzo Vidino, *The Closed Circle: Joining & Leaving the Muslim Brotherhood in the West* 7 (Colum. Univ. Press 2020) (describing a "conscious effort by the Western Brothers to downplay or deny their links to the Muslim Brotherhood").[4]

Nada alleges that he "knew he was the victim of a concerted effort to smear his name by falsely linking him and his company to terrorism" by July 2018, when he "learned that he had been designated" by a financial-watchdog entity as a compliance risk because of potential ties to extremist organizations.  Compl. ¶¶ 138–39.  "In spring and summer 2018," Nada "retained the U.K. law firm Carter-Ruck and sent legal letters to some of the outlets that had published false and defamatory statements about him demanding that they retract the statements and provide him with information about the parties responsible for writing them."  *Id.* ¶ 140; *see also id.* ¶ 138 (describing similar demand to a financial-watchdog organization on July 2, 2018), ¶ 141 (describing Carter-Ruck's efforts), ¶ 146 (alleging that Lord Energy "engaged a defamation law firm to bring legal action" against media organizations), ¶¶ 149–50 (describing Nada's emails to "to several of the financial institutions Lord Energy borrowed from, as well as some of Lord Energy's counterparties and business partners").

Meanwhile, Nada allegedly "filed a certificate of formation with the Texas Secretary of State" to create a U.S. subsidiary named Americas Lord Energy, Inc. ("Americas Lord Energy"),

---

[4] The Court may also take judicial notice of published sources, including such "materials as historical works, science, and art books."  *United States v. Neill*, 964 F. Supp. 438, 445 & n.8 (D.D.C. 1997) (quotation omitted).  The fact of publication, rather than the truth of the matters asserted therein, is what matters here.

Compl. ¶ 120, that "aim[ed] to expand into U.S. exports and imports," *id.* ¶ 121.  Nada does not allege that Americas Lord Energy entered into contracts or engaged in business in U.S. markets. Lord Energy dissolved Americas Lord Energy "in April 2019" and "filed for bankruptcy protection in Switzerland" later that month.  *Id.* ¶ 188.

## LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual allegations, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*; *see Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015).  In other words, the claim "must rise above the speculative level."  *Keren Kaymeth LeIsrael-Jewish Nat'l Fund v. Educ. for Just Peace in Middle East*, 66 F.4th 1007, 1013 (D.C. Cir. 2023) (quotation omitted).  "A claim cannot survive a motion to dismiss if based on inferences unsupported by facts or legal conclusions disguised as factual allegations."  *Id.* (quotation omitted); *see* Fed. R. Civ. P. 12(b)(6).

Moreover, when a RICO plaintiff alleges predicate acts of mail, wire, or bank fraud, the complaint must allege fraud with "the specificity required by the heightened pleading standard of" Federal Rule of Civil Procedure 9(b).  *Bates v. Nw. Hum. Servs., Inc.*, 466 F. Supp. 2d 69, 88 (D.D.C. 2006).

## ARGUMENT

This Court should dismiss Dr. Vidino from the case with prejudice because Nada has not, and cannot, plausibly allege that Dr. Vidino knowingly joined a criminal conspiracy to injure Nada and Lord Energy in the United States.  The Complaint barely mentions Dr. Vidino at all, naming him only in the RICO conspiracy count brought "[a]gainst [a]ll [d]efendants."  Compl. at 82.  The

handful of allegations referencing Dr. Vidino describe protected speech and petitioning activities undertaken as a globally recognized expert on the Muslim Brotherhood that cannot form the basis for liability consistent with the First Amendment. Even if this constitutional barrier could be overcome—and it cannot—Nada's sparse allegations against Dr. Vidino fall well short of stating the elements of a RICO conspiracy claim. This Court should reject Nada's attempt to evade the requirements for pleading defamation through a manufactured civil RICO lawsuit. Dismissal should be with prejudice because these fundamental flaws cannot be overcome by amendment.

I.     **The Complaint Should Be Dismissed On First Amendment Grounds.**

A.   **The First Amendment Bars Extending Civil Liability To Protected Conduct.**

The Supreme Court has long recognized that expansive civil liability has the potential to infringe the First Amendment rights at the heart of our democracy by punishing and chilling speech. "'[S]peech on matters of public concern . . . is at the heart of the First Amendment's protection,'" *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) (quoting *Dun & Broadstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–59 (1985)), and that protection "reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open,'" *id.* (quoting *Sullivan*, 376 U.S. at 270). This "express[]" constitutional shield "guard[s] in the same sentence, and under the same words, the freedom of religion, of speech, and of the press, insomuch, that whatever violates either, throws down the sanctuary which covers the others, and that libels, falsehoods, and defamation, equally with heresy and false religion, are withheld from the cognizance of federal tribunals."   8 Works of Thomas Jefferson 464–65 (Ford ed. 1904) (quoting Kentucky and Virginia Resolutions of 1798).

For this reason, plaintiffs cannot haul speakers into court based on allegations of falsity and injury standing alone. *See Snyder*, 562 U.S. at 461 (the First Amendment "shield[s]" protected

speech against claims for intentional infliction of emotional distress); *Sullivan*, 376 U.S. at 278
("[p]lainly . . . civil libel is a form of regulation that creates hazards to protected freedoms
markedly greater than those that attend reliance upon the criminal law" (quotation omitted)); *Phila.
Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986) (common-law defamation rules "must . . .
fall . . . to [this] constitutional requirement").  The First Amendment requires plaintiffs to prove
speech is unprotected because it was made with "'actual malice'—that is, with knowledge that it
was false or with reckless disregard of whether it was false or not." *Sullivan*, 376 U.S. at 279–80.
In all events, a civil action "can be maintained only to the extent it does not interfere with First
Amendment rights of free expression." *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 584 (D.C. Cir.
2016); *see also Snyder*, 562 U.S. at 458; *Sandvig v. Sessions*, 315 F. Supp. 3d 1, 17 (D.D.C. 2018)
("[P]rivate speech prohibitions can still implicate the First Amendment when given the imprimatur
of state protection through civil or criminal law.").

Similarly, plaintiffs cannot invoke broadly worded causes of action to punish or discourage
activities connected to petitioning government officials.  *See* U.S. Const. amend. I ("Congress shall
make no law . . . abridging the freedom of speech, or of the press; or the right of the people . . . to
petition the Government for a redress of grievances.").  When "a person petitions the government"
in good faith, "the First Amendment prohibits any sanction on that action." *Nader v. Democratic
Nat'l Comm.*, 567 F.3d 692, 696 (D.C. Cir. 2009).  The *Noerr-Pennington* doctrine implements
that general principle. Under the *Noerr-Pennington* doctrine, "petitioning the Government for
redress of grievances, whether by efforts to influence legislative or executive action or by seeking
redress in court, is immune from liability." *Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666,
677 (D.C. Cir. 2005); *see United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965); *E. R.R.
Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961).

The doctrine first arose in the context of the antitrust laws, but courts have extended it broadly to causes of action that raise similar concerns, *Venetian Casino*, 793 F.3d at 90 (federal labor laws), including to civil RICO claims, *Feld Ent., Inc. v. Am. Soc'y for Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288, 307–08 (D.D.C. 2012); *see also Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 930–31 (9th Cir. 2006); *cf. United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1123–24 (D.C. Cir. 2009) (per curiam) (recognizing that *Noerr-Pennington* could apply to RICO but concluding that defendants' statements were fraudulent and therefore unprotected).

### B.  Dr. Vidino Engaged In First Amendment Protected Speech.

This Court should dismiss Dr. Vidino from this action with prejudice because Nada seeks to hold him liable for constitutionally protected speech activities.  The Complaint falls well short of alleging the "malice" required to bring Dr. Vidino's speech as an expert on an issue of substantial public concern outside the First Amendment's protections, *Sullivan*, 376 U.S. at 281, and Nada cannot evade this fundamental constitutional barrier merely by asserting that protected speech furthered a criminal conspiracy.

