**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| HAZIM NADA, *et al.*, <br><br> *Plaintiffs*, <br><br> *v.* <br><br> THE UNITED ARAB EMIRATES, *et al.*, <br><br> *Defendants*. | Case No. 24-cv-206-ABJ |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT LORENZO VIDINO'S
MOTION TO DISMISS AMENDED COMPLAINT**

Matthew D. McGill (D.C. Bar #481430)
Nathaniel J. Tisa (D.C. Bar #90006243)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
T: (202) 887-3680
F: (202) 530-9662
mmcgill@gibsondunn.com
ntisa@gibsondunn.com

*Counsel for Lorenzo Vidino*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

STATEMENT OF THE CASE ............................................................................................. 4

LEGAL STANDARDS ...................................................................................................... 10

ARGUMENT ..................................................................................................................... 10

   I.   The Amended Complaint Should Be Dismissed On First Amendment Grounds. ............ 11

      A.  The First Amendment Bars Extending Civil Liability To Protected Conduct. ............ 11

      B.  Dr. Vidino Engaged In First Amendment Protected Speech. ...................................... 13

          i.   Dr. Vidino's speech about matters of public concern is protected. .................... 15

          ii.  Speech about limited public figures is protected. ............................................... 17

      C.  Dr. Vidino Is Entitled To Immunity Under The *Noerr-Pennington* Doctrine. ............. 21

  II.  The Amended Complaint Fails to State a RICO Conspiracy Claim
      Against Dr. Vidino. ..................................................................................................... 26

      A.  Nada Does Not Allege That Dr. Vidino Conspired To Violate RICO. ......................... 27

      B.  Nada Does Not Allege A Substantive RICO Violation And Therefore Cannot Maintain
         A RICO Conspiracy Claim. ..................................................................................... 31

          i.   Nada does not plausibly allege a single predicate RICO offense, let alone a
             pattern of racketeering activity. ........................................................................ 32

          ii.  Nada does not plausibly allege a domestic injury. .............................................. 36

          iii.  Nada does not plausibly allege proximate causation. .......................................... 41

          iv.  Nada's RICO claims are barred by the statute of limitations. ............................ 43

 III.  Dismissal Should Be With Prejudice. ............................................................................ 44

CONCLUSION .................................................................................................................. 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbas v. Foreign Policy Grp., LLC*,
    783 F.3d 1328 (D.C. Cir. 2015) ........................................................................44, 45

*Adler v. Loyd*,
    496 F. Supp. 3d 269 (D.D.C. 2020) ...........................................................................35

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*,
    483 U.S. 143 (1987) ...............................................................................................32, 43

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
    486 U.S. 492 (1988) ........................................................................................................22

*Am. Biocare, Inc. v. Howard & Howard Att'ys, PLLC*,
    2016 WL 5661583 (E.D. Mich. Sept. 30, 2016) .....................................................35

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ........................................................................................................14

*Anyanwutaku v. Wilson*,
    2005 WL 774854 (D.D.C. Apr. 5, 2005) ..................................................................38

*Anza v. Ideal Steel Supply Co.*,
    547 U.S. 451 (2006) ...........................................................................................36, 41, 42

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...........................................................................................10, 26, 35

*W. Assocs. Ltd. P'Ship, ex rel. Ave. Assocs. Ltd. P'Ship v. Mkt. Square Assocs.*,
    235 F.3d 629 (D.C. Cir. 2001) ....................................................................................32

*Barden v. Goodsell*,
    2021 WL 5921351 (D. Idaho Dec. 15, 2021) ..........................................................45

*Barlow v. McLeod*,
    666 F. Supp. 222 (D.D.C. 1986) .................................................................................27

*Bascuñán v. Elsaca*,
    874 F.3d 806 (2d Cir. 2017) .........................................................................................40

*Bates v. Nw. Hum. Servs., Inc.*,
    466 F. Supp. 2d 69 (D.D.C. 2006) ..................................................................10, 35, 36

*Bath Petrol. Storage, Inc. v. Mkt. Hub Partners, L.P.*,
    229 F.3d 1135 (2d Cir. 2000) ................................................................13

*BEG Invs., LLC v. Alberti*,
    85 F. Supp. 3d 13 (D.D.C. 2015) ..........................................................18

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .........................................................10, 31, 35

*Boley v. Atl. Monthly Grp.*,
    950 F. Supp. 2d 249 (D.D.C. 2013) ......................................................19

*Care One Mgmt., LLC v. United Healthcare Workers E.*,
    2024 WL 1327972 (D.N.J. Mar. 28, 2024) .............................................37

*Cheeks v. Ft. Meyer Constr. Corp.*,
    216 F. Supp. 3d 146 (D.D.C. 2016) ......................................................27

*City of Oakland v. Wells Fargo & Co.*,
    14 F.4th 1030 (9th Cir. 2021) (en banc) .........................................41, 43

*Comm. to Defend U.S. Const. v. Moon*,
    776 F. Supp. 568 (D.D.C. 1991) ...........................................................34

*Confederate Mem'l Ass'n, Inc. v. Hines*,
    995 F.2d 295 (D.C. Cir. 1993) ..............................................................44

*Covad Commc'ns Co. v. Bell Atl. Corp.*,
    398 F.3d 666 (D.C. Cir. 2005) ..............................................................13

*Covad Commc'ns Co. v. Bell Atl. Corp.*,
    407 F.3d 1220 (D.C. Cir. 2005) ..............................................................6

*Ctr. for Immigr. Stud. v. Cohen*,
    410 F. Supp. 3d 183 (D.D.C. 2019) ..........................................32, 33, 34

*Dun & Broadstreet, Inc. v. Greenmoss Builders, Inc.*,
    472 U.S. 749 (1985) ..............................................................................11

*E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
    365 U.S. 127 (1961) ..............................................................................13

*E. Sav. Bank, FSB v. Papageorge*,
    31 F. Supp. 3d 1 (D.D.C. 2014) ............................................................22

*Feld Ent. Inc. v. Am. Soc'y for Prevention of Cruelty to Animals*,
    873 F. Supp. 2d 288 (D.D.C. 2012) ...................13, 21, 22, 23, 24, 43

*Flanagan v. Islamic Republic of Iran*,
   190 F. Supp. 3d 138 (D.D.C. 2016) ................................................................6

*Flood v. Nat'l Football League*,
   2009 WL 86577 (E.D. Cal. Jan. 8, 2009) ......................................................21

*Frederick Douglass Found., Inc. v. District of Columbia*,
   82 F.4th 1122 (D.C. Cir. 2023) ......................................................................4

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323 (1974) ......................................................................................18

*Global Relief Found., Inc. v. N.Y. Times Co.*,
   390 F.3d 973 (7th Cir. 2004) ........................................................................16

*Greenfield v. City of Miami Beach*,
   844 F. Supp. 1519 (S.D. Fla. 1992) ..............................................................16

*Greenpeace, Inc. v. Dow Chem. Co.*,
   808 F. Supp. 2d 262 (D.D.C. 2011) ........................................................32, 40

*Hargraves v. Cap. City Mortg. Corp.*,
   140 F. Supp. 2d 7 (D.D.C. 2000) ..................................................................43

*Harris v. D.C. Water & Sewer Auth.*,
   791 F.3d 65 (D.C. Cir. 2015) ........................................................................10

*Hemi Grp., LLC v. New York*,
   559 U.S. 1 (2010) ....................................................................................41, 42

*Holmes v. Secs. Inv. Prot. Corp.*,
   503 U.S. 258 (1992) ..........................................................................32, 41, 42

*Hourani v. Mirtchev*,
   796 F.3d 1 (D.C. Cir. 2015) ....................................................................32, 41

*Hourani v. Mirtchev*,
   943 F. Supp. 2d 159 (D.D.C. 2013) ........................................................41, 44

*Humphrey v. GlaxoSmithKline PLC*,
   905 F.3d 694 (3d Cir. 2018) ..........................................................38, 39, 40

*Int'l Bhd. of Teamsters, Local 734 Health Workers & Welfare Tr. v. Phillip
   Morris, Inc.*, 196 F.3d 818 (7th Cir. 1999) ..................................................13

*Jankovic v. Int'l Crisis Grp.*,
   822 F.3d 576 (D.C. Cir. 2016) ..................................................12, 15, 18, 19

*Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Inv.'s Servs., Inc.*,
175 F.3d 848 (10th Cir. 1999) ......................................................................16

*Johnson v. Holder*,
2013 WL 6157345 (D.D.C. Nov. 25, 2013) ..................................................45

*Joseph Burstyn, Inc. v. Wilson*,
343 U.S. 495 (1952) ......................................................................................21

*Keren Kaymeth LeIsrael-Jewish Nat'l Fund v. Educ. for Just Peace in Middle*
*East*, 66 F.4th 1007 (D.C. Cir. 2023) ..........................................................10

*King v. Twp. of E. Lampeter*,
17 F. Supp. 2d 394 (E.D. Pa. 1998) ..............................................................21

*LeFande v. District of Columbia*,
613 F.3d 1155 (D.C. Cir. 2010) ....................................................................15

*Lewis v. Pension Benefit Guar. Corp.*,
314 F. Supp. 3d 135 (D.D.C. 2018) ................................................................8

*Liberty Lobby, Inc. v. Rees*,
852 F.2d 595 (D.C. Cir. 1988) ......................................................................14

*Marks v. City of Seattle*,
2003 WL 23024522 (W.D. Wash. Oct. 16, 2003) ........................................33

*Martinez v. JPMorgan Chase Bank, N.A.*,
178 F. Supp. 3d 184 (S.D.N.Y. 2016) ..........................................................42

*McFarlane v. Esquire Mag.*,
74 F.3d 1296 (D.C. Cir. 1996) ......................................................................18

*Meade v. Kiddie Acad. Domestic Franchising, LLC*,
501 F. App'x 106 (3d Cir. 2012) ..................................................................37

*Meng v. Schwartz*,
116 F. Supp. 2d 92 (D.D.C. 2000) ................................................................32

*Mirbaha v. Pompeo*,
513 F. Supp. 3d 179 (D.D.C. 2021) ................................................................5

*Molecular Diagnostics Labs. v. Hoffmann-La Roche Inc.*,
402 F. Supp. 2d 276 (D.D.C. 2005) ..............................................................43

*Montgomery v. Risen*,
875 F.3d 709 (D.C. Cir. 2017) ......................................................................15

*Murray v. Mulgrew,*
   704 F. Supp. 2d 45 (D.D.C. 2010) ...........................................................................41

*N. Am. Butterfly Ass'n v. Wolf,*
   977 F.3d 1244 (D.C. Cir. 2020) ...............................................................................45

*N.Y. Times Co. v. Sullivan,*
   376 U.S. 254 (1964) ...............................................................................2, 11, 12, 13

*NAACP v. Claiborne Hardware Co.,*
   458 U.S. 886 (1982) ...........................................................................................11, 12

*Nader v. Democratic Nat'l Comm.,*
   567 F.3d 692 (D.C. Cir. 2009) .................................................................................12

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra,*
   138 S. Ct. 2361 (2018) .............................................................................................22

*Ne. Women's Ctr., Inc. v. McMonagle,*
   868 F.2d 1342 (3d Cir. 1989) ...................................................................................14

*NOW, Inc. v. Scheidler,*
   510 U.S. 249 (1994) ..................................................................................................13

*Nunes v. WP Co. LLC,*
   513 F. Supp. 3d 1 (D.D.C. 2020) .............................................................................19

*United States ex rel. O'Connor v. U.S. Cellular Corp.,*
   2022 WL 971290 (D.D.C. Mar. 31, 2022) ...............................................................26

*OAO Alfa Bank v. Ctr. for Pub. Integrity,*
   387 F. Supp. 2d 20 (D.D.C. 2005) ...........................................................................14

*Optimum, S.A. v. Legent Corp.,*
   926 F. Supp. 530 (W.D. Pa. 1996) ...........................................................................39

*Owens v. Republic of Sudan,*
   826 F. Supp. 2d 128 (D.D.C. 2011) ...........................................................................6

*Paris Partners, L.P. v. Russo,*
   1995 WL 746585 (S.D.N.Y. Dec. 14, 1995) ...........................................................37

*Phila. Newspapers, Inc. v. Hepps,*
   475 U.S. 767 (1986) ...................................................................................12, 15, 18

*Republic of Kazakhstan v. Stati,*
   380 F. Supp. 3d 55 (D.D.C. 2019) .......................................................................3, 31

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
   487 U.S. 781 (1988)...........................................................................................21

*RJR Nabisco, Inc. v. European Community*,
   579 U.S. 325 (2016).............................................................................32, 36, 40

*Rotella v. Wood*,
   528 U.S. 549 (2000)...........................................................................................43

*RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*,
   682 F.3d 1043 (D.C. Cir. 2012)...............................................2, 27, 28, 29, 30, 31

*Rux v. Republic of Sudan*,
   495 F. Supp. 2d 541 (E.D. Va. 2007) ..............................................................6

*Samuel v. Wells Fargo & Co.*,
   311 F. Supp. 3d 10 (D.D.C. 2018)...................................................................45

*Sandvig v. Sessions*,
   315 F. Supp. 3d 1 (D.D.C. 2018).....................................................................12

*Savage v. Council on Am.-Islamic Rels., Inc.*,
   2008 WL 2951281 (N.D. Cal. July 25, 2008)..............................................13, 20

*Shatsky v. Palestine Liberation Org.*,
   955 F.3d 1016 (D.C. Cir. 2020).......................................................................45

*Smithfield Foods, Inc. v. United Food & Com. Workers Int'l Union*,
   585 F. Supp. 2d 789 (E.D. Va. 2008) .............................................................14

*Smithfield Foods, Inc. v. United Food & Com. Workers Int'l Union*,
   585 F. Supp. 2d 815 (E.D. Va. 2008) .............................................................13

*Snyder v. Phelps*,
   562 U.S. 443 (2011)....................................................................................11, 12

*Sosa v. DIRECTV, Inc.*,
   437 F.3d 923 (9th Cir. 2006) ..........................................................................13

*St. Amant v. Thompson*,
   390 U.S. 727 (1968)..........................................................................................19

