**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HAZIM NADA and LORD ENERGY SA, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) **Case No. 1:24-cv-00206-ABJ** |
| | ) |
| THE UNITED ARAB EMIRATES, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES**
**IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND................................................... 5

LEGAL STANDARD..................................................................................................... 8

ARGUMENT .................................................................................................................. 9

I.     THE COURT HAS JURISDICTION OVER THE UAE UNDER THE FSIA'S COMMERCIAL ACTIVITIES EXCEPTION. ............................................... 9

     A.    The First Two Clauses Of The Commercial Activities Exception Are Satisfied: The UAE Engaged In Wrongful Conduct In The United States.......................... 12

     B.    The Third Clause Of The Commercial Activities Exception Is Satisfied: The UAE's Commercial Activities Caused A Direct Effect In The United States...... 18

II.    THE COURT HAS PERSONAL JURISDICTION OVER THE ALP DEFENDANTS AND BESSON...................................................................................................... 24

     A.    The Court Has Specific Personal Jurisdiction Over The Alp Defendants And Besson Under Rule 4(k)(2). ............................................................................. 24

          1.    The Court has specific personal jurisdiction over the Alp Defendants under Rule 4(k)(2)................................................................................... 25

          2.    The Court has specific personal jurisdiction over Besson under Rule 4(k)(2)................................................................................................ 30

     B.    The Court Has Specific Personal Jurisdiction Over Besson And Badal Under Rule 4(k)(1)(C)............................................................................................... 32

III.   PLAINTIFFS STATE RICO CLAIMS UNDER 18 U.S.C. §1962(C). .......................... 34

     A.    Plaintiffs Allege RICO Predicate Acts. ......................................................... 34

          1.    Plaintiffs allege multiple instances of wire fraud. ..................................... 34

          2.    Plaintiffs allege multiple instances of bank fraud..................................... 40

     B.    Plaintiffs Allege A Pattern Of Racketeering Activity........................................ 42

          1.    Plaintiffs allege closed-ended continuity. .................................................. 43

          2.    Plaintiffs allege open-ended continuity. ..................................................... 46

     C.    Plaintiffs Allege RICO Proximate Causation. ...................................................... 47

D.  Plaintiffs Allege A Domestic Injury To Business And Property. ......................... 51

E.  Plaintiffs Allege An Association-In-Fact Enterprise. ............................................ 55

F.  Plaintiffs' RICO Claims Are Timely. ..................................................................... 60

IV.  PLAINTIFFS STATE RICO CONSPIRACY CLAIMS UNDER
18 U.S.C. §1962(D). ........................................................................................................ 62

A.  Plaintiffs Allege RICO Conspiracy Claims Against The UAE And The Alp
Defendants. ................................................................................................................ 63

B.  Plaintiffs Allege A RICO Conspiracy Claim Against Besson. ............................. 64

C.  Plaintiffs Allege A RICO Conspiracy Claim Against Vidino. ............................. 66

V.  PLAINTIFFS ALLEGE VIOLATIONS OF THE LANHAM ACT. .............................. 68

A.  Defendants' Statements Are "Commercial Advertising" And "Promotion." ....... 69

1.  Defendants' false statements are commercial speech. .............................. 70

2.  Defendants' false statements were made to influence consumers. ........... 74

3.  Defendants' false statements were widely disseminated. ......................... 74

B.  Defendants' False Statements Addressed Plaintiffs' "Commercial Activities." .. 76

C.  Plaintiffs' Lanham Act Claims Are Not Impermissibly Extraterritorial. ............. 77

VI.  PLAINTIFFS STATE SHERMAN ACT CLAIMS. ........................................................ 78

A.  The FTAIA Does Not Bar Plaintiffs' Sherman Act Claims. ................................ 78

B.  Plaintiffs Allege Product And Geographic Markets. ............................................ 84

C.  Plaintiffs Allege Antitrust Injury. .......................................................................... 85

D.  Plaintiffs Allege Claims Under Section 1. ............................................................. 88

E.  Plaintiffs Allege Claims Under Section 2. ............................................................. 92

F.  Plaintiffs' Sherman Act Claims Are Timely. ........................................................ 94

CONCLUSION .............................................................................................................................. 95

# TABLE OF AUTHORITIES

**Cases**

*Abitron Austria GmbH v. Hetronic Int'l, Inc.*,
  600 U.S. 412 (2023) .................................................................................................. 77

*Abrahams v. Simplify Compliance, LLC*,
  2021 WL 1197732 (D.D.C. Mar. 30, 2021) ............................................................. 69

*Access Telecom, Inc. v. MCI Telecomms. Corp.*,
  197 F.3d 694 (5th Cir. 1999) ................................................................................... 79

*Advanced Nano Coatings, Inc. v. Hanafin*,
  478 F. App'x 838 (5th Cir. 2012) ....................................................................... 54, 55

*Advisors Excel, LLC v. Scranton*,
  2014 WL 12543802 (S.D. Fla. Sep. 16, 2014) ........................................................ 74

*Am. Needle & Novelty, Inc. v. Drew Pearson Mktg., Inc.*,
  820 F. Supp. 107 (N.D. Ill. 1993) ........................................................................... 75

*Am. Needle, Inc. v. NFL*,
  560 U.S. 183 (2010) ................................................................................................. 94

\* *Am. President Lines, LLC v. Matson, Inc.*,
  633 F. Supp. 3d 209 (D.D.C. 2022) ............................................................... *passim*

*Andrx Pharms., Inc. v. Biovail Corp. Int'l*,
  256 F.3d 799 (D.C. Cir. 2001) ................................................................................. 87

\* *Ariix, LLC v. NutriSearch Corp.*,
  985 F.3d 1107 (9th Cir. 2021) .......................................................... 69, 70, 71, 73

*Aristotle Int'l, Inc. v. NGP Software, Inc.*,
  714 F. Supp. 2d 1 (D.D.C. 2010) ............................................................................ 69

*Asa Accugrade, Inc. v. Am. Numismatic Ass'n*,
  370 F. Supp. 2d 213 (D.D.C. 2005) ........................................................................ 91

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................... 8, 9

*Atchley v. AstraZeneca UK Ltd.*,
  22 F.4th 204 (D.C. Cir. 2022),
  *vacated on other grounds*, 144 S. Ct. 2675 (Mem) ........................................... 24, 25

\* *Atlantica Holdings Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
  813 F.3d 98 (2d Cir. 2016) ........................................................................ 18, 20, 22

\*   *Azima v. RAK Inv. Auth.*,
    305 F. Supp. 3d 149 (D.D.C. 2018),
    *rev'd on other grounds*, 926 F.3d 870 (D.C. Cir. 2019) ................................................... *passim*

*Bankers Tr. Co. v. Worldwide Transp. Servs., Inc.*,
    537 F. Supp. 1101 (E.D. Ark. 1982) ..................................................................................... 14

*Bayshore Cap. Advisors, LLC v. Creative Wealth Media Fin. Corp.*,
    667 F. Supp. 3d 83 (S.D.N.Y. 2023) ............................................................................... 32, 34

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .............................................................................................................. 9

*Bellsouth Corp. v. F.C.C.*,
    144 F.3d 58 (D.C. Cir. 1998) .............................................................................................. 54

*Betz v. Aidnest*,
    2018 WL 5307375 (D.D.C. Oct. 26, 2018) ......................................................................... 29

*Bible Way Church of Our Lord Jesus Christ World Wide, Inc. v. Showell*,
    578 F. Supp. 2d 164 (D.D.C. 2008) .................................................................................... 29

*Bloch v. SmithKline Beckman Corp.*,
    1988 WL 117927 (E.D. Pa. Nov. 1, 1988) .......................................................................... 88

*Blue Shield of Va. v. McCready*,
    457 U.S. 465 (1982) ............................................................................................................ 85

\*   *Bolger v. Youngs Drug Prods. Corp.*,
    463 U.S. 60 (1983) ........................................................................................................ 70, 73

*Borden, Inc. v. Spoor Behrins Campbell & Young, Inc.*,
    828 F. Supp. 216 (S.D.N.Y. 1993) ..................................................................................... 90

*Bowie v. Maddox*,
    642 F.3d 1122 (D.C. Cir. 2011) .......................................................................................... 63

\*   *Boyle v. United States*,
    556 U.S. 938 (2009) ............................................................................................................ 55

*BP Chems. Ltd. v. Jiangsu Sopo Corp.*,
    285 F.3d 677 (8th Cir. 2002) .............................................................................................. 15

\*   *Bridge v. Phoenix Bond & Indem. Co.*,
    553 U.S. 639 (2008) ...................................................................................................... *passim*

*Broadway Delivery Corp. v. UPS of Am., Inc.*,
    651 F.2d 122 (2d Cir. 1981) ............................................................................................... 93

\* *Calder v. Jones,*
    465 U.S. 783 (1984) .................................................................................. 17, 28

*Cannella v. Brennan,*
    2014 WL 3855331 (E.D. Pa. 2014) ............................................................. 70, 72

\* *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC,*
    148 F.3d 1080 (D.C. Cir. 1998) ............................................................. 79, 87, 90

*Carpenter v. United States,*
    484 U.S. 19 (1987) .......................................................................................... 35

*Catalyst & Chem. Servs., Inc. v. Glob. Ground Support,*
    350 F. Supp. 2d 1 (D.D.C. 2004) ..................................................................... 53

*Cedric Kushner Promotions, Ltd. v. King,*
    533 U.S. 158 (2001) ........................................................................................ 55

*Charles Schwab Corp. v. Bank of Am. Corp.,*
    883 F.3d 68 (2d Cir. 2018) .............................................................................. 30

*Clark v. Milam,*
    847 F. Supp. 409 (S.D.W. Va. 1994) ............................................................... 58

*Com. Bank of Kuwait v. Rafidain Bank,*
    15 F.3d 238 (2d Cir. 1994) .............................................................................. 22

*Companhia Brasileira Carbureto de Calcio-CBCC v. Applied Indus. Materials Corp.,*
    887 F. Supp. 2d 9 (D.D.C. 2012) ..................................................................... 49

*Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.,*
    858 F.2d 499 (9th Cir. 1988) ........................................................................... 94

\* *Conwood Co.  v. U.S. Tobacco Co.,*
    290 F.3d 768 (6th Cir. 2002) ..................................................................... 35, 91

*Copperweld Corp. v. Indep. Tube Corp.,*
    467 U.S. 752 (1984) ........................................................................................ 89

*Ctr. for Immigr. Studies v. Cohen,*
    410 F. Supp. 3d 183 (D.D.C. 2019) ................................................................. 37

*de Laire v. Voris,*
    2023 WL 5096150 (D.N.H. Aug. 9, 2023) ....................................................... 39

*Defiance Hosp. v. Fauster-Cameron, Inc.,*
    344 F. Supp. 2d 1097 (N.D. Ohio 2004) .......................................................... 93

*Den Norske Stats Oljeselskap As v. HeereMac Vof*,
   241 F.3d 420 (5th Cir. 2001) ........................................................... 83

*Doe I v. State of Israel*,
   400 F. Supp. 2d 86 (D.D.C. 2005) ................................................... 29

*Doe v. WebGroup Czech Republic*,
   93 F.4th 442 (9th Cir. 2024) ........................................................... 17

*Edison Elec. Inst. v. Henwood*,
   832 F. Supp. 413 (D.D.C. 1993) ...................................................... 43

*Edmondson & Gallagher v. Alban Towers Tenants Ass'n*,
   48 F.3d 1260 (D.C. Cir. 1995) ......................................................... 46

\* *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*,
   894 F.3d 339 (D.C. Cir. 2018) ............................................... 9, 20, 21

*Elsevier, Inc. v. Grossman*,
   77 F. Supp. 3d 331 (S.D.N.Y. 2015) ............................................... 33

*Empagran v. F. Hoffmann-LaRoche, Ltd.*,
   417 F.3d 1267 (D.C. Cir. 2005) ....................................................... 78

\* *Exxon Mobil Corp. v. Corporacion CIMEX, S.A.*,
   111 F.4th 12 (D.C. Cir. 2024) ................................................... *passim*

*F. Hoffman-LaRoche Ltd. v. Empagran S.A.*,
   542 U.S. 155 (2004) ........................................................................ 79

*Farah v. Esquire Mag.*,
   736 F.3d 528 (D.C. Cir. 2013) ................................................... 72, 73

\* *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
   314 F.3d 48 (2d Cir. 2002) ......................................................... 69, 70

*FC Inv. Grp. LC v. IFX Mkts., Ltd.*,
   529 F.3d 1087 (D.C. Cir. 2008) ................................................. 24, 32

*Feld Ent., Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals*,
   873 F. Supp. 2d 288 (D.D.C. 2012) ................................................ 35

*Flag Co. v. Maynard*,
   376 F. Supp. 2d 849 (N.D. Ill. 2005) .............................................. 30

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
   592 U.S. 351 (2021) .............................................................. 25, 27, 28

*Franchise Tax Bd. of Cal. v. Alcan Aluminium,*
    493 U.S. 331 (1990) ................................................................................ 54

*Friedman v. 24 Hour Fitness USA, Inc.,*
    580 F. Supp. 2d 985 (C.D. Cal. 2008) .................................................... 56

*Fuji Photo Film U.S.A., Inc. v. McNulty,*
    640 F. Supp. 2d 300  (S.D.N.Y. 2009) .................................................... 62

*Gagan v. Am. Cablevision, Inc.,*
    77 F.3d 951 (7th Cir. 1996) ................................................................... 62

*Galavan Supplements, Ltd. v. Archer Daniels Midland Co.,*
    1997 WL 732498 (N.D. Cal. Nov. 19, 1997) ......................................... 23

*Galloway v. Martorello,*
    2023 WL 5183204 (E.D. Va. Aug. 11, 2023) ........................................ 30

*Garland Co. v. Ecology Roof Sys. Corp.,*
    895 F. Supp. 274 (D. Kan. 1995) ........................................................... 75

\*  *Gen. Elec. Co. v. Lat, Am. Imps., S.A.,*
    187 F. Supp. 2d 749 (W.D. Ky. 2001) ............................................. 79, 80

*Gillette Co. v. Norelco Consumer Prods. Co.,*
    946 F. Supp. 115 (D. Mass. 1996) ......................................................... 76

*Glob. Index, Inc. v. Mkapa,*
    290 F. Supp. 2d 108 (D.D.C. 2003) ....................................................... 22

\*  *GN Netcom, Inc. v. Plantronics, Inc.,*
    967 F. Supp. 2d 1082 (D. Del. 2013) ..................................................... 87

*GOLO, LLC v. HighYa, LLC,*
    310 F. Supp. 3d 499 (E.D. Pa. 2018) ..................................................... 71

*Gomez v. Trs. of Harvard Univ.,*
    677 F. Supp. 23 (D.D.C. 1988) ........................................................ 38, 88

*GTE New Media Servs. Inc. v. BellSouth Corp.,*
    199 F.3d 1343 (D.C. Cir. 2000) ............................................................. 29

*Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.,*
    995 F.2d 425 (3d Cir. 1993) ................................................................... 87

*H.J. Inc. v. Nw. Bell Tel. Co.,*
    492 U.S. 229 (1989) ................................................................................ 42

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989) ................................................................................................ 39

*Hayden Publ'g Co. v. Cox Broad. Corp.*,
    730 F.2d 64 (2d Cir.1984) ..................................................................................... 93

*Hemi Group, LLC v. City of New York*,
    559 U.S. 1 (2010) .................................................................................. 49, 50, 51

*Herbert v. Lando*,
    441 U.S. 153 (1979) ................................................................................................ 39

*Herbstein v. Bruetman*,
    768 F. Supp. 79 (S.D.N.Y. 1991) .......................................................................... 17

*Hermes Int'l v. Rothschild*,
    --- F. Supp. 3d ----, 2024 WL 1089427 (S.D.N.Y. Mar. 13, 2024) ....................... 77

*Hill v. Opus Corp.*,
    841 F. Supp. 2d 1070 (C.D. Cal. 2011) ................................................................ 41

*Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc.*,
    535 U.S. 826 (2002) ................................................................................................ 78

*Hosp. Bldg. Co. v. Trs. of Rex Hosp.*,
    425 U.S. 738 (1976) ................................................................................................ 88

*Humphrey v. GlaxoSmithKline PLC*,
    905 F.3d 694 (3d Cir. 2018) ................................................................................... 54

\* *In re Aluminum Warehousing Antitrust Litig.*,
    95 F. Supp. 3d 419 (S.D.N.Y. 2015) ............................................................. 89, 90

*In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*,
    804 F.3d 633 (3d Cir. 2015) ................................................................................... 49

*In re Intel Corp. Microprocessor Antitrust Litig.*,
    452 F. Supp. 2d 555 (D. Del. 2006) ...................................................................... 81

*In re McCormick & Co. Pepper Prods. Mktg. & Sales Pracs. Litig.*,
    215 F. Supp. 3d 51 (D.D.C. 2016) ................................................................. 69, 72

*In re Search of Multiple Email Accts. Pursuant to 18 U.S.C. §2703*,
    585 F. Supp. 3d 1 (D.D.C. 2022) ........................................................................... 41

*In re Vitamins Antitrust Litig.*,
    2000 WL 1475705 (D.D.C. May 9, 2000) ............................................................. 94

*In re Warfarin Sodium Antitrust Litig.*,
214 F.3d 395 (3d Cir. 2000) ......................................................................... 93

\* *Int'l Travel Arrangers, Inc. v. W. Airlines, Inc.*,
623 F.2d 1255 (8th Cir. 1980) ............................................................... 90, 91

\* *Jericho Baptist Church Ministries, Inc. (D.C.) v. Jericho Baptist Church Ministries, Inc. (Md.)*,
223 F. Supp. 3d 1 (D.D.C. 2016) ............................................................. 35, 41

*Jordan v. Jewel Food Stores, Inc.*,
743 F.3d 509 (7th Cir. 2014) ....................................................................... 70

*Kimberlin v. Nat'l Bloggers Club*,
2015 WL 1242763 (D. Md. Mar. 17, 2015) .................................................. 37

*Kimm v. Lee*,
2005 WL 89386 (S.D.N.Y. Jan. 13, 2005) .................................................... 37

*Lavoho v. Apple Inc.*,
71 F. Supp. 3d 395 (S.D.N.Y. 2014) ............................................................ 79

*Leaf Trading Cards, LLC v. Upper Deck Co.*,
2018 WL 2971135 (N.D. Tex. Mar. 16, 2018) ............................................. 80

*Leibman v. Prupes*,
2015 WL 898454 (C.D. Cal. Mar. 2, 2015) .................................................. 17

*Lewis v. Mutond*,
62 F.4th 587 (D.C. Cir. 2023) ..................................................................... 31

\* *Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ..................................................................................... 69

*Livnat v. Palestinian Auth.*,
851 F.3d 45 (D.C. Cir. 2017) ....................................................................... 31

*Lopez v. Council on American-Islamic Relations Action Network, Inc.*,
657 F. Supp. 2d 104 (D.D.C. 2009) .............................................................. 46

*Lotes Co. v. Hon Hai Precision Indus. Co.*,
753 F.3d 395 (2d Cir. 2014) ........................................................................ 83

\* *Lu v. Lezell*,
45 F. Supp. 3d 86 (D.D.C. 2014) ................................................................ 42

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ..................................................................................... 51

ix

\*   *Malewicz v. City of Amsterdam*,
    517 F. Supp. 2d 322 (D.D.C. 2007) ....................................................................... 12

*Maritime Int'l Nominees Establishment v. Republic of Guinea*,
    693 F.2d 1094 (D.C. Cir. 1982) ............................................................................. 14

*Marks v. City of Seattle*,
    2003 WL 23024522 (W.D. Wash. Oct. 16, 2003) .................................................. 37

*McFarlane v. Esquire Mag.*,
    74 F.3d 1296 (D.C. Cir. 1996) ............................................................................... 29

\*   *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*,
    62 F.3d 967 (7th Cir. 1995) ................................................................................... 64

*Missouri ex rel. Bailey v. People's Republic of China*,
    90 F.4th 930 (8th Cir. 2024) ............................................................................ 23, 24

\*   *Mwani v. bin Laden*,
    417 F.3d 1 (D.C. Cir. 2005) ............................................................................ 25, 27

*N.M. Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*,
    54 F. Supp. 3d 1189 (D.N.M. 2014) ...................................................................... 93

\*   *Narce v. Mervilus*,
    2023 WL 7128475, (D.D.C. Oct. 30, 2023) ........................................................ 9, 64

*Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Lab'ys*,
    850 F.2d 904 (2d Cir. 1988) .................................................................................. 94

*Nat'l Org. for Women, Inc. v. Scheidler*,
    510 U.S. 249 (1994) ......................................................................................... 51, 66

*Nuevos Destinos, LLC v. Peck*,
    2019 WL 78780 (D.D.C. Jan. 2, 2019) .................................................................. 33

*OBB Personenverkehr AG v. Sachs*,
    577 U.S. 27 (2015) ................................................................................................ 15

*Odhiambo v. Republic of Kenya*,
    930 F. Supp. 2d 17 (D.D.C. 2013) ......................................................................... 20

*Ofisi v. Al Shamal Islamic Bank*,
    2019 WL 1255096 (D.D.C. Mar. 19, 2019) ........................................................... 30

*Ohralik v. Ohio State Bar Ass'n*,
    436 U.S. 447 (1978) .............................................................................................. 70

*Optimum, S.A. v. Legent Corp.*,
   926 F. Supp. 530 (W.D. Pa. 1996) ........................................................................ 54

*Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co.*,
   81 F. Supp. 3d 1 (D.D.C. 2015) ............................................................................ 8

*Palin v. N.Y. Times Co.*,
   940 F.3d 804 (2d Cir. 2019) ................................................................................ 39

*PepsiCo, Inc. v. Coca-Cola Co.*,
   1998 WL 547088 (S.D.N.Y. Aug. 27, 1998) ........................................................ 84

*Phoenix Consulting Inc. v. Republic of Angola*,
   216 F.3d 36 (D.C. Cir. 2000) ............................................................................... 9

*Princz v. Fed. Republic of Germany*,
   26 F.3d 1166 (D.C. Cir. 1994) ............................................................................. 20

\* *Proctor & Gamble Co. v. Haugen*,
   222 F.3d 1262 (10th Cir. 2000) ........................................................................... 76

*Pullman-Standard v. Swint*,
   456 U.S. 273 (1982) ............................................................................................. 38

\* *Reiss v. Société Centrale Du Groupe Des Assurances Nationales*,
   235 F.3d 738 (2d Cir. 2000) ................................................................................ 14

\* *Republic of Argentina v. Weltover, Inc.*,
   504 U.S. 607 (1992) ..................................................................................... 9, 10, 22

*Republic of Austria v. Altmann*,
   541 U.S. 677 (2004) ............................................................................................. 9

\* *Riddell v. Riddell Wash. Corp.*,
   866 F.2d 1480 (D.C. Cir. 1989) ........................................................................... 60

*Ritchie v. Sempra Energy*,
   2013 WL 12171757 (S.D. Cal. Oct. 15, 2013) ...................................................... 37

*Rockwell Automation, Inc. v. Parcop S.R.L.*,
   2023 WL 4585952 (D. Del. July 18, 2023) .......................................................... 78

\* *Rodriguez v. Pan Am. Health Org.*,
   29 F.4th 706 (D.C. Cir. 2022) ........................................................................ 15, 16

*Rollins Env't Servs. (NJ) Inc. v. EPA*,
   937 F.2d 649 (D.C. Cir. 1991) ............................................................................. 10

xi

*Rotella v. Wood*,
   528 U.S. 549 (2000) ................................................................................................ 60

*RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*,
   682 F.3d 1043 (D.C. Cir. 2012) ............................................................................ 68

\* *Rudersdal v. Harris*,
   2022 WL 263568 (S.D.N.Y. Jan. 28, 2022) ......................................................... 30

*Salinas v. United States*,
   522 U.S. 52 (1997) ............................................................................................ 62, 67

\* *Schacht v. Brown*,
   711 F.2d 1343 (7th Cir.1983) ........................................................................... 56, 60

*Sedima, S.P.R.L. v. Imrex Co.*,
   473 U.S. 479 (1985) ............................................................................................... 34

*Semco, Inc. v. Amcast, Inc.*,
   52 F.3d 108 (6th Cir. 1995) ............................................................................. 70, 73

\* *Shaw v. United States*,
   580 U.S. 63 (2016) ............................................................................................ 40, 41

\* *Siderman de Blake v. Republic of Argentina*,
   965 F.2d 699 (9th Cir. 1992) ....................................................................... 12, 14, 17

*Sinclair v. TubeSockTedD*,
   596 F. Supp. 2d 128 (D.D.C. 2009) ..................................................................... 29

*Solomon v. Dechert LLP*,
   2023 WL 6065025 (D.D.C. Sept. 18, 2023) ............................................. 49, 50, 60

*Sotloff v. Qatar Charity*,
   674 F. Supp. 3d 1279 (S.D. Fla. 2023) ................................................................. 30

*Summers v. Wash. Times*,
   1993 WL 391047 (D.D.C. Sept. 20, 1993) .......................................................... 17

*Turner v. Cook*,
   362 F.3d 1219 (9th Cir. 2004) .............................................................................. 42

*United States v. Brito*,
   136 F.3d 397 (5th Cir. 1998) ................................................................................ 62

*United States v. Cooper*,
   91 F. Supp. 2d 60 (D.D.C. 2000) ......................................................................... 46

*United States v. Crisci*,
   273 F.3d 235 (2d Cir. 2001) ............................................................... 40, 41

\* *United States v. Elliott*,
   571 F.2d 880 (5th Cir. 1978) ............................................. 55, 62, 66, 67

*United States v. Google LLC*,
   2024 WL 3647498 (D.D.C. Aug. 5, 2024) ............................................ 93

*United States v. Grinnell Corp.*,
   384 U.S. 563 (1966) ............................................................................... 92

\* *United States v. Jackson*,
   513 F.2d 456 (D.C. Cir. 1975) ............................................... 38, 64, 88

*United States v. Lemire*,
   720 F.2d 1327 (D.C. Cir. 1983) ........................................................... 34

*United States v. LSL Biotechnologies*,
   379 F.3d 672 (9th Cir. 2004) ......................................................... 81, 82

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) .............................................................. 90

*United States v. Neapolitan*,
   791 F.2d 489 (7th Cir. 1986) .............................................................. 64

*United States v. Oreto*,
   37 F.3d 739 (1st Cir. 1994) ................................................................. 60

*United States v. Perholtz*,
   1986 WL 31562 (D.D.C. Feb. 18, 1986) .............................................. 57

*United States v. Philip Morris Inc.*,
   130 F. Supp. 2d 96 (D.D.C. 2001) ................................................. 62, 66

*United States v. Philip Morris USA Inc.*,
   566 F.3d 1095 (D.C. Cir. 2009) ........................................................... 38

*United States v. Porat*,
   76 F.4th 213 (3d Cir. 2023) ................................................................ 35

\* *United States v. Rastelli*,
   870 F.2d 822 (2d Cir. 1989) ................................................................ 56

*United States v. Ring*,
   628 F. Supp. 2d 195 (D.D.C. 2009) .................................................... 36

*United States v. Time Warner Inc.*,
1997 WL 118413 (D.D.C. Jan. 22, 1997) ........................................................ 79

*United States v. Turkette*,
452 U.S. 576 (1981) ........................................................................................ 55

\* *United States v. Wilson*,
605 F.3d 985 (D.C. Cir. 2010) .................................................................. 43, 47

*United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n*,
33 F.3d 1232 (10th Cir. 1994) ........................................................................ 22

*Urquhart-Bradley v. Mobley*,
964 F.3d 36 (D.C. Cir. 2020) .......................................................................... 28

*US Dominion, Inc. v. MyPillow, Inc.*,
2022 WL 1597420 (D.D.C. May 19, 2022) ...................................................... 57

*Virden v. Graphics One*,
623 F. Supp. 1417 (C.D. Cal. 1985) ................................................................ 56

*Virtual Countries Inc. v. Republic of South Africa*,
300 F.3d 230 (2d Cir. 2002) ............................................................................ 21

\* *Virtual Def. & Dev. Int'l, Inc. v. Republic of Moldova*,
133 F. Supp. 2d 1 (D.D.C. 1999) .................................................................... 14

*Vuyyuru v. Reddy*,
2023 WL 6160056 (D.D.C. Sept. 21, 2023) .................................................... 31

*Walden v. Fiore*,
571 U.S. 277 (2014) .................................................................................. 28, 30

*Wye Oak Tech., Inc. v. Republic of Iraq*,
24 F.4th 686 (D.C. Cir. 2022) ........................................................................ 13

\* *Yegiazaryan v. Smagin*,
599 U.S. 533 (2023) .................................................................................. 52, 55

\* *Youming Jin v. Ministry of State Sec.*,
335 F. Supp. 2d 72 (D.D.C. 2004) ...................................................... 63, 66, 67

*Young v. New Haven Advoc.*,
315 F.3d 256 (4th Cir. 2002) .......................................................................... 29

*Zerangue v. TSP Newspapers, Inc.*,
814 F.2d 1066 (5th Cir. 1987) ........................................................................ 39

*Ziglar v. Abbasi,*
  582 U.S. 120 (2017)..................................................................... 63

**Statutes**

15 U.S.C. §§1–2 ........................................................................... 8, 89

15 U.S.C. §1125(a)(1) .............................................................. 8, 69, 77

18 U.S.C. §1343 ................................................................................ 35

18 U.S.C. §1344 ................................................................................ 40

18 U.S.C. §§1961–1968 ............................................................... *passim*

26 U.S.C. §7701 ................................................................................ 52

28 U.S.C. §1603 ................................................................................ 10

28 U.S.C. §1605(a) ..................................................................... *passim*

Fed. R. Civ. P. 4 ......................................................................... *passim*

Fed. R. Civ. P. 9 .................................................................... 36, 39, 70

Fed. R. Civ. P. 12 ............................................................................... 8

Fed. R. Civ. P. 17 ............................................................................. 54

**Other Authorities**

2A Areeda & Hovenkamp, *Antitrust Law* (5th ed. 2021) ........................... 86

Areeda & Hovencamp, *Antitrust Law* (1996 suppl.) ................................. 80

*Deception as an Antitrust Violation*, 125 Harv. L. Rev. 1235 (2012) ........... 93

H.R. Rep. No. 97-686 (1982), *reprinted in* U.S.C.C.A.N. 1982 ................... 80

## INTRODUCTION

Beginning in 2017, the United Arab Emirates orchestrated a massive, years-long conspiracy in which it, along with Swiss private investigative firm Alp Services SA and numerous other co-conspirators, operated as an association-in-fact enterprise to carry out disinformation campaigns against Plaintiffs Hazim Nada and his commodity trading firm Lord Energy SA, as well as dozens of other perceived rivals of the UAE.  The enterprise published blog posts, articles, and Wikipedia entries falsely linking Plaintiffs to the Muslim Brotherhood and terrorism.  Its express goal was to drive Hazim and his companies out of business by fraudulently inducing banks, counterparties, and other crude oil market participants to stop dealing with them.  The UAE targeted Plaintiffs specifically because they were the UAE's sole rival in a strategically important oil market.  The enterprise succeeded.  It bankrupted Lord Energy and drove its U.S. subsidiary out of business, resulting in hundreds of millions of dollars in losses.

