**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

HAZIM NADA, *et al.*,

        *Plaintiffs*,

        *v.*

THE UNITED ARAB EMIRATES, *et al.*,

        *Defendants*.

Case No. 24-cv-206-ABJ

---

**REPLY IN SUPPORT OF**
**THE UNITED ARAB EMIRATES' MOTION TO DISMISS**

John B. Bellinger III
Amy Jeffress
Sally L. Pei
Stephen K. Wirth
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, DC 20001
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
john.bellinger@arnoldporter.com

Robert Reeves Anderson
ARNOLD & PORTER KAYE SCHOLER LLP
1144 Fifteenth Street, Suite 3100
Denver, CO 80202

*Counsel for the United Arab Emirates*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ....................................................................................................... 1

ARGUMENT .............................................................................................................. 2

I.     The UAE Is Immune from Suit Under the Foreign Sovereign Immunities Act. ............... 2

     A.    The Amended Complaint fails to allege substantial commercial conduct in the United States that is attributable to the UAE. .................................................. 2

     B.    The Amended Complaint fails to allege direct effects in the United States. .......... 6

     C.    The gravamen of Plaintiffs' suit concerns conduct and effects outside of the United States. ........................................................................................... 12

II.    The Amended Complaint Fails to State a Claim. ........................................................ 13

     A.    Plaintiffs fail to state a claim under the Lanham Act. ......................................... 13

          1.    The alleged speech is non-commercial. ................................................... 14

          2.    The alleged speech is not advertising or promotion. ............................... 15

          3.    Plaintiffs' claim seeks an impermissible extraterritorial application of the Lanham Act. ..................................................................... 15

     B.    Plaintiffs fail to state a RICO claim. ................................................................ 16

          1.    The Amended Complaint fails to allege any predicate acts. .................... 16

          2.    The Amended Complaint fails to allege RICO proximate causation. ...... 17

          3.    The Amended Complaint fails to allege a domestic injury ..................... 18

          4.    The Amended Complaint fails to allege an enterprise ............................ 19

          5.    The Amended Complaint fails to allege a RICO conspiracy ................... 20

          6.    Plaintiffs' RICO claims are time-barred. ................................................ 20

     C.    Plaintiffs' Sherman Act claim fails for lack of subject-matter jurisdiction and fails to state a claim ................................................................................. 21

          1.    The Court lacks subject-matter jurisdiction under the FTAIA. ............... 21

          2.    Plaintiffs fail to state a claim under the Sherman Act. ........................... 22

a.      The Amended Complaint fails to allege antitrust injury...............22

b.      The Amended Complaint fails to state a Section 1 claim.............23

c.      The Amended Complaint fails to state a Section 2 claim.............24

3.      Plaintiffs' Sherman Act claims are time-barred........................................25

CONCLUSION...........................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                                              Page(s)

*Abitron Austria GmbH v. Hetronic Int'l, Inc.*,
   600 U.S. 412 (2023)...........................................................................................................16

*Am. President Lines, LLC v. Matson, Inc.*,
   633 F. Supp. 3d 209 (D.D.C. 2022) ...............................................................................22

*Ariix, LLC v. NutriSearch Corp.*,
   985 F.3d 1107 (9th Cir. 2021) .........................................................................................14

*Asa Accugrade, Inc. v. Am. Numismatic Ass'n*,
   370 F. Supp. 2d 213 (D.D.C. 2005).................................................................................23

*Azima v. RAK Inv. Auth.*,
   305 F. Supp. 3d 149 (D.D.C. 2018) ............................................................................6, 7

*Azima v. RAK Inv. Auth.*,
   926 F.3d 870 (D.C. Cir. 2019) .........................................................................................6

*Missouri ex rel. Bailey v. People's Rep. of China*,
   90 F.4th 930 (8th Cir. 2024) ....................................................................................11, 12

*Bankers Trust Co. v. Worldwide Trans. Servs., Inc.*,
   537 F. Supp. 1101 (E.D. Ark. 1982) .............................................................................4, 5

*Bell Helicopter Textron, Inc. v. Islamic Rep. of Iran*,
   734 F.3d 1175 (D.C. Cir. 2013) .......................................................................................7

*Bolger v. Youngs Drug Prods. Corp.*,
   463 U.S. 60 (1983)..........................................................................................................14

*BP Chems. Ltd. v. Jiangsu Sopo Corp.*,
   285 F.3d 677 (8th Cir. 2002) .........................................................................................4, 5

*Bridge v. Phoenix Bond & Indemnification Co.*,
   553 U.S. 639 (2008)..................................................................................................17, 18

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,
   173 F.3d 725 (9th Cir. 1999) ..........................................................................................15

*Companhia Brasileira Carbureto de Calcio-CBCC v. Applied Industrial Materials Corp.*,
   887 F. Supp. 2d 9 (D.D.C. 2012) ...................................................................................18

*Ctr. for Immigr. Studs. v. Cohen*,
   410 F. Supp. 3d 183 (D.D.C. 2019) ...............................................................................16

*De Csepel v. Republic of Hungary*,
  169 F. Supp. 3d 143 (D.D.C. 2016) ................................................................5

*De Csepel v. Republic of Hungary*,
  859 F.3d 1094 (D.C. Cir. 2017) .....................................................................5

*Dial A Car, Inc. v. Transp., Inc.*,
  82 F.3d 484 (D.C. Cir. 1996) ........................................................................22

*EIG Energy Fund XIV, L.P. v. Petroleo Brasiliero, S.A.*,
  894 F.3d 339 (D.C. Cir. 2018) ...................................................................8, 9

*\*Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*,
  417 F.3d 1267 (D.C. Cir. 2005)................................................................21, 22

*\*Exxon Mobil Corp. v. Corporacion CIMEX, S.A.*,
  111 F.4th 12 (D.C. Cir. 2024)...................................................................8, 12

*Firestone v. Firestone*,
  76 F.3d 1205 (D.C. Cir. 1996) .....................................................................21

*Gen. Elec. Co. v. Latin Am. Imports, S.A.*,
  187 F. Supp. 2d 749 (W.D. Ky. 2001)..........................................................22

*Hytera Commc'ns Corp. v. Motorola Sols., Inc.*,
  623 F. Supp. 3d 857 (N.D. Ill. 2022) .......................................................24, 25

*Jam v. Int'l Fin. Corp.*,
  586 U.S. 199 (2019)......................................................................................13

*Kimberlin v. Nat'l Bloggers Club*,
  No. 13-cv-3059, 2015 WL 1242763 (D. Md. Mar. 17, 2015) .................................16

*Kimm v. Lee*,
  No. 04-cv-5724, 2005 WL 89386 (S.D.N.Y. Jan. 13, 2005) ............................16, 17

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)......................................................................................19

*\*Maritime International Nominees Establishment* (*MINE*) *v. Republic of Guinea*,
  693 F.2d 1094 (D.C. Cir. 1982)................................................................3, 4, 5

*In re McCormick & Co., Inc., Pepper Prod. Mktg. & Sales Pracs. Litig.*,
  215 F. Supp. 3d 51 (D.D.C. 2016)..............................................................15

*Millicom Int'l Cellular v. Republic of Costa Rica*,
  995 F. Supp. 14 (D.D.C. 1998) .....................................................................11

iv

*OBB Personenverkehr AG v. Sachs,
    577 U.S. 27 (2015) .........................................................................................2, 5, 9, 12

Odhiambo v. Republic of Kenya,
    930 F. Supp. 2d 17 (D.D.C. 2013) ........................................................................6, 8

Princz v. Fed. Republic of Germany,
    26 F.3d 1166 (D.C. Cir. 1994) .............................................................................6, 8

