## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HAZIM NADA, *et al.*,

          *Plaintiffs,*

    *v.*

THE UNITED ARAB EMIRATES, *et al.*,

          *Defendants.*

No. 1:24-cv-206 (ABJ)

## DEFENDANTS ALP SERVICES SA, DILIGENCE SARL, MARIO BRERO, LIONEL BADAL, AND MURIEL CAVIN'S REPLY IN SUPPORT OF THEIR MOTION TO DISMISS

**TABLE OF CONTENTS**

REPLY BRIEF ................................................................................................................. 1

I.    PLAINTIFFS CANNOT DEMONSTRATE PERSONAL
      JURISDICTION OVER THE EUROPEAN DEFENDANTS. ........................... 1

II.   PLAINTIFFS FAIL TO STATE A CLAIM. ..................................................... 6

      A.   Plaintiffs' First Claim Under the Lanham Act Should Be
           Dismissed. ............................................................................................. 6

           1.   *The Statements at Issue Are Not "Commercial Advertising"
                or "Promotion."* ............................................................................ 6

                a.   The European Defendants Are Not Plaintiffs'
                     Competitors. .................................................................... 6

                b.   The Statements at Issue Are Not Commercial
                     Speech. ............................................................................ 7

                c.   The Statements at Issue Did Not Influence
                     Consumers to Purchase Defendants' Products. .............. 10

                d.   The Statements at Issue Were Not Widely
                     Disseminated. ................................................................. 11

           2.   *Plaintiffs' Lanham Act Claim Should Be Dismissed as to
                Defendant Cavin.* .......................................................................... 12

      B.   Plaintiffs' Civil Racketeering Claim Under RICO Should Be
           Dismissed. ........................................................................................... 13

           1.   *Plaintiffs Fail to Plead a Plausible Pattern of Racketeering
                Activity.* ....................................................................................... 13

           2.   *Plaintiffs Fail to Plead Under Open-Ended Continuity.* ............. 13

           3.   *Plaintiffs Fail to Plead Under Closed Continuity* ...................... 14

           4.   *Plaintiffs Fail to Plead an Association-In-Fact Enterprise.* ........ 16

      C.   Plaintiffs' Racketeering Conspiracy Claim Under RICO Should Be
           Dismissed. ........................................................................................... 17

           1.   *Plaintiffs Fail to Allege an Underlying RICO Claim.* .................. 17

           2.   *The Intracorporate Conspiracy Doctrine Precludes a
                Conspiracy.* .................................................................................. 17

      D.   Plaintiffs' Claims Under the Sherman Act Should Be Dismissed. ........ 18

           1.   *Harm to Competition Is Necessary for Antitrust Standing.* ......... 18

           2.   *Plaintiffs Fail to Plead Conspiracy.* ........................................... 21

           3.   *The Alleged Defamation Does Not Qualify as
                Anticompetitive Conduct Under Section 1.* ................................. 22

4.    *Plaintiffs Fail to Plead "Monopoly Power" Under Section 2* ........................................................................................... 24

III.    PLAINTIFFS' RICO AND SHERMAN ACT CLAIMS ARE TIME-BARRED BECAUSE THEY ARE NOT TOLLED BY THE DOCTRINE OF FRAUDULENT CONCEALMENT .............................................. 24

CONCLUSION ........................................................................................................ 25

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abrahams v. Simplify Compliance, LLC*,
   No. 19-3009, 2021 WL 1197732 (D.D.C. Mar. 30, 2021) ......................................................12

*AGS Int'l Servs. S.A. v. Newmont USA Ltd.*,
   346 F. Supp. 2d 64 (D.D.C. 2004) ...........................................................................................6

*Am. Needle, Inc. v. Nat'l Football League*,
   560 U.S. 183 (2010)................................................................................................................22

*Am. President Lines, LLC v. Matson, Inc.*,
   633 F. Supp. 3d 209 (D.D.C. 2022) ...................................................................................19, 21

*Amobi v. Dist. of Columbia Dep't of Corr.*,
   755 F.3d 980 (D.C. Cir. 2014)................................................................................................25

*Andrx Pharms., Inc. v. Biovail Corp. Int'l*,
   256 F.3d 799 (D.C. Cir. 2001)...........................................................................................20, 21

*Ariix, LLC v. NutriSearch Corp.*,
   985 F.3d 1107 (9th Cir. 2021) .............................................................................................8, 9

*Asa Accugrade, Inc. v. Am. Numsmatic Assoc.*,
   370 F. Supp. 2d 213 (D.D.C. 2005).........................................................................................23

*Asahi Metal Indus. Co. v. Superior Ct. of Cal.*,
   480 U.S. 102 (1987)..................................................................................................................4

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...........................................................................................................12, 15

*Avianca, Inc. v. Corriea*,
   705 F. Supp. 666 (D.D.C. 1989)...............................................................................................5

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...........................................................................................................12, 15

*Bernhardt v. Islamic Republic of Iran*,
   47 F.4th 856 (D.C. Cir. 2022)..................................................................................................3

*Bloch v. SmithKline Beckman Corp.*,
   No. CIV. A. No. 82–510, 1988 WL 117927 (E.D. Pa. Nov. 1, 1988)....................................21

*Bolger v. Youngs Drug Prod. Corp.*,
   463 U.S. 60 (1983)............................................................................................................7, 8, 9

*Borden, Inc. v. Spoor Behrins Campbell & Young, Inc.*,
    828 F. Supp. 216 (S.D.N.Y. 1993) ...................................................................22

*Bowie v. Maddox*,
    642 F.3d 1122 (D.C. Cir. 2011) .....................................................................17

*Brunson v. Kalil Co., Inc.*,
    404 F. Supp. 2d 221 (D.D.C. 2005) ...................................................................4

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) ..............................................................................18, 23

*Calder v. Jones*,
    465 U.S. 783 (1984)................................................................................1, 2

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*,
    148 F.3d 1080 (D.C. Cir. 1998) .................................................................19, 23

*Copperweld Corp. v. Indep. Tube Corp.*,
    467 U.S. 752 (1984).................................................................................21

*Edmondson & Gallagher v. Alban Towers Tenants Ass'n*,
    48 F.3d 1260 (D.C. Cir. 1995) ..................................................................15, 16

*Elsevier, Inc. v. Grossman*
    77 F. Supp. 3d 331 (S.D.N.Y. 2015)...............................................................5, 6

*Farah v. Esquire Mag.*,
    736 F.3d 528 (D.C. Cir. 2013) .......................................................................9

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*,
    592 U.S. 351 (2021)..................................................................................4

*GN Netcom, Inc. v. Plantronics, Inc.*,
    967 F. Supp. 2d 1082 (D. Del. 2013) ............................................................19, 20

*In re Aluminum Warehousing Antitrust Litig.*,
    95 F. Supp. 3d 419 (S.D.N.Y. 2015).................................................................22

*Int'l Travel Arrangers, Inc. v. West Airlines, Inc.*,
    623 F.2d 1255 (8th Cir. 1980) ......................................................................23

*Kareem v. Haspel*,
    986 F.3d 859 (D.C. Cir. 2021) ......................................................................13

*Kleo AG v. Rivada Networks, Inc.*,
    22-CV-01664 (DLF), 2023 WL 7921969 (D.D.C. Nov. 16, 2023)........................................13

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ............................................................................................7

*Mathis v. Geo Grp., Inc.*,
   535 F. Supp. 2d 83 (D.D.C. 2008) ......................................................................3

*Mills Corp. v. Miller*,
   No. CIV. A. 97-219, 1997 WL 280599 (D.D.C. May 20, 1997) ..........................13

*Moskal v. United States*,
   498 U.S. 103 (1990) ..........................................................................................12

*Mwani v. bin Laden*,
   417 F.3d 1, 11 (D.C. Cir. 2005) ...........................................................................1

