# Exhibit B-4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HAZIM NADA<br>Via XXVII Maggio 29<br>22100 Como (CO), Italy,<br><br>and<br><br>LORD ENERGY SA<br>Contrada di Verla 1<br>6901 Lugano, Switzerland,<br><br>     Plaintiffs,<br><br>   v.<br><br>THE UNITED ARAB EMIRATES<br>C/O Ambassador of the UAE<br>Mr. Yousef Al-Otaiba<br>UAE Embassy<br>3522 International Court N.W. #100<br>Washington, D.C. 20008,<br><br>ARIAF STUDIES AND RESEARCH LLC<br>P.O. Box 3088<br>Abu Dhabi, United Arab Emirates,<br><br>ALP SERVICES SA<br>Rue de Montchoisy 36<br>CH-1207 Geneva, Switzerland,<br><br>DILIGENCE SARL<br>Rue de Montchoisy 36<br>CH-1207 Geneva, Switzerland,<br><br>MARIO BRERO<br>Route de l'Allaman 14<br>1173 Fechy, Switzerland,<br><br>LIONEL BADAL<br>Rue Eugene Welter 60<br>2723 Howald, Luxembourg,<br><br>    *(continued)* | **Case No. 1:24-cv-00206-ABJ**<br>JURY TRIAL DEMANDED |

MURIEL CAVIN )
Avenue du Mail 27 )
Geneva, Switzerland, )
)
LORENZO VIDINO )
1110 23rd Street N.W., Apartment 604 )
Washington, D.C. 20037, )
)
SYLVAIN BESSON )
Route de la Vuy 10 )
1305 Penthalaz, Switzerland, )
)
and )
)
JOHN DOE NOS. 1–25, )
)
     Defendants. )
)

## AMENDED COMPLAINT

1.      Beginning in late 2017, the United Arab Emirates and some of its top officials managed, directed, and bankrolled a years-long "dark" public relations campaign through the Swiss private investigative firm, Alp Services S.A., which was founded, owned, and run by Mario Brero and Muriel Cavin.  The UAE and its officials, Alp, Brero, Cavin, and their employees, and a network of other co-conspirators and participants—including private operatives, paid "journalists," bloggers, Wikipedia moderators, and a professor at George Washington University in Washington, D.C., among many others—operated as an association-in-fact enterprise to smear dozens of innocent victims.

2.      For years, this enterprise made fraudulent statements disparaging its commercial competitors and other rivals by falsely linking its targets to the Muslim Brotherhood and terrorist organizations.  The enterprise made these false statements: (1) to the press, in the United States and abroad; (2) on blogs and websites, many of which were owned and operated by U.S. companies and hosted on servers in the United States; (3) on Wikipedia; and (4) to financial institutions and the world's top financial risk compliance monitors, including some in the United States.  The enterprise's objective was to "destroy" its targets' businesses and reputations by defrauding banks, the targets' customers and business partners, government decision makers, and the public.  More than 8,000 of the enterprise's internal documents, procured by anonymous hackers in April 2021 and shared with law enforcement, show the enterprise's objectives, its longevity, and its devastating consequences.

3.      Among the enterprise's first targets were Hazim Nada, a crude oil trader who is an American citizen with a residence in Texas, and his companies, Lord Energy SA and its U.S. subsidiary Americas Lord Energy Inc.  The enterprise used its network of participants and co-

conspirators to carry out what Alp routinely described as a "confidential offensive viral communication" campaign to, in Alp's words, "seriously damage, if not destroy, the reputation and viability" of Hazim and his companies.

4.      On information and belief, the UAE and its officials instructed Alp to target Hazim and his companies because they viewed Hazim and Lord Energy as strategic competitive threats in the spot market for light crude oil exported to Asia—a market that the UAE's state-owned oil company, the Abu Dhabi National Oil Company ("ADNOC"), dominated.

5.      In 2016, Hazim and Lord Energy brokered key relationships with officials at Algeria's state-owned oil company and at the only port in Algeria capable of loading very large crude oil cargoes.  These relationships enabled Hazim and Lord Energy to begin to ship Saharan Blend crude oil from Algeria to refineries in Asia, including to refineries owned by American companies Chevron and Exxon Mobil.  Hazim and Lord Energy's growing influence in North Africa—a region of great geopolitical importance to the UAE where the UAE had spent billions of dollars to maintain its influence and control since the Arab Spring—and their increasing involvement in the spot market for light crude oil exported to Asia captured the UAE's strategic attention.

6.      In early 2017, Hazim and Lord Energy began moving large cargoes—many in excess of 1 million barrels—of Saharan Blend crude oil from Algeria into Korea, Thailand, and Singapore.  By the end of 2017, Hazim and Lord Energy were responsible for about a quarter of Algeria's exports of Saharan Blend.  This marked the culmination of years of hard work by Hazim and Lord Energy.  It was also about the time when the enterprise began its smear campaign against them.

7.      Saharan Blend is a type of light, sweet crude oil that competes with Murban crude oil—another light crude oil blend that at the time was, and still is, the flagship crude oil produced by the UAE and ADNOC.  Between 2016 and 2018, Lord Energy shipped nearly 20 million barrels of Saharan Blend to Asia and supplanted about 13 million barrels of Murban from ADNOC, taking nearly $830 million in revenue directly from the UAE.  This put Lord Energy on the UAE and ADNOC's radars as a viable commercial threat.

8.      The competitive threat Lord Energy posed to the UAE and ADNOC went far beyond just the specific Murban cargoes it supplanted with Saharan Blend.  Once Lord Energy began actively moving large quantities of Saharan Blend crude oil into the UAE's main markets for Murban in Asia, the price differential of Murban relative to another similar grade of light, sweet crude oil commonly used as a price benchmark fell by about $0.27 per barrel.  Given the amount of Murban being exported from the UAE to Korea, Thailand, and Singapore at the time, Lord Energy's entry into those markets cost Murban producers, especially the UAE and ADNOC, about $324,000 per day.  During the year-plus that Lord Energy was competing with ADNOC (before the enterprise's fraudulent smear campaign bankrupted Lord Energy), ADNOC, which controls over 60% of Murban exports, lost about $70.1 million as a result of the lower prices it received.

9.      Having developed a particular expertise in light crude oil, in early 2018, Lord Energy established a U.S. subsidiary in Houston, Texas to gain a foothold in the market for West Texas Intermediate ("WTI"), another type of light, sweet crude oil that was considered an equivalent grade to Saharan Blend and Murban and becoming increasingly popular with large refineries in Asia, especially those controlled by Chevron and Exxon Mobil, two of Hazim and Lord Energy's closest commercial partners.  Lord Energy's entry into WTI domestic transport and export markets once again challenged the UAE and ADNOC, as the further growth of Lord

3

Energy—the only operator who had proven capable of exporting and selling a competing grade to Murban on the spot market in Asia—threatened to further undercut the price they could receive for Murban exports to Asia.

10.     So, the enterprise took out Americas Lord Energy Inc.  In an October 21, 2019 impact assessment report to the UAE and its officials, Alp bragged that "[f]ollowing our media attacks, listing in World Check, and the financial difficulties it created, the US-branch, Americas Lord Energy Inc., was forced to cease its operations."  The enterprise also noted in internal communications when Americas Lord Energy was forced to fire Doug Koskie, its managing director in Houston—a veteran American crude oil trader.

11.     At the UAE's direction, in 2017, Alp concocted and widely publicized a false narrative accusing Hazim and Lord Energy of terrorist financing.  Hazim's father had historic ties to the Muslim Brotherhood.  On information and belief, Alp learned of Hazim's father's historic connection to the Muslim Brotherhood because one of the journalists on Alp's payroll, Sylvain Besson, had previously written about Hazim's father.   Alp exploited this information about Hazim's father to lend credibility to the enterprise's spurious claims about Hazim and his companies.

12.     Unlike his father, Hazim has never been associated with the Muslim Brotherhood, a group whose leadership particularly disliked Hazim.  Hazim is an American citizen who was born in Silver Spring, Maryland, attended the New York Military Academy, graduated from Rutgers University in New Jersey, and maintains a house in Houston, Texas, where many members of his extended family permanently reside.  Hazim has also worked closely with the U.S. Air Force to provide special forces training abroad, and he has conducted activities in oil markets that advanced the interests of and were closely followed by the U.S. government.  He is proud of his

American heritage, does not consider himself attached to the Arab world, and has only ever been to Egypt—where his father was born but left for good in 1959 and where the Muslim Brotherhood was founded—once.  None of that mattered to Alp.

13.     The internal documents procured by the anonymous hackers show that one of Alp's preferred *modi operandi* was to unlawfully obtain phone records for its targets; use those records to map out the targets' supposed associates based on phone call data; dig for any dirt (regardless of how farfetched) on any of those associates (regardless of how far removed from the targets); and concoct a false narrative imputing to the targets the uncorroborated accusations Alp uncovered or fabricated about the targets' (in some cases, very distant) associates.  Alp would then widely publicize its false accusations—in articles, blog posts, Wikipedia entries, and elsewhere online— and pseudonymously send its lies directly to legitimate journalists, banks, compliance monitors, price reporting agencies, and others for the express purpose of fraudulently inducing the targets' business partners, customers, and lenders to stop transacting with the targets to "destroy" the targets' businesses and reputations.  Alp referred to this as a "confidential offensive viral communication" campaign.

14.     That is exactly what the enterprise did to Hazim and dozens, if not more, of other innocent and unwitting victims primarily based in the United States and Europe.  The enterprise unlawfully obtained Hazim's phone records in 2017; it used those phone records to map out Hazim's purported network of associates; and it used rumors—including many that had been conclusively debunked—about some of those associates to manufacture a false narrative accusing Hazim of using his companies as fronts to finance the Muslim Brotherhood and al Qaeda, even though there was no evidence that Hazim ever had any ties to the Muslim Brotherhood and

certainly not to al Qaeda. An example of a link diagram Alp prepared that supposedly maps out Hazim and Lord Energy's connections and associates is below.



15. The UAE was quick to approve Alp's proposal to smear Hazim and Lord Energy as terrorist financiers because the false narrative that Alp manufactured about Hazim's alleged connections to the Muslim Brotherhood and involvement in terrorist financing fit with the UAE's broader geopolitical agenda of discrediting its regional rival, Qatar. For years, the UAE had been locked in a shadow conflict with Qatar—a key Muslim Brotherhood ally. By smearing Hazim and Lord Energy in this way, the UAE could *not only* dispatch a competitive threat, *but also* sow suspicion about Qatar and the Muslim Brotherhood's activities in the United States and Europe.

16. The UAE's unlawful enterprise was highly discreet, organized, and effective. The UAE and then-Crown Prince of Abu Dhabi Mohamed bin Zayed Al Nahyan ("M.B.Z.") oversaw

the enterprise's larger campaign, providing strategic guidance and direction. M.B.Z. enlisted Ali Saeed al-Neyadi ("Ali"), a ministerial-level aide to Sheikh Tahnoun bin Zayed—the Emirati national-security adviser and M.B.Z.'s brother[1]—and another UAE government official, Matar Humaid al-Neyadi ("Matar"), to oversee operations at a more granular level by serving as a direct liaison with Alp. To hide the UAE's involvement, Matar enlisted a limited liability company in Abu Dhabi, Ariaf Studies and Research LLC, to contract with Alp and Diligence SARL, another firm that was founded, owned, and run by Mario Brero and Muriel Cavin, and to pay Alp and Diligence for their work on behalf of the UAE. Alp proposed targets and conducted "discreet" operations abroad to further the UAE's objectives, while keeping the UAE's role "invisible."

17.  Matar worked hand in glove with Brero, Cavin, and one of Alp's senior employees, Lionel Badal, to identify targets of confidential offensive viral communication campaigns including Hazim, Lord Energy, and dozens of others, and to hire trusted sources, journalists, and academics to write and publish false articles about those targets. The enterprise would then cite those false and misleading articles—which appeared legitimate but were actually fabricated by Brero, Cavin, Badal, and other Alp employees and written by journalists and academics on Alp's payroll—to defraud financial institutions, business partners, customers, and counterparties and induce them to break ties with the enterprise's targets, ruining the targets' businesses and reputations.

18.  The hacked documents lay out in detail each step of this plan. For example, a document written by Alp in February 2018 titled "Action Plan" explained Alp's proposal to the

---

[1] David Kirkpatrick, *The Dirty Secrets of a Smear Campaign*, The New Yorker (Mar. 27, 2023), https://www.newyorker.com/magazine/2023/04/03/the-dirty-secrets-of-a-smear-campaign.

UAE.  According to this document, which on information and belief, Alp shared with the UAE via email, Alp would:

- "*Launch massive negative articles* on dozens of key [Muslim Brotherhood] targets including but not limited to Lord Energy … in French, Italian and *most importantly English*."

- "*[I]nform selected journalists about our targets*, their leadership role within the MB in Europe and connections with Al Qaeda."

- "*[A]ctivate our network of trusted journalists and editors*, as we successfully did with Le Temps and soon in Le Point."

- "*[C]reate negative Wikipedia pages for our targets*, including the company and its key directors, in a negative tone, in English, French, and Italian.  This would be the first source of information for anyone looking at the company (e.g. journalists, politicians, law enforcement and intelligence officials, compliance officers, etc.)."

- "*[A]lert compliance databases and watchdogs, which are used by banks* and multinationals, for example about Lord Energy's real activities and links to terrorism."

- "*[D]iscreetly notify banks* of MB companies' (e.g. Lord Energy, Eurozone Equity) links to terrorism and Political Exposed Persons (PEPs), *the objective being to block their bank accounts and business*."

- "[U]se … social media to *boost public interest in the articles* and viral actions."

- And "*discreetly* lobby decision-makers."[2]

---

[2] Emphasis added.

> **2018 ACTION PLAN**
>
> 1.  Launch massive negative articles on dozens of key MB targets, including but not limited to Lord Energy, FEMYSO and Nabil Ennasri, in French, Italian and most importantly English.
>
> 2.  We would inform selected journalists about our targets, their leadership role within the MB in Europe and connections with Al Qaeda.
>
> 3.  We would activate our network of trusted journalists and editors, as we successfully did with *Le Temps* and soon in *Le Point*.
>
> 4.  We would create negative Wikipedia pages for our targets, including the company and its key directors, in a negative tone, in English, French and Italian. This would be the first source of information for anyone looking at the company (e.g. journalists, politicians, law enforcement and intelligence officials, compliance officers etc.).
>
> 5.  We would also alert compliance databases and watchdogs, which are used by banks and multinationals, for example about Lord Energy's real activities and links to terrorism.
>
> 6.  We would discreetly notify banks of MB companies' (e.g. Lord Energy, Eurozone Equity) links to terrorism and Political Exposed Persons (PEPs), the objective being to block their bank accounts and business.
>
> 7.  We would also make use of social media to boost public interest in the articles and viral actions.
>
> 8.  Lastly, we would discreetly lobby decision-makers, notably at the European level.

19.     Alp concluded, "Should you give us the green light, we believe that we could seriously damage, if not destroy, the reputation and viability of key MB European groups through our confidential offensive viral communication."

20.     Alp was not the only entity the UAE used to carry out its disinformation operations. For example, it also relied on former France24 journalist Atmane Tazaghart, who was fired from the French network for making antisemitic comments.[3]  Tazaghart communicated directly with Matar, and Alp described Tazaghart as "competition" in its internal documents.

21.     In Hazim's case, the enterprise hired "journalist" Sylvain Besson, whom Alp described as "part of [its] extensive network," to write an article in early 2018 in a prominent

---

[3] *See A France24 editor-in-chief, conspiracy theorist and anti-Semite.  The channel reacts*, Jewish Tribune (May 9, 2016), https://www.tribunejuive.info/2016/05/09/un-redacteur-en-chef-de-france24-complotiste-et-antisemite/.

newspaper falsely accusing Lord Energy of being a Muslim Brotherhood front company that funded terrorist organizations.  It then used bloggers to repeat Besson's "reporting" with even more incendiary tones, in dozens of outlets, the majority of which were on U.S. platforms such as Medium, WordPress, and Tumblr, giving these false claims the illusion of broad media consensus.

22.    The enterprise also created fake Wikipedia pages in English, French, and Italian to enshrine the false claims as genuine "controversies."  It used search engine optimization tactics, with a special focus on English-language Google search results, to ensure that the enterprise's sponsored articles were among the top results when searching for Hazim or Lord Energy on Google and other U.S.-based search engines such as Yahoo! and Bing.  It emailed the false claims that Hazim and Lord Energy were involved in terrorist financing to journalists—including U.S.-based journalists from major U.S. media outlets like Bloomberg and Axios.  Finally, it fraudulently induced the compliance platform World-Check, which is owned by Thomson Reuters—a company publicly traded on the New York Stock Exchange and with several offices throughout the United States—to flag Hazim and Lord Energy under the risk category "terrorism," ensuring that U.S. and international financial institutions would refuse to lend to Hazim and Lord Energy.

23.    The enterprise's lies were outlandish but devastating.  They bankrupted Lord Energy and its U.S. subsidiary—companies that took Hazim more than ten years to build from nothing—cost Hazim hundreds of millions of dollars (Lord Energy was valued at about $150 million before the enterprise's smear campaign took hold) and eliminated a growing competitive threat to the UAE and ADNOC in the spot market for light crude oil sold to refiners in Asia. Plaintiffs bring this lawsuit asserting claims for violations of the Lanham Act, 15 U.S.C. § 1125(a)(1), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, and the Sherman Act, 15 U.S.C. §§ 1–7.  They seek to vindicate their rights and

recover damages for the devastating economic harm that the enterprise's confidential, offensive, viral communication campaign caused to their businesses and reputations, along with the direct impact the smear campaign had on Hazim's personal life and emotional, physical, and psychological well-being.

## PARTIES AND RELEVANT NON-PARTIES

24.     Plaintiff Dr. Hazim Nada is the founder and sole owner of Lord Energy SA.  Hazim is a citizen of the United States and Italy.  Hazim was born in Silver Spring, Maryland, spent a substantial part of his youth in the United States—where a significant part of his extended family still lives—attended the New York Military Academy, went to college and graduated from Rutgers University in New Jersey, and maintains a home in Houston, Texas.  He has a U.S. passport and, like all U.S. citizens, is responsible for paying U.S. taxes.  When Lord Energy SA was still operational, Hazim had to submit financial reports for the company with his U.S. tax returns. Likewise, as a U.S. citizen, Hazim is—and was—required to comply with U.S. sanctions and export control laws even while living abroad.  During all relevant times, Lord Energy SA was also required to follow U.S. regulations governing crude oil trading domestically and internationally because it was owned by a U.S. citizen and had a subsidiary in the United States.[4]  Hazim currently resides and is domiciled in Como, Italy.

25.     Plaintiff Lord Energy SA is a crude oil and commodity trading company founded by Hazim in 2008.  It is and always has been fully owned by Hazim.  Lord Energy SA is incorporated under the laws of Switzerland and its principal place of business is located at Contrada di Verla 1, CH-6900 Lugano, Switzerland.  As of October 2018, Lord Energy SA was

---

[4] Dep't of Commerce, Dep't of the Treasury, & Dep't of Justice, *Tri-Seal Compliance Note: Obligations of foreign-based persons to comply with U.S. sanctions and export control laws*, at 2 (Mar. 6, 2024), https://www.justice.gov/opa/media/1341411/dl?inline.

valued at approximately $150 million, with annual revenue of about $1.71 billion.  Lord Energy was forced to declare bankruptcy in Switzerland in April 2019 as a result of the smear campaign conducted against it.  As a foreign company owned by a U.S. citizen, Lord Energy SA is—and was—bound by certain U.S. sanctions laws, including sanctions prohibiting transactions with Iran and Cuba.  31 C.F.R. §§ 560.215, 515.329.

26.     Today, Lord Energy is essentially worthless because it is no longer able to obtain the credit needed to finance its commodity trading operations.  In addition, Lord Energy's bankruptcy restructuring caused a substantial number of clients and counterparties to lose significant amounts of money, destroying the relationships and good will Lord Energy built with those clients and counterparties and ensuring they would never do business with Lord Energy again.  In March 2017, Hazim opened to the public a second business outside Milan, Italy: a vertical wind tunnel that the U.S. Air Force Special Forces and Italian military use to train paratroopers.

27.     Americas Lord Energy Inc. was a wholly owned subsidiary of Lord Energy SA. Americas Lord Energy Inc. was incorporated on April 24, 2018 under the laws of the State of Texas and had its principal place of business at 2101 City West Boulevard, Suite 230, Houston, Texas.  Americas Lord Energy Inc. was dissolved in March 2019.  Hazim and Douglas Koskie, a U.S. citizen domiciled in Texas, served as directors of Americas Lord Energy Inc.

28.     Defendant the United Arab Emirates is a foreign state.  The UAE maintains an Embassy in the District of Columbia.  It is located at 3522 International Court N.W., Suite 100, Washington, D.C. 20008.

29.     Non-party Mohamed bin Zayed Al Nahyan ("M.B.Z.") is a citizen of the UAE and the current President of the UAE and ruler of Abu Dhabi.  M.B.Z. was the Crown Prince of Abu

Dhabi until May 14, 2022, when he was elected President by a decision of the members of the Federal Supreme Council of the UAE.  M.B.Z. had ultimate approval authority over the enterprise's disinformation operations.

30.     Non-party Ali Saeed al-Neyadi is a ministerial-level aide to Sheikh Tahnoun bin Zayed—the Emirati national-security adviser and M.B.Z.'s brother.[5]  Ali met in person with Brero and other Alp employees on multiple occasions.  On information and belief, Ali was closely involved with approving the initial phases of the enterprise's smear campaign and served as an intermediary between M.B.Z. and other participants in the enterprise such as Matar and Brero.