Although the malice requirement first arose as a defense to common-law defamation claims, courts have applied it to civil RICO claims that are based on speech.  *See Savage v. Council on Am.-Islamic Rels., Inc.*, 2008 WL 2951281, at *12 (N.D. Cal. July 25, 2008).  This makes sense, as RICO claims based on speech implicate First Amendment concerns.  *See NOW, Inc. v. Scheidler*, 510 U.S. 249, 263–65 (1994) (Souter, J., concurring) (cautioning "courts applying RICO to bear in mind the First Amendment interests that could be at stake" because "RICO predicate acts may turn out to be fully protected First Amendment activity"); *Ne. Women's Ctr., Inc. v. McMonagle*, 868 F.2d 1342, 1348 (3d Cir. 1989) (expressing "grave concerns were these or any other defendants held liable under civil RICO for engaging in the expression of dissenting political opinions in a

manner protected under the First Amendment"); *Smithfield Foods, Inc. v. United Food & Com. Workers Int'l Union*, 585 F. Supp. 2d 789, 804 (E.D. Va. 2008) (recognizing that First Amendment limitations on civil RICO claims must be "analyzed under the specific facts of th[e] case"); *cf. United States v. Larson*, 807 F. Supp. 2d 142, 165–66 (W.D.N.Y. 2011) (recognizing First Amendment defense in criminal RICO cases).

When statements are "made about 'public figures,'" the actual malice standard applies. *Liberty Lobby, Inc. v. Rees*, 852 F.2d 595, 597 (D.C. Cir. 1988). There are two "subclassifications" of public figures: (1) those who are "public figures for all purposes" and (2) those who are "public figures for particular public controversies," *i.e.*, "limited-purpose public figure[s]." *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1292 (D.C. Cir. 1980). As relevant here, a limited-purpose public figure does not need to rise to the level of general notoriety, but is merely one who "voluntarily injects himself or is drawn into a particular public controversy and therefore becomes a public figure for a limited range of issues." *Id.* (quotation omitted). An organization may be a limited-purpose public figure. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (noting that the district court determined that respondents, a company and its founder, were limited-purpose public figures); *OAO Alfa Bank v. Ctr. for Pub. Integrity*, 387 F. Supp. 2d 20, 47 (D.D.C. 2005) (holding that "corporate plaintiffs . . . are also public figures for the purposes of the defamation analysis").

To determine whether speech concerns a limited-purpose public figure, the D.C. Circuit applies a three-part test. First, the court identifies "the relevant controversy and determine[s] whether it is a public controversy." *Jankovic*, 822 F.3d at 585. Second, the subject of the speech must have "played a significant role in th[e] controversy." *Id.* And third, the allegedly defamatory statement must be "germane" to the figure's participation in the controversy. *Id.*

To begin, Dr. Vidino's speech about the Muslim Brotherhood's operations in Europe and the United States—the only speech by Dr. Vidino that Nada references in the Complaint—is protected speech made in his capacity as an academic expert about a well-known public organization on a matter of significant public importance.  The only specific statement by Dr. Vidino alleged in the Complaint involves a Wikipedia article that quoted him as saying that members of the Muslim Brotherhood in the West engage in a "conscious effort . . . to downplay or even deny their ideological links to the Muslim Brotherhood."  Compl. ¶ 163.  The vague allegation that Dr. Vidino agreed to "provide '[i]nteresting leads/rumors . . . regarding the subject of investigation organisations/individuals/funding in Europe,'" *id.* ¶ 110, and in the United States, *id.* ¶ 126, similarly involves the Muslim Brotherhood's operations in the West.  This is classic speech about a "public controversy" because it involves "uncovering facts and theories to help the public formulate some judgment" on an issue that has been "debated publicly."  *Waldbaum*, 627 F.2d at 1297.  Indeed, Dr. Vidino has testified before Congress on this exact topic, *see Muslim Brotherhood Hr'g*, and lawmakers have debated at least twice whether to designate the Muslim Brotherhood on the State Department's list of foreign-terrorist organizations, *see, e.g.*, Muslim Brotherhood Terrorist Designation Act, S.3151, 117th Cong. (2021); Muslim Brotherhood Terrorist Designation Act, S.2230, 114th Cong. (2015).  These statements are part of Dr. Vidino's life's work for nearly 20 years, and his position on the Muslim Brotherhood has been consistent throughout that period.  *See, e.g.*, *Algeria Terrorism Hr'g*.

Next, the Muslim Brotherhood and its members "thrust themselves to the forefront" of the controversy by taking the very actions that make the organization so controversial.  *Waldbaum*, 627 F.2d at 1297–98 (noting the importance of the subject's "position in the controversy").  Whatever the ultimate merits and results of this public debate, there can be no dispute that the

Muslim Brotherhood and its membership are at the center of the controversy. Dr. Vidino is entitled under the First Amendment to take a position on this debate, whether when called before Congress to address the issue, when testifying in court, or in his work as an academic expert on the subject.

Finally, Dr. Vidino's speech is "germane" to the controversy because it directly relates to the Muslim Brotherhood's operations and the links between historical and global branches of the organization. *See Jankovic*, 822 F.3d 589 (germaneness looks at the "role in a public controversy"). Here again, the allegations in the Complaint demonstrate as much: Dr. Vidino's alleged role was limited to speech about the Muslim Brotherhood's organizing efforts, membership, and law-enforcement investigations into the same. *See* Compl. ¶¶ 110, 126, 163. And judicially noticeable testimony on this exact topic before Congress and in criminal and civil proceedings in federal court puts the germaneness of this speech beyond dispute.

Because the speech alleged in the Complaint involves a limited-purpose public figure, Nada must allege actual malice to survive a motion to dismiss on First Amendment grounds.[5]

The actual malice standard is a "daunting" hurdle to clear. *McFarlane v. Esquire Mag.*, 74 F.3d 1296, 1308 (D.C. Cir. 1996). It requires showing that the defendant made a statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *Jankovic*, 822 F.3d at 584 (quotation omitted). And "few public figures have been able" to make this showing. *Id.* at 590 (quotation and alterations omitted). To plead actual malice, a plaintiff must allege facts

___

[5] There is another reason why the actual malice standard applies here. Even a private figure must meet the actual malice standard "in order to recover . . . punitive damages." *Phila. Newspapers*, 475 U.S. at 774; *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 348–50 (1974). RICO's treble damages provision, which Nada invokes here, *see* Compl. ¶ 253, is punitive in nature. *United States v. Philip Morris USA Inc.*, 396 F.3d 1190, 1201 (D.C. Cir. 2005) (explaining that in civil RICO cases, "[i]ndividual plaintiffs are made whole and defendants punished through treble damages under 18 U.S.C. § 1964(c)"); *see also BEG Invs., LLC v. Alberti*, 85 F. Supp. 3d 13, 28–29 (D.D.C. 2015) (holding that RICO's treble damages provision is inapplicable to municipalities because treble damages are punitive in nature).

that would render it plausible that a defendant "in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).  And it is not enough to allege actual malice "'in the abstract'"—rather, the plaintiff "'must demonstrate actual malice *in conjunction* with a false defamatory statement.'" *Boley v. Atl. Monthly Grp.*, 950 F. Supp. 2d 249, 262 (D.D.C. 2013) (quoting *Tavoulareas v. Piro*, 817 F.2d 762, 794 (D.C. Cir. 1987)).  Otherwise, the complaint must be dismissed.  *Nunes v. WP Co. LLC*, 513 F. Supp. 3d 1, 7 (D.D.C. 2020).

Here, Nada comes nowhere close to meeting this pleading standard.  The Complaint is devoid of any allegations that Dr. Vidino made any statements about Nada or Lord Energy, let alone that he made false statements about them, and certainly not that he acted with malice in making any statements.  Indeed, Nada's threadbare allegations put him between a rock and a hard place with respect to Dr. Vidino.  Because Nada does not allege that Dr. Vidino made any statements about Nada or Lord Energy, the only "public figure" about which Dr. Vidino spoke was the Muslim Brotherhood.  Nada will either have to argue that Dr. Vidino's statements about the Muslim Brotherhood implicated Nada and Lord Energy—an association Nada emphatically denies, Compl. ¶¶ 9, 93, 97—or concede that Dr. Vidino did not say anything about Nada or his company.  The first argument would defeat Nada's claims by admitting the broader "conspiracy" was correct to imply an association, and the second would require dismissing Dr. Vidino from the case.