*Steele v. Fannie Mae*,
   134 F. Supp. 3d 191 (D.D.C. 2015)................................................................34

*Tavoulareas v. Piro*,
   817 F.2d 762 (D.C. Cir. 1987).........................................................................19

*Teltschik v. Williams & Jensen, PLLC*,
    748 F.3d 1285 (D.C. Cir. 2014)............................................................33

*Time, Inc. v. Hill*,
    385 U.S. 374 (1967)......................................................................21

*United Mine Workers of Am. v. Pennington*,
    381 U.S. 657 (1965)......................................................................13

*United States v. Alebbini*,
    979 F.3d 537 (6th Cir. 2020) ............................................................6

*United States v. Almadaoji*,
    2021 WL 5002373 (S.D. Ohio Oct. 27, 2021)................................................6

*United States v. Ceasar*,
    10 F.4th 66 (2d Cir. 2021) .........................................................5, 23

*United States v. Crisci*,
    273 F.3d 235 (2d Cir. 2001)............................................................35

*United States v. Dais*,
    482 F. Supp. 3d 800 (E.D. Wis. 2020)...................................................6

*United States v. Hendricks*,
    950 F.3d 348 (6th Cir. 2020) ............................................................6

*United States v. Larson*,
    807 F. Supp. 2d 142 (W.D.N.Y. 2011) ...................................................14

*United States v. Lemire*,
    720 F.2d 1327 (D.C. Cir. 1983).....................................................35, 36

*United States v. Neill*,
    964 F. Supp. 438 (D.D.C. 1997) .........................................................7

*United States v. Philip Morris USA Inc.*,
    396 F.3d 1190 (D.C. Cir. 2005)........................................................18

*United States v. Philip Morris USA Inc.*,
    566 F.3d 1095 (D.C. Cir. 2009) (per curiam) .......................................13, 22

*United States v. Ramic*,
    2024 WL 2274529 (W.D. Ky. May 20, 2024)...........................................5, 6

*United States v. Shafi*,
    2018 WL 3159769 (N.D. Cal. June 28, 2018) .....................................5, 6, 23

*Venetian Casino Resort, L.L.C. v. NLRB,*
    793 F.3d 85 (D.C. Cir. 2015) ....................................................................2, 13, 21

*Von Kahl v. Bureau of Nat'l Affairs, Inc.,*
    934 F. Supp. 2d 204 (D.D.C. 2013) ...................................................................25

*Waldbaum v. Fairchild Publ'ns, Inc.,*
    627 F.2d 1287 (D.C. Cir. 1980) ...................................................................14, 17

*Wash. Tennis & Educ. Found., Inc. v. Clark Nexsen, Inc.,*
    270 F. Supp. 3d 158 (D.D.C. 2017) ...................................................................37

*Yegiazaryan v. Smagin,*
    143 S. Ct. 1900 (2023) .......................................................................................37

**Constitutional Provisions**

U.S. Const. Amend. I ..............................................2, 3, 10, 11, 12, 13, 14, 18, 21, 45

**Statutes**

15 U.S.C. § 1 ................................................................................................................4

15 U.S.C. § 2 ................................................................................................................4

15 U.S.C. § 1125 .........................................................................................................4

18 U.S.C. § 1962 ...................................................................................4, 27, 31, 32

18 U.S.C. § 1964 ...........................................................................................4, 18, 32

**Court Rules**

Fed. R. Civ. P. 9 ..............................................................................................10, 35, 36

Fed. R. Civ. P. 10 ......................................................................................................26

Fed. R. Civ. P. 15 ........................................................................................................4

**Other Authorities**

*Algeria's Struggle Against Terrorism: Hr'g before H. Subcomm. on Int'l Rels.,*
    109th Cong. (Mar. 3, 2005) .........................................................................5, 17

*Beyond Iraq & Syria: ISIS' Global Reach: Hr'g before the S. Foreign Rels.*
    *Comm.,* 115th Cong. (June 8, 2017) ...................................................................5

David Kirkpatrick, *The Dirty Secrets of a Smear Campaign,*
    New Yorker (Mar. 27, 2023) ............................................................................29

Eugene Volokh, *Tort Liability and the Original Meaning of the Freedom of Speech, Press, and Petition*, 96 Iowa L. Rev. 249 (2010) ........................................................11

*Inside the Mind of ISIS: Hr'g before the S. Comm. on Homeland Sec. & Gov't Affs.*, 114th Cong. (Jan. 20, 2016) ............................................................5

Isabel Vega & Pablo Munoz, *Bloquean una cuenta de la mayor asociación musulmana de España*, ABC España (Feb. 4, 2020) ...........................................8, 16

*Islamic Extremism in Europe: Hr'g before the H. Subcomm. on Europe and Emerging Threats*, 109th Cong. (Apr. 27, 2005) .......................................................5

Lorenzo Vidino, *The Closed Circle: Joining & Leaving the Muslim Brotherhood in the West* (Colum. Univ. Press 2020)...........................................................7, 8, 24

Lorenzo Vidino, *The New Muslim Brotherhood in the West* (Colum. Univ. Press 2010)........................................................24

Lorenzo Vidino, Report: *The Muslim Brotherhood in Austria* (Aug. 2017) ...................................7

*The Muslim Brotherhood in the West: Hr'g before H. Subcomm. on Terrorism, HUMINT, Analysis & Counterintelligence*, 112 Cong. (Apr. 13, 2011) .................5, 7, 17, 23

Muslim Brotherhood Terrorist Designation Act, S.2230, 114th Cong. (2015) ...........................17

Muslim Brotherhood Terrorist Designation Act, S.3151, 117th Cong. (2021) ...........................17

Sergio Altuna & Lorenzo Vidino, Report: *La Hermandad Musulmana en España: Activismo Comunitario, Política y Terrorismo* (Oct. 27, 2022) ..........................................8, 24

U.S. Dep't of State Office of the Special Envoy to Monitor & Combat Anti-Semitism, *Islamic Relief Worldwide* (Dec. 30, 2020)...................................................8, 17, 25

Works of Thomas Jefferson (Ford ed. 1904) ..............................................................11

## INTRODUCTION

Hazim Nada filed this action for over a billion dollars in damages on January 24, 2024, alleging that a "'dark' public relations campaign" made false statements in 2017 and 2018 about Nada and his wholly-owned Swiss shipping company, Lord Energy SA, that led to the company's bankruptcy in mid-2019. *See* ECF No. 1.  In the Amended Complaint, Nada alleges that the United Arab Emirates ("UAE") and several of its top officials retained Swiss private-investigation firm Alp Services SA ("Alp") to develop a network of journalists to promote the narrative that Nada and Lord Energy were associated with the Muslim Brotherhood.  ECF No. 76 ("Am. Compl.") ¶¶ 11, 14.  These claims, Nada alleges, eventually made their way into foreign media outlets and websites, which were later noticed by financial-compliance entities, which then alerted banking institutions, which ultimately decided to cut off Lord Energy's financing.  *See id.* ¶¶ 21–22.

Like its predecessor, the Amended Complaint bears all the hallmarks of an effort to allege defamation without asserting a defamation claim.  Rather, Nada maintains this action under federal law—which does not recognize Anti-SLAPP protections for baseless claims that chill protected speech—and invokes causes of action under the Lanham Act, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and the Sherman Act—statutes that bear no relation to the alleged misconduct.  What is more, Nada does not limit himself to suing the actors involved in the alleged scheme.  Rather, Nada also names Dr. Lorenzo Vidino—an academic expert on the Muslim Brotherhood who, since 2005, has testified before Congress, frequently consults with U.S. law enforcement, regularly serves as an expert witness in federal cases, and has published academic research—in the Amended Complaint's RICO conspiracy count on the flimsy theory that "*[t]he enterprise* . . . relied on [Dr. Vidino], and his academic credentials, to legitimize the false and misleading statements *the enterprise published*[.]"  Am. Compl. ¶ 41 (emphases added).

Regardless whether Nada can maintain this action against any Defendant (and he cannot), the Amended Complaint fails to state a RICO conspiracy claim against Dr. Vidino for the same reasons identified in Dr. Vidino's prior motion to dismiss.  *See* ECF Nos. 71, 71-1.

*First*, the First Amendment bars using creative pleading tactics to silence protected speech and petitioning activities with threats of civil liability.  Nada's claim against Dr. Vidino is a brazen attempt to punish him for decades of work tracing the Muslim Brotherhood's operations, recruitment activities, and financing in the West—including by Nada's father, who Nada acknowledges had "historic ties to the Muslim Brotherhood," Am. Compl. ¶ 11—and for advocating particular policy responses by U.S. officials.  Nada still does not allege that Dr. Vidino made any false statements, acted with the "malice" required to hold a speaker liable for statements on matters of public concern, *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964), or engaged in petitioning activities for fraudulent or corrupt ends so as to take that conduct outside the immunity conferred by the *Noerr-Pennington* doctrine, *Venetian Casino Resort, L.L.C. v. NLRB*, 793 F.3d 85, 92 (D.C. Cir. 2015).  Indeed, Nada still does not allege that Dr. Vidino made *any public statements at all* about Nada or Lord Energy, only that other Defendants relied on his academic work on the Muslim Brotherhood or privately-expressed opinions on such topics.  That is insufficient to overcome the First Amendment concerns raised by allowing this action to proceed.

*Second*, the RICO conspiracy count against Dr. Vidino still fails as a matter of law because Nada still does not allege that Dr. Vidino knowingly agreed to join a RICO conspiracy.  *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1048 (D.C. Cir. 2012).  No matter how hard one squints, the Amended Complaint lacks any factual allegation that Dr. Vidino knew or should have known an alleged conspiracy *existed*, let alone that he agreed to further its supposed goals.  Nada alleges that Dr. Vidino had dinner with Alp employee Mario Brero and was

retained to provide "'[i]nteresting leads/rumours . . . regarding the subject of investigation organisations/individuals/funding in Europe.'"  Am. Compl. ¶ 129; *see id.* ¶¶ 127–28.  But all of this occurred in January 2018—months after Alp supposedly initiated the campaign against Lord Energy—and in any case, Nada never alleges that Dr. Vidino provided Alp with false or misleading information on Nada or Lord Energy.  Rather, the only allegation that Dr. Vidino said anything about Nada or Lord Energy involves private WhatsApp messages sent to an Alp employee in which he supposedly stated that "Crédit Suisse withdrew its line of credit to Lord Energy because of an article" Alp had supposedly published.  *Id.* ¶ 40.  That is an opinion about an event that Nada agrees occurred, *id.* ¶ 205, and allegations of *private* communications do nothing to further Nada's theory that the supposed enterprise used Dr. Vidino to lend *public* credence to Alp's publications.

*Third*, the RICO conspiracy count fails as a matter of law because Nada does not plausibly allege a substantive RICO claim against the other Defendants.  Plaintiffs cannot maintain an action for racketeering conspiracy without a corresponding racketeering claim, *Republic of Kazakhstan v. Stati*, 380 F. Supp. 3d 55, 65 (D.D.C. 2019), and Nada does not plausibly allege the essential elements—predicate offense, pattern of racketeering activity, domestic injury, or proximate cause—required for a civil RICO claim to survive a motion to dismiss.  Moreover, Nada's racketeering and conspiracy claims are plainly barred by RICO's statute of limitations because Nada waited more than four years after allegedly discovering his supposed injury to file suit.

This Court should dismiss Dr. Vidino from the case on First Amendment grounds or, in the alternative, because Nada fails to state a claim against him for racketeering conspiracy.  Dismissal should be with prejudice because Nada cannot overcome these flaws through yet another opportunity to amend the complaint.  Indeed, Nada has already exhausted his ability to amend by

right under Federal Rule of Civil Procedure 15 and has failed to cure the fundamental defects in his legal theory even with the benefit of the Defendants' first round of motions to dismiss.

## STATEMENT OF THE CASE

Nada filed this action for actual and treble damages under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), RICO, 18 U.S.C. §§ 1962(c)–(d), 1964(c), and the Sherman Act, 15 U.S.C. §§ 1–2, on January 24, 2024, and filed an Amended Complaint on August 6, 2024. Am. Compl. at 92, 97, 105–07.[1] Nada alleges that the UAE retained Alp to initiate a "'dark' public relations campaign" that caused Lord Energy's bankruptcy. *Id.* ¶¶ 1–23. The Amended Complaint names as defendants the UAE, Alp, several supposed Alp employees and contractors, and 25 John Does who allegedly perpetrated the scheme. *See id.* ¶¶ 28, 33, 34–39. It also names Dr. Vidino as a defendant in the RICO conspiracy count, which is brought "[a]gainst [a]ll [d]efendants." *Id.* at 115; *see id.* ¶ 40.[2]

According to the Amended Complaint, Dr. Vidino is a "credible and highly credentialed" expert on the Muslim Brotherhood's activities in Europe and North America. Am. Compl. ¶ 126; *see id.* ¶ 105. Dr. Vidino conducts academic research on that subject, including in his role as Director of the Program on Extremism at The George Washington University. *See id.* ¶ 40.

Public records confirm that Dr. Vidino is a "special[ist] in Islamism and political violence in Europe and North America" who authors books and reports about extremist organizations

---

[1] Because this is a motion to dismiss, Dr. Vidino recites the allegations as stated in the Amended Complaint without conceding their accuracy or completeness. *See Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1132 (D.C. Cir. 2023).