The UAE posits that "[a] reader patient enough to parse the 113-page Amended Complaint might question why this case was filed in the United States."  (UAE Mot. 1.)  However, only a careless reader who ignores and misrepresents well-pleaded factual allegations, as Defendants do here, would be left asking that question.  After all, Hazim Nada is an American citizen.  He was born in Silver Spring, Maryland, attended the New York Military Academy, and graduated from Rutgers University.  He has a residence in Houston and pays U.S. taxes.

His business, Lord Energy SA, must comply with U.S. export control and sanctions laws because it is owned by a U.S. citizen.  And before it went bankrupt, about half of Lord Energy's revenue came from deals with major U.S. oil groups, including Chevron and Exxon Mobil.  The U.S. subsidiary of Lord Energy that Defendants destroyed was headquartered and incorporated in Texas.  It was an active participant in domestic crude oil markets and the Texas oil pipeline system.  It also exported crude oil from the United States.  The subsidiary did business under the same name

as its parent company, so the enterprise's fraudulent claims about "Lord Energy" were just as harmful to the U.S. subsidiary as they were to Lord Energy SA.  As a result of the enterprise's campaign, Lord Energy's U.S. subsidiary lost business opportunities worth tens (if not hundreds) of millions of dollars and was forced to close, just as Defendants intended.  Of course, an American citizen and his business, who are bound by U.S. tax, export control, sanctions, and other laws, should be able to avail themselves of the U.S. legal system when their rights have been infringed.

These are not even the only ties between this case and the United States.  The enterprise also intentionally directed much of its unlawful conduct at the United States, including by emailing its fraudulent claims directly to U.S. bank compliance monitors and journalists, publishing fraudulent articles and blog posts on U.S. websites, creating fake Wikipedia profiles in English targeting U.S. audiences, and manipulating results on U.S. search engines.  Indeed, one of the enterprise's most damaging publications was a blog on the U.S. website WordPress.  The enterprise's goal, in its own words, was to "seriously damage, if not destroy" Hazim (who is a U.S. citizen) and his companies, including his wholly owned subsidiary in Texas.  To achieve its objective, the enterprise relied on a co-conspirator in the United States, Lorenzo Vidino—a prominent academic at George Washington University—and hired a private investigative firm in Miami.  And Plaintiffs were not the enterprise's only U.S. victims.

Defendants' domestic connections were substantial.  They just ignore or downplay the well-pleaded facts establishing their extensive nexus to the United States.  The reason for their duplicity is obvious: the UAE wants to hide behind the bulwark of sovereign immunity.  But that bulwark crumbles under the weight of Defendants' contacts with the United States.  Not only did the enterprise engage in wrongful commercial activities within the United States, but its commercial activities abroad also caused significant domestic effects.  Plaintiffs describe these

activities and their effects in detail.  The UAE ignores these facts, knowing that they land the UAE squarely within the commercial activities exception to sovereign immunity.  Sovereign immunity is meant to protect diplomatic relations, not to provide foreign states plenary protection for tortious and anticompetitive conduct to gain commercial advantages at the expense of U.S. citizens.

The other Defendants' jurisdictional defenses similarly fail.  Alp, Diligence, Brero, Cavin, Badal (the "Alp Defendants"), and Besson cannot escape the Court's jurisdiction.  They purposefully availed themselves of the privileges of conducting business and other activities in the United States by using U.S. websites, conspiring with individuals in the United States, and sending emails directly to U.S. recipients for the express purpose of influencing U.S. audiences and harming a U.S. citizen and his U.S. company.  Their domestic activities far surpass the minimum contacts required to establish personal jurisdiction.

Likewise, Defendants seek to recast their disinformation campaign as nothing more than garden-variety defamation.  But they ignore key characteristics of their campaign, which violated federal false advertising, racketeering, and antitrust laws.  The enterprise's false statements were disseminated to participants in the crude oil industry to influence Plaintiffs' lenders, trading partners, and customers by fraudulently inducing them to sever ties with Lord Energy so the UAE could gain an unfair competitive advantage in a strategically important oil market.

The UAE would have the Court believe that its motives were pure and that its racketeering was not actually meant to destroy a rival oil trader but rather to combat terrorism in Europe.  That makes no sense.  Hazim and his companies never had any ties whatsoever to the Muslim Brotherhood or to any terrorist organization.  And while the UAE is quick to point out that Hazim's father was once placed on a U.S. sanctions list, it once again cherry-picks facts, ignoring that Hazim's father was *removed* from that list years before Defendants' disinformation campaign.

Similarly, most (if not all) of the enterprise's other victims appear not to have had ties to the Muslim Brotherhood either.  The German publication Der Spiegel contacted many of the more than 1,000 individuals the enterprise identified as supposed Muslim Brotherhood sympathizers, and they all told Der Spiegel they had no idea why they were so identified.

The truth is that the enterprise did not target individuals linked to the Muslim Brotherhood; it targeted commercial and other rivals of the UAE.  If the UAE had truly been concerned with countering terrorism in Europe and the United States, it would not have relied on a private investigative firm whose founder was criminally indicted in the United States, was convicted of crimes in France, and is facing multiple criminal probes in France and Switzerland, and whose reputation is that of an unscrupulous mercenary specializing in "dark PR" and "fake news."

This case has nothing to do with combating terrorism in Europe.  It is about the unlawful conduct of a foreign government trying to commercially injure an American citizen who lived in the United States for a large part of his life and still maintains a residence in Texas, by bankrupting his company and its U.S. subsidiary.  Defendants can crow about their noble intentions all day long.  But their own documents tell a different story.[1]  Defendants admit that their enterprise's objective from the start was to "seriously damage, if not destroy" Hazim and Lord Energy.  And when they succeeded, they boasted that "[f]ollowing our media attacks, listing in World Check, and the financial difficulties it created, the US-branch, Americas Lord Energy Inc., was forced to cease its operations."  Defendants should not be able to evade accountability for their alarming, unlawful attacks on a U.S. citizen and his businesses by ignoring and downplaying the allegations against them.  The Court should deny Defendants' Motions to Dismiss.

---

[1] The UAE asserts that Plaintiffs allegedly had "access to 80,000 of Alp's hacked documents." (UAE Mot. 8.)  That is incorrect.  Plaintiffs gained access to about 8,000 of Alp's documents. Investigative journalists claimed to have obtained 80,000 documents.  (AC ¶279.)

## FACTUAL AND PROCEDURAL BACKGROUND

In late 2017, the United Arab Emirates, acting through its top officials—including then-Crown Prince of Abu Dhabi and current President H.H. Mohamed bin Zayed Al Nahyan, UAE Minister H.E. Ali Said Al-Neyadi, and senior government official Matar Humaid al-Neyadi ("Matar")—hired Alp Services, a private investigative firm in Switzerland, to conduct a years-long "dark" public relations campaign.  (AC ¶1.)  The UAE and its officials, along with Alp and its employees Mario Brero, Muriel Cavin, and Lionel Badal, operated as an association-in-fact enterprise that leveraged a network of co-conspirators, including Swiss journalist Sylvain Besson and American academic Lorenzo Vidino, to smear dozens of innocent victims by publishing false and misleading statements about those victims.  (*E.g.*, *id.* ¶¶1–2.)  The enterprise's objective was to "destroy" its targets' businesses and reputations by defrauding banks, their targets' customers and business partners, government officials, and the public.  (*E.g.*, *id.*)

Hazim Nada and his commodity trading companies Lord Energy SA and Americas Lord Energy Inc. (the U.S. subsidiary of Lord Energy SA) were some of the enterprise's first victims.  (*E.g.*, *id.* ¶3.)  The UAE and its officials directed Alp to target Hazim and his companies because they posed a competitive threat to the UAE state-owned Abu Dhabi National Oil Company ("ADNOC") in the spot market for light crude oil in Asia, and their competition was costing the UAE tens, if not hundreds, of millions of dollars annually.  (*Id.* ¶¶4, 7–8, 76.)

The UAE, through ADNOC, created a spot market for light crude oil in Asia by selling millions of barrels every month of its flagship crude oil blend, Murban, in short-term, spot transactions (as opposed to long-term contracts).  The UAE also allowed certain chosen Murban producers to sell some of their excess Murban production in spot sales.  The UAE's strategic objective was for Murban to become a crude oil benchmark (which it did in 2024); the creation of a spot market was key to achieving this goal.  (*Id.* ¶¶67–69, 331.)

Prior to 2016, Murban was the only light crude oil available on the Asian spot market.  But in 2016, Hazim brokered key relationships in Algeria and developed an innovative new route to economically ship a competing grade of light crude oil, Saharan Blend, to Asia.  Lord Energy began moving large quantities of Saharan Blend and offering these Saharan Blend cargoes for sale through spot transactions.  At that point, Saharan Blend was the only alternative to Murban on the spot market.  And Lord Energy was the only seller of light crude oil on the Asian spot market that was not directly under the UAE's control.  (*Id.* ¶¶73–75.)

Hazim's operations grew rapidly.  By the end of 2017, Plaintiffs were responsible for about a quarter of Algeria's exports of Saharan Blend.  (*Id.* ¶6.)  Between 2016 and 2018, Lord Energy syphoned nearly $830 million in UAE revenue, displacing huge quantities of the UAE's Murban crude in the Asian spot market.  (*Id.* ¶7.)  Once Lord Energy began moving large quantities of Saharan Blend, the price of Murban fell, causing ADNOC losses of about $70.1 million per year and jeopardizing the UAE's plans to establish Murban as a benchmark.  (*Id.* ¶¶8, 76.)

Having developed expertise in light crude oil, in early 2018, Lord Energy established a U.S. subsidiary in Houston to gain a foothold in the market for West Texas Intermediate ("WTI"), another competitive grade to Murban that was becoming popular with large refineries in Asia at the time, including those controlled by Chevron and Exxon Mobil, two of Plaintiffs' closest commercial partners.  (*Id.* ¶¶9, 87.)  Lord Energy's ambitions were clear: Hazim stated publicly Lord Energy's plans to "triple" its crude oil output, in part by replicating the innovative methods it used to move Saharan Blend to "expand into U.S. exports and imports."  (*Id.* ¶140.)  Lord Energy's entry into domestic WTI markets marked a further challenge to the UAE and ADNOC, as Lord Energy was the only operator who had proven capable of exporting and selling an alternative grade to Murban on the spot market in Asia.  (*Id.* ¶9.)  Left unchecked, Lord Energy

could replicate its successes with Saharan Blend and displace even more Murban with WTI.  (*Id.*) It was of paramount importance to the UAE to maintain Murban's dominance on the market.

So, the UAE hired Alp.  Together, they—along with their co-conspirators—formed an enterprise to conduct a disinformation campaign (which Alp referred to as a "confidential offensive viral communications campaign") to "seriously damage, if not destroy" Hazim and his companies, including his U.S. subsidiary.  (*Id.* ¶3.)  Between 2017 and 2019, the enterprise concocted and disseminated an untrue narrative that Plaintiffs had ties to the Muslim Brotherhood and al-Qaeda.  (*E.g.*, *id.* ¶11.)  There was no truth to these claims.  Plaintiffs have never been associated with the Muslim Brotherhood, al Qaeda, or any other terrorist group.  (*E.g.*, *id.* ¶¶11–12.)  The enterprise exploited Hazim's Muslim heritage and his *father's* past affiliation with the Muslim Brotherhood to craft a narrative that would appear credible and cause maximum harm.  (*Id.*)

The enterprise published these false claims through various channels including in the media, on U.S.-based blogging websites, on Wikipedia, and through pseudonymous emails to journalists, banks, and bank risk compliance monitors, including in the United States.  (*E.g.*, *id.* ¶¶11, 13.)  The enterprise also used search engine optimization techniques to ensure that its fraudulent articles remained among the top results when searching for Hazim or Lord Energy on Google, Bing, Yahoo!, and other U.S. search engines.  (*E.g.*, *id.* ¶22.)  Its objective was to fraudulently induce banks to stop lending to Plaintiffs and to deter customers, counterparties, and other crude oil market participants (such as the price reporting agency, Platts, and Algeria's national oil company, Sonatrach) from doing business with Plaintiffs.  (*E.g.*, *id.* ¶¶17–18.)  To do so, the enterprise exploited U.S. journalists, publications, bank risk management monitors, and others to destroy a U.S. citizen and a U.S. company.  (*Id.* ¶¶17–19.)

The enterprise went to extreme lengths to conceal its operations.  (*E.g.*, *id.* ¶229.)  Plaintiffs only learned of the enterprise and the scope and scale of its fraudulent campaign against them because hackers obtained tens of thousands of documents from Alp's servers and shared some of those documents with Hazim in April 2021.  (*E.g.*, *id.* ¶¶236–40.)

The enterprise's campaign against Hazim and Lord Energy was devastating.  It bankrupted Lord Energy and its U.S. subsidiary—companies that took Hazim more than ten years to build from nothing—cost Hazim hundreds of millions of dollars (Lord Energy was valued at about $150 million before the enterprise's campaign took hold), and eliminated a growing competitive threat to the UAE and ADNOC in the Asian spot market for light crude oil.  (*E.g.*, *id.* ¶23.)  By Alp's own admission, "following [Alp's] media attacks, listing in World Check, and the financial difficulties it created, the US-branch [of Lord Energy], Americas Lord Energy Inc., was forced to cease its operations," and Lord Energy SA went bankrupt.  (*E.g.*, *id.* ¶¶10, 25.)

On January 24, 2024, Hazim and Lord Energy filed a Complaint asserting claims for violations of the Lanham Act, 15 U.S.C. §1125(a)(1), the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§1961–1968, and the Sherman Act, 15 U.S.C. §§1–2.  Defendants moved to dismiss on July 16, 2024.  Plaintiffs filed an Amended Complaint on August 6, 2024.  And Defendants moved to dismiss the Amended Complaint on September 20, 2024.

## LEGAL STANDARD

To overcome a Rule 12 motion to dismiss, a plaintiff need only "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "'[D]etailed factual allegations' are not necessary."  *Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co.*, 81 F. Supp. 3d 1, 8 (D.D.C. 2015).  The facts alleged need only be "enough to raise a right to relief above the speculative level."  *Id.*  Courts "must consider the whole complaint, accepting all factual allegations in the complaint as true, 'even if

doubtful in fact,' and construing all reasonable inferences in the plaintiff's favor." *Narce v. Mervilus*, 2023 WL 7128475, at \*3 (D.D.C. Oct. 30, 2023).  "The plausibility standard is not akin to a 'probability requirement,'" *Iqbal*, 556 U.S. at 678, and "a well-pleaded complaint may proceed even if it appears 'that a recovery is very remote and unlikely,'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).  Indeed, "[a] complaint survives a motion to dismiss even if there are two alternative explanations, one advanced by the defendant and the other advanced by the plaintiff, both of which are plausible." *Narce*, 2023 WL 7128475, at \*3.

## ARGUMENT

## I.   THE COURT HAS JURISDICTION OVER THE UAE UNDER THE FSIA'S COMMERCIAL ACTIVITIES EXCEPTION.

The Court has subject-matter and personal jurisdiction over the UAE under the Foreign Sovereign Immunities Act ("FSIA"), which "provides the sole basis for obtaining jurisdiction over a foreign sovereign in the United States."[2] *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 611 (1992).  Sovereign immunity is not a get-out-of-jail-free card for foreign states that engage in unlawful conduct directed at U.S. citizens.  Rather, Congress codified a "restrictive theory" of immunity, *Republic of Austria v. Altmann*, 541 U.S. 677, 688–91 (2004), where the defendant must prove that "the plaintiff's allegations do not bring its case within a statutory exception," *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 894 F.3d 339, 344 (D.C. Cir. 2018).  The UAE has failed to meet that burden here.

The FSIA contains nine specific exceptions to sovereign immunity.  *See* 28 U.S.C. §1605(a).  The commercial activities exception applies here.  28 U.S.C. §1605(a)(2).  It provides

---

[2] The UAE's Motion raises only a facial challenge to the Court's jurisdiction that is analyzed under the same standard as a motion to dismiss under Rule 12(b)(6).  *Azima v. RAK Inv. Auth.*, 305 F. Supp. 3d 149, 159 (D.D.C. 2018), *rev'd on other grounds*, 926 F.3d 870 (D.C. Cir. 2019); *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000).

that "[a] foreign state shall not be immune" if an "action is based upon a commercial activity" that is (1) "carried on in the United States by the foreign state"; *or* (2) "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere"; *or* (3) "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." *Id.*

Commercial activity can include "a regular course of commercial conduct" or "a particular commercial transaction or act." *Id.* §1603(d). To determine if an activity is "commercial," courts consider only the activity's "nature," not its "purpose." *Weltover*, 504 U.S. at 614. An activity is commercial if it is the type of activity typically carried out by private parties rather than an activity that is uniquely sovereign. *See id.* (government's actions are "commercial" when it "acts, not as regulator of a market, but in the manner of a private player within it"); *Azima v. RAK Inv. Auth.*, 305 F. Supp. 3d 149, 161 (D.D.C. 2018) (Brown Jackson, J.), *rev'd on other grounds*, 926 F.3d 870 (D.C. Cir. 2019). Thus, "the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in trade and traffic or commerce." *Weltover*, 504 U.S. at 614. A suit is "based upon" a commercial activity if the conduct that constitutes the "gravamen of the complaint" is commercial. *Exxon Mobil Corp. v. Corporacion CIMEX, S.A.*, 111 F.4th 12, 30 (D.C. Cir. 2024).

The UAE does not dispute that this lawsuit is based upon commercial activities.[3] Nor could it. The gravamen of this suit is the offensive viral communications campaign that Defendants conducted against Plaintiffs. That campaign involved specific commercial acts carried out by the

---

[3] Because the UAE did not argue in its Motion to Dismiss that Plaintiffs fail to allege commercial activity, it has waived this argument. *Rollins Env't Servs. (NJ) Inc. v. EPA*, 937 F.2d 649, 652 n.2 (D.C. Cir. 1991) ("Issues may not be raised for the first time in a reply brief.").

UAE through its agents—the Alp Defendants—and others.  Indeed, all the specific actions giving rise to Plaintiffs' claims were commercial in nature; none was uniquely sovereign.

For example, Plaintiffs allege that the UAE, through Ariaf, entered into a commercial contract with a private commercial entity, Diligence SARL, for Alp—a private investigative firm that often did work for private clients including law firms, businesses, and ultra-high-net-worth individuals—to conduct offensive viral communications operations.  (AC ¶¶16, 33–37.)  These operations involved, among other things, publishing fraudulent articles and blog posts online; sending fraudulent emails directly to banks and bank risk monitors, journalists, price reporting agencies, and others; manipulating results on Google and other search engines; and creating fraudulent Wikipedia pages.  (*Id*. ¶¶13, 21–22, 47, 153, 181–84, 293, 310.)  The Alp Defendants also hired journalists, freelance writers, Wikipedia moderators, and subcontractors in the United States and Europe.  (*Id*. ¶¶47, 97, 98, 309.)  Those acts constitute the gravamen of Plaintiffs' claims, and they are activities typically carried out by private commercial actors, not governments.

In addition, Plaintiffs allege a course of commercial competition between the UAE (through ADNOC) and Lord Energy in the spot market for light crude oil in Asia from 2016 until 2019.  (*E.g.*, *id*. ¶¶4–11.)  The UAE orchestrated the offensive viral communications campaign against Plaintiffs to gain a commercial advantage over them in this strategically important market.  (*Id*.)  *See Azima*, 305 F. Supp. 3d at 154, 166 (holding commercial activities exception applied where plaintiff alleged that an instrumentality of the UAE hacked his computers and "published disparaging material" about him online to "gain an advantage over [him] in his commercial dealings with RAKIA and to inflict commercial and financial harm on" him).

### A.   The First Two Clauses Of The Commercial Activities Exception Are Satisfied: The UAE Engaged In Wrongful Conduct In The United States.

Plaintiffs allege commercial activities carried out by the UAE through its agents, the Alp Defendants, in the United States that satisfy the commercial activities exception's first and second clauses.  The first clause of the commercial activities exception provides jurisdiction when an "action is based upon a commercial activity carried on in the United States by the foreign state." 28 U.S.C. §1605(a)(2).  Although "isolated or transitory contacts with the United States" do not satisfy this requirement, a "foreign state need not engage in commercial activity in the United States on a regular basis"; commercial activity having "substantial contact with the United States" is enough.  *Malewicz v. City of Amsterdam*, 517 F. Supp. 2d 322, 328–29 (D.D.C. 2007); *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 709 (9th Cir. 1992).  Courts look to a "stricter" version of "minimum contacts analysis for guidance."  *Malewicz*, 517 F. Supp. 2d at 328–29.

Here, the UAE and its agents' commercial contacts with the United States were substantial. They specifically sought to influence U.S. audiences by publishing "negative information in 'English-speaking media' ... 'in the USA.'"  (AC ¶142.)  Among other things, they:

- Created a fraudulent blog about Plaintiffs titled "Lord Energy: the link between Al-Qaeda and the Muslim Brotherhood" (http://lordenergy.wordpress.com) on the U.S. website WordPress, which was online for at least three years, and which WordPress refused to take down without a U.S. court order (*id*. ¶160);

- Published numerous fraudulent articles about Plaintiffs on WordPress and other U.S. websites, including Medium and Tumblr (*id*. ¶21);

- Sent emails making fraudulent claims about Plaintiffs directly to U.S. journalists and U.S. bank compliance monitors (*id*. ¶¶22, 47, 180);

- Created fraudulent English-language Wikipedia pages (*id*. ¶¶22, 47, 98, 184–86);

- Manipulated results on U.S. search engines including Google, Yahoo!, and Bing (*id.* ¶¶22, 47, 98, 142, 293);

- Entered into a commercial contract with Vidino, a prominent academic who lived in Washington, D.C. and is affiliated with a well-known U.S. university, and directed him to conduct research on "key MB individuals/organisations/companies in the USA and interesting elements/rumours ... to show our capacities ... in the US," among other things (*id*. ¶40);

- Entered into a commercial contract with a private investigator in Miami to conduct research on Americas Lord Energy and an American journalist (*id*. ¶218);

- Caused multiple domestic, WTI transactions involving Americas Lord Energy to fail (*id*. ¶¶202–03, 212);

- Caused the U.S. branch of Macquarie Bank to terminate its futures clearing agreement with Plaintiffs (*id*. ¶209);

- Specifically targeted and sought to destroy Lord Energy, a business owned by a U.S. citizen and subject to numerous U.S. laws, and its subsidiary headquartered and incorporated in Texas (*id*. ¶¶3, 25, 27); and

- Conducted similar campaigns against other targets in the United States and sought to obtain derogatory information on U.S. political figures (*id*. ¶¶274–76).

These commercial activities in the United States were far from "isolated or transitory." They were intentional, prolonged, and substantial. And they constitute the gravamen of Plaintiffs' action.

The UAE makes two arguments as to why the first two clauses of the commercial activities exception do not apply. The UAE primarily contends that Plaintiffs do not satisfy the commercial activities exception because they do not identify any actions conducted by the UAE or its officials in the United States. (UAE Mot. 9–10.) It relies on *Wye Oak Technology, Inc. v. Republic of Iraq*, 24 F.4th 686 (D.C. Cir. 2022). But *Wye Oak*, a post-trial appeal, is inapposite. There, the court held that "that the second clause of the commercial activities exception [cannot] be satisfied ... based on the various acts that *the plaintiff* (Wye Oak) took inside the United States." *Id*. at 702. Here, Plaintiffs allege a litany of acts the UAE's conceded agents conducted in the United States. *Wye Oak* says nothing about whether the acts of a sovereign's agents can abrogate immunity.