Proctor & Gamble Co. v. Haugen,
    222 F.3d 1262 (10th Cir. 2000) ...............................................................................14

Reiss v. Société Centrale Du Groupe Des Assurances Nationales,
    235 F.3d 738 (2d Cir. 2000) ......................................................................................4

Republic of Argentina v. Weltover, Inc.,
    504 U.S. 607 (1992) ..............................................................................................6, 11

Ritchie v. Sempra Energy,
    No. 10-cv-1513, 2013 WL 12171757 (S.D. Cal. Oct. 15, 2013) ...........................16

Rodriguez v. Pan American Health Organization,
    29 F.4th 706 (D.C. Cir. 2022) ..................................................................................13

Sanderson v. Culligan Int'l Co.,
    415 F.3d 620 (7th Cir. 2005) ....................................................................................25

Saudi Arabia v. Nelson,
    507 U.S. 349 (1993) ...................................................................................................2

Siderman de Blake v. Republic of Argentina,
    965 F.2d 699 (9th Cir. 1992) .................................................................................4, 5

Smagin v. Yegiazaryan,
    37 F.4th 562 (9th Cir. 2022) .....................................................................................19

*Solomon v. Dechert LLP,
    No. 22-cv-3137 (JEB), 2023 WL 6065025 (D.D.C. Sept. 18, 2023) .....................18

United States v. LSL Biotech.,
    379 F.3d 672 (9th Cir. 2004) ....................................................................................21

Upton v. Empire of Iran,
    459 F. Supp. 264 (D.D.C. 1978) ................................................................................6

Upton v. Empire of Iran,
    607 F.2d 494 (D.C. Cir. 1979) ...................................................................................6

*US Dominion, Inc. v. MyPillow, Inc.*,
    No. 21-cv-0445 (CJN), 2022 WL 1597420 (D.D.C. May 19, 2022)................................19, 20

*Valambhia v. United Republic of Tanzania*,
    964 F.3d 1135 (D.C. Cir. 2020) .............................................................................................6

*Virtual Countries Inc. v. Republic of South Africa*,
    300 F.3d 230 (2d Cir. 2002)...................................................................................................10

*Virtual Defense & Development International, Inc. v. Republic of Moldova*,
    133 F. Supp. 2d 1 (D.D.C. 1999) ........................................................................................4, 5

*\*Wye Oak Tech., Inc. v. Republic of Iraq*,
    24 F.4th 686 (D.C. Cir. 2022)..................................................................................................2

*Yegiazaryan v. Smagin*,
    599 U.S. 533 (2023)................................................................................................................19

**Statutes**

15 U.S.C.
    § 6a(1) ....................................................................................................................................21
    § 15b .......................................................................................................................................25
    § 1125(a)(1)(B) .....................................................................................................................13

18 U.S.C.
    § 1589(b) ...............................................................................................................................13
    § 1595(a) ................................................................................................................................13

28 U.S.C.
    § 1603(e) .................................................................................................................................3
    § 1605(a)(2) .........................................................................................................................2, 6

**Other Authorities**

Restatement (3d) of Agency (2006)..........................................................................................2

## INTRODUCTION

Plaintiffs all but concede that, even after amending their Complaint, they have alleged no conduct by the UAE with the requisite nexus to the United States to abrogate the UAE's presumptive sovereign immunity: rather than identify any allegations of U.S. conduct by the UAE itself, Plaintiffs point to the purported conduct of others. But the Amended Complaint is devoid of any facts supporting the existence of an agency relationship in the first place, much less facts demonstrating that the UAE expressly directed anyone to engage in U.S. conduct. At most, Plaintiffs allege acts by the UAE that took place in the UAE, Switzerland, or in the Asian oil markets. But there are too many intervening events between that alleged foreign conduct and any downstream effects in the United States to support jurisdiction. The independent decisions of any one of numerous sophisticated financial institutions and market actors are sufficient to sever the causal chain. And even if there were *some* U.S. conduct or direct effect attributable to the UAE, the gravamen of Plaintiffs' suit is found in Europe, where the overwhelming majority of the jurisdictionally relevant conduct and effects allegedly occurred. The UAE is immune from suit, and all claims against it can and should be dismissed on that basis.

As for the merits, try as they might, Plaintiffs fail to disguise their defamation and business tort claims as federal claims under the Lanham Act, RICO Act, and Sherman Act. This Court and many others have emphatically rejected such attempts at artful pleading. Plaintiffs strain to distinguish their case on the facts, but their claims are so divorced from basic trademark, RICO, and antitrust concepts that they do not fit into those statutory frameworks at all. The Court should dismiss all of Plaintiffs' claims with prejudice.

## ARGUMENT

### I.    The UAE Is Immune from Suit Under the Foreign Sovereign Immunities Act.

For the FSIA's commercial activities exception to apply, Plaintiffs must allege some conduct that the UAE "performed in the United States," *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 700–02 & n.2 (D.C. Cir. 2022), or that the UAE's commercial conduct abroad had some "direct effect in the United States," 28 U.S.C. § 1605(a)(2). And those U.S. contacts must constitute the "gravamen of the complaint." *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 33–34 (2015) (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 357 (1993)). Plaintiffs' opposition brief confirms that the Amended Complaint fails to establish any of these elements.

#### A.    The Amended Complaint fails to allege substantial commercial conduct in the United States that is attributable to the UAE.

With respect to the commercial activity exception's first two clauses, 28 U.S.C. § 1605(a)(2), Plaintiffs do not allege that the UAE itself engaged in any U.S. conduct. Instead, their theory of jurisdiction relies on "allege[d] commercial activities carried out by the UAE *through its agents*." Opp. 12 (emphasis added); *see id.* at 10–11 ("through its agents"); *id.* at 13–14 ("broad agency principles"). But Plaintiffs have not even established the basic premise of their argument. The Amended Complaint does not allege any facts that establish (under Swiss, UAE, U.S., or any other law) that the UAE authorized Alp to act as its agent—that is, facts demonstrating that the UAE gave Alp the power to create or alter the UAE's "legal rights and duties," that the UAE had the "right to control" Alp's actions in that regard, and that Alp owed the UAE a "fiduciary" duty. *See* Restatement (3d) of Agency § 1.01 & comments c & e (2006). Rather, the Amended Complaint alleges that the UAE hired Alp under a "commercial contract" to render investigation

and communications services. Opp. 11; *see* Am. Compl. ¶ 16. Nothing about that alleged arrangement suggests that Alp had any power to, for instance, conduct business in the UAE's name, enter into contracts on the UAE's behalf, or waive the UAE's immunity.

Plaintiffs' inability to allege an agency relationship—even after amending their Complaint—is presumably why Plaintiffs rely heavily on a supposed "concession" by the UAE that the Alp Defendants are its agents. The UAE has never conceded any such thing. Plaintiffs cite a page of the UAE's memorandum in support of its motion to dismiss in which the UAE argued that Plaintiffs failed to allege a RICO enterprise by analogizing to a case that included an agency relationship. *See* Opp. 14 (citing UAE Mem. 26). That reference is irrelevant to whether the UAE authorized Alp to act as its agent. To be clear: the UAE does not concede that Alp ever had any authority to act as its agent.