*Nuevos Destinos, LLC v. Peck*,
   No. 15-cv-1846, 2019 WL 78780 (D.D.C. Jan. 2, 2019) ......................................5

*Okolie v. Future Servs. Gen. Trading & Contracting Co.*,
   102 F. Supp. 3d 172 (D.D.C. 2015) .....................................................................4

*Pope v. Bond*,
   641 F. Supp. 489 (1986) ....................................................................................25

*Procter & Gamble Co. v. Amway*,
   242 F.3d 539 (5th Cir. 2001) ...............................................................................8

*Republic of Kazakhstan v. Stati*,
   380 F. Supp. 3d 55 (D.D.C. 2019) .....................................................................17

*RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*,
   682 F.3d 1043 (D.C. Cir. 2012) .........................................................................18

*Semco, Inc. v. Amcast, Inc.*,
   52 F.3d 108 (6th Cir. 1995) .................................................................................8

*Solomon v. Dechert LLP*,
   No. 22-3137 (JEB), 2023 U.S. Dist. LEXIS 164821 (D.D.C. Sep. 18, 2023) ........25

*Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co.*,
   370 U.S. 19 (1962) ............................................................................................22

*United States v. Rastelli*,
   870 F.2d 822 (2d Cir. 1989) ...............................................................................16

*United States v. Wilson*,
   605 F.3d 985 (D.C. Cir. 2010) ...........................................................................14

*W. Assocs. Ltd. P'ship, ex rel. Ave. Assocs. Ltd. P'ship v. Mkt. Square Assocs.*,
   235 F.3d 629 (D.C. Cir. 2001) ................................................................18

*Walden v. Fiore*,
   571 U.S. 277 (2014)..........................................................................2, 3

*Watkins v. McCormick & Co. (In re McCormick & Co. Pepper Prods. Mktg. & Sales
   Practices Litig.)*,
   215 F. Supp. 3d 51 (D.D.C. 2016) .........................................................10

*Winmar Constr., Inc. v. Esf, Inc.*,
   No. 22-1829 (JDB), 2023 WL 1778201 (D.D.C. Feb. 6, 2023) ...........................3

*Ziglar v. Abbasi*,
   582 U.S. 120 (2017)............................................................................17

## STATUTES

15 U.S.C. § 1125(a)(2)(B) ............................................................................13

18 U.S.C. § 1965 ...................................................................................5, 6

## RULES

Fed. R. Civ. P. 4(k)(1)(C) ...........................................................................5

Fed. R. Civ. P. 9 ...............................................................................12, 13

## OTHER AUTHORITIES

D.C. Code § 13–423...................................................................................6

**REPLY BRIEF**

Plaintiffs' lengthy opposition (ECF No. 87, "Opp.") largely rehashes the allegations from their Amended Complaint. It does not, however, cure Plaintiffs' deficient pleading. This Court should grant the European Defendants' motion (ECF No. 81) and dismiss the Amended Complaint with prejudice.

## I.    PLAINTIFFS CANNOT DEMONSTRATE PERSONAL JURISDICTION OVER THE EUROPEAN DEFENDANTS.

Plaintiffs' Opposition cannot justify subjecting the European Defendants—who allegedly advanced the UAE's interests in the Asian spot market for light crude oil—to the jurisdiction of a U.S. court. Plaintiffs do not assert that the European Defendants are subject to the Court's general personal jurisdiction; they concede that "only specific jurisdiction applies here." Opp. 25. But Plaintiffs have not alleged adequately that the European Defendants have "sufficient contacts with the United States as a whole to justify the exercise of personal jurisdiction" consistent with due process. *Mwani v. bin Laden*, 417 F.3d 1, 11 (D.C. Cir. 2005). The alleged connections between the European Defendants and the United States are too attenuated to confer jurisdiction.

*First*, Plaintiffs argue that the European Defendants published statements linking Plaintiffs to terrorist organizations on "websites 'owned and operated by U.S. companies and hosted on servers in the United States.'" Opp. 25 (citation omitted). But as the European Defendants explained, the ability of U.S. residents to access online publications from the United States, or discover the writings through U.S. search engines, does not amount to purposefully directing activities at the United States. *See* ECF No. 81-1 ("Mot.") at 24. Plaintiffs argue that the European Defendants' alleged actions "targeted a U.S. citizen and purposefully destroyed a U.S. company," and therefore the European Defendants "expressly aimed" their actions at the United States under *Calder v. Jones*, 465 U.S. 783 (1984). Opp. 25, 28-29. *Calder*'s effect test, however, "focuses on

the relationship among *the defendant*, the forum, and the litigation." *Calder*, 465 U.S. at 788 (internal quotation marks and citations omitted) (emphasis added). Under *Calder*, therefore, the jurisdictional analysis is focused on the defendant, not the plaintiff. The Supreme Court made that clear in *Walden v. Fiore*: "*a plaintiff's* contacts with the forum State *cannot* be decisive in determining whether the defendant's due process rights are violated." 571 U.S. 277, 279 (2014) (internal quotation marks and citation omitted) (emphasis added); *see also id.* at 286 ("[A] defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction."). As the Supreme Court explained, the defendants in *Calder* intentionally "created" "various contacts . . . with California (and not just with the plaintiff)." *Id.* at 287. Here, by contrast, the European Defendants' attenuated connection with the United States is nowhere near the same "strength" as in *Calder*, where "the defendants' intentional tort actually occurred in California." *Id.* at 288 (citation omitted).

As the European Defendants explained (and as Plaintiffs concede, *see* Opp. 29), the Amended Complaint alleges that the European Defendants aimed their actions at the *Asian* spot market, not at the United States. *See* Mot. 13-14 (citing Am. Compl. ¶ 4). That is radically different from *Calder*, where "'California [wa]s the focal point . . . of the harm suffered.'" *Walden*, 571 U.S. at 287 (quoting *Calder*, 465 U.S. at 789). Plaintiffs' allegations that Lord Energy's U.S. subsidiary is located in Houston, Texas, and that Dr. Nada "maintains a home in Houston, Texas," Am. Compl. ¶¶ 24, 27, do not alter that core distinction. An indirect injury to a U.S.-based corporate subsidiary or a U.S. citizen (especially one residing abroad) from conduct allegedly aimed to affect a *foreign* market does not satisfy the due process requirements for haling *foreign* defendants into a U.S. court. Thus, as a court in this District observed, "communications and payments . . . technically received in D.C." are "not a sufficient basis for the Court to exercise

2

personal jurisdiction" because "the focus of the relevant business activity was outside of the forum and only defendants' emails . . . brought defendants' business activities into the forum." *Winmar Constr., Inc. v. Esf, Inc*., No. 22-1829 (JDB), 2023 WL 1778201, at *4 (D.D.C. Feb. 6, 2023) (internal quotation marks and citation omitted); *see also id.* at *12 ("'[H]owever significant the plaintiff's contacts with the forum may be, those contacts cannot be decisive in determining whether the defendant's due process rights are violated by the Court's exercise of personal jurisdiction.'") (quoting *Walden*, 571 U.S. at 285) (selected internal quotation marks and additional citation omitted).