31.     Non-party Matar Humaid al-Neyadi ("Matar") is a citizen of the UAE.  Matar was the UAE's main intermediary with Alp, Brero, and other co-conspirators outside the UAE.  Matar met with Brero numerous times in Switzerland and the UAE, he routinely approved Alp's proposed targets and viral communication operations, he kept his bosses Ali and M.B.Z. informed about Alp's operations, and he ensured that Alp and its operations were adequately funded.  Between 2017 and 2021, Matar directed and approved millions of dollars to Alp to fund its smear campaign.

32.     Non-party the Abu Dhabi National Oil Company ("ADNOC") is the state-owned oil company of the UAE.  ADNOC is an instrumentality of the UAE as defined in 28 U.S.C. § 1603(b).  Lord Energy was a direct commercial competitor of ADNOC in the spot market for light crude oil sold to refiners in Asia, including American-owned refiners operating in Asia like Chevron and Exxon Mobil.  M.B.Z. is the chair of the board of directors of ADNOC.

33.     Defendant Ariaf Studies and Research LLC ("Ariaf") is a limited liability company formed under the laws of the UAE with its principal place of business in Abu Dhabi.  Its address

---

[5] David Kirkpatrick, *The Dirty Secrets of a Smear Campaign*, The New Yorker (Mar. 27, 2023), https://www.newyorker.com/magazine/2023/04/03/the-dirty-secrets-of-a-smear-campaign.

is P.O. Box 3088, Abu Dhabi, UAE.  Ariaf was the signatory to the contracts between the UAE and Diligence SARL governing Brero, Cavin, and Alp's disinformation operations, including a March 22, 2018 non-disclosure agreement.  Between 2017 and 2019, Ariaf transferred nearly $5 million dollars from the UAE to Alp and Diligence as payment for their viral offensive communications campaigns and other operations targeting Hazim, Lord Energy, and dozens of other innocent victims.  Ariaf was also listed as the sponsor for Brero and Cavin on their applications for UAE work visas.  Ariaf's involvement was essential to conceal the identities and involvement of the UAE, M.B.Z., Matar, and other UAE officials and instrumentalities and to ensure they remained, in Alp's words, "invisible."

34.     Defendant Alp Services SA ("Alp") is a private investigative company founded, owned, and operated by Mario Brero and Muriel Cavin.  Alp is incorporated under the laws of Switzerland, and its principal place of business is located at Rue de Montchoisy 36, CH–1207 Geneva, Switzerland.  On information and belief, the majority of Alp's clients were private businesses, law firms, and ultra-high net worth individuals.

35.     Defendant Diligence SARL ("Diligence") is a private investigative company founded, owned, and operated by Mario Brero and Muriel Cavin.  Diligence is incorporated under the laws of Switzerland, and its principal place of business is located at Rue de Montchoisy 36, CH–1207 Geneva, Switzerland.  Diligence was a party to the contracts with Ariaf that governed Brero, Cavin, and Alp's disinformation operations.  Diligence entered into a non-disclosure agreement with Ariaf for work relating to the enterprise's smear campaign.

36.     Brero and Cavin used Alp and Diligence interchangeably as instrumentalities to plan and orchestrate disinformation operations in furtherance of the enterprise's smear campaigns targeting Hazim, Lord Energy, and dozens of other targets in the United States and Europe.

37.     Defendant Mario Brero resides and is domiciled in the Lausanne area of Switzerland.  He is a citizen of Italy.  Brero is one of the founders, owners, and operators of Alp and Diligence.  Brero routinely communicated and interacted with Ali, Matar, and other UAE officials in connection with the enterprise's smear campaigns targeting Hazim, Lord Energy, and dozens of other targets in the United States and Europe.  Among other things, Brero regularly proposed targets to Ali, Matar, and other UAE officials, devised tactics and operations to achieve the enterprise's objectives of destroying the businesses and reputations of their targets (including Hazim and Lord Energy), communicated with Matar regarding funding, and managed and directed Alp employees and the enterprise's co-conspirators and other participants in furtherance of the enterprise's objectives.  In 2024, authorities in France and Switzerland launched three separate criminal probes against Brero for his role in the UAE's disinformation campaign.  Another French investigation was launched in October 2023 by a legal complaint from a "lobbyist for Qatar in France, who said she and Qatar had been targeted by a 'destabilisation operation' on the basis of information given by ALP Services."[6]  Her complaint also alleges that Alp conducted surveillance outside her home, and that her home was burglarized and her laptop and other possessions were stolen.

38.     On information and belief, defendant Muriel Cavin is a citizen of, resides in, and is domiciled in Switzerland.  She co-founded Alp and Diligence with Brero and is a longstanding director of Alp.  Cavin helped devise and manage disinformation operations in furtherance of the enterprise's objectives of destroying the businesses and reputations of their targets (including Hazim and Lord Energy).  Cavin was routinely included on internal Alp emails relating to and was

---

[6] AFP, *Swiss Private Intelligence Agency Probed Over UAE Spy Allegations*, Barron's (Apr. 15, 2024), https://www.barrons.com/news/swiss-private-intelligence-agency-probed-over-uae-spy-allegations-0d97edc0.

fully aware of Alp's confidential offensive viral communication campaigns for the UAE. For example, in November 2019, an Alp employee sent Cavin a list of 58 "case studies" Alp had completed for the UAE since October 2017.

39.     On information and belief, Defendant Lionel Badal is a citizen of and resides in Luxembourg. Badal is a former senior Alp employee, who—like Brero and Cavin—devised and managed disinformation operations in furtherance of the enterprise's objectives of destroying the businesses and reputations of their targets (including Hazim and Lord Energy). Badal also routinely communicated with Matar. On information and belief, he is currently an investigator at the Luxembourg financial authority.

40.     Defendant Lorenzo Vidino, an American, is a citizen of, resides in, and is domiciled in Washington, D.C. Vidino is the Director of the Program on Extremism at the George Washington University. Vidino was hired by Alp as a contractor to provide leads on new targets and research and analysis on the Muslim Brotherhood. Alp routinely directed Vidino to obtain information it could then use in connection with its viral communication campaigns. He typically was paid between $2,000–$4,000 for each discreet assignment he completed for Alp. For example, an internal Alp document dated April 30, 2018 with the filename "arnica 6-lorenzo-to do list-20180430," summarized five projects for Vidino, including "Preparing an overview of key MB individuals/organisations/companies in the USA and interesting elements/rumours … to show our capacities … in the US" and "[p]reparing a short report … on [Islamic Relief Worldwide] and possible connections to terror." The budgets for these assignments ranged from EUR 2,000 to EUR 3,500. Vidino consulted with Alp about Lord Energy. Vidino routinely communicated with Brero, Badal, and another Alp employee via WhatsApp. In WhatsApp exchanges with Lionel

Badal, Vidino expressly stated his belief that Crédit Suisse withdrew its line of credit to Lord Energy because of an article the enterprise had published.

41.     The enterprise also funneled information to Vidino and relied on him, and his academic credentials, to legitimize the false and misleading statements the enterprise published to discredit, disparage, and destroy its targets.  For example, in 2020, Alp uncovered two antisemitic Facebook posts made by trustees of Islamic Relief Worldwide ("IRW") in 2014 and 2015.  IRW is one of the largest Muslim-led humanitarian non-governmental organizations in the world.  It operates in more than 47 countries worldwide.  In 2014, the UAE designated IRW a terrorist group. IRW was the target of one of the enterprise's offensive viral communications campaigns.  When Alp uncovered the Facebook posts, it passed them on to Vidino and told the UAE that Alp "channeled our findings to the academic expert Lorenzo Vidino," who shared them with a journalist at *The Times*.  Alp noted that using Vidino as an intermediary ensured that Alp would remain "completely confidential."

42.     When Vidino's involvement with the enterprise was made public, several research analysts and fellows at the George Washington University Program on Extremism, which was run by Vidino, renounced their affiliations with the program.  One research fellow stated: "I refuse to lend legitimacy to an organization [with] such an egregious ethical breach.  I too feel I should have done better diligence before agreeing to join, [and] I apologize to all Muslim organizations in particular who were directly harmed by these false, slanderous claims that came from a leader whose organization had my name attached to it."[7]

---

[7] Gerald T. FitzGerald, *Mapping Anti-Muslim Discrimination and Information Manipulation, and its Impact on Humanitarian Aid and Development*, George Mason Univ. (Feb. 2024), *available at* https://jliflc.com/wp-content/uploads/2024/02/Fitzgerald-WhitePaper2.pdf.

43.     Defendant Sylvain Besson is a citizen of, resides in, and is domiciled in Switzerland.  At all relevant times, Besson worked as a journalist for the Swiss publication Le Temps.  Besson was on Alp's payroll, and he routinely published stories he knew to be false and misleading at Alp's behest and attended lavish lunches and dinners hosted by Brero.  In January 2018, Besson was hired by Alp and wrote an article that was published in Le Temps about Hazim and Lord Energy falsely claiming that Hazim and Lord Energy had ties to the Muslim Brotherhood and "kept militant activities."  Besson had previously written about Hazim's father.  His prior work on Hazim's father also was false and misleading.  On information and belief, Besson gave Alp the idea to paint Hazim and Lord Energy as terrorist financiers based solely on Hazim's father's historic connections to the Muslim Brotherhood.

44.     Defendants John Doe Nos. 1–25 are individuals and entities who participated in and conspired with the enterprise to publish false and misleading statements about Hazim and Lord Energy.  Plaintiffs are currently unaware of the identities of John Doe Nos. 1–25, and they intend to identify John Doe Nos. 1–25 through discovery in this action.  Upon information and belief, John Doe Nos. 1–25 include other unidentified UAE officials, Alp employees, journalists, Wikipedia moderators, and academics.

## JURISDICTION AND VENUE

45.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the laws of the United States, specifically the Lanham Act, 15 U.S.C. § 1125(a)(1), RICO, 18 U.S.C. §§ 1961–1968, and the Sherman Act, 15 U.S.C. §§ 1–7.

46.     This Court has subject matter jurisdiction over Defendant the UAE pursuant to 28 U.S.C. § 1330 because the UAE is a foreign state, see id. § 1603(a).  The claims brought herein are for relief in personam with respect to which the UAE is not entitled to immunity under

18

28 U.S.C. § 1605(a)(2).  This action is based on the UAE's commercial activity in the United States, acts performed in the United States in connection with its foreign activities, and foreign acts in connection with its foreign commercial activity that caused a direct effect in the United States.  *See id.*

47.     The UAE and its officials and instrumentalities—through Ariaf—entered into valid, private, commercial contracts to hire a private investigative firm—Alp—to conduct "dark" public relations campaigns that spanned years against the UAE's commercial competitors Hazim and Lord Energy, as well as dozens of other targets in the United States and Europe.  The association-in-fact enterprise—which was overseen and managed by the UAE, its officials and instrumentalities, Alp, Brero, Cavin, and Badal—hired journalists, academics, Wikipedia moderators, and other participants and co-conspirators to engage in activities typically carried out by private commercial actors.  These commercial activities included: writing articles published by private media outlets and on internet blogs, the majority of which were, on information and belief, hosted on servers in the United States, subject to U.S. laws, and owned and operated by individuals and entities in the United States; writing and editing Wikipedia entries, including on English-language Wikipedia pages; conducting search engine optimization operations to manipulate English-language search results on Google and other U.S.-based search engines including Yahoo! and Bing; alerting private financial risk watchdogs—including watchdogs in the United States—of targets' supposed ties to terrorism; emailing private financial institutions and journalists, many of whom were located in the United States, directly to alert them to targets' alleged ties to terrorism; and writing and publishing academic papers that lent credibility to the enterprise's fraudulent claims.

48.     The enterprise's commercial activities directly affected U.S. citizens and businesses.  The enterprise's commercial activities targeting Hazim and Lord Energy also affected certain U.S. markets for physical crude oil and financial instruments pegged to crude oil, U.S. companies (notably Chevron and Exxon Mobile—two of Lord Energy's biggest trading partners) operating in the impacted markets, and U.S.-flagged transshipment and crude oil operators who lost money from Lord Energy's bankruptcy.

49.     This Court has personal jurisdiction over the UAE pursuant to 28 U.S.C. § 1330 for the same reasons it has subject-matter jurisdiction over claims against it.  *See supra* ¶ 38.

50.     This Court has general personal jurisdiction over Defendant Vidino because he is domiciled in the District of Columbia.  *See* D.C. Code § 13-422.

51.     This Court has personal jurisdiction over the other overseas Defendants—Ariaf, Alp, Diligence, Brero, Cavin, Badal, Besson, and any of the John Doe Defendants who are citizens of a foreign state—pursuant to Federal Rule of Civil Procedure 4(k)(2).  Plaintiffs' claims arise under federal law (i.e., the Lanham Act, RICO, and the Sherman Act), summonses have been served or service has been waived,[8] none of these Defendants are subject to the jurisdiction of any single state court, and the exercise of federal jurisdiction is consistent with the U.S. Constitution and laws of the United States, because Defendants have sufficient minimum contacts with the United States.  This Court also has personal jurisdiction over these Defendants pursuant to Federal Rule of Civil Procedure 4(k)(1)(C) and 18 U.S.C. § 1965.

52.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(3) and 1391(f)(4) and 18 U.S.C. § 1965(b).

---

[8] Ariaf has not yet been served.  Plaintiffs' Motion for Service of Process By Other Means to Defendant Ariaf Studies and Research LLC is pending before the Court.  (ECF Nos. 11, 53, 56.)

## FACTUAL ALLEGATIONS

### *Hazim Founds the Commodity Trading Firm Lord Energy.*

53.     Plaintiff Dr. Hazim Nada is an American citizen who was born in Silver Spring,
Maryland.  He attended the New York Military Academy and received his undergraduate degree
from Rutgers University in New Jersey.  After graduating from Rutgers with highest honors,
Hazim earned a master's in theoretical physics at Cambridge University, where he studied and
worked in close contact with and under the supervision of renowned experts in the field including
Stephen Hawking and Dr. Hawking's successor for the Lucasian Chair, Professor Michael Greene.
Hazim subsequently earned a doctorate in applied math at Imperial College London, where he
studied under Professor Nicos Christofides, the father of the homonym algorithm, which is used
for routing the World Wide Web.  As a doctoral candidate, Hazim also worked on projects used in
U.S. national defense systems, including those used for missile defense and detection.  Hazim is a
lifetime member of the U.S. National Society of Collegiate Scholars.

54.     While still a student, Hazim traded commodities to pay for his graduate studies.
During his Ph.D. studies, Hazim also worked as an analyst for Citigroup and, later, in an energy-
centered trading commodities role with Merrill Lynch.

55.     Hazim founded the commodities trading company Lord Energy SA in 2008, seven
months prior to completing his Ph.D.  Hazim sought to enter the lucrative oil trade, but the barriers
to entry were extremely strong.  Start-up costs and initial capital requirements were incredibly
high, as were fixed operating costs.  Costs of a single shipment of crude oil ranged from $60
million to $160 million, and the industry's major players—Exxon Mobil, Chevron, and BP—
delivered tens of billions of dollars to shareholders annually.  Other barriers to entry included
government regulations, such as environmental regulations, access to crude oil supplies, and access
to ports, to name a few.

21

56.     So, Lord Energy started by serving as a consultant to larger oil market participants and began trading smaller commodities and shipping coal, grain, cement, and steel across the Mediterranean and Pacific basin.  Hazim's business savvy and quantitative acumen brought him almost immediate success.  From 2010 to 2016, Lord Energy developed the largest bagged cement import market in the region.

57.     This allowed Hazim and Lord Energy to break into the oil market.  In 2014, Lord Energy entered into a Tripartite Agreement through the U.S. branch of Macquarie Bank that allowed Lord Energy to conduct futures trades, which were necessary for Lord Energy to manage its crude oil cargo pricing.  Lord Energy's U.S. subsidiary, Americas Lord Energy, was eventually forced to liquidate this Tripartite Agreement as a result of the enterprise's fraudulent conduct.

58.     To compete against much larger rivals, however, Hazim and Lord Energy needed to innovate.  In oil, that meant exploring new "grades" of crude oil, opening new markets, and finding opportunities to arbitrage: to buy the right grades of crude oil at low prices from regions of oversupply and sell them at higher prices to areas where those grades were in high demand.

### Lord Energy Begins Exporting Saharan Blend Crude Oil to Asia.

59.     Crude oil is not a monolithic commodity.  Rather, the term "crude oil" encompasses a wide variety of raw and unprocessed mixtures of hydrocarbons that can be extracted in liquid form from the substrata of the earth's surface.

60.     Every geological formation holding oil reservoirs is characterized according to specific mixtures of hydrocarbons, giving rise to different types or grades of crude oil.  Crude oils are generally categorized by density, ranging from "light" to "medium" to "heavy," and sulfur content, ranging from "sweet" (low in sulfur) to "sour" (high in sulfur).  Therefore, crude oils typically fall into one of six buckets: light-sweet, medium-sweet, heavy-sweet, light-sour, medium-sour, and heavy-sour.

61.    Different grades of crude oil are processed by different types of refineries and produce different end products.  For example, sulfur is highly corrosive for refining systems, so refineries must take special precautions to protect their equipment to refine sour crude oils with high sulfur contents.  Similar grades do not necessarily produce the same yields of refined products.  But similar grades can be processed equally well by refineries.  If a refiner is unable to obtain a specific grade at a certain time when it has excess refining capacity, the refiner will seek to substitute an equivalent grade.

62.    Crude oil is typically bought and sold through (1) long-term contracts that specify regular deliveries at set quantities or (2) through spot sales, i.e., short-term contracts for single or a small number of cargoes.  If a delivery under a long-term contract is delayed, for example because of bad weather or a problem with a tanker, a buyer may turn to the spot market to replace the delayed cargo.

63.    Different regions tend to produce different types of crude oil.  The Arabian Gulf produces a larger share of sour grades than light, sweet ones.  However, its overall production is so vast that even the relatively smaller volume of light, sweet crude oils (as compared to the volume of sour grades) produced by Gulf countries is still significant.  North Africa, West Africa, the United States, and the North Sea primarily produce light, sweet crude oils.

64.    Saharan Blend is a type of light, sweet crude oil, and it is Algeria's main crude oil export blend.  Algeria exports Saharan Blend from three shipping terminals: Béjaïa, Arzew, and Skikda.  Béjaïa is the only port in Algeria capable of fully loading Very Large Crude Carriers ("VLCCs")—the largest class of oil tankers, with the capacity to hold about 2 million barrels.

65.    Algeria produces approximately 1.2 million barrels of Saharan Blend daily, and about half of that volume is exported.  Historically, most Saharan Blend exports from Algeria were

delivered to Europe.  Algeria's national oil corporation Sonatrach is the largest seller of Saharan Blend in Algeria, and the only seller with sufficient quantities to sell VLCC-sized parcels.

66.     Murban is another type of light crude oil, similar to Saharan Blend, with a slightly higher sulfur content.  It is primarily produced in Abu Dhabi.  About 2 million barrels are produced daily, and about 1.2 million (roughly 36 million barrels per month) of those are sold for export on both the long-term and spot markets.  ADNOC is the dominant seller of Murban, accounting for about 60% of all Murban exports from the UAE.  Murban is typically sold to refineries in Asia.

67.     ADNOC created, and exercised absolute control over, the spot market for Murban cargoes sold to Asian refiners.  Certain crude oil grades are used as indices to set prices for other grades.  For example, Brent crude oil (a grade primarily extracted from oil fields in the North Sea) only accounts for a small volume of the world's overall crude oil supply.  But Brent serves as one of the main price setting benchmarks that has historically been used to set prices for over a third of the planet's overall crude oil production.  For a grade to serve as price index, there must be a spot market, where the value of the grade can be tested through a market-based, short-term temporal price discovery mechanism that is not tied to long-term contracts.

68.     For years, the UAE sought to establish Murban as an index for light crude oil.  To do so, it allowed the creation of a Murban spot market by granting revokable contractual rights to certain Murban cargo holders, long-time clients, and equity producers so they could resell Murban cargoes in short-term spot transactions.   ADNOC also engaged in such short-term spot transactions.

69.     Ultimately, between 2016 and 2019, the UAE allowed about 8 million barrels of Murban to be sold by ADNOC and other producers on the spot market to refiners in Asia.  ADNOC

was responsible for about 5 million of these 8 million Murban barrels (roughly 62.5%) and permitted other producers to sell about 3 million barrels per month.

70.     Around the same time, as ADNOC was seeking to establish Murban as a benchmark for light crude oil, it also sought to expand its volume of Murban production and exports.  In November 2016, M.B.Z.—then head of the UAE's Supreme Petroleum Council, the governing body of the UAE's gas and oil related industries that worked as the Board of Directors for ADNOC until 2021[9]—approved ADNOC's 2030 strategy and five-year business plan aimed at "generating sustained, strategic growth."[10]  In 2021, a new 10-member Board of Directors was established for ADNOC that was chaired by M.B.Z., confirming his control of ADNOC.[11]

71.     ADNOC intended to establish Murban as the dominant benchmark for crude oil prices in the Middle East.  The UAE's earlier creation of a spot market for Murban was aimed at achieving this objective.  Murban Crude Oil futures were launched in 2021, and earlier this year, Bloomberg announced the creation of the Bloomberg Commodity Murban Crude Oil Index.[12]

72.     Most large refineries in Asia have sophisticated de-sulfurization capabilities, so many of these refineries considered Murban to be equivalent to Saharan Blend, Arab Extra Light— a light, sweet crude oil exported by Saudi Arabia—and WTI, a type of light, sweet crude oil exported from the United States.  Beginning in the second half of 2018, WTI exports to Asia

---

[9] Dania Saadi, *UAE's Abu Dhabi forms new board for ADNOC amid spending spree*, S&P Glob. (Feb. 28, 2021), https://www.spglobal.com/commodityinsights/en/market-insights/latest-news/natural-gas/022821-uaes-abu-dhabi-forms-new-board-for-adnoc-amid-spending-spree.
[10] ADNOC Press Release, *Supreme Petroleum Council Approves ADNOC's 2030 Strategy and Five Year Business Plan Focused On Growth And Maximising Value* (Nov. 2, 2016), https://www.adnoc.ae/en/news-and-media/press-releases/2016/spc-approves-adnoc-strategy.
[11] Dania Saadi, *UAE's Abu Dhabi forms new board for ADNOC amid spending spree*.
[12] Press Release, *Bloomberg Commodity Murban Crude Oil Index Introduced in Latest Bloomberg Indices Commodities Expansion*, Bloomberg (Mar. 13, 2024), https://www.bloomberg.com/company/press/bloomberg-commodity-murban-crude-oil-index-introduced-in-latest-bloomberg-indices-commodities-expansion/.

increased dramatically, making it the dominant competitor to Murban in the region. Arab Extra Light, which is primarily sold on term contracts and generally is not available for purchase in the spot market, is the main price setter and benchmark for light crude oils like Saharan Blend and Murban.