First, Nada does not allege *any* statement by Dr. Vidino at all about Nada or Lord Energy, never mind a *false* statement.  While the Complaint is full of allegations of "fake reporting," "false and misleading articles," "negative articles," and "Wikipedia pages," Nada never alleges that Dr. Vidino himself made or published any such statements.  *See, e.g.*, Compl. ¶¶ 14, 15, 106, 122, 125; *see also id.* ¶¶ 128, 130, 134, 142, 144, 148.  Rather, Nada alleges that *Alp* "relied on" Dr. Vidino's "academic credentials" to "legitimize the false and misleading statements" that others

"had published," *id.* ¶ 34, and that unknown third parties quoted Dr. Vidino's general statements about the Muslim Brotherhood in a Wikipedia page to "add a thin veneer of legitimacy" to Alp's "spurious claims," *id.* ¶¶ 161, 163.

Second, Nada does not allege that Dr. Vidino acted with malice in making any statements. The word malice does not appear once in the Complaint.  While Nada alleges that the publication of the allegedly false statements was commercially motivated, *see, e.g.*, Compl. ¶ 228, he makes no allegations whatsoever that Dr. Vidino was motivated to make false statements about the Muslim Brotherhood for any reason or knew that any statements he made were false.  This case is thus similar to *Savage*, in which the court dismissed a civil RICO count because the complaint did "not even attempt[] to . . . allege" that "defendants' allegedly injurious false statement or portrayal of plaintiff's own speech was done with actual malice—that is, with knowledge that it was false or with reckless disregard of whether it was false or not."  2008 WL 2951281, at *12 (quotation omitted).

Nada's allegation that Dr. Vidino agreed to receive "3,000 Euros for his work" with Alp in providing leads regarding the Muslim Brotherhood's operations and members, Compl. ¶ 110, is irrelevant because the Complaint does not allege that Dr. Vidino made statements about Nada or Lord Energy after (or indeed, before) he supposedly signed an agreement with Alp in January 2018. But even if it were relevant, the mere fact that speech was paid "'does not prevent [it] from being a form of expression whose liberty is safeguarded by the First Amendment.'"  *Time, Inc. v. Hill*, 385 U.S. 374, 397 (1967) (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952)). Compensation does not remove protected speech from the First Amendment's ambit—were it otherwise, the vast majority of speech that informs public debate through print, broadcasts, and mass media would be unprotected.  Courts have uniformly held that "a speaker is no less a speaker

because he or she is paid to speak." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 801 (1988); *see Time, Inc.*, 385 U.S. at 396–97 (analyzing article published "'for trade purposes'"); *Joseph Burstyn*, 343 U.S. at 502 (same for "motion pictures"); *Feld*, 873 F. Supp. 2d at 307–08 (rejecting argument that "compensated" statements in publicity campaign meant to spur legislation were unprotected).

### C.  Dr. Vidino Is Entitled To Immunity Under The *Noerr-Pennington* Doctrine.

This Court should also dismiss Dr. Vidino from the case because he is entitled to immunity under the *Noerr-Pennington* doctrine.  Nada seeks to hold Dr. Vidino liable for speaking about the Muslim Brotherhood's operations in the West.  As noted, the only particular statement alleged involved a Wikipedia article that quoted Dr. Vidino as saying that there is a "conscious effort by the Western Brothers to downplay or even deny their ideological links to the Muslim Brotherhood" as well as stating that a specific organization should be considered a Brotherhood affiliate.  Compl. ¶ 163. But that is the same topic—Islamic fundamentalism—on which Dr. Vidino has testified before Congress at least five times, served as an expert witness in federal court on many occasions, and published books setting out his academic research.  That petitioning conduct falls squarely within the *Noerr-Pennington* doctrine, and Nada cannot be allowed to infringe Dr. Vidino's right to continue this advocacy by stretching civil RICO to encompass what amounts to a baseless defamation claim.

The *Noerr-Pennington* doctrine is "broad."  *Feld*, 873 F. Supp. 2d at 307.  It "protects petitions directed at 'all departments of the Government,'" *Venetian Casino*, 793 F.3d at 90, such as testifying before Congress, *Flood v. Nat'l Football League*, 2009 WL 86577, at *2 (E.D. Cal. Jan. 8, 2009), and testifying in court, *King v. Twp. of E. Lampeter*, 17 F. Supp. 2d 394, 414 (E.D. Pa. 1998).  The doctrine is not limited to government-facing speech and includes "publicity

campaign[s] to influence governmental action" such as participating in "press conferences, ma[king] other statements to news outlets, and post[ing] letters on organizational websites." *Feld*, 873 F. Supp. 2d at 307–08 (quotation omitted); *see Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 502 (1988) ("*Noerr* immunity cannot be dismissed on the ground that the conduct at issue involved no 'direct' petitioning of government officials."). Thus, speech "incidental to a valid effort to influence governmental action" is immune under *Noerr-Pennington*. *Allied Tube*, 486 U.S. at 502.

*Noerr-Pennington* immunity is inapplicable only when petitioning activity was "predicated on fraud or deliberate misrepresentation" or corrupt conduct, such as bribes. *Philip Morris USA*, 566 F.3d at 1123 (quotation omitted) (no immunity where defendant knowingly made fraudulent statements about cigarettes). Just like the "actual malice" standard, the threshold for invoking the fraud exception is difficult to meet. *See E. Sav. Bank, FSB v. Papageorge*, 31 F. Supp. 3d 1, 19–20 (D.D.C. 2014) (rejecting argument that *Noerr-Pennington* did not apply where plaintiff failed to show that lawsuits filed by the defendant were objectively baseless). And it does not matter that a defendant was "compensated" for his speech, as *Noerr-Pennington* still applies in that context. *Feld*, 873 F. Supp. 2d at 307; *see also Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371–72 (2018) ("professional speech" enjoys the same protections as any other speech).

*Feld* is instructive. In that case, the plaintiff sued several entities and an individual under civil RICO for making allegedly fraudulent claims about its use of Asian elephants in its circus. 873 F. Supp. 2d at 302, 304. Among other things, the plaintiff claimed that the individual defendant made false and misleading statements, including by testifying before Congress and in court and publishing articles in return for $190,000 in payments from the organizational defendants. *Id.* at 301, 303. This Court found that the *Noerr-Pennington* doctrine applied to those statements

because they were part of "publicity campaigns to influence governmental action," *id.* at 307–08, and, thus, that the plaintiff could not rely on them to make out a civil RICO claim.

Here, Nada seeks to hold Dr. Vidino liable for racketeering conspiracy based on speech that is indistinguishable from his speech petitioning the government regarding the Muslim Brotherhood.  Dr. Vidino has testified before Congress on multiple instances regarding extremism and the operations of the Muslim Brotherhood in particular.  For instance, in 2011, Dr. Vidino testified about the "offshoots" of the Muslim Brotherhood in the West, explaining that the Muslim Brothers "retai[n] historical, financial, personal, organizational, and most important, ideological ties to the Muslim Brotherhood" in the Middle East but have "operational independence." *Muslim Brotherhood Hr'g*; *see also supra*, at 4 (collecting additional examples of congressional testimony). Likewise, Dr. Vidino regularly serves as an expert witness in criminal and civil cases on similar subjects.  *See, e.g.*, *Ceasar*, 10 F.4th at 72 (noting Dr. Vidino "is an expert on terrorism"); *Shafi*, 2018 WL 3159769, at *2 (noting that Dr. Vidino is an expert "on ISIS, other terrorist organizations and individuals," and "the Muslim Brotherhood"); *see also supra*, at 5 (collecting cases describing additional instances of expert testimony on extremist organizations).

Dr. Vidino's testimony before and briefing of policymakers are part of his larger work as an academic to influence policy with solutions that resonate—a goal Dr. Vidino also furthers in his role as Director of the George Washington University Program on Extremism.  *See* Compl. ¶¶ 34, 107.  The research that Dr. Vidino allegedly performed for Alp is indistinguishable from these broader efforts.  For example, Dr. Vidino has previously written books explaining that "Yussuf Nada," Nada's father, was one of the "pioneers" of the Muslim Brotherhood in the West and describing the "conscious effort by the Western Brothers to downplay or deny their links to the Muslim Brotherhood."  Vidino, *The Closed Circle*, *supra*, at 4, 7; *see also* Lorenzo Vidino, *The*

*New Muslim Brotherhood in the West* 31 (Colum. Univ. Press 2010) ("[Yussuf] Nada's skills as a businessman enabled him to play a key role in the financial aspects of the Brotherhood's establishment in the West.").  Nada does not allege otherwise—in fact, the allegations are consistent with and indistinguishable from that protected conduct.  *See, e.g.*, Compl. ¶ 163 (alleging that a Wikipedia article quoted Dr. Vidino's prior research about the Muslim Brotherhood's "conscious effort" to downplay links between members).