[2] Nada dropped several defendants named in the original complaint—UAE President Mohamed bin Zayed Al Nahyan ("M.B.Z."), Matar Humaid al-Neyadi, and the Abu Dhabi National Oil Company—after the United States filed a suggestion of immunity for M.B.Z., ECF No. 75, and this Court entered an order to show cause why the claims against M.B.Z. should not be dismissed, Minute Order (Aug. 5, 2024). These three former defendants and Ali Saeed al-Neyadi are now listed in the Amended Complaint as "[n]on-part[ies]." Am. Compl. ¶¶ 29–32. In light of Nada's willingness to drop defendants against whom he has no claim for relief, Dr. Vidino's continued inclusion in this suit is inexplicable.

operating in the West. *Inside the Mind of ISIS: Hr'g before S. Comm. on Homeland Sec. & Gov't Affs.*, 114th Cong. 7 (Jan. 20, 2016) (Statement of Sen. Ron Johnson). Since 2005, Dr. Vidino has testified before Congress about Islamic fundamentalism, including the Muslim Brotherhood, and advocated for certain legislative, diplomatic, and law-enforcement responses based on his academic research and conclusions. *See id.*; *Beyond Iraq & Syria: ISIS' Global Reach: Hr'g before S. Foreign Rels. Comm.*, 115th Cong. (June 8, 2017); *The Muslim Brotherhood in the West: Hr'g before H. Subcomm. on Terrorism, HUMINT, Analysis & Counterintelligence*, 112 Cong. (Apr. 13, 2011) ("*Muslim Brotherhood Hr'g*"); *Islamic Extremism in Europe: Hr'g before H. Subcomm. on Europe and Emerging Threats*, 109th Cong. (Apr. 27, 2005); *Algeria's Struggle Against Terrorism: Hr'g before H. Subcomm. on Int'l Rels.*, 109th Cong. (Mar. 3, 2005) ("*Algeria Terrorism Hr'g*").[3]

Law enforcement officials regularly consult with Dr. Vidino on matters involving extremist organization financing, recruitment, and operations in the United States, including by procuring his testimony in federal prosecutions. *See, e.g.*, *United States v. Ceasar*, 10 F.4th 66, 70, 72 (2d Cir. 2021) (recounting Dr. Vidino's testimony about extremist organizations' influence outside of directly controlled territory at sentencing phase of conspiracy-to-provide-material-support prosecution); *United States v. Ramic*, 2024 WL 2274529, at *1 (W.D. Ky. May 20, 2024) (admitting similar testimony by Dr. Vidino in material-support-for-terrorism prosecution after concluding his testimony "will assist the jury in understanding and evaluating the evidence"); *United States v. Shafi*, 2018 WL 3159769, at *3–4 (N.D. Cal. June 28, 2018) (similar). Because of his academic credentials and publications, federal courts have permitted Dr. Vidino to serve as an expert witness on the subject of extremism and relied on his testimony. *See, e.g.*, *Ceasar*, 10 F.4th at 70, 72;

---

[3] "Courts may take judicial notice of congressional testimony because the [fact of the] testimony is not subject to reasonable dispute." *Mirbaha v. Pompeo*, 513 F. Supp. 3d 179, 185 n.2 (D.D.C. 2021) (quotation omitted).

*United States v. Alebbini*, 979 F.3d 537, 549–50 (6th Cir. 2020); *United States v. Hendricks*, 950 F.3d 348, 351, 353 (6th Cir. 2020); *Ramic*, 2024 WL 2274529, at *1; *United States v. Almadaoji*, 2021 WL 5002373, at *2–3 (S.D. Ohio Oct. 27, 2021); *United States v. Dais*, 482 F. Supp. 3d 800, 806 (E.D. Wis. 2020); *Shafi*, 2018 WL 3159769, at *3–4; *Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138, 176 (D.D.C. 2016); *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 141, 144 (D.D.C. 2011); *Rux v. Republic of Sudan*, 495 F. Supp. 2d 541, 552–53 (E.D. Va. 2007).[4]

Nada alleges that Lionel Badal, an Alp employee, invited Dr. Vidino to meet in Switzerland in January 2018—months after Alp had allegedly decided to target Nada.  Am. Compl. ¶¶ 17, 106, 127.  Badal told Dr. Vidino that Lord Energy was a "trading company based in Lugano."  *Id.* ¶ 127. Later that month, Dr. Vidino dined with Alp employee Mario Brero "in Geneva."  *Id.* ¶ 128.  To "disguise the identity" of Alp's clients, Brero stated that he was working for a "'London-based law firm.'"  *Id.*  Two weeks later, Dr. Vidino "signed a contract with Alp to provide '[i]nteresting leads/rumours . . . regarding the subject of investigation organisations/individuals/funding in Europe' and a '[l]ist of alleged members of the first tier organisations in European countries'" in exchange for "3,000 Euros."  *Id.* ¶ 129; *see also id.* ¶ 145.  According to Nada, Dr. Vidino was allegedly "paid between $2,000-$4,000 for each discreet assignment," although the Amended Complaint does not allege any particular assignments completed by Dr. Vidino.  *Id.* ¶ 40.

According to Nada, Alp sought out Dr. Vidino in order to "rel[y] on . . . his academic credentials" to legitimize statements allegedly published "to discredit, disparage, and destroy" Lord Energy.  Am. Compl. ¶ 41; *see also id.* ¶ 47 (alleging that the scheme involved "publishing academic papers that lent credibility to the enterprise's fraudulent claims").  The Amended

---

[4] Similarly, this Court may take judicial notice "of facts on the public record" in prior federal court decisions.  *Covad Commc'ns Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005).

Complaint alludes to "Wikipedia entries" that quoted Dr. Vidino as opining that "it is challenging to identify members of the Muslim Brotherhood as there is 'a conscious effort by the Western Brothers to downplay or even deny their ideological links to the Muslim Brotherhood.'" *Id.* ¶ 186.

That statement has nothing to do with Nada or Lord Energy—rather, it is a general statement about the Muslim Brotherhood, an organization to which Nada denies having any ties. *See, e.g.*, Am. Compl. ¶¶ 12, 108, 112.  Nada still does not specify whether the author of the Wikipedia entry cited a source for this general statement, but Dr. Vidino made similar statements in his 2011 congressional testimony, long before the events allegedly giving rise to this action, as well as in prior academic publications.  *See Muslim Brotherhood H'rg* (testifying that "it is fair to say that in the United States and in virtually all Western countries, there are organizations and networks that have historical, financial, personal, organizational, and ideological ties to the Muslim Brotherhood" and noting that some intelligence agencies have publicly concluded that "Muslim Brothers . . . do not always reveal their religious loyalties"); Lorenzo Vidino, Report: *The Muslim Brotherhood in Austria* 9 (Aug. 2017); *see also* Lorenzo Vidino, *The Closed Circle: Joining & Leaving the Muslim Brotherhood in the West* 7 (Colum. Univ. Press 2020) (describing a "conscious effort by the Western Brothers to downplay or deny their links to the Muslim Brotherhood").[5]

Nada now alleges that Dr. Vidino made three additional statements that either have nothing to do with Nada or Lord Energy, are not alleged to be false, or both.  In the first, Dr. Vidino supposedly alerted a reporter at *The Times* of London to "two antisemitic Facebook posts" by trustees of Islamic Relief Worldwide ("IRW").  Am. Compl. ¶ 41.  The Amended Complaint states

---

[5] The Court may also take judicial notice of published sources, including such "materials as historical works, science, and art books."  *United States v. Neill*, 964 F. Supp. 438, 445 & n.8 (D.D.C. 1997) (quotation omitted).  The fact of publication, rather than the truth of the matters asserted therein, is what matters here.

that IRW is "one of the largest Muslim-led humanitarian" organizations in the world. *Id.* IRW is also a subject of Dr. Vidino's academic research and publications, and, as a result, Dr. Vidino would have had legitimate reasons to expose antisemitism within the organization. *See* Vidino, *The Closed Circle*, *supra*, at 46–47 (explaining that IRW is a "welfare and relief organizatio[n]" that is "run by the Muslim Brotherhood" (quotation omitted)). Nada does not allege that these Facebook posts were fabricated, and indeed, in response to these posts, the U.S. State Department issued an official statement "condemn[ing] the well-documented record of anti-Semitic attitudes and remarks made by the senior leadership of [IRW]." U.S. Dep't of State Office of the Special Envoy to Monitor & Combat Anti-Semitism, *Islamic Relief Worldwide* (Dec. 30, 2020), https://2017-2021.state.gov/islamic-relief-worldwide/.[6]

In the second, Dr. Vidino allegedly posted on the Program on Extremism's Twitter account that "'Spanish authorities blocked bank accounts linked [to] the Kutayni clan, suspected of funding Islamic State.'" Am. Compl. ¶ 263. The Kutayni clan has also been the subject of Dr. Vidino's academic research. Sergio Altuna & Lorenzo Vidino, Report: *La Hermandad Musulmana en España: Activismo Comunitario, Política y Terrorismo* 50–54 (Oct. 27, 2022). Nada does not allege that this statement was false, and it tracks publicly available documents from Spanish authorities. *See* Isabel Vega & Pablo Munoz, *Bloquean una cuenta de la mayor asociación musulmana de España*, ABC España (Feb. 4, 2020).

In the third, Dr. Vidino allegedly expressed his "belief" in at least one WhatsApp message to Alp employees that "Crédit Suisse withdrew its line of credit to Lord Energy because of an article" that Alp supposedly "published." Am. Compl. ¶ 40. But again, Nada does not allege that

---

[6] The Court can take judicial notice of publicly available information on government websites. *See Lewis v. Pension Benefit Guar. Corp.*, 314 F. Supp. 3d 135, 164 n.12 (D.D.C. 2018).

this claim is false—indeed, Nada alleges that Crédit Suisse "stopped supporting Lord Energ[y]" and "closed [its] accounts" because of "an article published on Medium." *Id.* ¶ 205.

Nada alleges that he "knew he was the victim of a concerted effort to smear his name" by July 2018, when he "learned" that he was "designated" by a financial-watchdog entity as a compliance risk because of ties to extremist organizations. Am. Compl. ¶¶ 157–58. "In spring and summer 2018," Nada "retained the U.K. law firm Carter-Ruck and sent legal letters to some of the outlets that had published false and defamatory statements about him demanding that they retract the statements and provide him with information about the parties responsible for writing them." *Id.* ¶ 159; *see also id.* ¶ 157 (describing similar demand letter to a financial-watchdog organization on July 2, 2018), ¶ 160 (describing Carter-Ruck's efforts), ¶ 165 (alleging that Lord Energy "engaged a defamation law firm to bring legal action" against media organizations), ¶¶ 169–70 (describing Nada's emails "to several of the financial institutions Lord Energy borrowed from, as well as some of Lord Energy's counterparties and business partners").

Meanwhile, Nada allegedly "filed a certificate of formation with the Texas Secretary of State" to create a U.S. subsidiary named Americas Lord Energy, Inc. ("Americas Lord Energy"), Am. Compl. ¶ 139, that "'aim[ed] to expand into U.S. exports and imports,'" *id.* ¶ 140. Nada alleges that Americas Lord Energy had another director, Douglas Koskie, who attempted to enter into a deal with Castleton Commodities Merchant Trading LP ("CCI"). *Id.* ¶ 202. To promote the deal, Koskie allegedly informed CCI that Lord Energy (not Americas Lord Energy) had agreed "to purchase 1 million barrels of crude oil from Chevron" in September 2018. *Id.* A week later, however, CCI's compliance department rejected the proposed deal with Americas Lord Energy. *Id.* ¶ 203. Nada alleges that a trader at CCI told Koskie that compliance was "'being tough guys on everything'" and speculates that CCI "became aware" of the articles about Nada and Lord

Energy and found it "was too risky to do business with Lord Energy" (although the alleged proposed deal was with Americas Lord Energy). *Id.* ¶ 203.  In April 2019, Lord Energy dissolved Americas Lord Energy and "filed for bankruptcy protection in Switzerland." *Id.* ¶ 213.

## LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual allegations, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015).  In other words, the claim "must rise above the speculative level" and cannot rely "on inferences unsupported by facts or legal conclusions disguised as factual allegations." *Keren Kaymeth LeIsrael-Jewish Nat'l Fund v. Educ. for Just Peace in Middle East*, 66 F.4th 1007, 1013 (D.C. Cir. 2023) (quotations omitted).

When a RICO plaintiff alleges predicate acts of mail, wire, or bank fraud, the complaint must allege fraud with "the specificity required by the heightened pleading standard of" Federal Rule of Civil Procedure 9(b).  *Bates v. Nw. Hum. Servs., Inc.*, 466 F. Supp. 2d 69, 88 (D.D.C. 2006).

## ARGUMENT

This Court should dismiss Dr. Vidino from the case with prejudice because Nada has not, and cannot, plausibly allege that Dr. Vidino knowingly joined a criminal conspiracy to injure Nada and Lord Energy in the United States.  The Amended Complaint still barely mentions Dr. Vidino at all, naming him only in the RICO conspiracy count brought "[a]gainst [a]ll [d]efendants." Am. Compl. at 92.  The handful of allegations referencing Dr. Vidino describe protected speech and petitioning activities, undertaken as a globally recognized expert on the Muslim Brotherhood and other matters of public concern, that cannot form the basis for liability consistent with the First

Amendment.  Even if this constitutional barrier could be overcome—and it cannot—Nada's sparse allegations against Dr. Vidino fall well short of stating the elements of a RICO conspiracy claim. Nada's attempt to evade the requirements for pleading defamation through a manufactured civil RICO lawsuit should be rejected.  Dismissal should be with prejudice because these fundamental flaws cannot be overcome by yet another round of amendment with the benefit of the Defendants' second round of motions to dismiss.

I.  **The Amended Complaint Should Be Dismissed On First Amendment Grounds.**

A.  **The First Amendment Bars Extending Civil Liability To Protected Conduct.**

The Supreme Court has long recognized that expansive civil liability can infringe the First Amendment rights at the heart of our democracy by punishing and chilling speech.  *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 916–17 (1982); Eugene Volokh, *Tort Liability and the Original Meaning of the Freedom of Speech, Press, and Petition*, 96 Iowa L. Rev. 249, 250 (2010). "'[S]peech on matters of public concern . . . is at the heart of the First Amendment's protection,'" *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) (quoting *Dun & Broadstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–59 (1985)), and that protection "reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open,'" *id.* (quoting *Sullivan*, 376 U.S. at 270).  This "express[]" constitutional shield "guard[s] in the same sentence, and under the same words, the freedom of religion, of speech, and of the press, insomuch, that whatever violates either, throws down the sanctuary which covers the others, and that libels, falsehoods, and defamation, equally with heresy and false religion, are withheld from the cognizance of federal tribunals."  8 Works of Thomas Jefferson 464–65 (Ford ed. 1904) (quoting Kentucky and Virginia Resolutions of 1798).