Other cases establish that a foreign state "can surrender immunity by virtue of activities committed by an agent, and ... the 'carried on by' requirement can be interpreted in light of broad

13

agency principles." *Virtual Def. & Dev. Int'l, Inc. v. Republic of Moldova*, 133 F. Supp. 2d 1, 5 (D.D.C. 1999) (citing *Maritime Int'l Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094, 1104 (D.C. Cir. 1982)); *see also Reiss v. Société Centrale Du Groupe Des Assurances Nationales*, 235 F.3d 738, 748 (2d Cir. 2000) (remanding for discovery to determine if marketer in United States was agent of sovereign because clause one analysis was "inextricably intertwined" with whether marketer had "actual or apparent authority"); *Bankers Tr. Co. v. Worldwide Transp. Servs., Inc.*, 537 F. Supp. 1101, 1109–10 (E.D. Ark. 1982) (commercial activities exception satisfied by activities of sovereign's agents). The UAE and the Alp Defendants concede, and Plaintiffs agree, that the Alp Defendants were agents of the UAE. (UAE Mot. 26; Alp Mot. 28.) Thus, acts carried out by the Alp Defendants in the United States are attributable to the UAE.

Perhaps recognizing that fatal flaw in its primary argument, the UAE alternatively contends that, "even if Plaintiffs had alleged *some* U.S. conduct by the UAE," it is insufficient to shift the gravamen of Plaintiffs' lawsuit from alleged conduct abroad. (UAE Mot. 10.) That contention also fails. The gravamen of Plaintiffs' action is Defendants' offensive viral communications campaign against them. To be sure, some of the conduct in connection with that campaign was foreign. But the UAE and its agents' conduct nonetheless had a "significant nexus" to the United States. *Reiss*, 235 F.3d at 747 (action must be "'based upon' some 'commercial activity' by [a defendant] that had 'substantial contact' with the United States"). The first clause of the commercial activities exception does not require that the conduct forming the gravamen of Plaintiffs' claims be exclusively domestic; it requires only a substantial or significant nexus to the United States. Plaintiffs plead such a nexus here. *See Siderman*, 965 F.2d at 709 (finding "substantial contact" with United States where Argentina expropriated hotel and only connections to United States were that "Argentina advertise[d] the [hotel] in the United States and solicit[ed]

American guests through its U.S. agent"; "numerous Americans ... stayed at the Hotel"; and the

hotel "accept[ed] all the major American credit cards"); *see also BP Chems. Ltd. v. Jiangsu Sopo*

*Corp.*, 285 F.3d 677, 682, 684 (8th Cir. 2002) (foreign defendants' disclosure of trade secrets

stolen from foreign plaintiff to American vendors satisfied clause one).

The UAE cites *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27 (2015).  There, the plaintiff

purchased online an Austrian rail pass from a travel agent in Massachusetts.  *Id.* at 30.  She traveled

to Austria and was injured in a fall on a train platform.  *Id.*  The Court observed that "the only

relevant commercial activity within the United States was [plaintiff's] ... purchase of a Eurail pass"

from the travel agent in Massachusetts.  It held that the first clause of the commercial activities

exception did not apply because "there [was] nothing wrongful about the sale of the Eurail pass

standing alone.  Without the existence of the unsafe boarding conditions in [Austria], there would

have been nothing to warn [the plaintiff] about."  *Id.* at 31, 35–36.[4]

Unlike in *Sachs*, where the only domestic conduct was not wrongful in and of itself, here,

Plaintiffs plead numerous acts undertaken by the Alp Defendants in the United States that were

wrongful and fraudulent.  "If the conduct is itself wrongful—as opposed to wrongful based only

on other conduct—it constitutes the 'core' of the claim."  *Rodriguez v. Pan Am. Health Org.*, 29

F.4th 706, 716 (D.C. Cir. 2022).  *Rodriguez* is instructive.  It involved a class action against an

international organization that facilitated a program in which Cuba sent doctors to Brazil without

---

[4] The D.C. Circuit applied the same reasoning in *Jam v. International Finance Corp.*, 3 F.4th 405, 409 (D.C. Cir. 2021).  (UAE Mot. 9.)  In *Jam*, the court noted that the plaintiffs' claims "turn[ed] on allegedly wrongful conduct in India" resulting in injuries in India.  *Id.*  The only U.S. conduct was the disbursement of funds to build the plant in India where the injuries occurred.  *Id.*  There "would have been nothing wrongful about [the domestic conduct] ... [a]bsent the operation of the plant in India," so the court held that the domestic conduct alleged did not satisfy clause one.  *Id.*

the doctors' consent in violation of human trafficking laws.[5]  29 F.4th at 716.  The organization

acted as "a financial intermediary between Brazil and Cuba," accepting payments from Brazil to

its Citibank account in Washington, D.C. and transferring the bulk of the payments to Cuba.  *Id.*

at 709–10.  Even though the scheme was overwhelmingly foreign (the victims were foreign, the

primary actors were foreign, and the primary misconduct—human trafficking—was foreign), the

D.C. Circuit found no immunity because "[t]he 'financial benefit' that violates §1589(b) is itself

'wrongful conduct' and occurred in the United States."  *Id.* at 716.  Here, much of the UAE and

its agents' conduct in the United States, including publishing fraudulent statements on U.S.

websites and emailing fraudulent statements to U.S. journalists and bank compliance monitors,

was "itself 'wrongful conduct'" that satisfies the first clause.

Even if the UAE were right that Plaintiffs' claims primarily concern commercial activity

abroad (*see* UAE Mot. 10), the UAE's domestic actions still satisfy the commercial activities

exception's second clause.  That clause applies if a foreign state performs "an act ... in the United

States in connection with" its commercial activity elsewhere.  28 U.S.C. §1605(a)(2).  The UAE's

domestic conduct was carried out in connection with its overarching viral communications

campaign, which the UAE asserts was predominantly foreign.  In addition, that campaign was

carried out in connection with the UAE's commercial competition with Plaintiffs in the Asian spot

market for light crude oil.  The UAE's domestic conduct was intended to give the UAE "an

advantage in its commercial dealings" with Plaintiffs by "inflict[ing] commercial and financial

harm" on them through fraudulent statements meant to induce counterparties and financial

---

[5] The defendant asserted immunity under the International Organizations Immunities Act,
22 U.S.C. §288, which "grants designated international organizations the same immunity as
foreign sovereigns."  *Rodriguez v. Pan Am. Health Org.*, 29 F.4th 706, 710 (D.C. Cir. 2022).

institutions to sever ties with Plaintiffs. *Azima*, 305 F. Supp. 3d at 166. Thus, Plaintiffs also satisfy clause two of the commercial activities exception.

Finally, the UAE asserts, without citation to any authority, that emails the Alp Defendants sent to U.S. recipients and articles the Alp Defendants published on U.S. websites were not activities performed in the United States because the Alp Defendants were located in Switzerland. (UAE Mot. 11–12.) Publication does not occur until a statement is communicated to a third party. *See Summers v. Wash. Times*, 1993 WL 391047, at *1 (D.D.C. Sept. 20, 1993). The articles published and the emails sent by Defendants occurred where they were read and received, not where they were written. In the personal jurisdiction context, numerous courts have held that where a foreign defendant's intentional, tortious action is expressly aimed at a particular forum, such action creates minimum contacts with that forum. *See Calder v. Jones*, 465 U.S. 783, 791 (1984). In *Leibman v. Prupes*, the court held that extortionate emails the defendant wrote and sent from New Jersey to recipients he knew were in California were sufficient to create a substantial connection with California. 2015 WL 898454, at *10 (C.D. Cal. Mar. 2, 2015) ("Concluding that intentionally tortious emails cannot give rise to personal jurisdiction would insulate from liability a ubiquitous form of communication and entirely negate the otherwise permissible exercise of jurisdiction over defendants who purposefully directed their activities at a forum.").[6]

The same is true here. The emails and articles the Alp Defendants sent to U.S. recipients and published on U.S. websites—even if written in Switzerland—are properly viewed as conduct

---

[6] *See also Doe v. WebGroup Czech Republic*, 93 F.4th 442, 455 (9th Cir. 2024) ("The fact that [Defendants] may have also differentially targeted other particular locations does not detract from the fact that their use of U.S.-based CDNs shows that they expressly aimed their websites at the U.S. market."); *Herbstein v. Bruetman*, 768 F. Supp. 79, 81–82 (S.D.N.Y. 1991) ("caus[ing] letters and other documents containing fraudulent statements to be mailed and transmitted by wire in the United States" was "conduct and connection to the United States"); *Siderman*, 965 F.2d at 709.

in the United States because they were intentionally directed to recipients and audiences in the United States for the express purpose of causing harm to a U.S. citizen and his companies.

### B.     The Third Clause Of The Commercial Activities Exception Is Satisfied: The UAE's Commercial Activities Caused A Direct Effect In The United States.

Plaintiffs also satisfy the third clause of the commercial activities exception because the UAE's foreign conduct caused direct effects in the United States. This clause applies if the foreign state conducts "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. §1605(a)(2). The domestic effect does not have to be substantial or foreseeable. *Exxon Mobil*, 111 F.4th at 32. And the domestic effect does not have to cause harm or injury to the plaintiff. *Id*. ("[N]othing in the FSIA requires that the direct effect in the United States harm the plaintiff." (cleaned up)); *Atlantica Holdings Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 111–12 (2d Cir. 2016) ("[A]n FSIA plaintiff need only show a direct effect on someone in the United States."). Here, the UAE's actions caused domestic effects that were substantial, foreseeable, and intentional and that significantly harmed Plaintiffs.

Notably, the UAE does not dispute that its foreign commercial activity caused domestic effects. Instead, it argues only that those effects were not sufficiently direct. (UAE Mot. 12.) In making this argument, however, the UAE ignores and mischaracterizes Plaintiffs' well-pleaded factual allegations. For example, the UAE purports to describe actions taken by Alp and its employees as independent steps in supposedly attenuated chains of causation. (UAE Mot. 10, 12–13.) But, under clause three, acts by agents of the foreign state are attributable to the state directly. *Azima*, 305 F. Supp. 3d at 154 (computer hacking activities of agents "commissioned" by UAE state-owned entity attributable to that entity). Plaintiffs allege the following direct effects:

18

*First*, in June 2018, the Alp Defendants sent an email directly to Crédit Suisse, which they knew was Plaintiffs' primary lender, posing as a freelance journalist using the pseudonym Laurent Martin that fraudulently claimed that Lord Energy was linked to radical Islamists.  (AC ¶152.) The Alp Defendants admitted in a report to the UAE that the email to Crédit Suisse was intended to "put pressure on the bank and close the accounts of the company.  To be sure the bank received the message, we contacted them through the profile of a 'freelance journalist', investigating Lord Energy."  (*Id*. ¶191.)   In other words, the UAE and Alp Defendants specifically sought to fraudulently induce Crédit Suisse to cut ties with Plaintiffs.  That is exactly what Crédit Suisse did. It stopped supporting Lord Energy's trading positions in December 2018.  (*Id*. ¶205.)  As a result, Americas Lord Energy was unable to complete a major oil transaction involving domestic WTI crude oil, resulting in a $65 million loss.  (*Id*. ¶212.)  The failure of this transaction was itself a domestic effect sufficient to satisfy clause three.   And it was directly caused by the Alp Defendants' fraudulent communication to Crédit Suisse.  (*Id*.)

The UAE argues that the failure of that transaction was not a direct effect because it depended on the "independent judgment" of Crédit Suisse.  (UAE Mot. 14.)  But "[w]hen the involvement of third parties is an entirely foreseeable (and even intended) consequence of the defendants' relevant actions, ... it will not stand in the way of concluding that the defendants' activity causes a direct effect in the United States."  *Exxon Mobil*, 111 F.4th at 33.

In *Exxon Mobil*, the D.C. Circuit held that "third parties' decisions to send and receive remittances originating from the United States" did not render the domestic effects of the defendant's conduct indirect because the defendant "[knew] full well—and indeed, intend[ed]— that people" in the United States would use its remittance service to send money abroad.  *Id*. at 34. In *EIG Energy Fund*, the D.C. Circuit rejected the argument that decisions by "skittish" third-party

investors severed the direct chain of causation.  894 F.3d at 343, 346.  The court refused to adopt "a highly restrictive causation requirement under which contributing factors readily and predictably caused by the defendant's same act would preclude jurisdiction."  *Id*. at 346; *see also Atlantica Holdings*, 813 F.3d at 115–16 (third-party underwriters did not break "causal chain").

Here, there was at most one independent third party, Crédit Suisse, and its decision to close Lord Energy's paper position was not only foreseeable but exactly what the UAE and Alp Defendants intended.[7]  (AC ¶205.)  Crédit Suisse is not an intervening actor whose decisions broke the causal chain.  The failure of Americas Lord Energy's $65 million domestic WTI transaction was a direct result of the UAE and Alp Defendants' false statements to Crédit Suisse.

*Second*, in June 2018, the Alp Defendants sent an email to Platts—one of the premier oil price reporting agencies—linking Lord Energy to terrorism financing.  (*Id*. ¶181.)  As a result, Platts denied Lord Energy's request to participate in the Platts Market on Close price assessment process, which occurred daily in Houston, London, and Singapore.  (*Id*.)  Lord Energy's exclusion from this important price setting process in Houston was caused directly by the UAE and Alp Defendants' email to Platts.  Platts was the only third party, and its decision to deny Lord Energy's application was a foreseeable and intended effect of the Alp Defendants' fraudulent statements.

*Third*, in September 2018, the U.S. commodity trading company Castleton Commodities Merchant Trading LP ("CCI"), cancelled a transaction to which it had agreed in principle to sell Americas Lord Energy 600,000 barrels of WTI after CCI's compliance department raised concerns about Americas Lord Energy.  These concerns arose directly from the allegations the UAE and

---

[7] The UAE also cites *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1172 (D.C. Cir. 1994), and *Odhiambo v. Republic of Kenya*, 930 F. Supp. 2d 17, 31 (D.D.C. 2013).  (UAE Mot. 12–14.) Both cases hold that an effect is not direct if there are *many* intervening events and actors.  Here, there was at most one—Crédit Suisse, the target of Defendants' fraudulent manipulation.

Alp Defendants had published about Lord Energy.  (*Id*. ¶¶202–03.)  As with Crédit Suisse and Platts, CCI was the only intervening actor, and its decision was foreseeable and intended.

*Fourth*, the UAE and the Alp Defendants' fraudulent claims destroyed Americas Lord Energy, a U.S. company headquartered and incorporated in Texas.  This, too, was a direct domestic effect.  (*Id*. ¶¶212–13.)  The dissolution of Americas Lord Energy caused Douglas Koskie, a U.S. citizen who lived in Texas, to lose his job.  The UAE argues that "the independent choices of any one of these banks, partners, and rating agencies" which led to Americas Lord Energy's collapse "is sufficient to sever any 'direct' link between the UAE's conduct and the United States."  (UAE Mot. 14.)  This argument fails, though, because the UAE and Alp Defendants intended to induce those banks, counterparties, and rating agencies to stop working with Americas Lord Energy.  *See Exxon Mobil*, 111 F.4th at 33–34; *EIG Energy Fund*, 894 F.3d at 343, 346.

The UAE primarily relies on *Virtual Countries Inc. v. Republic of South Africa*, 300 F.3d 230 (2d Cir. 2002), to support its argument that its actions were too far removed from any domestic effects.  But *Virtual Countries* is distinguishable.  There, the court held that the third clause did not apply because a "press release's effect [fell] at the end of a long chain of causation and [was] mediated by numerous actions by third parties."  *Id*. at 237.  Specifically, the court noted that "wire services and newspapers ... obtained the release and wrote articles about it," then "current or potential investors ... learned of the release's contents," and "[d]rawing on news reports, ... formed their own independent assessments of [South Africa's] intentions and the possible effect of those intentions on" the plaintiff.  *Id.*  "At a minimum, two independent kinds of actors ... intervened between issuance of the press release and any alleged injurious effect on the plaintiff."  *Id*.

Crucially, there is no indication in *Virtual Countries* that South Africa foresaw or intended that its press release would be picked up by the press or read by the plaintiff's then-current and

potential business partners in the United States—or induce them to stop doing business with the

plaintiff.  Here, by contrast, the enterprise published many of its fraudulent statements directly,

without intervention from independent media actors.  (*E.g.*, AC ¶¶149, 152–53, 290, 310.)  And

the UAE expressly intended to cause banks, counterparties, and price reporting agencies to stop

doing business with Plaintiffs.  (*Id.* ¶18.)  Because the intervening parties acted exactly as the UAE

intended, the involvement of third parties does not break the causal chain.

> *Fifth*, because all of Lord Energy's trades were cleared by U.S. banks, primarily,

J.P. Morgan Chase in New York (*id.* ¶225), Lord Energy's bankruptcy and the collapse of its

U.S. subsidiary deprived J.P. Morgan and other U.S. banks of valuable clearing fees.  Notably,

while the UAE's Motion notes that Lord Energy's trades were dollar denominated, it ignores that

those trades were also *cleared* by U.S. banks.  Such financial loss to U.S. banks can sustain a

finding that the UAE's actions caused a direct effect in the United States.  *See Weltover*, 504 U.S.

at 619 (holding that Argentina's nonpayment of funds into a New York bank account caused direct

effect because "[m]oney that was supposed to have been delivered to [the] New York bank for

deposit was not forthcoming"); *Com. Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 241 (2d Cir.

1994) ("The failure of the Iraqi Banks to remit funds in New York ... had a direct effect in the

United States."); *Atlantica Holding*, 813 F.3d at 112–13.

> The UAE's caselaw does not justify a different conclusion.  In *Global Index, Inc. v. Mkapa*,

290 F. Supp. 2d 108, 114 (D.D.C. 2003), the court held that there was no direct effect because the

promissory notes at issue required payment in U.S. dollars but did not designate the United States

as the place for payment.  And in *United World Trade, Inc. v. Mangyshlakneft Oil Production

Ass'n*, 33 F.3d 1232, 1238–39 (10th Cir. 1994), the court held that a contractual provision

specifying payment in U.S. dollars to a bank in Paris did not constitute a direct effect in the United

States.  In both cases, the only domestic nexus was that the financial instruments were U.S. dollar denominated.  Neither instrument specified that payment was to be made in the United States. Here, by contrast, the clearing fees were paid to J.P. Morgan and other U.S. banks.

*Sixth*, the UAE and Alp Defendants' statements induced the U.S. branch of Macquarie Bank to cancel a 2014 futures clearing agreement with Lord Energy.  (AC ¶209.)

*Finally*, Lord Energy's collapse had a direct impact on the domestic WTI market.  The UAE claims that Plaintiffs "fail to allege any facts (such as price changes) demonstrating" an impact to the U.S. WTI market.  (UAE Mot. 13.)  Not so.  Plaintiffs allege that after they were pushed out of the Asian spot market for light crude oil, Murban prices were artificially inflated above competitive levels.  (AC ¶¶84–86.)  And Plaintiffs provide specific data regarding those Murban price movements.  (*Id.*)  Plaintiffs also allege that WTI shipped from the United States was a reasonably interchangeable substitute for Murban on the Asian spot market.  (*Id.* ¶87.)  These facts create a reasonable inference that, just as Murban sellers in the UAE were able to charge artificially high prices for Murban on the Asian spot market following Lord Energy's collapse, so too were domestic WTI sellers.  This created an economic incentive for WTI producers to divert WTI that would otherwise be available for domestic purchase to the Asian spot market.  *See Galavan Supplements, Ltd. v. Archer Daniels Midland Co.*, 1997 WL 732498, at *2 (N.D. Cal. Nov. 19, 1997) (fixing citric acid prices at "artificially high ... levels throughout the world," directly affected "the amount of citric acid sold into the United States" by influencing "the allocation of citric acid to and/or away from the U.S. domestic market").

Such domestic effects based on predictable market forces satisfy the third clause.  For example, in *Missouri ex rel. Bailey v. People's Republic of China*, 90 F.4th 930 (8th Cir. 2024), the court held that the Chinese government's hoarding of masks at the outbreak of Covid caused a

domestic effect because it led to a mask shortage in Missouri that allowed China to "enter the market and sell lower quality masks." *Id*. at 938. The court reasoned that this effect was sufficiently direct because "[t]he most basic supply-and-demand principles tell us that these market effects depended little, if at all, 'on variables independent' of the defendants' conduct." *Id*. at 939.

Plaintiffs allege numerous domestic effects, all of which were the direct result of the UAE's foreign commercial activities. Any one of these domestic effects is enough to abrogate immunity.

## II.   THE COURT HAS PERSONAL JURISDICTION OVER THE ALP DEFENDANTS AND BESSON.[8]

The Alp Defendants and Besson argue that the Court lacks personal jurisdiction over them. (Alp Mot. 7–15; Besson Mot. 8–14.) But their arguments fail. The Court has jurisdiction over them under Federal Rule of Civil Procedure 4(k)(2), which provides for personal jurisdiction over foreign defendants based on their contacts with the United States as a whole. The Court also has jurisdiction over Badal and Besson under Rule 4(k)(1)(C) and 18 U.S.C. §1965, which allows personal jurisdiction over RICO co-conspirators where personal jurisdiction is "established as to at least one defendant," *FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1099 (D.C. Cir. 2008), *overruled on other grounds by Erwin-Simpson v. AirAsia Berhad*, 985 F.3d 883 (D.C. Cir. 2021).

### A.   The Court Has Specific Personal Jurisdiction Over The Alp Defendants And Besson Under Rule 4(k)(2).

District courts have personal jurisdiction over a defendant when "an applicable long-arm statute ... authorize[s] the court to hear the case" and exercise of personal jurisdiction "comports with due process." *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 231 (D.C. Cir. 2022), *vacated on other grounds*, 144 S. Ct. 2675 (Mem). Federal Rule of Civil Procedure 4(k)(2) "is essentially

---

[8] Vidino does not contest that he is subject to general personal jurisdiction. Nor could he, as he is domiciled in the District of Columbia. (AC ¶40.)

a federal long arm-statute." *Id.* Aside from ordinary due-process restrictions, Rule 4(k)(2) requires only that the defendant be served and that they not be subject to any specific state's jurisdiction. *See* Fed. R. Civ. P. 4(k)(2)(A); *Mwani v. bin Laden*, 417 F.3d 1, 11 (D.C. Cir. 2005) ("[S]o long as a defendant does not concede to jurisdiction in another state, a court may use 4(k)(2) to confer jurisdiction."). The Alp Defendants and Besson do not contest service, and they do not argue that they are subject to personal jurisdiction in any specific state. Thus, the only issue is whether jurisdiction over them comports with due process.

Due process requires "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Atchley*, 22 F.4th at 232. This requirement "prevents a court from deciding claims against parties that have not in some way affiliated themselves with the forum." *Id.* Though "[c]ourts distinguish between all-purpose 'general' personal jurisdiction and claim-linked 'specific' jurisdiction," only specific jurisdiction applies here. *Id.* The "'essential foundation of specific jurisdiction' is the 'relationship among the defendant, the forum, and the litigation.'" *Id.* at 233 (quoting *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 365 (2021)). "The dispute here is whether that relationship is 'close enough to support specific jurisdiction.'" *Id.*

### 1. The Court has specific personal jurisdiction over the Alp Defendants under Rule 4(k)(2).

The Alp Defendants have contacts with the United States sufficient to justify the Court's exercise of personal jurisdiction. They (along with the rest of the enterprise) targeted a U.S. citizen and purposefully destroyed a U.S. company. (*E.g.*, AC ¶3.) But they did much more than that.

*First*, the Alp Defendants sent emails claiming that Plaintiffs were linked to terrorist organizations to U.S. press outlets; they published these statements on websites "owned and operated by U.S. companies and hosted on servers in the United States"; and they directed these

statements to "financial risk compliance monitors" in the United States.   (*Id*. ¶¶2, 176.)
Specifically, the Alp Defendants:

- "[C]reated fake Wikipedia entries in English" and used tactics to "ensure that the enterprise's sponsored articles were among the top results when searching for Hazim or Lord Energy on Google and other U.S.-based search engines" (*id*. ¶¶22, 142, 293);

- "[E]mphasized publication of negative information in 'English-speaking media,' specifically identifying 'Daily Kos in the USA'" (*id*. ¶142);

- Targeted U.S. journalists at Bloomberg and Axios by sending them emails claiming that "Hazim and Lord Energy were involved in terrorist financing" (*id.* ¶¶22, 180);

- "[F]raudulently induced the compliance platform World-Check, which is owned by Thomson Reuters—a company publicly traded on the New York Stock Exchange with several offices throughout the United States—to flag Hazim and Lord Energy under the risk category 'terrorism,' ensuring that U.S. and international financial institutions would refuse to lend to Hazim and Lord Energy" (*id.* ¶22); and

- Sought to have WorldCompliance, a database owned by Lexis Nexis Risk in Atlanta, do the same (*id*. ¶155).

*Second*, the Alp Defendants used specific American individuals and companies to effectuate the enterprise's scheme.   They worked with a Florida investigative firm to gather intelligence on Americas Lord Energy Inc.  (*Id.* ¶269.)  They used that Florida firm to compile information on "a high-profile journalist who lived in the United States, was a U.S. citizen, and worked for the prominent U.S. media outlet, Buzzfeed."  (*Id.*)  The Alp Defendants also hired a second private investigator to research the same American journalist.  (*Id.*)  The Alp Defendants used the Florida firm to investigate a Virginia economist, leading to the preparation of a "30-page 'confidential report'" about him.  (*Id.* ¶271.)  The Alp Defendants then had the Florida firm prepare another report "about a U.S. citizen who founded the U.S.-based company Global Risk Advisors ('GRA')," leading to the publication of an article "about GRA and its founder."  (*Id.* ¶272.)  The Alp Defendants hired U.S. citizen and domiciliary Lorenzo Vidino, "to provide leads on new targets and research and analysis on the Muslim Brotherhood."  (*Id.* ¶40.)  They identified Vidino

as an "expert on Islamism in Europe and North America," and the Alp Defendants instructed Vidino to prepare an "overview of key MB individuals/organisations/companies in the USA ... to show [the enterprise's] capabilities ... in the US." (*Id.* ¶126.)

*Third*, the Alp Defendants targeted other U.S. citizens. The enterprise "conducted a confidential offensive viral communications campaign and disinformation operations against George Soros and his Open Society Foundation." (*Id.* ¶274.) In "a March 7, 2019 Summary Report," "Alp accused Soros of 'funding several Muslim Brotherhood-related organizations in Europe.'" (*Id.*) Through "Project PEONY," Alp investigated "11 prominent U.S. political operatives and consultants to determine whether they 'have any suspicious contacts.'" (*Id.* ¶276.)