Moreover, Plaintiffs' own cases (*see* Opp. 13–14) hold that, to abrogate immunity under an agency theory, a foreign state must specifically "authorize[] [its alleged agent] to perform actions on [the foreign state's] behalf *in the United States*." *Maritime International Nominees Establishment* (*MINE*) *v. Republic of Guinea*, 693 F.2d 1094, 1107 (D.C. Cir. 1982) (emphasis added). In *MINE*, the D.C. Circuit was careful to clarify that "this is not to say that every action [a foreign state] 'authorizes' which eventually touches American soil will waive [its] immunity." *Id.* at 1107–08. Drawing on personal-jurisdiction principles, the court explained that the FSIA "demand[s] more than 'minimum contacts.'" *Id.* at 1109 n.23. Not only must the foreign state "purposefully avail[] itself of the benefits of conducting business in the United States"; its commercial contacts must be "substantial." *Id.* at 1108–09; *see* 28 U.S.C. § 1603(e) ("substantial contact"). That requirement takes into account the fact that "in an interdependent world economic system many foreign states may benefit from the acts of others in the United States but still not be considered

themselves to be conducting business in the United States within the contemplation of Congress." *MINE*, 693 F.2d at 1108. That caution was true in 1982; it carries even greater weight 42 years later as the world has grown only more interdependent.

The cases Plaintiffs cite (at 13–14), including *MINE*, bear this out. In each, the court abrogated sovereign immunity on an agency theory only when the foreign state directly engaged agents in the United States, engaged agents specifically to conduct substantial activity in the United States, or both. In *Virtual Defense & Development International, Inc. v. Republic of Moldova*, "not only did Moldova solicit Virtual, a United States corporation, in the United States, but it also authorized Virtual to deal solely with United States entities or those approved by the United States government." 133 F. Supp. 2d 1, 5 (D.D.C. 1999). In *Bankers Trust Co. v. Worldwide Transportation Services, Inc.*, a Mexican instrumentality purchased and transported "massive quantities of commodities from various American companies," engaged a U.S. company "as its agent to coordinate the movement of the commodities from inland points [including in the United States] to Mexico," and engaged another U.S. company as its "financial agent." 537 F. Supp. 1101, 1109 (E.D. Ark. 1982). In *BP Chemicals Ltd. v. Jiangsu Sopo Corp.*, the plaintiff alleged that the defendant engaged a Chinese state-owned company specifically to "act[] as [the defendant's] purchasing agent … in the United States" to "solicit[] business from vendors in the United States on an ongoing basis"; and the agent allegedly disclosed the plaintiff's trade secrets "to American vendors" at the defendant's behest. 285 F.3d 677, 681, 687 (8th Cir. 2002). And in *Reiss v. Société Centrale Du Groupe Des Assurances Nationales*, the plaintiff alleged that a person had been "authorized" by a French instrumentality to enter into an oral contract with the plaintiff in the United States—and even then the court remanded for jurisdictional discovery rather than hold that the

allegations defeated France's immunity. 235 F.3d 738, 740, 748 (2d Cir. 2000).[1]

Plaintiffs here do not allege the UAE entered into an agency relationship with any U.S. persons to conduct U.S. activities. *Cf. Virtual Def.*, 133 F. Supp. 2d at 5; *Bankers Tr.*, 537 F. Supp. at 1109. Nor do they allege that the UAE specifically directed any foreign persons to engage in any conduct as its agent in the United States. *Cf. ibid.*; *BP Chems.*, 285 F.3d at 687; *MINE*, 693 F.2d at 1108–09 & n.23. Plaintiffs merely allege that the UAE contracted with Alp (a foreign company) to provide investigative services and publish articles outside the United States. To be sure, Plaintiffs allege that Alp commissioned a handful of blog posts and articles that ultimately appeared on U.S.-based websites; edited Wikipedia articles; sent some emails to journalists and compliance monitors; and entered into contracts with Defendant Dr. Lorenzo Vidino and a private investigator in Miami. *See* Opp. 12–13. But these incidental U.S. contacts—none of which the UAE specifically directed—fail to meet the test laid out in Plaintiffs' own cases. *See MINE*, 693 F.2d at 1108–09 & n.23.

In any event, even if Plaintiffs had alleged sufficiently substantial U.S. commercial conduct by Alp (they have not) *and* even if Alp's conduct could be attributed to the UAE (it cannot), those U.S. activities are not sufficient to locate the gravamen of their lawsuit here under *Sachs*, 577 U.S. 27, as discussed below. *See infra* Section I.C.[2]

---

[1] *Siderman de Blake v. Republic of Argentina* is not an agency case at all: the court found that Argentina itself had published advertisements in the United States and had directly solicited U.S. hotel guests through its national airline, a state instrumentality. 965 F.2d 699, 709 (9th Cir. 1992).

[2] Notably, every case Plaintiffs rely on for their agency arguments—including, *MINE*, *Virtual Defense*, *Bankers Trust*, *BP Chemicals*, *Reiss*, and *Siderman*—predates *Sachs*. To the extent those (mostly out-of-circuit) cases are read to authorize the exercise of jurisdiction over a foreign sovereign where the gravamen of the suit is located abroad, the cases are inconsistent with *Sachs*, and the Court should not follow them. *See De Csepel v. Republic of Hungary*, 169 F. Supp. 3d 143, 158 n.5 (D.D.C. 2016) (declining to follow *Siderman* for this reason), *aff'd in part, appeal dismissed in part and remanded*, 859 F.3d 1094 (D.C. Cir. 2017).

**B.      The Amended Complaint fails to allege direct effects in the United States.**

The commercial activity exception's third clause applies only to commercial conduct committed by the foreign state "outside the territory of the United States" that "cause[d] a direct effect in the United States." *Valambhia v. United Republic of Tanzania*, 964 F.3d 1135, 1139 (D.C. Cir. 2020) (quoting 28 U.S.C. § 1605(a)(2)). A "direct effect" must "follow as an immediate consequence of the [foreign state's] activity," *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 617–18 (1992) (cleaned up), with "no intervening element," *Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1172 (D.C. Cir. 1994) (quoting *Upton v. Empire of Iran*, 459 F. Supp. 264, 266 (D.D.C. 1978), *aff'd mem.*, 607 F.2d 494 (D.C. Cir. 1979)).

Plaintiffs acknowledge (at 11) that the only alleged commercial conduct by the UAE consists of contracting with Alp in the UAE and Switzerland, and participating (through ADNOC) in the Asian oil market. In an effort to conjure a nexus between this conduct (which indisputably occurred abroad) and purported effects in the United States, Plaintiffs present long chains of contingencies, each of which turns on the independent choices of numerous third parties—not only Alp, but Alp's subcontractors and other third parties, including journalists, websites, financial institutions, and other market actors—each with their own interests and incentives. Such allegations cannot abrogate the UAE's immunity: "many events and actors necessarily intervened between the act perpetrated overseas and the impact felt here." *Odhiambo v. Republic of Kenya*, 930 F. Supp. 2d 17, 31 (D.D.C. 2013) (A.B. Jackson, J.) (cleaned up).

Plaintiffs attempt to foreshorten the causal chain by attributing all of Alp's conduct to the UAE. Opp. 18 (citing *Azima v. RAK Inv. Auth.*, 305 F. Supp. 3d 149 (D.D.C. 2018), *rev'd*, 926 F.3d 870 (D.C. Cir. 2019)). But, as explained, the Amended Complaint does not allege facts establishing an agency relationship between the UAE and Alp. *Supra* Section I.A. And *Azima* does not endorse Plaintiffs' theory of direct effects through agency in any event. There, the plaintiff

"plausibly alleged that RAKIA," a state agency, "hacked his personal computers" in the United States. 305 F. Supp. 3d at 170. The complaint alleged that RAKIA itself "directly" engaged in the tortious acts. *E.g.*, Am. Compl. ¶ 68, *Azima v. RAK Inv. Auth.*, No. 16-cv-1948 (May 16, 2017), ECF No. 28.