*Second*, Plaintiffs invoke their allegations that the European Defendants instructed a "Florida investigative firm" and Lorenzo Vidino to investigate Americas Lord Energy Inc., a U.S. journalist, a U.S. economist, and the Muslim Brotherhood. Opp. 26. These allegations cannot support jurisdiction here because Plaintiffs do not allege that the investigations themselves— particularly investigations of third parties, such as unnamed U.S. journalist and economist, or the Muslim Brotherhood—harmed Plaintiffs or satisfy any element of Plaintiffs' claims. "The plaintiff must show that the foreign defendant has purposefully directed his activities at residents of the forum, *and that the alleged injuries arise out of or relate to those activities*." *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 864 (D.C. Cir. 2022) (internal quotation marks and citations omitted) (emphasis added). Plaintiffs' peripheral allegations do not justify the assertion of jurisdiction because they are too attenuated from the gravamen of Plaintiffs' claims. *See, e.g.*, *Mathis v. Geo Grp., Inc.*, 535 F. Supp. 2d 83, 88 (D.D.C. 2008) (no specific jurisdiction where alleged contacts were "merely incidental to the plaintiffs' claims"). Moreover, the alleged contact is too isolated and brief to overcome the "significant weight" that must be given to "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system . . . in assessing the

3

reasonableness of stretching the long arm of personal jurisdiction over national borders." *Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 114 (1987); *see also Brunson v. Kalil Co., Inc.*, 404 F. Supp. 2d 221, 233 (D.D.C. 2005) (finding no specific jurisdiction where contact with District of Columbia "was isolated and brief").

*Third*, Plaintiffs argue that the European Defendants "targeted other U.S. citizens," like George Soros. Opp. 27. But neither Mr. Soros nor these unnamed "other U.S. citizens" are parties to this case. General allegations about connections to "other U.S. citizens" does not support exercise of specific jurisdiction. *See, e.g., Okolie v. Future Servs. Gen. Trading & Contracting Co.*, 102 F. Supp. 3d 172, 178 (D.D.C. 2015) ("[N]one of the potential minimum contacts raised by the plaintiffs are sufficiently related to the actions underlying this lawsuit, leaving no support for the exercise of specific jurisdiction.").

Plaintiffs attempt to shore up their jurisdictional argument by asserting that the United States has "'legitimate interest[s]'" in this lawsuit. Opp. 28 (quoting *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 592 U.S. 351, 360 (2021)). But *Ford* cuts the other way. In *Ford*, the Supreme Court upheld exercise of specific jurisdiction because "Ford had systematically served a market in Montana and Minnesota for the very vehicles that the plaintiffs allege malfunctioned and injured them in those States." *Id.* at 365. On those facts, the Court found "a strong 'relationship among the defendants, the forum, and the litigation'—the 'essential foundation' of specific jurisdiction." *Id.* (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)). By contrast, the Supreme Court observed that "[t]he law of specific jurisdiction . . . seeks to ensure that States with 'little legitimate interest' in a suit do not encroach on States more affected by the controversy." *Id.* at 360 (citation omitted). Here, both Europe and Asia are the areas "more affected by the controversy" because the suit concerns actions taken in Europe to influence Asian

spot market. The United States should not be the place to settle a dispute when the greater interests lie in Europe and Asia.

Plaintiffs also contend that this Court has personal jurisdiction over Mr. Badal under Federal Rule of Civil Procedure 4(k)(1)(C) and RICO Section 1965, 18 U.S.C. § 1965. Opp. 32-34. Settled authority forecloses this interpretation. Mot. 10-11. Plaintiffs' attempt to side-step it is unavailing. Plaintiffs first try to confine that case law to situations where defendants were served abroad, arguing that a different result should apply where (as here) defendants "waived service through their U.S. counsel." Opp. 33. Not so. In *Elsevier, Inc. v. Grossman*, "the parties stipulated as to the service of the Summons and Complaint on Defendants 'without prejudice to any of [the Defendants'] right to challenge this Court's personal jurisdiction over them,'" 77 F. Supp. 3d 331, 343 n.7 (S.D.N.Y. 2015), yet the court nevertheless rejected assertion of personal jurisdiction under Section 1965. The European Defendants here waived service subject to the same reservation. *See* ECF No. 28 at 2; ECF No. 40 at 2.

Nor is it correct that courts can automatically assume jurisdiction under Section 1965 over foreign defendants as long as jurisdiction can be established "over any of the participants in the alleged . . . conspiracy." Opp. 33. Section 1965 provides for "nationwide personal jurisdiction over all *domestic* defendants," to ensure they can be tried "in a single forum, regardless of the defendants' contact with the forum state." *Nuevos Destinos, LLC v. Peck*, No. 15-cv-1846, 2019 WL 78780, at *12 (D.D.C. Jan. 2, 2019) (internal quotation marks and citation omitted) (emphasis added). But although Section 1965 "authorizes nationwide service of process, it does not provide for service of process in a foreign country. [That] authority … must be found, if at all, in the District of Columbia long arm statute." *Avianca, Inc. v. Corriea*, 705 F. Supp. 666, 684 (D.D.C. 1989) (citations omitted), *aff'd sub nom. Aviana, Inc. v. Harrison*, 70 F.3d 637 (D.C. Cir. 1995).

Thus, Section 1965 requires *both* "(1) that at least one defendant have minimum contacts with the District of Columbia and (2) that *any additional foreign defendants must be served with process pursuant to the District's long arm statute*, D.C. Code § 13–423." *AGS Int'l Servs. S.A. v. Newmont USA Ltd.*, 346 F. Supp. 2d 64, 87 (D.D.C. 2004) (citation omitted) (emphasis added), *abrogation on other grounds recognized by Estate of Klieman v. Palestinian Auth.*, 82 F. Supp. 3d 237, 242 (D.D.C.2015). In fact, the *Elsevier* court rejected application of Section 1965 over two defendants even though it was conceded that the third defendant was "subject to the Court's jurisdiction." 77 F. Supp. 3d at 342-43.

Finally, Plaintiffs latch on to *Elsevier*'s observation that Section 1965 *may* "permit the assertion of personal jurisdiction over RICO defendants residing abroad," if served in the United States. *Id.* at 343 n.7 (internal quotation marks and citation omitted), *quoted in* Opp. 33. But Plaintiffs do not mention that *Elsevier* distinguished between such instances and where (as here) a defendant agreed to accept service subject to the reservation of their right to contest personal jurisdiction. 77 F. Supp. 3d at 343 n.7.

## II.  PLAINTIFFS FAIL TO STATE A CLAIM.

In any event, Plaintiffs fail to state a claim under the Lanham Act, RICO Act, and Sherman Act. *See also* Mot. 15-41; ECF No. 90 at 13-25 (UAE's reply, which the European Defendants incorporate by reference).

### A.  Plaintiffs' First Claim Under the Lanham Act Should Be Dismissed.

#### 1.  *The Statements at Issue Are Not "Commercial Advertising" or "Promotion."*

##### a.  The European Defendants Are Not Plaintiffs' Competitors.

As the European Defendants' motion demonstrates, the statements underlying a Lanham Act claim must have been made by a competitor to qualify as commercial advertising or promotion.

Mot. 16. Because European Defendants are not Plaintiffs' competitors, the European Defendants' statements cannot be the basis of a Lanham Act claim. Mot. 18-19.

Plaintiffs' response to this argument is an attempt at misdirection. Plaintiffs argue that, even if they are not the European Defendants' competitors, they have standing to bring a Lanham Act claim. Opp. 69. But that is irrelevant. If the statements at issue are not commercial advertising or promotion, it does not matter who has standing to bring the Lanham Act claim.[1]

Plaintiffs argue that the European Defendants competed with Plaintiffs because (allegedly) "they were the UAE's agents." Opp. 69 n.19. But even assuming allegations of an agency relationship,[2] Plaintiffs do not elaborate how the UAE is Plaintiffs' competitor. Plaintiffs allege that the UAE sought to promote Murban crude oil as an index for light crude oil in the spot market for light crude oil sold to Asian refiners. *See* Am. Compl. ¶¶ 67-68. Those allegations, however, do not indicate what services or products the UAE provided, much less make a case that the UAE was a competitor. Plaintiffs otherwise do not allege any interaction between the UAE's state-owned Abu Dhabi National Oil Company ("ADNOC") and the European Defendants.