73.    Because Saharan Blend historically was primarily exported to Europe and Murban was primarily exported to Asia, Saharan Blend was not generally considered to be a competitive threat to, or reasonably interchangeable with, Murban for refiners in Asia. That changed around 2016, when Hazim and Lord Energy brokered a deal with Sonatrach to use the Béjaïa port to load VLCCs with Saharan Blend and export it to Asia. This deal required months of effort and negotiation by Hazim and Lord Energy with Sonatrach and Algerian officials at Béjaïa. Enabling the loading of VLCCs at Béjaïa made it economically feasible to export Saharan Blend to refineries in Asia.

74.    Hazim and Lord Energy began shipping Saharan Blend from Algeria to Australia in early 2016. These initial shipments posed no threat to ADNOC because the refinery in Australia to which Lord Energy sold its Saharan Blend cargoes lacked the de-sulfurization capabilities necessary to process Murban.

75.    The dynamic shifted in late 2016, however, when Lord Energy began shipping Saharan Blend to Korea, Thailand, and Singapore—major markets for Murban. Between 2016 and 2018, Saharan Blend and Murban were the only light crude oil blends sold on the spot market to refiners in Asia. And prior to 2016—when Lord Energy brokered the deal with Sonatrach to use Béjaïa to load VLCCs—Murban was the only grade of light crude oil sold in meaningful volumes on the spot market to refiners in Asia.

76.     Lord Energy's innovative new route cost the UAE and ADNOC more than $70.1 million, both directly through supplanted spot cargoes that ADNOC lost to Lord Energy and indirectly as a result of the downward pressure that competition from Lord Energy exerted on Murban prices in spot and long-term markets.  These losses and the threat of continued competition from Lord Energy were more than enough incentive for the UAE and ADNOC to seek to eliminate this growing rival.

77.     Lord Energy's direct threat to ADNOC was abundantly clear.  Its Saharan Blend cargoes were in direct competition with Murban in Asian markets.  In particular, GS Caltex, the largest single customer of Lord Energy's Saharan Blend volumes, was also one of the largest purchasers of ADNOC's Murban.  The chart below lists specific cargoes Lord Energy exported to Asia between 2016 and 2018.  On information and belief, those highlighted in yellow are Lord Energy cargoes that directly supplanted Murban shipments from ADNOC.

| Lord Energy Cargoes Relevant for Murban | | | | |
|---|---|---|---|---|
| Name of Vessel | Volume (Barrels) | Destination | Bill of Lading Month/Year | Crude Grade |
| **2016** | | | | |
| Gener8 Maniate | 980,225.00 | Ampol | Feb. 2016 | Saharan |
| Seacross | 987,673.00 | Ampol | Feb. 2016 | Saharan |
| Cape Bastia | 967,272.00 | Ampol | May 2016 | Saharan |
| Cap Philip | 966,253.00 | Ampol | Sept. 2016 | Saharan |
| Daba/Cape Brindisi | 1,041,192.00 | Lukoil | Oct. 2016 | Saharan |
| United Kalavryta | 1,063,304.00 | GS Caltex | Nov. 2016 | Saharan |
| | | | | |
| **2017** | | | | |
| Cap Georges | 1,043,586.00 | GS Caltex | Mar. 2017 | Saharan |
| Christina | 1,050,690.00 | Lukoil Singapore | May 2017 | Saharan |
| Archangel | 1,076,472.00 | GS Caltex | May 2017 | Saharan |
| New Legend | 713,180.00 | Exxon Thailand | Jul. 2017 | Sarahan |
| New Legend | 350,000.00 | Ampol | Jul. 2017 | Saharan |
| Alagaila | 1,048,801.00 | Repsol (to Thailand) | Jul. 2017 | Saharan |
| Greek Warrior | 1,063,415.00 | GS Caltex | Sept. 2017 | Saharan |
| Greek Warrior | 638,625.00 | GS Caltex | Sept. 2017 | Saharan |
| DS Tina | 1,100,000.00 | GS Caltex | Oct. 2017 | Saharan |
| DS Tina | 981,268.00 | Chevron | Oct. 2017 | Saharan |
| DS Valentina | 1,972,171.00 | Chevron | Nov. 2017 | Saharan |
| Aegean Horizon | 997,484.00 | Ampol | Dec. 2017 | Saharan |
| Prudent Warrior | 1,058,386.00 | Ampol | Dec. 2017 | Saharan |
| | | | | |
| **2018** | | | | |
| Narmada Spirit | 1,060,572.00 | Repsol (China) | Mar. 2018 | Saharan |
| Marean Carina | 2,047,667.00 | GS Caltex | Nov. 2018 | WTI |

78.     Between 2016 and 2018, Lord Energy sold nearly 20 million barrels of Saharan Blend on the spot market to refineries in Asia and supplanted nearly 13 million barrels of Murban from ADNOC, worth about $829.9 million, with Saharan Blend.  This put Lord Energy on the UAE's radar as a growing commercial threat.

79.     But Lord Energy's threat to ADNOC's dominance in markets for light crude oil in Asia was far greater than the specific cargoes ADNOC lost to Lord Energy.  Lord Energy's introduction of Saharan Blend into spot markets in Asia as an alternative to Murban put significant downward pressure on the spot price for Murban.  This in turn put pressure on ADNOC and other Murban exporters to lower the prices they charged in Murban term contracts because it was difficult for ADNOC to justify higher prices to term customers than ADNOC was able to receive on the spot market.

80.     Thus, Lord Energy's entry into the market did not just affect the price ADNOC received for spot cargoes—it impacted the price ADNOC received for all Murban exports during the time it was competing with Lord Energy.  Lord Energy's entry into the market also complicated negotiations between ADNOC and its largest customers in Asia such as GS Caltex and U.S.-owned refiners Chevron and Exxon Mobil.

81.     Determining the magnitude of Lord Energy's commercial threat to the UAE and ADNOC is an exercise in eliminating lurking variables.  The best way to assess the impact of cargo movements from outside the Gulf (i.e., Lord Energy's exports of Saharan Blend) is to compare Murban prices to prices of a grade similar to Murban in quality, which is not subject to spot market dynamics, and that is exported from the Gulf to similar destinations and end users.

82.     Here, Arab Extra Light—a light sweet blend produced by Saudi Arabia—is the most logical benchmark.  Between 2016 and 2018, Arab Extra Light was produced in very large quantities (about 1 million barrels per day), it was fully sold on term contracts with prices set based on refining margins, and it was primarily exported to many of the same refiners in Asia as Murban.

83.     Comparing the monthly official selling prices of Murban to the monthly official selling prices for Arab Extra Light shows periods when Murban was under pressure relative to Arab Extra Light.  Such pressure could have resulted from (1) significant production changes in the two grades or (2) spot market dynamics for Murban, which then feed back into the official selling price for all Murban exports.  Between early-2016 and early-2018, production volumes for Murban and Arab Extra Light were stable, so any significant changes in the spread between prices for Murban and Arab Extra Light must have been caused by events affecting the spot market for Murban—such as Lord Energy's introduction of Saharan Blend into Asian markets.

84. Considering the size of the Murban spot market in Asia (about 8 million barrels per month), volumes of Saharan Blend as large as 2–3 million barrels in some months in 2017 would be expected to have a material impact on the differential between prices for Murban and prices for Arab Extra Light. The graph below, which charts the spread between Murban and Arab Extra Light prices from early 2016 until late 2018, shows that, once Lord Energy began shipping Saharan Blend to Asia in early 2017, the average price differential between Murban and Arab Extra Light (shown by the red line in the graph below) fell by $0.27 per barrel.



85. This decline in the average official selling price for Murban caused the UAE and ADNOC substantial losses. In 2016, when no other competing grades were being exported to Asia, Murban was sold at a premium to Arab Extra Light of $0.77 per barrel on average. In 2017, when Lord Energy was actively shipping large quantities of Saharan Blend to Asia the premium was only $0.50 per barrel. Given that the UAE exported about 1.2 million barrels of Murban per day, this decrease of $0.27 per barrel resulted in a loss of about $324,000 per day for Murban

producers. That loss would have been over $118.3 million for the year in which Lord Energy was selling Saharan Blend on spot markets in Asia. Since ADNOC produced about 60% of the UAE's total supply of Murban, it lost about $70.1 million as a result of competition from Lord Energy in 2017.

86.     Once Lord Energy stopped exporting Saharan Blend to Asia in mid-2018—when Sonatrach stopped dealing with Lord Energy (and cut off Lord Energy's access to Saharan Blend) because of the smear campaign orchestrated by the UAE's unlawful enterprise—Murban prices rebounded.

87.     In early 2018, WTI shipped from the United States was emerging as a competitor to Murban in Asia for the first time. Lord Energy established a subsidiary in Houston, Texas— Americas Lord Energy Inc.—around that time to try to use WTI as a replacement for the Saharan Blend it was no longer able to export. Lord Energy had been the main competitor to Murban from Mediterranean-based grades, and it wanted to become a major participant in the WTI trade into Asia which, starting in 2018, was competitive with Murban.

88.     In mid-2018, Lord Energy's primary focus was on U.S. expansion. It had been preparing supply from Ecuador to market in the United States, and it was preparing local logistics in Texas to position itself to take tankage and gather U.S. crude for export to Asia. Americas Lord Energy was also part of the weekly pipeline tenders in the United States for oil transport on all the major open U.S. pipelines, including the Magellan, Plains, Enterprise, and Energy Transfer. And Lord Energy traded barrels on the Chicago Mercantile Exchange and on the New York Mercantile Exchange as a significant part of its business. It dealt with U.S. brokers including PVM Houston and ICAP Houston, on a near daily basis. However, the enterprise's smear campaign quickly

crushed Lord Energy's U.S. subsidiary too, forcing the company into bankruptcy and ensuring that Lord Energy no longer posed a competitive threat to ADNOC.

89.     Lord Energy was not the only lucrative business Hazim owned and ran at the time. In 2017, he opened a wind tunnel near Milan that the Italian military and U.S. Air Force used (and continue to use) to train paratroopers.  However, the enterprise never sought to smear Hazim's wind tunnel business.  The reason is simple: the wind tunnel business did not pose a competitive threat to the UAE or ADNOC.  The enterprise's failure to go after Hazim's wind tunnel business confirms that its motives were commercial.  The enterprise targeted Lord Energy and Americas Lord Energy Inc. specifically because of the growing threat they posed to the UAE and ADNOC in the spot market for light crude oil exported to Asia.

### The UAE Hires Alp and Organizes an Unlawful Enterprise.

90.     In 2017, the UAE was approached by Alp Services, a private investigative firm in Switzerland.  Alp touted its ability to "destroy" targets through what it termed "offensive viral communication[s]."  Alp understood the power of online disinformation—and the value of online reputations.  It prided itself on secrecy.  And for a price, it was willing to do anything necessary to dispatch its targets, including breaking the law.

91.     Early in his career, one of Alp's founders and directors, Mario Brero, ran a business exporting computers and semiconductor manufacturing equipment from the United States to Europe.  He was indicted by federal prosecutors for violating U.S. laws prohibiting the export of sensitive American technologies to Eastern bloc countries through a system of straw buyers he set up in Western Europe.  Brero resolved the charges by signing a consent decree and exiting his computer export business.[13]

---

[13] David Kirkpatrick, *The Dirty Secrets of a Smear Campaign*.

92.     After that, Brero decided to start a career as an investigator, and he founded Alp, along with Muriel Cavin, in Geneva in 1989.  In 2007, he and Cavin incorporated a second entity, Diligence SARL, at the same address as Alp, for the sole purpose of confusing clients of a competing investigative firm, also called Diligence, that was launching a branch in Geneva.[14]

93.     Alp and Brero's methods were as unscrupulous as they were effective.  In 2012, Brero was sued in French court for invasion of privacy.  In those proceedings, Brero acknowledged violating Swiss law by paying phone company employees for lists of customers' call histories. The court convicted Brero of, among other things, disseminating information acquired by illegal means.

94.     Not only did Alp and Brero, at the UAE's behest, unlawfully *collect* private information about their targets, but they also *spread* disinformation about their targets—a technique they referred to as "offensive viral communication campaigns."

95.     Alp first pitched the UAE in May 2017.  Brero sent a letter on May 12, 2017 to give the UAE "a brief introduction to [Alp] and [its] specific skills," which included "finding negative information/red flags on individuals" and conducting "confidential offensive viral communication campaigns, notably through [Alp's] in-house team of IT and social media experts."  Brero boasted that Alp's "clients … include multinational companies, law firms, governments and government agencies," "Head of States," and "notorious ultra high-net-worth individuals."

96.     Brero assured the UAE that Alp's team, which comprised "a core of 20 analysts, investigators, and full-time consultants with extensive multi-disciplinary backgrounds," was "extremely sensitive to the necessity for any assignment to remain confidential."  All Alp employees and undercover consultants had "signed tight and legally binding confidentiality

---

[14] *Id.*

agreements," and Alp's "discreet offices and IT systems [were] the subject of appropriate, and regularly tested, security countermeasures." Alp also emphasized that "[b]eing solely headquartered in Switzerland also affords us a great degree of discretion and total independence, notably via-à-vis foreign governments."

97.     Despite Brero's bluster about Alp's sophisticated expertise, in truth, Alp's playbook was simple. Alp would run straightforward background checks on its targets and impersonate those targets to unlawfully obtain confidential information such as phone and bank records. It would use those records to diagram the targets' supposed associates and connections in elaborate link charts. Then, Alp would scour the internet looking for any "negative" information on its targets' connections—heedless of whether the "negative" information was wildly farfetched and obviously untrue or had been proven false. Alp would then hire journalists, academics, and freelance writers to publish stories and blog posts imputing the negative information Alp had uncovered about the targets' connections to the targets themselves to disparage the targets and their businesses.

98.     Alp legitimized and further disseminated the false claims it concocted about its targets by creating fake Wikipedia "controversy" sections—citing its own "reporting" as truth— and using search engine optimization tactics to ensure the stories it had sponsored and planted remained top results on Google, Yahoo!, Bing, and other search engines. Finally, Alp would alert banks and bank compliance monitors to the false claims Alp manufactured to get banks to stop lending to Alp's targets, isolating them financially.

99.     On July 22, 2017, Alp sent the UAE another letter "[f]urther to [its] 12 May 2017 general introduction document" that "set down" a "very broad outline" of some of Alp's

capabilities, which made reference to Alp's "extensive range of confidential sources" in the "financial and banking sectors."

100.     On August 7, 2017, Alp prepared a more detailed proposal for the UAE.  The document, which had the filename "Arnica 0-first proposal-not agreed-20170807," described a "Global Action Plan" for Alp to launch "widespread offensive actions" against Qatar and its networks, including the Muslim Brotherhood, to expose and counter Qatar's efforts to "direct[] a global media and political campaign against" the UAE.  "Arnica" was one of the codenames Alp used to refer to its work for the UAE.  There were at least eight "Arnica" projects.  Some of the subsequent projects Alp carried out for the UAE had the codenames "Quino," "Alekto," "Noatak," "Cleon," "Probus," "Clavius," "Baar," "Kirik," "Narcisse," "Swann," "Constellation," "Dragon," and "Crocus."

101.     Alp reiterated that it was "[i]ntransigent on security," and told the UAE that "given the sensitivity of the topic," Alp could not "put in writing the extent of [its] services."  Instead, the proposal was meant to provide an overview of Alp's capabilities.  Specifically, Alp proposed making "advanced cartographies of our targets' secret influence networks in Europe and the US," conducting "investigations to obtain damaging negative material on our key targets," and engaging in "offensive viral communication to discredit and embarrass key targets" using "dark PR" and "fake news."

102.     With respect to the offensive viral communications, Alp explained that, once it identified key targets and obtained "negative intelligence about them," it would "launch highly aggressive online negative campaigns, relaying and spreading in a viral and strategic manner the previously identified negative intelligence, that could then appear in mainstream media."  Alp claimed it would use "tested advanced confidential techniques in 'dark PR'" and "aim to discredit

[its] targets by discreetly, and subtlety, diffus[ing] embarrassing and compromising intelligence" to make their targets "appear as either perverts, corrupts, hypocrites and/or terrorists" in the "eyes of the media/public/officials." Alp wrote that it "could also use creative and particularly damaging actions, which [it] would describe verbally," and cautioned the UAE not to underestimate the "power of 'dark PR.'"

103.     On information and belief, Brero emailed Alp's proposal to the UAE officials before he travelled to Abu Dhabi to meet with them in person from August 7 to August 9, 2017.



104.     Nominally, Alp's client was an Emirati enterprise called Ariaf Studies and Research LLC. Yet the hacked documents make clear that the UAE's top leadership was in charge. Brero's main point of contact was Matar, but Brero also met with Matar's superior, whom Brero and Matar referred to as "His Excellency" and "the boss." On information and belief, they were

referring to Ali Saeed al-Neyadi. In other exchanges, Brero refers to "His Highness" and "the Sheikh of the country." On information and belief, these were references to M.B.Z.

105.    The UAE's unlawful enterprise had a clear chain of command. On information and belief, M.B.Z., Ali, Matar, and other UAE officials provided funding, strategic guidance, and final approval. Brero, Cavin, and their top deputy, Lionel Badal, devised the plan, identified targets, and oversaw execution of the campaign. Brero, Cavin, Badal, M.B.Z., Ali, and Matar were deeply involved in managing the enterprise's affairs. But to make the smear campaign effective, they conspired with journalists, academics, and others to legitimize their reputation and business-destroying lies. These co-conspirators included Swiss journalist Sylvain Besson and Washington, D.C.-based Muslim Brotherhood "expert" Lorenzo Vidino.

### The UAE Instructs Alp to Devise Operations to Destroy Hazim and Lord Energy.

106.    On information and belief, the UAE and its officials recognized that Alp offered an opportunity to eliminate Lord Energy as a competitive threat. As such, the UAE and its officials instructed Alp to devise operations against Hazim and Lord Energy as some of the first targets of the enterprise's overarching viral communication campaign. Acting on the UAE's instructions, on September 13, 2017, Alp prepared a "strictly confidential" internal memo for "Project Arnica" about Hazim and Lord Energy titled, "Lord of the Gas – Al Taqwa reloaded." The memo is only about a half a page long, but it identified Lord Energy as a trading company in Lugano, Switzerland. And it included two paragraphs on Hazim's father, whom the memo described as "one of the principle financial strategist[s] of the Muslim Brotherhood."

107.    About a month later, on October 6, 2017, Alp wrote its first official report referencing Hazim and his company. On information and belief, Alp shared this report internally and with the UAE and its officials via email. The report explained that "very little is known about [Lord Energy]" and "nobody ever investigated the identity of its managers and its links to the entire

network of the Muslim Brotherhood." In other words, there was nothing to refute the false accusations Alp planned to invent about Hazim and Lord Energy's involvement in terrorist financing. The report went on to claim:

- Lord Energy is "run by Doha-based heirs of the very senior Muslim Brotherhood leadership."

- "Confidential documents indicate that the company is at the center of European MB senior operators and has ties to Al-Qaeda related entities."

- "As we will demonstrate later on, confidential documents notably reveal contacts between Lord Energy executives, who are MB members, and Al-Qaeda related people and organisations."

- "Since 2013, Hazim Nada, CEO and founder of Lord Energy, is domiciled in Doha in Qatar, but still uses a Swiss mobile phone, for which we confidentially analysed its phone calls for June, July and August 2017. One of his sisters, most probably Hasna, is even married to Mohamed Qaradawi, the son of [prominent Muslim preacher] Yusuf Qaradawi."

- "Confidential documents also reveal contacts between Doha-based Hazim Nada and Attia Nasreddin, Chairman of the Al-Qaeda related Nasco Group and son of Ahmed Nasreddin."

- "We chose Hazim Nada in his quality of son and heir of his father Youssef Nada once considered to be the 'foreign minister' of the Muslim Brotherhood and its key financier."

- "Lord Energy officially trades liquefied natural gas (LNG), crude oil and bagged cement, allowing it to operate globally and transfer important sums of money, the perfect cover."

108. Hazim has never been a supporter, much less a financier, of the Muslim Brotherhood. He was never domiciled in Doha; in fact, he lives in Italy and maintains a residence in Houston, Texas. Lord Energy has never used crude trading as a "cover" for anything. On information and belief, the only "confidential documents" Alp had were phone records they unlawfully obtained. And those phone records did not reveal anything of substance. In fact, they revealed that Hazim was based in Italy and worked daily in the Lord Energy's office in Switzerland close to the Italian border and that he had no links whatsoever to the Muslim Brotherhood.