The best Nada can offer is that Dr. Vidino was "willing to say whatever [Alp] wanted in exchange for money."  Compl. ¶ 107.  But this "conclusory statement[]" lacks any supporting factual allegations, and this Court need not "credit" it even on a motion to dismiss.  *Iqbal*, 556 U.S. at 686.  Even taken at face value, Nada's allegation does not include any claim that Dr. Vidino "sa[id]" anything other than true statements about the Muslim Brotherhood.  Indeed, Nada concedes in the same breath that Dr. Vidino is "credible and highly-credentialed."  Compl. ¶ 107. Shorn of its conclusory assertions, there is absolutely nothing in the Complaint allowing Nada to argue plausibly that the *Noerr-Pennington* doctrine does not apply to Dr. Vidino's protected speech activities.  As a result, Dr. Vidino is immune from liability for the advocacy that forms the basis for his inclusion in this lawsuit, and this Court should reject Nada's effort to chill his protected activities by dismissing the claim against Dr. Vidino with prejudice.

## II.    The Complaint Fails to State a RICO Conspiracy Claim Against Dr. Vidino.

In the alternative, this Court should dismiss Dr. Vidino from the case for the further reason that Nada does not plausibly allege any of the elements of a civil RICO conspiracy claim with respect to Dr. Vidino.  The Complaint includes no allegations that Dr. Vidino knew about any racketeering conspiracy or agreed to further such a conspiracy's goals.  Nor does Nada plausibly allege any substantive RICO violation as against the other Defendants that Dr. Vidino could have

20

agreed to further as part of a supposed conspiracy.  Nada's sole claim against Dr. Vidino—for civil

RICO conspiracy—should be dismissed with prejudice.

### A.  Nada Does Not Allege That Dr. Vidino Conspired To Violate RICO.

To state a claim for RICO conspiracy, the plaintiff must allege that "(1) two or more people

agreed to commit a subsection (c) offense, and (2) a defendant agreed to further that endeavor."

*RSM Prod.*, 682 F.3d at 1048; *see* 18 U.S.C. § 1962(d).  To be liable, "each defendant" must "assent"

to the RICO conspiracy.  *Barlow v. McLeod*, 666 F. Supp. 222, 225 (D.D.C. 1986).  A defendant

"need not agree to be the one to commit the predicate acts," but he must at a minimum "adopt the

goal of furthering or facilitating the criminal endeavor."  *RSM Prod.*, 682 F.3d at 1048 (quotation

omitted).  A mere "conclusory statement" that defendants "conspired to violate RICO" is

insufficient.  *Cheeks v. Ft. Meyer Constr. Corp.*, 216 F. Supp. 3d 146, 162 (D.D.C. 2016) (quotation

and alteration omitted).  Rather, the plaintiff must allege that the defendant "knew of" the

racketeering conspiracy and "agreed to foster its goals."  *RSM Prod.*, 682 F.3d at 1048.

*RSM Production* is illustrative.  There, the D.C. Circuit affirmed the dismissal of a RICO

conspiracy claim against a law firm because the complaint did not "support[] a plausible inference"

that the firm "knew of the bribery-racketeering conspiracy and agreed to foster its goals."  682

F.3d at 1048.  The plaintiffs had entered an agreement with Grenada for oil and natural hydrocarbon

exploration that eventually soured.  *Id.* at 1046.  Grenada hired counsel to represent it in

international arbitration against the plaintiffs concerning offshore licenses.  *Id.*  The plaintiffs then

sued Grenada's lawyers, alleging that they were part of a conspiracy to bribe Grenadian officials

to deny the plaintiffs offshore-licensing rights.  *Id.* at 1047.  Specifically, the plaintiffs alleged that

the attorneys "knowingly agreed to perform services of a kind which have facilitated the activities

of those who are operating the Enterprise . . . in an illegal manner."  *Id.* (quotation omitted).  In

rejecting the RICO conspiracy claim, the D.C. Circuit emphasized that the plaintiffs "target[ed]

[the defendant's] services as attorneys, nothing more." *Id.* at 1051.  The court explained that defending a client was not enough to show that the law firm agreed to promote acts of racketeering. *Id.* at 1050.  Similarly, allegations that the firm was paid by third parties supposedly involved in the conspiracy was "insufficient" to show that they were "part of the bribery-racketeering conspiracy."  *Id.*  Thus, the allegations were insufficient to support a plausible inference that the attorneys "agreed to join or acted to foster the bribery-racketeering conspiracy."  *Id.* at 1051.

Here, Nada's allegations regarding Dr. Vidino are even more threadbare than those in *RSM Production* and are insufficient as a matter of law to show that Dr. Vidino "knew of" the alleged "racketeering conspiracy and agreed to foster its goals."  682 F.3d at 1048.  Nada alleges that Dr. Vidino "was hired by Alp as a contractor to provide leads on new targets and research and analysis on the Muslim Brotherhood" and that "Vidino consulted with Alp about Lord Energy." Compl. ¶ 34.  That does not show that Dr. Vidino knew about any alleged conspiracy.  As Nada concedes, Dr. Vidino is an "expert" on the Muslim Brotherhood, *id.* ¶ 90, and his consulting with Alp on that topic is no more unlawful than Dr. Vidino's academic research itself.  Thus, Dr. Vidino, like the attorneys in *RSM Production*, merely provided services consistent with "normal business practice" that do not establish knowing agreement to join a RICO conspiracy.  682 F.3d at 1049. Nor does Nada allege that Dr. Vidino, in consulting with Alp, actually "committed any of the predicate acts" or in any way "acted to foster" the racketeering conspiracy.  *Id.* at 1051.

Nada attempts to link Dr. Vidino to the conspiracy by alleging that he somehow knew that Alp had been retained by the UAE, citing a 2023 *New Yorker* article quoting Dr. Vidino as saying he thought that the UAE was the "most realistic client."  Compl. ¶ 109.  But this allegation fails to show that Dr. Vidino knew of or agreed to foster the goals of a conspiracy.  The *New Yorker* article makes clear that the reporter asked a leading question—"I said, [Vidino] must have realized that

only the U.A.E. had the means and the motive to pay a private investigator to dig up dirt on Brotherhood-style Islamists"—to which Dr. Vidino responded, "[t]hey were the most realistic client" but that "it wasn't clear cut whether it was the Emiratis, the Saudis, the Israelis, or some private entity in the States."   Read in full context, the *New Yorker* article referenced by and incorporated in the Complaint shows that Nada's allegation is misleading:  Dr. Vidino never stated that he knew at the time that the UAE was Alp's ultimate alleged client.  Rather, he answered a leading question and quickly clarified that "it was not clear cut."[6]

In any event, this allegation does not suffice to show that Dr. Vidino knew of or supported a conspiracy.  The Complaint states that in meeting with Dr. Vidino in January 2018, Alp decided "to disguise the identity of his Emirati clients, telling Vidino that Alp had been hired by a 'London-based law firm.'"  Compl. ¶ 109.  Thus, at the time of the meeting, Alp allegedly concealed the identity of its *supposed* client, which shows that Dr. Vidino was not privy to any alleged conspiracy and could not have agreed to it.  Dr. Vidino's comment quoted in the New Yorker article was made years later to a reporter in tentative terms and cannot retroactively establish knowledge.

The most one could infer from this allegation is that Dr. Vidino suspected that Alp had ultimately been hired by the UAE.  But that does not establish Dr. Vidino's knowledge of any alleged conspiracy—Nada alleges no reason that Dr. Vidino should have assumed that the UAE retained Alp for any unlawful purpose.  As a matter of law, even knowing that a client "had a reputation for corruption and bribery" is not enough to show an "agreement to further acts of racketeering."  *RSM Prod.*, 682 F.3d at 1048, 1050 (quotation omitted).  And "it is implausible to infer" from the fact that "alleged co-conspirators . . . provided the funding" for lawful services that

---

[6] David Kirkpatrick, *The Dirty Secrets of a Smear Campaign*, New Yorker (Mar. 27, 2023), https://www.newyorker.com/magazine/2023/04/03/the-dirty-secrets-of-a-smear-campaign.

the "provision of [lawful] services . . . was intended to further the criminal endeavor." *Id.* at 1050–51. Likewise, it is implausible to infer that Dr. Vidino knew that the payment from Alp was intended to further a supposedly criminal endeavor. Nada alleges that Dr. Vidino "signed a contract with Alp to provide" research, that Alp paid him "3,000 Euros for his work," and that Dr. Vidino and Alp employee Brero had a "$1,000 dinner" in Switzerland. Compl. ¶¶ 109–10. Because Dr. Vidino routinely provides research services as a subject-matter expert to governments and private firms, the allegation that Dr. Vidino was paid for his research "is more likely explained by" his "normal business practice of providing" research on the Muslim Brotherhood. *RSM Prod.*, 682 F.3d at 1051 (quotation omitted). Even "allegations that a defendant acted in ways consistent with a conspiratorial agreement, but also equally well explained by legitimate . . . incentives, do not suffice to show illegality." *Id.* at 1051–52 (quotation and alteration omitted).