For this reason, "the First Amendment imposes restraints on the grounds that may give rise to damages liability and the persons who may be held accountable for those damages." *Claiborne Hardware*, 458 U.S. at 916 (state malicious-interference and antitrust claims); *see Snyder*, 562 U.S. at 461 (the First Amendment "shield[s]" protected speech against claims for intentional infliction of emotional distress); *Sullivan*, 376 U.S. at 278 ("[p]lainly . . . civil libel is a form of regulation that creates hazards to protected freedoms markedly greater than those that attend reliance upon the criminal law" (quotation omitted)); *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986) (common-law defamation rules "must . . . fall . . . to [this] constitutional requirement"). The First Amendment requires proof that speech is made with "'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Sullivan*, 376 U.S. at 279–80. In all events, a civil action "can be maintained only to the extent it does not interfere with First Amendment rights of free expression." *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 584 (D.C. Cir. 2016); *see also Snyder*, 562 U.S. at 458; *Sandvig v. Sessions*, 315 F. Supp. 3d 1, 17 (D.D.C. 2018) ("[P]rivate speech prohibitions can still implicate the First Amendment when given the imprimatur of state protection through civil or criminal law.").

Similarly, plaintiffs cannot invoke broadly worded causes of action to punish or discourage activities connected to petitioning government officials. *See* U.S. Const. amend. I ("Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people . . . to petition the Government for a redress of grievances."). When "a person petitions the government" in good faith, "the First Amendment prohibits any sanction on that action." *Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 696 (D.C. Cir. 2009). The *Noerr-Pennington* doctrine implements that general principle. Under the *Noerr-Pennington* doctrine, "petitioning the Government for redress of grievances, whether by efforts to influence legislative or executive action or by seeking

redress in court, is immune from liability." *Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 677 (D.C. Cir. 2005); *see United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965); *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961).

The doctrine first arose in the context of the antitrust laws, but courts have extended it broadly to causes of action that raise similar concerns, *Venetian Casino*, 793 F.3d at 90 (federal labor laws), including to civil RICO claims, *Feld Ent., Inc. v. Am. Soc'y for Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288, 307–08 (D.D.C. 2012); *see also Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 930–31 (9th Cir. 2006); *Bath Petrol. Storage, Inc. v. Mkt. Hub Partners, L.P.*, 229 F.3d 1135 (2d Cir. 2000) (table); *Int'l Bhd. of Teamsters, Local 734 Health Workers & Welfare Tr. v. Phillip Morris, Inc.*, 196 F.3d 818, 826 (7th Cir. 1999); *cf. United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1123–24 (D.C. Cir. 2009) (per curiam) (recognizing that *Noerr-Pennington* could apply to RICO but concluding that defendants' statements were fraudulent and thus unprotected).

### B. Dr. Vidino Engaged In First Amendment Protected Speech.

This Court should dismiss Dr. Vidino from this action with prejudice because Nada seeks to hold him liable for constitutionally protected speech activities. The Amended Complaint fails to allege the "malice" required to bring Dr. Vidino's speech as an expert on issues of substantial public concern outside the First Amendment's protections, *Sullivan*, 376 U.S. at 281, and Nada cannot evade this fundamental constitutional barrier merely by asserting a criminal conspiracy.

Although the malice requirement first arose as a defense to common-law defamation claims, courts have applied it to civil RICO claims that are based on speech. *See Savage v. Council on Am.-Islamic Rels., Inc.*, 2008 WL 2951281, at *12 (N.D. Cal. July 25, 2008); *Smithfield Foods, Inc. v. United Food & Com. Workers Int'l Union*, 585 F. Supp. 2d 815, 824 (E.D. Va. 2008). This makes sense, as RICO claims based on speech implicate First Amendment concerns. *See NOW,*

*Inc. v. Scheidler*, 510 U.S. 249, 263–65 (1994) (Souter, J., concurring) (cautioning "courts applying RICO to bear in mind the First Amendment interests that could be at stake" because "RICO predicate acts may turn out to be fully protected First Amendment activity"); *Ne. Women's Ctr., Inc. v. McMonagle*, 868 F.2d 1342, 1348 (3d Cir. 1989) (expressing "grave concerns were these or any other defendants held liable under civil RICO for engaging in the expression of dissenting political opinions in a manner protected under the First Amendment"); *Smithfield Foods, Inc. v. United Food & Com. Workers Int'l Union*, 585 F. Supp. 2d 789, 804 (E.D. Va. 2008) (recognizing that First Amendment limitations on civil RICO claims must be "analyzed under the specific facts of th[e] case"); *cf. United States v. Larson*, 807 F. Supp. 2d 142, 165–66 (W.D.N.Y. 2011) (recognizing First Amendment defense in criminal RICO cases).

When statements are "made about 'public figures,'" the actual malice standard applies. *Liberty Lobby, Inc. v. Rees*, 852 F.2d 595, 597 (D.C. Cir. 1988).  There are two "subclassifications" of public figures:  (1) those who are "public figures for all purposes" and (2) those who are "public figures for particular public controversies," *i.e.*, "limited-purpose public figure[s]." *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1292 (D.C. Cir. 1980).  As relevant here, a limited-purpose public figure does not need to rise to the level of general notoriety, but is merely one who "voluntarily injects himself or is drawn into a particular public controversy and therefore becomes a public figure for a limited range of issues." *Id.* (quotation omitted).  An organization may be a limited-purpose public figure.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (noting that the district court determined that respondents, a company and its founder, were limited-purpose public figures); *OAO Alfa Bank v. Ctr. for Pub. Integrity*, 387 F. Supp. 2d 20, 47 (D.D.C. 2005) (holding that "corporate plaintiffs . . . are also public figures for the purposes of the defamation analysis").

To determine whether speech concerns a limited-purpose public figure, the D.C. Circuit applies a three-part test. First, the court identifies "the relevant controversy and determine[s] whether it is a public controversy." *Jankovic*, 822 F.3d at 585. Second, the subject of the speech must have "played a significant role in th[e] controversy." *Id.* And third, the allegedly defamatory statement must be "germane" to the figure's participation in the controversy. *Id.*

Even speech made about a "private figure" on a matter of public concern is protected unless the plaintiff shows "that the speech at issue is false." *Phila. Newspapers*, 475 U.S. at 777; *see also Montgomery v. Risen*, 875 F.3d 709, 713 (D.C. Cir. 2017) ("[W]here a person claims to have been defamed by statements about matters of public concern . . . [he] must make a showing of falsity as an element of his affirmative case."). Speech is a matter of public concern "if it is of political, social, or other concern to the community." *LeFande v. District of Columbia*, 613 F.3d 1155, 1159 (D.C. Cir. 2010); *see, e.g.*, *Montgomery*, 875 F.3d at 713 (speech regarding use of "dysfunctional software" by the government in national-security operations involved matters of public concern).

Nada's allegations regarding Dr. Vidino fall into two buckets: (1) allegations about a matter of public concern and (2) allegations about Dr. Vidino's general speech regarding the Muslim Brotherhood, a limited-purpose public figure. The first group of allegations involve speech that is protected because Nada does not allege falsity. The second group involves speech that is protected because Nada does not allege malice.

### i. *Dr. Vidino's speech about matters of public concern is protected.*

To begin, Dr. Vidino's alleged private statement of opinion that "Crédit Suisse withdrew its line of credit to Lord Energy because of an article" Alp published, Am. Compl. ¶ 40, is speech about a matter of public "concern to the community" in which Dr. Vidino has worked for decades as an academic expert on extremist-organization financing. *LeFande*, 613 F.3d at 1159. In addition, Nada alleges that Lord Energy posed a "strategic competitive threa[t] in the spot market for light

crude oil" and that Crédit Suisse's cutting off of funding was "the death knell for Lord Energy." Am. Compl. ¶¶ 4, 212. That is also a matter of "public concern" because of "the importance of [such] financial information to . . . the economy as a whole." *Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Inv.'s Servs., Inc.*, 175 F.3d 848, 856 (10th Cir. 1999). Nada does not allege that the statement was false—indeed, the Amended Complaint states that Crédit Suisse "stopped supportin[g] Lord Energy" and "closed [its] accounts" because of "an article published on Medium." Am. Compl. ¶ 205. And Dr. Vidino's supposed belief that this event was linked to any particular cause is a statement of opinion within the ken of his academic expertise. *See id.* ¶ 105.

Likewise, Dr. Vidino's supposed statement on the Program's Twitter account about Spanish authorities blocking the bank accounts of the Kutayni clan because it "'suspected [it] of funding [the] Islamic State,'" Am. Compl. ¶ 263, is also protected speech. Courts have held that statements about governmental "investigation of organization[s] for financial ties to terrorism" are matters of public concern. *Global Relief Found., Inc. v. N.Y. Times Co.*, 390 F.3d 973, 982 (7th Cir. 2004). Again, Nada does not allege that this statement was false or misleading, and this event received much news attention and is fully consistent with statements by the Spanish government. *See* Vega & Munoz, *supra*.

So, too, is Dr. Vidino's alleged transmission to a journalist at *The Times* of "two antisemitic Facebook posts" made by IRW trustees. Am. Compl. ¶ 41. Courts have previously recognized the "obvious fact that antisemitism is a matter of public concern." *Greenfield v. City of Miami Beach*, 844 F. Supp. 1519, 1527 (S.D. Fla. 1992). As with the other allegations in this bucket, Nada does not allege that Dr. Vidino made any false statements in sharing this information or that the posts were fabricated by Dr. Vidino or anyone else. Indeed, the U.S. State Department "condemn[ed]"

16

in an official statement this "well-documented record of anti-Semitic attitudes and remarks made by the senior leadership of [IRW]."  U.S. Dep't of State, *supra*.

### ii.  *Speech about limited public figures is protected.*

Dr. Vidino's speech about the Muslim Brotherhood's operations in Europe and the United States is protected speech about a well-known organization on a matter of significant public importance—and it is indistinguishable from prior statements made in his capacity as a recognized academic expert on the subject.  The Amended Complaint relies on a Wikipedia article that quoted Dr. Vidino as saying that members of the Muslim Brotherhood in the West engage in a "'conscious effort . . . to downplay or even deny their ideological links to the Muslim Brotherhood,'"  Am. Compl. ¶ 186, and vaguely alleges that Dr. Vidino agreed to "provide '[i]nteresting leads/rumors . . . regarding the subject of investigation organisations/individuals/funding'" in Europe and the United States, *id.* ¶¶ 129, 145.  This is classic speech about a "public controversy" because it involves "uncovering facts and theories to help the public formulate some judgment" on an issue that has been "debated publicly."  *Waldbaum*, 627 F.2d at 1297.  Indeed, Dr. Vidino has testified before Congress on this exact topic, *see, e.g.*, *Muslim Brotherhood Hr'g*, and lawmakers have debated at least twice whether to designate the Muslim Brotherhood on the U.S. State Department's list of foreign-terrorist organizations, *see, e.g.*, Muslim Brotherhood Terrorist Designation Act, S.3151, 117th Cong. (2021); Muslim Brotherhood Terrorist Designation Act, S.2230, 114th Cong. (2015).  These statements are part of Dr. Vidino's life's work for nearly 20 years, and his position on the Muslim Brotherhood has been consistent throughout that period.  *See, e.g.*, *Algeria Terrorism Hr'g*, *supra*.

Next, the Muslim Brotherhood and its members "thrust themselves to the forefront" of the controversy by taking the very actions that make the organization so controversial.  *Waldbaum*, 627 F.2d at 1297–98 (noting the importance of the subject's "position in the controversy").

Whatever the ultimate merits and results of this public debate, there can be no dispute that the Muslim Brotherhood and its membership are at the center of the controversy.  Dr. Vidino is entitled under the First Amendment to take a position on this debate, whether when called before Congress to address the issue, when testifying in court, or in his work as an academic expert on the subject.

Finally, Dr. Vidino's speech is "germane" to the controversy because it directly relates to the Muslim Brotherhood's operations and the links between historical and global branches of the organization.  *See Jankovic*, 822 F.3d 589 (germaneness looks at the "role in a public controversy").  Here again, the allegations in the Amended Complaint demonstrate as much:  Dr. Vidino's alleged role was limited to speech about the Muslim Brotherhood's organizing efforts, membership, and law-enforcement investigations into the same.  *See* Am. Compl. ¶¶ 129, 145, 186.  And judicially noticeable testimony on this exact topic before Congress and in criminal and civil proceedings in federal court puts the germaneness of this speech beyond dispute.  *See supra*, at 4–5.

Because the speech alleged in the Amended Complaint involves a limited-purpose public figure, Nada must allege actual malice to survive a motion to dismiss on First Amendment grounds.[7]

The actual malice standard is a "daunting" hurdle to clear.  *McFarlane v. Esquire Mag.*, 74 F.3d 1296, 1308 (D.C. Cir. 1996).  It requires showing that the defendant made a statement "with knowledge that it was false or with reckless disregard of whether it was false or not."  *Jankovic*,

---

[7] There is another reason why the actual malice standard applies here.  Even a private figure must meet the actual malice standard "in order to recover . . . punitive damages."  *Phila. Newspapers*, 475 U.S. at 774; *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 348–50 (1974).  RICO's treble damages provision, which Nada invokes here, *see* Am. Compl. ¶ 318, is punitive in nature.  *United States v. Philip Morris USA Inc.*, 396 F.3d 1190, 1201 (D.C. Cir. 2005) (explaining that in civil RICO cases, "[i]ndividual plaintiffs are made whole and defendants punished through treble damages under 18 U.S.C. § 1964(c)"); *see also BEG Invs., LLC v. Alberti*, 85 F. Supp. 3d 13, 28–29 (D.D.C. 2015) (holding that RICO's treble damages provision is inapplicable to municipalities because treble damages are punitive in nature).