These allegations are more than enough to show that the Alp Defendants should "reasonably anticipate being haled into" U.S. courts. *Mwani*, 417 F.3d at 4. It does not matter that they "did not *physically* enter the forum"—that is, the United States.[9] *Id.* at 12. It matters only that their "efforts [were] 'purposefully directed' toward residents" of the United States and that their conduct "ha[d] an effect in the forum." *Id.* at 12–13. Here, "there is no doubt that the defendants 'engaged in unabashedly malignant actions directed at and felt in this forum.'" *Id.* The Alp Defendants' purposeful interactions with U.S. media, U.S. bank compliance monitors, U.S. contractors, and U.S. victims gave it "clear notice of its exposure in [the United States] to suits arising from" those interactions. *Ford*, 592 U.S. at 363. The Alp Defendants "could [have] do[ne] something about that exposure: [they] could [have] 'act[ed] to alleviate the risk of burdensome litigation by ... severing [their] connection with the [United States]." *Id.* at 363–64. But they did not. They sought to influence U.S. audiences to harm a U.S. citizen and destroy his U.S. company.

---

[9] The relevant inquiry under Rule 4(k)(2) is the defendants' contacts with the United States as a whole, not with a particular State or District. *See Mwani*, 417 F.3d at 11.

Moreover, the United States has several "legitimate interest[s]" in this lawsuit.  *Ford*, 592 U.S. at 360.  For one, the enterprise severely damaged a U.S. citizen and destroyed a U.S. business. The United States has a strong interest in protecting its citizens from tortious behavior, as evidenced by the enactment of RICO.  *See id.* at 368 (States "have significant interests" in "providing [their] residents with a convenient forum for redressing injuries inflicted by out-of-state actors" and in "enforcing their own ... regulations." (cleaned up)).  The United States has further interests in ensuring its media outlets are not used to deliver disinformation regarding terrorism financing and in regulating the use of American businesses.

Personal jurisdiction over the Alp Defendants is also proper under *Calder*, 465 U.S. 783, and its progeny.  In *Calder*, a Californian sued three Floridians for libel based on an article that was published in a national magazine.  *Id.* at 784.  The Supreme Court held that California could exercise jurisdiction over the Floridians based on "the reputation-based 'effects' of the alleged libel." *Walden v. Fiore*, 571 U.S. 277, 287 (2014) (citing *Calder*).  This established what is now known as the "*Calder* effects test," under which courts may exercise personal jurisdiction over a defendant when the effects of his actions "connect[] [his] conduct to" the forum.  *Id.* at 288; *see also Urquhart-Bradley v. Mobley*, 964 F.3d 36, 45–46 (D.C. Cir. 2020) (applying *Calder*).  Here, the Alp Defendants' actions were "expressly aimed at" the United States, and they "knew" those actions "would have a potentially devastating impact upon" Plaintiffs.  *Calder*, 465 U.S. at 789. In fact, they intended for those actions to "seriously damage, if not destroy," Hazim and his companies.  (AC ¶19.)  The Alp Defendants should have "reasonably anticipate[d] being haled into court [in the United States] to answer for" their tortious conduct.  *Calder*, 465 U.S. at 790.

The Alp Defendants' arguments against personal jurisdiction ignore vast swaths of the Amended Complaint.  They argue first that the fact that U.S. residents can "access online

publications from the United States" does not mean they purposefully directed their activities toward the United States. (Alp Mot. 12.) But Plaintiffs do not just allege that Americans could access the enterprise's fraudulent statements. They allege that the Alp Defendants manipulated U.S. media outlets and figures to harm a U.S. citizen and his U.S. company. These facts distinguish the Alp Defendants' caselaw. In *McFarlane v. Esquire Magazine*, the defendants wrote an article that was merely "circulated throughout the nation." 74 F.3d 1296, 1300 (D.C. Cir. 1996). In *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1349 (D.C. Cir. 2000), the court declined to find jurisdiction just because District residents could access the Defendants' websites.[10]

Here, the Alp Defendants "purposely directed [their] activities toward" the United States in a way the publishers in the cases they cited did not. *Sinclair*, 596 F. Supp. 2d at 133. Thus, the Alp Defendants are similar to newspaper publishers who "manifest an intent to target and focus on" readers in a particular forum. *Young v. New Haven Advoc.*, 315 F.3d 256, 263 (4th Cir. 2002).

The Alp Defendants next argue that the enterprise "targeted Plaintiffs['] business in Asia, not any business in the United States." (Alp Mot. 13.) That is false. The enterprise targeted American journalists and bank compliance monitors, hired American investigators, and sought to harm American victims, including Hazim and Americas Lord Energy. It is true that the Alp Defendants' actions were designed in part to manipulate Asian oil markets. But that does not mean those actions were not also directed toward the United States. They were. Plaintiffs' theory of jurisdiction is therefore not "indirect" like the Alp Defendants claim. Plaintiffs detail myriad direct connections between the Alp Defendants and the United States. That distinguishes this case from

---

[10] *See also Betz v. Aidnest*, 2018 WL 5307375, at *7 (D.D.C. Oct. 26, 2018) (same); *Sinclair v. TubeSockTedD*, 596 F. Supp. 2d 128, 133 (D.D.C. 2009) (same); *Bible Way Church of Our Lord Jesus Christ World Wide, Inc. v. Showell*, 578 F. Supp. 2d 164, 171 (D.D.C. 2008) (same); *Doe I v. State of Israel*, 400 F. Supp. 2d 86, 121 (D.D.C. 2005) (same).

*Walden*, 571 U.S. at 279, which held that Nevada could not exercise jurisdiction over a defendant who had "no ... contacts with Nevada" except that he "knew his allegedly tortious conduct in Georgia would delay the return of funds to plaintiffs with connections to Nevada."

      **2.**      **The Court has specific personal jurisdiction over Besson under Rule 4(k)(2).**

Besson is also subject to the Court's jurisdiction because he was a knowing co-conspirator in enterprise's scheme, so all the enterprise's contacts with United States are imputed to him under Rule 4(k)(2). "To plead a conspiracy theory of jurisdiction under Rule 4(k)(2), [Plaintiffs] must show that '(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with [the United States].'" *Rudersdal v. Harris*, 2022 WL 263568, at *12 (S.D.N.Y. Jan. 28, 2022) (quoting *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018)). Plaintiffs satisfy these elements here. They allege a conspiracy in which Besson participated (*see infra* Arg. §IV.B.), and they allege that Besson's co-conspirators had sufficient domestic contacts.

In arguing against the application of conspiracy jurisdiction, Besson relies on *Ofisi v. Al Shamal Islamic Bank*, 2019 WL 1255096 (D.D.C. Mar. 19, 2019) (Besson Mot. 13–14)—in which this District addressed the issue in a footnote, noting that the plaintiffs "offer[ed] no authority" to support the court's assertion of conspiracy jurisdiction under Rule 4(k)(2). 2019 WL 1255096, at *5 n.8. Recent opinions have given fuller treatment to this issue and held that conspiracy jurisdiction *is* appropriate under Rule 4(k)(2). *See Galloway v. Martorello*, 2023 WL 5183204, at *10 (E.D. Va. Aug. 11, 2023) ("reasonable to rely on conspiracy jurisdiction" under "Rule 4(k)(2)"); *Sotloff v. Qatar Charity*, 674 F. Supp. 3d 1279, 1307 (S.D. Fla. 2023) (similar), *vacated on other grounds,* 2023 WL 6471413, at *1 (S.D. Fla. Sept. 29, 2023); *Rudersdal*, 2022 WL 263568, at *12; *Flag Co. v. Maynard*, 376 F. Supp. 2d 849, 855 (N.D. Ill. 2005).

Besson also rehashes the Alp Defendants' argument that personal jurisdiction does not lie just because an article is available in the United States and "a defendant knew that his actions might impact a U.S. citizen or even the country generally." (Besson Mot. 11 (quoting *Vuyyuru v. Reddy*, 2023 WL 6160056, at *8 (D.D.C. Sept. 21, 2023)). But Plaintiffs allege that the enterprise purposefully and intentionally reached into the United States using U.S. websites and businesses. The enterprise did not just know its actions "might" affect a U.S. citizen and a U.S. company; it purposefully sought to destroy them. (AC ¶3.)

Moreover, the cases Besson cites are readily distinguishable. *Vuyyuru* involved a frivolous complaint alleging the existence of a "'parallel economy,' which 'wield[s] unbelievable power in [U.S.] government.'" 2023 WL 6160056, at *3. The *pro se* plaintiff alleged that he had "developed '[t]emplates' for a 'futuristic city' that would serve as the capital of an Indian state" and that a "criminal syndicate" including the Indian prime minister and foreign officials "destroyed those plans, causing 'huge financial losses.'" *Id.* at *1. By contrast, Plaintiffs allege a plausible, unattenuated account of the enterprise's efforts to destroy Hazim and Lord Energy.

Besson next relies on *Lewis v. Mutond*, 62 F.4th 587 (D.C. Cir. 2023), which involved a "'propaganda campaign' to 'frame [the plaintiff] as an American mercenary.'" (Besson Mot. 11 (quoting *Lewis*, 62 F.4th at 593).) But *Lewis* involved a conspiracy to destabilize political order in Congo. 62 F.4th at 595. The plaintiff argued that his U.S. citizenship led to his injury. *Id.* The court rejected his argument, holding that his citizenship "was incidental to" the conspiracy's "chief concern." *Id.* at 594. Here, the enterprise's chief concern was destroying Hazim and Lord Energy.

Besson's reliance on *Livnat v. Palestinian Authority*, 851 F.3d 45 (D.C. Cir. 2017), is also misplaced. Even on Besson's account, the complaint in *Livnat* contained only a "bare allegation" that the events were "intended to influence U.S. policy." (Besson Mot. 12 (quoting *Livant*, 851

F.3d at 57).)  That contrasts markedly with Plaintiffs' detailed allegations that Besson and the enterprise intentionally sought to harm Plaintiffs in the United States.  (*E.g.*, AC ¶¶40, 47, 218.)

**B.    The Court Has Specific Personal Jurisdiction Over Besson And Badal Under Rule 4(k)(1)(C).**

Even if Rule 4(k)(2) did not allow personal jurisdiction over Besson and Badal, Rule 4(k)(1)(C) still would.  That rule provides that "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant ... when authorized by a federal statute."  Fed. R. Civ. P. 4(k)(1)(C).  These requirements are met here.  Besson and Badal waived service of process through their U.S. counsel.  (ECF Nos. 45, 52.)  *See Bayshore Cap. Advisors, LLC v. Creative Wealth Media Fin. Corp.*, 667 F. Supp. 3d 83, 119–20 (S.D.N.Y. 2023) ("[S]ervice upon a foreign defendant's United States counsel constitutes service ... within the United States.").  And 18 U.S.C. §1965 "grants personal jurisdiction over an initial defendant in a civil RICO case to the district court for the district in which ... personal jurisdiction ... is established" for that defendant. *FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1099–1100 (D.C. Cir. 2008), *overruled on other grounds by Erwin-Simpson v. AirAsia Berhad*, 985 F.3d 883 (D.C. Cir. 2021).  Section 1965(b) then allows for "jurisdiction over 'other parties' not residing in the district, who may be additional defendants of any kind," when the "ends of justice [so] require." *Id.* at 1100.

The D.C. Circuit has construed Section 1965 to convey personal jurisdiction over all defendants in a RICO case "where personal jurisdiction ... is established as to at least one defendant." *Id.* at 1099.  The effect of Section 1965 is that the Court has personal jurisdiction over all co-conspirators as long as it has jurisdiction "over at least *one* of the participants in the ... conspiracy" and "there is no other district in which a court will have personal jurisdiction over all of the alleged co-conspirators." *Id.* at 1100 (citation omitted).

Besson and Badal identify no such district, so the only questions are whether one defendant is subject to the Court's personal jurisdiction and whether "the ends of justice" are served by suing all defendants in one district.  As discussed above, the Court has jurisdiction over each Defendant independently.  And for jurisdiction under Section 1965 not to apply, the Court would have to find that it lacks jurisdiction over *every* defendant, including Vidino, who does not contest personal jurisdiction.  Finally, the ends of justice are served by haling all the co-conspirators into the same court, as opposed to prosecuting RICO cases against each of them in separate districts.  This administrability concern is especially strong here, where Defendants may not even be subject to the jurisdiction of any other *country*, let alone another U.S. State.

Citing two cases, Besson and Badal argue that Section 1965 does not reach foreign defendants.  (Alp Mot. 11; Besson Mot. 13.)  But they overread these cases.  *Nuevos Destinos, LLC v. Peck*, 2019 WL 78780, at \*12 (D.D.C. Jan. 2, 2019), declined jurisdiction under Section 1965 for two reasons, neither of which applies here.  First, the foreign defendants "were served abroad and therefore were not served properly under the RICO statute."  *Id*.  Here, Besson and Badal were not served abroad.  Instead, they waived service through their U.S. counsel.  Second, the *Nuevos Destinos* court held that it did not have personal jurisdiction over any of the participants in the alleged multidistrict conspiracy.  *Id.*  Here, the Court has personal jurisdiction over every other defendant.  At minimum, Vidino does not contest personal jurisdiction.

The court declined to exercise jurisdiction under Section 1965 in *Elsevier, Inc. v. Grossman*, 77 F. Supp. 3d 331 (S.D.N.Y. 2015), on similar grounds.  However, the court exercised jurisdiction under New York's long-arm statute, and it noted that the Second Circuit indicated that Section 1965 "would seem to permit the assertion of personal jurisdiction over RICO defendants residing abroad," so long as those defendants were served in the United States.  *Id*. at 343 n.7.  A

33

later case from the same court held that "service upon a foreign defendant's United States counsel constitutes service ... within the United States." *Bayshore*, 667 F. Supp. 3d at 119–20.

### III.   PLAINTIFFS STATE RICO CLAIMS UNDER 18 U.S.C. §1962(C).

Plaintiffs state claims for substantive RICO violations against the UAE, Alp, Brero, Cavin, and Badal under 18 U.S.C. §1962(c).  Under Section 1962(c), a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).  Here, Plaintiffs allege that the UAE, Alp, Brero, Cavin, Badal, their employees, and a broad network of co-conspirators—including Ariaf, Besson, Diligence, Vidino, and others—formed an association-in-fact enterprise.  (AC ¶1.)  That enterprise conducted offensive viral communications campaigns against dozens of victims to destroy perceived rivals of the UAE.  (*Id*. ¶¶1–2.)  The enterprise had a distinct modus operandi, publishing fraudulent statements to banks, compliance monitors, business partners, the media, and others falsely linking its victims to terrorism.  (*Id*. ¶¶13, 18–19.)  The enterprise carried out this pattern of racketeering activity for years, and its own documents indicate that the conspiracy is ongoing.  (*Id*. ¶282.)

### A.   Plaintiffs Allege RICO Predicate Acts.

Racketeering activity is broadly defined as any of the predicate offenses specifically enumerated in Section 1961 of the RICO Act.  18 U.S.C. §1961(1)(B).  This list of predicate acts includes wire fraud and bank fraud—the racketeering activities alleged here.  To satisfy RICO, a plaintiff need only allege two related predicate acts over a ten-year period.  18 U.S.C. §1961(5).  Plaintiffs easily clear this low bar.  They allege that Defendants committed dozens of acts of wire fraud and bank fraud over several years.  (*Id*. ¶¶290, 307, 310, 311, 314.)

### 1.   Plaintiffs allege multiple instances of wire fraud.

Wire fraud involves (1) a scheme to defraud, and (2) the use of interstate wires to further that scheme.  18 U.S.C. §1343; *United States v. Lemire*, 720 F.2d 1327, 1334–35 (D.C. Cir. 1983).

A "scheme to defraud" broadly encompasses any scheme to deprive someone of money or property through false statements of material fact. *Carpenter v. United States,* 484 U.S. 19, 27 (1987) ("'[T]o defraud' ... [has] the common understanding of wrongdoing one in his property rights by dishonest methods or schemes." (cleaned up)); *Jericho Baptist Church Ministries, Inc. (D.C.) v. Jericho Baptist Church Ministries, Inc. (Md.)*, 223 F. Supp. 3d 1, 8 (D.D.C. 2016) (the term defraud "signif[ies] the deprivation of something of value by trick, deceit, chicane or overreaching").

Needless to say, the same statement can give rise to claims for defamation and wire fraud. *See Conwood Co.  v. U.S. Tobacco Co.*, 290 F.3d 768, 783–84 (6th Cir. 2002).  Both involve false statements of fact.  What sets wire fraud apart is the intent to deprive the victim of money or property.  The victim's loss of money or property cannot be "only an incidental byproduct of the scheme"; it must be "an 'object of the fraud.'" *United States v. Porat*, 76 F.4th 213, 218 (3d Cir. 2023).  The perpetrator need not "end[] up with the victim's property or money." *Feld Ent., Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288, 318 (D.D.C. 2012).

Here, Defendants intended to (and did) deprive Plaintiffs of money and property, as confirmed by Defendants' own internal documents.  For example, in a February 2018 Action Plan, Alp acknowledged that it would "[d]iscreetly notify banks of" Lord Energy's "links to terrorism and Political Exposed Persons, the *objective being to block their bank accounts and business*." (AC ¶18.)  In June 2018, Alp reiterated to the UAE that its "'objective remain[ed] to paralyze' Lord Energy," and it bragged that its plan to deprive Plaintiffs of access to funding and destroy their business was working: "[F]ollowing our viral communication, [Lord Energy] is having serious problems with Western banks to receive credits.  It has apparently be[en] put on a watchlist used by banks.  Banks are concerned about its connections to radical islamists. ... This is all good

news: it seems that our viral actions are working [and] Lord Energy is facing serious problems for its business operations." (*Id.* ¶¶98, 141, 150, 162, 167.)

Plaintiffs also allege with particularity that Defendants sent numerous emails and published numerous articles, blog posts, and Wikipedia entries making the false claims that Plaintiffs were linked to the Muslim Brotherhood and terrorism. These statements were communicated using interstate wires. *United States v. Ring*, 628 F. Supp. 2d 195, 217 (D.D.C. 2009). That use of interstate wires was not just foreseeable; it was an essential element of Defendants' scheme that allowed them to disseminate their fraudulent statements to specific audiences around the globe, including in the United States, and to do so pseudonymously. (AC ¶310.)

Plaintiffs also allege in no uncertain terms that Defendants' claims were false, and Plaintiffs identify each fraudulent statement with particularity as required by Federal Rule of Civil Procedure 9(b).[11]  (*Id.* ¶¶11–14, 290, 310.) Plaintiffs provide each statement's date, contents, speaker, recipient, and medium. (*Id.* ¶¶290, 310.) For example, Plaintiffs allege that on "June 13, 2018, Alp sent an email about Lord Energy to the Crédit Suisse media relations email address (media.relations@credit-suisse.com), posing as a freelance journalist and using the pseudonym Laurent Martin. The email falsely claimed that Lord Energy was linked to radical Islamists, and it cited stories that Alp had sponsored and planted about Lord Energy." (*Id.* ¶310(g).) In addition, "[b]etween June 7 and June 19, 2018, Alp used a secure, encrypted Protonmail account under the pseudonym 'Yvan Doucet' to send 15 emails falsely claiming that 'Lord Energy SA' was linked to 'terrorism' financing to reporters from *Bloomberg*, *Axios*, *Reuters*, *The Sunday Times*, *The Observer*, *The Guardian*, *Financial Times*, *The Sun*, and *The Times*, as well as the price reporting

---

[11] The Alp Defendants and Vidino's argument (which Besson incorporates by reference) that Plaintiffs fail to identify the fraudulent statements with particularity is disingenuous and ignores Plaintiffs' well-pleaded allegations. (Vidino Mot. 35–36; Alp Mot. 24; Besson Mot. 19.)

agency Platts." (*Id.* ¶310(h).)  And "[o]n June 12, 2018, using the pseudonym Laurent Martin, Alp sent emails to WorldCompliance, World-Check, and Info4C falsely claiming that Lord Energy was 'directly linked to radical Islamists' and urging those compliance monitors to add the 'name of Lord Energy' to their databases." (*Id.* ¶310(f).)  Each of these emails, and each of the enterprise's articles and blog posts, was a separate act of wire fraud. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 648 (2008).

Defendants' failure to address allegations that they intended to deprive Plaintiffs of money and property (and succeeded in doing so) is fatal to their argument that Plaintiffs do not allege predicate acts because the scheme was nothing more than simple defamation.  Defendants discuss five cases, none of which supports their argument.  (UAE Mot. 21–22; Vidino Mot. 33.)

In *Center for Immigration Studies v. Cohen*, 410 F. Supp. 3d 183, 190 (D.D.C. 2019), this Court held that the plaintiff failed to plead predicate acts of mail or wire fraud because the "complaint [was] devoid of any allegation that defendants made a statement that was false."  In *Kimberlin v. National Bloggers Club*, 2015 WL 1242763, at *5 (D. Md. Mar. 17, 2015), the plaintiff failed to allege the "time, place, and contents of any of the alleged mail and wire communications" and thus did not satisfy Rule 9(b).  In *Ritchie v. Sempra Energy*, 2013 WL 12171757, at *3 (S.D. Cal. Oct. 15, 2013), and *Kimm v. Lee*, 2005 WL 89386, at *1, *4 (S.D.N.Y. Jan. 13, 2005), the statements were "designed to injure [the plaintiffs'] goodwill and business reputation[s]," not to deprive them of money or property.  In *Marks v. City of Seattle*, 2003 WL 23024522, at *3, 6 (W.D. Wash. Oct. 16, 2003), the court dismissed defamation claims for failure to plead the statements with specificity and a RICO claim for failure to allege any predicate act, noting that the complaint "did not clarify what specific actions ... constitute predicate acts."

Here, Plaintiffs identify dozens of fraudulent statements (including statements falsely linking them to the Muslim Brotherhood and terrorism) with particularity, plead that (and how) those statements were designed to deprive them of money and property (and in fact did so), and identify Defendants' actions that constitute RICO predicate acts.  (AC ¶¶290, 310.)  Defendants' argument that Plaintiffs' pleading is paper-thin should be rejected.

Vidino (and Besson by reference) additionally contend that Plaintiffs' wire fraud allegations are deficient because Plaintiffs do not adequately plead that Defendants knew their statements linking Plaintiffs to terrorism were false.  (Vidino Mot. 34.)  As an initial matter, questions of intent are "particularly ill suited for summary disposition."  *Gomez v. Trs. of Harvard Univ.*, 677 F. Supp. 23, 25 (D.D.C. 1988); *accord Pullman-Standard v. Swint*, 456 U.S. 273, 288 (1982) ("Treating issues of intent as factual matters for the trier of fact is commonplace.").  Indeed, even under Rule 9's heightened pleading standard, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  "Intent may, and generally must, be proved circumstantially; normally, the natural probable consequences of an act may satisfactorily evidence the state of mind accompanying it."  *United States v. Jackson*, 513 F.2d 456, 461 (D.C. Cir. 1975); *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1118–19 (D.C. Cir. 2009) ("[T]he factfinder 'is permitted to impute knowledge of the falsity of the statements to the accused ... as a consequence of inferences reasonably drawn.'").

The Amended Complaint is rife with allegations that give rise to a plausible inference that Defendants knew their statements were false.  For example, in a proposal for the UAE in August 2017, Alp stated that it would engage in "offensive viral communication to discredit and embarrass key targets" using "dark PR" and "fake news" to make its targets "appear as either perverts, corrupts, hypocrites and/or terrorists."  (AC ¶¶101–02.)  That was *before* Alp had identified its

targets or conducted any research.  Setting out with a predetermined negative narrative such as this is strong circumstantial evidence of a defendant's subjective knowledge of falsity.  *E.g.*, *Palin v. N.Y. Times Co.*, 940 F.3d 804, 813 (2d Cir. 2019).  So too is evidence of motive.  *E.g.*, *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667–68 (1989).  Here, Defendants acknowledged in their internal communications that their objective was to "paralyze" and "seriously damage, if not destroy," Plaintiffs.  (AC ¶¶3, 167.)

Defendants also knew that Plaintiffs vigorously disputed the false claims the enterprise concocted linking Plaintiffs to terrorism.  When Hazim sought to have the fraudulent Wikipedia entries the enterprise published about him corrected, Defendants responded by enlisting the "assistance of friendly moderators" to counter what Alp described as Hazim's "repeated attacks" to "remove the critical content" Alp had fabricated.  (*Id*. ¶166.)  When Hazim was successful in having negative stories about him and his companies taken down, Defendants "countered with additional negative articles" that they had republished "somewhere else."  (*Id*. ¶¶161, 195.) Defendants' efforts to prevent Hazim from correcting the record provides still more evidence that Defendants subjectively knew their claims were false.  *E.g.*, *Herbert v. Lando*, 441 U.S. 153, 164 n.12 (1979); *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1071 (5th Cir. 1987).

The extreme measures that Defendants implemented to hide their identities and, in their words, "remain invisible"—*e.g.*, using pseudonyms, employing encrypted email, directing members of the enterprise to delete files, and rarely referring to one another by name (AC ¶¶148, 196)—provide further circumstantial evidence that Defendants knew their statements were false and their activities were unlawful.  *See de Laire v. Voris*, 2023 WL 5096150, at *12–13 (D.N.H. Aug. 9, 2023) (efforts to hide author's identity were evidence of subjective knowledge of falsity).

Finally, Vidino (and Besson by reference) argues that Plaintiffs fail to allege wire fraud because "Nada does not allege that any false statements were made to him." (Vidino Mot. 36.) But the Supreme Court addressed this very issue in *Bridge*, holding that mail fraud does not require that the victim rely on the false statements to its detriment; reliance by a third-party is sufficient. *See* 553 U.S. at 647 ("[W]e hold that a plaintiff asserting a RICO claim predicated on mail fraud need not show ... that it relied on the defendant's alleged misrepresentations.").

### 2.       Plaintiffs allege multiple instances of bank fraud.

Plaintiffs also allege predicate acts of bank fraud. (*E.g.*, AC ¶¶313–14.) The bank fraud statute makes it unlawful to participate in a "scheme ... to defraud a financial institution." 18 U.S.C. §1344(1). Under Section 1344(1), the defendant need not actually deprive the financial institution of anything of value, or even intend to do so—the scheme itself is sufficient for liability. *Shaw v. United States*, 580 U.S. 63, 67 (2016) ("[T]he statute ... demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss."). In addition, a scheme to "cheat only a bank depositor, not a bank" suffices to violate Section 1344(1). *Id.* at 65.

Here, Defendants made statements falsely accusing Plaintiffs of having links to the Muslim Brotherhood and terrorism directly to banks and bank compliance monitors to fraudulently induce banks to stop dealing with Plaintiffs. (AC ¶¶310(f)–(g).) That is exactly what Defendants intended to happen, and that is exactly what several financial institutions did. (*Id.* ¶¶203–09.)

Defendants do not seriously contest that Plaintiffs adequately pleaded predicate acts of bank fraud. The UAE only mentions bank fraud in a footnote in which, relying on *United States v. Crisci*, 273 F.3d 235 (2d Cir. 2001), it asserts that Plaintiffs do not allege bank fraud because "they do not allege that Defendants received any money from the banks[,] ... do not allege that the banks released any property[,] ... and do not allege that Defendants intended to harm the banks." (UAE Mot. 22 n.2; Vidino Mot. 35.) But *Crisci* actually undercuts that argument. In *Crisci*, the

court *affirmed* an indictment charging the defendant with bank fraud, noting that "'[t]he bank need not be the immediate victim of the fraudulent scheme' and need not have suffered actual loss." 273 F.3d at 240.  And even though *Crisci* can be read to suggest that the fraudulent scheme must be "designed to deceive" a bank "into releasing property," this is not the law following the Supreme Court's subsequent decision in *Shaw*, which expressly held that bank fraud does *not* require intent to harm a bank—knowledge that a bank would likely suffer harm to a property interest is sufficient.  *Shaw*, 580 U.S. at 64; *see also In re Search of Multiple Email Accts. Pursuant to 18 U.S.C. §2703*, 585 F. Supp. 3d 1, 15 (D.D.C. 2022) ("[A] §1344(1) violation does not require that a defendant intended to cause financial harm ... to a financial institution.").