If anything, *Azima* supports the UAE's immunity. The case confirms that "purely trivial effects, such as harm to a U.S. citizen's commercial reputation, or a U.S. citizen's having suffered a financial loss from a foreign tort, will not suffice to qualify as a direct effect within the United States." *Azima*, 305 F. Supp. 3d at 168 (cleaned up) (citing and quoting *Bell Helicopter Textron, Inc. v. Islamic Rep. of Iran*, 734 F.3d 1175, 1183–84 (D.C. Cir. 2013)). That holding disposes of Plaintiffs' repeated references to Mr. Nada's citizenship. *See* Opp. 1–4, 7, 13, 18. Rather, because the "locus of [a] tort" is "typically" where "the plaintiff suffers" his "injury," "the direct effect question often reduces to whether or not the plaintiff sustained his cognizable injury in the United States." *Azima*, 305 F. Supp. 3d at 167. Plaintiffs identify no such direct effects here: Plaintiffs sustained their alleged reputational and financial injuries in Italy and Switzerland, where they respectively reside and are headquartered.

Turning to the supposed "direct effects" Plaintiffs identify, each one is far too attenuated to abrogate the UAE's immunity.

*First*, Plaintiffs cite (at 19) an alleged email from Alp to Crédit Suisse's email address for media inquiries in June 2018, in which an Alp employee allegedly posed as a freelance journalist to inquire about Crédit Suisse's relationship with Lord Energy. Plaintiffs do not allege that Crédit Suisse ever responded to that email. Nevertheless, Plaintiffs allege that, *six months later*, Alp's email ultimately caused Crédit Suisse's CEO to decide to "stop[] supporting Lord Energy's trading positions" (Opp. 19), a decision that they speculate (conclusorily on information and belief) "was

not made based on market risk considerations, but rather because Crédit Suisse feared that [providing Lord Energy with credit] would make the bank appear to be supporting the Muslim Brotherhood." Am. Compl. ¶ 212. That decision allegedly contributed to Lord Energy's loss of access to credit from financial institutions worldwide, which, according to Plaintiff, then prevented Americas Lord Energy from completing an important trade, after which Lord Energy decided to dissolve its U.S. subsidiary, Americas Lord Energy. *See id.* ¶¶ 205, 210–213. Notably, not until the very final links in this causal chain is the United States even mentioned, much less affected. The independent choices of any one of these actors—Alp and its employees, Crédit Suisse and its employees, or any of the many other financial institutions that refused to do business with Plaintiffs—sever any "direct" link between the UAE's conduct and any effects on Americas Lord Energy felt the United States. *See Princz*, 26 F.3d at 1172; *Odhiambo*, 930 F. Supp. 2d at 31.

Plaintiffs cite (at 19–20) *Exxon Mobil Corp. v. Corporacion CIMEX, S.A.*, 111 F.4th 12 (D.C. Cir. 2024), and *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 894 F.3d 339 (D.C. Cir. 2018), to argue that Crédit Suisse's decision to terminate its relationship with Lord Energy was "intended" by the UAE, so that notwithstanding the presence of independent third parties in the causal chain, the downstream effects on Americas Lord Energy were the "direct effect" of the UAE's conduct. Opp. 19–20. But *Exxon* and *EIG* do not stand for such a broad proposition. In *Exxon*, a Cuban state-owned corporation (CIMEX) directly operated commercial facilities in Cuba that processed remittances from the United States. 111 F.4th at 32. Not only did that commercial conduct "cause[] a direct effect in the United States by creating a market for remittances and drawing money from the United States to Cuba"; CIMEX "'specifically target[ed]' parties in the United States." *Id.* at 32, 34; *see id.* at 34 ("CIMEX's entire remittance business [was] aimed at bringing money from the United States into Cuba."). Likewise, in *EIG*, a Brazilian state-owned corporation

(Petrobras) "specifically targeted U.S. investors" and defrauded them into investing in a Brazilian oil project. 894 F.3d at 345. Neither case endorsed a long causal chain of the sort Plaintiffs plead here based on allegations of the sovereign's subjective intent. If merely pleading intent sufficed to allege direct effects, plaintiffs could plead around immunity in nearly every case. *See Sachs*, 577 U.S. at 36 (construing the commercial activities exception to prevent plaintiffs from "evad[ing] the [FSIA's] restrictions through artful pleading").

And even if a foreign state's subjective intent were relevant to the analysis, Plaintiffs have not pleaded that the UAE intended any effects *in the United States*. The alleged hacked communications Plaintiffs cite throughout the Amended Complaint establish that the UAE was specifically focused on exposing the Muslim Brotherhood "in Europe" and "in European countries." *E.g.*, Am. Compl. ¶¶ 18, 129, 258, 274–75. And even if the Court accepts Plaintiffs' conjecture that the UAE's focus on the Muslim Brotherhood was a ruse, Plaintiffs' proffered alternative motive—that the UAE was seeking to advantage ADNOC in Asia—also does not evince any intent to affect the United States.

*Second*, Plaintiffs cite (at 20) an alleged email Alp sent to Platts (a price reporting agency). They allege (again on information and belief) that Alp's email "resulted in Platts denying Lord Energy's request to be upgraded to participate in the Platts Market on Close assessment process." Am. Compl. ¶ 181. Even apart from depending on the purported actions of intervening actors (Alp and Platts), the allegation is conclusory. The only U.S. connection Plaintiffs allege is that "[t]he Platts approval process is managed in part from the United States." *Id.* Plaintiffs notably do not allege when Lord Energy made its request to Platts, whom Alp emailed at Platts, or when Platts denied that request in relation to Alp's email, much less any factual basis from which the Court could infer that Lord Energy otherwise met the qualifications for being "upgraded to participate in

the Platts Market on Close assessment process." *Id.*

*Third*, Plaintiffs cite (at 20–21) a deal between Americas Lord Energy and a commodity trading firm (CCI), which was "subject to credit department approval by CCI" and which CCI ultimately cancelled. Am. Comp. ¶¶ 202–03. Based on those bare facts, Plaintiffs surmise (yet again on information and belief) that "CCI's compliance department became aware of the false allegations the enterprise published about [Plaintiffs] being linked to terrorism and decided that it was too risky to do business with Lord Energy." *Id.* ¶ 203. But CCI is an intervening actor that exercised its own judgment. Further, Plaintiffs allege no contact between any Defendant (much less the UAE) and CCI, and cite no factual basis for their assertion that CCI based its decision on information allegedly published or commissioned by Alp linking Lord Energy to terrorism.

*Fourth*, Plaintiffs point (at 21) to Lord Energy's decision to dissolve Americas Lord Energy. The causal chain from the UAE's alleged commercial contract with Alp to Americas Lord Energy's dissolution depends on the independent choices of numerous intervening actors—including banks, partners, and rating agencies—any one of which severs any direct link between the UAE's commercial conduct and the United States. *See* UAE Mem. 13–14. Plaintiffs cite no factual allegations that the UAE was even aware of Americas Lord Energy's existence *before* Alp allegedly informed a UAE official that it had ceased operations, much less that the UAE intended to induce anyone to stop working with Americas Lord Energy. *See* Am. Compl. ¶ 219.[3]

---

[3] Plaintiffs also attempt to distinguish *Virtual Countries Inc. v. Republic of South Africa*, 300 F.3d 230 (2d Cir. 2002). They assert (at 21) that "there is no indication in *Virtual Countries* that South Africa foresaw or intended that its press release would be picked up by the press." But what else is a press release for? Plaintiffs also emphasize that there was no allegation in *Virtual Countries* that South Africa *intended* to harm plaintiff. Opp. 21. Plaintiffs derive this supposed intent element from their misreading of *Exxon* and *EIG*, as explained. But conclusory allegations of intent do not make any U.S. effect more or less direct.