### b.    The Statements at Issue Are Not Commercial Speech.

The "core notion of commercial speech" is "speech which . . . propose[s] a commercial transaction." *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 66 (1983). Plaintiffs do not identify a commercial transaction proposed in any of the statements at issue; nor a product; nor a competitor. That is because the statements at issue relate to potential terrorism concerns stemming

---

[1] For this reason, Plaintiffs' reliance (Opp. 69 n.19) on *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), is beside the point. *Lexmark* was concerned with whether a party had *standing* to bring a Lanham Act claim. *Id.* at 136.

[2] For avoidance of all doubt, in making any arguments based on the alleged agency relationship, the European Defendants do not concede they were the UAE's agents. Nor have Plaintiffs adequately alleged any agency relationship between the UAE and the European Defendants. *See* ECF No. 90 at 2-3.

from connections between Plaintiffs and the Muslim Brotherhood. The statements are simply not commercial in nature, which ought to be dispositive of the inquiry.

Plaintiffs (Opp. 70) rely on *Bolger*'s three-factor test to determine whether non-traditional forms of advertising qualify as commercial speech: (1) whether the communication is an advertisement; (2) whether it refers to a specific product or service; and (3) whether the speaker has an economic motive. 463 U.S. at 67-68. Plaintiffs dismiss the first two factors (which they cannot meet, for the statements at issue are neither advertisements nor refer to a specific product or service) as unnecessary when analyzing nontraditional advertising. Opp. 70-71. But their self-serving assertion that the first two *Bolger* factors may be disregarded as "not tell[ing] us much" or "shed[ding] much light in non-traditional advertising contexts," Opp. 71 (internal quotation marks omitted), finds no support in case law.[3]

A single-factor test examining whether a defendant has an economic motivation in making a statement would allow the Lanham Act to effectively regulate all speech by market actors.[4] Any such statement would naturally be motivated by the actor's economic interests. Put differently, any statement with the possibility of some economic effect down the road would be commercial speech. That alone cannot define commercial speech. Even Plaintiffs' primary authority—an out-of-circuit decision, *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107 (9th Cir. 2021)—does not

---

[3] Plaintiffs' reliance (Opp. 70) on the out-of-circuit decision in *Semco, Inc. v. Amcast, Inc.*, 52 F.3d 108, 112-13 (6th Cir. 1995), is unavailing. *Semco* merely noted that the "*Bolger* Court did not require *each* element," meaning not *all* factors need to be met. *Id.* at 113. That is markedly different from changing the three-factor test into a one-factor test. Indeed, *Semco* involved statements discussing manufacturing methods for the defendant's plunger tips, and the defendants were economically motivated to assist in the publication of the article containing the statements at issue. *Id.* at 110-13. Thus, all three factors were met in *Semco*.

[4] Although some circuit courts have described economic motivation as the primary motivation, *see, e.g.*, *Procter & Gamble Co. v. Amway*, 242 F.3d 539, 552–53 (5th Cir. 2001), the D.C. Circuit has not done so. Regardless, even if one *Bolger* factor is more important than others, that does not transform the *Bolger* test into a single-factor one.

support this extreme departure. Opp. 70-72. There, a plaintiff nutritional supplement manufacturer brought a Lanham Act claim against defendant guidebook publisher and its author. *Ariix*, 985 F.3d at 1111-12. The guidebook compared and reviewed specific products, such as nutritional supplements, including the plaintiff's and those of the defendants' former employer, one of plaintiff's competitors. *Id.* at 1111. Although the defendants represented that their guidebook and reviews therein were based on objective data, they were not. *Id.* at 1117. Instead, the guidebook was skewed in favor of the defendant's former employer and against the plaintiff. *Id.* at 1112-13, 1117. Applying the *Bolger* factors, the Ninth Circuit observed that "[a] publication that is not in a traditional advertising format *but that still refers to a specific product can . . . be commercial speech*." *Id.* at 1116 (emphasis added). Here, the statements at issue are not in any form of traditional advertising media and do not reference any product or service. Rather, the statements are akin to allegedly defamatory speech.

Plaintiffs next attempt to distinguish *Farah v. Esquire Magazine*, 736 F.3d 528 (D.C. Cir. 2013), as merely holding that "political speech aimed at critiquing [a plaintiff's] position on a topic cannot be turned into a Lanham Act claim simply by virtue of the defendant speaker being a 'general[]' competitor of the plaintiff." *Id.* at 541, *quoted in* Opp. 72-73. But Plaintiffs overlook that, because the speech at issue in *Farah* was merely political speech, it did not reference a *product*. Plaintiffs' observation that "the plaintiff in *Farah* did not allege that the defendant sold compet[itive] products," Opp. 73 (citing 736 F.3d at 541), is similarly inapposite. Plaintiffs' allegations that "they were direct competitors with the UAE in the spot market for light crude oil in Asia," Opp. 73, are entirely unsupported. The UAE is not a "direct competitor" of Lord Energy for the simple reason that the UAE does not sell oil. Nor did Defendants' alleged statements

"disparage[] the services Plaintiffs provided." Opp. 73. The alleged statements related to Plaintiffs'

activities of "finance[ing] terrorism." Opp. 73.

Finally, Plaintiffs fail to respond to the European Defendants' argument that even "native

advertising," that is, advertising designed not to look like traditional commercial advertising, must

be commercial in nature, and not merely economically motivated. *See* Mot. 17-18 & n.6. Indeed,

Plaintiffs have no response to the fact that even the Federal Trade Commission guidelines

referenced in the Amended Complaint stress the importance of reference to products in any kind

of advertising. *See* FTC, *Native Advertising: A Guide for Businesses* (Dec. 2015),

https://www.ftc.gov/business-guidance/resources/native-advertising-guide-businesses  (providing

as an example that an article sponsored by a fitness company of potential vacation spots fitness

enthusiasts may want to visit is not native advertising "as it does not promote any . . . products").

> ### c.    The Statements at Issue Did Not Influence Consumers to Purchase Defendants' Products.

As other courts in this District have held, commercial speech must be made "*for the*

*purpose* of influencing consumers to buy the defendant's goods or services." *Watkins v.*

*McCormick & Co. (In re McCormick & Co. Pepper Prods. Mktg. & Sales Practices Litig.)*, 215 F.

Supp. 3d 51, 59 (D.D.C. 2016) (internal quotation marks and citations omitted) (emphasis added),

*quoted in* Mot. 19. Plaintiffs instead urge a rule where disparaging statements about a competitor

(*i.e.* defamation) are sufficient. Opp. 74. That is squarely contrary to *Watkins*, which turned on

whether the size of a pepper container (without express discussion) misled consumers into

purchasing a competitor's containers. 215 F. Supp. 3d at 59-60 (citing cases). Plaintiffs' remaining

arguments (Opp. 74) fare no better. Arguing effect is not the same as alleging intent, and so the

alleged results from Defendants' statements are insufficient to plead purpose. And the fact that

Murban became the only available alternative light crude oil available on the spot market in Asia

10

does not necessarily mean the UAE and ADNOC benefitted, given the presence of other producers and sellers of Murban in that market.

### d.    The Statements at Issue Were Not Widely Disseminated.

The Lanham Act is unambiguous that actionable false advertisement statements must have been disseminated to the relevant *purchasing* public.[5] The Amended Complaint lacks allegations demonstrating dissemination to a purchasing public. In response, Plaintiffs point to allegations "concerning the disruptive impact the enterprise's statements had on Lord Energy's relationships with other market participants." Opp. 74. But impact and "dissemination" are two different things. The fact that a few of Lord Energy's business relationships were allegedly disrupted says nothing about the scope (and sufficiency) of the dissemination of the statements at issue.