109.    Alp's allegations that Hazim had links to the Muslim Brotherhood were based solely on Hazim's father's historic ties to the group.  In its October 6, 2017 report, Alp wrote: "It goes without saying that [Youssef's] son will pursue the business activities, but also the cause of the Brotherhood."

110.    The report also alleged that Hazim's business associates Youssef Himmat, American citizen Imama Fatima, Davide Piccardo, and Omar Nasreddin were affiliated with the Muslim Brotherhood, thus further implicating Hazim in terrorist financing activity.  "They are young, they handle huge amounts of money, they are politically engaged, and they keep a discrete profile.  For these reasons, we have decided to focus our investigation on them," the report said.

111.    Yet Alp did to Himmat, Fatima, Piccardo, and Nasreddin exactly what it did to Hazim—it selectively interpreted their public connections to impute affiliations that did not exist. Himmat, a junior trader at Lord Energy who started working at the firm when he was 20 years old, was never a Muslim Brotherhood member and holds strong views against the group.  His father was friends with Hazim's father, Youssef, and, like Youssef, had long ago been placed on, and later removed from, a U.S. sanctions list.  Himmat was also the head of an official consultative body of the Council of Europe, FEMYSO.  Although Alp accused FEMYSO of Muslim Brotherhood affiliations, nothing links the charity to the Brotherhood except Alp's own assertions.

112.    Nor did any of Hazim's other alleged Muslim Brotherhood contacts have any direct Brotherhood ties.  Imama Fatima, a U.S. citizen and Lord Energy board member, had briefly worked part-time for a company, MIGA Chamber, that had been removed from a U.S. sanctions list five years prior to her employment.  Piccardo, an Italian citizen who was active in the Italian Muslim community, was never a member of the Muslim Brotherhood.  Prior to joining Lord Energy, he worked in the foreign office for the mayor of Bogotá, Colombia.  His regional expertise

was the main reason he was hired by Lord Energy as a Latin American crude oil originator. Nasreddin was a Lord Energy operator and also never a member of the Muslim Brotherhood. His father, like Youssef, had been removed from a U.S. sanctions list decades earlier. Hazim knew all three since they were children, and he hired them for their professional experience and language ability, which was difficult to find in the south of Switzerland. They were not the next generation of Muslim Brotherhood leaders as Alp falsely claimed. Alp exploited the facts that they were Muslim and *their parents* had ties to the Muslim Brotherhood to make its lies about them seem more plausible.

### The Enterprise Launches a "Dark PR" and "Fake News" Campaign to Destroy Lord Energy and Eliminate a Competitive Threat.

113.    The enterprise's first public strike against Hazim and Lord Energy came on December 5, 2017, two months after Alp's report identifying Hazim and Lord Energy as potential targets. Alp commissioned the political gossip website Africa Intelligence, which is widely read in the commodities trading industry, to write an article about Lord Energy falsely claiming that Algeria had blocked a Lord Energy tanker, the DS Valentina, at port because of purported concerns about its "waterproofness." The article then mentioned Hazim's relationship with Youssef, reporting that Youssef was "alleged to have financed terrorism." A Word document version of the article with the file name "Arnica-article lord energy-africa intelligence-201712" was among the documents obtained from Alp by the unidentified hackers.

114.    This article was false and misleading in several respects. Algerian authorities did not block the DS Valentina over its seaworthiness. The Algerian authorities were not involved with this matter at all. The captain of the tanker halted loading because there was a dispute between Lord Energy and the shipowner. The dispute was ultimately resolved years later through arbitration that was successfully settled in favor of Lord Energy.

115.    The Africa Intelligence article also falsely claimed that Lord Energy used crude oil tankers to transport cement.  This accusation was preposterous.  It is nearly impossible to transport cement on crude oil tankers, and Lord Energy has never done so.  The obvious purpose of including this false statement in the article was to link Hazim and Lord Energy with the cement business of Hazim's father.  The article went on to state (incorrectly) that Hazim's father previously supplied cement to Libya during the Gaddafi era.  The suggestion that Lord Energy was associated with or the continuation of a business run by Hazim's father that previously dealt with Libya under the notorious Gadaffi regime was not only false, but highly damaging to Lord Energy's business relationships in the region (including its business with Libya's National Oil Corporation).  In truth, Youssef Nada did not conduct business with Libya during the Gadaffi era.  In fact, he was on a Gadaffi "death list" and a hit squad was sent by Gadaffi to kill him in the 1980s.

116.    In June 2018, legal counsel for Hazim sent a letter to Phillippe Vasset, then the editor of Africa Intelligence, informing him that Africa Intelligence's December 2017 article about Lord Energy was materially false and misleading and demanding that Africa Intelligence take down the article and publish an apology.  The letter explained that, as a result of the Africa Intelligence article, Lord Energy was experiencing delayed credit facilities totaling $240 million, which deprived Lord Energy of profits of about $3.5 million per month.

117.    On information and belief, Vasset was one of many participants in the UAE and Alp's unlawful enterprise.  Vasset was listed as one of Alp's "sources / subcontractors" in an internal Alp document dated July 27, 2017 document with the filename "arnica-internal note-subcontractors+questions-20170725," and he exchanged numerous WhatsApp messages and emails with Brero, Badal, and Cavin.  On information and belief, Vasset was a willing participant in the enterprise who was aware of its purpose, i.e., to damage the businesses and reputations of

its targets. This belief is based on Vasset's involvement in publishing these false statements about Hazim and Lord Energy, Vasset's inclusion on Alp's list of "sources / subcontractors," and the volume and frequency of Vasset's communications with Alp employees.

118. The Africa Intelligence article was just the enterprise's opening salvo. But already it confirmed why the UAE directed Alp to target Hazim and his company: The UAE wanted to disrupt Lord Energy's crude oil exports from Algeria. This was the first, but not the last, time that the enterprise would specifically attack Lord Energy's business in Algeria.

119. About a month after the Africa Intelligence article was published, the enterprise had another of its paid journalists publish a false article about Hazim and Lord Energy. This time, in a much more prominent publication—Le Temps, the sole French-language, nationwide daily newspaper in Switzerland.

120. In December 2017, Alp drafted a confidential "preliminary report" on Hazim and Lord Energy with the file name "arnica 3-lord energy note-sylvain-20171214." The report falsely claimed that Lord Energy was a "mysterious Muslim Brotherhood trading company linked to Al-Qaeda," and "[d]ocuments indicate that the Swiss company is at the center of European MB senior operations and has ties to Al-Qaeda related entities." On information and belief, Alp emailed this memo to Le Temps reporter Sylvain Besson, who used the information Alp supplied to write an article for Le Temps.

121. Brero met with Besson several times while pitching the UAE and after. Among the hacked documents are numerous calendar entries for phone calls and meetings—usually at Alp—between Besson and Brero. According to these entries, Besson met with or spoke to Brero on at least January 17, 2017, June 19, 2017, December 14, 2017, February 1, 2018, November 1, 2018, January 21, 2019, February 4, 2019, June 3, 2019, June 6, 2019, and September 17 and 18, 2019.

Besson also exchanged dozens of text, email, and WhatsApp messages with Badal and Brero. This correspondence suggests Besson and Brero were more than casual business associates—they were friends and co-conspirators.

122.    Later Alp communications with the UAE characterized Besson as "part of our extensive network." In a January 17, 2018 internal Alp strategy document, Alp wrote an outline of topics to discuss during Alp employees' next visit to the UAE, which was scheduled for February 18–21, 2018. Notably, the outline described Besson as part of Alp's network who could conduct "confidential actions" and whom Alp could use to "strike" Alp's targets using "viral com."

123.    Besson had published a book in 2005 accusing Youssef Nada of ties with a supposed Islamist conspiracy. That book, *The Conquest of the West: The Secret Project of the Islamists*, was largely based on an unsigned, 14-page document from 1982 that authorities discovered at Youssef's house more than a decade later. Now Brero offered Besson a way to bear out his thesis—while also benefitting financially.[15]

124.    On January 5, 2018, Besson wrote an article about Hazim and Lord Energy for Le Temps. The article, which Le Temps published online, falsely claimed there were "traces" of "historical MB networks" at Lord Energy and that "this new generation has sometimes kept some militant activities." This statement was categorically false—no one at Lord Energy "kept militant activities."

125.    Besson's Le Temps article in January 2018 was followed by a flurry of fake reporting intended to solidify its fraudulent premise as truth. Alp quickly published three other articles online that cited Besson's article and accused Lord Energy of links to "Islamic networks." Badal boasted in internal Alp emails that these new articles "amplify the impact of Le Temps

---

[15] David Kirkpatrick, *The Dirty Secrets of a Smear Campaign*.

article" and "put pressure on Swiss federal and local authorities to investigate LE and the MB." Alp also planned to discuss the "practical impact of Le Temps article" during its February visit to the UAE.

126.    Around the same time, Badal and Brero identified another valuable co-conspirator who could lend credibility to their false claims: Lorenzo Vidino, the Director of the Program on Extremism at George Washington University in Washington, D.C. and a supposed expert on Islamism in Europe and North America, including the Muslim Brotherhood. They intended to use Vidino as an American analogue to Besson—a credible and highly-credentialed intermediary who was willing to say whatever they wanted in exchange for money.

127.    On January 3, 2018, Badal asked Vidino for a meeting to discuss Lord Energy, which Badal described as "a very interesting (and discreet) trading company based in Lugano."

128.    Days later, on January 12, 2018, Brero treated Vidino to a $1,000 dinner at the Beau Rivage Hotel in Geneva. According to Brero's prepared talking points, he initially planned to disguise the identity of his Emirati clients, telling Vidino that Alp had been hired by a "London-based law firm." However, Vidino later acknowledged to *The New Yorker* that he knew the UAE was the "most realistic client."[16]

129.    On January 24, 2018, Vidino signed a contract with Alp to provide "[i]nteresting leads/rumours … regarding the subject of investigation organisations/individuals/funding in Europe" and a "[l]ist of alleged members of the first tier organisations in European countries." Alp agreed to pay Vidino 3,000 Euros for this work.

130.    In early 2018, the enterprise vastly expanded its disinformation campaign. An updated Alp strategy document from January underscored the campaign's secrecy and breadth. It

---

[16] David Kirkpatrick, *The Dirty Secrets of a Smear Campaign*.

mentioned communicating using "encrypted channels" and engaging in "confidential actions," and proposed "strik[ing]" targets using "viral com" and "social media." It required a budget of 300,000 Euros.

131. On February 15, 2018, Alp published a "detailed investigative analysis" that falsely described Hazim and Lord Energy, among other targets, as part of the Muslim Brotherhood's "macro-level funding system." On information and belief, Alp shared this document internally and sent it to the UAE and its officials via email.

132. Days later, Alp prepared a PowerPoint presentation for the UAE—with the filename "August 2017 / February 2018 – ongoing"—that included a slide about Lord Energy, falsely accusing it of being a "front compan[y]" for the Muslim Brotherhood and of being "linked to Al-Qaeda." The presentation ends: "Thank you very much for your trust." On information and belief, Alp emailed this presentation to the UAE and its officials.

133. That month, Brero visited Abu Dhabi, and afterwards, on information and belief, he sent via email a "formal letter of appreciation" to his "Excellency." He wrote, "Your comments and advices were very helpful, especially on the next steps, and we will do everything possible to match your expectations." Brero also offered thanks to "our dear friend" (a.k.a, Matar) for his "much valued feedbacks."

### *The Enterprise Fraudulently Induces Bank Risk and Compliance Monitors to Blacklist Hazim and Lord Energy for Alleged Ties to Terrorism.*

134. By spring 2018, the enterprise's "offensive viral communication" plan began to have its desired effects.

135. In March 2018, Hazim received an email from one of his contacts at Sonatrach forwarding a link to Besson's January 5, 2018 Le Temps article. That month, he was also forced to defend Lord Energy to "new management" at Sonatrach, even though he had been working with

Sonatrach for years. Hazim explained to Sonatrach that Lord Energy "deal[s] with all major oil companies on a direct basis, including Chevron, Exxon Mobil, Shell and BP,"—in fact over 50% of Lord Energy's annual sales were with the U.S.-based companies Exxon Mobil and Chevron, and their affiliates and subsidiaries. Hazim also explained to Sonatrach that "[o]ver the past three years [Lord Energy was] instrumental in recreating a market for Saharan Blend in Asia … [and] re-establishing the trade into Korea which had been closed for over 4 years." Hazim also noted that Lord Energy had recently "establish[ed] a presence in Houston which [would] begin to handle US exports of light grades in May 2018."

136.    Sonatrach responded, "many thanks for your below email in which you explain briefly LORD Energy activities. In order to complete this information, we kindly ask you to send us a presentation on LORD-Energy crude oil and products trades during the period 2015, 2016 and 2017 (sources and destinations / Buyers and Sellers...)."

137.    Sonatrach's requirement that Lord Energy undergo a new background check was particularly puzzling given that Lord Energy was Sonatrach's largest trading partner in 2017 and Sonatrach had written a reference letter for Lord Energy a few months earlier describing it as an excellent operator. Lord Energy made more than $10 million in profit from its deals with Sonatrach in 2017 and more than $7 million in profit from its deals with Sonatrach in 2016. Sonatrach ultimately stopped working with Lord Energy in mid-2018 as a result of Alp's false claims.

138.    As the enterprise's false claims about Lord Energy began to erode Lord Energy's relationship with Sonatrach, Hazim and his company continued to press forward with their pivot to U.S. markets for WTI, the only significant alternative to Saharan Blend as a competitor to Murban on spot markets in Asia. Hazim hired a seasoned oil industry executive who was a U.S.

citizen and lived in Houston, Douglas Koskie, to manage Lord Energy's planned subsidiary there. That April, Americas Lord Energy, Inc. entered into an indemnity agreement with Koskie that stated, "The Company is preparing to engage in the oil and gas sector in the United States by establishing a local fully owned subsidiary."

139.    On April 24, 2018, Americas Lord Energy, Inc. filed a certificate of formation with the Texas Secretary of State.

140.    The following month, on May 16, 2018, Reuters published an article about Lord Energy's expansion. Hazim told Reuters "We currently move about 3–4 million barrels of crude oil per month. We plan to triple this over the next 18 months. Our key to success has been in developing new markets for either established grades or finding new niches for difficult grades." He also said, "We have been the first to open the market for (Algerian) Saharan Blend into Australia for over 35 years and we reopened the arbitrage into South Korea ... and managed to find a blend for it to take into the Chinese market." The article noted that Lord Energy's "end-users have been concentrated in Asia and the United States" and that the company "aim[ed] to expand into U.S. exports and imports."[17]

141.    Meanwhile, as Lord Energy was seeking to expand its presence in the United States and increase its exports of WTI (another grade, like Saharan Blend, that competed with Murban), the UAE's unlawful enterprise was determined to redouble its efforts to take down Hazim and Lord Energy. On February 26, 2018, Badal sent via email an "updated, more detailed" proposal to Matar recommending a "new three-months testing phase." Alp proposed:

- Publishing "massive negative articles on dozens of key MB targets," including 10 negative articles about Lord Energy;

---

[17] Julia Payne, *Small Swiss trader Lord Energy enters Russian oil market with CEFC deal*, Reuters (May 16, 2018), https://www.reuters.com/article/idUSKCN1IH1K0/.

- Informing selected journalists about targets' "connections with Al Qaeda";

- Creating negative Wikipedia pages for targets in English, French, and Italian;

- Alerting "compliance databases and watchdogs, which are used by banks and multinationals, for example about Lord Energy's … links to terrorism";

- "Discreetly notify[ing] banks of MB companies' (e.g. Lord Energy … ) links to terrorism … the objective being to block their bank accounts and business";

- Putting "negative information on Lord Energy in the first pages of Google and other search engines (e.g. Yahoo, Bing)."

142. In addition to fabricating negative pages on Wikipedia—a U.S.-based company— and manipulating results on U.S.-based search engines like Google, Yahoo!, and Bing, the proposal emphasized publication of negative information in "English-speaking media," specifically identifying "Daily Kos in the USA (which was once described as 'the second best blog' by Time Magazine)" as one potential outlet for negative information.

143. In the proposal, Alp told Matar: "should you give us the green light, *we believe that we could seriously damage, if not destroy, the reputation and viability* of key MB European groups through our confidential offensive viral communication."  (Emphasis added.)

144. An internal Alp document written on March 1, 2018, with the file name "arnica 6-action plan-I," outlined a plan for Alp to have 45 articles published about the targets it had identified at that point, about four per week, and Wikipedia pages.  The action plan called for 10 articles about Lord Energy, and it specifically called for an "[a]rticle in English" on the San Francisco-based blogging website Medium that would tie Lord Energy to "AQ."  The action plan also mentioned "[i]nform[ing] media UK + USA."

145. At the same time, Alp began to prime its co-conspirators for the next phase of operations against Hazim and Lord Energy.  On April 30, 2018, Alp drafted a document with the file name "arnica 6-lorenzo-to do list-20180430," which included having Vidino prepare an

"overview of key MB individuals/organisations/companies in the USA and interesting elements/rumours … to show our capacities by obtaining new, concrete, up-to-date information in the US."

146.     On May 7, 2018, Alp published a "confidential internal report" on Lord Energy titled "Lord Energy: The mysterious Muslim Brotherhood trading company linked to Al-Qaeda." The report falsely claimed once again that Lord Energy was "at the center of European MB senior operators and has ties to Al-Qaeda related entities."  The report also discussed Lord Energy's shipments of oil from Algeria to South Korea and its business with Sonatrach.

147.     One week later, on May 15, 2018, Alp drafted an email that, on information and belief, it sent to Nina May, a freelance journalist, directing her to prepare three articles about Lord Energy.  Alp itself wrote the headlines: "Lord Energy: the mysterious company linking Al-Qaeda and the Muslim Brotherhood"; "Lord Energy trading company linked to US designated terror-entities"; and "Exclusive: The Muslim Brotherhood has its own Swiss trading company."

148.     Alp instructed May to peruse the "background" materials it provided as "[t]he topic is complex."  Alp also instructed May not to share the confidential report and to "delete it safely after" she reviewed it.

149.     May wrote the articles as directed by Alp and published them pseudonymously.  On May 31, 2018, she sent Alp an invoice for nine articles she wrote "across three projects," five of which falsely accused Lord Energy of terrorist affiliations.  One article was titled "Lord Energy linked to US designated terror-entities."  Another was titled, "Reuters misses major terrorism link in oil coverage: the true story of Swiss Lord Energy."  This article was published on the U.S.-based blogging website WordPress.  The article falsely claimed that Hazim "took over" his father's business, and it falsely concluded that "[t]he connections of Lord Energy to the Brotherhood—and

to radical Islam and financiers—are substantial." May charged £250 per day. The total amount due was £1,140.



150. That month, the enterprise also expanded its campaign to defraud banks and financial institutions into believing the false claims it manufactured about Hazim and Lord Energy's ties to terrorism, with the goal of causing those banks to sever ties with Hazim and Lord Energy, cutting off their access to credit.

151. On June 6, 2018, Alp sent another email to Nina May and another freelance journalist on its payroll commissioning "a new short article" on Lord Energy, this time focused on its accounts at Crédit Suisse. The article was to be titled, "Compliance: Muslim Brotherhood company Lord Energy linked to Crédit Suisse."

152. A week later, on June 13, 2018, Alp sent an email about Lord Energy to the Crédit Suisse media relations email address (media.relations@credit-suisse.com), posing as a freelance journalist and using the pseudonym Laurent Martin. The email claimed that Lord Energy was linked to radical Islamists and cited stories that Alp had planted about Lord Energy. Alp's objective was to fraudulently induce Crédit Suisse to stop lending to Hazim and Lord Energy, thereby denying Hazim and Lord Energy access to their main source of credit, without which they would be unable to operate, and depriving Crédit Suisse of valuable banking relationships and interest income.

153. On June 12, 2018, using that same pseudonym (Laurent Martin), Alp sent emails to WorldCompliance, World-Check, and Info4C—major bank risk compliance databases—claiming that Lord Energy was "directly linked to radical Islamists." Alp once again cited some of the articles it had fabricated about Lord Energy, including Besson's January 5, 2018 Le Temps article. The email concluded, "given counter-terrorist financing regulations, it would seem obvious to see the name of Lord Energy" in the databases.

154. Based on Alp's report, Hazim, Lord Energy, and Alp employee Youssef Himmat were added to World-Check under the "terrorism" risk category for "suspected links to the Muslim Brotherhood."

51



155.    These databases are not mere public clearinghouses for business grievances.  They correlate sanction and embargo lists, monitor regulatory and enforcement lists, and compile their own de facto blacklists of high-risk individuals and entities, with a particular focus on terrorism, organized crime, and fraud.  These databases are owned, operated, and maintained by reputable companies that banks trust to provide accurate and up to date information.  WorldCompliance, for

example, was acquired in 2013 by LexisNexis Risk Solutions, which is headquartered in Atlanta, Georgia.[18] World-Check was acquired in 2011 by Thomson Reuters, a company whose shares are publicly traded on the New York Stock Exchange and has several offices throughout the United States.[19] Banks then rely on these databases when performing due diligence on current and potential clients. Appearing on a WorldCompliance or World-Check list can be fatal for a business of any type, but especially one in the oil business, where substantial bank loans are necessary to fund operations and national security interests are at stake.

156.     Alp knew all of this. In June 2018, it prepared a "strictly confidential" "urgent update" report, stating: "We learned from a confidential source that, following our viral communication, [Lord Energy] is having serious problems with Western banks to receive credits. It has apparently being put on a watchlist used by banks. Banks are concerned about its connections to radical Islamists." On information and belief, Alp shared this report with the UAE and its officials via email.