Moreover, the Complaint alleges that Dr. Vidino's involvement with Alp began months *after* Alp had already decided to "target" Nada and Lord Energy. Nada alleges that Dr. Vidino was hired to provide "leads" about "individuals" and a "[l]ist of members," and that Alp planned to ask him to prepare a list of "key [Muslim Brotherhood] individuals/organisations/companies." Compl. ¶¶ 110, 126. But the first time allegation of contact between Alp and Dr. Vidino dates to January 2018, at least four months after Alp had allegedly targeted Nada and Lord Energy in September 2017. *See id.* ¶¶ 91, 108. Under Nada's theory of the case, Dr. Vidino could not have pointed out Nada or Lord Energy as a "lead[]" because they were already targets—indeed, Nada alleges that Badal asked Vidino "for a meeting *to discuss Lord Energy.*" *Id.* ¶ 108 (emphasis added).

In short, "the complaint alleges no conduct" by Dr. Vidino "beyond the provision of normal . . . services" and "so fails to support a reasonable inference" that Dr. Vidino "agreed to assist others in the commission of unlawful acts." *RSM Prod.*, 682 F.3d at 1051 (quotation and

alterations omitted); *see Twombly*, 550 U.S. at 556–57 (allegations that a defendant acted in ways consistent with conspiratorial agreements, but also equally explained by legitimate economic incentives, do "not suffice . . . to show illegality" on a motion to dismiss).

### B. Nada Does Not Allege A Substantive RICO Violation And Therefore Cannot Maintain A RICO Conspiracy Claim.

Nada does not name Dr. Vidino in the racketeering count under 18 U.S.C. § 1962(c). Compl. ¶¶ 240–53.  Nevertheless, Nada's failure to allege a substantive RICO violation is an independent reason for concluding that Nada failed to plead a RICO conspiracy as against Dr. Vidino under 18 U.S.C. § 1962(d).  *See Republic of Kazakhstan*, 380 F. Supp. 3d at 65 ("Because the Court finds that plaintiff failed to allege a substantive RICO violation under Section 1962(c), it also finds that it has failed to plead a conspiracy to violate RICO under Section 1962(d)."); *Greenpeace, Inc. v. Dow Chem. Co.*, 808 F. Supp. 2d 262, 274 (D.D.C. 2011) (similar).

A substantive RICO violation under Section 1962(c) consists of four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *W. Assocs. Ltd. P'Ship, ex rel. Ave. Assocs. Ltd. P'Ship v. Mkt. Square Assocs.*, 235 F.3d 629, 633 (D.C. Cir. 2001) (quotation omitted).  To state a civil RICO claim, the plaintiff must also allege a *domestic* injury to "business or property," 18 U.S.C. § 1964(c); *RJR Nabisco, Inc. v. European Community*, 579 U.S. 325, 350 (2016), and that the alleged misconduct bears "some direct relation" to the asserted injury as a matter of proximate cause, *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 265–68 (1992). Civil RICO actions also must be brought within four years of the plaintiff's discovery of the injury. *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987).

Nada does not plausibly allege any of these elements, and, moreover, brought this action too late for either of his civil RICO claims to fall within RICO's statute of limitations.

####        i.    *Nada does not plausibly allege a predicate RICO offense.*

To state a RICO claim, "a plaintiff must allege, inter alia, two or more predicate acts that constitute a 'pattern of racketeering activity.'" *Meng v. Schwartz*, 116 F. Supp. 2d 92, 95 (D.D.C. 2000) (quotation omitted). The "law is clear" that "defamation is not a predicate act under RICO." *Ctr. for Immigr. Stud. v. Cohen*, 410 F. Supp. 3d 183, 191–92 (D.D.C. 2019) (citing *Hourani v. Mirtchev*, 796 F.3d 1 (D.C. Cir. 2015)). And a plaintiff cannot plead around this rule by "shoehorn[ing] a defamation claim into the RICO framework." *Id.* at 191. Courts in this Circuit have not looked favorably on plaintiffs who attempt to "end-run the requirements for a defamation claim" by pleading it as a RICO violation. *Teltschik v. Williams & Jensen, PLLC*, 748 F.3d 1285, 1288 (D.C. Cir. 2014); *see, e.g.*, *Cohen*, 410 F. Supp. 3d at 191 (collecting cases).

In *Cohen*, for instance, this Court rejected a civil RICO claim alleging wire fraud based on defendants' designation of the plaintiff as a "hate group" and dissemination of that designation over the Internet. 410 F. Supp. 3d at 187, 194. This Court found that the plaintiff failed to allege wire fraud because the designations "d[id] not depend upon objective data or evidence, and there is no basis upon which to establish that they were *known to be false when made*." *Id.* at 191 (emphasis added). This Court also cited *Marks v. City of Seattle*, 2003 WL 23024522 (W.D. Wash. Oct. 16, 2003), favorably. *Id.* In that case, the court similarly dismissed a civil RICO claim for failure to state a predicate act where a plaintiff alleged that defendant aired a broadcast making false statements about her, including that she used city equipment for personal business. 2003 WL 23024522, at *2. The court reasoned that the claims amounted to "defamation or false light" and were not "false statements in the sense of fraudulent misrepresentation." *Id.* at *6.

Here, Nada's Complaint is similarly deficient. Nada alleges a scheme that supposedly engaged in defamation. Nada himself admits as much, characterizing the alleged misconduct as a "defamatory campaign against [Nada] and his companies." Compl. ¶ 205; *see also id.* ¶ 138

(email where Nada characterizes the conduct against him as an "unknown defamation effort"); *id.* (stating that a financial-compliance entity "stymied" Nada's efforts "to identify his unknown defamers"). Nowhere in the Complaint does Nada allege that the statements made about him, which he claims were false, were made with *knowledge* that they were false. To be sure, Nada alleges that one of the journalists Alp supposedly hired "routinely published stories he knew to be false and misleading," but he never alleges that any of these articles were about Nada. *See id.* ¶ 35. Similarly, Nada alleges that Alp at times "scour[ed] the internet looking for any 'negative' information" even if it "was wildly farfetched . . . or had been proven false" and "disseminated the false claims." *Id.* ¶¶ 83–84. But again, Nada does not allege any statements that Alp knew were false or say anything at all about the supposedly disproven third-party statements. The Complaint repeats that the statements were "false," but nowhere claims that any member of the supposed conspiracy knew that the statements were false when they made them. *See, e.g.*, *id.* ¶¶ 107, 112– 13, 119, 127, 130. When the Complaint does address knowledge, it has nothing to do with the false statements. For instance, Nada alleges that "Alp knew all of this," referencing that Lord Energy was having "serious problems with Western banks to receive credits," *id.* ¶ 137, and that other Defendants "knew, and intended, that the banks would suffer financial harm," *id.* ¶ 249. Again, that is not knowledge of false statements. *Id.* ¶ 249.

Failure to allege any knowingly false statement is fatal to Nada's RICO claim because it shows that he alleges nothing more than defamation, which is insufficient as a RICO predicate, and not intentional fraud or misrepresentation. *Cohen*, 410 F. Supp. 3d at 191; *see, e.g.*, *Steele v. Fannie Mae*, 134 F. Supp. 3d 191, 200 (D.D.C. 2015) ("To plead a *prima facie* claim for fraudulent misrepresentation, a plaintiff must allege (1) a false representation (2) in reference to a material

fact, (3) made with knowledge of its falsity, (4) with intent to deceive, and (5) action . . . taken in reliance upon the representation" (quotations omitted)).