822 F.3d at 584 (quotation omitted).  And "few public figures have been able" to make this showing. *Id.* at 590 (quotation and alterations omitted).  To plead actual malice, a plaintiff must allege facts that would render it plausible that a defendant "in fact entertained serious doubts as to the truth of his publication."  *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).  And it is not enough to allege actual malice "'in the abstract'"—rather, the plaintiff "'must demonstrate actual malice *in conjunction* with a false defamatory statement.'"  *Boley v. Atl. Monthly Grp.*, 950 F. Supp. 2d 249, 262 (D.D.C. 2013) (quoting *Tavoulareas v. Piro*, 817 F.2d 762, 794 (D.C. Cir. 1987)).  Otherwise, the complaint must be dismissed.  *Nunes v. WP Co. LLC*, 513 F. Supp. 3d 1, 7 (D.D.C. 2020).

Here, Nada comes nowhere close to meeting this pleading standard.  The Amended Complaint is devoid of any allegations that Dr. Vidino made any false statements about Nada or Lord Energy, let alone that he acted with malice in making any such statements.  Indeed, Nada's threadbare allegations put him between a rock and a hard place with respect to Dr. Vidino.  Because Nada does not allege that Dr. Vidino made any public statements about Nada or Lord Energy, the only "public figure" about which Dr. Vidino spoke was the Muslim Brotherhood.  Nada will either have to argue that Dr. Vidino's statements about the Muslim Brotherhood implicated Nada and Lord Energy—an association Nada emphatically denies, Am. Compl. ¶¶ 12, 108, 112—or concede that Dr. Vidino did not say anything publicly about Nada or his company.  The first argument would defeat Nada's claims by admitting the broader "conspiracy" was correct to imply an association, and the second would require dismissing Dr. Vidino from the case.

As to the first point, Nada does not allege *any* public statement by Dr. Vidino about Nada or Lord Energy, never mind a *false* statement.  And, as explained above, the private WhatsApp statements Nada alleges Dr. Vidino made about Lord Energy expressed an opinion on events that the Amended Complaint takes to be true.  *See supra*, at 3, 8–9.  While the Amended Complaint is

19

full of allegations of "fake reporting," "false and misleading articles," "negative articles," and "Wikipedia pages," Nada never alleges that Dr. Vidino himself made or published any such statements. *See, e.g.*, Am. Compl. ¶¶ 17–18, 125, 141, 144; *see also id.* ¶¶ 147, 149, 153, 161, 163, 167. Rather, Nada alleges that *Alp* "relied on" Dr. Vidino's "academic credentials" to "legitimize the false and misleading statements" that others "had published," *id.* ¶¶ 40-41, and that unknown third parties quoted Dr. Vidino's general statements about the Muslim Brotherhood in a Wikipedia page to "add a thin veneer of legitimacy" to Alp's "spurious claims," *id.* ¶¶ 184, 186.

As to the second point, Nada does not allege that Dr. Vidino acted with malice in making any statements. The word malice does not appear once in the Amended Complaint. While Nada alleges that the publication of the allegedly false statements was commercially motivated, *see, e.g.*, Am. Compl. ¶ 292, he makes no allegations whatsoever that Dr. Vidino was motivated to make any statements, let alone false statements, about the Muslim Brotherhood for any unlawful reason, or that Dr. Vidino knew or should have known that any statements he made were false. This case is thus similar to *Savage*, in which the court dismissed a civil RICO count because the complaint did "not even attempt[] to . . . allege" that "defendants' allegedly injurious false statement or portrayal of plaintiff's own speech was done with actual malice—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 2008 WL 2951281, at *12 (quotation omitted).

Nada's allegation that Dr. Vidino agreed to receive "3,000 Euros for [h]is work" or was paid "$2,000-$4,000 for each discreet assignment," Am. Compl. ¶¶ 18, 40, 129, is irrelevant because Nada never alleges that Dr. Vidino made public statements about Nada or Lord Energy after (or indeed, before) he supposedly signed an agreement with Alp in January 2018. But even if it were relevant, the mere fact that speech was paid "'does not prevent [it] from being a form of

expression whose liberty is safeguarded by the First Amendment.'" *Time, Inc. v. Hill*, 385 U.S. 374, 397 (1967) (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952)).  Compensation does not remove protected speech from the First Amendment's ambit—were it otherwise, the vast majority of speech that informs public debate through print, broadcasts, and mass media would be unprotected.  Courts have uniformly held that "a speaker is no less a speaker because he or she is paid to speak." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 801 (1988); *see Time, Inc.*, 385 U.S. at 396–97 (analyzing article published "'for trade purposes'"); *Joseph Burstyn*, 343 U.S. at 502 (same for "motion pictures"); *Feld*, 873 F. Supp. 2d at 307–08 (rejecting argument that "compensated" statements in publicity campaign meant to spur legislation were unprotected).

### C.  Dr. Vidino Is Entitled To Immunity Under The *Noerr-Pennington* Doctrine.

This Court should also dismiss Dr. Vidino from the case because he is entitled to immunity under the *Noerr-Pennington* doctrine.  Nada seeks to hold Dr. Vidino liable for speaking about the Muslim Brotherhood's operations in the West.  As noted, all the speech Dr. Vidino is alleged to have made involves the areas of his expertise—Islamic fundamentalism and financing.  But those are the same topics on which Dr. Vidino has testified before Congress at least five times, served as an expert witness in federal court on many occasions, and published books setting out his academic research.  That petitioning conduct falls squarely within the *Noerr-Pennington* doctrine, and Nada cannot be allowed to infringe Dr. Vidino's right to continue this advocacy by stretching civil RICO to encompass what amounts to a baseless defamation claim.

The *Noerr-Pennington* doctrine is "broad."  *Feld*, 873 F. Supp. 2d at 307.  It "protects petitions directed at 'all departments of the Government,'" *Venetian Casino*, 793 F.3d at 90, including testimony before Congress, *Flood v. Nat'l Football League*, 2009 WL 86577, at *2 (E.D. Cal. Jan. 8, 2009), and testimony in court, *King v. Twp. of E. Lampeter*, 17 F. Supp. 2d 394, 414

(E.D. Pa. 1998). The doctrine is not limited to government-facing speech and includes "publicity campaign[s] to influence governmental action" such as participating in "press conferences, ma[king] other statements to news outlets, and post[ing] letters on organizational websites." *Feld*, 873 F. Supp. 2d at 307–08 (quotation omitted); *see Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 502 (1988) ("*Noerr* immunity cannot be dismissed on the ground that the conduct at issue involved no 'direct' petitioning of government officials."). Thus, speech "incidental to a valid effort to influence governmental action" is immune from civil liability under *Noerr-Pennington*. *Allied Tube*, 486 U.S. at 502.

*Noerr-Pennington* immunity is inapplicable only when petitioning activity was "predicated on fraud or deliberate misrepresentation" or corrupt conduct, such as bribes. *Philip Morris USA*, 566 F.3d at 1123 (quotation omitted) (no immunity where defendant knowingly made fraudulent statements about cigarettes). Just like the "actual malice" standard, the threshold for invoking the fraud exception is difficult to meet. *See E. Sav. Bank, FSB v. Papageorge*, 31 F. Supp. 3d 1, 19–20 (D.D.C. 2014) (rejecting argument that *Noerr-Pennington* did not apply where plaintiff failed to show that lawsuits filed by the defendant were objectively baseless). And it does not matter that a defendant was "compensated" for his speech, as *Noerr-Pennington* still applies in that context. *Feld*, 873 F. Supp. 2d at 307; *see also Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371–72 (2018) ("professional speech" enjoys the same protections as any other speech).

*Feld* is instructive. In that case, the plaintiff sued several entities and an individual under civil RICO for making allegedly fraudulent claims about its use of Asian elephants in its circus. 873 F. Supp. 2d at 302, 304. Among other things, the plaintiff claimed that the individual defendant made false and misleading statements, including by testifying before Congress and in court and publishing articles in return for $190,000 in payments from the organizational defendants. *Id.* at

301, 303. This Court found that the *Noerr-Pennington* doctrine applied to those statements because they were part of "publicity campaigns to influence governmental action," *id.* at 307–08, and, thus, that the plaintiff could not rely on them to make out a civil RICO claim.

Here, Nada seeks to hold Dr. Vidino liable for racketeering conspiracy based on speech that is indistinguishable from protected petitioning activities regarding the Muslim Brotherhood. Dr. Vidino has testified before Congress on multiple instances regarding extremism and the operations of the Muslim Brotherhood in particular. For instance, in 2011, Dr. Vidino testified about the "offshoots" of the Muslim Brotherhood in the West, explaining that the Muslim Brothers "retai[n] historical, financial, personal, organizational, and most important, ideological ties to the Muslim Brotherhood" in the Middle East but have "operational independence." *Muslim Brotherhood Hr'g*; *see also supra*, at 4–5 (collecting additional examples of congressional testimony). Likewise, Dr. Vidino regularly serves as an expert witness in criminal and civil cases on similar subjects. *See, e.g.*, *Ceasar*, 10 F.4th at 72 (noting Dr. Vidino "is an expert on terrorism"); *Shafi*, 2018 WL 3159769, at *2 (noting that Dr. Vidino is an expert "on ISIS, other terrorist organizations and individuals," and "the Muslim Brotherhood"); *see also supra*, at 5–6 (collecting cases describing additional instances of expert testimony on extremist organizations).

Dr. Vidino's testimony before and briefing of policymakers are part of his larger work as an academic to influence policy with solutions that resonate—a goal Dr. Vidino also furthers in his role as Director of the Program on Extremism at The George Washington University. *See* Am. Compl. ¶¶ 40, 126. The research that Dr. Vidino allegedly performed for Alp—including allegedly expressing his opinion about Crédit Suisse's funding decision, *id.* ¶ 40—is indistinguishable from these broader efforts. For example, Dr. Vidino has previously written books explaining that "Yussuf Nada," Nada's father, was one of the "pioneers" of the Muslim Brotherhood in the West

and describing the "conscious effort by the Western Brothers to downplay or deny their links to the Muslim Brotherhood."  Vidino, *The Closed Circle*, *supra*, at 4, 7; *see also* Lorenzo Vidino, *The New Muslim Brotherhood in the West* 31 (Colum. Univ. Press 2010) ("[Yussuf] Nada's skills as a businessman enabled him to play a key role in the financial aspects of the Brotherhood's establishment in the West.").  Nada does not allege otherwise—in fact, the allegations here are consistent with and indistinguishable from that protected conduct.

Nada also seeks to hold Dr. Vidino liable for alleged speech about entities other than Nada and Lord Energy, but the speech involved in these allegations is likewise indistinguishable from Dr. Vidino's work as an academic.  The Amended Complaint faults Dr. Vidino for supposedly stating on the Program's Twitter account that "'Spanish authorities blocked bank accounts linked [to] the Kutayni clan'" because it was "'suspected of funding Islamic State'" and that one of the clan's accounts was "linked to the Muslim Brotherhood."  Am. Compl. ¶ 263.  This is part and parcel of Dr. Vidino's work as an academic—indeed, Dr. Vidino wrote a report in Spanish in 2022 explaining the events surrounding this news story.  *See* Altuna & Vidino, *supra*, at 50–54.  Nada does not allege that in supposedly sharing this newsworthy development, Dr. Vidino made any misrepresentations in any way.

All else failing, Nada attempts to hold Dr. Vidino liable for sharing "two antisemitic Facebook posts" made by trustees of IRW with a journalist at *The Times*.  Am. Compl. ¶ 41.  But IRW is also a subject of Dr. Vidino's academic research and publications.  *See* Vidino, *The Closed Circle*, *supra*, at 46–47 (explaining that IRW is one of the "welfare and relief organizations, that are run by the Muslim Brotherhood" (quotation and alterations omitted)).  And this conduct is exactly the type of "publicity campaign[s] to influence governmental action" protected by the *Noerr-Pennington* doctrine.  *Feld*, 873 F. Supp. 2d at 307–08 (quotation omitted).  Indeed,

governments—including the United States—*did* respond to these posts becoming public.  *See, e.g.*, U.S. Dep't of State, *supra* (explaining that a "July 2020 expose by the London Times and Dr. Lorenzo Vidino" exposed the anti-Semitic posts by IRW's trustees and encouraging "all government bodies" to examine "IRW activities and their relationship with IRW" because of a "rise in anti-Semitism in every corner of the globe").  And, as with the previous statements, Nada does not question the authenticity of the Facebook posts or allege that they were shared with malice. Indeed, the opposite is true:  As the U.S. State Department recognized, "it is incumbent on all people of good conscience to stand strong and exhibit zero tolerance for the blatant and horrifying anti-Semitism and glorification of violence exhibited at the most senior levels of IRW."  *Id.*[8]

Nor does it matter that, according to Nada, a research fellow at the Program reacted to the IRW revelations in *The Times* by apologizing to Muslim organizations supposedly "'harmed'" by "'false, slanderous claims'" in the article and faulting Dr. Vidino for passing along the undisputedly authentic Facebook posts by the IRW trustees.  Am. Compl. ¶ 42.  That statement of opinion by a third party is irrelevant, and the Amended Complaint does not allege with any specificity what these supposedly false and slanderous claims were.  *See Von Kahl v. Bureau of Nat'l Affairs, Inc.*, 934 F. Supp. 2d 204, 217 (D.D.C. 2013) ("In order to plead defamation, a plaintiff should allege specific defamatory comments . . . by pleading the time, place, content, speaker, and listener of the alleged defamatory matter.").

The best Nada can offer is that Dr. Vidino was "willing to say whatever [Alp] wanted in exchange for money."  Am. Compl. ¶ 126.  But this "conclusory statement[]" lacks any supporting

---

[8] In those posts, one IRW trustee called Jews the "grandchildren of monkeys and pigs," called President Abdul Fattah al-Sisi of Egypt a "Zionist pimp," and praised Hamas—which is designated as a terrorist organization by the United States—calling it "the purest resistance movement in modern history."  U.S. Dep't of State, *supra.*

factual allegations, and this Court need not "credit" it even on a motion to dismiss.  *Iqbal*, 556 U.S. at 686.  Even taken at face value, the Amended Complaint never alleges that Dr. Vidino "sa[id]" anything untrue about the Muslim Brotherhood.  Indeed, Nada concedes in the same breath that Dr. Vidino is "credible and highly-credentialed."  Am. Compl. ¶ 126.