Regardless, here Defendants *did* intend to induce banks to stop lending to Plaintiffs, depriving the banks of revenue from longstanding customer relationships, and in two cases, costing the banks millions that they had to recover through bankruptcy proceedings.  (AC ¶¶313–15.)

Vidino raises the additional argument that Plaintiffs lack standing to allege bank fraud as a RICO predicate act because Plaintiffs are not financial institutions.  (Vidino Mot. 35.)  It is telling that no other Defendant (except Besson by reference) raises this meritless standing argument. Nothing in the bank fraud statute or this Circuit's precedents limits standing for bank fraud to financial institutions.  Vidino cites only one district court case in support of his position.  (*Id.*)  But it is contradicted by rulings from this District.  For example, in *Jericho Baptist Church*, this District denied a motion to dismiss RICO claims premised on predicate acts of mail, wire, and bank fraud asserted by a church, not a financial institution.  223 F. Supp. at 8; *see also Hill v. Opus Corp.*, 841 F. Supp. 2d 1070, 1098 (C.D. Cal. 2011).  If a plaintiff suffers injury to money or property, that plaintiff has standing to assert predicate acts of bank fraud.

**B.      Plaintiffs Allege A Pattern Of Racketeering Activity.**

Defendants engaged in a pattern of racketeering activity by conducting multiple schemes over several years targeting dozens of victims using nearly identical methods.  To satisfy RICO's pattern requirement, a plaintiff need only show two related predicate acts over a ten-year period. 18 U.S.C. §1961(5); *see Lu v. Lezell*, 45 F. Supp. 3d 86, 96 (D.D.C. 2014).  "[E]vidence of multiple schemes is not required ... and, indeed, proof of a single scheme can be sufficient so long as the predicate acts involved are not isolated or sporadic."  *Turner v. Cook*, 362 F.3d 1219, 1229 (9th Cir. 2004); *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989) ("[I]t is implausible to suppose that Congress thought continuity might be shown *only* by proof of multiple schemes.").

For predicate acts to form a "pattern," there must be sufficient "continuity" between the defendant's unlawful actions.  *Lezell*, 45 F. Supp. 3d at 99 (allowing RICO case to proceed where defendants allegedly "defraud[ed] three separate Plaintiffs on three distinct occasions").  Continuity can be either closed-ended—meaning "a closed period of repeated conduct"—or open-ended—meaning "past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 97.  The Alp Defendants (and Besson by reference) are the only Defendants who contest continuity.  The UAE made this argument in its Motion to Dismiss the original Complaint (ECF No. 62 27–30), but it omitted the argument from its Motion to Dismiss the Amended Complaint (ECF No. 80)—a tacit admission that the Amended Complaint adequately alleges a pattern.

The Alp Defendants first argue that the Amended Complaint makes only "conclusory" allegations to establish a pattern of racketeering activity.  (Alp Mot. 22.)  But what the Alp Defendants label conclusory are actually specific, factual allegations based on Defendants' own documents.  For example, the Alp Defendants contend that "Plaintiffs merely assert that Defendants 'enterprise engaged in a continuous pattern of racketeering that began in 2017 and lasted until at least 2021, and almost certainly beyond."  (*Id*.)  Far from being a mere assertion,

that claim is actually based on specific statements in a "strictly confidential" action plan that Alp

sent to the UAE in January 2020.  (AC ¶282.)  That action plan stated that Alp was "ready to start

the new *five year Action Plan*," which would combine "'media attacks' with actions to 'influence

decision makers,' including 'politicians, compliance databases, banks' and 'the public.'"  (*Id.*)

The Alp Defendants also contend that Plaintiffs fail to allege closed-ended and open-ended

continuity.  Once again, the Alp Defendants ignore and mischaracterize well-pleaded factual

allegations.  A fair reading of the Amended Complaint shows that Plaintiffs allege both closed-

and open-ended continuity, even though they need only allege one or the other.

### 1.      Plaintiffs allege closed-ended continuity.

Closed-ended "continuity is 'primarily a temporal concept,'" and "[w]hile there is no clear

rule defining a substantial period of time," courts have found closed-ended conspiracies of eight

months, fourteen months, and two years sufficient to satisfy RICO's continuity requirement.

*Edison Elec. Inst. v. Henwood*, 832 F. Supp. 413, 417 (D.D.C. 1993) (collecting cases).  The D.C.

Circuit has also found repeated predicate acts spanning a year and four months to cover a

sufficiently substantial period.  *United States v. Wilson*, 605 F.3d 985, 1021 (D.C. Cir. 2010).

The Alp Defendants contend that Plaintiffs fail to establish closed-ended continuity

because Plaintiffs allege only "one victim," a "single objective" (to eliminate Lord Energy), and a

"short" timeframe "from December 2017 to August 2018."  (Alp Mot. 26.)  That is not what

Plaintiffs allege.  They allege a long-running conspiracy in which the enterprise conducted

numerous offensive viral communications campaigns against dozens of apparent rivals of the

UAE.  (*E.g.*, AC ¶¶13–14, 241–82.)  And they allege that Defendants used the same modus

operandi in each of these campaigns.  (*Id.* ¶¶13–14.)

Indeed, Alp's own documents confirm that all its offensive viral communications

campaigns followed the same approach that involved: (1) launching "massive negative articles"

about the targets; (2) informing selected journalists of the targets' supposed leadership roles within the Muslim Brotherhood and connections with al Qaeda; (3) activating its network of trusted journalists; (4) creating negative Wikipedia pages; (5) alerting compliance databases and watchdogs used by banks and multinational corporations; (6) discreetly notifying banks, with the "objective being to block [the targets'] bank accounts and business"; (7) using social media to amplify the harm caused by the fraudulent claims; and (8) discreetly lobbying decision-makers. (AC ¶18.)  This description creates a reasonable inference that all the enterprise's offensive viral communications campaigns involved acts of wire fraud because the enterprise published false statements to deprive targets of money and property.  (*Supra* Arg. §III.A.1.)

Plaintiffs identify by Alp's specific codenames more than 20 distinct schemes to launch "widespread offensive actions" on behalf of the UAE.  (AC ¶100.)  One of those schemes was the scheme targeting Plaintiffs.  The Alp Defendants contend that the scheme does not satisfy the closed-ended continuity requirement because it only targeted one victim and lasted for less than a year.  (Alp Mot. 26–27.)  But the Alp Defendants mischaracterize the scheme.  The scheme had multiple victims.  The enterprise targeted as part of the scheme against Plaintiffs several of Lord Energy's Muslim employees, including U.S. citizen Imama Fatima, Davide Piccardo, and Omar Nasreddin, by publishing articles and Wikipedia entries falsely linking these individuals to terrorism.  (*Id.* ¶¶110–12.)  The scheme also involved dozens of predicate acts of wire fraud, and Plaintiffs identify Defendants' fraudulent statements with specificity.  (*See supra* Arg. §III.A.1.)  With regard to the temporal aspect, the scheme against Plaintiffs began in December 2017 (which the Alp Defendants do not dispute) and continued until after November 2019.  (AC ¶257.)  Even though Lord Energy was bankrupt at that point, the Alp Defendants stated in a November 2019 proposal to the UAE for a new six-month phase that they were continuing operations to "finish[]

Lord Energy," noting that the scheme against Lord Energy was only 90% complete.  (*Id.*)  Plus, their racketeering activity continued against other targets after Lord Energy's bankruptcy—it was ongoing as of April 2021, when Hazim received Alp's documents from the hackers.  (*Id.* ¶2.)

Plaintiffs also allege other schemes.  The enterprise targeted a Muslim youth organization, FEMYSO.  Plaintiffs identify specific false statements the enterprise published about FEMYSO, including a French Wikipedia entry in June 2018 falsely claiming that FEMYSO was "considered close to the Muslim Brotherhood."  (AC ¶163.)  Alp's documents make clear that its intent was to "disrupt the funding FEMYSO receives ... by making them toxic."  (*Id.* ¶243.)

The enterprise conducted a similar fraudulent scheme against the non-profit organization Nectar Trust.  (*Id.* ¶¶244–61.)  Again, Plaintiffs identify with particularity numerous fraudulent statements the enterprise published about Nectar Trust, including a September 19, 2018 email sent by Alp under the pseudonym Gregory Addington to World-Check falsely claiming that the Nectar Trust "was blacklisted by Israel for supporting terrorism."  (*Id.* ¶245.)  The enterprise also created a "highly critical section on the Nectar Trust" on Wikipedia.  (*Id.* ¶252.)  It then leveraged a "contact" at the Sunday Telegraph to have two articles published about the Nectar Trust falsely accusing it of terrorism funding.  (*Id.* ¶260.)  The Telegraph ultimately retracted and apologized for the articles, noting that there was no reason to believe that the Nectar Trust supported terrorism.  (*Id.*)  That apology is powerful evidence of the falsity of the enterprise's claims about the Nectar Trust.  Alp acknowledged in its communications that its goal was to have Nectar Trust blacklisted by World-Check and WorldCompliance to cut off the Nectar Trust's access to funding from Western banks, and it celebrated when it learned that the Nectar Trust was facing financial difficulties as a result of its campaign.  (*Id.* ¶¶256, 261.)  These allegations are more than sufficient

at the pleading stage to establish that the enterprise conducted a similar, yet distinct campaign involving numerous predicate acts of wire fraud and bank fraud against the Nectar Trust.

The enterprise conducted similar offensive viral communications campaigns against the U.K. real estate firm Leedsgate (*id.* ¶¶247, 250, 254), the Kutayni Clan in Spain (*id.* ¶¶262–64), Swiss national Nicolas Blancho (*id.* ¶265), the General Prosecutor of Qatar (*id.* ¶¶265–68), George Soros (*id.* ¶¶274–75), and others (*e.g.*, *id.* ¶188 (July 2018 summary report describing viral communication operations against 10 key targets)). Plaintiffs also cite a class-action lawsuit filed by U.S. academic Dr. Farid Hafez asserting RICO claims predicated on wire fraud against Alp, Diligence, Brero, Cavin, Badal, and Vidino. (*Id.* ¶¶277–78.)

The Alp Defendants, in addition to ignoring and downplaying the scope of the conspiracy alleged, rely on cases that lack anything close to the number of schemes and victims, the years-long temporal scope, and the targeted, repeated, and continuous conduct that characterize their pattern of racketeering activity. For example, *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1263 (D.C. Cir. 1995) involved a "single scheme ... designed to frustrate one transaction and inflicting a single, discrete injury on a small number of victims." Similarly, *Lopez v. Council on American-Islamic Relations Action Network, Inc.*, 657 F. Supp. 2d 104, 107, 115 (D.D.C. 2009), involved only *one* discrete offense—an attempt to cover up the unauthorized practice of law by an unlicensed attorney. Those facts are not comparable to the facts here.

### 2.      Plaintiffs allege open-ended continuity.

Plaintiffs also allege open-ended continuity. Open-ended continuity requires a showing that there is "a distinct threat of long-term racketeering activity, either implicit or explicit." *United States v. Cooper*, 91 F. Supp. 2d 60, 75 (D.D.C. 2000). Here, the threat of continuing racketeering is established by Defendants' use of an identical playbook for all of their offensive viral communications campaigns—which were centered around predicate acts of wire fraud—and

46

Defendants' agreement in 2020 to launch a new "five year Action Plan" that, according to Alp's internal documents, would use "media attacks" to "influence decision makers," including "politicians, compliance databases, banks" and "the public."  (AC ¶282.)

In *Wilson*, 605 F.3d at 1021, the D.C. Circuit held a defendant's statement that "[n]othing will stop this money train!" sufficient to show a likelihood of continued criminal activity.  So, too, is Defendants' express admission that their conduct would continue until at least 2025—for a price of 2.4 million Euros.  The Alp Defendants' Motion does not mention that startling admission.

## C.    Plaintiffs Allege RICO Proximate Causation.

Plaintiffs allege that Defendants' offensive viral communications campaign against them was the direct and proximate cause of their injuries.  Although proximate cause in the RICO context requires that the plaintiff's injury be directly caused by the defendant's scheme, "a plaintiff [may be] directly injured by a fraudulent misrepresentation ... even though it was a third party, and not the plaintiff, who relied on the defendant's misrepresentation."  *Bridge*, 553 U.S. at 656.

That is what Plaintiffs allege here.  Defendants made fraudulent statements directly to third parties with the intent of causing those third parties to stop dealing with Plaintiffs.  As explained in connection with the FSIA (*see supra* Arg. §I.B), Defendants sent an email directly to Crédit Suisse making the false claim that Plaintiffs were linked to radical Islamists.  (AC ¶152.)  That representation induced Crédit Suisse to cancel Lord Energy's paper position, causing a massive, domestic oil transaction to fail, which was the death knell for Lord Energy.  (*Id*. ¶212.)  Likewise, Defendants sent an email directly to Platts that resulted in Platts rejecting Plaintiffs' application to participate in the Market on Close price setting process in Houston, London, and Singapore.  (*Id*. ¶181.)  Similarly, Defendants sent emails directly to World-Check, WorldCompliance, and Info4C—three major bank risk compliance monitors—that resulted in Plaintiffs being blacklisted.  (*Id*. ¶¶153–54.)  The blacklisting was itself an injury to Plaintiffs.  Defendants were particularly

focused on having Plaintiffs blacklisted by these entities because they knew banks would be unwilling to do business with anyone blacklisted for terrorism.  (*Id*. ¶18.)  They were right.

The scores of articles and blog posts that the enterprise—not independent journalists—published, and the false Wikipedia entries the enterprise created also caused several other banks and counterparties to stop dealing with Plaintiffs.  For example, in March 2018, Sonatrach ended the years-long relationship it had with Plaintiffs, citing Besson's January 5, 2018 article in Le Temps.  (*Id*. ¶135.)  In July 2018, Exxon Mobil and Litasco stopped dealing with Plaintiffs because of compliance concerns.  (*Id*. ¶201.)  In August 2018, CCI cancelled a large WTI deal with Americas Lord Energy that had been agreed to in principle because CCI's compliance department raised concerns.  (*Id*. ¶¶202–03.)  By November 2018, three other banks (Société Générale, Natixis, and BCP Bank) stopped working with Plaintiffs.  (*Id*. ¶204.)  And throughout 2019, UBS, Swiss Card, and Macquarie all terminated Plaintiffs' accounts.  (*Id*. ¶¶206–09.)

These injuries to Plaintiffs were not just a foreseeable and natural consequence of Defendants' offensive viral communications campaign; they were the express objectives.  The campaign was specifically aimed at destroying Plaintiffs' business because Plaintiffs competed with the UAE in a specific, strategically important crude oil market.  (*E.g.*, AC ¶¶3, 8–10, 78–80, 89.)  Defendants' own documents expressly confirm that they sought to "paralyze" and "'seriously damage, if not destroy the reputation and viability' of Hazim and his companies" by "blocking their bank accounts."  (*E.g.*, *id.* ¶¶3, 18–19, 90, 143, 167.)  And throughout the campaign, Defendants routinely bragged in internal communications about how their "media attacks, listing in World Check, and the financial difficulties it created," were having the desired effect of denying Plaintiffs access to credit and harming their business.  (*Id*. ¶¶10, 219.)  In November 2019, Alp boasted to the UAE that its goal of "[f]inishing Lord Energy" was about 90% complete.  (*Id*. ¶257.)

Defendants primarily argue that there is no proximate causation because Plaintiffs' injuries depended on the "intervening actions" of third parties and were too remote.  (UAE Mot. 23; Vidino Mot. 41–42.)  This argument mirrors the UAE's FSIA argument that the domestic effects of Defendants' conduct were not sufficiently direct because the effects resulted from independent decision-making by Crédit Suisse and other third parties.  Defendants' argument here fails for the same reason.  The mere "presence of intermediaries" does *not* "destroy[] proximate causation," *In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 804 F.3d 633, 645 (3d Cir. 2015), particularly where those intermediaries acted in reliance on Defendants' fraudulent statements in the manner that Defendants expected and intended, *cf. Exxon Mobil*, 111 F.4th at 33.

The Supreme Court's holding in *Bridge* makes that clear.  In *Bridge*, a RICO plaintiff's commercial competitor submitted fraudulent attestations to a county government to secure benefits at a property auction.  *Bridge*, 553 U.S. at 644–45.  The Court held that the county government's decision, which was influenced by the defendant's fraudulent attestations, to let the defendant participate in the auction deprived the plaintiff of financial benefits and did not break the causal chain.  *Id*.  In *Companhia Brasileira Carbureto de Calcio-CBCC v. Applied Industrial Materials Corp.*, 887 F. Supp. 2d 9, 13 (D.D.C. 2012), this District similarly held that an intervening decision by the International Trade Commission did not destroy proximate causation.

In support of their proximate causation arguments, Defendants primarily rely on *Solomon v. Dechert LLP*, 2023 WL 6065025 (D.D.C. Sept. 18, 2023), and *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 8–9 (2010).  But neither supports their position.

In *Solomon*, the defendants hacked the plaintiff-journalist's email account, "dumped the data ... onto blog sites," and emailed the information to the plaintiff's employer, The Wall Street Journal.  2023 WL 6065025 at *3.  The emails suggested that the plaintiff may have been involved

49

in illicit dealings.  *Id*.  The Journal confronted the plaintiff about the emails but did not fire him.
*Id*.  More than six months later, a different media outlet published a story about the plaintiff based
on the hacked emails, at which point the Journal fired him.  *Id*.  The court held that defendants'
action (disseminating the plaintiff's hacked emails) was not the proximate cause of his injuries
because the Journal only fired the plaintiff after a separate media outlet wrote a story about him.
Thus, it was the story—not the emails—that was the "decisive" factor in "influencing a third
party's injurious action."  *Id*. at *11.  Importantly, the *Solomon* court also specifically noted that
the plaintiff never alleged "any false communications."  *Id*. at *12.

Here, by contrast, Plaintiffs allege that Defendants' fraudulent statements were not just the
decisive factor, but the only factor that influenced third parties' decisions to close Plaintiffs' bank
accounts and stop doing business with them.  The Amended Complaint creates the reasonable
inference that those parties decided to sever their longstanding, profitable business relationships
with Plaintiffs because of Defendants' fraudulent claims linking Plaintiffs to terrorism.
Defendants' own communications reflect their belief that banks had stopped lending to Plaintiffs
because of "concern[s] about [Lord Energy's] connections to radical Islamists."  (AC ¶¶156, 162,
313.)  When World-Check learned that Alp's email accusing Plaintiffs of terrorist ties was false,
it reversed its decision to blacklist Plaintiffs and removed them from its database of politically
exposed persons.  (*Id*. ¶157.)  That is compelling evidence that the fraudulent claims were the
"decisive" factor influencing World-Check's decision to blacklist Plaintiffs.

In *Hemi*, the Court concluded there was no proximate cause because the relationship
between the racketeering activity and injury was significantly more attenuated than the relationship
Plaintiffs allege here.  There, an out-of-state cigarette seller failed to file reports with its home
state, as required by law, and New York City lost tax revenue as a result.  559 U.S. at 8–9.  The

Court found proximate cause lacking because "the conduct directly responsible for the City's harm was the customers' failure to pay their taxes.  And the conduct constituting the alleged fraud was Hemi's failure to file Jenkins Act reports.  Thus, ... the conduct directly causing the harm was distinct from the conduct giving rise to the fraud."  *Id*. at 11.  Not so here.  Defendants' emails, blog posts, articles, and Wikipedia entries were the fraud that caused Plaintiffs' injuries.

**D.      Plaintiffs Allege A Domestic Injury To Business And Property.**

Plaintiffs' application of RICO to conduct that is both foreign and domestic is not impermissibly extraterritorial where, as here, there is domestic injury.  The UAE would have the Court believe that the complete destruction of a business—which was headquartered and incorporated in Texas, considered a "U.S. person" under U.S. law, *e.g.*, 26 U.S.C. §7701, owned by a U.S. citizen, engaged in U.S.-based oil trading, had a physical office in Houston, and was managed by a Houston-based executive—does not constitute a domestic injury.  The UAE argues that this injury is insufficient because "the allegations of harm suffered by non-party Americas Lord Energy are threadbare and tangential ... the Amended Complaint contains no allegations that Americas Lord Energy had any revenues, earnings, or capital *whatsoever*."  (UAE Mot. 24 (emphasis in original).)  However, the UAE cites no authority for that contention.

"At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 256 (1994) (finding RICO standing adequately pleaded where complaint alleged conspiracy "injured the business and/or property interests of the [petitioners].").  The Amended Complaint need not detail Americas Lord Energy's balance sheets.  It alleges sufficient facts to establish that Americas Lord Energy was a legitimate and distinct corporate entity, with independent legal rights and obligations, actively engaged in the domestic oil trade.

For example, in September 2018, Americas Lord Energy completed a deal with Chevron USA to purchase 1 million barrels of U.S. crude oil. (AC ¶202.) The same month, Americas Lord Energy entered into a deal to purchase 600,000 barrels of WTI from CCI—a deal which ultimately fell through because of Defendants' fraudulent statements. (*Id.* ¶203.) In December 2018, Americas Lord Energy purchased a series of cargoes from U.S. oil producers and loaded them on a tanker in the U.S. Gulf, but that transaction was also scuttled by Defendants' fraudulent claims, costing Plaintiffs tens of millions of dollars. (*Id.* ¶212.) In addition, Americas Lord Energy was a participant in weekly pipeline tenders in the United States for all major U.S. pipelines, and it regularly dealt with U.S. brokers. (*Id.* ¶88.) Although many benefits from Americas Lord Energy's U.S. operations ultimately flowed to Hazim and Lord Energy—the sole shareholders— that does not erase the domestic injury they felt from Americas Lord Energy's collapse.

The UAE and Vidino cite *Yegiazaryan v. Smagin*, 599 U.S. 533 (2023), for the proposition that determining domestic injury is a context-dependent inquiry. (UAE Mot. 24; Vidino Mot. 37.) But that case clarifies that the loss of an expected benefit in the United States—such as revenue from already-inked domestic oil deals or access to U.S. oil markets—*is* a cognizable domestic injury in the RICO context. *Id.* at 543. In *Yegiazaryan*, a Russian-citizen-plaintiff alleged that the defendant's unlawful conduct denied him access to a California arbitral judgment. *Id.* The court held that denial of access to the judgment was domestic injury because, "while some of [the defendant's] scheme to avoid collection occurred abroad, the scheme was directed toward frustrating the California judgment." *Id.* The court continued: "While it may be true, in some sense, that [the plaintiff] has felt his economic injury in Russia, focusing solely on that fact would miss central features of the alleged injury." *Id.* at 545; *see also Bridge*, 553 U.S. at 649 (finding injury where respondents "lost valuable liens they otherwise would have been awarded.").

The same reasoning applies here. Focusing solely on Lord Energy's place of incorporation, as Defendants urge, would miss central features of the alleged injury. Plaintiffs devoted substantial resources to standing up a U.S. subsidiary to shift the focus of their operations to U.S. markets. (AC ¶88.) That subsidiary was actively conducting large U.S. oil trades, and its destruction deprived Plaintiffs of expected economic benefits. (*Id.* ¶¶88, 202–03, 212.)

Defendants also purposefully ignore that Hazim is a U.S. citizen who maintains a residence in Texas. While that may not be dispositive, it is certainly relevant. Defendants assume, without citation to any authority, that Hazim's place of domicile is the only factor that matters in assessing whether the actions against him are domestic or foreign. (UAE Mot. 24.) But a U.S. citizen does not relinquish the legal rights or obligations citizenship confers just because he moves overseas.

What's more, Defendants purposefully directed their fraudulent statements to the United States—by sending emails to U.S. journalists and bank compliance monitors, publishing their fraudulent blog posts on U.S. websites, creating false English-language Wikipedia entries, and manipulating U.S. search engines—for the express purpose of influencing U.S. audiences and destroying Americas Lord Energy. (AC ¶¶10, 89, 218–19.)

Vidino (and Besson by reference) argues that Plaintiffs lack standing to sue on behalf of Americas Lord Energy. (Vidino Mot. 37–38.) That argument fails because Vidino relies on the wrong law. Whether a parent corporation can sue on behalf of a subsidiary is a matter of state corporate law. *See* Fed. R. Civ. P. 17(b) (corporation's capacity to sue determined by law of state of incorporation); *Catalyst & Chem. Servs., Inc. v. Glob. Ground Support*, 350 F. Supp. 2d 1, 21–22 (D.D.C. 2004) (Maryland law determined standing of corporations incorporated in Maryland).

Americas Lord Energy was organized under Texas law (AC ¶27), but Vidino does not cite a single case applying Texas law. For good reason: Under Texas law, a parent company has

standing to sue on behalf of its wholly owned subsidiary.  *Advanced Nano Coatings, Inc. v. Hanafin*, 478 F. App'x 838, 842 (5th Cir. 2012) ("It is undisputed that ANC is a wholly owned subsidiary of Vado," and thus "as a parent corporation to ANC, [Vado] would have standing to bring suit on behalf of ANC."); *see also Franchise Tax Bd. of Cal. v. Alcan Aluminium*, 493 U.S. 331, 336 (1990) (foreign parent had standing to challenge taxes paid by wholly owned U.S. subsidiary).  Even if D.C. law applied, the D.C. Circuit has held that a parent may sue on behalf of a subsidiary if (1) the parent is the sole shareholder and (2) the parent itself suffers injury. *Bellsouth Corp. v. F.C.C.*, 144 F.3d 58, 62 (D.C. Cir. 1998).  Both requirements are met here.

Moreover, the cases Vidino cites are factually distinguishable.  For example, in *Humphrey v. GlaxoSmithKline PLC*, 905 F.3d 694, 708 (3d Cir. 2018)—Vidino's main case (Vidino Mot. 38)—the plaintiffs "[did] not allege[] that they possess[ed] offices, assets, or any other property in the United States" such that they "[did] not allege[] a domestic injury."[12]  And none of Vidino's cases involved a situation in which a subsidiary had been driven out of business by the defendant's unlawful conduct.  It would be inequitable to prevent a parent corporation and sole shareholder from recovering for harm inflicted on a wholly owned subsidiary where, as here, the *only* reason the subsidiary cannot vindicate its own rights is because Defendants destroyed it.

Defendants attempt to trap Plaintiffs in a Catch-22.  On one hand, the UAE argues that injuries to Americas Lord Energy were not sufficiently independent from its foreign parent to be domestic.  (UAE Mot. 24.)  On the other, Vidino argues that injuries to Americas Lord Energy are not cognizable because only its foreign parent is "a party in this case."  (Vidino Mot. 37.)

---

[12] Vidino also cites *Optimum, S.A. v. Legent Corp.*, 926 F. Supp. 530, 532 (W.D. Pa. 1996), which involved injury to a U.S. company that was not even affiliated with the foreign plaintiff-corporation, let alone wholly owned by it.