*Fifth*, Plaintiffs allege that "Lord Energy's bankruptcy and the collapse of its U.S. subsidiary deprived J.P. Morgan and other U.S. banks of valuable clearing fees." Opp. 22. But this derivative harm is one step further removed than Plaintiffs' other allegations, so it fails *a fortiori*. *See Millicom Int'l Cellular v. Republic of Costa Rica*, 995 F. Supp. 14, 22 (D.D.C. 1998) ("[P]laintiffs cannot rely on any repercussion felt by their … creditors to establish 'direct effects' … because any derivative harm would be too indirect to qualify as an 'immediate consequence' of the defendants' conduct." (quoting *Weltover*, 504 U.S. at 618)).

*Sixth*, Plaintiffs summarily cite (at 22) an allegation that "Macquarie terminated the 'Futures Trading and Clearing Agreement' with Lord Energy that had been in place since 2014" and later "declined to enter into a new business relationship with Hazim [Nada]." Am. Compl. ¶ 209. Again, like the cancelled CCI deal, Macquarie is an intervening actor that exercised its own judgment; Plaintiffs allege no contact between any Defendant and Macquarie; and Plaintiffs cite no factual basis for their assertion that Macquarie based its decision on information published by Alp linking Lord Energy to terrorism.

*Finally*, Plaintiffs' allegation (at 23) that "Lord Energy's collapse had a direct impact on the domestic WTI market" relies on countless intervening acts by oil market participants around the globe. If foreign commercial conduct that merely has a downstream effect on U.S. oil markets were sufficiently direct to abrogate sovereign immunity, that would throw open the door to countless suits against foreign states.[4]

---

[4] *Missouri ex rel. Bailey v. People's Republic of China*, 90 F.4th 930 (8th Cir. 2024), does not support Plaintiffs' "market effects" theory. There, China engaged in two courses of conduct with direct effects in the United States. It allegedly hoarded personal protective equipment (PPE) during the COVID-19 pandemic and then "sold lower-quality equipment in the United States." *Id.* at 938. And it allegedly took over factories that made masks on behalf of American companies, preventing them from supplying masks to the United States. *Id.* at 938. The court thus concluded that China's

(Continued on following page.)

**C.**    **The gravamen of Plaintiffs' suit concerns conduct and effects outside of the United States.**

Even if Plaintiffs could identify *some* U.S. conduct by the UAE or *some* direct effect in the United States, the gravamen of Plaintiffs' lawsuit lies outside of the United States.

Specifically, Plaintiffs allege that the UAE contracted with a Swiss firm to investigate and expose Plaintiffs' financial ties to the Muslim Brotherhood in Europe. Am. Compl. ¶¶ 18, 90–105. To that end, Plaintiffs allege that Alp spread "app[arently] legitimate" articles, allegedly "fabricated by … Alp employees and written by journalists and academics on Alp's payroll," to "induce [foreign banks] to break ties" with Plaintiffs, causing reputational and financial harm that Plaintiffs felt in Switzerland and Italy. *Id.* ¶ 9–10, 17, 284. Switzerland, in particular, was the site of Alp's alleged contact with "Plaintiffs' primary lender," Crédit Suisse, which Plaintiffs identify as especially consequential. Opp. 19. Indeed, Plaintiffs allege that Crédit Suisse's decision to stop lending to Lord Energy directly precipitated Lord Energy's bankruptcy (in Switzerland). Am. Compl. ¶ 212. The core of Plaintiffs' claims—both the allegedly wrongful conduct and that conduct's intended effects—is thus found outside the United States, so the commercial activities exception does not apply. *See Sachs*, 577 U.S. at 33–34; *Exxon*, 111 F.4th at 30.

Plaintiffs respond (at 14) that "the conduct forming the gravamen of Plaintiffs' claims" does not have to be "exclusively domestic." But merely identifying *some* domestic conduct—even wrongful domestic conduct—is not sufficient; Plaintiffs must locate the "core," the "essentials," or the "gravamen" of their claims in the United States. *Sachs*, 577 U.S. at 34–36. In *Sachs*, the plaintiff identified domestic conduct (selling her the train ticket), which she alleged was wrongful because the Austrian state railway (OBB) "should have alerted her to the dangerous conditions at

---

conduct directly affected Americans' ability to obtain PPE and masks.

the Innsbruck train station when OBB sold the Eurail pass to her *in the United States*." *Id.* at 35–36 (emphasis in original). Yet the Supreme Court held that this domestic conduct was insufficient to abrogate OBB's immunity because the locus of the tort was in Austria. *Id.* Here, the locus of Plaintiffs' Lanham Act, RICO, and Sherman Act claims is Europe, where the overwhelming majority of the allegedly wrongful conduct was performed and where Plaintiffs purportedly suffered the reputational and financial injuries that form the basis for their claims. *See Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 215 (2019) ("[I]f the 'gravamen' of a lawsuit is tortious activity abroad, the suit is not 'based upon' commercial activity within the meaning of the FSIA's commercial activity exception.").

Plaintiffs rely (at 15–16) on *Rodriguez v. Pan American Health Organization*, 29 F.4th 706, 716 (D.C. Cir. 2022), which permitted a suit to proceed against a Cuban agency (PAHO) accused of trafficking Cuban doctors to Brazil. But the specific claim at issue in *Rodriguez* was not human trafficking (which occurred abroad); rather, the claim was based on PAHO's illegal conduct, namely, "moving money, for a fee, between" Cuba and Brazil via "PAHO's Citibank account in Washington, D.C." *Id.* at 710. That commercial conduct—committed directly by PAHO *in the United States*—was itself a violation of federal law and the core of the plaintiffs' "cause of action." *Id.* at 716 (citing 18 U.S.C. §§ 1589(b), 1595(a)). Here, by contrast, both the core wrongful conduct *and* Plaintiffs' injuries occurred in Europe.

## II.    The Amended Complaint Fails to State a Claim.

### A.    Plaintiffs fail to state a claim under the Lanham Act.

The Lanham Act provision Plaintiffs invoke, 15 U.S.C. § 1125(a)(1)(B), applies only to commercial speech, advertising or promotion, and domestic uses in commerce. The Amended Complaint fails to allege any of these necessary elements.

       *1.     The alleged speech is non-commercial.*

    Plaintiffs try to transform the alleged statements here (blog posts, news articles, and Wikipedia edits) into commercial speech simply by claiming that Defendants had "an economic motivation." Opp. 70–71. In so doing, Plaintiffs misread their own authorities. In *Ariix, LLC v. NutriSearch Corp.*, the Ninth Circuit made clear that a defendant's economic motivation was relevant only because the statements at issue, although "not in a traditional advertising format," still "refer[red] to" and "comparatively rate[d]" the parties' "specific products." 985 F.3d 1107, 1111, 1116 (9th Cir. 2021). Indeed, the Supreme Court has emphasized that merely having an "economic motivation … *would clearly be insufficient* by itself to turn the materials into commercial speech." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 67 (1983) (emphasis added).[5]

    Here, there is no dispute that the alleged statements are "not in the traditional form of an advertisement—for example, there is no price or availability information listed." *Ariix*, 985 F.3d at 1116. Nor do Plaintiffs identify a single statement about any party's "specific products." *Id.* Instead, they focus entirely on Defendants' alleged economic motivations, contending that the Defendants' alleged communications about exposing the Muslim Brotherhood in Europe were a cover for the UAE's true purpose of raising the price for Murban on the spot market in Asia. *See* Opp. 72. Even accepting that speculation at face value, Plaintiffs' allegation that Defendants acted with an "economic motivation" is "clearly insufficient by itself to turn [the alleged statements] into commercial speech." *Bolger*, 463 U.S. at 67. Plaintiffs thus cannot state a Lanham Act claim.