Even if impact did equal dissemination (it does not), the "other market participants" Plaintiffs invoke are only their business partners and banks. Opp. 74. They are not members of the *purchasing* public of Plaintiffs' goods or services. For instance, Sonatrach was not a purchaser of Plaintiffs' products but a provider. *See* Opp. 75 (arguing that Sonatrach "stopped *selling* Saharan Blend to Lord Energy") (emphasis added). Similarly, CCI was set to *sell* Plaintiffs oil. Opp. 75 (citing Am. Compl. ¶¶ 201-203). And while Plaintiffs assert that Exxon Mobil and Litasco stopped buying from Plaintiffs, the allegations they invoke in support reference only general business between Plaintiffs and those entities—not to any sale by Plaintiffs to those entities. *Compare* Opp. 75, *with* Am. Compl. ¶¶ 201-03 ("Exxon Mobil *temporarily stopped* doing business . . . . Litasco stopped working with Lord Energy.") (emphasis added).

---

[5] Plaintiffs argue that the alleged statements do not need to be disseminated specifically to Plaintiffs' consumers and that dissemination to a relevant "purchasing public" is sufficient. Opp. 75. But the European Defendants never argued that the statements at issue must have been disseminated specifically to Plaintiffs' consumers.

Plaintiffs argue (in a footnote) that financial institutions like banks are consumers under the Lanham Act. Opp. 74 n.22. But, in the ordinary meaning of the word, a consumer *purchases* something. *See Moskal v. United States*, 498 U.S. 103, 108 (1990) (unless otherwise defined, "words used" in statute are given their "ordinary meaning"). The Amended Complaint contains no allegations as to whether the financial institutions identified had ever purchased anything from Plaintiffs. Thus, they cannot be considered consumers.

Plaintiffs next point to allegations of dissemination to Africa Intelligence (in Plaintiffs' own words, a "gossip website") and allegedly "widely read" news publications and blogs as sufficient to satisfy this element. Opp. 75. But Plaintiffs allege no facts supporting the assertion that those publications are "widely read," and conclusory allegations are not credited. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Much of the media Plaintiffs reference are general websites available to anyone; they are not sites specifically targeted to the purchasing public with interest in the crude oil trade. *See* Am. Compl. ¶ 290 (referring to a single online newspaper article, WordPress, Tumblr, and Medium, none of which are specific to the crude oil trading industry).

### 2. *Plaintiffs' Lanham Act Claim Should Be Dismissed as to Defendant Cavin.*

Plaintiffs argue that Rule 9 does not apply to Lanham Act claims, relying on the unpublished decision in *Abrahams v. Simplify Compliance, LLC*, No. 19-3009, 2021 WL 1197732 (D.D.C. Mar. 30, 2021). *See* Opp. 69 n.18. *Abrahams* is inapplicable, as it involved a Lanham Act claim based on false association, as opposed to false advertising. 2021 WL 1197732, at *4. A false association claim only requires a plaintiff to show: (1) a trademark, (2) use of that trademark in a manner likely to cause consumer confusion, and (3) likely damage to the plaintiff. *Id.* But a false advertising claim (like the one here) requires a "*misrepresent[ation]* [of] the nature, characteristics

[etc.]" 15 U.S.C. § 1125(a)(2)(B). Thus, a false advertising claim is precisely the type of claim that is subject to Rule 9. *See Mills Corp. v. Miller*, No. CIV. A. 97-219, 1997 WL 280599, at *2 (D.D.C. May 20, 1997) (declining to apply Rule 9 to trademark infringement and dilution claims for same reason).

In the alternative, Plaintiffs assert that they identified specific fraudulent statements. *See* Opp. 69 n.18. But that is not responsive to the European Defendants' argument that none of those statements is attributable to Defendant Cavin. Nor do Plaintiffs cite any portions of the Amended Complaint that purportedly "identif[ied]" these allegedly fraudulent statements.

### B.    Plaintiffs' Civil Racketeering Claim Under RICO Should Be Dismissed.

#### 1.    *Plaintiffs Fail to Plead a Plausible Pattern of Racketeering Activity.*

As Defendants demonstrated, Plaintiffs' allegations of a pattern of racketeering activity are entirely conclusory. In response, Plaintiffs double-down on an action plan that Alp allegedly sent to the UAE in January 2020. Opp. 43 (citing Am. Compl. ¶ 282). But the Amended Complaint refers only to a *draft* correspondence where Alp informed the UAE that Alp is ready to start a five-year action plan. Am. Compl. ¶ 282. While Plaintiffs allege "based on information and belief" that Alp sent that correspondence, *id.*, Plaintiffs offer no basis for their alleged information and belief, and "inserting the phrase on "information and belief' does not cure an otherwise conclusory allegation." *Kleo AG v. Rivada Networks, Inc.*, 22-CV-01664 (DLF), 2023 WL 7921969, at *4 (D.D.C. Nov. 16, 2023); *see also Kareem v. Haspel*, 986 F.3d 859, 866 (D.C. Cir. 2021) ("[A]llegations based on information and belief [must] be accompanied by a statement of the facts upon which the allegations are based.") (internal quotation marks omitted).

#### 2.    *Plaintiffs Fail to Plead Under Open-Ended Continuity.*

Plaintiffs argue that they have sufficiently alleged open-ended continuity because the European Defendants and the UAE allegedly entered into an agreement to act on the five-year plan

and because they previously relied on similar strategies with respect to different targets. *See* Opp. 46-47. Plaintiffs' argument is unavailing. *First*, Plaintiffs' allegations with respect to the five-year plan are entirely conclusory. *See supra* at Sec. II.B.1. *Second*, that Defendants previously relied on similar strategies does not indicate that they will do so again in the future, particularly since Plaintiffs do not plead any facts supporting this inference. If prior acts alone were sufficient to show threat of future harm, *every* close-ended pattern of racketeering activity would also be open-ended.

Plaintiffs mischaracterize *United States v. Wilson*, 605 F.3d 985 (D.C. Cir. 2010), to suggest that a single statement is sufficient to allege a future threat of harm necessary for open-ended continuity. Opp. 47. But *Wilson* expressly noted the existence of *separate evidence* supporting closed and open-ended continuity *in addition* to the "money train" statement. 605 F.3d at 1021.

Plaintiffs otherwise offer no response to the European Defendants' argument that the other acts Plaintiffs allege in an attempt to extend the lifeline of a purportedly complete campaign against Plaintiffs are (1) not criminal in nature or improperly pleaded to be predicate acts under RICO (*see* Mot. 23-24)[6] and/or (2) entirely unrelated to Defendants' purported scheme to remove an alleged competitor from the spot market. *See* Mot. 24-25.

### 3.    *Plaintiffs Fail to Plead Under Closed Continuity.*

Plaintiffs argue that closed continuity is met because Defendants had multiple targets and relied on similar strategies against them. Opp. 43-44. But without more, that does not mean

---

[6] Contrary to Plaintiffs' mischaracterization (*see* Opp. 36 n.11), the European Defendants are arguing that even if such acts are criminal in nature, because they sound in fraud (*i.e.* further wire fraud), Plaintiffs have failed to specifically plead the relevant supporting allegations. *See* Mot. 24. The European Defendants are not arguing that Plaintiffs have failed to specifically plead the allegations supporting the predicate acts underlying their RICO claim.

Defendants' alleged targeting of others was unlawful and/or in furtherance of the alleged RICO enterprise during a closed period. *See Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265 (D.C. Cir. 1995) ("[N]umber of unlawful acts" and "character of the unlawful activity" are two of six factors considered when analyzing closed-continuity.). As Plaintiffs acknowledge, the European Defendants are a "private investigative company." Am. Compl. ¶¶ 34-35. Beyond conclusory statements, Plaintiffs do not offer any allegations sufficient to infer that any of the European Defendants' other projects on behalf of the UAE were unlawful. For example:

- Plaintiffs refer to "20 distinct schemes to launch 'widespread offensive actions' on behalf of the UAE." Opp. 44. But Plaintiffs are silent as to their allegedly unlawful nature.