157.     When Hazim learned that he had been designated by World-Check, he emailed World-Check on July 2, 2018 informing World-Check that there was an "ongoing" and "unknown defamation effort" against him and Lord Energy and asking World-Check to disclose "all the researchers who were involved in placing [Hazim, Lord Energy, and Himmat] in [World-Check's] system, along with all their professional links." World-Check responded a week later on July 9 acknowledging that "an error was made." However, World-Check stymied Hazim's efforts to

---

[18] Relx, *LexisNexis Acquires WorldCompliance, Leading Provider of Global Anti-Money Laundering and Compliance Solutions* (Aug. 7, 2013), https://www.relx.com/media/press-releases/archive/07-08-2013.

[19] Thomson Reuters, *Thomson Reuters Acquires World-Check* (May 16, 2011), https://ir.thomsonreuters.com/news-releases/news-release-details/thomson-reuters-acquires-world-check; Thomson Reuters, 2022 Annual Report, https://ir.thomsonreuters.com/static-files/c8f80e59-857a-4312-a478-e7dc1e206891.

identify his unknown defamers by refusing Hazim's request to identify the researchers who worked on his profile.

### Hazim Fights Back, and the Enterprise Redoubles its Efforts.

158.   By this point, Hazim knew he was the victim of a concerted effort to smear his name by falsely linking him and his company to terrorism.  He believed he was being targeted by a rival commodity trading firm.  However, he could not have imagined the scope or scale of the scheme against him.  Never in his wildest dreams would he have believed that he was at the center of a massive conspiracy masterminded by the UAE and its top officials, who were colluding with a private investigative firm and its network of sources, journalists, and academics to spread false claims and destroy Hazim's business and reputation.

159.   In spring and summer 2018, Hazim tried to clear his name and identify the parties responsible for originating the false statements about him.  Hazim retained the U.K. law firm Carter-Ruck and sent legal letters to some of the outlets that had published false and defamatory statements about him demanding that they retract the statements and provide him with information about the parties responsible for writing them.  For example, on May 28 and again on May 30, 2018, Hazim sent an email to the contact email address (contact@mediapart.fr) for the French blogging website Mediapart regarding an article published on Mediapart titled, "Lord Energy SA: The Financial Networks of the Muslim Brotherhood in Switzerland Persist."  Hazim notified Mediapart that the article "contained misinformation," and he demanded that Mediapart "remove" the article and "furnish [him] with the details as to the person who has written such article, with strong defamatory connotations against our company."  Mediapart refused.

160.   Carter-Ruck, on Hazim's behalf, also sent similar retraction demand letters to Africa Intelligence, Le Temps, WordPress, and other websites.  On June 21, 2018, Hazim also submitted a report to WordPress regarding terms of service violations by the blog

http://lordenergy.wordpress.com. Hazim explained that the blog contained "highly inaccurate content" and was aimed at ruining Lord Energy's business. He informed WordPress that he had tried to contact the site owner to have the offending content removed to no avail. He therefore requested that WordPress take down the blog. WordPress responded that it would not take down the blog without "a U.S. court order, or a foreign order that has been recognized by a California state or federal court, regarding this particular content." Hazim made similar reports to WordPress requesting that the blog be taken down in 2020 and 2021. But WordPress continued to refuse to do so.

161.     When Alp realized that Hazim was taking affirmative steps to try to counter the enterprise's disinformation campaign, Alp intensified its efforts. In an "Urgent Update" to the UAE on June 6, 2018, Alp wrote that Carter-Ruck and Hazim were successful in removing two online articles; however, Alp planned to "re-publish them somewhere else in the coming days." Alp also warned that Hazim was "likely to launch legal procedures in the UK," but Alp was unconcerned because its "work remain[ed] strictly confidential."

162.     Alp bragged that "following our viral communication, [Lord Energy] is having serious problems with Western banks to receive credits. It has apparently be[en] put on a watchlist used by banks. Banks are concerned about its connections to radical islamists." Alp concluded: "This is all good news: it seems that our viral actions are working 1) Lord Energy is facing serious problems for its business operations and 2) it is going viral, with new people focusing on the company."

163.     In early June 2018, Alp published a French-language Wikipedia entry on Lord Energy which included a "controversies" section falsely accusing the company and its employees of terrorist ties. Specifically, the entry stated that Hazim's father was the "shadow ambassador of

the Muslim Brotherhood"; Himmat's student organization FEMYSO was "considered close to the Muslim Brotherhood"; Lord Energy had "ties to the movement of the Muslim Brotherhood"; Davide Piccardo was an "Italian Islamist"; and Fatima Imama was "associated with US and UN sanctioned companies."  The entry cited Besson's January 5, 2018 article in Le Temps and other articles concocted by Alp.

164.    Hazim sought to have the Wikipedia page corrected and found himself in an "edit war" because Alp had a Wikipedia editor named Bédévore on its payroll.  Bédévore rebuffed Hazim's attempts to correct the article.  When Hazim attempted to edit the Wikipedia page by removing the false information and adding a section explaining that Lord Energy is pursuing legal action against the various media outlets responsible for publishing false claims about him, Bédévore rejected Hazim's revisions and sent him a Wikipedia message asking him for proof of legal action.

165.    Hazim informed Bédévore that Lord Energy engaged a defamation law firm to bring legal action against Le Temps, Africa Intelligence, and Mediapart.  Hazim noted that Besson had revised his Le Temps article, and Hazim was negotiating with Africa Intelligence to have its article corrected.  Hazim also pointed out that certain propositions in the Wikipedia article were not supported by the sources cited.  None of that mattered.

166.    In another "strictly confidential" "Urgent update" to the UAE on June 13, 2018, Alp wrote that "the French Wikipedia page for Lord Energy was attacked eight times by a user … [who] tried to remove all the critical content we created."  But Alp "quickly reacted" by blocking the user, and "requested assistance of friendly moderators" (i.e., Bédévore) "who countered the repeated attacks."  Alp reassured the UAE that, although Hazim made additional "attempts to remove the critical content," Alp and Bédévore were able to "put back the information."

167.     Alp reiterated that its "objective remains to paralyze" Lord Energy and outlined its plan to do so, including by creating new Lord Energy Wikipedia articles in English and Italian, creating Wikipedia articles for Hazim and Himmat, and "inform[ing] [Lord Energy's] bank, Crédit Suisse, and compliance databases about the risks of working with Lord Energy."

168.     In another similar update to the UAE, Alp specifically noted that its false "articles [were] visible in Google USA." Alp also reported that due to its search engine optimization efforts, Google automatically proposed the search terms "lord energy muslim brotherhood" when typing "lord energy" into the Google search bar. Alp reiterated that Lord Energy "used to be seen as a serious commodity-trading firm with a legitimate business," but "due to our actions, Lord Energy is today publicly exposed as a controversial Muslim Brotherhood company with ties to terrorism financing and opaque activities."

169.     To further mitigate the harm the enterprise's smear campaign was causing, Hazim sent emails between June 13 and 22, 2018, to several of the financial institutions from which Lord Energy borrowed, as well as some of Lord Energy's counterparties and business partners, attaching a letter and supporting documentation to refute the enterprise's lies. Hazim sent this information to UBS, Exxon Mobile, ING, Mare Shipping, Natixis, Swiss Card, BRS Shipbrokers, GS Caltex, and Litasco. He also sent the letter and supporting documentation to Julia Payne, the Reuters journalist who had written favorably about Lord Energy just weeks before.

170.     In his letter, Hazim explained that: "[a] recent effort to smear and defame our company … has been undergoing, trying to undermine our work and growing presence in the oil market." He noted that, as part of a "concerted effort," "[r]ecent articles have attacked [Lord Energy's] employees, with particular attention to the Muslim ones." Hazim, assuming a rival trading firm was responsible, wrote that it was "disturbing to see … facts being twisted by [Lord

Energy's] competition and foes to try to force us out of the market after the growth and success we have had with the hard work we have done."

### *The Enterprise Bankrupts Hazim and his Companies.*

171.     Hazim's efforts to refute the enterprise's false allegations were not enough.  The enterprise countered Hazim's actions by continuing to bombard the internet with articles touting the untrue narrative the enterprise had concocted that Hazim and Lord Energy had ties to terrorism.

172.     On June 4, 2018, the enterprise published an article titled "Lord Energy SA: The Muslim Brotherhood has its own trading company" on Tumblr, a blogging and social networking site headquartered in New York.  The article falsely asserted, among other things, that Hazim "continues to support the network" and that "Lord Energy is a front for Muslim Brotherhood funding through the sale of crude oil from North Africa."

173.     On June 6, 2018, the enterprise published an article titled "Lord Energy: the mysterious company linking Al-Qaeda and the Muslim Brotherhood" on WordPress, another U.S.-based blogging website.

174.     On June 7, 2018, the enterprise published an article titled "Why the next series of Homeland should play in Lugano and include Lord Energy" on Live Journal, a Russian-owned website with an office in California.  The article falsely asserted, among other things, that Lord Energy's "profits go to an organization deeply ingrained in the Muslim Brotherhood, with old ties to Al-Qaida.  Unsurprisingly, Swiss intelligence agency was said to be investigating its activities." The article attributed the information to Besson, stating he is "one of the world's more authoritative experts on radical Islamism."

175.     On June 8, 2018, Alp published an article titled "Reuters misses major terrorism link in oil coverage: the true story of Swiss Lord Energy trading company" on WordPress.

176.    On June 30, 2018, Alp published the sponsored article it had commissioned May to write earlier that month titled "Compliance: Muslim Brotherhood trading company Lord Energy linked to Crédit Suisse" on Medium, which is headquartered in San Francisco, California and hosts its data throughout the United States.[20]    The article falsely claimed that Lord Energy was "apparently being monitored by the Swiss intelligence agency" and called into question Crédit Suisse's compliance with U.S. laws, stating "Lord Energy, a Swiss company with strong ties to the Muslim Brotherhood and al Qaeda sympathizers holds substantial assets at bank Crédit Suisse, raising questions about compliance and corporate governance at the banking giant. … While Crédit Suisse already had to pay $536 million to settle changes it violated [U.S.] sanctions on Iran, these revelations on Lord Energy could put the bank in trouble with the [U.S.] Treasury Department."

177.    The article was purportedly written by Brenda Owens.  On information and belief, Brenda Owens is not a real person—it is a pseudonym that the enterprise used to hide the true identities of those responsible for the false article.   In July 2018, Hazim hired the digital intelligence and online reputation management firm Digitalis to analyze some of the false articles and blogs about him and Lord Energy, including the blog that the enterprise created on WordPress (https://lordenergy.wordpress.com) and the June 30, 2018 article on Medium.  Digitalis was unable to determine the identities of any of the authors or owners of the WordPress blog.  However, it concluded that the WordPress blog and Medium article were written in a similar style, suggesting

---

[20] *Data Protection FAQs for European Users*, Medium ("Medium is based in the United States. By using Medium Services, you authorize Medium to transfer, store, and use your information in the United States and any other country where we operate."), https://help.medium.com/hc/en-us/articles/360005037173-Data-Protection-FAQ-for-European-Users#:~:text=In%20what%20country%20does%20Medium,other%20country%20where%20we%20operate.

the same person(s) was responsible for both publications.  Digitalis also concluded that Brenda Owens, the supposed author of the Medium article, was likely not a real person.

178.    In addition, among the hacked documents, there were several lists containing login information for various blogs and websites Alp used to publish its disinformation.  These included WordPress, Medium, Tumblr, Live Journal, and Wikipedia.  Next to the login information, Alp listed the "names" (almost certainly pseudonyms) associated with each account.  One was "Brenda Owens."

179.    The enterprise continued to publish additional articles throughout summer and fall 2018.  On August 22, 2018, for example, the enterprise had an article that was written by Nina May under the pseudonym "Farrah Ahmed" published on Medium.  The article, which was titled "How the European Union funds the Muslim Brotherhood's youth organization FEMYSO," falsely accused Lord Energy of being "a new financing vehicle for the Muslim Brotherhood."  On September 3, 2018, the enterprise had another article written by Nina May published on WordPress.  It was titled "KYC: Trading company Lord Energy linked to the Muslim Brotherhood."

180.    The enterprise also sought to defraud mainstream journalists, including in the United States, and induce them to repeat and republish the lies the enterprise concocted about Hazim and Lord Energy.  Between June 7 and June 19, 2018, Alp used a secure, encrypted Protonmail account under the pseudonym "Yvan Doucet" to send 12 emails with the subject line "Lord Energy SA – terrorism financing (confidential)" to reporters from the U.S.-based media outlets *Bloomberg* and *Axios* and the U.K.-based media outlets *The Sunday Times*, *The Observer*, *The Guardian*, *Financial Times*, *The Sun*—which is ultimately owned by the U.S.-based media company News Corp.—and *The Times*.

181.     On June 8, 2018, Alp sent the same email to Platts, one of the preeminent crude oil price reporting agencies, which is owned by S&P Global.  On information and belief, the enterprise's email to Platts resulted in Platts denying Lord Energy's request to be upgraded to participate in the Platts Market on Close assessment process, conducted in Houston, London, and Singapore at 4:30 pm local time in each time zone daily.  The Platts approval process is managed in part from the United States.

182.     On June 7 and June 19, 2018, Alp sent the same email to Reuters reporter Julia Payne.

183.     The body of the email that Alp widely disseminated to U.S. and U.K.-based media outlets and a major crude oil price reporting agency contained links to several of the enterprise's prior planted articles.  The email also noted that, "[a]s a result of the article of Le Temps"—an article which the enterprise instructed and paid for Besson to write—"Lord Energy has apparently been blacklisted by banks (under counter terrorism financing regulations)."

184.     The enterprise also drafted and submitted to Wikipedia English-language and Italian-language entries falsely accusing Hazim and Lord Energy of being involved with the Muslim Brotherhood and terrorist financing.  On June 18, 2018 and July 6, 2018, Alp employee Raihane Hassaine emailed drafts of French-language Wikipedia entries about Hazim and Lord Energy to Badal, Brero, Cavin and other Alp employees for approval.  Of course, this draft entry cited to the other articles the enterprise previously commissioned, including Besson's January 5, 2018 article in Le Temps.

185.     The English and French Wikipedia entries falsely claimed that: "Hazim Nada … who was described as 'the shadow ambassador of the Muslim Brotherhood' by the Swiss newspaper Le Temps, founded Lord Energy SA," and "[a]ccording to an article in the newspaper

Le Temps, historical networks of the Muslim Brotherhood have reappeared in Switzerland through the trading company Lord Energy. While Lord energy denies any links to the Muslim Brotherhood, Le Temps noted that several of its managers were Islamist militants close to the Muslim Brotherhood."

186.    To add a thin veneer of legitimacy to these spurious claims, the Wikipedia entries also quoted Lorenzo Vidino. They said, "According to Dr. Lorenzo G. Vidino, it is challenging to identify members of the Muslim Brotherhood as there is 'a conscious effort by the Western Brothers to downplay or even deny their ideological links to the Muslim Brotherhood', before adding that FEMYSO should be considered a 'transnational Brotherhood initiative and organization.'"

### The UAE and its Officials Remain in Close Contact with Alp, Brero, Cavin, and Badal Regarding the Status and Impact of the Enterprise's Operations Against Hazim and Lord Energy.

187.    Throughout 2018 and 2019, Alp routinely communicated with the UAE and its officials and kept them apprised of the status and impact of the enterprise's operations against Hazim, Lord Energy, and other targets through regular "Summary Reports," "Action Plans," And "Impact Assessments." Alp also created "Press Reviews" listing the dozens of articles that Alp had planted, including numerous articles about Hazim and Lord Energy.

188.    As one example, Alp prepared and, on information and belief, sent to the UAE a "Summary Report – Impact Assessment" on July 23, 2018, that described the enterprise's "viral communication and discreet lobbying operations on 10 key targets," including Lord Energy.

189.    With respect to Lord Energy specifically, the report noted that "[w]ith our actions, Lord Energy is today publicly exposed as a controversial Muslim Brotherhood company with ties to terrorism financing and opaque activities. Our Wikipedia page disclosed the various links

between the firm's executives and Al-Qaeda related individuals and entities."  Even though "Lord Energy reacted furiously to the French Wikipedia page," Alp "won" the "battle."



190.    Alp boasted how, "through intense discreet lobbying over a period of two months," it was "able to add the names of Lord Energy, Youssef Himmat and Hazim Nada on the world's most influential compliance database World-Check" under the "'terrorism' category."  According to Alp's sources, "while Lord Energy was expected to increase its operations and revenues, it is now facing serious problems due to these embarrassing and damaging revelations."



191.    Not only did Alp seek to disrupt Lord Energy's relationships with financial institutions by fraudulently inducing World-Check to add Lord Energy, Hazim, and Himmat to its database under the terrorism risk category, but Alp also "contacted [Crédit Suisse] through the

profile of a 'freelance journalist', investigating Lord Energy" to "put pressure on the bank and close the accounts of the company." Alp commented that its sources "later told [it] that Lord Energy's accounts were 'blocked by banks.'"



192.     The report also identified seven "new case studies" for the enterprise to target in "the next phase" of its disinformation scheme. Alp noted that "[a]s always, all our actions were made strictly confidential and we remained invisible."

193.     In an August 6, 2018 "Summary Report – Impact Assessment," Alp also explained to the UAE how it "used social media and SEO techniques ('Search engine optimization') to boost visibility for our actions," and as a result, several of the articles the enterprise fabricated were "visible" on the first three pages of "Google USA."



194.    And Alp's "intervention also permitted to link the Muslim brotherhood to the company by automatically proposing a related result on Google when 'Lord Energy' is typed."



195.    In a similar update, which on information and belief, Alp sent via email to the UAE and some of its officials on November 6, 2018, Alp boasted that "[f]ollowing our latest actions, Google now directly associates Lord Energy with terrorism, and Hazim Nada with the [Muslim Brotherhood].  Importantly, both Lord Energy and Hazim Nada have launched counter-attacks: they now publish fake positive articles in a desperate attempt to 'clean' their online reputations, which we have countered with additional negative articles."



196.     Matar was Alp's main point of contact.  Brero and Badal frequently communicated with Matar via telephone, WhatsApp messages, and emails.   Alp's primary method of communicating with Matar and other UAE officials was through secure, encrypted Protonmail email accounts.  Alp used the account, "487563@protonmail.com" and Matar used the account, "547321@protonmail.com."  The parties rarely referred to each other by name, instead greeting one another as "My Friend" or "Dear Friend."  These were obvious security measures meant to ensure that the enterprise's unlawful activities remained concealed, and the identities of the culpable parties remained confidential.

197.     Brero, Cavin, Badal, and other Alp employees also repeatedly met in person with Matar, Ali, M.B.Z., and other UAE officials.  On July 4, 2018, Brero had a telephone call with Matar to provide status updates.  Matar told Brero that Brero's team had done an "excellent job" and that "everyone is appreciat[ive] of what you've done so far."  Matar also informed Brero that Matar "told His Excellency" about the "action plan."  Matar mentioned that he was not sure if "they" would visit Brero or ask Brero to meet them in Abu Dhabi.

198.     On July 23, 2018, Matar had another telephone call with Brero and Badal, during which Matar informed them that he "did talk to His Excellency and … he's very pleased to meet you there next week."

199.     According to Alp's internal meeting minutes, on August 9 and 10, 2018, Brero and another Alp employee met in Zurich with Matar and another UAE official.  During that meeting,

Matar informed the Alp representatives that he was "very pleased with the results of [Alp's] work so far." Matar and the other official said that, "in terms of Alp's proposal," they "did not have the opportunity to discuss it with the 'big boss'"—presumably M.B.Z.—but "they will do so and keep Alp informed." They told Brero and the other Alp employee to "continue with new cases trying to achieve the same impact as with Lord Energy (World Check, attach on Wikipedia, hiring UK lawyers …)." Matar and the other official suggested that "the next big targets could be FEMYSO and other MB organizations in the EU – Alp needs to find additional evidence." In a list of action items, "Matar/Ali" were to "send Alp info on Obama's 6 advisors linked to MB (CNN report)." Matar and the other official also indicated they would provide Alp with a "safe (Katim) phone to communicate together."

### The Enterprise's Smear Campaign Disrupts Lord Energy's Business and Banking Relationships.

200.     The enterprise's campaign to "continue to critically reshape the reputation of [its] initial targets" was successful and destroyed both Hazim and Lord Energy. As a result of the enterprise's efforts, various financial institutions and business partners ended their existing relationships with Lord Energy—some of which had begun decades earlier—and others refused to start new business dealings with Lord Energy.

201.     In July 2018, Exxon Mobil and Litasco—two companies with which Lord Energy had been doing business for years—required Hazim to provide information for their internal and compliance reviews regarding "trading with Lord Energy." Exxon Mobil temporarily stopped doing business with Lord Energy while it conducted a compliance review. Litasco stopped working with Lord Energy altogether.

202.     At the end of August 2018, Koskie entered into a deal for Americas Lord Energy to buy a cargo of 600,000 barrels of WTI on the spot market from a terminal in Houston, Texas

that was being offered by the U.S. commodity trading company, Castleton Commodities Merchant Trading LP ("CCI"). The deal—brokered by Texas-based Link Crude Resources—was subject to credit department approval by CCI. On September 7, 2018, in response to a request from CCI's compliance department, Koskie sent CCI Americas Lord Energy's latest confirmation of a deal it had done with a "US major for the purchase of US crude oil." That deal was for Lord Energy to purchase 1 million barrels of crude oil from Chevron USA in early September 2018.

203.     A week later, on September 13, 2018, a trader at CCI messaged Koskie and informed him that "compliance [was] being tough guys on everything." Ultimately, CCI cancelled the deal. On information and belief, CCI's compliance department became aware of the false allegations the enterprise published about Hazim and Lord Energy being linked to terrorism and decided that it was too risky to do business with Lord Energy.