Even if the predicate offense were *not defamation*, Nada does not plausibly allege any other predicate RICO offense.  Nada attempts to base his RICO claim on conclusory assertions of "bank fraud" and "wire fraud," Compl. ¶ 243, both of which must be alleged "with particularity," Fed. R. Civ. P. 9(b); *see Bates*, 466 F. Supp. 2d at 88 ("It is well-settled in this and other Circuits that where acts of mail and wire fraud constitute the alleged predicate racketeering activity, these acts are subject to the heightened pleading requirement of [Rule 9(b)]." (quotation and alterations omitted)).  Nada does not plausibly allege fraud under any standard, let alone under the Rule 9(b) standard.

With respect to bank fraud, many courts have held that "only a defrauded financial institution may assert bank fraud as a predicate act for a federal RICO claim." *Am. Biocare, Inc. v. Howard & Howard Att'ys, PLLC*, 2016 WL 5661583, at *8 (E.D. Mich. Sept. 30, 2016) (collecting cases).  Nada does not allege that either he or Lord Energy is a defrauded financial institution.  Moreover, bank fraud requires alleging that the defendant "(1) engaged in a course of conduct designed to deceive a federally chartered or insured financial institution into releasing property" and "(2) possessed an intent to victimize the institution by exposing it to actual or potential loss." *United States v. Crisci*, 273 F.3d 235, 239–40 (2d Cir. 2001) (quotation omitted). Nada does not allege that Defendants received money from any bank or that any bank released any property, and he does not plausibly allege with particularity that Defendants intended to harm any bank.[7]

___

[7] The bare statement that Defendants other than Dr. Vidino "knew, and intended, that the banks would suffer financial harm" from terminating their relationship with Lord Energy, Compl. ¶ 249, falls well short of plausibly stating an intent to defraud, particularly under Rule 9(b).  *See Iqbal*, 556 U.S. at 686; *Twombly*, 550 U.S. at 566–67.  That conclusory, two-word assertion of intent is never explained, revisited, or referenced anywhere else in the Complaint, which alleges intent

The elements of wire fraud are "(1) formation of a 'scheme to defraud'" and "(2) use of interstate wire communication to further that scheme." *United States v. Lemire*, 720 F.2d 1327, 1334–35 (D.C. Cir. 1983). "At the core of the judicially defined 'scheme to defraud' is the notion of a trust owed to another and a subsequent breach of that trust." *Id.* at 1335. In the RICO predicate-act context, "the defendant must make a false statement or omission of fact *to the plaintiff*." *Bates*, 466 F. Supp. 2d at 91 (quotation omitted, emphasis in original). Nada does not allege that any false statements were made *to him*; rather, he alleges that his defamers were "unknown" to him and communicated exclusively to others. *E.g.*, Compl. ¶ 138. Moreover, Nada does not allege with the "particularity" required by Rule 9(b) "what [fraudulent] statements were made and in what context, when they were made, who made them, and the manner in which the statements were misleading." *Bates*, 466 F. Supp. 2d at 89 (quoting *Intex Recreation Corp. v. Team Worldwide Corp.*, 390 F. Supp. 2d 21, 24 (D.D.C. 2005)). Nada does not allege a single statement made by Dr. Vidino about Nada or Lord Energy, and just about every statement allegedly made by other Defendants was "prepared," "drafted," and "shared *internally*" within Alp or between Alp and the UAE. Compl. ¶¶ 246(a)–(e), 247(a)–(j) (emphasis added). That is not enough to allege wire fraud against the plaintiffs with particularity or otherwise. *See Bates*, 466 F. Supp. 2d at 91.[8]

---

exclusively in reference to the UAE's purported desire to address a competitive threat. Nor does this bare allegation show the other elements required to establish bank fraud, as explained above.

[8] The few statements that Nada alleges were made by other Defendants to non-participants in the alleged scheme, *see* Compl. ¶ 246 (f)–(h), likewise were not made to Nada or Lord Energy and cannot show "actual fraud *directed at the plaintiffs*." *Bates*, 466 F. Supp. 2d at 91 (emphasis in original). As explained below, this requirement arises both from the substantive wire-fraud offense and from RICO's proximate-cause requirement, which requires alleging that the plaintiff was "the direct victim" of the defendants' "purportedly fraudulent statements." *Id.* (quoting *Anza v. Ideal Steel Supply Co.*, 547 U.S. 451, 457 (2006)). Here, the supposed recipients of the few statements allegedly made to non-participants were compliance firms, news outlets, and (in one instance) Credit Suisse, and Nada cannot bring RICO claims on their behalf. *See id.*; *infra*, at 34–36.

> ### ii.   *Nada does not plausibly allege a domestic injury.*

Nada also fails to allege any domestic injury within the United States.  The Supreme Court has held that because RICO's private right of action does not apply extraterritorially, "[a] private RICO plaintiff . . . must allege and prove a *domestic* injury to its business or property."  *RJR Nabisco*, 579 U.S. at 346 (emphasis in original).  The domestic-injury analysis is a "context-specific inquiry" that turns on where the asserted harm "arises."  *Yegiazaryan v. Smagin*, 143 S. Ct. 1900, 1909 (2023).  The plaintiff must show that "the nature of the alleged injury, the racketeering activity that directly caused it, and the injurious aims and effects of that activity" "sufficiently ground the injury in the United States."  *Id.* at 1909–10.  Thus, what matters is not the injury "in insolation," but the injury "as the product of racketeering activity."  *Id.* at 1910.  To that end, courts consider where "[m]uch of the alleged racketeering activity that caused the injury occurred" and where the "injurious effects of the racketeering activity [were] largely manifested."  *Id.*

In *Humphrey v. GlaxoSmithKline PLC*, 905 F.3d 694 (3d Cir. 2018), the Third Circuit concluded in a comparable context that the plaintiffs had failed to allege a domestic injury.  The plaintiffs had founded an investigation firm in China that worked with American companies doing business in China to assist with American anti-bribery compliance.  *Id.* at 696.  Plaintiffs brought a civil RICO lawsuit against a multinational healthcare company for allegedly engaging in widespread bribery in China to "destroy[]" and "eviscerate[]" their "prospective business ventures." *Id.* at 696–97.  Applying a context-specific analysis, the court "ha[d] no difficulty concluding that Plaintiffs have not alleged a domestic injury" because "Plaintiffs lived in China," had their principal place of business there, and "provided services in China" to American companies.  *Id.* at 707–08.  That the plaintiffs alleged "loss of goodwill and some unidentified number of actual and prospective U.S. customers" was not enough to allege a domestic injury.  *Id.* at 708.

Here, Nada alleges RICO violations by a supposed enterprise that had aims exclusively outside the United States, engaged in conduct exclusively outside the United States, and caused specific and cognizable harm exclusively outside the United States. The Complaint includes no factual allegations that the aim of the alleged racketeering activity was to cause harm in the United States. Instead, the focus of the Complaint is on the "competitive threat" that Lord Energy supposedly posed in "crude oil exported to Asia." Compl. ¶ 75. Nada alleges that the objects of the alleged racketeering activity were Lord Energy and Nada. *Id.* ¶ 14. But Lord Energy was incorporated and has its principal place of business in Switzerland, *id.* ¶ 20, and Nada was a citizen of Italy and resided there, *id.* ¶ 19. While the Complaint includes conclusory allegations that Nada registered a U.S. subsidiary named Americas Lord Energy *after* the supposed enterprise was underway—and quickly shuttered that subsidiary, apparently before doing any actual business— Nada never alleges that the conspirators knew about or took aim at the subsidiary in any way. *See id.* ¶¶ 7, 22, 74, 120, 187–88, 198. Logically, the aim of the racketeering activity could not have been harm in the United States because the Complaint alleges that the racketeering activity began in 2017, *id.* ¶ 76, yet Americas Lord Energy was not formed in Texas until April 24, 2018, *see id.* ¶ 120.

Similarly, Nada does not allege that any racketeering activity occurred in the United States. For instance, the Complaint includes an allegation that Alp investigated U.S. citizens, but does not allege that any of that work occurred in the United States or how those investigations were related to or part of the same racketeering activity targeting Nada. *See, e.g.*, Compl. ¶¶ 213–19. Similarly, the Complaint includes an allegation that Dr. Vidino resided in the United States, *id.* ¶ 34, but never alleges that Dr. Vidino did any of his work for Alp in the United States—in fact, every allegation about Dr. Vidino in the Complaint supposedly took place in Switzerland, *see, e.g.*, *id.* ¶ 109.