Perhaps recognizing that he lacks a claim against Dr. Vidino, Nada borrows allegations from the complaint in a separate lawsuit, *Hafez v. Vidino*, 24-cv-00873 (D.D.C. filed Mar. 27, 2024).  But "Federal Rule of Civil Procedure 10(c) bars the court from considering pleadings incorporated by reference from other cases."  *United States ex rel. O'Connor v. U.S. Cellular Corp.*, 2022 WL 971290, at *6 (D.D.C. Mar. 31, 2022).  In any event, Hafez's allegation that Dr. Vidino supposedly "'blacklisted'" Hafez for challenging "'Dr. Vidino's false accusations against Western Muslims,'" Am. Compl. ¶ 278, is conclusory and not pleaded with any specificity.  Nada does not explain what false accusations Dr. Vidino allegedly made against Western Muslims—and he certainly does not point to any that are relevant to this action.

Shorn of its legal conclusions and conclusory assertions, there is absolutely nothing in the Amended Complaint allowing Nada to argue plausibly that the *Noerr*-*Pennington* doctrine does not apply to Dr. Vidino's protected activities.  As a result, Dr. Vidino is immune from liability for the advocacy that forms the basis for his inclusion in this lawsuit, and this Court should reject Nada's effort to chill protected activity by dismissing the claim against Dr. Vidino with prejudice.

## II.     The Amended Complaint Fails to State a RICO Conspiracy Claim Against Dr. Vidino.

In the alternative, this Court should dismiss Dr. Vidino from the case for the further reason that Nada does not plausibly allege any of the elements of a civil RICO conspiracy claim with respect to Dr. Vidino.  The Amended Complaint includes no allegations that Dr. Vidino knew about any racketeering conspiracy or agreed to further such a conspiracy's goals.  Nor does Nada plausibly allege any substantive RICO violation as against the other Defendants that Dr. Vidino

26

could have agreed to further as part of a supposed conspiracy.  Nada's sole claim against Dr. Vidino—for civil RICO conspiracy—should be dismissed with prejudice.

### A.  Nada Does Not Allege That Dr. Vidino Conspired To Violate RICO.

To state a claim for RICO conspiracy, the plaintiff must allege that "(1) two or more people agreed to commit a subsection (c) offense, and (2) a defendant agreed to further that endeavor." *RSM Prod.*, 682 F.3d at 1048; *see* 18 U.S.C. § 1962(d).  To be liable, "each defendant" must "assent" to the RICO conspiracy.  *Barlow v. McLeod*, 666 F. Supp. 222, 225 (D.D.C. 1986).  A defendant "need not agree to be the one to commit the predicate acts," but he must at a minimum "adopt the goal of furthering or facilitating the criminal endeavor."  *RSM Prod.*, 682 F.3d at 1048 (quotation omitted).  A mere "conclusory statement" that defendants "conspired to violate RICO" is insufficient.  *Cheeks v. Ft. Meyer Constr. Corp.*, 216 F. Supp. 3d 146, 162 (D.D.C. 2016) (quotation and alteration omitted).  Rather, the plaintiff must allege that the defendant "knew of" the racketeering conspiracy and "agreed to foster its goals."  *RSM Prod.*, 682 F.3d at 1048.

*RSM Production* is illustrative.  There, the D.C. Circuit affirmed the dismissal of a RICO conspiracy claim against a law firm because the complaint did not "support[] a plausible inference" that the firm "knew of the bribery-racketeering conspiracy and agreed to foster its goals." 682 F.3d at 1048.  The plaintiffs had entered an agreement with Grenada for oil and natural hydrocarbon exploration that eventually soured.  *Id.* at 1046.  Grenada hired counsel to represent it in international arbitration against the plaintiffs concerning offshore licenses.  *Id.*  The plaintiffs then sued Grenada's lawyers, alleging that they were part of a conspiracy to bribe Grenadian officials to deny the plaintiffs offshore-licensing rights.  *Id.* at 1047.  Specifically, the plaintiffs alleged that the attorneys "knowingly agreed to perform services of a kind which have facilitated the activities of those who are operating the Enterprise . . . in an illegal manner."  *Id.* (quotation omitted).  In rejecting the RICO conspiracy claim, the D.C. Circuit emphasized that the plaintiffs "target[ed]

27

[the defendant's] services as attorneys, nothing more." *Id.* at 1051.  The court explained that defending a client was not enough to show that the law firm agreed to promote acts of racketeering. *Id.* at 1050.  Similarly, allegations that the firm was paid by third parties supposedly involved in the conspiracy was "insufficient" to show that they were "part of the bribery-racketeering conspiracy." *Id.*  Thus, the allegations were insufficient to support a plausible inference that the attorneys "agreed to join or acted to foster the bribery-racketeering conspiracy." *Id.* at 1051.

Here, Nada's allegations regarding Dr. Vidino are even more threadbare and, thus, are insufficient to show that Dr. Vidino "knew of" the alleged "racketeering conspiracy and agreed to foster its goals."  682 F.3d at 1048.  Nada alleges that Dr. Vidino "was hired by Alp as a contractor to provide leads on new targets and research and analysis on the Muslim Brotherhood" and that "[Dr.] Vidino consulted with Alp about Lord Energy."  Am. Compl. ¶ 40.  According to Nada's allegations, Alp apparently prepared a report detailing "projects for [Dr.] Vidino," which included "'[p]reparing an overview of key [Muslim Brotherhood] individuals/organisations/companies in the USA.'"  *Id.*  That does not show that Dr. Vidino knew about any alleged conspiracy.  As Nada concedes, Dr. Vidino is an "'expert'" on the Muslim Brotherhood, *id.* ¶ 105, and his consulting with Alp on that topic is no more unlawful than Dr. Vidino's academic research itself.

Similarly, the allegation that Dr. Vidino "stated his belief" in one or more Whatsapp messages that Crédit Suisse withdrew its funding for Lord Energy because of an article Alp had published, Am. Compl. ¶ 40, does not show knowledge of or agreement to join a criminal conspiracy and falls within his ordinary scope of work as an expert on the intricacies of extremist-organization financing, including compliance and governmental efforts to cut off such financing. Like the attorneys in *RSM Production*, Dr. Vidino acted consistent with "normal business practice" by stating an opinion about a fact that Nada himself alleges to be true.  682 F.3d at 1049.  Nor does

Nada allege that Dr. Vidino, in consulting with Alp, actually "committed any of the predicate acts" or in any way "acted to foster" the racketeering conspiracy.  *Id.* at 1051.[9]

Nada fares no better in attempting to allege that Dr. Vidino somehow knew that Alp had been retained by the UAE.  To this end, Nada relies exclusively on a 2023 *New Yorker* article that quotes Dr. Vidino as saying that when Alp employees contacted him in Switzerland in 2018, he thought that the UAE was the "'most realistic client.'"  Am. Compl. ¶ 128.  Read in full context, the *New Yorker* article referenced by and incorporated into the Amended Complaint fails to show that Dr. Vidino knew who Alp's client was at the time, let alone knew of or agreed to foster the goals of any conspiracy.  The *New Yorker* article makes clear that the reporter asked a leading question—"I said, [Dr. Vidino] must have realized that only the U.A.E. had the means and the motive to pay a private investigator to dig up dirt on Brotherhood-style Islamists"—to which Dr. Vidino responded, "[t]hey were the most realistic client" but that "it wasn't clear cut whether it was the Emiratis, the Saudis, the Israelis, or some private entity in the States."  Nada's allegation is thus misleading:  Dr. Vidino never stated that he knew at the time that the UAE was Alp's ultimate alleged client.  Rather, he answered a leading question and quickly clarified that "it was not clear cut."[10]

---

[9] Nada's allegations that Dr. Vidino passed along antisemitic Facebook posts by IRW trustees and tweeted about Spanish authorities' seizure of bank accounts held by the Kutayni clan, Am. Compl. ¶¶ 41, 263, are similarly irrelevant and cannot show knowledge of or agreement to join a RICO conspiracy against Nada and Lord Energy.  Because of the heinous nature of the Facebook posts— which Nada does not dispute—and the newsworthiness of the Spanish government's actions against the Kutayni clan, Dr. Vidino had "legitimate . . . incentives" to share this information as an academic expert in the field.  *RSM Prod.*, 682 F.3d at 1051–52 ("[A]llegations that a defendant acted in ways consistent with a conspiratorial agreement, but also equally well explained by legitimate . . . incentives, do not suffice to show illegality." (quotation and alteration omitted)).

[10] *See* David Kirkpatrick, *The Dirty Secrets of a Smear Campaign*, The New Yorker (Mar. 27, 2023), https://www.newyorker.com/magazine/2023/04/03/the-dirty-secrets-of-a-smear-campaign.

If anything, this allegation tends to show that Dr. Vidino *did not* know of or support the supposed conspiracy. The Amended Complaint states that in meeting with Dr. Vidino in January 2018, Alp decided "to disguise the identity of [its] Emirati clients, telling Vidino that Alp had been hired by a 'London-based law firm.'" Am. Compl. ¶ 128. Thus, Alp allegedly concealed the identity of its *supposed* client, which shows that Dr. Vidino was not privy to the alleged conspiracy and could not have agreed to further its purposes. Dr. Vidino's comment quoted in the *New Yorker* was made years later to a reporter in tentative terms and cannot retroactively establish knowledge.

The most one could infer from this allegation is that Dr. Vidino suspected that Alp was hired by the UAE. But that does not establish Dr. Vidino's knowledge of any alleged conspiracy. Nada alleges no reason for Dr. Vidino to have assumed that the UAE retained Alp for an unlawful purpose. Even knowing that a client "had a reputation for corruption" is not enough to show an "agreement to further acts of racketeering." *RSM Prod.*, 682 F.3d at 1048, 1050 (quotation omitted). And "it is implausible to infer" from the fact that "alleged co-conspirators . . . provided the funding" for lawful services that the "provision of [lawful] services . . . was intended to further the criminal endeavor." *Id.* at 1050–51.

For similar reasons, it is implausible to infer that Dr. Vidino knew that the payments Alp allegedly promised him were intended to further a supposedly criminal endeavor. Nada alleges that Dr. Vidino "signed a contract with Alp to provide" research, that Alp paid him "3,000 Euros for [h]is work," and that Dr. Vidino and Alp employee Brero had a "$1,000 dinner" with him in Switzerland. Am. Compl. ¶¶ 128–29. Because Dr. Vidino routinely provides research services as a subject-matter expert to governments and private firms, these allegations are "more likely explained by" his "normal business practice of providing" research on the Muslim Brotherhood. *RSM Prod.*, 682 F.3d at 1051 (quotation omitted). Even "allegations that a defendant acted in ways

30

consistent with a conspiratorial agreement, but also equally well explained by legitimate . . . incentives, do not suffice to show illegality." *Id.* at 1051–52 (quotation and alteration omitted).

Moreover, the Amended Complaint alleges that Dr. Vidino's involvement with Alp began months *after* Alp decided to "target" Nada and Lord Energy.  According to Nada, Alp hired Dr. Vidino to provide "leads" about "individuals" and planned at an unspecified time in the future to ask him to prepare a list of "key [Muslim Brotherhood] individuals/organisations/companies." Am. Compl. ¶¶ 129, 145.  But the first allegation of contact between Alp and Dr. Vidino dates to January 2018, at least four months after Alp allegedly targeted Nada and Lord Energy.  *See id.* ¶¶ 106, 127.  Under Nada's theory, Dr. Vidino could not have pointed out Nada or Lord Energy as a "lea[d]" because they were already targets—indeed, Nada alleges that Badal asked Vidino "for a meeting *to discuss Lord Energy*." *Id.* ¶ 127 (emphasis added).

In short, "the complaint alleges no conduct" by Dr. Vidino "beyond the provision of normal . . . services" and "so fails to support a reasonable inference" that Dr. Vidino "agreed to assist others in the commission of unlawful acts." *RSM Prod.*, 682 F.3d at 1051 (quotation and alterations omitted); *see Twombly*, 550 U.S. at 556–57 (allegations that a defendant acted in ways consistent with conspiratorial agreements, but also equally explained by legitimate economic incentives, do "not suffice . . . to show illegality" on a motion to dismiss).

**B.  Nada Does Not Allege A Substantive RICO Violation And Therefore Cannot Maintain A RICO Conspiracy Claim.**

Nada still does not name Dr. Vidino in the racketeering count under 18 U.S.C. § 1962(c). Am. Compl. ¶¶ 304–318.  Nevertheless, Nada's failure to allege a substantive RICO violation is an independent reason for concluding that Nada failed to plead a RICO conspiracy as against Dr. Vidino under 18 U.S.C. § 1962(d).  *See Republic of Kazakhstan*, 380 F. Supp. 3d at 65 ("Because the Court finds that plaintiff failed to allege a substantive RICO violation under Section

1962(c), it also finds that it has failed to plead a conspiracy to violate RICO under Section 1962(d).”); *Greenpeace, Inc. v. Dow Chem. Co.*, 808 F. Supp. 2d 262, 274 (D.D.C. 2011) (similar).

A substantive RICO violation under Section 1962(c) consists of four elements: “(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.” *W. Assocs. Ltd. P'Ship, ex rel. Ave. Assocs. Ltd. P'Ship v. Mkt. Square Assocs.*, 235 F.3d 629, 633 (D.C. Cir. 2001) (quotation omitted). To state a civil RICO claim, the plaintiff must allege a *domestic* injury to “business or property,” 18 U.S.C. § 1964(c); *RJR Nabisco, Inc. v. European Community*, 579 U.S. 325, 350 (2016), and that the alleged misconduct bears “some direct relation” to the asserted injury as a matter of proximate cause, *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 265–68 (1992). Civil RICO actions also must be brought within four years of the plaintiff's discovery of the injury. *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987).

Nada does not plausibly allege any predicate RICO offense, let alone a pattern of racketeering activity, and he fails to allege a domestic injury and proximate causation. Moreover, Nada brought his conspiracy and substantive claims too late to satisfy RICO's statute of limitations.