But that Catch-22 is illusory.  The UAE's argument fails because it ignores that Defendants intentionally targeted Americas Lord Energy, knowing that destroying the U.S. subsidiary would cripple the parent corporation.  (*E.g.*, AC ¶¶10, 89.)  Vidino's argument fails because under Texas law, a parent may sue on behalf of its wholly owned subsidiary.  *Advanced Nano Coatings*, 478 F. App'x at 842.  And both defendants miss the crucial inquiry in determining domestic injury: whether the "circumstances surrounding the alleged injury" indicate that it "arose in the United States."  *Yegiazaryan*, 599 U.S. at 543–44.  Here, those circumstances do.

**E.      Plaintiffs Allege An Association-In-Fact Enterprise.**

As the UAE acknowledges, Plaintiffs allege a "sprawling conspiracy" (UAE Mot. 11 n.1) that is more than sufficient to satisfy the low bar for pleading an association-in-fact RICO enterprise.  A plaintiff need only "allege ... the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name."  *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 158 (2001).  "[T]he definition [of enterprise] has a wide reach, and the very concept of an association in fact is expansive."  *Boyle v. United States*, 556 U.S. 938, 944 (2009) (citations omitted).  An association-in-fact enterprise need only possess three characteristics: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  *Id.* at 946, 948 (association-in-fact enterprise is "simply a continuing unit that functions with a common purpose" and the term should be "liberally construed").  It does not need to have a "hierarchical structure" or "chain of command."  *Id.*  Nor do members need to have "fixed roles."  *Id.*; *United States v. Turkette*, 452 U.S. 576, 583 (1981).  All that is required is "evidence of an ongoing organization, formal or informal, and … evidence that the various associates function as a continuing unit."  *Boyle*, 556 U.S. at 945; *see United States v. Elliott*, 571 F.2d 880, 897–900 (5th Cir. 1978) ("A jury is entitled to infer the existence of an enterprise on the basis of ... circumstantial evidence. ...

[A] RICO enterprise cannot be expected to maintain a high profile in the community.  Its affairs are likely to be conducted in secrecy and to involve a minimal amount of necessary contact.").

Consistent with the Supreme Court's instruction that the enterprise requirement should be broadly construed, courts have held that a RICO enterprise can include "those merely associated with an enterprise—who participate directly and indirectly in the enterprise's affairs." *Schacht v. Brown*, 711 F.2d 1343, 1360 (7th Cir.1983) (cleaned up); *see also Virden v. Graphics One*, 623 F. Supp. 1417, 1432–33 (C.D. Cal. 1985).  Moreover, Plaintiffs need not allege that all participants in the enterprise shared the Defendants' "fraudulent purpose." *Friedman v. 24 Hour Fitness USA, Inc.*, 580 F. Supp. 2d 985, 991 (C.D. Cal. 2008) (plaintiffs alleged association-in-fact enterprise even though two participants in scheme were "unwitting").  Rather, "[i]t is sufficient that the defendant know the general nature of the enterprise and know that the enterprise extends beyond his individual role." *United States v. Rastelli*, 870 F.2d 822, 828 (2d Cir. 1989).

Here, Plaintiffs allege an enterprise in which the UAE, the Alp Defendants, co-conspirators like Vidino and Besson, and dozens of other participants including Ariaf, Wikipedia moderators, writer Nina May, journalist Phillippe Vasset, and unidentified sources and subcontractors functioned as a continuing unit for years.  Plaintiffs identify the enterprise's clear organization and structure.  (*Id*. ¶306.)  The UAE provided funding, strategic guidance, and ultimate approval for the enterprise's operations.  (*Id*.)  The Alp Defendants oversaw its day-to-day actions by identifying targets, hiring sources, sending fraudulent emails, and writing, commissioning, and publishing articles, blog posts, and Wikipedia entries.  (*Id*.)  The enterprise's vast network of other witting participants and co-conspirators gathered information, published articles written or commissioned by the Alp Defendants, and ensured false Wikipedia entries were not corrected, among other things.  (*Id*.)  Each member of the enterprise shared the common purpose of

destroying the UAE's rivals using similar methods to falsely link their targets to terrorism, inducing banks, business partners, and others to stop dealing with those targets.  (*Id.* ¶¶117, 249.)

The UAE, Alp Defendants, and Besson (by reference) argue that Plaintiffs fail to allege a RICO enterprise because the alleged enterprise is nothing more than the UAE and its agents, the Alp Defendants.   (UAE Mot. 25–26; Alp Mot. 27–29; Besson Mot. 19.)   But that grossly mischaracterizes the allegations in the Amended Complaint.  Notably, Vidino argued that Plaintiffs failed to allege an enterprise in his motion to dismiss the original Complaint (ECF No. 71 at 35–37), but he has abandoned this argument in his Motion to Dismiss the Amended Complaint—another tacit concession that Plaintiffs adequately allege a RICO enterprise.

Defendants primarily rely on *US Dominion, Inc. v. MyPillow, Inc.*, 2022 WL 1597420, at *5 (D.D.C. May 19, 2022), in which the court held that an association-in-fact RICO enterprise cannot consist *solely* of a corporation and its agents because such an enterprise lacks any "distinctness" between the "person" and the "enterprise."  (*See* UAE Mot. 33; Alp Mot. 27–28.) *US Dominion* does *not* establish that an association-in-fact cannot consist of a sovereign state and its private agents.  But even assuming the same logic applies, Plaintiffs need only allege one other non-agent participant in the enterprise.  *United States v. Perholtz*, 1986 WL 31562, at *1 (D.D.C. Feb. 18, 1986) ("[E]ven if the parent and its affiliates were not sufficiently distinct, the parent was still distinct from the alleged enterprise because the enterprise included at least one key player that was not owned by the parent company or operating as its agent.").  Here, they have alleged a vast web of co-conspirators that includes far more than simply the UAE and its agents.

In addition to Vidino—who the UAE concedes was an independent contractor, not its agent (UAE Mot. 10–11 n.1)—and Besson (whose involvement is discussed below in connection with Plaintiffs' RICO conspiracy claims, *infra* Arg. §§IV.B–C), Plaintiffs allege that Defendant Ariaf

Studies & Research LLC, a private company in the UAE, was a member of the enterprise.  (AC ¶33.)  Ariaf was the signatory to the contract and non-disclosure agreement with Diligence SARL. (*Id*.)  Ariaf sponsored Brero and Cavin's UAE visas.  (*Id*.)  And Ariaf paid all Alp's invoices and transferred nearly $5 million to Alp between 2017 and 2019.  (*Id*.)  Ariaf's involvement was essential for keeping the UAE's participation secret.  *See Clark v. Milam*, 847 F. Supp. 409, 417 (S.D.W. Va. 1994) (Accountants who "knowingly concealed the activity of other defendants" participated in the enterprise because concealment was "integral to the continuing operation of the RICO enterprise.").  Defendants do not argue that Ariaf was an agent of the UAE.  Indeed, they do not mention Ariaf at all in their Motions.

Plaintiffs also allege that the Wikipedia moderator Bédévore and other unidentified "friendly" Wikipedia moderators were witting participants in the enterprise.  These moderators were essential to combating "counter-attacks" by Hazim and other victims to correct the Alp Defendants' falsehoods in Wikipedia entries.  (*Id*. ¶¶166, 252.)  Plaintiffs allege sufficient facts to infer that these "friendly" moderators were knowing participants in Defendants' fraudulent schemes.  (*Id*. ¶253.)  Defendants do not contend that these moderators were agents of the UAE. Again, they do not address Plaintiffs' allegations relating to the Wikipedia moderators at all.

Plaintiffs also allege that freelance writer Nina May, who was responsible for writing and publishing numerous fraudulent articles about Plaintiffs and others, was another witting participant in the enterprise.  (AC ¶249.)  Numerous facts give rise to the plausible inference that May was aware of, and agreed to further, the enterprise's fraudulent activities: (1) the Alp Defendants routinely sent May titles, text, and background information for the articles she was instructed to publish (*e.g.*, *id*. ¶¶147–48, 179, 247); (2) the Alp Defendants instructed May to delete the information they sent her after she read it—an odd request that suggests unlawful activity (*id*.);

(3) the Alp Defendants paid May for her services (*e.g.*, *id.* ¶149); (4) May wrote or published a substantial number of articles (nine in May 2018 alone (*id.*)) making similar allegations of ties to the Muslim Brotherhood and terrorism or other illicit activities, thus suggesting coordination; and (5) May used pseudonyms for the articles the Alp Defendants commissioned (*e.g.*, *id.* ¶179). Defendants ignore Plaintiffs' allegations that May was a witting participant.

Plaintiffs further allege that Phillippe Vasset, the editor of Africa Intelligence, the outlet that published the first fraudulent article about Plaintiffs in December 2017 falsely claiming that Algerian authorities had blocked Lord Energy's tanker over concerns of "waterproofness," was a witting participant in the enterprise's disinformation operations. (*Id.* ¶¶113, 116–17.) Plaintiffs allege that Vasset was listed in Alp's documents as a "source / subcontractor." (*Id.* ¶117.) Vasset also exchanged numerous WhatsApp messages and emails with Brero, Badal, and Cavin. (*Id.*) Vasset's role in publishing the December 2017 Africa Intelligence article, his status as a "source /subcontractor" for Alp, and the volume of communications he had with Alp executives all create the plausible inference that he too was aware of, and willfully furthered, the activities of the enterprise. Defendants do not address any of those allegations.

Finally, Plaintiffs allege, based on Defendants' own statements in their internal documents, that the enterprise relied on dozens of other trusted journalists (including Atmane Tazaghart, who Alp described as a competitor), academics, and other unidentified "confidential" sources and subcontractors—including sources in the banking sector who were critical to Defendants' efforts to fraudulently induce banks to stop lending to the enterprise's targets—to carry out its offensive viral communications campaigns. (*Id.* ¶¶17, 20, 99, 117, 191, 270, 306, 309.)

These allegations adequately plead an association-in-fact enterprise. After all, "the RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise."

*Schacht*, 711 F.2d at 1360 (quotation marks omitted); *see also United States v. Oreto*, 37 F.3d 739, 751 (1st Cir. 1994) ("Congress intended to reach all who participate in the conduct of that enterprise, whether they are generals or foot soldiers.").

### F.    Plaintiffs' RICO Claims Are Timely.

Plaintiffs' RICO claims are timely because the doctrine of fraudulent concealment tolled RICO's four-year statute of limitations until April 2021, when Plaintiffs learned from the hacked documents the nature of the conspiracy against them and the availability of a cause of action under RICO.  Thus, the statute of limitations does not expire until April 2025.

"[E]ven after a claim has accrued upon discovery of an injury, RICO is 'subject to equitable principles of tolling.'"  *Solomon*, 2023 WL 6065025, at *6.  "Fraudulent concealment ... tolls the running of the statute of limitations when (1) defendants engaged in a course of conduct designed to conceal evidence of their alleged wrong-doing and (2) the plaintiffs were not on actual or constructive notice of that evidence, despite (3) their exercise of diligence."  *Id.* (cleaned up); *see Rotella v. Wood*, 528 U.S. 549, 560–61 (2000) ("[F]ederal statutes of limitations are generally subject to equitable principles of tolling, and where a pattern remains obscure in the face of a plaintiff's diligence in seeking to identify it, equitable tolling may be one answer.").  Generally, "determination of whether a defendant has committed an act of concealment ... is a matter for the jury."  *Riddell v. Riddell Wash. Corp.*, 866 F.2d 1480, 1484 (D.C. Cir. 1989).

Fraudulent concealment tolls the statute of limitations until the plaintiff is aware of "sufficient facts to identify ... the particular cause of action at issue, not [notice] of just any cause of action."  *Id.* at 1494.  Here, Defendants concealed their identities and activities.  In the Alp Defendants' communications with the UAE, they consistently emphasized that their activities were "discreet" and "kept strictly confidential" to ensure they left "no traces" and remained "invisible." (AC ¶¶16, 33, 41, 96, 192, 230.)  Diligence SARL entered into a strict non-disclosure agreement

with Ariaf for work relating to the campaign.  (*Id.* ¶¶33, 35.)  Likewise, the Alp Defendants required their employees and "undercover consultants" to sign strict confidentiality agreements. (*Id.* ¶96.)  They also used pseudonyms to hide their identities (*id.* ¶¶149, 152–53, 177–80); they used "encrypted channels," end-to-end encrypted Protonmail accounts, and a "safe (Katim) phone" to communicate securely (*id.* ¶¶130, 199, 229); they used intermediaries like Ariaf, Besson, May, Vidino, and Wikipedia moderators to remain "completely confidential" (*id.* ¶¶16, 33, 41, 122); they kept the identities of their sources confidential (*id.* ¶¶99, 156); they rarely referred to UAE officials by name, referring to one another as "my friend" (*id.* ¶196); and they used secure IT systems and security countermeasures (*id.* ¶96).

Plaintiffs exercised reasonable diligence to ascertain the nature and scope of the campaign against them but could not successfully ascertain it until April 2021, when the hacked documents revealed the nature of the enterprise.  Plaintiffs repeatedly sought to learn from World-Check and media outlets the identities of the sources that provided them with the false information linking Plaintiffs to terrorism.  (*Id.* ¶¶157, 228.)  Plaintiffs hired a law firm that similarly demanded media outlets provide information about the parties responsible for writing false and misleading articles. (*Id.* ¶159.)  World-Check and these media outlets refused Plaintiffs' and Plaintiffs' law firm's demands.  (*Id.* ¶¶157, 159, 228.)  Plaintiffs hired a digital intelligence and online reputation management firm to analyze the fraudulent articles, but the firm was unable to determine the identities of any of the authors.  (*Id.* ¶177.)  Plaintiffs reported the smear campaign against them to Swiss law enforcement and filed a criminal complaint in Switzerland.  (*Id.* ¶231.)  And Hazim sent two emails to Alp's general "contact us" email address after he saw Alp's name in the investigative files of a Swiss police officer he met with in February 2020.  (*Id.* ¶¶231–32.)  Alp never responded to Hazim's emails, but, as the hacked documents later revealed, the Alp

Defendants quickly sent an email to Matar expressing concern that Hazim would "launch legal action against us." (*Id*. ¶233.)  Because of Defendants' concealment, Plaintiffs could not have known of their RICO claims against Defendants until April 2021, despite their diligent efforts.

## IV.    PLAINTIFFS STATE RICO CONSPIRACY CLAIMS UNDER 18 U.S.C. §1962(D).

In addition to their substantive RICO claims, Plaintiffs allege RICO conspiracy claims against all Defendants under 18 U.S.C. §1962(d).  To state a RICO conspiracy claim, a plaintiff need only establish that the defendant "intend[ed] to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense." *Salinas v. United States*, 522 U.S. 52, 65 (1997).  A defendant need not commit any predicate acts itself as long as it agreed to further the conspiracy with knowledge that another member of the conspiracy would engage in predicate acts.  In other words, conspiracy liability only requires a knowing agreement to "facilitate the commission of a RICO offense by another conspirator." *United States v. Philip Morris Inc.*, 130 F. Supp. 2d 96, 98–99 (D.D.C. 2001) (quotation marks omitted); *see also Fuji Photo Film U.S.A., Inc. v. McNulty*, 640 F. Supp. 2d 300, 314, 321 (S.D.N.Y. 2009) (RICO conspiracy may consist of an individual at the enterprise's "heart" and a "collection of outside vendors" who "were aware of the general scope and nature of the conspiracy").

A plaintiff "need show only 'slight evidence' that a particular person was a member of the conspiracy," and "a party to a conspiracy need not know the identity, or even the number, of his confederates." *Elliott*, 571 F.2d at 903.  It follows that "a conspiracy can be inferred from a combination of close relationships or knowing presence and other supporting circumstantial evidence." *United States v. Brito*, 136 F.3d 397, 409 (5th Cir. 1998); *Gagan v. Am. Cablevision, Inc.*, 77 F.3d 951, 961 (7th Cir. 1996) ("[A] 'RICO conspiracy, like all conspiracies, does not require direct evidence of agreement; an agreement can be inferred from the circumstances.'");

*Youming Jin v. Ministry of State Sec.*, 335 F. Supp. 2d 72, 83 (D.D.C. 2004) (defendant's close relationship to Chinese government was evidence of participation in conspiracy).

A. **Plaintiffs Allege RICO Conspiracy Claims Against The UAE And The Alp Defendants.**

The UAE's only argument that Plaintiffs' RICO conspiracy claims fail is that Plaintiffs do not state a claim for a substantive RICO violation under Section 1962(c).  (UAE Mot. 26–27.)  But as explained above, Plaintiffs adequately plead substantive RICO claims (*supra* Arg. §III), and so the UAE's RICO conspiracy argument fails.  The Alp Defendants make the same argument, and it fails for the same reason.  (Alp Mot. 31.)

In addition, the Alp Defendants try to evade conspiracy liability by invoking the "Intracorporate Conspiracy Doctrine."  (Alp. Mot. 29–31.)  They contend that, as agents of the UAE, they could not have conspired with it, because a "single entity" cannot conspire with itself.  (*Id.*)  This is similar to the Alp Defendants' RICO enterprise argument, and it suffers from the same fatal defect: The UAE and Alp Defendants are not the only members of the conspiracy.  Even if the Alp Defendants' intracorporate conspiracy argument were correct, they still violated Section 1962(d) by conspiring with all the other participants in the enterprise.

Moreover, nearly all the intracorporate conspiracy cases the Alp Defendants cite involved *literal corporations* and their employees.  (Alp Mot. 30–31 n.18.)[13]  As the Alp Defendants acknowledge, this Circuit has never applied the intracorporate conspiracy doctrine to RICO cases.  (Alp Mot. 30.)  The Court should decline to do so in circumstances so far afield from the limited corporate context in which the doctrine typically applies.

---

[13] The two exceptions underscore the intracorporate conspiracy doctrine's limited application.  In *Ziglar v. Abbasi*, 582 U.S. 120, 153–54 (2017), the Court declined to rule on whether the doctrine extended to officers in the same federal department, and in *Bowie v. Maddox*, 642 F.3d 1122, 1130 (D.C. Cir. 2011), the court declined to rule on whether the doctrine applied to civil rights cases.

**B.**       **Plaintiffs Allege A RICO Conspiracy Claim Against Besson.**

Besson argues that the RICO conspiracy claim against him should be dismissed because Plaintiffs fail to allege that he knew about or agreed to further Defendants' RICO scheme or that he committed any predicate acts, and because, according to Besson, his relationship with Alp was nothing more than that of a journalist and his source.  (Besson Mot. 14–19.)  As an initial matter, at the motion-to-dismiss stage the Court cannot credit Besson's characterization of his relationship with Alp as innocent.[14]  Rather, it must accept all allegations in the Amended Complaint and draw all reasonable inferences in Plaintiffs' favor.  *Narce*, 2023 WL 7128475, at *3.

Beyond that, Plaintiffs do not need to allege that Besson himself committed any predicate acts.  Plaintiffs only need to allege that Besson agreed to further the commission of predicate acts by other members of the conspiracy.  *United States v. Neapolitan*, 791 F.2d 489, 498 (7th Cir. 1986) (RICO conspiracy encompasses "persons who, while intimately involved in the conspiracy, neither agreed to personally commit nor actually participated in the commission of the predicate crimes"); *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 979–80 (7th Cir. 1995) ("The defendant need not have agreed to actually commit the predicate acts itself or even to participate in the commission of those acts so long as it agreed that the acts would be committed on behalf of the conspiracy.").  That is because "Section 1962(d)'s target … is 'the agreement to violate RICO's substantive provisions, not the actual violations themselves.'"  *Id*.  "Intent may, and generally must, be proved circumstantially; normally, the natural probable consequences of an act may satisfactorily evidence the state of mind accompanying it."  *Jackson*, 513 F.2d at 461.

---

[14] Besson contends that his January 5, 2018 article was not false.  (Besson Mot. 19.)  That is wrong. The article states that Hazim "kept militant activities."  (AC ¶43; *see also* Besson Decl., Ex. C ("This new generation has sometimes retained militant activities" (as translated by Besson via Google)).)  That claim is categorically false.

Here, Plaintiffs plead facts sufficient to create a plausible inference that Besson intended to further the enterprise's objectives by lending its fraudulent claims a veneer of legitimacy. Alp communications describe Besson as "part of [Alp's] extensive network" who could "conduct 'confidential actions'" and "'strike' at Alp's targets using 'viral com.'" (AC ¶ 122.) This allegation is not conclusory—it is a direct quotation from Alp's internal documents. This allegation alone is more than enough to create a plausible inference that Besson knowingly agreed to further the acts of the enterprise: it suggests he knew that Alp was using viral communications to strike its targets, and that he agreed to further those operations by conducting confidential actions.[15] In addition, the Alp Defendants stated in a February 2018 Action Plan that they had "activated their network of trusted journalists and editors, as we successfully did with Le Temps"—a reference to Besson's January 5, 2018 article about Lord Energy. (*Id.* ¶ 18 (cleaned up).) Not only does that confirm that Besson was part of Alp's "trusted network," but also that his January 5 article was written and published at the enterprise's behest, in furtherance of its scheme to "seriously damage, if not destroy, the reputation and viability" of Lord Energy. (*Id.* ¶ 19.) This was a seminal article—its false accusation that Hazim "kept militant activities" lent legitimacy to and formed the basis of the enterprise's other fraudulent publications. (*Id.* ¶ 124.) And that article was based on notes that Alp gave to Besson, not his own independent reporting. (*Id.* ¶ 120.)

In addition, Alp's calendar entries show at least 11 meetings between Besson and Alp employees between January 2017 and September 2019, and Besson, Brero, and Badal exchanged dozens of emails, text messages, and WhatsApp messages. (*Id.* ¶ 121.) The volume and frequency

---

[15] Besson contends that he was never paid by Alp. (Besson Mot. 17.) Besson's contention, which carries no weight at this stage, is contradicted by Alp's description of Besson as part of its extensive network. The Amended Complaint expressly alleges that Alp paid other members of its network such as Vidino, so it is reasonable to infer that Besson also got paid. (*E.g.*, AC ¶ 40.)

of these meetings and communications suggests a close relationship sufficient to give rise to an inference that Besson was a witting co-conspirator. *Youming Jin*, 335 F. Supp. 2d at 83. These documents provide more than circumstantial evidence that Besson's relationship with Alp was not just that of a reporter and his source. Finally, even if Besson did not know any of the other members of the enterprise (as he claims) he can still have violated Section 1962(d). *Elliott*, 571 F.2d at 903 ("[A] party to a conspiracy need not know the identity ... of his confederates.").

## C.  Plaintiffs Allege A RICO Conspiracy Claim Against Vidino.

Surprisingly, Vidino devotes nearly 15 pages of his Motion to Dismiss arguing that Plaintiffs fail to state a claim against him for RICO conspiracy because his statements are protected by the First Amendment. (Vidino Mot. 11–26.) He also faults Plaintiffs for failing to allege that he made "*any public statements at all* about [Hazim] or Lord Energy." (*Id.* at 2.) These arguments miss the mark. Plaintiffs need only allege that Vidino "knowingly agreed to facilitate the commission of a RICO offense by another conspirator," not that he committed a predicate act himself. *Philip Morris*, 130 F. Supp. 2d at 98–99. And the First Amendment does not protect agreements to further others' racketeering activity. *Cf. Nat'l Org. for Women, Inc.*, 510 U.S. at 252–53 (holding that RICO applied to antiabortion protest activities).

Plaintiffs do not allege that Vidino's statements constituted fraud (or even defamation), and they do not question his record of academic achievement. But Plaintiffs *do* allege that Vidino agreed to conspire with the enterprise—not only to destroy Lord Energy, but to further additional schemes against additional targets, underscoring his intentional facilitation of the enterprise's unlawful acts. (AC ¶¶40–42, 105, 126–29, 145, 186, 263–64, 277–78, 281.)

Specifically, Plaintiffs allege that Vidino conspired with Alp to further its unlawful "dark public relations" campaigns against Plaintiffs and others. (AC ¶40.) The enterprise hired Vidino to gather "rumours" and provide other information which lent legitimacy to the fraudulent

statements published by other members of the enterprise.  (*Id.*)  Alp did not just use Vidino as a source; it also used him as an intermediary, to help keep its involvement in such campaigns "completely confidential."  (*Id.*)  For example, Alp used Vidino to funnel derogatory information Alp uncovered about an Islamic charity that was the subject of another one of its offensive viral communications campaigns to a journalist.  (*Id.* ¶41.)  And Alp leveraged Vidino's prominence to amplify the reach of its fraudulent claims.  (*Id.* ¶263.)

Vidino also met with Alp employees on multiple occasions, including at a lavish dinner in Geneva in January 2018.  (*Id.* ¶126.)  And he routinely exchanged WhatsApp messages with Brero, Badal, and another Alp employee.  (*Id.* ¶40.)  As with Besson, the volume and frequency of Vidino's communications with Alp evince a closeness that provides evidence of Vidino's agreement to further the enterprise's racketeering activities.  *Youming Jin*, 335 F. Supp. 2d at 83.

Vidino knew that the UAE was Alp's "most realistic client"—even though he knew that it sought to conceal its identity—and that one of its targets was Lord Energy.  (*Id.* ¶128.)[16]  Vidino was also aware of Alp's efforts to induce banks to stop dealing with Alp's targets.  In fact, he remarked that Alp's actions had destroyed Lord Energy—on WhatsApp, he told Badal that he believed Crédit Suisse had withdrawn its line of credit to Lord Energy because of the enterprise's actions.  (*Id.* ¶40.)  This provides clear evidence that Vidino knew what the enterprise was up to.  And he signed a contract to further its endeavors in exchange for thousands of Euros.[17]  (*Id.* ¶129.)

---

[16] Even if Vidino did not know that the UAE was ultimately behind the conspiracy (Vidino Mot. 29–30), he still can be held liable for RICO conspiracy because a party to a conspiracy need not know the identities of his co-conspirators.  *Elliott*, 571 F.2d at 903.

[17] Vidino argues that the fact that he was paid by Alp is irrelevant.  (Vidino Mot. 21.)  Compensation may evidence a co-conspirator's knowledge of a scheme.  *See Salinas*, 522 U.S. at 66 (defendant's receipt of "a pair of designer watches and a pickup truck" was evidence of participation in RICO conspiracy).

Indeed, multiple credible sources acknowledged Vidino's importance to the enterprise's fraudulent campaigns.  After reviewing tens of thousands of the enterprise's documents, respected German newspaper Der Spiegel concluded in 2023 that Vidino "played an important role" in the enterprise's campaign.  (*Id*. ¶281.)  Farid Hafez sued Vidino and his employer, asserting RICO claims predicated on fraud.  (*Id.* ¶277.)  And several of Vidino's employees at George Washington University's Program on Extremism resigned after Vidino's role in the scheme became public, with one calling his conduct an "egregious ethical breach."  (*Id*. ¶42.)  This is sufficient to raise a plausible inference that Vidino agreed to facilitate the enterprise's fraudulent campaigns.

Vidino primarily relies on *RSM Production Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043 (D.C. Cir. 2012).  There, the court dismissed RICO conspiracy claims against a law firm representing Grenada.  *Id.* at 1046.  The plaintiff's only evidence of the firm's intent to further Granada's illicit aims was a conclusory allegation that Grenada "had a reputation for corruption and bribery," and allegations that another law firm had declined to represent Grenada, and the defendant-firm accepted payment from a third-party.  *Id.* at 1046–48.  The plaintiff in *RSM Production Corp.* failed to allege that Grenada intentionally used the defendant-firm to carry out or conceal its racketeering acts.  The sparse evidence of agreement in *RSM Production Corp.* stands in sharp contrast to the robust evidence of Vidino's witting participation in the enterprise.