---

[5] *Ariix* and *Bolger* are consistent with *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262 (10th Cir. 2000), which Plaintiffs discuss (at 76–77). The court in *Proctor & Gamble* found that the statements at issue promoted "commercial transactions" by "unambiguously urg[ing] recipients to eschew purchasing P & G products in favor of Amway products." 222 F.3d at 1276. Plaintiffs allege nothing like that here.

        2.     *The alleged speech is not advertising or promotion.*

The Lanham Act does not create a cause of action for general interference with business relations. Rather, as Plaintiffs acknowledge (at 74–75), the Act's prohibition on false advertising is limited to statements made "for the purpose of influencing consumers to buy the defendant's goods or services" and that are "disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within [the relevant] industry." *In re McCormick & Co., Inc., Pepper Prod. Mktg. & Sales Pracs. Litig.*, 215 F. Supp. 3d 51, 59 (D.D.C. 2016) (quoting *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999)).

Plaintiffs allege that Defendants' statements influenced Plaintiffs' "business partners" and the "financial institutions" that loaned Plaintiffs money. Opp. 74 & n.22. Neither of these groups is Plaintiffs' "consumers" or the general "purchasing public." *McCormick & Co.*, 215 F. Supp. 3d at 59–60 (citation omitted). Plaintiffs' business partners were allegedly *selling* crude *to Plaintiffs*, which Plaintiffs would then sell to consumers on the spot market in Asia. *See, e.g.*, Am. Compl. ¶ 202 (referring to "a deal for Americas Lord Energy to buy a cargo of 600,000 barrels of WTI"); *id.* ¶ 223 (alleging Defendants "induced Sonatrach to stop selling Lord Energy cargoes of Saharan Blend"). As for the financial institutions, Plaintiffs note (at 74 n.22) that there is "no authority … to support the claim that, as a matter of law, financial institutions cannot be consumers under the Lanham Act." But that misses the point entirely. The problem is that these financial institutions are not the relevant purchasing public: they are not *Plaintiffs'* consumers on the spot market for light crude oil in Asia.

        3.     *Plaintiffs' claim seeks an impermissible extraterritorial application of the Lanham Act.*

Plaintiffs' claim is also impermissibly extraterritorial because the alleged statements were not made to influence the purchasing decisions of anyone in the United States. *See* UAE Mem.

19–20; *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 415 (2023). Plaintiffs assert that their claims are domestic because "[m]any of the 'false and misleading statements were published directly on U.S. websites.'" Opp. 77 (quoting Am. Compl. ¶¶ 290, 293). But they have no answer to the floodgates problem that would create: if merely posting statements on a website that happened to be hosted by a U.S. entity were sufficient to domesticate foreign conduct, that would open the doors to countless false advertising claims that otherwise lack any connection to the United States. *Abitron* forecloses that outcome.

### B. Plaintiffs fail to state a RICO claim.

Plaintiffs fail to allege RICO predicate acts, RICO causation, domestic injury, a RICO enterprise, or a RICO conspiracy; *and* Plaintiffs' claims are time-barred.

### 1. The Amended Complaint fails to allege any predicate acts.

The UAE's memorandum in support of its motion to dismiss (at 21–22) identified cases from across the country (including from this Court) that rejected attempts "to shoehorn a defamation claim into the RICO framework." *Ctr. for Immigr. Studs. v. Cohen*, 410 F. Supp. 3d 183, 191 (D.D.C. 2019) (A.B. Jackson, J.). Plaintiffs' attempts (at 37) to distinguish these cases on their facts ignore the fundamental point: Plaintiffs cannot state a RICO claim by recasting defamation or other business torts—a "smear campaign"—as violations of the federal criminal statutes prohibiting wire fraud and bank fraud. Courts "are universally hostile to such attempts." *Kimberlin v. Nat'l Bloggers Club*, No. 13-cv-3059, 2015 WL 1242763, at *9 (D. Md. Mar. 17, 2015) (citing cases); *see Kimm v. Lee*, No. 04-cv-5724, 2005 WL 89386, at *5 (S.D.N.Y. Jan. 13, 2005) (citing cases).[6] The Court should reject Plaintiffs' transparent attempt at artful pleading here.

---

[6] For example, Plaintiffs attempt to distinguish *Ritchie v. Sempra Energy*, No. 10-cv-1513, 2013 WL 12171757 (S.D. Cal. Oct. 15, 2013), and *Kimm*, 2005 WL 89386, on the grounds that "the statements were 'designed to injure [the plaintiffs'] goodwill and business reputation[s],' not to

(Continued on following page.)

2.    *The Amended Complaint fails to allege RICO proximate causation.*

Just as Plaintiffs have not alleged sufficiently "direct effects" to abrogate the UAE's immunity—because numerous intervening actors exercised their own judgment, *see supra* Section I.B—so too have Plaintiffs failed to plead proximate causation under RICO.

Plaintiffs' opposition confirms that their injuries depend on the independent decisions of numerous sophisticated financial institutions and market participants, any one of which breaks the causal chain. *See* Opp. 47–48. Sonatrach allegedly vetted Plaintiffs over several months before ultimately ending its relationship with them. Am. Compl. ¶¶ 135–37. Likewise, Crédit Suisse's CEO was personally involved in deciding to end the bank's financial relationship with Lord Energy (*id.* ¶¶ 212, 297), and there is a distinct temporal gap between the alleged communications in June 2018 and Crédit Suisse's decision to close Lord Energy's account in 2019 (*id.* ¶¶ 310–11, 314). And while Plaintiffs allege that Alp induced World-Check to list them under its "terrorism" risk category, they also allege that World-Check rescinded that designation in July 2018, long before Plaintiffs lost access to credit in December 2018 and the following months. *Id.* ¶¶ 157, 205–09. As for Plaintiffs' allegations concerning other banks and market participants, they are simply too threadbare to support an "inference" (Opp. 50) that Defendants' conduct—and not those institutions' independent judgment and interests—caused them to stop dealing with Plaintiffs. *See* Opp. 48 (citing Am. Compl. ¶¶ 201–04, 206–09). Notably, Plaintiffs do not allege that Defendants had any contact with any of those financial institutions and market participants.

Plaintiffs rely (at 49) on *Bridge v. Phoenix Bond & Indemnification Co.*, 553 U.S. 639

---

deprive them of money or property." Opp. 37 (quoting 2005 WL 89386, at *1, *4). But that is exactly what Plaintiffs allege here: a smear campaign designed to injure their goodwill and business reputations. Any harms to money or property are derived from their reputational injuries, as in *Ritchie* and *Kimm*.

(2008). But that case stands for the modest proposition that neither the mail fraud statute nor RICO itself requires Plaintiffs to plead "first-party reliance." *Id.* at 641. The decision in *Companhia Brasileira Carbureto de Calcio-CBCC v. Applied Industrial Materials Corp.*, 887 F. Supp. 2d 9 (D.D.C. 2012), is even further afield. There, the court held that the plaintiffs' alleged injury was sufficiently causally related to the alleged wrongdoing to support antitrust standing; the International Trade Commission's decision was not an intervening cause because the ITC had specifically "determined that it imposed duties [on the plaintiffs] based on the wrongdoing of the ITC petitioners and Defendants." *Id.* at 22. These cases say nothing about instances like this, where Plaintiffs' injuries are allegedly caused by the independent choices of a host of sophisticated financial institutions and market participants. That distinction makes this case far more like *Solomon v. Dechert LLP*, No. 22-cv-3137 (JEB), 2023 WL 6065025, at *11 (D.D.C. Sept. 18, 2023), where the defendants' conduct was not "decisive" and thus not the proximate cause of the plaintiff's injuries.