- Plaintiffs refer to alleged schemes against a real estate firm in the United Kingdom, the Kutayni Clan in Spain, a Swiss national, a Qatari government official, George Soros, Nectar Trust,[7] and others. Opp. 46. But the Amended Complaint is devoid of factual allegations supporting the alleged falsity (and therefore unlawfulness) of those statements.

Thus, the above-mentioned references to other schemes are conclusory as to their unlawful nature and should not be assumed true. *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678.

Plaintiffs argue that three employees of Lord Energy were affected by the European Defendants' alleged scheme. Opp. 44. But based on Plaintiffs' allegations, the only reason these employees were affected at all was by virtue of their affiliation with Lord Energy. Opp. 45.[8] Thus, these employees are no different than the small number of individuals affected by the blocked

---

[7] Plaintiffs point to an alleged retraction of an article about Nectar Trust as evidence of falsity. Opp. 45. But a retraction is an exercise of a newspaper's editorial judgment.

[8] Plaintiffs refer to FEMYSO, a Muslim youth organization, as another alleged target. Opp. 45. But they neglect to mention that FEMYSO was headed by one of Lord Energy's employees. Am. Compl. ¶ 111. Thus, to the extent FEMYSO was affected, as pleaded, it was by virtue of its affiliation with Lord Energy.

transaction in *Edmonson*. *See* 48 F.3d at 1265.

Plaintiffs also argue that the alleged campaign against Lord Energy continued after November 2019 because the European Defendants in a proposal to the UAE around that time allegedly discussed "finish[ing]" Lord Energy, even though the scheme was ninety-percent complete. Opp. 44-45. But Plaintiffs do not dispute (and therefore concede) that the substantively significant relevant activity allegedly occurred between December 2017 and August 2018 (less than a year), with the bulk occurring in June 2018. Mot. 26. Indeed, the fact that Lord Energy filed for bankruptcy less than a year later in April 2019 is indicative of the relevant timeframe.

In sum, like in *Edmondson*, Plaintiffs ultimately plead only one scheme, one target, and one goal. *See* 48 F.3d at 1265 (one scheme to block one real-estate transaction). That is not sufficient to allege an ongoing conspiracy. *See* Mot. 25-27.

### 4.    *Plaintiffs Fail to Plead an Association-In-Fact Enterprise.*

Plaintiffs do not meaningfully challenge Defendants' argument that the UAE and the European Defendants (in their alleged capacity as the UAE's agents) cannot form an enterprise because they would be effectively a single entity. Opp. 57. Though the UAE is not a corporate entity, Plaintiffs offer no counterargument as to why the relationship between a sovereign entity and its agent and that of a corporate entity and its agent should be treated differently. *See* Opp. 57.

Instead, Plaintiffs argue that the enterprise also consisted of non-agents sufficient to associate with the UAE as an enterprise. Opp. 57-59. But members of an enterprise must be generally aware of the nature of the enterprise and that the enterprise extends beyond their individual involvement. *United States v. Rastelli*, 870 F.2d 822, 828 (2d Cir. 1989). Here, however, other than the UAE and European Defendants, the Amended Complaint contains no allegations as to other actors' awareness of the existence of an alleged enterprise or even the existence of other

members.[9] As alleged, the other actors were only aware of the immediate tasks for which they were responsible. For instance, even if Alp allegedly contacted certain Wikipedia moderators multiple times to counteract efforts to change certain Wikipedia entries, that is not a factual basis to assume that those moderators were aware of an enterprise or any of its alleged members other than Alp. Am. Compl. ¶ 253. And even if Alp commissioned multiple articles from freelance writer Nina May and instructed her to delete Alp's information after she read it, that is not a factual basis to assume that May was aware of anyone beyond Alp. Am. Compl. ¶ 249. The same can be said of Phillippe Vasset, the editor of Africa Intelligence, and "dozens of other trusted journalists" referenced by Plaintiffs. Opp. 59. Because Alp was the sole alleged point of contact for these other actors, there is no factual basis for the actors to be aware of a larger effort involving other actors beyond the immediate tasks they were given.

### C.    Plaintiffs' Racketeering Conspiracy Claim Under RICO Should Be Dismissed.

#### 1.    *Plaintiffs Fail to Allege an Underlying RICO Claim.*

Plaintiffs' RICO conspiracy claim fails because Plaintiffs' underlying RICO claim fails. *Supra* at Sec. II.B; *Republic of Kazakhstan v. Stati*, 380 F. Supp. 3d 55, 65 (D.D.C. 2019).

#### 2.    *The Intracorporate Conspiracy Doctrine Precludes a Conspiracy.*

Plaintiffs argue that the intracorporate conspiracy doctrine should not be extended to RICO conspiracy claims. Opp. 63.[10] But although courts have applied this doctrine to corporations and

---

[9] Plaintiffs cannot rely on Ariaf Studies & Research LLC as a separate entity. Plaintiffs allege (without any basis) that Ariaf is but a front for the UAE and its officials. Am. Compl. ¶ 33.

[10] Plaintiffs reference two cases to argue that the doctrine's application should be limited. Opp. 63 n.13. But those courts declined to extend the doctrine for reasons inapplicable here. *See Ziglar v. Abbasi*, 582 U.S. 120, 154 (2017) (observing, in the Civil Rights Act context, that "the law on the point is not well established"); *Bowie v. Maddox*, 642 F.3d 1122, 1131 (D.C. Cir. 2011) ("Mindful of the general rule that a federal appellate court does not consider an issue not passed upon below, we decline to decide the validity of Defendants' intracorporate conspiracy defense in the absence of a relevant decision by the district court.") (internal quotation marks and citation removed).

their employees, as opposed to a sovereign entity and its purported agents, the rationale underlying the doctrine logically applies in the sovereign entity context as well. *See* Mot. 29-31.

Plaintiffs next argue that even if the doctrine applies, the UAE and European Defendants are not the only pleaded conspirators. Opp. 63. That argument fails for reasons similar to Plaintiffs' RICO enterprise argument. Conspirators must agree to commit RICO, *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1048 (D.C. Cir. 2012), and RICO requires an enterprise, *W. Assocs. Ltd. P'ship, ex rel. Ave. Assocs. Ltd. P'ship v. Mkt. Square Assocs.*, 235 F.3d 629, 633 (D.C. Cir. 2001). Here, as pleaded, only the UAE and European Defendants could have been aware of the existence of an enterprise or accompanying plans. Thus, the other actors could not have entered into an agreement to commit something they were not aware was possible.

### D.    Plaintiffs' Claims Under the Sherman Act Should Be Dismissed.

#### 1.    *Harm to Competition Is Necessary for Antitrust Standing.*

Plaintiffs argue that Defendants' alleged actions reduced the supply of light crude oil in the relevant spot market in Asia, which in turn increased prices for the same. Opp. 85. This is nothing more than an attempt to repackage an injury to Lord Energy as an injury to competition. To be sure, Lord Energy's exit from the market could have led to a reduction in supply, resulting in a temporary price increase.[11] But Lord Energy was a *single* market actor. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) ("The antitrust laws . . . were enacted for the

---

[11] As the European Defendants pointed out, Plaintiffs appear to have had at best a minimal influence on the market. Mot. 33. Plaintiffs effectively concede that fact. *Compare* Opp. 86 ("Once Lord Energy began exporting Saharan Blend, it increased the supply of light crude oil available on the Asian spot market by . . . nearly 20 million barrels *overall*.") (emphasis added), *with* Am. Compl. ¶ 331 ("Murban producers in the UAE sold about 8 million barrels of Murban *per month* on the spot market in Asia.") (emphasis added).

protection of competition not competitors.") (internal quotation marks and citation omitted).[12]  The effects are linked to the existence of an *actor*, not to the fact that competition is somehow impacted. If such effects were sufficient to constitute harm to competition, then any action against any competitor would be sufficient. That, however, is not the law.