204.     By mid-November 2018, Société Générale, Natixis, and BCP Bank also refused to work with Lord Energy. BCP explained to Lord Energy that, while its compliance department "ha[d] no problem with [Hazim's] [f]ather (cleared by the US)," it did "not feel comfortable with [Himmat], [Piccardo], and Fatima"—three Muslim Lord Energy employees the enterprise had falsely identified as having ties to the Muslim Brotherhood, al Qaeda, or both.

205.     As the enterprise repeatedly acknowledged, it had specifically targeted and sought to disrupt Lord Energy's relationship with Crédit Suisse. Not only did it have an article published on Medium in June 2018 falsely claiming that Lord Energy had "strong ties to the Muslim Brotherhood and al Qaeda sympathizers," which "rais[ed] questions about compliance and corporate governance at" Crédit Suisse, but the enterprise also used an alias to contact Crédit Suisse directly and put pressure on the bank to end its relationship with Lord Energy. These efforts

were ultimately successful. In December 2018, Crédit Suisse stopped supporting Lord Energy's trading positions, and in February 2019, it formally closed Lord Energy's accounts at the bank.

206. Over the next several months, other banks and financial institutions ended their relationships with Hazim and Lord Energy or declined to enter into new relationships. On January 16, 2019, a Swiss credit card company—Swiss Card—terminated Lord Energy's account.

207. On January 25, 2019, UBS informed Hazim and Himmat that "[a]fter intensive and exceptionally long discussions with our compliance and due diligence teams, it has been [] decided by our firm that we won't be in a position to help you with the financing of your business activity."

208. On February 8, 2019, UBS informed Hazim that it would also be closing his personal bank account, which he had held for more than 27 years, along with the personal bank accounts of Hazim's mother and brother.

209. On April 17, 2019, Macquarie terminated the "Futures Trading and Clearing Agreement" with Lord Energy that had been in place since 2014. And on December 2, 2020, Macquarie declined to enter into a new business relationship with Hazim because it "had no appetite to proceed further with the opportunity" given the enterprise's false allegations about Hazim and Lord Energy.

### Because of the Harm Caused by the Enterprise's Smear Campaign, Lord Energy Closes its US Subsidiary and Declares Bankruptcy.

210. Once banks stopped lending to Lord Energy, its days were numbered. Given the incredibly high costs associated with purchasing crude oil cargoes, access to credit was essential. Without credit, Lord Energy could not operate.

211. It did not take long for Lord Energy's business to fall apart. As of October 2018, Lord Energy was valued at about $150 million. It had about $60 million in cash on hand. And its

fixed assets were worth about $9 million.  By April 2019—only six months later—Lord Energy was over-indebted by about $80 million.

212.    In a last-ditch attempt to save his company, in December 2018, Hazim orchestrated a complex transaction in which Americas Lord Energy Inc. loaded a series of cargoes purchased from U.S. oil producers and transshipped them in the U.S. Gulf onto a VLCC.  The trade had a flat price optionality that required Americas Lord Energy Inc. to keep a long-term paper position to monetize.  However, at the end of the month, Crédit Suisse closed Lord Energy's paper position.  On information and belief, Crédit Suisse's decision was not made based on market risk considerations, but rather because Crédit Suisse feared that holding the position would make the bank appear to be supporting the Muslim Brotherhood.  The question of whether to close Lord Energy's position went all the way to Crédit Suisse's CEO at the time, Tidjane Thiam.  As a result, Lord Energy lost about $65 million.  This loss was the death knell for Lord Energy.  The enterprise's scheme to fraudulently induce Crédit Suisse to stop lending to Lord Energy worked, and it accomplished the enterprise's objective of destroying Lord Energy.

213.    Lord Energy dissolved its U.S. subsidiary, Americas Lord Energy Inc., in April 2019.  Later that month, Lord Energy, SA filed for bankruptcy protection in Switzerland.

214.    As a direct result of the enterprise's unlawful scheme, Hazim suffered actual economic losses of about $150 million (i.e., the difference in the valuation of Lord Energy—which Hazim owned entirely—before the effects of the smear campaign kicked in and its valuation after the smear campaign had bankrupted it).  Prior to the damaging effects of enterprise's smear campaign, Lord Energy was a valuable asset for Hazim that he could have sold for about $150 million, but as a result of the smear campaign, that asset became worthless.

215.    Separately, Lord Energy incurred actual economic losses of about $149 million, as its balance sheet went from positive $69 million in cash on hand and fixed assets to negative $80 million in the blink of an eye once banks stopped lending to Lord Energy and counterparties stopped trading with it, all because of the false accusations that the enterprise concocted about how Hazim and Lord Energy were involved in financing terrorism and the Muslim Brotherhood.

216.    Hazim and Lord Energy have also lost substantial profit over the past nearly five years as a result of being forced out of business in early 2019 by the enterprise's unlawful conduct. Notably, 2019–2023 were banner years for the oil industry. At the end of 2022, for example, Bloomberg reported a "Windfall for Vitol," a "Monster Year" for Trafigura, and "record" profitability for Glencore.







217.    From 2019–2022,[21] other oil trading firms with which Lord Energy competed—such as Vitol, Trafigura, and Glencore—made an average of 3.2 times their average annual profits from 2016–2018.  Lord Energy's average annual profit from 2016–2018 was about $16.8 million.  Multiplying that by the average industry-wide increase in profits during the 2019–2023 oil boom and the number of years Lord Energy has been unable to operate equals about $268.75 million in

---

[21] Sufficient data for 2023 has not yet been reported.

lost profits.  Profits in the oil trading industry have returned to pre-boom year levels so far in 2024.

Hazim has lost an additional $9.8 million in profits in the first seven months of this year.

218.    Despite the damage that its smear campaign had already caused, the enterprise still

continued to spread its lies about Lord Energy.  In May 2019, Alp hired Mariela Geier of G5

Integritas International, a private investigative firm in Miami, Florida, to perform background

checks and "due diligence" on Americas Lord Energy Inc. and Koskie.

219.    In an update to Matar on June 19, 2019, Alp explained that it published an article

in the Swiss financial blog *Inside Paradeplantz* titled "CS suffers millions worth of losses with

risky Muslim traders."  Alp bragged that the blog "also published our comments about possible

US sanctions against the bank."  Alp also proudly informed Matar of its success in destroying

Americas Lord Energy Inc.  "Following our media attacks, listing in World Check, and the

financial difficulties it created, the US-branch, Americas Lord Energy Inc., was forced to cease its

operations," Alp wrote.



220.    On July 23, 2019, the enterprise had another online article published about Lord

Energy by Africa Intelligence titled, "Lord Energy's troubles far from over."  The article claimed

that "[w]hile its former operations in Algeria are being dissected by the new power, Lord Energy

is being targeted by new creditors." The article noted that a shipping company had enlisted a Swiss lawyer to recover unpaid sums owed by Lord Energy, and Lord Energy had fallen behind payments on loans taken out with Crédit Suisse and closed its "Texan branch."

221. In a 2019 update to the UAE, Alp expressly stated that its goal was to "push … Lord Energy towards bankruptcy." Alp explained that to "generate maximum coverage," it had "creat[ed] a negative section on Lord Energy in the Wikipedia page of Algerian oil company Sonatrach, including the corruption accusations[.]" Alp created similar entries on Crédit Suisse Wikipedia pages, falsely adding that the bank and Lord Energy "could be the subject of US investigations," and boasting that Wikipedia pages are "read by over 35,000 people every month[.]"

222. The harm that the enterprise's false accusations have caused to Hazim and Lord Energy persist to this day. As recently as March 2023, the "Know Your Customer" diligence department of Element Alpha—another oil trading firm—responded to a due diligence request relating to doing business with Lord Energy: "You mean these guys: I mean there have been worrying allegations of some employees being linked to the Muslim Brotherhood … Happy to start KYC, but this will require careful due diligence."

### Lord Energy's Bankruptcy Has a Direct Effect in the United States.

223. The enterprise's efforts to drive Lord Energy out of the spot market for light crude oil had a substantial impact on U.S. commerce. When the enterprise fraudulently induced Sonatrach to stop selling Lord Energy cargoes of Saharan Blend, that did not just impact the price of Murban in Asia. It also impacted the price for WTI on the spot market. WTI, Murban, and Saharan Blend are all viewed as equivalent blends of light crude oil by refineries in Asia. So, impacting the supply of one blend impacts the price for all three. Cutting off the supply of Saharan

Blend substantially affected the spot market for WTI, which is produced in the United States, as well as Murban.

224.     More to the point, Americas Lord Energy Inc. was established precisely so Lord Energy could increase its exports of WTI.  Americas Lord Energy Inc. was a participant in the market for U.S.-produced WTI, and when it was dissolved that directly affected a major U.S. oil market.

225.     Additionally, every one of Lord Energy's trades were U.S. dollar denominated.  All U.S. dollar denominated trades must be cleared by U.S. financial institutions.  In Lord Energy's case, virtually all its trades were cleared by the New York branch of J.P. Morgan Chase.  When Lord Energy was forced to declare bankruptcy and stop operating, it had a substantial impact on U.S. banks.

226.     Finally, when Lord Energy filed for bankruptcy in Switzerland, many of its priority creditors were U.S. entities.  They included Texas-based entities AMSPEC LLC, Lightering LLC, and Valls Ship Agencies, LP.  The enterprise's false and misleading smear campaign, which bankrupted Lord Energy and Americas Lord Energy Inc., also impacted U.S. commerce by preventing Lord Energy from continuing to do business with these, and other, U.S. entities, and forcing these U.S. entities to seek to recover debts owed to them by Lord Energy through Swiss bankruptcy proceedings.

### *Despite His Best Efforts, Hazim Is Unable to Determine Who Was Behind the Smear Campaign that Destroyed His Company.*

227.     Once Hazim realized he was the victim of a concerted disinformation campaign, he did everything he could to ascertain who was responsible.  He believed it was a rival commodity trading firm.

228.    He demanded that the media outlets responsible for publishing false accusations about him disclose their sources, and he demanded that World-Check provide him information about the researchers that had him designated.  They all refused.

229.    The enterprise's robust operational security measures stymied Hazim's efforts to identify the true parties responsible for the smear campaign against him.  All the members of the conspiracy took affirmative steps to conceal their involvement.  As just some examples, they used Protonmail accounts, which are end-to-end encrypted; they used aliases and pseudonyms to disguise their true identities; and they instructed their co-conspirators to delete emails after reading them.

230.    In 2020, Alp submitted a "five-year action plan" to the UAE, in which Alp recognized the enterprise would "face a growing pressure to leave no traces, as we have managed to do so far.  This will further require us to take all the appropriate measures to remain our identity unknown – in terms of discreet contacts with the press, our viral campaigns, growing risks of physical surveillance …."  This was consistent with Alp's routine reassurances to the UAE that the enterprise's actions would always be "made strictly confidential" and "remain[] invisible."

231.    In June 2018, Hazim reported the smear campaign against him and his companies to Swiss law enforcement, and he filed a criminal complaint in Switzerland.  After a perfunctory "investigation," Hazim met with a Swiss police officer in February 2020 who explained to Hazim that he and the prosecutor were closing the investigation, supposedly because of lack of evidence. During their meeting, the officer left the room where he and Hazim had been meeting, and the case file was strewn on the table in front of Hazim.  While the officer was away, Hazim shuffled through the file and found requests for records about Lord Energy by a Geneva-based investigative firm— Alp.  This was the first time Hazim had ever heard of Alp.  At the time, Hazim did not know

whether Alp was involved in the smear campaign against him or just collecting information for due diligence purposes by a crude oil market participant.

232.    Nevertheless, anxious for answers, in late February 2020, Hazim emailed the general "contact us" email address listed on Alp's website.  Hazim alleged in his email that Alp was responsible for the actions against him and his companies.  Hazim wrote to Alp that it had engaged in "acts of fraud and prank calling to obtain private information regarding [Lord Energy]." He offered to resolve the matter "amicably."

233.    Upon receipt of this email from Hazim, Alp immediately sent an update to Matar informing him of Hazim's email.  Alp wrote that, "Of course, we are not planning to reply.  We expect that he will escalate the matter and perhaps launch legal actions against us.  We are ready to confront him.  Let's talk rapidly to agree on a strategy and next steps."

234.    In April 2020, Brero wrote to Matar once again expressing concern that Hazim might "launch[] legal actions" in Switzerland, the U.K., or the United States.  Brero suggested "denounc[ing] Nada or his company for financing terrorism or corruption."  Brero also wrote that, "[i]f Nada attacks us, we would obviously be ready to counter attack firmly."

235.    True to its word, Alp never replied to Hazim.  In early 2021, Hazim emailed the Alp general "contact us" email address again.  And again, Alp did not respond.

### *Hackers Steal Documents from Alp's Internal Servers, and Hazim Learns the Truth.*

236.    In April 2021, Hazim received a message from an encrypted French phone number he did not recognize.  The sender wrote that he represented a group of hackers who had infiltrated Alp's servers.  He sent Hazim a copy of the message that Hazim had sent to Alp's "contact us" email address as proof that the hackers were legitimate.

237.    The hackers also allowed Hazim to review the internal Alp documents they had obtained, but they prevented him from downloading or saving any of the files.  Hazim was shocked

at what he read.  The documents included emails among the enterprise and its co-conspirators directing operatives to publish articles linking Hazim and Lord Energy to terrorism.  With these documents, Hazim was finally able to appreciate the enormity of the conspiracy against him.  In a way, he was right that a competitor was responsible for the smear campaign against him.  But that competitor was not a rival commodity trading firm as he suspected.  It was the UAE, its top officials, and its state-owned oil company.

238.    The hackers offered to sell the Alp files to Hazim for $30 million in cryptocurrency. Hazim responded that he was unable—and unwilling—to pay $30 million for the hacked files.

239.    Hazim reported the hackers' communications to Swiss authorities, and a Swiss intelligence officer met with Hazim and took photos of the hackers' encrypted messages.  Hazim heard nothing from the Swiss authorities for months after that.  Eventually, however, the authorities obtained copies of the hacked documents and shared them with Hazim.

240.    Around the same time, in 2021, Hazim consulted with a Swiss law firm about potential legal actions he could take in Switzerland against Alp and other participants in the enterprise.  He was advised not to file any legal actions in Switzerland as they would be futile.

### The Documents Expose the Enterprise's Long-Running, Wide-Ranging Conspiracy.

241.    The scope and scale of the enterprise's overarching conspiracy was brazen and daunting.  The hacked documents revealed that Hazim was far from the enterprise's only target. According to the documents, the enterprise targeted more than 50 individuals and entities, using the same "viral communication" and "discreet lobbying" tactics they employed against Hazim.

242.    In a July 20, 2018 "Summary Report – Impact Assessment," which on information and belief Alp sent to the UAE, Alp identified 10 "Confidential Offensive Viral Communication and Discreet Lobbying and Influence" campaigns it was carrying out.  Lord Energy and Himmat's Muslim youth charity FEMYSO were listed as two of the ten discreet viral communication and

discreet lobbying and influence campaigns underway. The report noted that the "objective" of the campaigns was to "negatively reshape the reputation of these targets" by "carefully prepar[ing] and publish[ing] over 50 articles, websites and Wikipedia pages, as well as discreetly contacting journalists, policy makers, banks and compliance databases." The report also explained that Alp "aimed to conduct these actions discreetly and ensure they appeared spontaneous and credible," and it "aimed to discreetly lobby and alert compliance databased and watchdogs, which are globally used by banks and multinationals, about key MB targets, such as Lord Energy, Youssef Himmat and Hazim Nada."

243.    With respect to FEMYSO, the report stated that Alp "created" a "French Jewish journalist 'Tanya Klein' … to expose the nebula of fake associations and NGO's created by the MB to lobby the European Union, including FEMYSO." The enterprise also ensured that the article it published on Mediapart under the fake persona Tanya Klein was a top result on Google. In a subsequent summary report, Alp noted that its objective was to "disrupt the funding FEMYSO receives from the European Union, by making them toxic," and touted that "[t]he results have remained very strong."

244.    These were just some of the first—and by no means the only—unlawful schemes the enterprise conducted. For example, the enterprise conducted an offense viral communication campaign against Nectar Trust, a charity registered in England and Wales focused on making sustainable and meaningful impacts on communities. The enterprise first identified Nectar Trust as a potential target in early 2018. It began its offensive viral communication campaign against Nectar Trust shortly thereafter.

245.    On September 19, 2018, the enterprise sent an email to World-Check claiming that Nectar Trust was "linked to terrorism," "directly linked to radical Islamists," and controlled by

Qatar Charity, which according to the email, was "blacklisted by Israel for supporting terrorism." The email was ostensibly from someone named Gregory Addington, and it was sent using the Protonmail email address Gregory.Addington@protonmail.com.

246. On information and belief, these statements about Nectar Trust were false, and "Gregory Addington" is not a real person—it is a pseudonym used by Alp to hide its involvement.

247. On February 20, 2019, Alp prepared a story for Nina May to have published on the website www.muslim-brotherhood-watch.com. That article falsely claimed that "Nectar Trust, in 2017, changed its name from Qatar Charity UK, in an effort to detoxify its name. Qatar Charity … is seen by international security forces as the funding vehicle for Qatar's support of the Muslim Brotherhood." The same article accused Leedsgate, a real estate firm in the U.K., of being a "financing vehicle for [a] radical group." Leedsgate was another target of an offensive viral communication campaign by the enterprise. On March 4, 2019, an Alp employee sent Badal two articles for Nina May to publish about Leedsgate. Brero and Cavin were copied on the email, presumably so they were aware of and could review the articles prior to publication.

248. Also on February 20, 2019, the enterprise had Nina May publish an article on qatarcharitynectartrust.wordpress.com claiming that one of the trustees of Nectar Trust "trained terrorists." The article also falsely described Nectar Trust as "the British offshoot of Qatar Charity," a "priority III terrorism support entity."

249. On information and belief, Nina May was a willing participant in the enterprise who understood its common purpose to damage the businesses and reputations of its targets. This belief is based on May's repeated role in having stories published for the enterprise, the uniform damaging content of those stories accusing the story subjects of having links to terrorism, the fact that the stories were often published anonymously or using pseudonyms, and the fact that Alp

provided the stories to May fully researched and often fully written without asking her to verify any of the information before publishing it.

250.    These are just some examples of the many false articles Alp published and false statements Alp made accusing Nectar Trust of having ties to terrorism.  In a March 7, 2019 "Summary Report – Impact Assessment" to the UAE, Alp provided an update on its "viral communication and discreet lobbying operations" against "10 key targets," including Nectar Trust and Leedsgate.  The report noted that this was Alp's "third three-month phase" of confidential offensive viral communication and discreet lobbying and influence operations.  The report also noted that Alp was "maintaining" its operations against Lord Energy and FEMYSO.

251.    According to the report, Alp "prepared and published about 50 articles, websites and Wikipedia pages, as well as discreetly contacting dozens of journalists and compliance databases."  The summary report also stated that Alp "published about 15 articles in both English and French" to "seriously impact the first page of Google for Nectar Trust."  In addition, Alp told the UAE that it was "able to add the name of the Nectar Trust on the global watchlist World Compliance, which is operated by Lexis Nexis" and Alp was continuing its efforts to have Nectar Trust blacklisted by World-Check.

252.    And Alp bragged that it created a "highly critical section on the Nectar Trust" on Qatar Charity's Wikipedia page.  Alp claimed that it "faced serious counter-attacks from the Qatar Charity, which tried to censor our new critical sections in their Wikipedia pages."  However, Alp enlisted the help of unidentified friendly Wikipedia moderators on its payroll to "[fight] back and put these sections, on terrorism support and the Nectar Trust, back online."

253.    On information and belief, these Wikipedia moderators were willing participants in the enterprise who understood its common purpose of destroying the businesses and reputations

of the enterprise's targets by falsely accusing them of supporting or being linked to the Muslim Brotherhood and terrorist organizations. This belief is based on the facts that: Alp routinely enlisted these moderators to undo corrections made to pages by the subjects of those pages who were better positioned than Alp to know whether the information about them was true; Alp paid the moderators to ensure the damaging information Alp provided remained on the pages; and the information Alp wanted on numerous Wikipedia pages uniformly related to allegations that the subjects supported terrorism.

254. The March 7, 2019 report also provided an update on Alp's efforts against Leedsgate. Alp noted that, prior to its viral communication campaign, Leedsgate "had a perfect reputation." But within three months, Alp was able to put three negative articles on the "first page of Google when searching the company's name." Alp stated that it would "aim to add the company's name in compliance databases such as World Compliance during the next phase."

255. As with Hazim and Lord Energy, the articles and other online statements the enterprise had published about Nectar Trust falsely linked Nectar Trust with terrorism for the express purpose of inducing financial institutions and donors to stop funding Nectar Trust and deprive Nectar Trust of the funds it needed to continue to operate.

256. In an October 21, 2019 Impact Assessment to the UAE, Alp noted that "the revenues of the Nectar Trust fell sharply" after Alp "started [its] aggressive viral communication and attacked [Nectar Trust's] reputation." Alp again boasted how it was "able to add the name of the Nectar Trust" in World Compliance, which "will undoubtedly complicate the work" of Nectar Trust because "Western banks will now be aware of the links between the Nectar Trust and terrorism funding." Alp emphasized that Nectar Trust's new profile in the World Compliance

database "specifically states that [Nectar Trust] has been accused of terrorism funding." Alp concluded that "[t]he outlook for the Nectar Trust … looks increasingly miserable."