Furthermore, the asserted injuries occurred outside the United States.  Lord Energy filed for bankruptcy in Switzerland.  Compl. ¶ 188.  While Nada attempts to allege that the bankruptcy in Switzerland had effects in the United States by impacting unspecified third-party creditors and investors, *id.* ¶ 197–200, such an injury is insufficiently direct to show domestic injury.  *See RJR Nabisco*, 579 U.S. at 346 (a private RICO plaintiff must allege and prove domestic injury "to *its* business or property." (emphasis added)); *Humphrey*, 905 F.3d at 707–08 (harms to American clients of foreign business are not enough); *Greenpeace, Inc.*, 808 F. Supp. 2d at 273 ("RICO plaintiffs generally cannot recover for harm that befalls third parties.").  Nor does Nada's allegation that Americas Lord Energy dissolved suffice to show domestic injury.  At most, the harm to Americas Lord Energy—which was "preparing to engage in the oil and gas sector in the United States—was a harm to "prospective" business, which is "not enough to overcome the Supreme Court's caution against extraterritorial application of domestic law."  *Humphrey*, 905 F.3d at 708.

### iii.    *Nada does not plausibly allege a "pattern of racketeering activity."*

To show a pattern of racketeering activity, Nada must allege more than "a single scheme, a single injury, and few victims."  *W. Assocs.*, 235 F.3d at 636 (quotation omitted).  The D.C. Circuit has emphasized that allegations of concentrated impact make it "virtually impossible for plaintiffs to state a RICO claim."  *Id.* at 634 (quotation omitted); *see, e.g.*, *Papageorge*, 31 F. Supp. 3d at 12–13 (pleasing "a 'pattern' consisting of a single scheme" is insufficient).  The relevant inquiry is whether the scheme involves "a single discrete goal."  *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265 (D.C. Cir. 1995).  Where only a "single discrete goal" is alleged, "the number of predicate acts and the length of time over which the acts occurred [are] far less important" and cannot, standing alone, suffice to state a substantive RICO claim.  *Papageorge*, 31 F. Supp. 3d at 13 (quotation omitted).

Here, Nada alleges a "'pattern' consisting of a single scheme," a "single injury" and a few

victims. *Papageorge*, 31 F. Supp. 3d at 12–13.  The Complaint states that the scheme served a

"single discrete goal," namely, to "eliminate Lord Energy as a competitive threat."  Compl. ¶ 91.

That is insufficient to show a *pattern* of racketeering activity.  Courts have found, for example,

that a single scheme to "wrest control of [] [p]roperty from the plaintiff" is insufficient.

*Papageorge*, 31 F. Supp. 3d at 12.  Similarly, conduct "retaliat[ing] against, discredit[ing], and

ultimately silenc[ing]" a plaintiff by "manufacturing negative news stories" and "exposing his

confidential communications" involved "a single scheme" that is not actionable under civil RICO.

*Broidy Cap. Mgmt. LLC v. Muzin*, 2020 WL 1536350, at *10 (D.D.C. 2020) (quotations omitted).

Nada alleges only a single injury—the bankruptcy of Lord Energy—and at most two victims—

Nada and Lord Energy, a privately held corporation over which Nada had complete control.  Compl.

¶ 19.  That, too, is not enough to show a pattern of racketeering.  *See Edmondson*, 48 F.3d at 1264–

65 (alleged scheme involving three victims insufficient); *Lopez v. Council on Am.-Islamic Rels.*

*Action Network, Inc.*, 657 F. Supp. 2d 104, 115 (D.D.C. 2009) ("one scheme, spanning about two

years, with only four identified victims" is insufficient to maintain civil RICO claims).

### iv.     *Nada does not plausibly allege proximate causation.*

Nada also fails to allege that the asserted misconduct fell within the "first step" in the causal

chain between wrongdoing and injury as is necessary to satisfy RICO's proximate cause

requirement.  *Holmes*, 503 U.S. at 271–72; *see also Anza*, 547 U.S. at 456–57, *Murray v. Mulgrew*,

704 F. Supp. 2d 45, 47 (D.D.C. 2010).  In the civil RICO context, proximate cause requires alleging

"some direct relation," and a link that is "too remote, purely contingent, or indirect is insufficient."

*Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010) (quotation and alteration omitted); *see*

*City of Oakland v. Wells Fargo & Co.*, 14 F.4th 1030, 1035 (9th Cir. 2021) (en banc) (explaining

that the statutory "direct relation" requirement is "more stringent" than the "foreseeability" standard for proximate cause used in other contexts).

In *Hemi Group*, the City of New York sued an online seller of cigarettes for allegedly causing the loss of tax revenue for retail cigarette purchases.  559 U.S. at 5.  The City alleged that Hemi failed to provide necessary information about its customers to the State, meaning the State could not pass on the information to the City, and the City, in turn, could not ensure that customers paid cigarette taxes on their online purchases.  *Id.* at 9.  In rejecting this theory, the Supreme Court explained that "the conduct directly responsible for the City's harm was the customers' failure to pay their taxes" to the City, whereas the conduct constituting "the alleged fraud" was Hemi's failure to file reports with the State.  *Id.* at 11.  The Court held that the City had not alleged proximate cause and refused to "extend RICO liability to situations where the defendant's fraud on the third party (the State) has made it easier for a *fourth* party (the taxpayer) to cause harm to the plaintiff (the City)."  *Id.* (emphasis in original).

*Hemi Group* is directly applicable here.  Nada's allegations involve a causal chain that is far too attenuated to satisfy RICO's proximate-cause requirement.  Nada's theory is that the Defendants caused journalists and others to make or repeat false statements about Nada and Lord Energy, which were then picked up by media organizations and websites, which then led terrorist-financing watchlists to designate Nada and Lord Energy as a risk based in part on that information, which then led (yes there is more) banks to refuse to do business with Lord Energy, which eventually led to its bankruptcy.  This causal chain certainly requires "'go[ing] beyond the first step.'"  *Hemi Grp.*, 559 U.S. at 10 (quoting *Holmes*, 503 U.S. at 271).

The conduct directly responsible for Nada's asserted injury was the bank's refusal to do business with Lord Energy, while the conduct constituting the alleged RICO violation was

34

sponsoring false statements by third parties.  That omits at least three steps by independent actors: (1) the media organizations and websites that picked up the statements; (2) the watchlist organizations that credited the statements as suggesting a risk; and (3) the bank officials that decided to cut off financing in light of information available at the time, including Nada's representations contesting the statements in letters sent directly to the banks, Compl. ¶¶ 149–50.

As in *Hemi Group*, Nada asks this Court to "extend RICO liability" to situations where misrepresentations to a third party (the news organizations and websites), caused a fourth party (watchlists) to designate Nada as a risk, which then caused a fifth party (the banks) to stop doing business with Lord Energy.  Any one of these additional steps would be enough to defeat proximate cause because "the conduct directly causing the harm"—the banks' decisions to cut off financing— "was distinct from the conduct giving rise to the [alleged] fraud." *Hemi Grp.*, 559 U.S. at 11 (citing *Anza*, 547 U.S. at 458).  But here, "[s]everal intervening causes break the chain." *Martinez v. JPMorgan Chase Bank, N.A.*, 178 F. Supp. 3d 184, 192 (S.D.N.Y. 2016) (dismissing RICO claim where plaintiff's failure to pay a judgment against him was directly caused by Cuba's failure to pay a judgment owed to the plaintiff, not the bank's allegedly unlawful failure to freeze Cuban government assets on plaintiff's request); *see also City of Oakland*, 14 F.4th at 1039–40 (reversing district court and panel decision and dismissing Fair Housing Act claim under the "direct relation" standard where plaintiff failed to allege that tax revenue lost because of "an increase in foreclosures [was] 'surely attributable' to the [alleged] discriminatory lending").