### i.     *Nada does not plausibly allege a single predicate RICO offense, let alone a pattern of racketeering activity.*

To state a RICO claim, “a plaintiff must allege, *inter alia*, two or more predicate acts that constitute a 'pattern of racketeering activity.'” *Meng v. Schwartz*, 116 F. Supp. 2d 92, 95 (D.D.C. 2000) (quotation omitted). Nada has failed to allege a single RICO predicate.

The “law is clear” that “defamation is not a predicate act under RICO.” *Ctr. for Immigr. Stud. v. Cohen*, 410 F. Supp. 3d 183, 191–92 (D.D.C. 2019) (citing *Hourani v. Mirtchev*, 796 F.3d 1 (D.C. Cir. 2015)). And a plaintiff cannot plead around this rule by “shoehorn[ing] a defamation claim into the RICO framework.” *Id.* at 191. Courts in this Circuit have not looked favorably on plaintiffs who attempt to “end-run the requirements for a defamation claim” by pleading it as a

RICO violation.  *Teltschik v. Williams & Jensen, PLLC*, 748 F.3d 1285, 1288 (D.C. Cir. 2014); *see, e.g.*, *Cohen*, 410 F. Supp. 3d at 191 (collecting cases).

In *Cohen*, for instance, this Court rejected a civil RICO claim alleging wire fraud based on defendants' designation of the plaintiff as a "hate group" and dissemination of that designation over the Internet.  410 F. Supp. 3d at 187, 194.  This Court found that the plaintiff failed to allege wire fraud because the designations "d[id] not depend upon objective data or evidence, and there is no basis upon which to establish that they were *known to be false when made*."  *Id.* at 191 (emphasis added).  This Court also cited *Marks v. City of Seattle*, 2003 WL 23024522 (W.D. Wash. Oct. 16, 2003), favorably.  *Id.*  In that case, the court similarly dismissed a civil RICO claim for failure to state a predicate act where a plaintiff alleged that defendant aired a broadcast making false statements about her, including that she used city equipment for personal business.  2003 WL 23024522, at *2.  The court reasoned that the claims amounted to "defamation or false light" and were not "false statements in the sense of fraudulent misrepresentation."  *Id.* at *6.

Here, Nada's Amended Complaint is similarly deficient.  Nada alleges a scheme that supposedly engaged in defamation.  Nada himself admits as much, characterizing the alleged misconduct as a "'defamation effort.'"  Am. Compl. ¶ 157; *see also id.* (email where Nada characterizes the conduct against him as an "'unknown defamation effort'"); *id.* (stating that a financial-compliance entity "stymied" Nada's efforts "to identify his unknown defamers"); *id.* ¶ 231 (alleging a "smear campaign against him").  Nada does not allege that the statements made about him and Lord Energy were made with *knowledge* that they were false.  To be sure, Nada alleges that one of the journalists Alp supposedly hired "routinely published stories he knew to be false and misleading," but he never alleges that any of these articles were about Nada.  *See id.* ¶ 43. Similarly, Nada alleges that Alp at times "scour[ed] the internet looking for any 'negative'

information" even if it "was wildly farfetched . . . or had been proven false" and "disseminated the false claims." *Id.* ¶¶ 97–98. But again, Nada does not allege Alp made statements it knew were false and does not identify the supposedly disproven third-party statements. The Amended Complaint repeats that the statements were "false," but nowhere claims that any member of the supposed conspiracy knew that the statements were false when they made them. *See, e.g.*, *id.* ¶¶ 126, 131–32, 138, 146, 149. When it does address knowledge, the allegations have nothing to do with the false statements. For instance, Nada alleges that "Alp knew all of this," referencing that Lord Energy was having "'serious problems with Western banks to receive credits,'" *id.* ¶ 156, and that other Defendants "knew, and intended, that the banks would suffer financial harm," *id.* ¶ 313. Again, that is not knowledge of false statements. *Id.* ¶ 313.

Failure to allege any knowingly false statement is fatal to Nada's RICO claim because it shows that he alleges nothing more than defamation, which is insufficient as a RICO predicate, and has not even attempted to allege intentional fraud or misrepresentation. *Cohen*, 410 F. Supp. 3d at 191; *see, e.g.*, *Steele v. Fannie Mae*, 134 F. Supp. 3d 191, 200 (D.D.C. 2015) ("To plead a *prima facie* claim for fraudulent misrepresentation, a plaintiff must allege (1) a false representation (2) in reference to a material fact, (3) made with knowledge of its falsity, (4) with intent to deceive, and (5) action . . . taken in reliance upon the representation" (quotations omitted)).

Even if the predicate offense were *not* defamation, Nada does not plausibly allege any other predicate RICO offense, let alone a pattern of racketeering activity. *See Comm. to Defend U.S. Const. v. Moon*, 776 F. Supp. 568, 571 (D.D.C. 1991) (requiring plaintiffs to allege "two or more predicate acts"). Nada at one point attempts to base his RICO claim on conclusory assertions of "bank fraud" and "wire fraud." Am. Compl. ¶ 307. "These predicates raise the bar" for Nada because "[a] RICO claim based on mail and wire fraud receives careful scrutiny because of the

relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Adler v. Loyd*, 496 F. Supp. 3d 269, 278–79 (D.D.C. 2020) (quotation omitted). Both mail and wire fraud must be alleged "with particularity." Fed. R. Civ. P. 9(b); *see Bates*, 466 F. Supp. 2d at 88 ("It is well-settled in this and other Circuits that where acts of mail and wire fraud constitute the alleged predicate racketeering activity, these acts are subject to the heightened pleading requirement of [Rule 9(b)]." (quotation and alterations omitted)).

Nada does not plausibly allege fraud under any standard, let alone under the Rule 9(b) standard. With respect to bank fraud, many courts have held that "only a defrauded financial institution may assert bank fraud as a predicate act for a federal RICO claim." *Am. Biocare, Inc. v. Howard & Howard Att'ys, PLLC*, 2016 WL 5661583, at *8 (E.D. Mich. Sept. 30, 2016) (collecting cases). Nada does not allege that either he or Lord Energy is a defrauded financial institution. Moreover, bank fraud requires alleging that the defendant "(1) engaged in a course of conduct designed to deceive a federally chartered or insured financial institution into releasing property" and "(2) possessed an intent to victimize the institution by exposing it to actual or potential loss." *United States v. Crisci*, 273 F.3d 235, 239–40 (2d Cir. 2001) (quotation omitted). Nada does not allege that Defendants received money or property from any bank, and he does not plausibly allege with particularity that Defendants intended to harm any bank.[11]

Nor does Nada allege the elements of wire fraud, which are "(1) formation of a 'scheme to defraud'" and "(2) use of interstate wire communication to further that scheme." *United States v.*

---

[11] The bare statement that Defendants other than Dr. Vidino "knew, and intended, that the banks would suffer financial harm" from terminating their relationship with Lord Energy, Am. Compl. ¶ 313, falls well short of plausibly stating an intent to defraud, particularly under Rule 9(b). *See Iqbal*, 556 U.S. at 686; *Twombly*, 550 U.S. at 566–67. That conclusory assertion of intent is never explained, revisited, or referenced anywhere else in the Amended Complaint, which alleges intent exclusively in reference to the UAE's purported desire to address a competitive threat. Nor does this bare allegation show the other elements required to establish bank fraud, as explained above.

*Lemire*, 720 F.2d 1327, 1334–35 (D.C. Cir. 1983).  "At the core of the judicially defined 'scheme to defraud' is the notion of a trust owed to another and a subsequent breach of that trust."  *Id.* at 1335.  In the RICO predicate-act context, "the defendant must make a false statement or omission of fact *to the plaintiff*."  *Bates*, 466 F. Supp. 2d at 91 (quotation omitted).  Nada does not allege that any false statements were made *to him*; rather, his defamers were "unknown" to him and communicated exclusively to others.  *E.g.*, Am. Compl. ¶ 157.  Moreover, Nada does not allege with the "particularity" required by Rule 9(b) "what [fraudulent] statements were made and in what context, when they were made, who made them, and the manner in which the statements were misleading."  *Bates*, 466 F. Supp. 2d at 89 (quotation omitted).  Nada does not allege a single public statement made by Dr. Vidino about Nada or Lord Energy, and nearly every statement allegedly made by other Defendants was "prepared," "drafted," and "shared *internally*" within Alp or between Alp and the UAE.  Am. Compl. ¶¶ 310(a)–(e), 311(a)–(j) (emphasis added).  That is not enough to allege wire fraud with particularity or otherwise.  *See Bates*, 466 F. Supp. 2d at 91.[12]

### ii.    *Nada does not plausibly allege a domestic injury.*

Nada also fails to plausibly allege any domestic injury within the United States.  The Supreme Court has held that because RICO's private right of action does not apply extraterritorially, "[a] private RICO plaintiff . . . must allege and prove a *domestic* injury to its business or property."  *RJR Nabisco*, 579 U.S. at 346 (emphasis in original).  The domestic-injury analysis is a "context-

---

[12] The few statements that Nada alleges were made by other Defendants to non-participants in the alleged scheme, *see* Am. Compl. ¶ 310 (f)–(h), likewise were not made to Nada or Lord Energy and cannot show "actual fraud *directed at the plaintiffs*."  *Bates*, 466 F. Supp. 2d at 91 (emphasis in original).  This requirement arises both from the substantive wire-fraud offense and from RICO's proximate-cause requirement, which requires alleging that the plaintiff was "the direct victim" of the defendants' "purportedly fraudulent statements."  *Id.* (quoting *Anza v. Ideal Steel Supply Co.*, 547 U.S. 451, 457 (2006)).  Here, the supposed recipients of the few statements allegedly made to non-participants were compliance firms, news outlets, and (in one instance) Crédit Suisse, and Nada cannot bring RICO claims on their behalf.  *See id.*; *infra*, at 42.

specific inquiry" that turns on where the asserted harm "arises." *Yegiazaryan v. Smagin*, 143 S. Ct. 1900, 1909 (2023). The plaintiff must show that "the nature of the alleged injury, the racketeering activity that directly caused it, and the injurious aims and effects of that activity" "sufficiently ground the injury in the United States." *Id.* at 1909–10. Thus, what matters is not the injury "in insolation," but the injury "as the product of racketeering activity." *Id.* at 1910. To that end, courts consider where "[m]uch of the alleged racketeering activity that caused the injury occurred" and where the "injurious effects of the racketeering activity [were] largely manifested." *Id.* None of the harms alleged by Nada are sufficient to show a domestic injury.

Nada alleges that Americas Lord Energy, a subsidiary of Lord Energy, "'was forced to cease its operations,'" Am. Compl. ¶ 10, and lost out on one potential business agreement "as a result of the enterprise's" conduct, *id.* ¶ 57. But these harms to Americas Lord Energy—which is not a party in this case—are not domestic injuries for purposes of the *Plaintiffs'* civil RICO claims.

It is well-established that "a parent corporation cannot bring action on behalf of its subsidiary," *Wash. Tennis & Educ. Found., Inc. v. Clark Nexsen, Inc.*, 270 F. Supp. 3d 158, 163 (D.D.C. 2017), and thus cannot "recover for damages suffered by its subsidiary" under civil RICO, *Care One Mgmt., LLC v. United Healthcare Workers E.*, 2024 WL 1327972, at *10 (D.N.J. Mar. 28, 2024) (dismissing damages claim brought by parent on behalf of subsidiary in a case asserting RICO claims, among others); *see, e.g.*, *Paris Partners, L.P. v. Russo*, 1995 WL 746585, at *5 (S.D.N.Y. Dec. 14, 1995) (holding that partnership had no standing to bring a RICO claim on behalf of subsidiary corporation). Here, because Americas Lord Energy is a subsidiary of Lord Energy, Am. Compl. ¶ 3, any harm to it cannot show that *Lord Energy* suffered a domestic injury.

Similarly, "[i]t is well established that . . . the president . . . of a corporation lacks standing to sue for an injury *to the corporation*." *Meade v. Kiddie Acad. Domestic Franchising, LLC*, 501

F. App'x 106, 108 (3d Cir. 2012) (emphasis added); *see, e.g.*, *Anyanwutaku v. Wilson*, 2005 WL 774854, at *2 (D.D.C. Apr. 5, 2005) ("Any wrong done to the corporation that led to the alleged loss of its interest in the property is cognizable if brought by the corporation, not one of its directors or incorporators."). The Amended Complaint alleges that Nada was a director of Americas Lord Energy. Am. Compl. ¶ 27. As with Lord Energy, any injury to Nada that occurred by way of Americas Lord Energy cannot serve as the domestic injury for the RICO claim.

Even if Nada could rely on injury to Americas Lord Energy, that would not be sufficient to show a *domestic* injury. In *Humphrey v. GlaxoSmithKline PLC*, 905 F.3d 694 (3d Cir. 2018), the Third Circuit concluded in a comparable context that the plaintiffs had failed to allege an injury within the United States. The plaintiffs in that case founded an investigation firm in China that worked with American companies doing business in China to assist with American anti-bribery law compliance. *Id.* at 696. Plaintiffs brought a civil RICO lawsuit against a multinational healthcare company for allegedly engaging in widespread bribery in China to "destroy[]" and "eviscerate[]" their "prospective business ventures." *Id.* at 696–97. Applying a context-specific analysis, the court "ha[d] no difficulty concluding that [p]laintiffs have not alleged a domestic injury" because "[p]laintiffs lived in China," had their principal place of business there, and "provided services in China." *Id.* at 707–08. That the plaintiffs alleged "loss of goodwill and some unidentified number of actual and prospective U.S. customers" was not enough. *Id.* at 708.