## V.       PLAINTIFFS ALLEGE VIOLATIONS OF THE LANHAM ACT.

Plaintiffs state claims for false advertising in violation of the Lanham Act against the UAE, Alp, Brero, Cavin, and Badal.  Section 43(a)(1)(B) of the Lanham Act authorizes false advertising claims where a defendant makes a "false or misleading representation of fact, which ... in commercial advertising or promotion, misrepresents the nature, characteristics, [or] qualities" of a plaintiff's "goods, services, or commercial activities."  15 U.S.C. §1125(a)(1)(B).  To state a claim for false advertising under the Lanham Act, a plaintiff must show that the defendant's advertising

or promotion was: "(1) false or misleading, (2) actually or likely deceptive, (3) material in its effect on buying decisions, (4) connected with interstate commerce, and (5) actually or likely injurious to the plaintiff."[18]  *Aristotle Int'l, Inc. v. NGP Software, Inc.*, 714 F. Supp. 2d 1, 6 (D.D.C. 2010). Here, Defendants contend only that their false and deceptive statements were not "advertising or promotion" (UAE Mot. 16–20; Alp Mot. 15–21) and that application of the Lanham Act to them is impermissibly extraterritorial (UAE Mot. 19–20; Alp Mot. 20 n.8).  Both arguments fail.

### A.      Defendants' Statements Are "Commercial Advertising" And "Promotion."

Advertising is broadly defined as any "organized campaign to penetrate the relevant market"—which is exactly what Defendants' fraudulent statements were meant to do here. *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002).  Courts have defined "commercial advertising or promotion" under the Lanham Act as (1) commercial speech (2) for the purpose of influencing consumers to buy the defendant's goods or services (3) that is disseminated sufficiently to the relevant purchasing public to constitute advertising or promotion within that industry.  *In re McCormick & Co. Pepper Prods. Mktg. & Sales Pracs. Litig.*, 215 F. Supp. 3d 51, 59 (D.D.C. 2016) (citation omitted).  And notably, the plaintiff need not be the defendant's competitor to have standing to assert a Lanham Act false advertising claim.[19] *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 136 (2014); *see also Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1120 (9th Cir. 2021) (*Lexmark* "likely abrogated"

---

[18]  The Alp Defendants argue that Plaintiffs' Lanham Act claims must satisfy Rule 9(b)'s heightened pleading standard.  (Alp Mot. 20.)  That is not the law in this District.  *E.g.*, *Abrahams v. Simplify Compliance, LLC*, 2021 WL 1197732, at *3 (D.D.C. Mar. 30, 2021).  And even if it were, Plaintiffs identify the fraudulent statements with sufficient particularity to satisfy Rule 9(b).

[19] The Alp Defendants assert that they cannot be liable under the Lanham Act because they were not in commercial competition with Plaintiffs.  (Alp Mot. 18.)  The law does not limit Lanham Act standing to commercial competitors.  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 136 (2014).  But even if it did, Plaintiffs were in commercial competition with the UAE, and the Alp Defendants concede that they were the UAE's agents.

the commercial competition element of commercial advertising or promotion.); *Fashion Boutique of Short Hills, Inc.*, 314 F. 3d 48, 58 (2d Cir. 2002) (similar).  Defendants' statements satisfy each element of this definition.  Thus, the statements were advertisements under the Lanham Act.

### 1.    Defendants' false statements are commercial speech.

"Speech need not closely resemble a typical advertisement to be commercial."  *Semco, Inc. v. Amcast, Inc.*, 52 F.3d 108, 112 (6th Cir. 1995) (holding that magazine article written by competitor was "commercial speech"); *see also Cannella v. Brennan*, 2014 WL 3855331, at *7–9 (E.D. Pa. 2014) (anonymous website made by competitor with disparaging comments about plaintiff was commercial speech).  The commercial speech inquiry is "fact-driven, due to the inherent difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category."  *Ariix*, 985 F.3d at 1115 (quotation marks omitted).  And whether speech "propose[s] a commercial transaction[] is just a starting point."  *Id.*

To determine whether non-traditional advertisements are commercial, courts consider three factors: (1) whether the communication is an advertisement; (2) whether it refers to a specific product or service; and (3) whether the speaker has an economic motive.  *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 67–68 (1983).  Notably, a statement need not satisfy every factor to be "commercial."  *Semco, Inc.*, 52 F.3d at 112–13 ("the *Bolger* Court did not require each element").  Rather, courts aim to give effect to "a 'common-sense distinction' between commercial speech and other varieties of speech."  *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 516–17 (7th Cir. 2014) (quoting *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455–56 (1978)).

The Ninth Circuit's recent decision in *Ariix* is instructive.  There, the court directly addressed how to identify commercial speech "given today's sophisticated and subtle marketing campaigns."  985 F.3d at 1116.  In *Ariix*, a nutritional supplement manufacturer brought a Lanham Act claim against a guidebook publisher and its author who previously worked for one of the

manufacturer's "fiercest" competitors.  *Id.* at 1111–12.  The guidebook compared and reviewed nutritional supplements and purported to present objective data.  *Id.* at 1111.  But, in fact, the defendants "concocted the [guidebook] to ratchet up sales for [the competitor's] products."  *Id.* at 1117.  The guidebook publisher and its author "collud[ed]" with the competitor (the author's former employer) to "improperly thwart [the manufacturer] from obtaining the top medal certification in the Guide," while ensuring the competitor attained top ratings.  *Id.* at 1112–13.  The Ninth Circuit concluded the guidebook was commercial speech.

The *Ariix* court observed that the first two *Bolger* factors—whether the communication is an advertisement and whether it refers to a specific product—"do[] not tell us much," nor do they "shed much light" in non-traditional advertising contexts.  *Id.* at 1116.  The court thus focused on the third factor: whether the defendant "acted primarily out of economic motivation."  *Id.* at 1116–17 (emphasis deleted).  The court noted, "economic motivation is not limited simply to the expectation of a direct commercial transaction with consumers."  *Id.* at 1117.  "Rather, the crux is on whether the speaker had an adequate economic motivation so that the economic benefit was the primary purpose for speaking."  *Id.*

The court held that the manufacturer alleged the defendants "mainly" published statements with an economic goal "to reap the financial benefits of a hidden marketing arrangement ... rather than to inform consumers."  *Id.*  Thus, it concluded that the guidebook was "*a sham marketing scheme intended to benefit [plaintiffs' competitor]*."  *Id.* at 1118 (emphasis added).  And, as a result of that hidden arrangement, the plaintiff's competitor successfully "ratchet[ed] up sales" for its own product.  *Id.* at 1117; *accord GOLO, LLC v. HighYa, LLC*, 310 F. Supp. 3d 499, 505 (E.D. Pa. 2018) (collecting cases and explaining that "liability can arise under the Lanham Act if

71

websites purporting to offer reviews are in reality stealth operations intended to disparage a competitor's product while posing as a neutral third party").

The same reasoning applies here.  Defendants' purpose in publishing false articles accusing Plaintiffs of terrorism was to induce commercial actors to stop dealing with Lord Energy so the UAE could gain a competitive advantage.  (*E.g.*, AC ¶¶17, 156.)  As in *Ariix*, Defendants sought to "reap the financial benefits of a hidden marketing arrangement," not inform consumers.  They purposefully disguised the commercial nature of their statements by publishing articles pseudonymously and relying on bought-and-paid-for "journalists" to mispresent the enterprise's fraudulent claims as neutral reporting and disinterested internet commentary.  (*Id.* ¶¶1–2, 4, 10– 11, 13, 17, 90, 95–97.)  And like the guidebook author and publisher in *Ariix*, the enterprise's false claims about Plaintiffs (that they were linked to terrorism) were intended to (and did) cause suppliers and refiners (i.e., consumers) to turn away from Lord Energy and to the only reasonable alternative: the UAE and its Murban oil.  (*Id.* ¶¶4, 66–69, 86.)  Thus, Defendants' "sham marketing scheme" was intended "to influenc[e] consumers." *McCormick*, 215 F. Supp. 3d at 59–60.[20]

The UAE and Alp Defendants contend that their fraudulent articles were not commercial speech because the articles "were silent about any of Plaintiffs' or Defendant[s'] 'competing' products." (UAE Mot. 17; Alp Mot. 18.)  They rely on *Farah v. Esquire Magazine*, 736 F.3d 528, 541 (D.C. Cir. 2013), to support their argument.  But *Farah* did not create a requirement that a statement must mention a competing product to give rise to a Lanham Act claim.  Rather, it held

---

[20] Defendants' scheme also mirrors that in *Cannella v. Brennan*, 2014 WL 3855331, at *8 (E.D. Pa. Aug. 6, 2014).  There, a competing financial advisory firm and its employees created an anonymous website "to disparage Plaintiffs and their business," including by falsely stating Plaintiffs were "known criminals" who "abuse elderly victims."  *Id.*  "[T]he defendants' goal ... was to encourage Plaintiffs' customers and potential customers to do business with Defendants instead of the Plaintiffs."  *Id.*  Because the website was anonymous, it did not name the defendants' competing business.  *Id.* at *1.  The court still held that it was commercial speech.  *Id.* at *8.

that "political speech aimed at critiquing [a plaintiff's] position" on a topic cannot be turned into a Lanham Act claim simply by virtue of the defendant speaker being a "general[]" competitor of the plaintiff.  *Id.*  By misinterpreting *Farah*'s holding, Defendants urge the Court to adopt a rule that a statement is not commercial speech if it does not name the competing company or product.  (UAE Mot. 16; Alp Mot. 14–15.)  But the Supreme Court has made clear that reference to a specific product or service is just one factor to be considered.  *Bolger*, 463 U.S. at 66–67; *see also Semco, Inc.*, 52 F.3d at 112–13.  And recent cases have explained how that factor "does not shed much light" in a non-traditional advertising context such as this.  *Ariix*, 985 F.3d at 1116.

Defendants' reliance on *Farah* is also misplaced because the plaintiff in *Farah* did not allege that the defendant sold competing products.  736 F.3d at 541.  The plaintiff was a book author and the defendant sold magazines.  *Id.*  They were merely "general[]" competitors in the "marketplace of ideas."  *Id.*  Here, Plaintiffs allege they were direct competitors with the UAE in the spot market for light crude oil in Asia.  Indeed, Plaintiffs allege that, until mid-2018, they were the only sellers that offered a crude oil grade that competed with Murban.  (AC ¶¶4, 66-69, 86.)  Additionally, the defendant in *Farah* did not disparage the plaintiff's product (a book); it merely posted a satirical article claiming the book had been "pulled from shelves."  736 F.3d at 531.  But here, Defendants' statements disparaged the services Plaintiffs provided by, for example, accusing Hazim of using his companies as "fronts" to finance terrorism.  (AC ¶¶172, 290(a)–(j).)[21]

---

[21] The fact that Defendants' false statements referenced public issues like global terrorism does not render them immune from liability.  (UAE Mot. 24 (suggesting, without citation, that the "newsworth[iness]" of its statements should save it from liability).)  The Supreme Court has "made clear that advertising which 'links a product to a current public debate' is not thereby entitled to the constitutional protection afforded noncommercial speech."  *Bolger*, 463 U.S. at 68.

**2.      Defendants' false statements were made to influence consumers.**

Defendants also posit a nonexistent rule that for a statement to be made "for the purpose of influencing consumers," it must discuss "products that were competing with those of Lord Energy in the crude oil energy market." (UAE Mot. 19; Alp Mot. 19.)  But the consumer influence element does not require a reference to a defendant's products as an alternative—particularly in a product disparagement case.  *See Advisors Excel, LLC v. Scranton*, 2014 WL 12543802, *4–5 (S.D. Fla. Sep. 16, 2014) (defendants' disparaging statements about plaintiffs were designed to advance defendants' business even though statements did not promote defendants' competing services).  Defendants' false advertisements caused Plaintiffs' business partners to stop working with Plaintiffs.  (AC ¶¶4, 66–69, 86, 201–03.)  Thus, because Murban was the only alternative to the light crude oil Plaintiffs sold on the spot market in Asia, those business partners must have turned to Murban to replace the cargoes they were no longer buying from or selling to Plaintiffs.

**3.      Defendants' false statements were widely disseminated.**

The UAE and the Alp Defendants also assert that Plaintiffs' Lanham Act claims fail because Plaintiffs do not allege that Defendants directed their statements to "the purchasing public." (UAE Mot. 19; Alp Mot. 19–20.)  But their argument is factually and legally flawed.

It is factually flawed because the UAE and the Alp Defendants focus exclusively on Plaintiffs' allegations relating to how the enterprise's fraudulent statements disrupted Plaintiffs' relationships with banks.[22]  They ignore well-pleaded allegations concerning the disruptive impact the enterprise's statements had on Lord Energy's relationships with other market participants like Sonatrach, Exxon Mobil, and Litasco.  (AC ¶¶135–37, 201.)

---

[22] Defendants cite no authority, and Plaintiffs have found none, to support the claim that as a matter of law, financial institutions cannot be consumers under the Lanham Act.

It is also legally flawed. The requirement that a statement be "sufficiently disseminated" is meant to distinguish isolated misrepresentations made only to a handful of consumers—which fall outside the Lanham Act's reach—and the "public dissemination of information"—which is within the Lanham Act's reach. *Garland Co. v. Ecology Roof Sys. Corp.*, 895 F. Supp. 274, 279 (D. Kan. 1995). The rule is not meant to limit Lanham Act liability to statements specifically targeting a plaintiff's consumers. Statements made to the "general purchasing public" are enough. *Am. Needle & Novelty, Inc. v. Drew Pearson Mktg., Inc.*, 820 F. Supp. 1072, 1078 (N.D. Ill. 1993).

But even if the law required Defendants to direct their false claims to Plaintiffs' consumers, Defendants did so here. They sponsored and wrote an article in Africa Intelligence falsely claiming that Algeria blocked a Lord Energy tanker, the DS Valentina, at port because of purported concerns about its "waterproofness." (AC ¶¶113–14, 290(a).) The article then mentioned Hazim's relationship with his father, reporting that Hazim's father was "alleged to have financed terrorism." (*Id.*) Africa Intelligence is widely read in the commodities industry. (*Id.* ¶113.) Thus, even under Defendants' improperly narrow definition, Plaintiffs sufficiently plead dissemination.

Turning to the proper test for dissemination, Defendants published their false statements through widely read news publications and blogs. (*Id.* ¶290.) And Plaintiffs' consumers read and *were commercially impacted* by those statements. (*Id.* ¶200.) For example, in 2018, Sonatrach, one of Lord Energy's primary business partners, forwarded a link to Besson's January 5, 2018 Le Temps article to Hazim. (*Id.* ¶135.) Thereafter, Sonatrach required Lord Energy undergo a new background check and then stopped selling Saharan Blend to Lord Energy. (*Id.* ¶136.) Likewise, CCI cancelled a deal with Americas Lord Energy citing compliance concerns, and Exxon Mobil and Litasco stopped buying from Lord Energy for the same reason. (*Id.* ¶¶201–03.) Thus, Plaintiffs allege that Defendants' statements were disseminated to Plaintiffs' "purchasing public."

**B.      Defendants' False Statements Addressed Plaintiffs' "Commercial Activities."**

According to the UAE, its statements do not satisfy the "commercial advertising or promotion" prong of the Lanham Act because advertising or promotion *must* refer to "a particular product to be sold."  (UAE Mot. 18.)  Not so.  The Lanham Act's "commercial advertising or promotion" prong is "easy to meet."  *Gillette Co. v. Norelco Consumer Prods. Co.*, 946 F. Supp. 115, 133 (D. Mass. 1996).  The Lanham Act applies to "commercial advertising or promotion [that] misrepresents ... goods, services, *or commercial activities*."  15 U.S.C. §1125(a)(1)(B) (emphasis added).  Defendants' failure to address commercial activities is fatal to their argument.

The Tenth Circuit rejected an argument similar to Defendants' in *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262 (10th Cir. 2000).  There, a distributor of products that competed with the plaintiffs' issued a statement to a distribution network that "a large portion of the profits from [plaintiffs'] products go to support [the church of Satan]."  *Id.* at 1268.  The district court dismissed the plaintiffs' Lanham Act claim because the statement "did not 'contain false representations about the *qualities or characteristics* of [the plaintiffs'] products.'"  *Id.* at 1270 (emphasis in original).  The Tenth Circuit reversed, observing that the district court's "focus[] on ... 'goods' and 'services' caused it not to consider ... 'commercial activities.'"  *Id.*

The Tenth Circuit first recognized that "the term 'commercial activities' ... [encompassed the plaintiffs'] use of the profits from the sale of its goods."  *Id.* at 1273.  Next, it explained that "[g]iven the common association of Satan and immorality, a direct affiliation with the church of Satan could certainly undermine a corporation's reputation and goodwill by suggesting the corporation conducts its commercial activities in an unethical or immoral manner."  *Id.* at 1272 & n.7 (collecting cases).  Accordingly, the court held that the statement was actionable because it made misrepresentations about the plaintiffs' commercial activities.  *Id.* at 1273.

76

So, too, here.  Just as the defendant in *Proctor & Gamble* falsely accused the plaintiffs of using their profits to fund satanism, Defendants falsely accused Plaintiffs of using Lord Energy's profits to finance terrorism.  (AC ¶¶113, 124–25, 290(a)–(j).)  Thus, Defendants' advertisements are actionable as misrepresentation about Plaintiffs' "commercial activities."

### C.        Plaintiffs' Lanham Act Claims Are Not Impermissibly Extraterritorial.

Finally, Plaintiffs' Lanham Act claims are sufficiently domestic.  Section 1125(a) applies with full force to "use[s] in commerce" that occur in the United States.  *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 422 (2023).  This is true "even if other conduct occurred abroad."  *Id.* at 419; *see also Hermes Int'l v. Rothschild*, --- F. Supp. 3d ----, 2024 WL 1089427, at *4 n.3 (S.D.N.Y. Mar. 13, 2024) ("[A]ctions that include foreign conduct still fall within the Lanham Act's scope when they 'involve domestic applications' of the statute.").

Here, the enterprise's campaign against Plaintiffs involved several domestic uses in commerce.  Many of the "false and misleading statements were published directly on U.S. websites."  (AC ¶¶290, 293.)  These include sponsored articles on Medium (*id.* ¶¶290(h), 290(i)), WordPress (*id.* ¶¶290(d), 290(f), 290(j)), and Tumblr (*id.* ¶290(e)).  These domestic statements and several other articles in foreign publications were aimed toward U.S. journalists, U.S. "price reporting agencies," and U.S. "bank risk monitors."  (*Id.* ¶293.)  Defendants also manipulated results on U.S. search engines to promote their false and misleading statements.  (*Id.*)

The UAE asserts that *Abitron* "forecloses Plaintiffs' claim."  (UAE Mot. 19–20.)  Far from it.  *Abitron* expressly contemplates Lanham Act claims where some conduct "occurred abroad," so long as "use[s] in commerce" are domestic.  600 U.S. at 419, 422.  Lower courts have confirmed this reading of *Abitron*: The Southern District of New York has noted that "actions that include foreign conduct still fall within the Lanham Act's scope when they 'involve domestic applications' of the statute."  *Rothschild*, 2024 WL 1089427, at *4 n.3.  The District of Delaware has similarly

"disagree[d]" with the argument that after *Abitron*, a plaintiff "can only rely on U.S. conduct to support [its] claims." *Rockwell Automation, Inc. v. Parcop S.R.L.*, 2023 WL 4585952, at *2 (D. Del. July 18, 2023). In truth, the theory of extraterritoriality *Abitron* rejected was extreme: "[T]he plaintiff sought damages for Arbitron's infringing acts *worldwide*." *Id.* (emphasis in original). Here, "the 'focus' of" Plaintiffs' Lanham Act claim is use in commerce "*in the United States*." *Id.* And Plaintiffs do not seek damages for use in commerce globally; they seek damages specifically for putting Hazim, a U.S. citizen, and Americas Lord Energy, a domestic U.S. entity, "out of business" by publishing fraudulent statements in the United States. (AC ¶302.)

## VI.  PLAINTIFFS STATE SHERMAN ACT CLAIMS.

### A.  The FTAIA Does Not Bar Plaintiffs' Sherman Act Claims.

Plaintiffs assert antitrust claims against the UAE and the Alp Defendants.[23] The Foreign Trade Antitrust Improvement Act ("FTAIA") does not bar these antitrust claims because Defendants' anticompetitive conduct, which was both domestic and foreign, directly caused domestic injury to Americas Lord Energy, a U.S. company engaged in export commerce. Although "the FTAIA excludes from the Sherman Act's reach most anti-competitive conduct that causes only foreign injury," *Empagran v. F. Hoffmann-LaRoche, Ltd.*, 417 F.3d 1267, 1269 (D.C. Cir. 2005), under the FTAIA's "direct effects exception," the Sherman Act applies to foreign anticompetitive conduct "where the conduct (1) has a 'direct, substantial, and reasonably

---

[23] The UAE contends that Plaintiffs' Sherman Act claims should fail because Plaintiffs omitted ADNOC as a defendant in the Amended Complaint. (UAE Mot. 28.) There is no basis for this contention. Whether ADNOC is a party to the lawsuit does not weaken the allegations against it or the claims against its co-conspirators who are named defendants, and who engaged in anticompetitive conduct. *See Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 831 (2002) ("[T]he plaintiff is 'the master of the complaint.'").

foreseeable effect' on domestic commerce, and (2) 'such effect gives rise to a [Sherman Act] claim.'" *F. Hoffman-LaRoche Ltd. v. Empagran S.A.*, 542 U.S. 155, 159 (2004).

Notably, the direct effects exception applies when foreign anticompetitive conduct limits "the export opportunities of a domestic person." *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1085 (D.C. Cir. 1998); *see also Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 713 (5th Cir. 1999) (holding that plaintiff met "export trade exception" to FTAIA where plaintiff "was engaged in export trade" and defendants' monopolistic conduct caused plaintiff's business to fail); *Lavoho v. Apple Inc.*, 71 F. Supp. 3d 395, 398 (S.D.N.Y. 2014) (noting that "the failure of an exporter's business" may satisfy the FTAIA's domestic effects exception); *United States v. Time Warner Inc.*, 1997 WL 118413, at *4–5 (D.D.C. Jan. 22, 1997) ("[R]espondents are not exempt from the Sherman Act if their export-oriented conduct had the direct effect of injuring competing U.S. exporters."); *id.* at *4–5 (If "export-oriented conduct affects export commerce of another person doing business in the United States ... [jurisdiction is preserved] insofar as there is injury to that person." (quoting Areeda & Hovencamp, *Antitrust Law* ¶236, at 337 (1996 suppl.))); H.R. Rep. No. 97-686, at 9–10 (1982), *reprinted in* U.S.C.C.A.N. 1982, 2487, 2494–95 (The FTAIA does not bar American antitrust jurisdiction over foreign conduct that has a "direct, substantial and reasonably foreseeable effect on domestic commerce *or a domestic competitor*." (emphasis added)).  Defendants' campaign directly caused Americas Lord Energy—an American company engaged in exporting crude oil from the United States (AC ¶¶87–88)—to go out of business.  Thus, Defendants' anticompetitive conduct substantially impacted "the export opportunities of a domestic person" by eliminating those export opportunities.

*General Electric Co. v. Latin American Imports, S.A.*, 187 F. Supp. 2d 749 (W.D. Ky. 2001), is directly on point.  There, the court held that the FTAIA did not bar antitrust claims by

LATAM, a foreign company involved in shipping products from its factory in Kentucky to Peru, where the defendants' anticompetitive conduct sought to "cripple" LATAM. *Id*. at 751–52. As an initial matter, the court concluded that LATAM was "within the specified class of exporters under the FTAIA" "by virtue of its shipping arrangements" from the United States. *Id*. The court then considered whether "G.E.'s attempt to destroy a participant in a U.S. export market (namely, LATAM) supplies the requisite effect" on export commerce. The court held that it did. *Id*. The court noted that LATAM "was GE's only potential competition in Peru" and had GE not "crippled" LATAM, LATAM would have competed with GE. *Id*. at 752. Thus, GE's actions, which "affected only one business," satisfied the direct effects exception. *Id*.; *see also Leaf Trading Cards, LLC v. Upper Deck Co.*, 2018 WL 2971135, at *3 (N.D. Tex. Mar. 16, 2018) (defendant's exclusion of plaintiff from Canadian market "hampered [plaintiff's] ability to ... compete in the smaller American market").

Just as LATAM was the defendant's only competition in *General Electric*, here, Lord Energy was the "only operator who had proven capable of exporting and selling a competing grade [of crude oil] to Murban on the spot market in Asia." (AC ¶10.) All the other spot market sellers sold Murban. By providing an alternative grade to Murban, Lord Energy threatened to interfere with the UAE's plans to establish Murban as a crude oil benchmark—the whole reason the UAE created a Murban spot market in Asia and contractually allowed certain Murban producers to sell Murban cargoes in spot transactions.[24]   (AC ¶68.) The defendant's "crippling" of LATAM supplied the "requisite [direct] effect" in *General Electric*. 187 F. Supp. 2d at 751–53. The same is true here: Defendants' "crippling" of Americas Lord Energy supplies the requisite direct effect.

---

[24] Defendants ignore these unique characteristics of the alleged market, which made their crippling of Lord Energy and Americas Lord Energy particularly harmful to competition.

Defendants next contend that the FTAIA bars Plaintiffs' Sherman Act claims because the domestic effects of Defendants' campaign were not sufficiently direct.  (*E.g.*, UAE Mot. 29–30.)  But their argument focuses solely on allegations concerning the domestic effects that *flowed from* America Lord Energy's collapse (i.e., the impact that Americas Lord Energy's collapse had on the market for U.S.-produced WTI.  They ignore entirely the fact that Americas Lord Energy's collapse was itself a sufficient domestic effect.  As discussed in connection with Defendants' FSIA and RICO arguments, Defendants' viral communications directly caused Americas Lord Energy to go out of business.  (*See supra* Arg.§§I.B, III.D.)  Defendants even boasted that their "media attacks, listing in World Check, and the financial difficulties it created" "forced" Lord Energy's "US-branch" to "cease operations."  (AC ¶¶10, 219.)

Defendants primarily rely on two cases in support of their causation arguments: *In re Intel Corp. Microprocessor Antitrust Litigation*, 452 F. Supp. 2d 555 (D. Del. 2006), and *United States v. LSL Biotechnologies*, 379 F.3d 672 (9th Cir. 2004).  Both are inapposite.