### 3.    The Amended Complaint fails to allege a domestic injury.

RICO applies only to domestic injuries, yet Plaintiffs' opposition confirms that their injuries were felt in Europe, where they live, work, and are headquartered—not in the United States. Plaintiffs do not dispute that the Amended Complaint contains no allegations that Americas Lord Energy had any revenues, earnings, or capital *whatsoever*. Nor do Plaintiffs identify any injuries or business losses actually suffered by Americas Lord Energy, as opposed to its foreign parent, Lord Energy—presumably because Americas Lord Energy had no business or capital that was independent of Lord Energy. Indeed, the only injuries Plaintiffs allege are the diminution of Lord Energy's valuation and losses on its balance sheets. Am. Compl. ¶¶ 214–15

Plaintiffs focus (at 52) on a planned transaction involving Americas Lord Energy that was "scuttled." But Plaintiffs' allegations make clear that the failure of that transaction was a downstream effect of Lord Energy (in Switzerland) losing access to credit (from a Swiss bank). Am.

Compl. ¶¶ 212–13. The same goes for any disruption of Americas Lord Energy's "participa[tion] in weekly pipeline tenders" and "deal[ings] with U.S. brokers." Opp. 52. Those operations only ceased because Lord Energy dissolved Americas Lord Energy after losing access to credit. Am. Compl. ¶¶ 212–13. If such indirect effects sufficed to domesticate foreign injuries, then any foreign corporation with a U.S. subsidiary could claim domestic injuries, so long as some harm abroad produced a downstream effect on the subsidiary's operations.[7]

Clutching at straws, Plaintiffs rely on cases where courts permitted "general factual allegations of injury" to support *standing*. Opp. 51 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). But alleging a domestic RICO injury requires plaintiffs to allege "particular facts" that locate the "central features of the alleged injury" in the United States. *Yegiazaryan v. Smagin*, 599 U.S. 533, 543–45 (2023) (quoting *Smagin v. Yegiazaryan*, 37 F.4th 562, 544 (9th Cir. 2022)). Plaintiffs' allegations locate the central features of their alleged injury—the harms to their reputation and ensuing loss of access to credit—firmly in Switzerland.

### 4. The Amended Complaint fails to allege an enterprise.

Plaintiffs fail to allege a RICO enterprise because they fail to identify any purpose of the enterprise beyond "the UAE's objectives" (Am. Compl. ¶ 16)—whether those objectives are investigating and exposing the Muslim Brotherhood in Europe or increasing the price for Murban on the spot market in Asia. *See US Dominion, Inc. v. MyPillow, Inc.*, No. 21-cv-0445 (CJN), 2022 WL 1597420, at *5 (D.D.C. May 19, 2022).[8] Every member of the supposed enterprise—the UAE

---

[7] The UAE properly "ignore[d] that Hazim [Nada] is a U.S. citizen who maintains a residence in Texas" (Opp. 52) because that fact is irrelevant. Plaintiffs allege that Mr. Nada "was based in Italy and worked daily in the Lord Energy's office [*sic*] in Switzerland." Am. Compl. ¶ 108. They make no claim that Mr. Nada was even present in Texas, much less that he suffered an injury there.

[8] *US Dominion* concerned a supposed enterprise comprising both agents (a law firm) and non-agents (a public-relations firm) and the company that hired them; the court's analysis did not turn
(Continued on following page.)

and its officials, ADNOC, Alp, its employees and subcontractors, and anyone else Plaintiffs try to sweep into their claims of a vast conspiracy—allegedly acted to further "the UAE's objectives." Am. Compl. ¶ 16. That is no more an enterprise than the U.S. government and its officials and contractors are.

5.    *The Amended Complaint fails to allege a RICO conspiracy.*

Plaintiffs do not dispute that they cannot sustain a RICO conspiracy claim without an underlying substantive RICO violation. *See* UAE Mem. 26–27; Opp. 63. Because Defendants' alleged conduct—commissioning articles and other communications concerning Plaintiffs' ties to the Muslim Brotherhood—fail to allege racketeering conduct (or any predicate act), Plaintiffs' conspiracy claim must also be dismissed.

6.    *Plaintiffs' RICO claims are time-barred.*

Finally, even if Plaintiffs could allege RICO's elements, their claim would still be time-barred. Plaintiffs do not dispute that they were on notice of (1) the existence of their injuries, (2) their cause, and (3) some evidence of wrongdoing more than four years before filing this lawsuit in January 2024. *See* UAE Mem. 27–28. Nor could they: "In June 2018, Hazim [Nada] reported the smear campaign against him and his companies to Swiss law enforcement." Am. Compl. ¶ 231; *see id.* ¶¶ 213, 231. Plaintiffs invoke the doctrine of fraudulent concealment, claiming that because Defendants allegedly "concealed their identities and activities," it was not until April 2021 that Plaintiffs "learned from the hacked documents the nature of the conspiracy against them and

---

on any finding of a formal agency relationship among them but on the fact that there were no allegations that the law firm or the public-relations firm did anything "outside the scope" of their commercial contractual "relationship" with the company. 2022 WL 1597420, at *5–6. To be clear, the UAE has never contended that Alp or any other Defendant acted as the UAE's *agent* or had any express or implied authority to bind the UAE or otherwise act in the UAE's name.

the availability of a cause of action under RICO." Opp. 60. But the doctrine of fraudulent conceal-

ment "requires that the defendant make an affirmative misrepresentation tending to prevent dis-

covery of the wrongdoing." *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996). Plaintiffs

allege no such affirmative representation, and Plaintiffs allege they had actual knowledge of the

wrongdoing in any event. The doctrine therefore does not apply, and Plaintiffs' claims are time-

barred.

### C.    Plaintiffs' Sherman Act claim fails for lack of subject-matter jurisdiction and fails to state a claim.

Finally, Plaintiffs have not alleged a proper Sherman Act claim. They have not alleged a

direct effect on U.S. commerce that proximately caused their injury, so the Court lacks subject-

matter jurisdiction under the FTAIA, and Plaintiffs fail to allege even the most basic elements of

a Section 1 or Section 2 claim.

#### 1.    *The Court lacks subject-matter jurisdiction under the FTAIA.*

Plaintiffs fail to allege a "direct, substantial, and reasonably foreseeable effect" on U.S.

commerce that proximately caused their alleged antitrust injury. 15 U.S.C. § 6a(1); *see Empagran*

*S.A. v. F. Hoffmann-LaRoche, Ltd.*, 417 F.3d 1267, 1271 (D.C. Cir. 2005). The Court therefore

lacks jurisdiction under the FTAIA.

An effect on U.S. commerce is "direct" under the FTAIA only if it "follows as an imme-

diate consequence of the defendant's activity" with no "intervening developments." *United States*

*v. LSL Biotech.*, 379 F.3d 672, 680–81 (9th Cir. 2004). Plaintiffs identify *one* supposedly domestic

effect: the dissolution of Americas Lord Energy. Opp. 79. But, for the same reasons that any U.S.

effects are too indirect to abrogate the UAE's immunity or to domesticate Plaintiffs' foreign inju-

ries, *see supra* Sections I.B, II.B.3, the dissolution of Americas Lord Energy is too indirectly re-

lated to Defendants' alleged conduct to satisfy the FTAIA's direct-effect requirement. *See* 15

U.S.C. § 6a(1). Plaintiffs' allegations—that Defendants allegedly defamatory statements caused financial institutions to close Lord Energy's accounts (in Switzerland), which caused Lord Energy to dissolve its U.S. subsidiary—turn on the intervening actions of numerous financial institutions and market participants worldwide and are thus too indirect to support jurisdiction.[9]

Plaintiffs also fail to allege that any U.S. effects proximately caused their antitrust injury. *See Empagran S.A.*, 417 F.3d at 1271. Plaintiffs assert that "Americas Lord Energy's collapse … *was* the effect on U.S. commerce," and "that effect gives rise to Plaintiffs' Sherman Act claims." Opp. 82–83. But Americas Lord Energy's collapse is, at most, a downstream *consequence* of the alleged injuries Plaintiffs felt in Europe—not a *cause* of them. *See* UAE Mem. 30–31.