Plaintiffs invoke *American President Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209 (D.D.C. 2022), for the proposition that "conduct to drive a rival out of the market" can qualify as antitrust conduct. Opp. 86. But (as Plaintiffs tacitly acknowledge, *see* Opp. 86) the only two competitors in the market in that case were the plaintiffs and defendants. *Am. President Lines*, 633 F. Supp. 3d at 217. In such a situation, harm to the plaintiffs by the defendants was no different from harm to competition. *Id.* at 221 ("[Defendants'] anticompetitive behavior foreclose[d] [plaintiff]—[defendants'] *sole* competitor—from parts of the . . . market, *depriving shipping customers of the benefits of competition*") (emphasis added). Here, by contrast, Plaintiffs do not (and cannot) allege that Lord Energy and ADNOC were the only two actors in the market. Without more (and here, there is no more), injuries to Plaintiffs do not equate to injuries to competition.[13]

Plaintiffs invoke *GN Netcom, Inc. v. Plantronics, Inc.*, 967 F. Supp. 2d 1082 (D. Del. 2013), for the proposition that antitrust standing is "generally met if the plaintiff is a competitor or a consumer in the relevant market." Opp. 87. But the court's analysis in *GN Netcom* focused on a

---

[12] Contrary to Plaintiffs, the European Defendants do not concede that the Amended Complaint "alleges concrete and specific 'price, volume, and revenue figures' that reflect the anticompetitive injury." Opp. 86. In reality, the European Defendants acknowledged that "Plaintiffs do plead price, volume, and revenue figures, *but only as they relate to Lord Energy's effect on the UAE*." Mot. 33 n.21 (emphasis added).

[13] Plaintiffs' reliance (Opp. 87-88) on *Caribbean Broadcasting Systems, Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080 (D.C. Cir. 1998), is similarly misplaced. There, as alleged, the defendants and plaintiff were the only broadcasting competitors in an area. *See* 148 F.3d at 1082. When the defendants misrepresented their broadcasting capability as covering the entirety of the area, and lodged sham objections to the plaintiff's broadcasting application for that area, the defendants prevented competition in that market through its anticompetitive conduct. *Id.* at 1087.

close examination of the relevant market. 967 F. Supp. 2d at 1085 ("An antitrust analysis must always be attuned *to the particular structure and circumstances of the industry at issue*. As such, the Court begins its analysis by *examining the industry in which the parties compete*.") (internal quotation marks and citation omitted) (emphasis added). In doing so, the court found that a defendant already controlling seventy-five percent of a market harmed competition when, in direct response to a new competitor's entry, the defendant required its distributors to enter into exclusive distribution agreements. *Id.* at 1085-86. The industry was heavily dependent on a highly limited number of distributors, and following the defendants' push for exclusive distribution agreements, the defendant obtained such agreements with eighty percent of those distributors. *Id.* at 1085. Thus, by forcing distributors to enter into exclusive distributor agreements previously not in place, the defendant harmed competition in the industry by "preventing [plaintiff] and other competitors from building a viable distribution network and competing with [defendants'] monopoly." *Id.* at 1086. That is radically different from this case. Here, the Amended Complaint is devoid of information about the state of competition in the spot market for light crude oil in Asia. Without adequate allegations as to the state of the relevant market, Plaintiffs lack the foundation to assert that harm to Plaintiffs harmed competition therein.

Plaintiffs' reliance on *Andrx Pharmaceuticals, Inc. v. Biovail Corporation International*, 256 F.3d 799 (D.C. Cir. 2001), confuses injury-in-fact with antitrust standing. *Compare* Opp. 87, *with Andrx*, 256 F.3d at 812 ("A private antitrust plaintiff does not acquire standing merely by showing that it was injured in a proximate and reasonably measurable way by conduct of the defendant violating the antitrust laws (injury-in-fact)."). In any event, the *Andrx* defendant bringing the antitrust counterclaim was not the only competitor affected by the plaintiff's actions. 256 F.3d at 807. The plaintiff allegedly conspired with a patent holder of a brand name drug to

extend the drug's exclusivity period provided by the FDA, while simultaneously entering into an agreement to exclusively manufacture generic versions of that drug. *Id.* Thus, *all other manufacturers* seeking approval for generic versions of that drug—not just the defendant—were affected. *Id.* at 807, 810-11. But here, according to the Amended Complaint, only Lord Energy was affected by Defendants' alleged actions.[14]

### 2.    *Plaintiffs Fail to Plead Conspiracy.*

Plaintiffs assert they have sufficiently pleaded specific intent with respect to conspiracy to engage in anticompetitive actions, and that such intent can be implied. Opp. 88-89. But Plaintiffs did not plead *any* communication between Defendants (and others) and *ADNOC*, the relevant actor in the market. Thus, Plaintiffs fail to plead the necessary building blocks for the inference they seek. "[S]pecific intent must be supported by factual assertions," and "conclusory allegations won't do." *Am. President Lines*, 633 F. Supp. 3d at 232.

Plaintiffs argue the intracorporate conspiracy doctrine should not apply in this case. Opp. 89. But the doctrine arose in the antitrust context, *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984), and there is no reason to bar its application here. The ultimate inquiry is whether various defendants, allegedly acting as agents under the UAE, "depriv[e] the marketplace of the independent centers of decisionmaking." *Id.* at 769. "The relevant inquiry, therefore, is whether there is a contract, combination …, or conspiracy *amongst separate economic actors* pursuing *separate economic interests*, such that the agreement deprives the marketplace of independent centers of decisionmaking, and therefore of diversity of entrepreneurial interests, and

---

[14] Plaintiffs rely (Opp. 88) on an out-of-circuit decision in *Bloch v. SmithKline Beckman Corp.*, No. CIV. A. No. 82–510, 1988 WL 117927 (E.D. Pa. Nov. 1, 1988), for the proposition that lost profits resulting from allegedly anticompetitive conduct are sufficient to confer antitrust standing. But Plaintiffs omit to mention that lost profits were only one of many other factors the *Bloch* court considered in analyzing antitrust standing. 1988 WL 117927, at *23 ("[N]one of the other *Associated General* factors weighs against such a determination.").

thus of actual or potential competition." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195 (2010) (internal quotation marks and citations omitted) (emphasis added). In fact, courts have applied the doctrine in similar contexts. *See*, *e.g.*, *Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co.*, 370 U.S. 19, 29 (1962).

Plaintiffs argue it is sufficient that they have pleaded more than one defendant entering into a conspiracy. Opp. 88-89. But, as the Supreme Court explained, courts should look beyond the number of alleged conspirators to see if the agreement between them "deprives the marketplace of independent centers of decisionmaking, and therefore of diversity of entrepreneurial interests, and thus of actual or potential competition." *Am. Needle*, 560 U.S. at 195 (internal quotation marks and citations omitted) (focusing on separate economic actors pursuing separate economic interests in the marketplace, not the existence of separate actors themselves).[15] Contrary to Plaintiffs' assertions, the "practical" realities of even legally separate entities should be examined to see if there is an actual conspiracy. *Sunkist Growers*, 370 U.S. at 29. Here, the practical realities show that ADNOC is the only actor involved in the alleged conspiracy who is an actor in the relevant market. Thus, there is no coordination between *separate* actors in the market.[16] In other words, a conspiracy to violate the Sherman Act cannot exist.

### 3. *The Alleged Defamation Does Not Qualify as Anticompetitive Conduct Under Section 1.*

Plaintiffs argue that even if Defendants' alleged actions were defamatory, they can still be the basis of a Section 1 claim. Opp. 90. But Plaintiffs' authority does not support that argument.

---

[15] Plaintiffs' argument also fails for the same reason as in the RICO enterprise and RICO conspiracy contexts. *See supra* at Secs. II.B.4, II.C.2.