257. In November 2019, Alp sent the UAE a proposal for the next six-month phase of its "investigations and discreet yet offensive media campaign" aimed at "disrupting … key actors and funding." The proposal explained that Alp's strategy was to use "media attacks" to "[i]nfluence decision makers" including "politicians, compliance databases, banks, academics, etc." The proposal identified new schemes and targets, and it also provided an update on the status of existing schemes. Notably, objectives of this new six-month phase included "[f]inishing Lord Energy" and "[e]nding the Nectar Trust." According to the proposal, operations against Lord Energy and Nectar Trust were 90% and 80% complete, respectively, as of November 2019.

| Follow-up Case | Investigations | Media attacks | Influence decision-makers |
|---|---|---|---|
| Finishing Lord Energy | 90% | 90% | 90% |
| Ending the Nectar Trust | 80% | 80% | 80% |
| Terrorism links (e.g. MB schools in France) | 60% | 60% | 60% |
| General Prosecutor | 80% | 90% | 50% |
| Emir's brother, etc. | 90% | 90% | 80% |

258. The proposal also suggested that Alp sought to create a "dedicated web resource," which it would call the "encyclopedia on terrorism in Europe," to "further influence decision-makers such as politicians, NGOs, journalists, [and] compliance databases." Alp planned to use "a series of firewalls" to ensure the web resource would "remain highly secure and anonymous."

259.    In February 2020, Brero wrote to Matar that construction on a mosque in France funded by Nectar Trust was halted because "French banks now refuse to receive the money [from Nectar Trust]" and the mosque's bank account was blocked.  According to Brero, this "was the result of Nectar Trust's listing in World Compliance"—which the enterprise engineered—"and the media campaign."

260.    In June 2020, The Telegraph published an apology to Nectar Trust for articles it had written about Nectar Trust in August and October 2019 that linked Nectar Trust to Qatar Charity, which The Telegraph described as a terrorist organization.[22]  These articles were based on information Alp shared with Alp's "contact" at the Sunday Telegraph.  Alp wrote in its October 21, 2019 Impact Assessment to the UAE that it "discreetly briefed our contact at the Sunday Telegraph," giving him "the key elements, such as the accusations of terrorism funding," and "[o]n 17 August 2019, the Political Editor of the Sunday Telegraph wrote the article in both the paper version (page 2) and the online edition of the well-known British newspaper."  In its apology, The Telegraph acknowledged that there was no reason to question the independence of Nectar Trust and no reason to suggest that Nectar Trust is or had been in any way supported by or supportive of any terrorist or extremist organization.

261.    On July 1, 2020, Brero sent Matar an email providing a "[q]uick update for the Nectar Trust."  Brero informed Matar that Alp had just "obtained a copy of [Nectar Trust's] latest accounts," and its net assets fell from "**GBP 19 million in 2018 to GBP 2.9 million in 2019, likely due to financial difficulties with our negative media campaign and the World Compliance listing**."  Brero lamented that Nectar Trust was still able to fund projects across Europe and the

---

[22] Telegraph Reporters, *An Apology – The Nectar Trust*, The Telegraph (June 14, 2020), https://www.telegraph.co.uk/news/2020/06/14/apology-nectar-trust/.

United States with the money it received in 2018, and Brero assured Matar that, "[i]f we keep the pressure, the Nectar Trust will face increasing difficulties," including "being unable to continue to operate (our ambitious objective for 2020)."

262.    The enterprise also carried out a similar scheme against the Kutayni clan in Spain. On April 4, 2020, Brero sent Matar an email stating, "we have great news coming from Spain. Further to our research and media attacks on Kutayni clan from last June (via our contacts at OKDiario newspaper), Spanish authorities have blocked their bank accounts."  Alp once again leveraged participants of the enterprise—this time, Alp's contacts at OKDiario—to have fraudulent claims published in the media about one of the enterprise's targets, the Kutayni clan, accusing it of funding the Islamic State.  The specific purpose of these claims was to fraudulently induce third parties such as government authorities and banks to deprive the Kutayni Clan of money.

263.    On information and belief, Alp then instructed Vidino to post about the Spanish government's actions against the Kutayni clan on Twitter to amplify the harm caused by the enterprise's false claims.  The official Twitter account for the George Washington University Program on Extremism, which was and still is run by Vidino, posted that "Spanish authorities blocked bank accounts linked the Kutayni clan, suspected of funding Islamic State."



Spanish authorities blocked bank accounts linked the Kutayni clan, suspected of funding Islamic State. One of the accounts blocked is of the Muslim Association of Spain (AME), mainstream group linked to the Muslim Brotherhood

264.    Brero then sent Matar an email updating him about Vidino's post.  He informed Matar that Alp had "discreetly shared our Spanish findings with Dr. Lorenzo Vidino."

265.    On August 1, 2020, Brero sent Matar an email providing an update on the enterprise's confidential offensive viral communication campaign targeting an individual in Switzerland named Nicolas Blancho.  Brero informed Matar that the Swiss newspaper Tribune de Geneve wrote an article about Blancho and his organization reporting that they were "facing a financial crisis," their funds had declined, and they were dealing with legal problems.  Brero bragged that "[t]his was of course the result of our media campaign and investigations on Blancho's links with the Al Thani family."  Brero noted that, "[c]onfidentially, the author of the article is a good contact."

266.    Another target of one of the enterprise's confidential offensive viral communications campaigns was the General Prosecutor of Qatar, Ali Bin Fetais Al-Marri.  Alp wrote in a "strictly confidential" March 2019 "Action Plan Summary" that it would "name and shame" Al-Marri globally to accomplish its "ambitious goal" of "forc[ing] him to resign."

267.    In a different March 2019 draft Impact Assessment, Alp explained that it had learned that the General Prosecutor was building a house in Geneva, Switzerland.  Alp reported

that it "published three articles in renowned Swiss newspapers (Le Matin Dimanche, Tribune de Genève and 24 Heures), and another one in the French newsmagazine Le Point." The articles, which Alp described as "very aggressive, by French standards, towards the General Prosecutor," strongly implied that Al-Marri obtained the money to build this new home in Geneva through corruption. One of the articles was written by Besson. Alp also asked its contacts in Senegal to publish the story about Al-Marri's new home to "further amplify the negative revelations."

268. In March 2018, Alp sent emails directly to journalists—including reporters for the New York Post, Foreign Policy, and Thomson Reuters—using the pseudonymous email account "Pierre.roussel@gmx.com." The emails claimed that a French investigative journalist had uncovered Al-Marri's "ill-gotten gains in Paris and Geneva." On information and belief, these statements about Al-Marri were false. This belief is based on Alp's routine publication of false and misleading statements about other targets of its offensive viral communications campaigns.

269. The enterprise's targets also included numerous other U.S. citizens and entities. For example, on May 3, 2018, Badal instructed Mariela Geier of G5 Integritas International—the private investigative firm in Florida that Alp tasked to compile background reports on Americas Lord Energy Inc.—to conduct a "solid background check" on a high-profile journalist who lived in the United States, was a U.S. citizen, and worked for the prominent U.S. media outlet, Buzzfeed. The enterprise also hired another private investigator, Ian Withers of Priority International Limited, to gather information from U.S. sources on this American journalist. Badal was particularly interested in "any red flags, rumors or negative information" and "any links with security services or foreign governments" the investigators could uncover.

270. On May 7, 2018, Badal sent Matar a "preliminary report" on the American journalist, noting that Alp was "still waiting [for] additional information from human sources and

more details on" the journalist's spouse. Alp subsequently prepared an additional research memo

on his spouse and daughter.

271.     The enterprise used Geier to investigate other potential targets in the United States,

including an Argentinian economist who lived in McLean, Virginia. On October 10, 2019, Alp

prepared and, on information and belief, sent to the UAE a 30-page "confidential report" on this

U.S.-based economist.

272.     The enterprise also prepared an in-depth report about a U.S. citizen who founded

the U.S.-based company Global Risk Advisors ("GRA"). On January 8, 2020, Badal emailed

Pierre Gastineau of Intelligence Online informing him of a civil lawsuit against GRA and its

founder. Badal told Gastineau that "according to [Alp's] sources," GRA's founder "always

seemed pretty close to the CIA." A week later, on January 15, 2018, Intelligence Online published

an article about GRA and its founder.

273.     That same day, Alp emailed Matar to inform him about the article. Alp wrote, "As

agreed, we informed our contact at Intelligence Online about the new US federal complaint …

against Global Risk Advisors and [its founder]. Good news, they wrote an article about it today

(please find attached). As a result of the complaint, they also wrote about Q's new US lobbyist

(please also find attached)."

274.     These were not the only other American individuals and entities the enterprise

targeted. It also conducted a confidential offensive viral communications campaign and

disinformation operations against George Soros and his Open Society Foundation. In a March 7,

2019 Summary Report, Alp accused Soros of "funding several Muslim Brotherhood-related

organizations in Europe." Alp claimed that, while Soros's alleged connection to the Muslim

Brotherhood had "been mentioned … in the USA, the situation in Europe is not so well known." "As such," Alp wrote, "we started revealing the situation in the European continent."

275.    The enterprise also had its co-conspirators publish an article on Medium on January 13, 2019, titled "How George Soros funds the Muslim Brotherhood in Europe."   The enterprise then used search engine optimization techniques to ensure the article appeared at the top of Google search results for "George Soros and the Muslim Brotherhood."



276.    In September 2019, the enterprise received an urgent request from the UAE to investigate 11 prominent U.S. political operatives and consultants to determine whether they "have any suspicious contacts."   Alp codenamed the assignment "Project PEONY."   The targets of Project PEONY were: Lynton Crosby, Mark Fullbrook, Steve Schmidt, James Carville, Alastair

Campbell, Karl Rove, Mark McKinnon, David Plouffe, Ed Gillispie, Howard Wolfson, and Chris LaCivita.  Alp charged the UAE more than $70,000 for PEONY.

277.    In March 2024, Dr. Farid Hafez, a professor at Williams College, filed a class action lawsuit in the U.S. District Court for the District of Columbia against Alp, Diligence, Brero, Cavin, Badal, Vidino, and The George Washington University asserting RICO claims predicated on wire and mail fraud, among other things.[23]

278.    Hafez's lawsuit alleges that the enterprise "made a series of fraudulent or continuing and knowingly false representations concerning Plaintiff as well as other similarly situated individuals," accusing them of having "illicit and improper ties with the Muslim Brotherhood."   Hafez's complaint also alleges that the enterprise's fraudulent statements "amounted to guilt by association dressed up in innuendo and shopped and filtered through various foreign intelligence or police agencies and authorities receptive to same, thereby giving the innuendo and allegations the veneer of authority, and to complete the façade, done from a storied academic perch with a vainglorious important title of Director of GWU's Program on Extremism." And Hafez claims that he was "effectively blacklisted by Dr. Vidino's and GWU's activities which were taken under the influence of the UAE, simply for being a voice for moderation and religious tolerance and for challenging Dr. Vidino's false accusations against Western Muslims."

279.    These are just some of the many victims targeted by the enterprise's disinformation campaign.   The hacked documents suggest that, between 2017 and April 2021—when the documents were obtained—the enterprise conducted operations targeting more than 50 individuals and entities.    While Hazim ultimately received about 8,000 hacked documents from law enforcement, the investigative journalism consortium European Investigative Collaborations

---

[23] Class Action Compl., *Hafez v. Vidino*, 24-cv-00873-ABJ (D.D.C. Mar. 27, 2024).

("EIC") eventually obtained about 80,000 of Alp's documents, which show that Alp sent the UAE the names of more than 1,000 individuals and 400 organizations labeling them part of the Muslim Brotherhood. The EIC published numerous articles about Alp's work for the UAE under the moniker "Abu Dhabi Secrets." EIC investigative journalists described Alp's research for the UAE as "a haphazard collection of names and organizations, connected by artificial links to public figures without any logical coherence ... [and] based on mere rumors or controversies."

280. The German publication Der Spiegel contacted many of the people whom Alp identified as being part of the Muslim Brotherhood. They told Der Spiegel that Der Spiegel's outreach was the first they had ever heard of the accusations, and they could not explain how they were identified as being part of the Muslim Brotherhood. In fact, one local politician Der Spiegel spoke with said that he was trying to combat the influence of the Muslim Brotherhood in Islamic organizations.

281. In November 2023, Der Spiegel published an article titled "How United Arab Emirates Seeks to Leverage Its Influence in Europe." The article reported that:

> An Italian-American scholar named Lorenzo Vidino played an important role in the campaign … Since 2018, he has repeatedly performed work for Alp Services … Vidino … was able to establish contacts to reputable media outlets and he had access to a network through which Alp Services could receive secret service information – a network the company could also use to funnel information back into intelligence and government channels. Vidino also apparently had contact with state agencies in Germany. In February 2020, the scholar wrote a memo on behalf of Alp Services about members of the Muslim Brotherhood in Germany. At one point, he asked an Alp Services employee how quickly the memo had to be finished, because, he said, he would be in Berlin for a few days in mid-March as a "guest of the government." If he could send his report after that visit, he said, it would be "juicier." When contacted by DER SPIEGEL, Vidino said that the trip never actually took place. But he sent a memo anyway.

282. The enterprise continued to operate for years after it bankrupted Lord Energy in 2019. Indeed, it may still be operating today. On January 18, 2020, Alp prepared, and on information and belief, sent to the UAE a new "strictly confidential" action plan for 2020-–2025.

Alp wrote, "Thank you for renewing your trust with us. We are ready to start the new five year Action Plan" which would follow the enterprise's tried and true strategy combining "media attacks" with actions to "influence decision makers," including "politicians, compliance databases, banks" and "the public." Alp proposed a budget of 2.4 million Euros for the first year of the new five-year plan.

### COUNT ONE
### Violations of the Lanham Act, 15 U.S.C § 1125(a)(1)(B)
*(Against the UAE, Alp, Brero,*
*Cavin, Badal, and some of John Doe Nos. 1–25)*

283.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth fully herein.

284.    Beginning in May 2017, the UAE, Alp, Brero, Cavin, Badal, and some of John Doe Nos. 1–25—working jointly and in concert with journalists, academics, private investigators, and others—arranged for false and deceptive advertising to be distributed in international and interstate commerce via the internet to Plaintiffs' current and prospective creditors, customers, counterparties, business partners, and a global internet audience. Typically, this false and deceptive advertising took the form of articles and blog posts published online. Although these appeared to be legitimate editorial pieces, they were in fact sponsored content commissioned, written, and published for the express purpose of damaging the business and reputation of one of the UAE and ADNOC's commercial competitors.

285.    Defendants relied on a modern advertising strategy known as "native advertising"—also known as "sponsored content" or "advertorials."

92

286.     Native advertising is content that bears a similarity to the news, feature articles, and other material that surrounds it online.[24]  When native advertising is posted by a news publisher or web blog, it mimics the styling of the publisher's articles.  Thus, it is designed to take the form of and blend in with the surrounding articles and post.  In other words, it is specifically designed not to appear as an advertisement.

287.     Sponsors use native advertising for exactly this reason: by seamlessly integrating their content alongside standard editorial content, readers might mistake the advertisement as news, and be more likely to read or trust it.  Without proper disclosures, native advertising is inherently deceptive, as it is designed to appear like an impartial news article and conceal the commercial nature of its content.

288.     This made it the perfect tool to execute Defendants' "dark PR" campaign, as it accomplished the same objectives Alp presented to the UAE in its proposal.  Using paid journalists to post undisclosed native advertising allowed Defendants to "discredit and embarrass" Lord Energy through what appeared to be impartial sources—thereby lending credibility to its "aggressive online negative campaigns" while also maintaining the secrecy of who was actually behind articles disparaging Lord Energy's business and operations.

289.     The enterprise directed those false and misleading advertisements to Plaintiffs' consumers, counterparties, business partners, compliance and risk monitors, lenders, and the public for the express purpose of destroying Lord Energy's business and eliminate a growing competitive threat to ADNOC.

290.     The advertisements contain false claims about Hazim and Lord Energy, including

---

[24] FTC, *Native Advertising: A Guide for Businesses* (Dec. 2015), https://www.ftc.gov/business-guidance/resources/native-advertising-guide-businesses.

but not limited to the following:

(a)     On December 5, 2017, the enterprise published an article online on the website Africa Intelligence falsely claiming that Algeria had blocked a Lord Energy oil tanker over concerns about the "waterproofness" of the vessel, and that Hazim's father was "alleged to have financed terrorism."

(b)     On January 5, 2018, the enterprise had an article written by Besson published online by Le Temps that falsely claimed there were "traces" of "historical [Muslim Brotherhood] networks" at Lord Energy that "has sometimes kept some militant activities."

(c)     On May 15, 2018, the enterprise commissioned freelance writer Nina May to write an article that falsely accused Lord Energy of being "linked to US designated terror-entities."   On information and belief, this sponsored content was published online.

(d)     On May 15, 2018, the enterprise commissioned May to write a separate article that falsely accused Lord Energy of "linking Al-Qaeda and the Muslim Brotherhood."  The enterprise published this sponsored content on WordPress on June 6, 2018.

(e)     On May 15, 2018, the enterprise commissioned May to write a third article that falsely accused Lord Energy of being the Muslim Brotherhood's "own Swiss trading company" that falsely claimed that Hazim "continues to support the network" and "Lord Energy is a front for Muslim Brotherhood funding through the sale of crude oil from North Africa."  The enterprise published this sponsored content on Tumblr on June 4, 2018.

(f)     On or around May 31, 2018, the enterprise commissioned May to write and publish an article titled "Reuters misses major terrorism link in oil coverage: the true story of Swiss Lord Energy," which falsely claimed that Hazim "took over" his father's business and "[t]he connections of Lord Energy to the Brotherhood—and to radical Islam and financiers—are substantial." The enterprise published this sponsored content on WordPress on June 8, 2018.

(g)     On June 7, 2018, the enterprise published an article titled "Why the next series of Homeland should play in Lugano and include Lord Energy" on Live Journal.  The article falsely claimed that Lord Energy's "profits go to an organization deeply ingrained in the Muslim Brotherhood, with old ties to Al-Qaida" and a "Swiss intelligence agency was said to be investigating its activities."

(h)     On June 30, 2018, the enterprise published an article it had commissioned titled "Compliance: Muslim Brotherhood trading company Lord Energy linked to Crédit Suisse."  This sponsored content was published on Medium,

and the article falsely claimed that Lord Energy was "apparently being monitored by the Swiss intelligence agency" and had "strong ties to the Muslim Brotherhood and al Qaeda sympathizers." The article also stated that "Lord Energy could put [Crédit Suisse] in trouble with the [U.S.] Treasury Department."

(i)     On August 22, 2018, the enterprise published an article it commissioned Nina May to write titled "How the European Union funds the Muslim Brotherhood's youth organization FEMYSO." This sponsored content was published on Medium and falsely accused Lord Energy of being "a new financing vehicle for the Muslim Brotherhood."

(j)     On September 3, 2018, the enterprise published on WordPress another article it commissioned May to write that falsely accused Lord Energy of being "linked to the Muslim Brotherhood."

291.    These claims are false because they conflict with reality in several ways, as set forth above.

292.    Defendants were motivated to make these false claims because they were in commercial competition with Hazim and Lord Energy. The articles that the enterprise concocted and commissioned constituted advertising and promotion because they were paid-for, sponsored content intended to boost ADNOC's spot-market sales and the price it could demand for Murban by disparaging Lord Energy and driving it out of the market. The enterprise's sham accusations that Hazim and Lord Energy were involved in terrorist financing were meant to—and did—eliminate a commercial competitor by causing banks and financial institutions to stop lending to Hazim and Lord Energy and causing other industry participants to stop doing business with Hazim and Lord Energy.

293.    Defendants' advertising and promotion was made in the United States. Several of the relevant false and misleading statements were published directly on U.S. websites including, Medium, WordPress, and Tumblr. Other false and misleading statements were published on foreign websites, such as Le Temps, and sent via email to U.S. journalists, price reporting agencies, and bank risk monitors. Defendants also manipulated results on U.S. search engines such as

Google, Yahoo!, and Bing so that the enterprise's false and misleading advertising appeared on the first pages of these search engines.

294. These false claims had the tendency to deceive a substantial segment of the target audience, Defendants intended that they deceive the target audience, and they did deceive the target audience. In fact, Alp routinely boasted that, as a result of its "viral actions" and "viral communications" Lord Energy was "facing serious problems for its business operations" and was "going viral, with new people focusing on the company."

295. Because Defendants' false statements that Plaintiffs were involved in terrorist financing posed business and reputational risks to Plaintiffs' consumers, counterparties, business partners, creditors, and others, they found those false statements to be material.

296. Further, the facts show that consumers, counterparties, business partners, and creditors in fact found Defendants' false claims to be material to their business decisions. For example, Société Générale, Natixis, and BCP refused to work with Lord Energy because while they "ha[d] no problem with [Hazim's] [f]ather (cleared by the US)" they did "not feel comfortable with [Himmat], [Piccardo], and Fatima"—Muslim employees of Lord Energy that Defendants falsely claimed were linked to the Muslim Brotherhood, al Qaeda, or both.

297. Likewise, Crédit Suisse's CEO decided to terminate the bank's longstanding relationship with Hazim and Lord Energy because he feared that continuing to lend to Hazim would make the bank appear to be supporting the Muslim Brotherhood.

298. UBS also closed Hazim's personal account with the bank, telling Hazim that, "[a]fter intensive and exceptionally long discussions with our compliance and due diligence teams, it has been [] decided by our firm that we won't be in a position to help you with the financing of your business activity."

299. Litasco, another commodity trading firm, also stopped trading with Hazim and Lord Energy because Litasco had compliance concerns as a result of Defendants' statements falsely linking Hazim and Lord Energy to terrorist financing.