### v.    *Nada does not plausibly allege a RICO enterprise.*

Nada is required to plead facts showing that the Defendants were part of an "enterprise." The Complaint includes a conclusory allegation that Defendants formed an "association-in-fact enterprise."  Compl. ¶ 243.  An association-in-fact enterprise must have three structural features: (1) "a purpose," (2) "relationships among those associated with the enterprise," and (3) "longevity

sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). "Individuals who act independently and without coordination, however, cannot constitute a RICO enterprise." *Quick v. EduCap, Inc.*, 318 F. Supp. 3d 121, 142 (D.D.C. 2018). Such an association does not exist unless it is "an entity separate and apart from the pattern of activity in which it engages." *United States v. Turkette*, 452 U.S. 576, 583 (1981). Nor is there continuity if the predicate acts extend "over a few weeks or months and threaten[] no future criminal conduct." *Stankevich v. Kaplan*, 156 F. Supp. 3d 86, 94 (D.D.C. 2016) (quotation omitted). Thus, a plaintiff has not alleged an "enterprise" where the "common denominator among the three defendants . . . is their involvement in the particular transaction which is the subject of th[e] suit." *Dist. Telecomms. Dev. Corp. v. Dist. Cablevision, Inc.*, 638 F. Supp. 418, 421 (D.D.C. 1985).

The Complaint does not allege facts showing a RICO enterprise. Nada alleges only that The only common denominator alleged between the Defendants is that the UAE contracted with Alp (which, in turn, contracted with others) to engage in particular conduct alleged to constitute predicate acts—Nada asserts no additional commonality between the Defendants. For instance, Nada alleges that Dr. Vidino entered into a contract with Alp to provide research on the Muslim Brotherhood, Compl. ¶ 34, but there are no allegations that Dr. Vidino knew about the existence of the enterprise or was associated with Alp in any other way or with the UAE in any way at all. Nor does Nada allege that the UAE, Alp, and the other Defendants shared a common motive or purpose independently of the alleged predicate acts. *See, e.g.*, Compl. ¶ 1 ("the [UAE] and some of its top officials managed, direct, and bankrolled" the alleged campaign), ¶ 5 (alleging "[t]he competitive threat Lord Energy posed to the UAE and ADNOC" was the motivation for the scheme). A bare allegation that parties were retained for a particular purpose does not state a RICO enterprise. *See Martinez*, 178 F. Supp. 3d at 191 (dismissing claim where complaint "merely

state[d] that JPM Chase provided banking services to BNP Paribas or Cuban entities, which is insufficient to constitute a RICO enterprise"). Furthermore, the Complaint includes no allegations of a threat of "future criminal conduct" by the supposed enterprise. *Strankevich*, 156 F. Supp. 3d at 94 (quotation omitted). This failure is yet another reason that Nada cannot be allowed to shoehorn his gripes into a cause of action that plainly does not apply.[9]

### vi.   Nada's RICO claims are barred by the statute of limitations.

The Court should also dismiss the RICO conspiracy count against Dr. Vidino because, like Nada's substantive RICO count, it is barred by the applicable four-year statute of limitations. "[W]here, as here, it appears from the face of the complaint that the relevant statute of limitations bars much of [Plaintiffs'] claims, the court may rule in favor of the moving party." *Molecular Diagnostics Labs. v. Hoffmann-La Roche Inc.*, 402 F. Supp. 2d 276, 283 (D.D.C. 2005) (dismissing claims at the motion-to-dismiss stage that plainly accrued outside the limitations period).

A plaintiff has four years from discovering an injury to bring a civil RICO claim. *See Agency Holding Corp.*, 483 U.S. at 156. "Under the discovery rule, a cause of action accrues when the plaintiff has knowledge of (or by the exercise of reasonable diligence should have knowledge of) (1) the existence of the injury, (2) its cause in fact, and (3) *some* evidence of wrongdoing." *Feld*, 873 F. Supp. 2d at 308 (emphasis in original, quotation omitted). The Supreme Court has

---

[9] Nor can Nada show a RICO enterprise by alleging collaboration within the UAE among UAE officials and the UAE's state-owned oil company. "Plaintiffs 'may not plead the existence of a RICO enterprise between a corporate defendant and its agents or employees acting within the scope of their roles for the corporation because a corporation necessarily acts through its agents and employees.'" *US Dominion, Inc. v. MyPillow, Inc.*, 2022 WL 1597420, at *5 (D.D.C. May 19, 2022) (quoting *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1357 (11th Cir. 2016)). At minimum, they were acting as the UAE's agents, which is "entirely inconsistent" with the allegation that they "formed a RICO enterprise." *Id.* (dismissing RICO claim alleging that Dominion formed a RICO enterprise with public-relations firm Hamilton Place and law firm Clare Locke). That leaves Nada with allegations that a government contracted with others for particular services, not a well-pleaded claim of a RICO enterprise.

"been at pains to explain that discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." *Rotella v. Wood*, 528 U.S. 549, 555 (2000).  "Awareness of the pattern of RICO activity is not necessary to start the statute of limitations period running." *Hargraves v. Cap. City Mortg. Corp.*, 140 F. Supp. 2d 7, 17 (D.D.C. 2000).

Here, the Complaint makes clear that Nada "knew" before July 9, 2018, that he was "the victim of a concerted effort to smear his name by falsely linking him and his company to terrorism." Compl. ¶ 139.  In May 2018, Nada supposedly sent emails to a blogging website asking them to remove an article containing allegedly false information about him and continued to send such emails and letters over the following months.  *Id.* ¶¶ 140, 149.  In June 2018, Nada supposedly "reported the defamatory campaign against him and his companies to Swiss law enforcement."  *Id.* ¶ 205.  The Complaint states that the culmination of the harm to Nada occurred "[b]y April 2019," when Lord Energy was "over-indebted by about $80 million," "dissolved its U.S. subsidiary," and "filed for bankruptcy protection in Switzerland."  *Id.* ¶¶ 186, 188; *see id.* ¶ 187 (calling the events in April 2019 "the death knell for Lord Energy").  Even taking the latest point in time when Nada knew of these injuries—April 2019—the RICO statute of limitations ran out four years later in April 2023.  But Nada filed his complaint in January 2024.  That makes this action untimely as a matter of law based solely on the allegations included in the Complaint.

## III.    Dismissal Should Be With Prejudice.

Dr. Vidino should be dismissed from this action with prejudice because "the allegation of other facts consistent with the challenged pleading could not possibly cure the[se] deficienc[ies]." *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1340 (D.C. Cir. 2015) (quoting *Belizan v. Hershon*, 434 F.3d 579, 583 (D.C. Cir. 2006)).  Nada cannot plausibly allege additional facts sufficient to overcome the First Amendment's protections because, as a matter of law, Dr. Vidino's

speech and petitioning activities cannot give rise to RICO liability. *See id.* (dismissing defamation claim with prejudice where the plaintiff "relie[d] exclusively on two questions in one article" that "d[id] not qualify as false and defamatory statements under D.C. law"). Similarly, Nada cannot allege consistent, additional facts that bring this case within RICO's four-year statute of limitations given the allegation in the Complaint that Nada was on notice of legally actionable injury as early as Spring 2018. *See Samuel v. Wells Fargo & Co.*, 311 F. Supp. 3d 10, 17 (D.D.C. 2018) (dismissing claims "with prejudice because the statute of limitations has run"); *Barden v. Goodsell*, 2021 WL 5921351, at *6 (D. Idaho Dec. 15, 2021) (same for civil RICO claimed filed more than four years after limitations period began to run).[10]

## CONCLUSION

Because Nada has not, and cannot, overcome the First Amendment's protections for Dr. Vidino's protected speech and petitioning advocacy or state a plausible RICO conspiracy claim against him, this Court should dismiss Dr. Vidino from this action with prejudice.

---

[10] For the same reasons, Dr. Vidino should be dismissed with prejudice even if the Court dismisses the other Defendants without prejudice for lack of subject-matter or personal jurisdiction. *See N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1253 (D.C. Cir. 2020) ("dismissal for want of subject-matter jurisdiction" is "without prejudice" because the court cannot review the merits); *Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016, 1038 (D.C. Cir. 2020) (similar for personal jurisdiction). A particular defendant may "be dismissed as [a] part[y] to [an] action" where "[t]he [c]omplaint fails to assert a cognizable legal claim against [him]" regardless of the outcome as against other defendants. *Johnson v. Holder*, 2013 WL 6157345, at *2 n.1 (D.D.C. Nov. 25, 2013); *see also Barden*, 2021 WL 5821351, at *6 (dismissing RICO claims on a defendant-by-defendant basis).

Dated:  July 16, 2024

Respectfully submitted,

*/s/ Matthew D. McGill*
Matthew D. McGill (D.C. Bar #481430)
Nathaniel J. Tisa (D.C. Bar #90006243)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
T: (202) 887-3680
F: (202) 530-9662
mmcgill@gibsondunn.com
ntisa@gibsondunn.com

*Counsel for Lorenzo Vidino*