Here, Nada alleges RICO violations by a supposed enterprise that had aims exclusively outside the United States, engaged in conduct exclusively outside the United States, and caused specific and cognizable harm to Nada and Lord Energy exclusively outside the United States. The Amended Complaint includes no allegations that the aim of the alleged racketeering activity was to cause harm to Nada and Lord Energy in the United States. Instead, the focus of the alleged

conspiracy was on the "competitive threat" that Lord Energy supposedly posed in "crude oil exported to Asia."  Am. Compl. ¶ 89.  Nada alleges that the objects of the alleged racketeering activity were Lord Energy and Nada.  *Id.* ¶ 17.  But Lord Energy was incorporated and has its principal place of business in Switzerland, *id.* ¶ 25, and Nada was a citizen of Italy and resided there, *id.* ¶ 24.  While the Amended Complaint includes conclusory allegations that Nada registered Americas Lord Energy in the United States *after* the supposed enterprise was underway, Nada never alleges that the conspirators took aim at the subsidiary in any way.  *See id.* ¶¶ 10, 27, 87, 139, 212–13, 224.  Logically, the aim of the supposed racketeering enterprise could not have been harm in the United States because Nada alleges that the enterprise began in 2017, *id.* ¶ 90, yet Americas Lord Energy was not formed until April 24, 2018, *id.* ¶ 139.

Without explanation, Nada references a deal for Lord Energy to purchase 1 million barrels of crude oil from Chevron in September 2018.  Am. Compl. ¶ 202.  This threadbare allegation cannot establish a domestic injury.  For starters, Nada does not allege any injury whatsoever in connection with this deal.  Nor does Nada allege that the negotiations of this deal took place in the United States, that any part of the agreement would have been executed in the United States, or that any performance would have occurred in the United States.  *See id.* ¶¶ 5, 8, 32, 135 (alleging that Lord Energy dealt with Chevron in Asian markets).  All that connects this deal to the United States is the allegation that the deal was with "Chevron USA;" but harm based on "lost prospective business opportunities from U.S. suppliers" is "insufficient to establish that the plaintiff experienced a domestic injury."  *Humphrey*, 905 F. 3d at 706; *see also Optimum, S.A. v. Legent Corp.*, 926 F. Supp. 530, 532 (W.D. Pa. 1996) (finding that "a foreign company cannot demonstrate the domestic injury requirement [under the Sherman Act] by piggy-backing onto the injury of a United States exporter" (quotation omitted)).

Similarly, Nada does not allege that any racketeering activity occurred in the United States. For instance, Nada alleges in a conclusory fashion that Alp investigated U.S. citizens, but does not allege that any of that work occurred in the United States or how those investigations were related to or part of the same racketeering activity targeting *Nada*. *See, e.g.*, Am. Compl. ¶¶ 241–74. Critically, although Nada alleges that Dr. Vidino resided in the United States, *id.* ¶ 40–42, he never alleges that Dr. Vidino did any work for Alp in the United States.

Furthermore, the asserted injuries occurred outside the United States. Lord Energy filed for bankruptcy in Switzerland. Am. Compl. ¶ 213. While Nada attempts to allege that the bankruptcy in Switzerland had effects in the United States by impacting unspecified third-party creditors and investors, *id.* ¶ 223–226, such effects are insufficiently direct to show domestic injury. *See RJR Nabisco*, 579 U.S. at 346 (RICO plaintiffs must allege and prove domestic injury "to *its* business or property." (emphasis added)); *Humphrey*, 905 F.3d at 707–08 (harms to American clients of foreign business are not enough); *Greenpeace, Inc.*, 808 F. Supp. 2d at 273 ("RICO plaintiffs generally cannot recover for harm that befalls third parties."). Nor does Nada's allegation that Americas Lord Energy dissolved suffice to show domestic injury. At most, harm to Americas Lord Energy—which was "'preparing to engage in the oil and gas sector in the United States,'" Am. Compl. ¶ 138—was a "prospective" injury that is "not enough to overcome the Supreme Court's caution against extraterritorial application of domestic law." *Humphrey*, 905 F.3d at 708.

In last-ditch efforts to show domestic injury, Nada alleges that the supposed enterprise relied on "U.S.-based [media] compan[ies]" and "search engines" in conducting its publicity campaign, Am. Compl. ¶ 142, 149, 180, and that Lord energy used the "U.S. dollar" in its trading, *id.* ¶ 225. But courts have previously found similar allegations insufficient to show a domestic injury. *See Bascuñán v. Elsaca*, 874 F.3d 806, 819 (2d Cir. 2017) (holding that "use of the U.S.

financial system . . . does not, on its own, turn an otherwise foreign injury into a domestic one").

Nor is the fact that Nada was a U.S. citizen, Am. Compl. ¶ 24, sufficient to make his injury

domestic.  In *Hourani*, this Court held that "U.S. citizenship, the location of the enterprise, and

laundering money through accounts in the United States" were not enough to "change the

'essentially foreign' nature of the racketeering activity."  943 F. Supp. 2d at 167 (finding no

domestic injury even though the plaintiff and defendant were both U.S. citizens).

### iii.     *Nada does not plausibly allege proximate causation.*

Nada fails to allege that the asserted misconduct fell within the "first step" in the causal

chain as required to satisfy RICO's proximate-cause requirement.  *Holmes*, 503 U.S. at 271–72;

*see also Anza*, 547 U.S. at 456–57, *Murray v. Mulgrew*, 704 F. Supp. 2d 45, 47 (D.D.C. 2010).  For

civil RICO, proximate cause requires alleging "some direct relation," and a link that is "too remote,

purely contingent, or indirect is insufficient."  *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9

(2010) (quotation and alteration omitted); *see City of Oakland v. Wells Fargo & Co.*, 14 F.4th 1030,

1035 (9th Cir. 2021) (en banc) (explaining that the statutory "direct relation" requirement is "more

stringent" than the "foreseeability" standard for proximate cause used in other contexts).

In *Hemi Group*, New York City sued an online cigarettes retailer for allegedly causing the

loss of tax revenue for retail cigarette purchases.  559 U.S. at 5.  The City alleged that Hemi failed

to provide necessary information to the State, which could then not provide the information to the

City, and the City thus could not ensure that customers paid taxes on their online purchases.  *Id.* at

9.  In rejecting this theory, the Supreme Court explained that "the conduct directly responsible for

the City's harm was the customers' failure to pay their taxes" to the City, whereas the conduct

constituting "the alleged fraud" was Hemi's failure to file reports with the State.  *Id.* at 11.  The

Court held that the City failed to allege proximate cause and refused to "extend RICO liability to

situations where the defendant's fraud on the third party (the State) has made it easier for a *fourth* party (the taxpayer) to cause harm to the plaintiff (the City)." *Id.* (emphasis in original).

*Hemi Group* directly applies here. Nada alleges a causal chain that is far too attenuated. Nada's theory is that the Defendants caused journalists and others to make or repeat false statements about Nada and Lord Energy, which were then picked up by media organizations and websites, which then led terrorist-financing watchlists to designate Nada and Lord Energy as a risk based in part on that information, which then led (yes there is more) banks to refuse to do business with Lord Energy, which eventually led to its bankruptcy. This causal chain certainly requires "'go[ing] beyond the first step.'" *Hemi Grp.*, 559 U.S. at 10 (quoting *Holmes*, 503 U.S. at 271).

The conduct directly responsible for Nada's asserted injury was the bank's refusal to do business with Lord Energy, while the conduct constituting the alleged RICO violation was sponsoring false statements by third parties. That omits at least three steps by independent actors: (1) the media organizations and websites that picked up the statements; (2) the watchlist organizations that credited the statements as suggesting a risk; and (3) the bank officials that decided to cut off financing given information available at the time, including Nada's contesting the statements in letters sent directly to the banks. Am. Compl. ¶¶ 169–70.

As in *Hemi Group*, Nada asks this Court to "extend RICO liability" to situations where misrepresentations to a third party (the news organizations and websites), caused a fourth party (watchlists) to designate Nada as a risk, which then caused a fifth party (the banks) to stop doing business with Lord Energy. Any one of these additional steps would be enough to defeat proximate cause because "the conduct directly causing the harm"—the banks' decisions to cut off financing— "was distinct from the conduct giving rise to the [alleged] fraud." *Hemi Grp.*, 559 U.S. at 11 (citing *Anza*, 547 U.S. at 458). But here, "[s]everal intervening causes break the chain." *Martinez v.*

*JPMorgan Chase Bank, N.A.*, 178 F. Supp. 3d 184, 192 (S.D.N.Y. 2016) (dismissing RICO claim where plaintiff's failure to pay a judgment against him was directly caused by Cuba's failure to pay a judgment owed to the plaintiff, not the bank's allegedly unlawful failure to freeze Cuban government assets on plaintiff's request); *see also City of Oakland*, 14 F.4th at 1039–40 (reversing district court and panel decision and dismissing Fair Housing Act claim under the "direct relation" standard where plaintiff failed to allege that tax revenue lost because of "an increase in foreclosures [was] 'surely attributable' to the [alleged] discriminatory lending").

### iv.    Nada's RICO claims are barred by the statute of limitations.

The Court should also dismiss the RICO conspiracy count against Dr. Vidino because, like the substantive count, it is barred by the applicable four-year statute of limitations.  "[W]here, as here, it appears from the face of the complaint that the relevant statute of limitations bars much of [Plaintiffs'] claims, the court may rule in favor of the moving party." *Molecular Diagnostics Labs. v. Hoffmann-La Roche Inc.*, 402 F. Supp. 2d 276, 283 (D.D.C. 2005) (dismissing claims at the motion-to-dismiss stage that plainly accrued outside the limitations period).

A plaintiff has four years from discovering an injury to bring a civil RICO claim.  *See Agency Holding Corp.*, 483 U.S. at 156.  "Under the discovery rule, a cause of action accrues when the plaintiff has knowledge of (or by the exercise of reasonable diligence should have knowledge of) (1) the existence of the injury, (2) its cause in fact, and (3) *some* evidence of wrongdoing." *Feld*, 873 F. Supp. 2d at 308 (emphasis in original, quotation omitted).  The Supreme Court has "been at pains to explain that discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." *Rotella v. Wood*, 528 U.S. 549, 555 (2000).  "Awareness of the pattern of RICO activity is not necessary to start the statute of limitations period running." *Hargraves v. Cap. City Mortg. Corp.*, 140 F. Supp. 2d 7, 17 (D.D.C. 2000).

Here, the Amended Complaint makes clear that Nada "knew" before July 2018 that he was "the victim of a concerted effort to smear his name by falsely linking him and his company to terrorism." Am. Compl. ¶ 158.  In May 2018, Nada supposedly sent emails to a blogging website asking them to remove an article containing allegedly false information about him and continued to send such emails and letters over the following months.  *Id.* ¶¶ 159, 169.  In June 2018, Nada supposedly "reported the defamatory campaign against him and his companies to Swiss law enforcement." *Id.* ¶ 231.  The Amended Complaint states that the culmination of the harm to Nada occurred "[b]y April 2019," when Lord Energy was "over-indebted by about $80 million," "dissolved its U.S. subsidiary," and "filed for bankruptcy protection in Switzerland." *Id.* ¶¶ 211, 213; *see id.* ¶ 212 (calling the events in April 2019 "the death knell for Lord Energy").  Even taking the latest point in time when Nada knew of these injuries—April 2019—the RICO statute of limitations ran out four years later in April 2023.  But Nada filed this case in January 2024.  That makes this action untimely as a matter of law based solely on Nada's own allegations.

## III.    Dismissal Should Be With Prejudice.

Dr. Vidino should be dismissed from this action with prejudice because Nada has already shown in the Amended Complaint that the flaws in his legal theory cannot be rectified by additional allegations.  *See Confederate Mem'l Ass'n, Inc. v. Hines*, 995 F.2d 295, 299–300 (D.C. Cir. 1993) (affirming dismissal of RICO claim with prejudice for repeated failure to plead essential elements of the cause of action); *Hourani v. Mirtchev*, 943 F. Supp. 2d 159, 172 (D.D.C. 2013) (dismissing RICO complaint where "Plaintiffs have already had two bites at the proverbial apple").

Further opportunity to amend would be futile because "the allegation of other facts consistent with the challenged pleading could not possibly cure the[se] deficienc[ies]." *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1340 (D.C. Cir. 2015) (quotation omitted).  Nada cannot

plausibly allege additional facts to overcome the First Amendment's protections because, as a matter of law, Dr. Vidino's speech and petitioning activities cannot give rise to RICO liability. *See id.* (dismissing defamation claim with prejudice where the plaintiff "relie[d] exclusively on two questions in one article" that "d[id] not qualify as false and defamatory statements under D.C. law"). Similarly, Nada cannot allege additional facts that bring this case within RICO's four-year statute of limitations given that Nada was on notice of legally actionable injury as early as Spring 2018. *See Samuel v. Wells Fargo & Co.*, 311 F. Supp. 3d 10, 17 (D.D.C. 2018) (dismissing claims "with prejudice because the statute of limitations has run"); *Barden v. Goodsell*, 2021 WL 5921351, at *6 (D. Idaho Dec. 15, 2021) (same for late civil RICO claims).[13]

## CONCLUSION

Because Nada once again has not, and cannot, overcome the First Amendment's protections for Dr. Vidino's protected speech and petitioning advocacy or state a plausible RICO conspiracy claim against him, this Court should dismiss Dr. Vidino from this action with prejudice.

---

[13] For the same reasons, Dr. Vidino should be dismissed with prejudice even if the Court dismisses the other Defendants without prejudice for lack of subject-matter or personal jurisdiction. *See N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1253 (D.C. Cir. 2020) ("dismissal for want of subject-matter jurisdiction" is "without prejudice" because the court cannot review the merits); *Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016, 1038 (D.C. Cir. 2020) (similar for personal jurisdiction). A particular defendant may "be dismissed as [a] part[y] to [an] action" where "[t]he [c]omplaint fails to assert a cognizable legal claim against [him]" regardless of the outcome as against other defendants. *Johnson v. Holder*, 2013 WL 6157345, at *2 n.1 (D.D.C. Nov. 25, 2013); *see also Barden*, 2021 WL 5821351, at *6 (dismissing RICO claims on a defendant-by-defendant basis).

Dated:  September 20, 2024

Respectfully submitted,

_/s/ Matthew D. McGill_
Matthew D. McGill (D.C. Bar #481430)
Nathaniel J. Tisa (D.C. Bar #90006243)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
T: (202) 887-3680
F: (202) 530-9662
mmcgill@gibsondunn.com
ntisa@gibsondunn.com

_Counsel for Lorenzo Vidino_