*In re Intel Corp.* involved a "chain of effects [] full of twists and turns ... contingent upon numerous developments."  452 F. Supp. 2d at 560.  The plaintiff alleged that a "deal between Intel and a German retailer to promote Intel-based systems" in Germany "affect[ed] U.S. commerce because it reduce[d] [the plaintiff's] German subsidiary's sales of German-made microprocessors in Germany, which in turn affect[ed] the profitability of the U.S. [parent], which in turn affect[ed] the funds that [the U.S. parent had] for discounting to U.S. customers, which in turn affect[ed] the discounts that it offers in particular U.S. transactions, which in turn affect[ed] its competitiveness in the United States, and which in turn affect[ed] U.S. commerce."  *Id*.  This attenuated chain of "ripple effects" is nothing like the domestic effect Plaintiffs allege here.  Plaintiffs allege that Defendants' knowingly fraudulently statements induced banks to stop lending to Lord Energy and

its U.S. subsidiary, driving them out of business.  (AC ¶¶206–09, 212, 313.)  The failure of the U.S. subsidiary was a direct domestic effect of Defendants' anticompetitive conduct, not the result of an attenuated chain of causation like in *In re Intel Corp.*

*LSL Biotechnologies* also involved indirect effects on commerce.  There, a U.S. company and a foreign company entered into a restrictive agreement that prohibited the foreign company from selling genetically modified tomato seeds in North America.  379 F.3d at 674–76.  The government argued that the agreement had a direct effect on domestic commerce because it (1) made "less likely possible innovations from [the foreign company] in the creation of heartier tomato seeds" and (2) allowed the defendants to "charge more for their seeds."  *Id*.  The court concluded that neither effect was direct because the "delay of possible 'innovations'" was "speculative at best," and the government "presented no evidence" that the U.S. company had or would artificially inflate the prices it charged for its genetically modified seeds.  *Id.* at 681–82. *LSL Biotechnologies* did not involve a scenario like the one alleged here in which a domestic exporter was excluded from a market by a rival seeking to maintain market power.  Unlike the domestic effect in *LSL Biotechnologies*, the domestic effect here is not speculative: Americas Lord Energy was driven out of business, and Defendants were able to charge higher prices for Murban after they pushed Lord Energy out of the market.  (*Id.* ¶¶84–86, 213.)

Perhaps recognizing the weakness of their caselaw analogies, Defendants then contend that Plaintiffs cannot satisfy the FTAIA's direct effects exception because Plaintiffs' "theory of injury turns the causation inquiry on its head."  (UAE Mot. 37–38.)  Again, Defendants focus solely on the effects that *flowed from* Americas Lord Energy's collapse and ignore that the collapse *was* the effect on U.S. commerce; that effect flowed directly from Defendants' anticompetitive conduct;

and that that effect gives rise to Plaintiffs' Sherman Act claims (*see infra* Arg. §VI.C).  Defendants'
elimination of Americas Lord Energy was both the domestic effect and the antitrust injury.

Defendants rely on *Den Norske Stats Oljeselskap As v. HeereMac Vof*, 241 F.3d 420 (5th
Cir. 2001), and *Lotes Co. v. Hon Hai Precision Industry Co.*, 753 F.3d 395 (2d Cir. 2014), to
support their causation argument.  (UAE Mot. 30–31.)  But neither case involved harm to a
domestic exporter.  *Den Norske* involved claims by "a Norwegian oil corporation that conduct[ed]
business solely in the North Sea" seeking "redress ... for an alleged anticompetitive conspiracy
that supposedly inflated the plaintiff's operating costs in the North Sea."  241 F.3d at 421.  And
*Lotes* involved claims by a Taiwanese corporation against Chinese competitors whose
anticompetitive conduct overseas threatened to "force Lotes to close its factories, eliminate it as a
major competitor, and enable the defendants to become the dominant supplier in the market,"
which would "have downstream effects worldwide."  753 F.3d at 402.  In both cases, foreign
plaintiffs were injured by foreign defendants in foreign markets.  The foreign plaintiffs' foreign
injuries then caused downstream effects in the United States.

Unlike *Den Norske* and *Lotes*, Plaintiffs' antitrust injuries arose from the domestic effect
(i.e., the collapse of Americas Lord Energy) that was directly caused by Defendants'
anticompetitive conduct in the United States and abroad.  For example, Plaintiffs specifically
allege that in December 2018, Americas Lord Energy was involved in a $65 million transaction to
export WTI from the United States.  (AC ¶212.)  Defendants purposely and fraudulently induced
Lord Energy's bank, Crédit Suisse, to stop lending to Lord Energy, causing Americas Lord
Energy's $65 million WTI export deal to fall apart.  (*Id*.)  This failed transaction was the "death
knell" for Lord Energy and its U.S. subsidiary.  (*Id*.)  Thus, the domestic effects directly caused
by Defendants' fraudulent communications gave rise to Plaintiffs' antitrust claims.

B.         **Plaintiffs Allege Product And Geographic Markets.**

Plaintiffs adequately define the relevant antitrust market as the spot market for light crude oil sold to refineries in Asia.[25]   A "properly defined antitrust market" includes "both a relevant product market and a relevant geographic market," and all "reasonably interchangeable" products. *Am. President Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209, 222 (D.D.C. 2022).   "[M]arket definition is predominantly a factual rather than a legal inquiry," and "antitrust complaints generally are dismissed on market definition grounds only if they are 'glaringly deficient' and dismissals on such grounds are 'relatively rare.'"   *Id.*; *see also PepsiCo, Inc. v. Coca-Cola Co.*, 1998 WL 547088, at *6 (S.D.N.Y. Aug. 27, 1998) (dismissal based on a failure to define the market "may be granted only if the alleged market makes 'no economic sense under any set of facts'").

Far from making "glaringly deficient" allegations, Plaintiffs clearly, consistently, and specifically define both the relevant product market (i.e., the spot market for light crude oil) and the relevant geographic market (i.e., Asia, particularly Korea, Thailand, and Singapore).   (*E.g.*, AC ¶¶4–6.)   They also identify all reasonably interchangeable substitutes.   Prior to 2016, Murban was the only light crude oil sold on the spot market in Asia—there were no reasonably interchangeable substitutes.   (*Id.* ¶76.)   Beginning in 2016, Saharan Blend emerged as a reasonably interchangeable substitute.   (*Id.*)   And beginning in early 2018, WTI emerged as a third alternative.   (*Id.* ¶87.)

Defendants contend that Plaintiffs' market definition is deficient because "it is unclear whether Plaintiffs are trying to allege a geographic market with respect to an Asian spot market for light crude oil or an American market for light crude oil exportation to Asia," and whether the

---

[25] Defendants seem to suggest that Plaintiffs' market definition is insufficient because it does not identify a geographic or product market *in the United States*.   (UAE Mot. 32.)   However, the relevant antitrust market does not need to be a domestic market.   Under the FTAIA, the Sherman Act applies to foreign antitrust markets if the anticompetitive conduct has a direct, substantial, and reasonably foreseeable effect on domestic commerce or a domestic exporter.   (*Supra* Arg. §VI.A.)

product market is "light crude oil, generally, or WTI, Murban, or Saharan Blend, specifically."
(UAE Mot. 32.)  Defendants' purported confusion is puzzling given that the Amended Complaint
alleges at least a dozen times that the UAE viewed Lord Energy as a competitive threat "in the
spot market for light crude oil to Asia."  (AC ¶¶4, 5, 23, 32, 89, 223, 325, 326–27, 331–32, 334.)
Some of the crude oil sold to refineries in Asia was exported from the United States.  And Murban,
Saharan Blend, and WTI were three grades of light crude oil sold on the spot market in Asia at
various times.  Plaintiffs make this abundantly clear, and there is nothing contradictory, confusing,
or otherwise deficient about their market definition.

> ### C.        Plaintiffs Allege Antitrust Injury.

Plaintiffs suffered antitrust injury when they were driven out of the market because of
Defendants' anticompetitive conduct.  An antitrust injury is an "injury of the type the antitrust laws
were intended to prevent and that flows from that which makes defendants' acts unlawful."  *Blue
Shield of Va. v. McCready*, 457 U.S. 465, 482 (1982) (citation and quotation marks omitted).
"Typical anticompetitive effects 'include ... reduction of output, increase in price, or deterioration
in quality.'"  *Am. President Lines*, 633 F. Supp. 3d at 220–21 (citation omitted).  "Substantial
market foreclosure ... is a recognized antitrust injury."  *Id*. at 221 (citing 2A Areeda & Hovenkamp,
*Antitrust Law* ¶348(d)(3) (5th ed. 2021)).

Here, Defendants' unlawful, fraudulent conduct caused a reduction in the supply of light
crude oil on the spot market in Asia, resulting in increased prices for refineries in Asia, including
refineries owned by U.S. companies like Chevron and Exxon Mobil.  (AC ¶9.) Defendants contend
that the Amended Complaint "does not contain any concrete, non-speculative facts to establish

that the 'spot market for light crude oil in Asia' has suffered an anticompetitive injury."[26]  (UAE Mot. 33; Alp Mot. 32–33.)  Yet again, Defendants ignore well-pleaded, specific factual allegations.

For example, Plaintiffs describe in detail how, prior to Lord Energy's entry into the spot market for light crude oil in Asia, there were about 8 million barrels of light crude oil (all Murban) available for sale each month.  (AC ¶¶69, 84, 331.)  Once Lord Energy began exporting Saharan Blend, it increased the supply of light crude oil available on the Asian spot market by as many 2–3 million barrels some months, and nearly 20 million barrels overall.  (*Id.* ¶¶7, 78, 84.)  As a result, the Murban price differential fell by $0.27 per barrel.  (*Id*. ¶8.)  Defendants' anticompetitive conduct drove Lord Energy out of the market, reducing supply and driving prices back up.  (*Id.* ¶¶84–86.)  As the Alp Defendants concede, the Amended Complaint alleges concrete and specific "price, volume, and revenue figures" (Alp Mot. 33 n.21) that reflect the anticompetitive injury that resulted from Defendants' fraudulent conduct.[27]

Courts have routinely found antitrust injury in situations like this where a monopolist engages in anticompetitive conduct to drive a rival out of the market and maintain market power.  For example, in *American President Lines*, 633 F. Supp. 3d at 221–22, this District held that the plaintiff "sufficiently alleged antitrust injury" where the defendant's "anticompetitive behavior foreclose[d]" the plaintiff, who was the defendant's "sole competitor," from parts of the market.

---

[26] Defendants also argue that Plaintiffs fail to allege antitrust injury because they do not allege a "direct, substantial, and foreseeable effect on U.S. citizens and business."  (UAE Mot. 34.)  This is the same argument Defendants raised in the context of the FTAIA, and it fails for the same reason: driving a U.S. exporter out of the market to maintain monopoly power is a sufficient domestic effect.  (*See supra* Arg. §VI.A.)

[27] At the motion to dismiss stage, the Court must draw all reasonable inferences in the Plaintiffs' favor, and it cannot credit the Alp Defendants' contention that Plaintiffs had the "wherewithal to obtain information regarding the Asian crude oil markets," but Plaintiffs' failure to allege this this information in the Amended Complaint implies that "there was no harm to competition."  (Alp Mot. 33 n.21.)  Moreover, the "Asian crude oil market[]" is not the relevant antitrust market here. The relevant market is the spot market for light crude oil sold in Asia.

*GN Netcom, Inc. v. Plantronics, Inc.*, 967 F. Supp. 2d 1082 (D. Del. 2013), is also instructive. There, the defendant controlled about 75% of a specialized headset market. *Id*. at 1085–87. The plaintiff sought to enter the market and would have been the defendant's "first significant competitor." *Id*. To prevent the plaintiff from doing so, the defendant induced 80% of distributors to agree to deal exclusively with the defendant. *Id*. The court held that plaintiff alleged antitrust injury because the defendant "(1) prevent[ed] entry of new competitors into the market; (2) decreas[ed] consumer options and information about available competing products; and (3) caus[ed] the price of the products to remain artificially inflated." *Id*. at 1085.

The court in *GN Netcom* also explained that the requirement that "injury to the plaintiff [must] flow[] from that which makes the defendant's acts unlawful" "is generally met if the plaintiff is a competitor or a consumer in the relevant market." *Id*. at 1087 (quoting *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 429 (3d Cir. 1993)). The court concluded that, "[b]ecause GN has pled that it is a direct competitor of Plantronics in the relevant market, the second prong of the test also is satisfied." *Id*. The same reasoning applies here. Lord Energy was a direct competitor of ADNOC in the restrained market. And, as such, it suffered antitrust injury. *See also, e.g.*, *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 806 (D.C. Cir. 2001) ("When competitors violate the antitrust laws and another competitor is forced from a market, the latter suffers an injury-in-fact.");[28] *Caribbean Broad.*, 148 F.3d at 1087 (plaintiff, a foreign radio station, suffered antitrust injury when another foreign radio station "intentionally and

---

[28] In *Andrx*, another case on which Defendants rely (UAE Mot. 33; Alp Mot. 32), the D.C. Circuit held that Biovail's antitrust claim should *not* have been dismissed with prejudice because Biovail *could* allege antitrust injury where Andrx Pharmaceuticals and another company "combined to achieve an unlawful objective" to extend an exclusivity period, preserve a monopoly, and exploit their market power to exclude Biovail from the market. 256 F.3d at 813–15. Biovail's claim was curably deficient because Biovail failed to allege its intent and preparedness to enter the market.

successfully, by means of fraud and deceit," delayed plaintiff's entry into the relevant market); *Bloch v. SmithKline Beckman Corp.*, 1988 WL 117927, at *23 (E.D. Pa. Nov. 1, 1988) (finding antitrust injury where plaintiff lost profits as a result of defendant's efforts to suppress the market and eliminate plaintiff as a competitor).

      **D.**      **Plaintiffs Allege Claims Under Section 1.**

Plaintiffs state claims under Section 1 of the Sherman Act against the UAE and Alp Defendants.  Section 1 prohibits all contracts, combinations, and conspiracies that restrain trade. 15 U.S.C. §1.  To adequately plead a violation of Section 1, a plaintiff need only allege "(1) that defendants entered into some agreement for concerted activity (2) that either did or was intended to restrict trade in the relevant market, which (3) affects interstate commerce."  (UAE Mot. 34.) Defendants do not dispute that their anticompetitive conduct affected interstate commerce.

Instead, the Defendants argue first that Plaintiffs do not allege "non-speculative and non-conclusory facts that ... Defendants formed an agreement to *restrain trade unreasonably*." (*Id*. 35; Alp Mot. 34–35.)  Questions of intent are "particularly ill suited for summary disposition." *Gomez v. Trs. of Harvard Univ.*, 677 F. Supp. 23, 25 (D.D.C. 1988), and intent may be shown through circumstantial evidence, *Jackson*, 513 F.2d at 461.  Indeed, the Supreme Court has recognized that courts should be particularly reluctant to dismiss antitrust claims on the pleadings because the "proof is largely in the hands of the alleged conspirators."  *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746–47 (1976).

As discussed with respect to Plaintiffs' RICO and RICO conspiracy claims, the UAE and Alp Defendants knowingly entered into an agreement—with each other and with numerous other co-conspirators—to destroy Plaintiffs' business by disseminating false information to market participants including banks, counterparties, and suppliers.  (*Supra* Arg. §§III.A, IV.)

Courts can infer specific intent to restrain trade from "conduct that has no legitimate business justification but to destroy or damage competition," and "[a] plaintiff adequately pleads specific intent where 'it is otherwise apparent from the character' of the alleged anticompetitive action—as with actions that 'eliminat[e] a viable means of competition' or 'channel[] customers away from the competition.'"  *Am. President Lines*, 633 F. Supp. 3d at 232.  Defendants' dissemination into the marketplace of false information about Lord Energy had no procompetitive justification and was solely intended to damage competition.  (AC ¶¶19–143.)

The Alp Defendants also argue that Plaintiffs fail to allege a conspiracy because Alp was an agent of the UAE and, an agent acting in the scope of its agency cannot conspire with its principal.  (Alp Mot. 34–35.)  They cite *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984).  That case does not sweep so broadly.  In *Copperweld*, the Supreme Court considered the limited question whether "a parent and its wholly owned subsidiary are capable of conspiring in violation of §1."  *Id*. at 768.  It held only that a corporation cannot conspire with its wholly owned subsidiary.  The Court expressly declined to "consider under what circumstances, if any, a parent may be liable for conspiring with an affiliated corporation it does not completely own."  *Id*. *Copperweld* does *not* hold that a sovereign state (UAE) is incapable of conspiring with an otherwise-separate agent (Alp) it specifically hired to engage in anticompetitive conduct.

Moreover, even treating the Alp Defendants and the UAE as a single entity for Section 1 conspiracy purposes, they are far from the only participants in the conspiracy to destroy Plaintiffs' businesses.  (*Supra* Arg. §III.E.)  For example, in *In re Aluminum Warehousing Antitrust Litigation*, 95 F. Supp. 3d 419, 446 (S.D.N.Y. 2015), the court held that while certain affiliated defendants that were part of the "same corporate group" could not conspire "amongst themselves," the complaint nonetheless adequately alleged a Section 1 conspiracy because it described "a web

of alleged agreements or understandings between a number of entities from different corporate families."  *Id.* at 446; *see also Borden, Inc. v. Spoor Behrins Campbell & Young, Inc.*, 828 F. Supp. 216, 223 (S.D.N.Y. 1993) (distinguishing *Copperweld* and holding that claim that corporate defendants conspired with their subsidiary was "not precluded as a matter of law" because "plaintiffs point to a number of third parties—with no corporate relationship to defendants").

Defendants next argue that Plaintiffs fail to allege that Defendants' restraint of trade was unreasonable.  (UAE Mot. 35–36; Alp Mot. 36–37.)  Defendants once again try to diminish their misconduct by mischaracterizing it as simple defamation.  While Defendants' false statements about Hazim and Lord Energy were certainly defamatory, they were also fraudulent and specifically intended to induce banks, counterparties, and other market participants to stop dealing with Plaintiffs to drive Plaintiffs out of the market.  Such intentional dissemination of false information about a rival to exclude that rival from the market unreasonably restrains trade by restraining rational action by other market participants who rely on the false information to their detriment.  *See Int'l Travel Arrangers, Inc. v. W. Airlines, Inc.*, 623 F.2d 1255 (8th Cir. 1980).

The D.C. Circuit has recognized that "'[a]nticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties," and acts of fraud can give rise to antitrust liability.  *Caribbean Broad.*, 148 F.3d at 1087.  In *Caribbean Broadcasting*, the D.C. Circuit held that the defendants' "fraudulent misrepresentations to advertisers and sham objections to a government licensing agency in order to protect their monopoly" were "anticompetitive conduct."  *Id.*; *see also United States v. Microsoft Corp.*, 253 F.3d 34, 76–77 (D.C. Cir. 2001) (Microsoft's deceptive statements to Java developers intended to "thwart" the threat Java posed and "protect" Microsoft's monopoly were exclusionary conduct).

The D.C. Circuit is not alone in concluding that intentional, prolonged, and coordinated disinformation campaigns, such as the campaign at issue here can amount to unreasonable restraints of trade in violation of the Sherman Act.  For example, in *International Travel Arrangers*, 623 F.2d at 1272, the Eighth Circuit held that a regional airline violated Sections 1 and 2 of the Sherman Act when it instituted a campaign of newspaper ads and sent letters to travel agents containing materially false statements of fact about a rival.  The court emphasized that the regional airline "organized [a] full frontal attack which (1) used false, misleading and deceptive advertising and (2) was directed at (a) consumers and (b) travel agents" to "prevent[] ... effective competition" and maintain its monopoly power.  *Id*. at 1268.  That is exactly what Defendants did here.

Defendants' reliance on *Asa Accugrade, Inc. v. American Numismatic Ass'n*, 370 F. Supp. 2d 213 (D.D.C. 2005), is misplaced.  (UAE Mot. 33–36; Alp Mot. 36–37).  There, the court dismissed the plaintiff's antitrust claims because the complaint failed to allege harm to competition.  *Id*. at 216.  "This omission alone," the court held, was "fatal to both Sherman Act claims."  *Id*.  Here, unlike in *Asa Accugrade*, Defendants' fraudulent statements were intended to, and did, drive the UAE's only proven competitor out of the market, resulting in reduced output and increased prices in the spot market for light crude oil in Asia.  (AC ¶¶9, 84–86.)

Moreover, "merely because a particular practice might be actionable under tort law does not preclude an action under the antitrust laws as well."  *Conwood*, 290 F.3d at 783–84 (rejecting defendant's argument that its conduct, which included providing misleading information to retailers, was "no more than isolated sporadic torts," and affirming denial of motion to dismiss antitrust claims).  "[W]hen," as here, "a monopolist deceives in order to achieve or maintain monopoly power, or when firms combine or conspire to deceive in way that causes significant anticompetitive effects, then deception crosses the line from an ordinary business tort to an

antitrust violation." *Deception as an Antitrust Violation*, 125 Harv. L. Rev. 1235, 1255 (2012). Defendants' fraudulent statements were prolonged, widespread, and specifically intended to drive Lord Energy out of business to prevent it from competing with the UAE.

### E.      Plaintiffs Allege Claims Under Section 2.

Plaintiffs also state claims under Section 2 of the Sherman Act against the UAE and Alp Defendants.  To adequately plead a claim for monopolization, a plaintiff must allege "monopoly power and 'anticompetitive' or 'exclusionary conduct.'"  *Am. President Lines*, 633 F. Supp. 3d at 220.  Monopoly power "mean[s] sufficient power to 'control prices or exclude competition.'"  *Id.* at 224.  To show monopoly power, a plaintiff can "allege either (1) direct evidence that the defendant exerts control in the market or (2) that the defendant possesses a dominant share of the relevant market that is protected by entry barriers."  *Id.*  Plaintiffs do both.

*First*, Plaintiffs allege that the UAE—through ADNOC—"created, and exercised absolute control over, the spot market for Murban cargoes sold to Asian refiners" by selling Murban cargoes on the spot market itself or "granting revocable contractual rights to certain Murban cargo holders, long-time clients, and equity producers" to resell Murban in spot transactions.  (AC ¶¶67–68.)

*Second*, Plaintiffs allege that ADNOC's market share of the spot market for light crude oil in Asia was about 62.5% prior to 2016, when Lord Energy began exporting Saharan Blend.  (AC ¶¶69, 331.)[29]  "The existence of [market] power ordinarily may be inferred from the predominant share of the market."  *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966).  Numerous courts have found that market shares of around 50% or 60% are sufficient to infer market power,

---

[29] Plaintiffs allege that ADNOC controlled about 60% of all Murban exports from the UAE (including Murban sold through term contracts and spot transactions to refineries all over the world).  (AC ¶¶8, 66, 85.)  And its market share was slightly higher (62.5%) in the Asian spot market for light crude oil, which is the relevant market here.  (*Id.* ¶69.)

particularly when coupled with other factors that restrict the market like high barriers to entry.  *See United States v. Google LLC*, 2024 WL 3647498, at *88 (D.D.C. Aug. 5, 2024) (recognizing that "a share between 50% and 70% can occasionally show monopoly power" but finding no monopoly power because market not "protected by high barriers to entry" (quoting *Broadway Delivery Corp. v. UPS of Am., Inc.*, 651 F.2d 122, 129 (2d Cir. 1981))); *see also Hayden Publ'g Co. v. Cox Broad. Corp.*, 730 F.2d 64, 69 n.7 (2d Cir.1984) ("[A] party may have monopoly power in a particular market, even though its market share is less than 50%.").[30]

Plaintiffs also allege barriers to entry, including extremely high capital and operating costs, government regulations, access to crude oil supplies, and access to ports.  (AC ¶ 55.)  It took Hazim and Lord Energy months to broker the relationships necessary to gain access to Béjaïa port in Algeria, so they could economically export Saharan Blend to Asia.  (*Id*. ¶ 73.)  Lord Energy's trading operations also depended on ready access to capital to finance Lord Energy's ability to purchase huge crude oil cargoes, which it could then export and resell on the spot market in Asia. (*Id.* ¶ 152.)  Given these and other barriers to entry, and ADNOC's predominant market share of the spot market for light crude oil in Asia, monopoly power can be inferred.  (*Id*. ¶ 69.)

Just as a prolonged campaign of disinformation directed at market participants to disparage a rival and maintain market power amounts to an unreasonable restraint of trade under Section 1, so too is such conduct anticompetitive and exclusionary under Section 2.  *See In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 397 (3d Cir. 2000) (reversing dismissal of Section 2 claim where pharmaceutical company published "false and misleading information to the public

---

[30] *N.M. Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 54 F. Supp. 3d 1189, 1207–10 (D.N.M. 2014) (declining to dismiss Section 2 claims where plaintiff alleged market share of at most more than 50%); *Defiance Hosp. v. Fauster-Cameron, Inc.*, 344 F. Supp. 2d 1097, 1112 (N.D. Ohio 2004) (requiring more than 60% market share).

regarding" a competitor, undertook "aggressive public relations efforts involving circulation of deceptive information," and fed "misinformation to doctors and medical professionals" to preserve its monopoly); *Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Lab'ys*, 850 F.2d 904, 906, 917 (2d Cir. 1988) (reversing dismissal of Section 2 claim where pharmaceutical company sent letter to pharmacists that contained false statements disparaging rival drug company). Plaintiffs therefore state a monopolization claim under Section 2 of the Sherman Act.[31]

### F.  Plaintiffs' Sherman Act Claims Are Timely.

Plaintiffs' Sherman Act claims are timely for the same reason their RICO claims are timely: the Sherman Act's four-year statute of limitations was tolled until April 2021 because of Defendants' fraudulent concealment. (*Supra* Arg. §III.F.) *See In re Vitamins Antitrust Litig.*, 2000 WL 1475705, at *8 (D.D.C. May 9, 2000) (applying fraudulent concealment to toll statute of limitations for antitrust claims); *see also Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 858 F.2d 499, 502 (9th Cir. 1988) ("The central question, however, is not whether Conmar had actual knowledge of its antitrust cause of action, but whether ... it should have been alerted to facts that, following duly diligent inquiry, could have advised it of its claim.").

---

[31] The Alp Defendants argue that they cannot be held liable for violating Section 2 because they were not participants in the Asian spot market for light crude oil. Therefore, according to the Alp Defendants, the only way they could have violated Section 2 is by conspiring with the UAE, and an agent cannot conspire with its principal. (Alp. Mot. 34 n.22.) Unlike Section 1, which "applies only concerted action that restrains trade," Section 2 "covers both concerted and independent action ... that ... monopolize[s]." *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 190 (2010). Plaintiffs do not dispute that the Alp Defendants acted as the UAE's agents. Thus, Alp and the UAE effectively functioned as a single entity with respect to the anticompetitive conduct alleged, and the Alp Defendants can be held liable under Section 2 by virtue of the UAE's monopolization.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motions to Dismiss.  Pursuant to Local Civil Rule 7(b), Plaintiffs respectfully request an oral hearing on Defendants' Motions to Dismiss.

Dated: October 7, 2024

Respectfully Submitted,

/s/ *Thomas A. Clare, P.C.*

Thomas A. Clare, P.C. (D.C. Bar No. 461964)
Nicholas J. Brechbill (D.C. Bar No. 229988)
Eric D. Hageman (D.C. Bar No. 1601820)
CLARE LOCKE LLP
10 Prince Street
Alexandria, Virginia 22314
Telephone: (202) 628-7400
Email: tom@clarelocke.com
Email: nick@clarelocke.com
Email: eric.hageman@clarelocke.com

*Attorneys for Plaintiffs Hazim Nada &*
*Lord Energy SA*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 7, 2024, I caused a true and correct copy of the foregoing

to be served on all counsel of record by filing it using the Court's CM/ECF system.

Date:   October 7, 2024                                         CLARE LOCKE LLP

                                                                              */s/ Thomas A. Clare, P.C.*
                                                                              Thomas A. Clare, P.C. (D.C. Bar No. 461964)

                                                                              *Attorney for Plaintiffs Hazim Nada &*
                                                                              *Lord Energy SA*