2.    *Plaintiffs fail to state a claim under the Sherman Act.*

a.    *The Amended Complaint fails to allege antitrust injury.*

To state an antitrust claim, Plaintiffs must allege that Defendants have harmed competition as a whole in the relevant market, not just Plaintiffs as the competitor. *See Dial A Car, Inc. v. Transp., Inc.*, 82 F.3d 484, 486–87 (D.C. Cir. 1996); *Am. President Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209, 220–21 (D.D.C. 2022). In response to Defendants' motion to dismiss, Plaintiffs have now clarified that the market is limited to "the spot market for light crude oil sold to refineries in Asia." Opp. 84. But, as explained in the UAE's memorandum in support of its motion to dismiss (at 33–34), Plaintiffs allege, at most, injuries to themselves, not an injury to *competition* in the spot market for light crude in Asia.

In response, Plaintiffs assert that "Defendants' anticompetitive conduct drove Lord Energy

---

[9] The cases Plaintiffs cite that deal with whether a U.S. exporter can bring an antitrust claim are nonresponsive. *See* Opp. 79–80 (citing, *inter alia*, *Gen. Elec. Co. v. Latin Am. Imports, S.A.*, 187 F. Supp. 2d 749 (W.D. Ky. 2001)). The problem here is that the causal chain between Defendants' foreign conduct and the United States is too attenuated to be a "direct effect." That is true regardless of whether Americas Lord Energy can be viewed as an exporter.

out of the market, reducing supply and driving prices back up." Opp. 86 (citing Am. Compl. ¶¶ 84–86). But Plaintiffs' allegations do not support that conclusion. The Amended Complaint demonstrates that Lord Energy was, in fact, only a minor player in the spot market for light crude in Asia: over the course of *three years*, Lord Energy shipped fewer than "20 million barrels of Saharan Blend to Asia." Am. Compl. ¶ 7. During that period, "Murban producers in the UAE sold about 8 million barrels of Murban *per month* on the spot market in Asia." *Id.* ¶ 331. Critically, nowhere in the Amended Complaint do Plaintiffs describe the state of competition in the spot market for light crude oil sold to Asian refiners, such as how many barrels of Murban, Saharan Blend, Arab Extra Light, and WTI were sold on the spot market during the relevant period, how prices for those blends on the spot market changed over time, or how any price changes affected Asian spot market consumers. Instead, Plaintiffs cite a dip in *Murban* prices compared to Arab Extra Light (which Plaintiffs did not trade). *Id.* ¶ 84. Without more information about the broader state of the market, the fact that Murban prices dropped compared to Arab Extra Light says nothing about the effect on competition in the Asian spot market as a whole. Plaintiffs respond (at 86 & n.27) that the Court just needs to take them at their word, but that flips the burden on its head: Plaintiffs must allege *facts* to support the conclusion that Defendants' conduct harmed competition. They have not.

> b.    *The Amended Complaint fails to state a Section 1 claim.*

Plaintiffs have failed to allege that Defendants entered into an agreement to unreasonably restrain trade under Section 1 of the Sherman Act. In response, Plaintiffs contend that the Court can "infer specific intent to restrain trade from 'conduct that has no legitimate business justification but to destroy or damage competition.'" Opp. 89 (citation omitted). But "[p]ublishing negative statements about a business is not the sort of conduct that … is … manifestly anticompetitive, nor would it almost always tend to restrict competition." *Asa Accurade, Inc. v. Am. Numismatic Ass'n*, 370 F. Supp. 2d 213, 217 (D.D.C. 2005) (cleaned up); *see also* UAE Mem. 36 (citing cases).

Plaintiffs claim (at 91) that "Defendants' fraudulent statements were intended to, and did, drive the UAE's only proven competitor out of the market." The Amended Complaint does not so allege. Instead, Plaintiffs themselves have pleaded dozens of pages of allegations supporting an alternative motive: that the UAE was concerned, not with propping up crude prices on the spot market in Asia, but with combatting terrorist financing in Europe. *E.g.*, Am. Compl. ¶¶ 18–19, 100, 106–07, 143, 242–82. Plaintiffs do not identify a single statement in the thousands of pages of hacked documents to which they allegedly have access that suggests that the UAE's intent was to affect oil prices or eliminate a commercial competitor. And out of the "1,000 individuals and 400 organizations" flagged by Alp as having ties to the Muslim Brotherhood (*id.* ¶ 279), Plaintiffs do not identify even one of ADNOC's other competitors. Under these circumstances, "[f]alse statements about a competitor—without more—do not give rise to an antitrust violation." *Hytera Commc'ns Corp. v. Motorola Sols., Inc.*, 623 F. Supp. 3d 857, 879–80 (N.D. Ill. 2022).

> c.    *The Amended Complaint fails to state a Section 2 claim.*

Plaintiffs argue (at 92–93) that they have stated a Section 2 claim based on ADNOC's control of Murban exports from the UAE. But they ignore that "[m]ost large refineries in Asia … considered Murban to be equivalent to Saharan Blend, Arab Extra Light[,] and WTI." Am. Compl. ¶ 72. In other words, all of these blends competed on the spot market for light crude in Asia, so Plaintiffs' allegation that ADNOC controls Murban exports from the UAE does not establish that ADNOC has a monopoly on the spot market for *all* light crude in Asia. *See id.* ¶¶ 68–69, 72. Beyond that, even if *ADNOC* possessed market power, Plaintiffs have not alleged facts demonstrating that ADNOC is the UAE's alter ego such that the UAE can be held liable for ADNOC's alleged monopoly. *See* UAE Mem. 37. Plaintiffs have no response.

Finally, even if ADNOC exercised market power *and* the UAE could be held liable for it,

"[f]alse statements about a rival[] … do not curtail output in either the short or long term." *Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 623 (7th Cir. 2005); *see Hytera Commc'ns*, 623 F. Supp. 3d at 879–80. Plaintiffs have not alleged that Defendants' statements harmed competition (as opposed to harming Plaintiffs themselves), so they cannot state a Section 2 claim.

   *3.    Plaintiffs' Sherman Act claims are time-barred.*

   Finally, Plaintiffs' Sherman Act claims are time-barred because they filed suit more than four years after they sustained their injury, *see* 15 U.S.C. § 15b, and the doctrine of fraudulent concealment does not apply, *see supra* Section II.B.6.

## CONCLUSION

   The United Arab Emirates respectfully asks the Court to dismiss the Amended Complaint with prejudice.

Dated: November 8, 2024                    Respectfully submitted,

                                           */s/ John B. Bellinger*
                                           John B. Bellinger III (Bar No. 405059)
                                           Amy Jeffress (Bar No. 449258)
                                           Sally L. Pei (Bar No. 1030194)
                                           Stephen K. Wirth (Bar No. 1034038)
                                           ARNOLD & PORTER KAYE SCHOLER LLP
                                           601 Massachusetts Avenue, N.W.
                                           Washington, DC 20001
                                           Telephone: (202) 942-5000
                                           Facsimile: (202) 942-5999
                                           john.bellinger@arnoldporter.com

                                           Robert Reeves Anderson (Bar No. 994989)
                                           ARNOLD & PORTER KAYE SCHOLER LLP
                                           1144 Fifteenth Street, Suite 3100
                                           Denver, CO 80202

                                           *Counsel for the United Arab Emirates*