[16] By contrast, *In re Aluminum Warehousing Antitrust Litigation*, 95 F. Supp. 3d 419, 446 (S.D.N.Y. 2015), involved a "web of alleged agreements or understandings" between "entities from different corporate families," but those who were independent actors in the relevant market. And *Borden, Inc. v. Spoor Behrins Campbell & Young, Inc.*, 828 F. Supp. 216, 224 (S.D.N.Y. 1993), does not involve the Sherman Act at all.

Plaintiffs invoke *International Travel Arrangers, Inc. v. West Airlines, Inc.*, 623 F.2d 1255 (8th Cir. 1980), for the blanket proposition that defamatory statements are unreasonable restraints on competition. Opp. 90. But in *International Travel Arrangers*, the parties had stipulated to the fact that the defendant was a monopoly. 623 F.2d at 1267-68. This stipulation guided the court's decision. *Id.* at 1267 ("The market power is relevant as part of the overall analysis inasmuch as it has been accepted in antitrust law that Davids can engage in many kinds of conduct in the marketplace that are forbidden to Goliaths.") (internal quotation marks and citation omitted). As such, the Eight Circuit held that due to the defendant's "great" market power, "the limitations upon [the defendant's] activities in regard to 'competition' increased somewhat commensurately with its power." *Id.* at 1267-68.[17]

Plaintiffs misrepresent *Asa Accugrade, Inc. v. American Numsmatic Association*, 370 F. Supp. 2d 213, 217 (D.D.C. 2005), asserting that the plaintiff's failure to allege antitrust injury "alone" was "fatal." *See* Opp. 91. But the court in *Asa Accugrade* also noted several others, including a failure to allege unreasonable anticompetitive action notwithstanding defamation allegations. 370 F. Supp. 2d at 217.

Plaintiffs next argue that a tort can also be the basis of an antitrust claim. Opp. 91-92. But even if so, that does not mean that all torts are anticompetitive conduct. Indeed, anticompetitive conduct at its core harms competition—not competitors. *See Brunswick Corp.*, 429 U.S. at 488. The alleged defamation campaign here does not rise to that level. *See supra* at Sec. II.D.1.

---

[17] Plaintiffs' in-circuit references on this point focus on dicta. The D.C. Circuit in *Caribbean Broadcasting Systems* analyzed a complaint in the context of determining whether the court had subject-matter jurisdiction—not whether the plaintiff had sufficiently pleaded a claim. 148 F.3d at 1085 ("[W]e turn to CBS's argument that it made allegations sufficient to support subject matter jurisdiction."). And in *United States v. Microsoft Corp.*, the D.C. Circuit was similarly addressing Section 2 of the Sherman Act (and therefore was accepting as true the fact that the defendant Microsoft had monopoly power). 253 F.3d 34, 76-77 (D.C. Cir. 2001).

### 4. *Plaintiffs Fail to Plead "Monopoly Power" Under Section 2.*

Plaintiffs also attempt to rehabilitate their insufficient pleading as to monopoly power. Opp. 92-93. That effort fails.

*First*, Plaintiffs assert, in a conclusory fashion, that the UAE through ADNOC "created, and exercised absolute control" by selling Murban on the spot market in Asia or granting certain parties revocable contractual rights to resell Murban in spot transactions. Opp. 92. But selling Murban in the spot market does not transform one into a monopolist. Nor does granting revocable contractual rights to others to do the same; to the contrary, it is exactly the opposite of excluding such actors. Presumably, any actor within the market can participate in spot transactions, even if, as Plaintiffs allege, the UAE "created" that market. Plaintiffs' statement that the UAE exercised absolute control is thus entirely conclusory.

*Second*, Plaintiffs assert that the UAE possessed a dominant share of the market because "ADNOC's market share of the spot market for light crude oil in Asia was about 62.5% prior to 2016." Opp. 92. But Plaintiffs' theory is not that the UAE barred Lord Energy's entry into the market, but that the UAE caused Lord Energy's exit. Thus, the UAE's market share in 2016 (before Lord Energy's entrance) is irrelevant, since Plaintiffs are complaining of allegedly anticompetitive actions *while* Lord Energy was active in the market. Critically, the Amended Complaint is silent as to this time.

*Finally*, for the reasons stated above, defamation alone does not qualify as anti-competitive behavior. *Supra* at II.D.3.

## III. PLAINTIFFS' RICO AND SHERMAN ACT CLAIMS ARE TIME-BARRED BECAUSE THEY ARE NOT TOLLED BY THE DOCTRINE OF FRAUDULENT CONCEALMENT.

Plaintiffs argue that their RICO and Sherman Act claims are timely "because the doctrine of fraudulent concealment tolled [the] four-year statute[s] of limitations until April 2021, when

Plaintiffs learned from the hacked documents the nature of the conspiracy against them and the availability of [the] cause[s] of action." Opp. 60; *see also* Opp. 94. But fraudulent concealment only tolls the statute of limitations if "plaintiffs were not on actual or constructive notice" of the defendants' alleged wrongdoing. *Solomon v. Dechert LLP*, No. 22-3137 (JEB), 2023 U.S. Dist. LEXIS 164821, at *21 (D.D.C. Sep. 18, 2023). Moreover, "the fraudulent concealment must actually succeed in precluding the plaintiff from acquiring knowledge of the material facts." *Amobi v. Dist. of Columbia Dep't of Corr.*, 755 F.3d 980, 988 (D.C. Cir. 2014). Plaintiffs' Amended Complaint, however, establishes that Plaintiffs were on notice of their claims in 2018.

The allegations underlying the claims against the European Defendants are that they caused to be published Wikipedia entries, blog posts, and articles. *See, e.g.*, Opp. 28. These writings were publicly available. *Id.* Plaintiffs allege that they suffered damage as a result of these publications in November 2018, when certain banks and financial institutions refused to work with Lord Energy. Am. Compl. ¶ 314(a). Plaintiffs even described to "Swiss law enforcement" in June 2018 the very "smear campaign" that it complains about in this case. Am. Compl. ¶ 231. It was very clear to Mr. Nada, as he alleges, that "[b]y this point [in 2018], [he] knew he was the victim." Am. Compl. ¶ 158; *see also* Am. Compl. ¶ 231. Therefore, Plaintiffs were on notice of the claims in 2018, which is more than four years before filing the complaint in 2024, so the fraudulent concealment doctrine does not resuscitate the RICO and Lanham Act claims. *See, e.g.*, *Pope v. Bond*, 641 F. Supp. 489, 496 (1986) (no fraudulent concealment where "plaintiff's own submissions show that he knew of the basic acts alleged in the complaint").

## CONCLUSION

This Court should dismiss the Amended Complaint against the European Defendants with prejudice.

Dated:  November 8, 2024

By:     */s/ Igor V. Timofeyev*
        Igor V. Timofeyev (D.C. Bar No. 998291)
        Vanessa Omoroghomwan (D.C. Bar No. 1644765)
        PAUL HASTINGS LLP
        2050 M Street NW
        Washington, DC 20036
        Telephone: (202) 551-1700
        igortimofeyev@paulhastings.com
        vanessaomoroghomwan@paulhastings.com

        Adam Fee (*pro hac vice*)
        PAUL HASTINGS LLP
        1999 Avenue of The Stars, 27th Floor
        Los Angeles, California 90067
        Telephone: (310) 620-5700
        adamfee@paulhastings.com

        D. Scott Carlton (*pro hac vice*)
        PAUL HASTINGS LLP
        515 South Flower Street, 25th Floor
        Los Angeles, California 90071
        Telephone: (212) 683-6000
        scottcarlton@paulhastings.com

        *Attorneys for Defendants ALP Services SA,*
        *Diligence SARL, Mario Brero, Lionel Badal, and*
        *Muriel Cavin*

26