300. The UAE, Alp, Brero, Cavin, Badal, and some of John Doe Nos. 1–25 are jointly and severally liable for both their own false claims about Plaintiffs and similar claims that Defendants and their co-conspirators disseminated because they worked together to develop the false narrative that Hazim and Lord Energy are linked to the Muslim Brotherhood and involved in terrorist financing, and they all contributed to the publication and dissemination of Defendants' false statements.

301. These false claims eroded Plaintiffs' goodwill among customers, counterparties, business partners, creditors, and the public which caused consumers, counterparties, business partners, and creditors to cease doing business with Plaintiffs.

302. These false claims ultimately forced Plaintiffs out of business.

303. Plaintiffs demand that the UAE, Alp, Brero, Cavin, Badal, and some of John Doe Nos. 1–25 be ordered to account for and pay to Plaintiffs all gains, profits, and damages derived from the above-described wrongful acts and that the Court issue an order multiplying or otherwise enhancing any award under the Lanham Act.

## COUNT TWO
### Civil Racketeering, 18 U.S.C. § 1962(c)
### *(Against the UAE, Alp, Brero, Cavin,*
### *Badal, and some of John Doe Nos. 1–25)*

304. Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth fully herein.

305. At all relevant times, the UAE, Alp, Brero, Cavin, Badal, and some of John Doe Nos. 1–25 constituted "persons" within the meaning of 18 U.S.C. § 1961(3).

97

306.     Between at least May 2017 and April 2021, and almost certainly beyond,
Defendants were associated with and in fact constituted an "enterprise" within the meaning of
18 U.S.C. § 1964(c), engaging in and affecting international and interstate commerce.   The
enterprise had a clear organization and structure.   The UAE, through M.B.Z., oversaw the
enterprise's larger campaign, providing strategic guidance and direction.   Matar managed
operations at a more granular level by serving as a liaison between the UAE and Alp.   Alp, Brero,
Cavin, and Badal carried out the enterprise's day-to-day operations by, among other things,
proposing targets, hiring sources, and commissioning false and misleading articles.   The
enterprise's network of co-conspirators wrote the articles and otherwise published and
disseminated the enterprise's false and misleading claims.   In a March 2020 email from Brero to
Matar, at the outset of the COVID pandemic, Brero explained that, because of COVID, "some
actions could become more difficult for obvious logistical reasons, for example if we are unable
to travel to meet sources or media contacts.   Should we be unable to travel, it could also have an
impact on our media operations (as we often publish in different European cities for added
security/discretion and credibility)."

307.     At all relevant times, the members of this association-in-fact enterprise, agreed to,
intended to, and did conduct, and directly or indirectly participate in the conduct, of the enterprise's
affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), including
international and interstate wire fraud in violation of 18 U.S.C. § 1343 and bank fraud in violation
of 18 U.S.C. § 1344.

308.     The UAE, Alp, Brero, Cavin, Badal, and some of John Doe Nos. 1–25 are persons
distinct from the association-in-fact enterprise.   They managed and operated the enterprise's affairs
with full knowledge that their activities were unlawful and with intent to defraud.   Specifically,

the enterprise orchestrated a years' long coordinated smear campaign to publish false information about dozens of targets, including Hazim, Lord Energy SA, and Americas Lord Energy Inc.  The enterprise used similar methods, which it referred to as "confidential offensive viral communication" operations and "discreet lobbying" to accomplish the enterprise's overarching objective of destroying the businesses and reputations of its dozens of targets by falsely linking those targets to the Muslim Brotherhood and terrorism.

309.    To carry out this fraudulent scheme, the enterprise utilized a network of co-conspirators and other witting participants, including journalists, bloggers, freelance writers, Wikipedia editors, academics, and other sources to concoct and disseminate false information about their targets with the specific intent of fraudulently inducing their targets' business partners, counterparties, financial institutions, and others to sever ties with those targets.  The UAE also relied on Atmane Tazaghart, the Editor in Chief of the website Global Watch Analysis, whom Brero referred to as "competition," to publish false and misleading articles about the enterprise's targets, including Hazim and Lord Energy.  Tazaghart communicated directly with Matar.

310.    In the case of Hazim and Lord Energy, the enterprise concocted the false narrative that Hazim and his companies were closely tied to the Muslim Brotherhood and involved in terrorist financing.  In addition to the false statements listed in paragraph 290 above, which the enterprise used international and interstate wires to commission and publish online, the enterprise made use of international and interstate wires to disseminate the following false statements in furtherance of its scheme to defraud, in violation of 18 U.S.C. § 1343:

> (a)    On October 6, 2017, Alp wrote a report, which on information and belief it shared internally and with the UAE via email, falsely claiming that: Lord Energy was "run by Doha-based heirs of the very senior Muslim Brotherhood leadership"; Lord Energy was "at the center of European MB senior operators and has ties to Al-Qaeda related entities"; Lord Energy executives "are MB members, and Al-Qaeda related people"; Hazim was

"domiciled in Doha in Qatar"; Hazim's father was "considered to be the 'foreign minister' of the Muslim Brotherhood and its key financier"; Lord Energy provided the "perfect cover" for terrorist financing; Hazim would "pursue the business activities, but also the cause of the Brotherhood"; and Hazim's business associates Youssef Himmat, American citizen Imama Fatima, Davide Piccardo, and Omar Nasreddin were affiliated with the Muslim Brotherhood.

(b)     In December 2017, Alp drafted a confidential "preliminary report" on Hazim and Lord Energy with the file name "arnica 3-lord energy note-sylvain-20171214," which falsely claimed that Lord Energy was a "mysterious Muslim Brotherhood trading company linked to Al-Qaeda," and "at the center of European MB senior operations." On information and belief, Alp shared this memo via email with Besson, who used the information Alp supplied to write his January 5, 2018 article for Le Temps.

(c)     On February 15, 2018, Alp published a "detailed investigative analysis," which on information and belief it shared internally and with the UAE via email, that falsely described Hazim and Lord Energy, among other targets, as part of the Muslim Brotherhood's "macro-level funding system."

(d)     On February 21, 2018, Alp prepared a PowerPoint presentation, which on information and belief it shared internally and with the UAE via email, that included a slide about Lord Energy, falsely accusing it of being a "front compan[y]" for the Muslim Brotherhood and of being "linked to Al-Qaeda."

(e)     In February 2018, Alp prepared an "Action Plan," which on information and belief it circulated internally and shared with the UAE via email, that falsely claimed that Lord Energy had "links to terrorism and Political Exposed Persons," as well as the Muslim Brotherhood.

(f)     On June 12, 2018, using the pseudonym Laurent Martin, Alp sent emails to WorldCompliance, World-Check, and Info4C falsely claiming that Lord Energy was "directly linked to radical Islamists" and urging those compliance monitors to add the "name of Lord Energy" to their databases.

(g)     On June 13, 2018, Alp sent an email about Lord Energy to the Credit Suisse media relations email address (media.relations@credit-suisse.com), posing as a freelance journalist and using the pseudonym Laurent Martin. The email falsely claimed that Lord Energy was linked to radical Islamists, and it cited stories that Alp had sponsored and planted about Lord Energy.

(h)     Between June 7 and June 19, 2018, Alp used a secure, encrypted Protonmail account under the pseudonym "Yvan Doucet" to send 15 emails falsely claiming that "Lord Energy SA" was linked to "terrorism financing" to reporters from *Bloomberg*, *Axios*, *Reuters*, *The Sunday Times*, *The*

> *Observer*, *The Guardian*, *Financial Times*, *The Sun*, and *The Times*, as well as the price reporting agency Platts.

> (i)    In early June 2018, the enterprise published a French-language Wikipedia entry on Lord Energy that cited the January 5, 2018 Le Temps article the enterprise had previously commissioned and falsely accused Lord Energy of terrorist ties.

> (j)    On or around July 6, 2018, the enterprise submitted English and Italian-language Wikipedia entries that falsely claimed that: Hazim was "'the shadow ambassador of the Muslim Brotherhood,'" "historical networks of the Muslim Brotherhood have reappeared in Switzerland through the trading company Lord Energy," and several Lord Energy managers "were Islamist militants close to the Muslim Brotherhood."

311.    The enterprise routinely made use of international and interstate wires to plan, facilitate, and carry out its scheme to destroy Hazim and Lord Energy's business and reputations. Between May 2017 and April 2021, members of the enterprise sent dozens—if not hundreds—of emails to one another and routinely participated in video meetings and phone calls to, among other things, formulate strategies; identify targets; identify and recruit co-conspirators; arrange for meetings and travel; pay sources, contractors, and co-conspirators; and address logistical matters, all in furtherance of the enterprise's overarching scheme. As just some examples:

> (a)    On August 7, 2017, Alp prepared a detailed proposal for the UAE in which Alp outlined a "Global Action Plan" involving "widespread offensive actions." On information and belief, Alp shared this document with the UAE via email.

> (b)    On January 3, 2018, Badal and Vidino exchanged emails (Brero and Cavin were copied on the exchange) to arrange for Vidino to meet with Badal, Brero, and Cavin in Geneva on January 12, 2018.

> (c)    On February 26, 2018, Badal sent an "updated, more detailed" proposal to Matar recommending a "new three-month testing phase" and providing an overview of Alp's proposed targets and the actions Alp intended to take against each.

> (d)    On May 7, 2018, Alp published a "confidential internal report" on Lord Energy that falsely claimed that Lord Energy was "at the center of European MB senior operators and has ties to Al-Qaeda related entities." On information and belief, the report was shared internally at Alp via email.

(e)    On May 15, 2018, Alp drafted an email that, on information and belief, it sent to Nina May directing her to write three articles about Lord Energy.

(f)    On June 6, 2018, Alp prepared an "Urgent Update" for the UAE regarding Hazim and Lord Energy's efforts to counter the enterprise's smear campaign. On information and belief, Alp shared the update internally and with the UAE via email.

(g)    On June 13, 2018, Alp prepared another "strictly confidential" "Urgent Update" for the UAE regarding Hazim and Lord Energy's efforts to try to correct the French-language Wikipedia page for Lord Energy that Alp created. On information and belief, Alp shared this Update with the UAE via email.

(h)    On July 23, 2018, Alp prepared for the UAE a "Summary Report – Impact Assessment" that described the enterprise's "viral communication and discreet lobbying operations on 10 key targets," including Lord Energy. On information and belief, Alp shared this Report with the UAE via email.

(i)    Alp prepared, and on information and belief sent via email to the UAE, another "Summary Report – Impact Assessment" on August 6, 2018 that explained how Alp used social media and search engine optimization techniques to "boost visibility for [their] actions."

(j)    In a similar update to Matar and the UAE on November 6, 2018, Alp boasted that "[f]ollowing our latest actions, Google now directly associates Lord Energy with terrorism, and Hazim Nada with the [Muslim Brotherhood]."

312.    These are just some examples of the many "Summary Reports," "Urgent Updates," "Impact Assessments," and other emails, electronic communications, and international and interstate wires the enterprise used to further its scheme to defraud. The enterprise's use of international and interstate wires was not only anticipated, but it was an essential part of the enterprise's scheme to create the false public perception that Hazim and his companies were involved in terrorist financing.

313.    The enterprise also routinely committed acts of bank fraud in violation of 18 U.S.C. § 1344. Through its false and misleading statements, it intended to and in fact did deceive numerous banks and financial institutions and fraudulently induce those banks and financial

institutions to end their banking relationships with Hazim and Lord Energy.  The enterprise knew, and intended, that the banks would suffer financial harm from terminating their profitable, longstanding lending arrangements with Hazim and his companies.  Indeed, in June 2018, Alp bragged that "following our viral communication, [Lord Energy] is having serious problems with Western banks to receive credits.  It has apparently being put on a watchlist used by banks.  Banks are concerned about its connections to radical Islamists."

314.    Specifically, the following banks and financial institutions terminated profitable banking relationships with Hazim and Lord Energy or declined to initiate new banking relationships as a result of the enterprise's false statements:

(a)    In November 2018, Société Générale refused to work with Lord Energy;

(b)    In November 2018, BCP Bank refused to work with Lord Energy because its compliance department did "not feel comfortable" with three Lord Energy employees the enterprise had falsely identified as having ties to terrorism and the Muslim Brotherhood;

(c)    In December 2018, Crédit Suisse—a bank the enterprise specifically targeted—stopped supporting Lord Energy's trading positions, and in February 2019, formally closed Lord Energy's accounts;

(d)    In January 2019, Swiss Card terminated Lord Energy's account;

(e)    In January 2019, UBS—after long discussions with its compliance and due diligence teams—declined to finance Lord Energy's business activities;

(f)    In February 2019, UBS closed Hazim's personal account—which he had held for more than 27 years—and the personal accounts of Hazim's mother and brother;

(g)    In April 2019, Macquarie Bank terminated its Futures Trading and Clearing Agreement with Lord Energy, which had been in place since 2014; and

(h)    In December 2020, Macquarie Bank declined to enter into a new banking relationship with Lord Energy because it had "no appetite to proceed" with the opportunity.

315.     In addition, Crédit Suisse and British Arab Commercial Bank Plc were owed millions of dollars when Lord Energy declared bankruptcy, and they had to seek to recover a portion of what they were owed through Swiss bankruptcy proceedings.

316.     These acts of racketeering activity were related to each other and the enterprise as a whole.  The enterprise engaged in a continuous pattern of racketeering that began in 2017 and lasted until at least 2021, and almost certainly beyond.  In January 2020, Brero sent an email to Matar in which he wrote that he looked forward to working "alongside [Matar] for the next five years."  In the email, Brero also thanked Matar for the Tudor watches Matar had given Brero during Brero's recent visit to the UAE.  Brero wrote that he was "thrilled by the personal bond [he and Matar] created over these last couple of years and hope it grows further."  He extended his thanks to "His Excellency and His Highness and also Fahad and Salem"—on information and belief, references to M.B.Z., Ali, and two other UAE officials involved in the enterprise.  And Brero thanked Matar for his trust as the enterprise engaged in a "very sensitive … new long-term assignment."  Cavin and Badal were included on drafts of this email that were circulated internally at Alp.

317.     The association-in-fact enterprise was engaged in and affected international and interstate commerce.  The enterprise's smear campaign against Hazim and Lord Energy was meant to, and did, drive a competing oil company out of business.  The enterprise's racketeering activities destroyed a business valued at over $150 million, and which generated over $1.71 billion in annual revenue.  The enterprise's efforts to bankrupt Lord Energy also impacted global spot-market prices for light crude oil exported to Asia, including markets for U.S.-produced WTI.  The price dynamics that the enterprise sought to (and did) affect through its pattern of racketeering activity impacted billions of dollars' worth of crude oil trades.

318. As a direct and proximate result of Defendants' racketeering activities in violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property in an amount to be proven at trial. Plaintiffs now seek treble damages under 18 U.S.C. § 1964(c) to remedy that injury. Plaintiffs' injuries are grounded in the United States. Among other things, Hazim is an American citizen with a residence in Texas, and Defendants specifically targeted and destroyed Lord Energy's American subsidiary, which was located and incorporated in Texas.

### COUNT THREE
#### Racketeering Conspiracy, 18 U.S.C. § 1962(d)
*(Against All Defendants)*

319. Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth fully herein.

320. 18 U.S.C. § 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

321. As set forth above, Defendants, unlawfully and willfully combined, conspired, and agreed to violate 18 U.S.C. § 1962(c). Specifically, Defendants committed overt acts in furtherance of the conspiracy described above, including by publishing and directing the publication of dozens of false and misleading articles about Hazim, Lord Energy, and dozens of other individuals and entities.

322. Defendants intentionally conspired and agreed to directly and indirectly participate in the conduct of the enterprise's affairs through a pattern of racketeering activity. Defendants knew their acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

323. As a direct and proximate result of the enterprise's conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been

injured in their business and property in an amount to be proven at trial. Plaintiffs now seek treble damages under 18 U.S.C. § 1964(c) to remedy that injury.

### COUNT FOUR
**Violations of Section 1 of the Sherman Act, 15 U.S.C. § 1**
*(Against the UAE, Alp, Diligence, Brero,*
*Cavin, Badal, and some of John Doe Nos. 1–25)*

324.     Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth fully herein.

325.     As set forth above, Defendants contracted, combined, conspired, and agreed to unlawfully and unreasonably restrain international and interstate commerce. Defendants' smear campaign against Lord Energy was specifically intended to—and did—eliminate a growing competitive threat to ADNOC in the spot market for light crude oil exported to Asia. Defendants fabricated and publicized false statements that Hazim and Lord Energy were involved in terrorist financing to prevent banks from lending to Hazim or Lord Energy and discourage customers, counterparties, and business partners from doing business with Hazim or Lord Energy.

326.     Lord Energy's export of Saharan Blend and WTI to Asia put downward pressure on prices ADNOC could charge for Murban—an equivalent grade of light crude oil. Through their unreasonable anticompetitive conduct, Defendants forced Lord Energy out of the spot market for light crude oil in Asia, driving back up the prices the UAE and ADNOC received for Murban exports.

327.     Defendants' conspiracy, and the resulting impact on the spot market for light crude oil in Asia, occurred in and affected international and interstate commerce, and it had a direct, substantial, and foreseeable effect on U.S. export trade and commerce with foreign nations. Prices that U.S.-based producers of WTI could receive for WTI exports were directly impacted by the enterprise's unlawful efforts to drive Lord Energy out of the market.

328.    Defendants' unlawful and anticompetitive conduct also had a direct, substantial, and foreseeable effect on Americas Lord Energy Inc., a U.S. company engaged in the export of WTI to foreign nations, primarily in Asia.  Specifically, Defendants' unlawful conduct forced Americas Lord Energy Inc. out of business completely.  It also forced Lord Energy SA to declare bankruptcy, which impacted U.S. companies engaged in foreign commerce by preventing Lord Energy from continuing to do business with several U.S. entities and forcing these U.S. entities to seek to recover debts owed to them by Lord Energy through Swiss bankruptcy proceedings.

329.    Plaintiffs are entitled to treble damages for the violations of the Sherman Act alleged herein.

### COUNT FIVE
**Violations of Section 2 of the Sherman Acts, 15 U.S.C. § 2**
***(Against the UAE, Alp, Diligence, Brero,***
***Cavin, Badal, and some of John Doe Nos. 1–25)***

330.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth fully herein.

331.    As set forth above, prior to 2017 when Lord Energy entered the spot market for light crude oil exported to Asia, ADNOC possessed monopoly power.  At the time, Murban from the UAE was the only light crude oil grade exported in volume to refineries in Asia.  The UAE, through ADNOC, created and controlled the spot market for Murban.  Murban producers in the UAE sold about 8 million barrels of Murban per month on the spot market in Asia.  ADNOC was the dominant seller of Murban, accounting for about 62.5% (approximately 5 million barrels per month) of all Murban cargoes sold on the spot market in Asia.  It also determined who could sell the other 3 million barrels that were sold on the spot market.  At the time, ADNOC sought to expand Murban production with the ultimate goal of making Murban a benchmark for oil prices in the Middle East.

332.    Lord Energy's entry into the spot market for light crude oil in Asia threatened ADNOC's monopoly and its plans for continued growth.  During some months in 2017, Lord Energy sold volumes of Saharan Blend as large as 2–3 million barrels on the spot market in Asia.

333.    Defendants launched their unlawful smear campaign against Hazim and Lord Energy with the specific intent of "destroy[ing]" Lord Energy and driving it out of the market so ADNOC could maintain its monopoly power.

334.    Defendants' conspiracy, and the resulting impact on the spot market for light crude oil in Asia, occurred in and affected international and interstate commerce, and it had a direct, substantial, and foreseeable effect on U.S. export trade and commerce with foreign nations.  Prices that U.S.-based producers of WTI could receive for WTI exports were directly impacted by the enterprise's unlawful efforts to drive Lord Energy out of the market.

335.    Defendants' unlawful and anticompetitive conduct also had a direct, substantial, and foreseeable effect on Americas Lord Energy Inc., a U.S. company engaged in the export of WTI to foreign nations, primarily in Asia.  Specifically, Defendants' unlawful conduct forced Americas Lord Energy Inc. out of business completely.  It also forced Lord Energy SA to declare bankruptcy, which impacted U.S. companies engaged in foreign commerce by preventing Lord Energy from continuing to do business with several U.S. entities and forcing these U.S. entities to seek to recover debts owed to them by Lord Energy through Swiss bankruptcy proceedings.

336.    Plaintiffs are entitled to treble damages for the violations of the Sherman Act alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter an award and judgment in their favor, and against all Defendants jointly and severally, as follows:

(a)    Awarding Plaintiffs actual damages of not less than $299 million;

(b)     Awarding Plaintiffs lost profits of not less than $278.55 million;

(c)     Awarding Plaintiffs disgorgement of Defendants' profits not less than $354.8 million;

(d)     Awarding Plaintiffs treble damages;

(e)     Awarding Plaintiffs all expenses and costs, including attorneys' fees; and

(f)     Awarding Plaintiffs damages in an amount to be determined at trial for emotional, psychological, and reputational harm;

(g)     Such other and further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims and issues so triable.

Date:   August 6, 2024

/s/ Thomas A. Clare, P.C.
Thomas A. Clare, P.C. (D.C. Bar No. 461964)
Nicholas J. Brechbill (D.C. Bar No. 229988)
CLARE LOCKE LLP
10 Prince Street
Alexandria, Virginia 22314
Telephone: (202) 628-7400
tom@clarelocke.com
nick@clarelocke.com

*Attorneys for Plaintiffs Hazim Nada and Lord Energy SA*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that Plaintiffs' Amended Complaint was served on all counsel of record by filing it using the Court's CM/ECF system, and I caused it to be served on all counsel of record by mail and email.

Dated: August 6, 2024

/s/ *Nicholas J. Brechbill*
Nicholas J. Brechbill

*Attorney for Plaintiffs Hazim Nada &*
*Lord Energy SA*